UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------------------X
JOHN O'HARA,

                              **Plaintiff,**          **Docket No.:**
                                               **17-cv-4766**

                   **-against-**

CITY OF NEW YORK, DISTRICT ATTORNEY CHARLES     **COMPLAINT**
J. HYNES, ASSISTANT DISTRICT ATTORNEY JOHN P.
O'MARA, ASSISTANT DISTRICT ATTORNEY ANGELO M.
MORELLI, ASSISTANT DISTRICT ATTORNEY DINO       **JURY TRIAL**
AMOROSO, DISTRICT ATTORNEY INVESTIGATOR       **DEMANDED**
ALLEN PRESSER, ASSEMBLYMAN JAMES F. BRENNAN,
JOHN W. CARROLL, ESQ., JOHN KEEFE, and
JEFFREY WAITE, ESQ.,

                              **Defendants.**
------------------------------------------------------------------------------------X

       Plaintiff, JOHN O'HARA, by his attorneys LAW OFFICES OF DENNIS J. KELLY and
THE LAW OFFICE OF ANTHONY M. GRANDINETTE, alleges as follows:

### NATURE OF THE ACTION

   1.   Plaintiff, John O'Hara, brings this action to recover damages for the politically motivated
baseless prosecution, which was knowingly supported by fabricated evidence and witnesses who
were coerced and bribed to provide false testimony in violation of his constitutional and civil
rights, which ultimately resulted in him being indicted, tried three times, and convicted.

### JURISDICTION AND VENUE

   2.   This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988, the First, Fourth, and
Fourteenth Amendments to the United States Constitution, Due Process, and the Constitution and
laws of the State of New York.

   3.   Jurisdiction is founded upon 28 U.S.C. §§ 1331, 1343, and 2202.

   4.   Plaintiffs further invokes the supplemental jurisdiction of this Court to adjudicate pendant
New York state law claims pursuant to 28 U.S.C. § 1367.

   5.   Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1) and (2).

## PARTIES

6.    Plaintiff JOHN O'HARA ("O'Hara") resides in the County of Kings, State of New York.

7.    Defendant CITY OF NEW YORK is a duly constituted municipality in the State of New York, and at all relevant times was the public employer of Defendants District Attorney Charles J. Hynes, Assistant District Attorney John P. O'Mara, Assistant District Attorney Angelo M. Morelli, Assistant District Attorney Dino Amoroso, and District Attorney Investigator Allen Presser, who at all relevant times herein acted under color of state law and within the scope of their employment.

8.    Defendant DISTRICT ATTORNEY CHARLES J. HYNES ("District Attorney Hynes") is believed to be residing in Kings County, State of New York. At all relevant times herein, District Attorney Hynes was the Kings County District Attorney who acted under color of state law and within the scope of his employment, in his individual capacity, and/or in a managerial capacity whereby he set policy at the Kings County District Attorney's Office ("KCDA"). However, District Attorney Hynes did not perform advocacy functions with respect to the allegations giving rise to liability against him, and is therefore not entitled to absolute immunity. District Attorney Hynes is being sued in his individual and official capacities.

9.    Defendant ASSISTANT DISTRICT ATTORNEY JOHN P. O'MARA ("ADA O'Mara") is believed to be residing in the City of Troy, Rensselaer County, State of New York. At all relevant times herein, ADA O'Mara was an Assistant District Attorney employed by the KCDA, who acted under color of state law and within the scope of his employment, as well as in his individual capacity. However, ADA O'Mara did not perform advocacy functions with respect to the allegations giving rise to liability against him, and is therefore not entitled to absolute immunity. Rather, ADA O'Mara acted in an investigative capacity when he performed functions normally performed by the police, such as his investigation of O'Hara, his intimidating and coercing witnesses to provide false testimony, and so forth. Plaintiff is not seeking to hold ADA O'Mara liable for actively presenting the case against O'Hara to the Grand Jury that indicted him, or for actively prosecuting O'Hara's three criminal trials. ADA O'Mara is being sued in his individual and official capacities.

10.    Defendant ASSISTANT DISTRICT ATTORNEY ANGELO M. MORELLI ("ADA Morelli") is believed to be residing in Richmond County, State of New York. At all relevant times herein, ADA Morelli was an Assistant District Attorney employed by the KCDA, who acted under color of state law and within the scope of his employment, as well as in his individual capacity. However, ADA Morelli did not perform advocacy functions with respect to the allegations giving rise to liability against him, but rather acted in an investigative capacity as he performed functions normally performed by the police, and is therefore not entitled to absolute immunity. ADA Morelli is being sued in his individual and official capacities.

11.    Defendant ASSISTANT DISTRICT ATTORNEY DINO AMOROSO ("ADA Amoroso") is believed to be residing in Nassau County, State of New York. At all relevant times herein, ADA Amoroso was an Assistant District Attorney employed by the KCDA, who acted under color of state law and within the scope of his employment, as well as in his individual

capacity. However, ADA Amoroso did not perform advocacy functions with respect to the allegations giving rise to liability against him, but rather acted in an investigative capacity as he performed functions normally performed by the police, and is therefore not entitled to absolute immunity. ADA Amoroso is being sued in his individual and official capacities.

12.    Defendant DISTRICT ATTORNEY INVESTIGATOR ALLEN PRESSER ("Investigator Presser") is believed to be residing in Kings County, State of New York. At all relevant times herein, Investigator Presser was an investigator employed by the KCDA, who acted under color of state law and within the scope of his employment, as well as in his individual capacity. Investigator Presser is being sued in his individual and official capacities.

13.    Defendant ASSEMBLYMAN JAMES F. BRENNAN ("Assemblyman Brennan") is believed to be residing in Kings County, State of New York. At all relevant times herein, Assemblyman Brennan was a member of the New York State Assembly, who acted under color of state law and within the scope of his employment, as well as in his individual capacity. To the extent Assemblyman Brennan did not act under color of law as a member of the New York State Assembly, he nonetheless acted under color of law sufficient to impose Section 1983 liability because he conspired with, and acted in concert with, state actors to jointly deprive O'Hara of his constitutional rights. Assemblyman Brennan is being sued in his individual capacity.

14.    Defendant JOHN W. CARROLL, Esq. ("Mr. Carroll") is believed to be residing in Kings County, State of New York. At all relevant times herein, Mr. Carroll was counsel to Assemblyman Brennan. Mr. Carroll acted under color of state law sufficient to impose Section 1983 liability because he conspired with, and acted in concert with, state actors to jointly deprive O'Hara of his constitutional rights. Mr. Carroll is being sued in his individual capacity.

15.    Defendant JOHN KEEFE ("Mr. Keefe") is believed to be residing in Kings County, State of New York. At all relevant times herein, Mr. Keefe was Assemblyman Brennan's Chief of Staff. Mr. Keefe acted under color of state law sufficient to impose Section 1983 liability because he conspired with, and acted in concert with, state actors to jointly deprive O'Hara of his constitutional rights. Mr. Keefe is being sued in his individual capacity.

16.    Defendant JEFFREY WAITE, Esq. ("Mr. Waite") is believed to be residing in the Albany County, State of New York. At all relevant times herein, Mr. Waite was an investigating attorney with the New York State Board of Elections who acted under color of state law and within the scope of his employment, as well as in his individual capacity. To the extent Mr. Waite did not act under color of law as a member of the New York State Board of Elections, he nonetheless acted under color of law sufficient to impose Section 1983 liability because he conspired with, and acted in concert with, state actors to jointly deprive O'Hara of his constitutional rights. Mr. Waite is being sued in his individual capacity.

17.    Plaintiff is placing Defendants on notice that should Plaintiff learn during the course of discovery of additional conduct committed by Defendants which may give rise to liability, or of the identities of additional individuals who committed acts which may give rise to liability, that Plaintiff will seek to amend his Complaint to allege additional claims and/or to name additional defendants, accordingly.

## NEW YORK STATE NOTICE OF CLAIM REQUIREMENTS

18.   Plaintiff served a timely Notice of Claim upon the City of New York in compliance with General Municipal Law § 50-e.

19.   At least thirty days have elapsed since the service of said Notice of Claim and the City of New York has neglected or refused to adjust or pay the claims.

20.   The City of New York examined Plaintiff pursuant to General Municipal Law § 50-h on June 7, 2017, in advance of Plaintiff commencing this action.

21.   This action has been commenced within one year and ninety days after the happening of the events upon which these claims are based.

## FACTUAL AND GENERAL ALLEGATIONS

22.   In 1996, John O'Hara was the subject of politically-motivated prosecution. O'Hara was unlawfully indicted and convicted, and thereafter disbarred from the practice of law, because he made enemies with individuals who controlled the 'Brooklyn Democratic Machine.' On January 12, 2017, twenty years later, his conviction was vacated and the indictment was dismissed, after the KCDA finally acknowledged that material evidence which resulted in O'Hara's conviction was false and misleading.

## EFFORTS TO IMPEDE O'HARA'S POLITICAL ACTIVITIES

23.   O'Hara was a political activist in the early 1980's and 1990's. He first became involved in politics at the age of 11, and remained active until indicted in 1996. He was a member of his Community Board in Brooklyn for nine years, and he ran for public office seven times between 1988 and 1996—five times for a seat in the New York State Assembly, and twice for New York City Council.

24.   At the start of his political career, O'Hara, a registered Democrat, supported the local democratic candidates, including District Attorney Hynes whom O'Hara first encountered in 1978. For example, when District Attorney Hynes first ran, successfully, for the Office of the District Attorney in 1989, O'Hara raised money, coordinated petition drives, and sponsored a community forum for District Attorney Hynes to speak at.

25.   At that time, O'Hara intended on running in the following year's Democratic primary election for a seat in the New York State Assembly, against incumbent Assemblyman James F. Brennan.

26.    O'Hara had previously run for State Assembly against Assemblyman Brennan in 1988. Assemblyman Brennan's attorneys, led by John W. Carroll, Esq., challenged signatures on O'Hara's validating petition and O'Hara ultimately withdrew from the election.

27.    In 1989, District Attorney Hynes promised O'Hara that in exchange for O'Hara supporting his campaign to become the Kings County District Attorney, District Attorney Hynes would support O'Hara in his 1990 campaign for a seat in the New York State Assembly.

28.    During his 1989 campaign however, District Attorney started fostering a political relationship with Assemblyman Brennan, who ultimately supported Hynes's 1989 campaign.

29.    While campaigning for State Assembly in 1990, O'Hara met with District Attorney Hynes's Deputy Assistant District Attorney, ADA Amoroso, at the KCDA. ADA Amoroso advised O'Hara that District Attorney Hynes would not be supporting O'Hara's campaign, because District Attorney Hynes struck a political deal with O'Hara's opponent, Assemblyman Brennan. Part of the deal required O'Hara to drop out of the race for State Assembly which would leave Assemblyman Brennan unopposed, and in exchange O'Hara would run for Democratic State Committee District Leader, and District Attorney Hynes and Assemblyman Brennan would allow O'Hara to run unopposed in that race.

30.    O'Hara declined to withdraw from the State Assembly race, and told ADA Amoroso that he expected District Attorney Hynes to honor the promise he made to O'Hara the previous year and support his campaign.

31.    In addition to running for State Assembly in 1990, O'Hara ran candidates for District Leaders. Assemblyman Brennan's attorneys, led by Mr. Carroll, challenged O'Hara and his District Leader candidates' validating petitions in Kings County Supreme Court. O'Hara and his candidates defeated the challenges to their validating petitions, but were ultimately unsuccessful in the Democratic primary. O'Hara lost the Democratic primary against Assemblyman Brennan.

32.    From that point on however, District Attorney Hynes and Assemblyman Brennan developed a personal and professional animus toward O'Hara.

33.    Assemblyman Brennan openly demonstrated his animus toward O'Hara. For example, in 1991 when O'Hara applied for admission to the Bar of the State of New York State, Assemblyman Brennan filed a complaint with the Committee on Character and Fitness opposing O'Hara's admission to the Bar, listing O'Hara's political activities, and stating that O'Hara was "morally depraved." (The Committee on Character and Fitness conducted an investigation, the complaint was unsuccessful, and O'Hara was admitted by the Appellate Division, Second Department, on March 27, 1991).

34.    Assemblyman Brennan is quoted in a June 16, 1997 article by the New York Times as stating that "John O'Hara is a pathological liar and fraud and a danger to the public because of his fraud."

35.    From 1988 through O'Hara's indictment in 1996, O'Hara ran primary campaigns against the 'Brooklyn Democratic Machine.'

36.    O'Hara himself ran for office five additional times against candidates supported by the 'Brooklyn Democratic Machine,' and specifically those supported by Assemblyman Brennan.

37.    In 1991, O'Hara ran for City Council against a Democratic Party candidate backed by Assemblyman Brennan. Assemblyman Brennan's attorneys, led by Mr. Carroll, challenged O'Hara's validating petition in court. O'Hara prevailed, however he lost the Democratic primary to Assemblyman Brennan's candidate.

38.    In 1992, O'Hara ran for State Assembly against a Democratic Party candidate backed by Assemblyman Brennan. Assemblyman Brennan's attorneys, led by Mr. Carroll, challenged O'Hara's validating petition in court again. O'Hara prevailed, however he lost the Democratic primary to Assemblyman Brennan's candidate. During that year, parties represented by Assemblyman Brennan's attorneys sued O'Hara for defamation as well. (The plaintiffs dropped their suit in 1995).

39.    In 1993, O'Hara ran for City Council again against a Democratic Party candidate backed by Assemblyman Brennan. Assemblyman Brennan's attorneys, led by Mr. Carroll, challenged O'Hara's validating petition in court, yet again, specifically challenging O'Hara's residency at 553 47th Street in Brooklyn, New York. After the trial, the presiding judge indicated that he was inclined to rule in O'Hara's favor, at which point Assemblyman Brennan's attorneys voluntarily dismissed the action. O'Hara ultimately lost the Democratic primary.

40.    During that year, District Attorney Hynes ran for re-election as Kings County District Attorney. District Attorney Hynes sought the support of the Republican Party in an effort to run unopposed. O'Hara convinced his friend, James P. McCall, to run against Hynes in the Republican primary. O'Hara ran McCall's campaign. O'Hara wrote a check for $1,000 to get the campaign committee started (this amount was 20% of McCall's ultimate campaign fund), which was a matter of public record given that campaign contributions must be disclosed, he had the petitions printed, organized drives to have the petitions signed, hung posters, and so forth. O'Hara's efforts were successful, and McCall defeated District Attorney Hynes in the Republican primaries (but ultimately lost in the general election).

41.    District Attorney Hynes had challenged McCall's nominating petition in Kings County Supreme Court. Outside the courthouse one day, ADA Amoroso mentioned to O'Hara that District Attorney Hynes was "enraged" at O'Hara's role in the McCall campaign.

42.    District Attorney Hynes's challenge was successful, and McCall was removed from the ballot. Thereafter, O'Hara orchestrated a successful write-in campaign for McCall for the Republican primaries, which resulted in District Attorney Hynes's humiliating defeat in the Republican primaries by an opponent who was not even on the ballot.

43.    In 1994, O'Hara ran for State Assembly again against a Democratic Party candidate backed by Assemblyman Brennan. Assemblyman Brennan's attorneys, led by Mr. Carroll, challenged O'Hara's validating petition in court, yet again challenging O'Hara's residency at 553 47th Street. O'Hara ultimately withdrew his petition to validate in middle of the trial due to errors pertaining to the signatures on the petition, and the presiding judge, Justice Irving Aronin, sealed the records.

44.    During these proceedings, Justice Aronin complained to both parties' attorneys in open court that Assemblyman Brennan had been calling his chambers in an attempt to speak with him regarding the challenges. Assemblyman Brennan later confirmed that he had made these phone calls, however claimed that he just wanted to confirm that Justice Aronin had received certain evidence.

45.    In 1996, O'Hara ran for State Assembly again against a Democratic Party candidate backed by Assemblyman Brennan. Assemblyman Brennan's attorneys, led by Mr. Carroll, challenged O'Hara's candidacy yet again, but once again voluntarily dismissed the action before a ruling was issued.

46.    During that year, District Attorney Hynes supported Supreme Court Justice Michael Feinberg in his campaign to become the Kings County Surrogate Court Judge. There is only one Kings County Surrogate Court Judgeship, and the term is 14 years. District Attorney Hynes's Chief of Staff, Harvey Greenberg, resigned from the KCDA to run Justice Feinberg's campaign.

47.    O'Hara supported Justice Feinberg's opponent, Judge Lila Gold, who at the time was a judge of the Civil Court of the City of New York.

48.    The primaries were held on September 10, 1996. The polls were supposed to be open from 6:00 AM through 9:00 PM. However in districts were Justice Feinberg was politically weak and Judge Gold had greater support, the voting machines were delivered late. Many voting machines were not delivered until 3:00 PM. In some of these districts, voting machines did not have a lever next to Judge Gold's name, therefore voters could not vote for her even if they had wanted to. *See* Exhibit A for a political cartoon which appeared in the papers at the time.

49.    O'Hara and his girlfriend, Vicki G., started collecting the names and contact information of individuals who had arrived at the polls to vote, but were denied access to the polls. Following primary day, O'Hara organized volunteers to go door-to-door to recruit individuals who had been denied access to the polls, for an anticipated federal lawsuit seeking a new election.

50.    Before the polls closed on primary day, Assemblyman Brennan drove up to a poll site where O'Hara's girlfriend, Vicki, was taking down the names and contact information of individuals who were turned away from the polls. She stood outside the poll site in front of a O'Hara poster. Assemblyman Brennan's Chief of Staff, John Keefe, exited Assemblyman Brennan's car, ripped the O'Hara poster, and assaulted Vicki. Vicki was taken to the hospital.

51.    Mr. Keefe was arrested the next day and charged with violating PL § 120.00(1), Assault in the Third Degree, PL § 130.55, Sexual Abuse in the Third Degree, and two counts of PL § 240.26(1), Harassment in the Second Degree. Facts pertaining to the criminal proceedings against him are discussed below at *infra* ¶¶ 122-23. Ultimately however, on November 6, 1997, Mr. Keefe plead guilty to one count of Harassment in the Second Degree, a violation not a crime, and was sentenced to a conditional discharge, one day of community service (7 hours), $40 surcharge, and $5 crime victim's fee. An Order of Protection on behalf of Vicki was also issued.

52.    On September 20, 1996, O'Hara had an action filed in the United States District Court, Eastern District of New York, ultimately seeking to void the September 10, 1996 Democratic primaries, and seeking a new primary election day. The action was entitled *Gold, et al. v. Feinberg, et al.*, 96-cv-4651 (DGT) (JLC). Assemblyman Brennan's attorneys, led by Mr. Carroll, represented defendants in that proceeding.

53.    On October 1, 1996, District Court Judge David G. Trager ordered that a continued primary election will be held on October 10, 1996 for those districts where the voting machines arrived late. All parties appealed the decision. On October 10, 1996, the United States Court of Appeals for the Second Circuit reversed the order for a continued election. Additional proceedings followed before the District Court. However in the interim, on or about October 16, 1996, O'Hara had the plaintiffs' counsel prepare an emergency appeal to United States Supreme Court.

## O'HARA'S POLITICALLY-MOTIVATED PROSECUTION

54.    Given O'Hara's political activities against the 'Brooklyn Democratic Machine,' as well as some of the additional facts mentioned above, O'Hara made enemies with the politicians who ran that machine, including District Attorney Hynes and various individuals employed in his office, and Assemblyman Brennan. These individuals repeatedly attempted to have O'Hara removed from the ballot, and repeatedly looked for grounds upon which to do that.

55.    O'Hara lives at 579 61st Street, in Brooklyn, New York. He lived there on and off since 1980.

56.    O'Hara's former girlfriend, Magaly Lucas, owned a brownstone located at 553 47th Street, Brooklyn, New York.

57.    Although 579 61st Street and 553 47th Street are only 14 blocks apart, they were located in different election districts.

58.    In October 1992, O'Hara moved into the basement apartment of the brownstone. The basement apartment consisted of a big room, a kitchen which had a working stove and refrigerator, and a half-bathroom with a shower stall and a sink.

59.    The 61st Street apartment was a rent-stabilized apartment, and O'Hara did not give it up when he moved to the 47th Street basement apartment.

60.    However, after moving into the basement apartment, O'Hara changed his address from the 61st Street apartment to the 47th Street apartment with Chase bank, American Express, the Office of Court Administration during his Biennial Registration, and the New York City Campaign Finance Board. O'Hara received mail at the 47th Street address, and he spent most nights in that apartment.

61.    Ms. Lucas did not charge O'Hara rent for his living in the basement apartment. Rather, she allowed O'Hara to live there rent free in exchange for O'Hara watching the property, and assisting her in collecting rent from the tenants who moved in upstairs in December 1992— Rafael Munoz, Roberto Lozano, and Quetzal Martinez. She also allowed O'Hara to live there rent-free because O'Hara had allowed her to live in his apartment rent free while the two attended law school and were studying for the Bar examination.

62.    Munoz, Lozano, and Martinez's payments equaled Ms. Lucas's monthly mortgage payments. Eventually, they entered into an agreement with Ms. Lucas that she would sell the property to them, and in exchange they would pay off the mortgage on the property.

63.    O'Hara lived in the basement apartment on 47th Street until November 1993, when Ms. Lucas sold it to Munoz, Lozano, and Martinez.

64.    While living there, O'Hara voted five times, twice in primaries, twice in general elections, and once for a school board election.

65.    In 1994, Assemblyman Brennan, Mr. Keefe, and Mr. Carroll hired a Private Investigator, Neil Spungin, to investigate O'Hara's residence in order to oppose O'Hara's candidacy for State Assembly and to eliminate him as a political opponent. Assemblyman Brennan illegally obtained O'Hara's confidential records which he forwarded to PI Spungin, including O'Hara's New York State Tax returns from the New York State Department of Taxation and Finance.

66.    PI Spungin submitted two reports to Assemblyman Brennan, c/o John Carroll, one on July 16, 1994, and a follow-up on July 25, 1994. In these reports, PI Spungin details his investigation of O'Hara's residency, including information obtain from "confidential" sources. At Assemblyman Brennan and Mr. Carroll's behest, PI Spungin employed unethical and illegal tactics to retrieve personal and protected financial information regarding O'Hara, which Assemblyman Brennan and Mr. Carroll eventually submitted to ADA Angelo Morelli and ADA John O'Mara.

67.    Assemblyman Brennan, Mr. Keefe, and Mr. Carroll's efforts at silencing O'Hara's political voice were not successful.

68.    Therefore, District Attorney Hynes, ADA Morelli, the Chief of the Investigations Bureau at the KCDA, ADA O'Mara, who worked in the Investigations Bureau, Investigator Allen Presser, a Detective Investigator at the KCDA, Assemblyman Brennan, his Chief of Staff Mr. Keefe, and his attorney Mr. Carroll, entered into a conspiracy to neutralize O'Hara's political activities, and to punish him for his prior political activities. Ultimately, they agreed to find some crime which they would be able to indict and prosecute O'Hara for.

69.    As Assemblyman Brennan's staff counsel Ben Meskin later stated in an audio-recorded interview with Harper's Magazine's Christopher Ketcham, O'Hara was "an irritant," and the sentiment at the time "was let's find a reason to go after him."

70.   In 1994, word started spreading in the community that District Attorney Hynes had made a deal with Assemblyman Brennan that the KCDA would have O'Hara indicted. Their goal was to put an end to O'Hara's political activities. Additionally, they were seeking retribution for O'Hara's past political opposition.

71.   ADA O'Mara, who presented the case against O'Hara to a Grand Jury and prosecuted all three trials against him, later stated in an audio-recorded conversation with Harper's Magazine's Christopher Ketcham, that Assemblyman Brennan was "interested in the outcome of the case, and I called and spoke to him about the outcome of the case." In fact, Assemblyman Brennan testified that District Attorney Hynes personally called him as soon as the guilty verdict in O'Hara's first trial came down.

72.   Assemblyman Brennan did not attempt to keep the agreement he entered into with District Attorney Hynes to have O'Hara indicted, a secret, and told multiple individuals that O'Hara would be indicted.

73.   Ross Branca, an attorney and member of the Community Board, expressly provided O'Hara with this information.

74.   One of O'Hara's neighbors, Kathleen Vetere, who was active in Brooklyn politics, stated that she had a meeting in May 1996 at the American Diner with Bob Knoll, who anticipated running against O'Hara in the 1996 race for State Assembly, and with Mr. Carroll. During the meeting, Mr. Carroll explained that he and Assemblyman Brennan had a deal with District Attorney Hynes to have O'Hara indicted.

75.   During that time period, and through O'Hara's indictment in 1997, O'Hara also started noticing that he was constantly under surveillance.

76.   For example, he would notice a black Crown Victoria parked outside the house, and a male in a suit and tie would be sitting in it. O'Hara provided the license plate to a friend of his who had personal injury law practice, and O'Hara was told that the car was registered to the KCDA.

77.   As another example, O'Hara was not receiving his mail on time, and asked his mailman about it. His mailman advised that the Brooklyn District Attorney's Office had O'Hara's mail held at the post office, and that it would be delivered once the District Attorney's Office had an opportunity to go through it. Once O'Hara did receive the mail that had been held, he noticed that some of it had been ripped open and the contents removed and then replaced.

78.   Once when O'Hara had gone to the bank, he was told that the bank had received a subpoena from the District Attorney's Office for O'Hara's banking records.

79.   Additionally, neighbors at O'Hara's 61st Street apartment, neighbors at O'Hara's parents' apartment, and individuals at his campaign headquarters, commented to him that individuals from the Brooklyn District Attorney's Office with guns and badges showed up at these locations asking questions about him. Investigator Presser was one of the individuals who frequently

showed up at these locations.

80.    Children often played in front of O'Hara's 61st Street apartment building. A parent of one of these children told O'Hara that individuals from the KCDA rounded up the children one day and told them that if they did not tell them something bad about O'Hara, then they, the individuals from the KCDA, would show up at the children's schools and pull them out of class.

81.    The KCDA's surveillance was run by ADA O'Mara and Investigator Presser, in conjunction with Assemblyman Brennan, Mr. Keefe, and Mr. Carroll.

82.    The KCDA and Assemblyman Brennan also utilized the New York City Police Department to 'investigate' O'Hara, and Investigator Presser and ADA O'Mara actively participated in the NYPD's investigation by monitoring the activity at local precincts.

83.    The KCDA, primarily through ADA O'Mara, Investigator Presser, and Assemblyman Brennan, and the NYPD at the direction of the these individuals, conducted the surveillance in violation of the 1985 Handschu Consent Decree, and therefore intentionally did not record notes regarding the surveillance and investigation.

84.    The KCDA worked hard to conceal the fact that it was investigating O'Hara, however Christopher Cincotta, a retired NYPD Detective, stated that Assemblyman Brennan and Investigator Presser routinely camped out at the 66th Precinct in Brooklyn, and gave him orders on how to conduct the O'Hara investigation and how to run his Detective Squad.

85.    O'Hara's political activities in 1996, running for State Assembly again, and supporting Judge Gold for Kings County Surrogate Court Judge, was ultimately the straw that broke the camel's back and caused District Attorney Hynes and Assemblyman Brennan to finally initiate the formal criminal proceedings against O'Hara, after months of having him under surveillance.

86.    ADA O'Mara stated in his audio-recorded conversation with Harper's Magazine, that O'Hara "was not deterred by the civil actions that (Inaudible) against him," meaning Assemblyman Brennan and Mr. Carroll's election challenges to O'Hara's validating petitions, and therefore they had to take further action against him.

87.    In fact, Mr. Meskin further stated during his audio-recorded interview with Harper's Magazine, that they "went after him in '96" because "it got to the point" where it "touched a nerve," "it clearly was because it touched a political nerve."

88.    Thereafter, sometime between late May and early June of 1996, three months before the September 10, 1996 primaries in which O'Hara ran for State Assembly again and supported Justice Gold for Kings County Surrogate Court Judge, District Attorney Hynes arranged a meeting which took place at the KCDA, to discuss the steps that would be taken to prosecute O'Hara in order to neutralize him as a political threat to District Attorney Hynes and Assemblyman Brennan. Present at the meeting were ADA Morelli, ADA O'Mara, Assemblyman Brennan, and his Chief of Staff Mr. Keefe.

89.   Although Plaintiff does not yet know whether ADA Amoroso or Mr. Carroll were also present at this meeting, after being advised as to the steps that would be taken to prosecute O'Hara in order to neutralize him as a political threat to District Attorney Hynes and Assemblyman Brennan, ADA Amoroso and Mr. Carroll also agreed to take steps to neutralize O'Hara as a political threat and to ensure his conviction.

90.   District Attorney Hynes, ADA Morelli, ADA O'Mara, ADA Amoroso, Assemblyman Brennan, Mr. Keefe, and Mr. Carroll, agreed to neutralize O'Hara as a political opponent by having O'Hara prosecuted for purportedly voting out of a residence in which he did not live, namely 553 47th Street for the period between November 1992 through November 1993, and 6017 4th Avenue, for the period between November 1993 through December 1996.

91.   As a subcommittee of the State of New York Committees on Character and Fitness for the Second Judicial Department later found, "Mr. O'Hara, accurately it appears, claims that the machine went gunning for him and pounced on his change of residency calling it election fraud."

92.   District Attorney Hynes, ADA Morelli, ADA O'Mara, ADA Amoroso, Assemblyman Brennan, Mr. Keefe, and Mr. Carroll knew that O'Hara did in fact live at 553 47th Street for the period between November 1992 through November 1993, and at 6017 4th Avenue for the period between November 1993 through December 1996, and that the anticipated charges were baseless.

93.   During this time period, ADA Morelli was actively seeking the Democratic nomination for New York State Supreme Court Justice in 1997, and Assemblyman Brennan controlled approximately twenty percent of the Judicial Delegates at the Kings County Democratic Judicial Convection. Assemblyman Brennan publically stated that ADA Morelli required his support at the Judicial Convention.

94.   Assemblyman Brennan pledged the support of his Judicial Delegates for ADA Morelli's nomination, in exchange for ADA Morelli pursuing a criminal prosecution against O'Hara. Because ADA Morelli agreed to Assemblyman Brennan's proposal, ultimately Assemblyman Brennan had the Convention Chair, Assemblyman Anthony Genovesi, commit to giving ADA Morelli the nomination for Supreme Court Justice at the convention in September 1998. (Morelli's judgeship fell apart when Assemblyman Genovesi was killed in a car accident in August 1998).

95.   In order to cover up their unlawful conduct, District Attorney Hynes, ADA Morelli, ADA O'Mara, ADA Amoroso, Assemblyman Brennan, Mr. Keefe, and Mr. Carroll needed to present an official reason as to why the KCDA would be investigating O'Hara for voting out of a residence in which he purportedly did not live. Therefore, the story they created was that the State Board of Elections was pursuing an investigation into O'Hara for violating the election law, and it wanted the assistance of the KCDA in investigating O'Hara and pursuing potential criminal charges.

96.   This reason given however was absurd. As Judge Rosenblatt of the New York State Court of Appeals noted in 2001, O'Hara's criminal prosecution was "a unique one at that. So far

as we can discern, defendant [O'Hara] is the only person ever brought to trial in New York on a charge of this kind." *See People v. O'Hara*, 96 N.Y.2d 378, 390 (2001). Although claims had been made to the State Board of Elections regarding voting from incorrect addresses, those allegations were always resolved in civil proceedings.

97.    In order to give this 'story' credibility, the co-conspirators listed above induced Jeff Waite, who at the time was an investigating attorney with the State Board of Elections, into initiating an investigation into O'Hara, and into going along with their plan of prosecuting O'Hara. Mr. Waite then became a willful participant in the conspiracy to prosecute O'Hara for crimes he did not commit.

98.    Toward that end, with District Attorney Hynes's knowledge and support, Assemblyman Brennan forwarded the materials that he, Mr. Keefe, Mr. Carroll, and PI Spungin had gathered, to Mr. Waite, for use in the State Board of Election's purported 'investigation' into O'Hara.

99.    In 2005, in response to a request from Judge Abraham Gerges as to how the investigation into O'Hara began, ADA Anne Gutmann provided a false and misleading chronicle of the events that had occurred. *See* Exhibit B.

100.   At the behest of District Attorney Hynes and ADA O'Mara, she represented to Judge Gerges that Mr. Waite contacted the KCDA and "sought the assistance" of the KCDA in investing O'Hara for voter-residence fraud. By doing so, they sought to create the false impression that the investigation into O'Hara was initiated by an independent source.

101.   According to this July 7, 2005 letter, at this point "[t]he investigation was commenced." *See id.* at 2.

102.   ADA O'Mara, an experienced prosecutor who tried high profile homicide cases who worked under ADA Morelli, was assigned to prosecute O'Hara's class E felony illegal voting charges. District Attorney Hynes and ADA Morelli assigned ADA O'Mara to prosecute this case because they required someone loyal to them whom they could trust to follow through on the plan to prosecute O'Hara for crimes they knew he did not commit.

103.   ADA O'Mara personally oversaw the 'investigation' in this case, presented to the case against O'Hara to a grand jury, and prosecuted all three criminal trials against O'Hara. He also committed multiple improprieties as well as outright illegal conduct such as witness intimidation to ensure O'Hara's conviction, which are described more fully below.

104.   ADA O'Mara intimidated and harassed O'Hara's former landlord, Immacollata Pelliccio, who was 83 years old at the time. O'Hara lived at 6017 4th Avenue for some time after he moved out of the 47th Street basement apartment. ADA O'Mara and KCDA investigators routinely showed up at Ms. Pelliccio's coffee shop which was on the ground floor of O'Hara's apartment building, and went through the garbage, in order to create the appearance that the evidence from the garbage supported the fact that O'Hara did not live at that address. Ms. Pelliccio stated that they kicked the garbage all over the place, and then stated to her that O'Hara did not have any garbage there. She tried to explain to them however that the garbage they went through was the

garbage from the coffee shop and not from the apartments.

105.  During his audio-recorded interview with Harper's Magazine, ADA O'Mara mocked the fact that Ms. Pelliccio "practically died when we went to speak to her." He went on to say that "I went there with a detective and she started (inaudible) and shaking."

106.  ADA O'Mara coordinated the harassment of Ms. Immacollata with Mr. Waite, whom ADA O'Mara stated would drive down to Brooklyn from Albany once a month to see Ms. Pelliccio. Mr. Waite repeatedly showed up with an investigator to 'question' Ms. Pelliccio as to why O'Hara was not home in the middle of a work day.

107.  Of the over eight million registered voters in New York State, Mr. Waite was focused on O'Hara, and, although District Attorney Hynes claimed that the Board of Elections conducted an investigation on O'Hara, no documents pertaining to such an investigation seem to exist.

108.  Because of the intimidation and harassment by ADA O'Mara and Mr. Waite, Ms. Immacollata served O'Hara with eviction papers causing him to move back to 579 61st Street address, which ADA O'Mara utilized to demonstrate that the 61st Street address is the location O'Hara 'always intended on returning to' and therefore that alone was his legal residence.

109.  ADA O'Mara and Investigator Presser routinely conferred with Assemblyman Brennan, Mr. Keefe, and Mr. Carroll regarding the status of the investigation into O'Hara.

110.  The investigation by the KCDA did not produce incriminating evidence against O'Hara, therefore ADA O'Mara, Investigator Presser, Assemblyman Brennan, Mr. Keefe, and Mr. Carroll agreed to create false incriminating evidence.

111.  Assemblyman Brennan, Mr. Keefe, and Mr. Carroll advised ADA O'Mara and Investigator Presser to speak with Rafael Munoz, Roberto Lozano, and Quetzal Martinez, as they would be willing participants in a conspiracy if provided with sufficient incentives.

112.  The three men moved into the brownstone in December 1992 and were O'Hara's upstairs neighbors at the time he lived in the basement apartment on 47th Street, and Assemblyman Brennan and Mr. Carroll utilized them, and the false testimony they agreed to provide, in the election proceedings against O'Hara.

113.  Munoz had previously been charged with attempted murder in New York County, and he was released from prison in or about 1990 after serving five years on what Plaintiff believes to be a plea to assault.

114.  Lozano routinely broke into houses, and was charged several time for possession of burglary tools, and possibly with burglary as well.

115.  Martinez ran an auto-stripping business, and was arrested approximately 14 times by the KCDA.

116.  Munoz, Lozano, and Martinez were extremely close. They called themselves brothers, purchased the brownstone from Ms. Lucas together, and all profited from the auto-stripping business.

117.  Assembly Brennan, Mr. Keefe, and Mr. Carroll thereafter set up meeting between Munoz, Lozano, and Martinez, and ADA O'Mara and Investigator Presser. Assembly Brennan, Mr. Keefe, and Mr. Carroll may have also attended the meeting.

118.  ADA O'Mara and Investigator Presser agreed to assist Munoz, Lozano, and Martinez with the criminal charges resulting from their criminal enterprises, and agreed not to shut down Martinez's auto-stripping business which the three all profited from, in exchange for procuring Munoz, Lozano, and Martinez's false statements that they moved into the brownstone in October 1992, when O'Hara had moved into the basement apartment, and that O'Hara never lived there.

119.  Upon information and belief, ADA O'Mara and Investigator Presser also issued asset forfeiture checks to Munoz, Lozano, and Martinez in exchange for their false information and anticipated false testimony against O'Hara. Upon information and belief, ADA Amoroso facilitated the issuing of the asset forfeiture checks to them.

120.  Once ADA O'Mara and Investigator Presser secured Munoz, Lozano, and Martinez's false information, they were ready to set the wheels in motion for O'Hara's unlawful prosecution.

121.  District Attorney Hynes and ADA Morelli were routinely apprised as to the status of the 'investigation' of O'Hara, and approved and supported the actions taken against him.

122.  Several weeks after Mr. Keefe assaulted Vicki during the September 10, 1996 primaries, Assistant District Attorney Rhonnie Jaus, the Chief of the Sex Crimes Unit at the KCDA, appeared unannounced at Vicki's office in Atlantic City with three additional individuals, to attempt to persuade her to drop the charges against Mr. Keefe. Vicki refused to do so. ADA Jaus advised her that if the prosecution was not successful and Mr. Keefe was acquitted at trial, he may be able to sue Vicki, which may then impact Vicki's employment as an executive at a casino in Atlantic City. Vicki nonetheless refused to withdraw the charges.

123.  The criminal case against Mr. Keefe was adjourned for over a year, until November 6, 1997 when he plead guilty. Assemblyman Brennan, whom Mr. Keefe worked for, publically claimed that because of his close relationship with District Attorney Hynes, the case was adjourned until the eye-witness to the assault moved to Florida. *See* Exhibit C.

124.  Around the time of ADA Jaus's unannounced visit to Vicki's office, O'Hara hired attorneys to pursue an emergency appeal to the United States Supreme Court from the Second Circuit's decision reversing the continued election.

125.  Approximately two weeks later, on Friday, October 19, 1996, Investigator Presser contacted O'Hara's election law attorney Robert Meyers, and advised him that O'Hara was indicted on several felony counts, and that Mr. Meyers should surrender O'Hara at the KCDA.

126.  In addition to having O'Hara indicted in order to silence his political opposition to District Attorney Hynes and Assemblyman Brennan and to punish him for his prior political activities, District Attorney Hynes, ADA Morelli, and ADA O'Mara, in agreement with and at the behest of Assemblyman Brennan, Mr. Keefe, and Mr. Carroll, rushed to have O'Hara indicted at the time in order to obtain an immediate collateral advantage—preventing him from pursuing legal action pertaining to the election for Kings County Surrogate Court Judge.

127.  This strategy worked. Once O'Hara was indicted and his time was consumed with the criminal prosecution against him, he was no longer involved in the race for Kings County Surrogate Court Judge.

128.  On or about either October 21 or 22, 1996, Meyers surrendered O'Hara at the KCDA as instructed. Investigator Presser and another uniformed officer formally placed O'Hara under arrest, and then processed his arrest which included fingerprinting and photographing O'Hara.

129.  Investigator Presser then brought O'Hara to the courthouse where he was placed in a holding cell, and eventually brought to be arraigned in Kings County Criminal Court. The judge however advised that he did not have jurisdiction to arraign O'Hara on an indictment, and ultimately O'Hara was released.

130.  The Following day, on or about either October 22 or 23, 1996, O'Hara was arraigned on the indictment in Kings County Supreme Court – Criminal Term.

131.  O'Hara was charged under Indictment Number 13525/1996 with the following: one count of offering a false instrument for filing in the first degree under Penal Law § 175.35 in that on or about November 2, 1992, O'Hara "presented a voter registration form to the New York City Board of Elections knowing that said instrument contained a false statement or information"; one count of false registration under Election Law § 17-104(4) in that on or about November 2, 1992 O'Hara "did knowingly give a false residence within the 20th Election District in the 51st Assembly District" when "registering as an elector with the New York City Board of Election"; and five counts of illegal voting under Election Law § 17-132(3) in that O'Hara "presented himself as an elector and voted at a duly held election in the 20th Election District and 51st Assembly District, from a place where he did not reside- to wit 553 47th Street," on November 3 1992, and May 4, September 14, September 28, and November 2, 1993. *See* Exhibit D.

132.  O'Hara plead not guilty, and was released on his own recognizance.

133.  O'Hara was arrested and indicted without probable cause to believe he committed the charged crimes, and there was no probable cause to believe a criminal prosecution on those charges would be successful.

134.  The indictment against O'Hara was achieved through misconduct undertaken in bad faith, fraud, perjury, misrepresentation and falsification of evidence, and the failure to make a full and complete statement of facts to the grand jurors.

135.  ADA O'Mara intentionally failed to present exculpatory evidence to the Grand Jury.

136.  For example, the reports Assemblyman Brennan received from PI Spungin which he then submitted to ADA Morelli and ADA O'Mara, contained multiple references that O'Hara did in fact live at 553 47th Street. Despite that, ADA O'Mara intentionally failed to present this exculpatory evidence before the Grand Jury, and intentionally failed to call PI Spungin to testify that his investigation revealed that O'Hara did in fact live at 553 47th Street.

137.  ADA O'Mara handwrote in a "Chronological Date Sheet" "regarding 553/47TH St." that "Postal carrier states mail for O'Hara presently being delivered @ this location." However, he did not call the postal carrier, or the KCDA Investigators to whom the postal carrier made this comment to, to testify as to these facts before the Grand Jury.

138.  ADA O'Mara was also in possession of additional exculpatory information, such as O'Hara's Chase bank account and American Express credit card statements for the 1992 through 1993 period which listed O'Hara's address as 553 47th Street. ADA O'Mara intentionally failed to present this evidence before the Grand Jury.

139.  ADA O'Mara obtained this exculpatory evidence in bad faith. As noted above, in 1994 O'Hara withdrew from the race for State Assembly, and Justice Irving Aronin sealed the records from the election-law proceedings.

140.  Mr. Waite had petitioned Judge Aronin to unseal the proceedings, however the petition was denied. Undeterred and unethically, and rather than appealing the decision, ADA O'Mara then petitioned politically-allied Judge Matthew D'Emic to unseal the records, without indicating that this very same application was already denied by Justice Aronin. Interestingly, although ADA O'Mara referenced an affirmation in a cover letter to Judge D'Emic, there is no affirmation by ADA O'Mara in the court's file.

141.  At the start of O'Hara's second trial in 1999, ADA O'Mara acknowledged that the sealed election-law file contained *Rosario* material, but falsely represented to the court that he had only just received it.

142.  ADA O'Mara and Investigator Presser knew that Magaly Lucas owned the brownstone while O'Hara lived there from November 1992 through November 1993. Therefore, they only made a superficial attempt to reach out to her, and Investigator Presser first left a note on her door to contact him on the day O'Hara was indicted.

143.  ADA O'Mara intentionally failed to call Ms. Lucas to testify regarding O'Hara's residence because he knew her testimony would be exculpatory—he knew that she would testify that O'Hara did in fact live at the 47th Street address from November 1992 through November 1993, which would not support the anticipated Grand Jury charges.

144.  Rather than presenting the exculpatory evidence referenced above, in presenting the case to the Grand Jury, ADA O'Mara relied heavily on the false testimony he knowingly solicited of Rafael Munoz and Roberto Lozano, the tenants who rented the upstairs floors at the 553 47th Street brownstone.

145.  Plaintiff does not yet know whether Martinez also testified before the Grand Jury. If he did however, ADA O'Mara failed to present evidence that Martinez had several pending criminal charges stemming from his auto-stripping business.

146.  ADA O'Mara and Investigator Presser promised Martinez leniency in the prosecution he faced, and promised not to shut down his auto-stripping business which Lozano and Munoz also profited from, if Lozano and Munoz testified that they moved into the brownstone in October 1992 and that O'Hara never lived there.

147.  Munoz and Lozano moved into the 47th Street brownstone in December 1992. ADA O'Mara knew they moved in in December 1992 because he had obtained the Con Edison bills for the 47th Street address going back numerous years, which reflected Lozano and Martinez opening accounts on December 1, 1992.

148.  Despite that, ADA O'Mara had Munoz and Lozano testify falsely, and knowingly solicited false testimony from them, that they moved into the brownstone in October 1992, that O'Hara never lived there, and certainly did not live there on November 2 or 3, 1992, the dates at issue in the first three counts of the indictment.

149.  Because the Con-Edison bills would have discredited Munoz and Lozano's false testimony, ADA O'Mara intentionally did not present that evidence before the Grand Jury.

150.  The bad faith acts before the Grand Jury went further than merely presenting testimony which ADA O'Mara knew to be false. To further prejudice the Grand Jurors against O'Hara in order to secure his indictment, ADA O'Mara concocted a real estate scam, and knowingly solicited false testimony from Munoz and Lozano that O'Hara and Ms. Lucas scammed them out of the property.

151.  As noted above, sometime after Munoz, Lozano, and Martinez moved into the brownstone, they entered into an agreement with Ms. Lucas to purchase the property. They made an initial $10,000 down payment when the agreement was entered into, and in November 1993, the property was formally transferred to them, and the deed was recorded in the Kings County Office of the City Register on November 15, 1993.

152.  The mortgage on the property was current on the date Ms. Lucas transferred the property to them. Ms. Lucas was not discharged from the mortgage when she transferred the property to Munoz, Lozano, and Martinez. Rather, she assigned the mortgage to them but remained personally liable as well.

153.  O'Hara moved out of the brownstone after the property was transferred, at which time Munoz, Lozano, and Martinez stopped making payments on the mortgage, started renting the apartments in the brownstone to other individuals and collected rent from them, and started using it as a crack house.

154.  On May 24, 1996, a foreclosure proceeding was initiated. ADA O'Mara knowingly solicited false testimony from Munoz and Lozano that they never received the deed for the

property, and that O'Hara assisted Ms. Lucas in scamming them out of the property while tricking them into accepting liability for the mortgage causing a foreclosure proceeding to be initiated against them. ADA O'Mara however had the deed to the property, and knew that Munoz and Lozano scammed Ms. Lucas and caused a foreclosure proceeding to be initiated against her.

155.  Given the above bad-faith acts, O'Hara was ultimately indicted. Although Investigator Presser indicated to O'Hara's attorney that O'Hara was indicted the previous Friday, which was October 18, 1996, the Indictment is stamped October 21, 1996 at 6:37 PM. *See* Exhibit D at 1.

156.  Ms. Lucas called Investigator Presser on October 22, 1996, the day after he had left a note on her door to contact him. During their telephone conversation, Ms. Lucas advised Investigator Presser that she owned the brownstone located at 553 47th Street, and that O'Hara did in fact live there from November 1992 through November 1993. Plaintiff does not yet know if Investigator Presser immediately disclosed this exculpatory information to ADA O'Mara, however regardless of whether he did or not, Investigator Presser brought O'Hara to Criminal Court to be arraigned.

## O'HARA'S UNPRECEDENTED THREE CRIMINAL TRIALS

157.  The KCDA tried O'Hara three times on these victimless election-law charges.

158.  This was the only case which District Attorney Hynes tried three times.

159.  Additionally, this was the first time in New York State history that an individual was criminally tried for illegal voting since Susan B. Anthony's trial in 1873.

160.  The issue in each case was whether O'Hara lived in the basement apartment of 553 47th Street from November 1992 through November 1993.

161.  Throughout O'Hara's three criminal trials, ADA O'Mara and Investigator Presser continued their illegal and unethical conduct, which District Attorney Hynes and ADA Morelli were apprised of and condoned.

162.  At each of O'Hara's three criminal trials, ADA O'Mara and Investigator Presser continued to induce Munoz and Lozano to knowingly provide false testimony that they moved into the brownstone in October 1992, that O'Hara never lived there, and that O'Hara assisted Ms. Lucas in defrauding them out of their property. Their testimony was critical to the juries finding O'Hara guilty on all counts. ADA O'Mara relied heavily on their testimony, and focused on it in his summations.

163.  In order to ensure that Munoz and Lozano continued to provide false testimony as they had during the Grand Jury proceedings, ADA O'Mara and Investigator Presser had the KCDA dismiss approximately six of Martinez's criminal charges prior to O'Hara's first trial.

164.   Over the course of the Grand Jury proceedings and O'Hara's three criminal trials, Martinez was arrested approximately 14 times, and each charge was dismissed and the record was sealed. Martinez was also arrested on a drug charge, however his sentence was adjourned approximately for five years, until after O'Hara's third trial.

165.   Additionally, upon information and belief, ADA O'Mara and Investigator Presser continued issuing asset forfeiture checks to Munoz, Lozano, and Martinez in exchange for Munoz and Lozano's false testimony. Upon information and belief, ADA Amoroso continued facilitating the issuing of the asset forfeiture checks to them knowing they were payouts for providing false testimony.

166.   O'Hara was first tried on May 5 through May 13, 1997, before the Honorable Priscilla Hall.

167.   O'Hara intended on calling Magaly Lucas as a defense witness to testify that she owned the property at the time O'Hara lived there, and that he did in fact live there from November 1992 through November 1993.

168.   However in March 1997, prior to trial, ADA O'Mara had subpoenaed Ms. Lucas to bring certain documents to court. Ms. Lucas complied with the subpoena and ADA O'Mara copied some of the documents she had brought. On that day however, ADA O'Mara advised her that she could get in "big trouble" for what she had previously told Investigator Presser regarding owning the 553 47th Street brownstone while O'Hara lived there, and that O'Hara did in fact live there. *See* Exhibit E.

169.   Once the first trial started, O'Hara's attorneys called Ms. Lucas to testify. She appeared in court ready to testify, however the trial was adjourned and she was told to come back another day. While there however, ADA O'Mara approached Ms. Lucas and threatened that if she testified on O'Hara's behalf, she would be criminally prosecuted for her role in the alleged real estate scam, and that she would lose her law license. He explicitly told her that she "[i]f you testify and he goes down, you'll go down," and that "we're not giving you any immunity." *See id.*

170.   Ms. Lucas complained to Judge Hall that ADA O'Mara was intimidating her not to testify on O'Hara's behalf. Judge Hall however stated that it's not her responsibility. Ms. Lucas was scared due to ADA O'Mara's threats, and therefore did not testify on O'Hara's behalf. *See id.*

171.   At the conclusion of the first trial, Judge Hall then granted ADA O'Mara's request for a missing witness charge against O'Hara for failing to call Ms. Lucas to testify on his behalf, despite the fact that she failed to appear because ADA O'Mara had threatened her not to.

172.   On May 13, 1997, O'Hara was found guilty on all seven felony counts. He was sentenced to 5 years' probation, 1,500 hours of community service, and $14,192 in penalties and reparations to the New York City Campaign Finance Board.

173.  Given his felony conviction, O'Hara was disbarred from the practice of law on November 10, 1997, and his name was immediately stricken from the roll of attorneys and counselors-at-law. *See* Exhibit F.

174.  O'Hara filed a motion to set aside the verdict, and submitted an affidavit by Ms. Lucas in support, Exhibit E, but the motion was denied.

175.  Thereafter, O'Hara filed an appeal.

176.  On August 31, 1998, the New York Appellate Division, Second Judicial Department, reversed O'Hara's conviction due to the missing witness charge.

177.  At that time, O'Hara had started, but not yet completed, his 1,500 hours of community service, and he had not yet paid the penalties and reparations to the New York City Campaign Finance Board. The portions of the sentence which was not yet completed was stayed pending a new trial.

178.  The People had filed an application for leave to appeal to the Court of Appeals, which was denied.

179.  In the interim, immediately after the Second Department vacated O'Hara's conviction, and in anticipation of O'Hara's second trial, ADA O'Mara sought to intimidate Ms. Lucas from testifying on O'Hara's behalf. Therefore, he subpoenaed her tax returns and other financial documents, creating the appearance that he was investigating her and that he was making good on his threat to prosecute her, because she had submitted an affidavit in support of O'Hara's post-conviction motion.

180.  As a result, Ms. Lucas left a voicemail for O'Hara explaining what ADA O'Mara was doing, and stating that she wants nothing to do with the trial, that they should not bother subpoenaing her to testify, and that she will not comply with a subpoena if O'Hara's attorney issues one for her testimony.

181.  ADA O'Mara's tactics did not end with Ms. Lucas. ADA O'Mara also intimidated two witnesses who testified on O'Hara's behalf during the first trial—Juan Perez and Yvette Aguirre.

182.  Juan Perez was a political activist. He ran against O'Hara in 1992 for a seat in the New York State Assembly.

183.  In 1993 O'Hara and Perez worked together on David Dinkins's Mayoral campaign. During this timeframe, he periodically met O'Hara at his basement apartment located at 553 47th Street, after which the two would walk the neighbor soliciting support for various candidates.

184.  O'Hara had asked Perez to testify to these facts during his first trial, and Perez did so. Therefore in anticipation of his second trial, O'Hara once again asked Perez to testify on his behalf, and Perez again agreed to do so.

185.  Perez's testimony contradicted ADA O'Mara's theory, and his witnesses' testimony, therefore ADA O'Mara had to silence him.

186.  Shortly before O'Hara's second trial, ADA O'Mara appeared at Perez's home one day, unannounced, very early morning, and threatened him not to testify on O'Hara's behalf. ADA O'Mara threatened Perez that he "would go down with [O'Hara]" if he testified on his behalf, and that if Perez testified consistent with his testimony at the first trial, he would be prosecuted for perjury, and would therefore lose his Section-8 housing, landing himself and his children on the street without a home. *See* Exhibit G.

187.  Perez was scared by ADA O'Mara's threats against him and his family, therefore he did not contact O'Hara or his attorneys when they tried reaching out to him to have him testify at O'Hara's second and third trials, and he did not testify at those trials. *See id.*

188.  Yvette Aguirre lived on 47th Street, two houses from 553 47th Street. She was a New York City schoolteacher for many years, and was involved in civic and political matters in the community. She had testified in O'Hara's first trial that she had seen O'Hara living two houses away from her.

189.  In an effort to ensure Ms. Aguirre did not testify on O'Hara's behalf again so that O'Hara would be convicted, ADA Amoroso contacted Ms. Aguirre the day after the Court of Appeals denied the KCDA's application for leave to appeal. Ms. Aguirre was to receive one of four awards to be presented by District Attorney Hynes at an awards ceremony. ADA Amoroso threatened her that if she did not agree not to testify again on O'Hara's behalf, the award would be rescinded. She asked what one had to do with the other, and stated that she would testify on O'Hara's behalf.

190.  Therefore as threatened, although her name appeared in the program printed for the awards ceremony, and the thirty individuals whom she invited to accompany her to the ceremony appeared, she was not presented with the award.

191.  O'Hara's second trial took place on May 25 through June 2, 1999, before the Honorable Abraham Gerges.

192.  On June 2, 1999, the jury indicated it was deadlocked, and Judge Gerges declared a mistrial.

193.  On that date, Judge Gerges immediately scheduled a re-trial for June 8, 1999.

194.  O'Hara's was tried for the third time on June 23, 1999 through July 1, 1999.

195.  Munoz and Lozano testified on behalf of the People that O'Hara never live in the 553 47th Street basement apartment.

196.  O'Hara presented witnesses, as well as documentary evidence, to the contrary.

197.  ADA O'Mara called Josephine Vales as a surprise rebuttal witness. She had not testified in either the first or second trials, however ADA O'Mara realized that in order to obtain a conviction given that the second trial ended with a hung jury, he needed new incriminating evidence.

198.  Therefore, ADA O'Mara and Investigator Presser created the incriminating evidence. Ms. Vales's son, David, had a lengthy criminal record, and he had previously been prosecuted by the KCDA. Prior to O'Hara's third trial, he had hijacked a truck. Investigator Presser approached Ms. Vales, and advised her that if she cooperated with ADA O'Mara and testified that there was no basement apartment and that no one has ever lived there, the KCDA would assist her son with his legal issues. Thereafter, ADA O'Mara spoke with Ms. Vales, reaffirmed the deal that Investigator Presser had offered her, and directed her as to how to testify in court.

199.  ADA O'Mara knowingly solicited false testimony from Ms. Vales at trial. She testified that she sold the brownstone to Magaly Lucas in 1990. At the direction of ADA O'Mara, she then falsely testified that in all the years her family lived there, the basement was never renovated, there was never a basement apartment in that brownstone, no one ever lived there, her son and his family lived in one of the rooms on the second floor of the brownstone after his wife had a baby, and that the basement "wasn't liveable."

200.  Upon information and belief, ADA O'Mara was in possession of an appraisal report which was created when Ms. Vales sold the brownstone to Ms. Lucas, which stated "POTENTIAL RENTABLE IN CELLAR." *See* Exhibit H.

201.  Ms. Vales's testimony was unequivocal, and completely contrary to, for example, Ms. Aguirre's testimony that the Valeses had renovated the basement when their son's wife had a baby so that he could live there with his family.

202.  ADA O'Mara relied heavily on her seemingly unbiased testimony in his summation to the jury, and Ms. Vales's testimony is ultimately what sealed O'Hara's fate as the jury returned a guilty verdict on all seven felony counts.

203.  O'Hara was sentenced on October 18, 1999 to a conditional discharge, conditioned on the fact that he "does not get into trouble" for three years, $14,615 in penalties and restitution to the New York City Campaign Finance Board, $6,000 in fines, and the completion of the 1,500 hours of community service which he had been sentenced to after the first trial but had not completed prior to the Second Department vacating his initial conviction.

204.  O'Hara appealed, however this time the Second Department affirmed his conviction.

205.  He thereafter filed an application for leave to appeal to the Court of Appeals, which the Court of Appeals granted. The issue on appeal was the legal definition of residency. The Court of Appeals however affirmed his conviction in a 5-2 decision.

206.  In or about 2002, O'Hara filed a petition for a writ of habeas corpus in the United States District Court for the Eastern District of New York. The petition was ultimately denied. O'Hara

appealed to the Second Circuit on the issue regarding the legal definition of residency, however in or about 2003 the court determined the issue had not been preserved. O'Hara filed a petition for writ of certiorari to the United States Supreme Court, which was denied on January 12, 2004.

207.  Defendants' conspiracy to prosecute O'Hara, and his actual prosecution, was politically motivated. Once the prosecution had started, but was proving more challenging than anticipated, the prosecution was continued in order to prevent O'Hara from filing a malicious prosecution lawsuit against his conspirators.

208.  Indeed, in ADA O'Mara's handwritten notes regarding O'Hara's prosecution, he wrote the following: "discussed the law -  ACD would foreclose lawsuit for malicious prosecution." *See* Exhibit I.

209.  Ultimately however, Defendants elected not to offer O'Hara the ACD because they had successfully intimidated witnesses favorable to O'Hara not to testify on his behalf, and they intimidated others to testify falsely against him

210.  District Attorney Hynes and ADA Morelli monitored and approved ADA O'Mara, Investigator Presser, and the other KCDA investigators' action during the investigation and prosecution of O'Hara.

211.  District Attorney Hynes also made disparaging statements about O'Hara in the media to save face for the actions he permitted his employees to engage in.

212.  Prior to O'Hara's sentencing, District Attorney Hynes stated during an on-air radio interview that he would be seeking 3-5 years' prison sentence. He is quoted in a New York Times article stating that O'Hara "is incapable of telling the truth . . . That's why he got into trouble," and that's why it took the jury "less than two hours" of deliberations to reach a guilty verdict.

213.  District Attorney Hynes wrote a letter to the editor of Times Union, an Albany Newspaper, regarding the veracity of the claimed allegations against O'Hara.

214.  After Harper's Magazine's Christopher Ketcham published an article regarding O'Hara and District Attorney Hynes entitled *Meet the New Boss*, District Attorney wrote a letter to the editor at Harper's Magazine, and threatened Ketcham with prosecution.

## O'HARA'S SELECTIVE PROSECUTION
## AND DISTRICT ATTORNEY'S HYNES'S UNLAWFUL POLICY OF
## PROSECUTING POLITICAL OPPONENTS

215.  As noted above, in 2001, Judge Rosenblatt of the New York State Court of Appeals noted that O'Hara's criminal prosecution was "a unique one at that. So far as we can discern, defendant [O'Hara] is the only person ever brought to trial in New York on a charge of this kind." *See People v. O'Hara*, 96 N.Y.2d 378, 390 (2001).

216.  O'Hara's criminal prosecution still remains the only one of its kind.

217.  Although claims of election-related fraud against candidates running for public office such as filing false registration instruments and voting from incorrect addresses have been made, those allegations were always resolved in civil proceedings, before and after O'Hara's indictment and criminal prosecution.

218.  Additionally, although the KCDA, and District Attorney Hynes himself, knew that individuals were voting from addresses they did not live at, the KCDA *never* prosecuted a single individual for that crime.

219.  For example, in *Matter of Gregory v. Board of Elections of City of N.Y*, 93 A.D.2d 894, (2d Dep't 1983), the New York Appellate Division Second Department reversed an order of the Supreme Court, Kings County, which failed to invalidate a candidate's petition, because the evidence indicated that the candidate did not live at the claimed address.

220.  In *Matter of Markowitz v. Gumbs*, 122 A.D.2d 906, 907 (2d Dept 1986), the New York Appellate Division Second Department affirmed an order of the Supreme Court, Kings County, invalidating a candidate's designating petition because "the evidence supports the conclusion that candidate Gumbs was not a resident" of the district for the requisite period.

221.  In *Carey v. Foster*, 164 A.D.2d 930, 930 (2d Dep't l990), the New York Appellate Division Second Department affirmed an order of the Supreme Court, Kings County, invalidating a candidate's designating petition because there "was no evidence" that the candidate resided in the district, and "when questioned at the hearing about his residency status in Florida, Mr. Foster chose to invoke his Fifth Amendment right against self-incrimination."

222.  In *Matter of Ramos v. Gomez*, 196 A.D.2d 620, 620-21 (2d Dep't 1993), the New York Appellate Division Second Department affirmed an order of the Supreme Court, Kings County, invalidating a candidate's designating petition, because Gomez "falsely stated her address as 460 7th Avenue in the 51st Assembly District in Kings County," and that the basement apartment where she claimed to live was really a storage space for the building's occupants.

223.  In *Matter of Walkes v. Farrakhan*, 286 A.D.2d 464, 465 (2d Dep't 2001), the New York Appellate Division Second Department affirmed an order of the Supreme Court, Kings County, invalidating a candidate's petition, because "[b]ased upon the credibility of the witnesses, the Supreme Court determined that the address which Abdur Rahman Farrakhan listed on the designating petition was not one of his residences."

224.  In *Matter of Eisenberg v. Strasser*, 100 N.Y.2d 590, 591 (2003), which was an appeal from an order of the Supreme Court, Kings County, invalidating a candidate's designating petition, the New York Court of Appeals found that the "petition was properly invalidated because the candidate did not actually reside at the address he listed as his residence on the designating petition and which he had used for purposes of voter registration."

225.  In *Matter of Robinson v. Sharpe*, 32 A.D.3d 488, 488-89 (2d Dep't 2006), the New York Appellate Division Second Department reversed an order of the Supreme Court, Kings County, which failed to invalidate a candidate's petition, because the "evidence established that Wellington Sharpe was not a resident of the 58th Assembly District 'for the twelve months immediately preceding his [ ] election,'" because the candidate had transferred ownership of the address he had given to his children and then moved out shortly thereafter, did not maintained any utilities after he moved out, and cancelled his telephone service.

226.  The KCDA, and District Attorney Hynes himself, knew that these individuals, and numerous others, were committing election fraud because District Attorney Hynes was intimately involved in Brooklyn politics, but he *never* prosecuted a single individual for those crimes.

227.  O'Hara had filed a motion in 2005 which raised questions about District Attorney Hynes's knowledge and indulgence of several Assistant District Attorneys in his office residing outside New York City in violation of County Law, or using a false New York City address for voting purposes, but District Attorney Hynes took no action against any of his employees.

228.  ADA Amoroso, Chief Counsel to District Attorney Hynes, lived with his family in Nassau County, but registered and voted from his parents' address in Queens County. A spokesman for District Attorney Hynes acknowledged in 2013 that District Attorney Hynes had "permitted" this.

229.  District Attorney Hynes also "permitted" Amy Feinstein, for example, his Chief Assistant District Attorney, or top aide, who also served as the "designated assistant" when District Attorney Hynes was unavailable, to live in Manhattan, even though the law required that assistant to reside in Brooklyn if she were to be qualified to assume the "duties" of District Attorney Hynes's office in his absence. And in 2013, Hynes, through an official press spokesman, acknowledged that while "[a]ll Kings County assistant district attorneys must live within the state of New York," five of District Attorney Hynes's assistants, including ADA O'Mara, resided in New Jersey, all with District Attorney Hynes's "permission."

230.  In 2013 it was reported that Vito Lopez, the former longtime Chair of the Democratic Party organization in Brooklyn, lived in Queens while claiming to be a Brooklyn resident. District Attorney Hynes knew where Lopez really lived, and he proudly acknowledged that "the Kings County Democratic Party, led by Assemblyman Lopez," was a longtime political supporter of his. Therefore, the KCDA never investigated or prosecuted Lopez for registering to vote at, and voting from, a false address.

231.  Indeed, District Attorney Hynes himself was guilty of the same criminal charges he had filed against O'Hara. District Attorney Hynes lived in Breezy Point, Queens, and even earned the nickname "Breezy Point Joe." Because he did not live in Brooklyn as required and needed a Brooklyn address, when he registered to vote on May 7, 1996 he listed "210 Joralemon Street, Brooklyn, New York 11201,"  which is a municipal building, as the "Address where You Live." *See* Exhibit J.

232. Mr. Meskin, who worked for Assemblyman Brennan, candidly admitted during his audio-recorded conversation with Harper's Magazine that O'Hara "was selectively prosecuted," and the sentiment between the District Attorney Hynes, ADA Morelli, ADA O'Mara, Investigator Presser, Assemblyman Brennan, Mr. Keefe, Mr. Carroll, and Mr. Meskin was that "if anyone deserved to be selectively prosecuted, it was John Kennedy O'Hara." Mr. Meskin also acknowledged that "Yes, he was selectively prosecuted. Yes, Joe Hynes is not the paragon of virtue and the tribute of the people of Brooklyn. Right? Having said all that, if anyone ever deserved to be, it was John -- it was him."

233. The KCDA prosecuted O'Hara in retaliation for opposing the established 'Brooklyn Democratic Machine," in order to silence O'Hara's political voice, and in order to obtain political support from Assemblyman Brennan.

234. District Attorney Hynes was the Kings County District Attorney for 23 years, from January 1990 through December 2013.

235. As the Kings County District Attorney, District Attorney Hynes managed the KCDA and set its policies and customs. Therefore, District Attorney Hynes was a New York City municipal policymaker.

236. In managing the KCDA, District Attorney Hynes created an informal policy and custom pursuant to which his political affiliates, as well as Assistant District Attorneys within the KCDA, could use the power and authority of the KCDA to eliminate political opponents.

237. Therefore at all times relevant herein, it was the policy and custom of the KCDA to assist political affiliates of District Attorney Hynes, as well as of Assistant District Attorneys within the KCDA, to use the power and authority of the KCDA to eliminate political opponents.

238. To that end, Assistant District Attorney and Investigators at the KCDA fabricated documents, harassed and intimidated witnesses, and bribed and coerced witnesses into providing false statements and testimony. Once a prosecution began, they committed additional improprieties such as failing to present exculpatory evidence, presenting fabricated evidence, and knowingly soliciting false testimony, before grand juries and at trial.

239. District Attorney Hynes knew of the KCDA's unlawful policy and custom, as he is the one who established it. Additionally, he sanctioned, and actively participated in, his office's execution of the unlawful policy and custom, and was intimately familiar with the steps taken pursuant to the unlawful policy and custom.

240. For example, with respect to O'Hara, as noted above District Attorney Hynes entered into an agreement with Assemblyman Brennan to find some reason to indict O'Hara. Thereafter, he arranged for ADA O'Mara, Investigator Presser, and other investigators at the KCDA, in conjunction with the NYPD, to surveille O'Hara, in violation of the 1985 Handschu Consent Decree. He then arranged a meeting to take place at the KCDA where a plan would be reached as to how to achieve O'Hara's conviction. He then affirmatively sanctioned his office's anticipated prosecution of O'Hara while knowing that O'Hara did not in fact commit the crimes which

O'Hara would be charged with, and that his office, in conjunction with Assemblyman Brennan, Mr. Keefe, and Mr. Carroll, fabricated the incriminating evidence which they then intended to use, and then did use, against O'Hara.

241.  Other political opponents against whom the KCDA used its power and authority to eliminate, include, but are not limited to, Porfirio Placencia, Judge John L. Phillips, Sandra E. Roper, Esq., and Ralph Perfetto.

242.  Porfirio Placencia filed a validating petition on behalf of a candidate for Office of the State Committeeman who ran in opposition to a candidate supported by Assemblyman Brennan. Mr. Carroll, on behalf of Assemblyman Brennan, challenged signatures on the validating petition in Supreme Court, Kings County, after which the candidate withdrew from the election. Assemblyman Brennan had District Attorney Hynes started a criminal prosecution against Placencia for filing the petition containing the challenged signatures. District Attorney Hynes had Roger Adler appointed as a Special Prosecutor, who kicked back portions of his fee to District Attorney Hynes's campaign committee. Placencia was charged and indicted 1992, however the indictment was dismissed in 1993 because Mr. Carroll, who challenged the petition in Supreme Court, was called as an "expert witness" in election law and impermissibly tainted the grand jurors. *See People v. Placencia*, 157 Misc. 2d 397 (Sup. Ct. 1993).

243.  In 1997, retired New York Civil Court Judge John L. Phillips, who was approximately 72 years old at the time, intended on opposing District Attorney Hynes's race for reelection that year.  He lived in Bedford-Stuyvesant, and carried a gun for protection. One month before he officially announced his plans to oppose District Attorney Hynes, but after individuals in the political arena already knew of his plans, two plainclothes officers arrested him as he left his campaign headquarters, on a tip, believed to be from the KCDA, that his gun license had expired. Judge Phillips, who always carried his gun in his jacket and kept his jacket closed in order to conceal the gun, was charged with exhibiting and displaying an unlicensed weapon and resisting arrest.

244.  In 2001, Judge Phillips again announced his intent to oppose District Attorney Hynes's race for reelection. Therefore, District Attorney Hynes conducted an 'investigation' into Judge Phillips which 'determined' that he was the victim of a real estate scheme and was incompetent to handle his own affairs. District Attorney Hynes then had his office file an Ex-Parte Petition in Supreme Court, Kings County, to declare Judge Phillips mentally incompetent, and to appoint a guardian to 'manage' his ten million dollar real estate fortune. The Court granted the application, and District Attorney Hynes's former Chief of Staff and campaign treasurer, Harvey Greenberg, was appointed temporary guardian over Judge Phillips and his 12 real estate holdings. Judge Phillips was confined to a nursing home against his will, denied visitation for months, and eventually died there. Ultimately, the guardians sold the real estate in unpublished auctions, for pennies on the dollar, and squandered his fortune.

245.  After District Attorney Hynes eliminated Judge Phillips as an opponent in the 2001 election for Kings County District Attorney, Sandra E. Roper announced that she would run in his place. Therefore District Attorney Hynes conducted an 'investigation' into Ms. Roper which 'determined' that she had stolen money from a client whom she had purportedly agreed to

represent for free. Ms. Roper was indicted and tried. The jury however was deadlocked and a mistrial was declared. The charges were ultimately dropped and Ms. Roper was not tried a second time.

246.  Ralph Perfetto was a political activist from 1992 through 2010. In 2005, he opposed Vito Lopez, whom District Attorney Hynes supported, for District Leader of the Brooklyn Democratic Party. In 2008, he accompanied his cousin's son to Kings County Criminal Court, and provided some documents to the Assistant District Attorney handling the case. Thereafter, in 2010, days before Perfetto launched his re-election campaign for District Leader of the Brooklyn Democratic Party, the KCDA filed a criminal complaint against him charging him with the unauthorized practice of law, a misdemeanor. Perfetto was convicted, but he never appealed the conviction.

247.  District Attorney Hynes remained deliberately indifferent to the fact that his office was used to eliminate his political opponents, as well as the political opponents of his allies and supporters.

248.  District Attorney Hynes was obligated to supervise and discipline the Assistant District Attorneys and Investigators at the KCDA to ensure that they did not commit these illegal and unethical acts.

249.  Despite knowing that Assistant District Attorneys and Investigators were committing these acts of misconduct, District Attorney Hynes failed to properly supervise or discipline them, which permitted this conduct to remain ongoing.

250.  Based upon the unlawful policy and custom which District Attorney Hynes sanctioned, and the acts committed pursuant thereto which District Attorney Hynes actively participated in, ADA Morelli, ADA O'Mara, ADA Amoroso, Investigator Presser, Assemblyman Brennan, Mr. Keefe, and Mr. Carroll committed illegal and unethical acts which directly resulted in O'Hara's indictment, conviction, and loss of liberty.

251.  If District Attorney Hynes had disciplined and/or prosecuted individuals who improperly used the KCDA to promote their political agendas, ADA Morelli, ADA O'Mara, ADA Amoroso, Investigator Presser, Assemblyman Brennan, Mr. Keefe, and Mr. Carroll would not have done so against O'Hara, and O'Hara's constitutional rights would not have been violated.

## O'HARA'S EXONERATION

252.  Despite numerous appeals and motions, O'Hara lived as a convicted felon for 20 years. He was subject to probation, completed 1,500 hours of community service, paid over $20,000 in fines and penalties, expended approximately $375,000.00 in costs and attorneys' fees, lost the right to vote, and was disbarred as an attorney.

253.  O'Hara never gave up on proving his innocence and worked diligently over the years to clear his name.

254.  After his appeals were unsuccessful, he sought pardons from Governors George Pataki, Eliot Spitzer, David Paterson, and Mario Cuomo.

255.  In the interim, he started participating in the democratic process again in order to remove corrupt judges, and well as District Attorney Hynes, from office.

256.  In June 2008, O'Hara applied to be re-admitted to the Bar of the State of New York. After a committee investigated the matter, it issued a report finding that it "has grave doubts that Mr. O'Hara did anything that justified his criminal prosecution." It further found that O'Hara "has the requisite character and fitness to be reinstated as a member of the bar." *See* Exhibit K.

257.  Accordingly, on October 6, 2009, O'Hara was finally reinstated to the bar, after having been disbarred for 12 years.

258.  In 2013, District Attorney Hynes lost his campaign for reelection to Kenneth P. Thompson, who had run a campaign highlighting District Attorney Hynes's abuse of his prosecutorial power, focusing for example on the prosecution of O'Hara and the actions against Judge Phillips, whom District Attorney Hynes had silenced.

259.  District Attorney Thompson created a Conviction Review Unit ("CRU") to examine the many troubling prosecutions obtained by District Attorney Hynes. Prior to reviewing O'Hara's case, the CRU overturned 21 convictions which were dubiously obtained by District Attorney Hynes.

260.  In 2014, O'Hara asked the CRU to review his case. Thereafter, in January 2015, he filed a motion to vacate his conviction based upon selective prosecution.

261.  The CRU conducted a complete review of O'Hara's case. As part of its review, investigators spoke with Ms. Vales, who admitted to them that she had not testified truthfully during O'Hara's third trial, and the CRU concluded that her testimony was so severely false and misleading that it resulted in an unjust conviction.

262.  Based upon the CRU's investigation, On January 12, 2017, the KCDA ultimately stipulated to vacating O'Hara's conviction on the grounds that "[t]he People recently discovered that a material witness who testified against Defendant at trial provided false and misleading testimony which was of such character that had the witness testified truthfully, the verdict would have been more favorable to Defendant." *See* Exhibit L.

263.  Given the stipulation, O'Hara withdrew his pending motion to vacate his conviction based upon selective prosecution. *See id.* at 2.

264.  Given the stipulation to vacate O'Hara's conviction, on January 12, 2017, the KCDA also moved to dismiss the indictment against O'Hara on the grounds that

> there is no present ability nor any desire to retry Mr. O'Hara on this case. Because of this revelation and many others, we've had the

occasion to examine all of the evidence in the case; the evidence which was printed at trial, evidence which was not presented at trial, newly discovered evidence, and on balance, it appears to the People that this case has reasonable doubt in it which we don't believe could or should result in a verdict of guilt beyond a reasonable doubt, and because of that, Your Honor, because of that uncertainty, we would posit that justice would not be served by going forward with the trial against Mr. O'Hara, that it would not be served by continuing this indictment in any fashion and ask that on that basis, in the interest of justice, that the indictment also be dismissed and sealed.

*See* Exhibit M at 7:2-18.

265.  On January 12, 2017, the Honorable Miriam Cyrulnik so-ordered the stipulation in open court, vacated O'Hara's conviction, and dismissed the indictment against him. *See* Exhibit L; Exhibit M at 7:19-8:7.

266.  Based upon Defendants' conduct, O'Hara was falsely arrested, maliciously and selectively prosecuted, his Due Process and First Amendment rights, as well as additional civil rights, were violated, and he lost his liberty.

267.  Based upon Defendants' conduct, O'Hara also suffered additional damages which are described below.

268.  O'Hara was criminally tried three times, was convicted twice of crimes he did not commit, and therefore lived as a convicted felon, and with the stigma that attaches thereto, for 20 years.

269.  O'Hara was sentenced to five years' probation. Although that sentence was not reinstated after his first conviction was vacated, while on probation, O'Hara could not leave New York City without permission from his probation officer.

270.  O'Hara's girlfriend, Vicki, lived in New Jersey, and in order to visit her there, he was required to submit a written application stating where he intended to go, how long he intended to remain there, and what he intended to do there. O'Hara was given permission to visit his girlfriend in New Jersey approximately once a month.

271.  O'Hara was also sentenced to complete 1,500 hours of community service. He cleaned bathrooms and toilets, and picked up trash, in sixteen parks, sometimes encountering individuals from his community whom he knew.

272.  O'Hara was also sentenced to pay $20,615.60 in penalties and restitution.

273.  In addition to the penalties and restitution, O'Hara spent approximately $375,000 in attorneys' costs and fees in defending against the false charges through three criminal trials, countless motions, and several appeals.

274.  Because O'Hara was a convicted felon, he was disbarred from the practice of law for 12 years, from November 10, 1997 through October 6, 2009.

275.  O'Hara had worked at a litigation firm defending insurance companies, and then as a solo practitioner where he worked on plaintiffs' negligence cases. Once disbarred, O'Hara lost significant potential earning which he would have made through the practice of law. O'Hara only started earning an income once he was reinstated to the Bar of the State of New York.

276.  Because O'Hara was a convicted felon, he also lost the right to vote for ten years, from when he was initially sentenced in 1997, until 2007. Prior to his conviction, O'Hara had never missed an opportunity to vote in an election. Once while on vacation, he even travelled three hours by bus each way in order to come back and vote.

277.  Because O'Hara was a convicted felon, his relationship with his girlfriend was impacted, and he could not marry or start a family.

278.  O'Hara's girlfriend, Vicki, was, and is, an executive at a casino in Atlantic City. Her job requires her to maintain a top level gaming license, and in order to do so, she cannot associate with convicted felons. Although O'Hara and Vicki wanted to marry and start a family, they could not do so while O'Hara remained a convicted felon.

279.  Although O'Hara and Vicki are still in a relationship and intend on marrying now that he was exonerated, too much time has passed and he can no longer start a family.

280.  Additionally, O'Hara suffered mental and emotional distress, including anxiety, stress, difficulty sleeping, nightmares when he did sleep (particularly when he was advised that District Attorney Hynes would be seeking a three-to-five year prison sentence), and extreme humiliation. His reputation was also permanently damaged.

## CAUSES OF ACTION

### ONE
### 42 U.S.C. § 1983 – Conspiracy

281.  Plaintiff repeats and realleges the allegations set forth in paragraphs 1-280 as though fully set forth herein.

282.  Defendants District Attorney Hynes, ADA Morelli, ADA O'Mara, ADA Amoroso, Investigator Presser, Assemblyman Brenna, Mr. Keefe, Mr. Carroll, and Mr. Waite conspired to violate O'Hara's constitutional rights and to deprive him of his civil liberties.

283.  Defendants intentionally entered into an agreement to put an end to O'Hara's political activities, and to punish him for his political acts in opposing the 'Brooklyn Democratic Machine,' by having him prosecuted for crimes he did not commit, in violation of O'Hara's

constitutional rights.

284.  Each defendant thereafter committed overt acts in furtherance of the conspiracy, and intentionally participated in the furtherance of their agreement.

285.  In furtherance of the conspiracy to procure O'Hara's unlawful indictment and conviction, ADA Morelli, ADA O'Mara, ADA Amoroso, Investigator Presser, Assemblyman Brennan, Mr. Keefe, and Mr. Carroll entered into further agreements with Lozano and Munos to have them provide false testimony before the Grand Jury that indicted O'Hara, and at O'Hara's three trials, with Vales to provide false testimony at O'Hara's third trial, and with Perez not to testify on O'Hara's behalf at his second and third trial.

286.  As a result of Defendants' agreement to violate O'Hara's constitutional rights, and as a result of the overt acts committed in furtherance of the conspiracy, O'Hara was maliciously prosecuted, wrongfully convicted, and his due process and First Amendment rights were violated.

## TWO
## 42 U.S.C. § 1983 – Malicious Prosecution (4th Amendment)

287.  Plaintiff repeats and realleges the allegations set forth in paragraphs 1-286 as though fully set forth herein.

288.  Defendants initiated, and continued, a criminal proceeding against O'Hara, and did so without probable cause.

289.  Defendants acted maliciously, and for a purpose other than bringing O'Hara to justice.

290.  O'Hara was indicted, arrested, arraigned, and tried three times based upon the false charges filed against him, therefore he was seized and his personal liberty and privacy was infringed upon.

291.  Although O'Hara was indicted by a Grand Jury, the indictment was procured by misconduct undertaken in bad faith, fraud, perjury, misrepresentation and falsification of evidence, withholding of exculpatory evidence, and the failure to make a full and complete statement of facts to the grand jurors.

292.  After twenty years, the criminal proceedings were finally terminated in O'Hara's favor on January 12, 2017.

## THREE

**42 U.S.C. § 1983 – Due Process Fabricating/Falsifying Evidence (14th Amendment)**

293.  Plaintiff repeats and realleges the allegations set forth in paragraphs 1-292 as though fully set forth herein.

294.  Defendants fabricated evidence against O'Hara prior to the start of O'Hara's criminal proceedings while they were 'investigating' the case, and continued fabricating evidence while O'Hara's criminal proceedings were pending, by influencing and coercing witnesses to testify falsely against O'Hara.

295.  Defendants fabricated evidence against O'Hara prior to the start of O'Hara's criminal proceedings while they were 'investigating' the case, and continued fabricating evidence while O'Hara's criminal proceedings were pending, by knowingly soliciting false statements and testimony from witnesses

296.  Defendants fabricated evidence against O'Hara prior to the start of O'Hara's criminal proceedings while they were 'investigating' the case, and continued fabricating evidence while O'Hara's criminal proceedings were pending, by knowingly making false statements and omissions which were material to the proceedings.

297.  The fabricated evidence was the direct and proximate cause of O'Hara's indictment and convictions as he would not have been indicted or convicted if Defendants had not fabricated the evidence against him.

298.  Therefore, each of these fabricated acts were part of the chain of causation which deprived O'Hara of his liberty

**FOUR**
**42 U.S.C. § 1983 – Malicious Abuse of Process/Denial of Procedural Due Process**

299.  Plaintiff repeats and realleges the allegations set forth in paragraphs 1-298 as though fully set forth herein.

300.  Defendants employed regularly issued legal process—a criminal prosecution—in order to compel forbearance of some act, and in order to achieve an improper collateral objective outside the legitimate ends of such process—namely to silence O'Hara's political voice and eliminate him as a political opponent to the established 'Brooklyn Democratic Machine,' to punish him for his prior political activities in opposition to the established 'Brooklyn Democratic Machine,' to prevent him from pursuing legal action pertaining to the election for Kings County Surrogate Court Judge, and to benefit from political endorsements and support which were contingent on the KCDA prosecuting O'Hara.

301.  Additionally, Defendants continued the prosecution against O'Hara in order to prevent O'Hara from filing a civil suit for damages against them, which would be contingent on O'Hara receiving a favorable termination.

302.  Defendants criminally prosecuted O'Hara for the express purpose and intent of causing him unjustified harm, and in doing so, violated O'Hara's clearly established constitutional rights.


### FIVE
### 42 U.S.C. § 1983 – Retaliation (1st Amendment)

303.  Plaintiff repeats and realleges the allegations set forth in paragraphs 1-302 as though fully set forth herein.

304.  O'Hara had an interest protected by the First Amendment—the right to participate in the electoral process through both political expression and political association, which included the right to vote, the right to run for public office, and the right to support specific candidates for public office.

305.  Defendants retaliated against O'Hara because he exercised his right of political expression and political association. They unlawfully prosecuted O'Hara without probable cause in an effort to silence his political speech and association.

306.  Defendants' actions achieved the intended goal and they chilled O'Hara's exercise of political expression and political association, as O'Hara was legally barred from voting for ten years, he could not actively support political candidates while his three criminal trials and the related motions and appeals were pending, and he could not run for public office.


### SIX
### 42 U.S.C. § 1983 – Supervisory Liability

307.  Plaintiff repeats and realleges the allegations set forth in paragraphs 1-307 as though fully set forth herein.

308.  Defendants violated O'Hara's constitutional rights as discussed above.

309.  District Attorney Hynes was ADA Morelli, ADA O'Mara, Investigator Presser, and the additional KCDA investigators who 'investigated' O'Hara's supervisor, and he supervised Assemblyman Brennan, Mr. Keefe, and Mr. Carroll's conduct as well, as it pertained to their violation of O'Hara's constitutional rights.

310.  District Attorney Hynes also directly participated in the violation of O'Hara's constitutional rights by initially entering into the agreement with Assemblyman Brennan to have O'Hara indicted for some unknown crime which ultimately resulted in O'Hara's indictment and conviction, and thereafter by approving and overseeing the other defendants' unlawful conduct, and the subsequent unlawful actions taken while the prosecution was pending, which violated O'Hara's constitutional rights.

311.  District Attorney Hynes's conduct was even more egregious, as he himself had created a

policy and custom within the KCDA pursuant to which he utilized the KCDA to maliciously eliminate his political opponents and pursue them with criminal charges and other legal action, as well as the political opponents of the 'Brooklyn Democratic Machine,' in order to silence their political opposition.

312.   After District Attorney Hynes set the wheels in motion to have O'Hara maliciously prosecuted, and then not only did he fail to remedy the violation and was grossly negligent in supervising his subordinates who were continuing to violate O'Hara's constitutional rights, but he was deliberately indifferent to the fact that O'Hara's constitutional rights were violated because his aim at inhibiting O'Hara's political speech was being accomplished.

313.   ADA Morelli, the Chief of the Investigations Bureau, was ADA O'Mara and Investigator Presser's supervisor in the O'Hara prosecution. He too, directly participated in the violation of O'Hara's constitutional rights by entering into the agreement to have O'Hara prosecuted for crimes he did not commit and thereafter by taking overt acts in furtherance of the conspiracy, as well as by supervising ADA O'Mara and Investigator Presser's unlawful acts in furtherance of the conspiracy.

314.   After ADA Morelli entered into the agreement to have O'Hara maliciously prosecuted for crimes he did not commit, as District Attorney Hynes had done, ADA Morelli then failed to remedy ADA O'Mara and Investigator Presser's violation of O'Hara's constitutional rights, was grossly negligent in supervising them, and was deliberately indifferent to the fact that O'Hara's constitutional rights were violated because his aim at inhibiting O'Hara's political speech was being accomplished, and he was guaranteed Assemblyman Brennan's support at the judicial convention.

315.   ADA O'Mara was Investigator Presser's supervisor with respect to the O'Hara investigation, as he not only supervised Investigator Presser's actions, but he also directed Investigator Presser to intimidate witnesses and coerce witnesses to testify falsely against O'Hara.

316.   As with District Attorney Hynes and ADA Morelli, ADA O'Mara failed to remedy Investigator Presser's violation of O'Hara's constitutional rights, was grossly negligent in supervising Investigator Presser to ensure he does not violate O'Hara's constitutional rights, and was deliberately indifferent to the fact that O'Hara's constitutional rights were violated because his aim at inhibiting O'Hara's political speech was being accomplished.

317.   District Attorney Hynes, ADA Morelli, and ADA O'Mara are therefore liable for the actions of the individual defendants whom they supervised, which violated O'Hara's constitutional rights.

**SEVEN**

**42 U.S.C. § 1983 – Selective Prosecution**

318.  Plaintiff repeats and realleges the allegations set forth in paragraphs 1-317 as though fully set forth herein.

319.  O'Hara was the only person ever prosecuted and tried for filing a false instrument, registering to vote, and voting, due to an allegation that he did not live at the address he utilized for those purposes, despite the fact that Defendants knew of numerous other individuals who were guilty of those crimes.

320.  Compared with others similarly situated, O'Hara was selectively treated and prosecuted.

321.  O'Hara was selectively treated and prosecuted based upon impermissible considerations and a malicious and bad faith intent to harm him—namely, to inhibit the exercise of his First Amendment right of political expression, to silence O'Hara's political voice and eliminate him as a political opponent to the established 'Brooklyn Democratic Machine, to punish him for his prior acts in opposition to the established 'Brooklyn Democratic Machine, and to benefit from political endorsements and support which were contingent on the KCDA prosecuting O'Hara.

**EIGHT**
**42 U.S.C. § 1983 – *Monell* Claim**

322.  Plaintiff repeats and realleges the allegations set forth in paragraphs 1-321 as though fully set forth herein.

323.  District Attorney Hynes, when acting as the manager of the Kings County District Attorney's Office, acted a New York City policymaker.

324.  Therefore, City of New York is liable for District Attorney Hynes's conduct insofar as he acted as a New York City policymaker, which resulted in the violation of O'Hara's constitutional rights.

325.  Additionally, the KCDA, through District Attorney Hynes, maintained an unlawful policy and custom of conducting illegal and unethical acts, including fabricating evidence, harassing, intimidating and bribing witnesses to provide false testimony, and filing false criminal charges, against political opponents of District Attorney Hynes and his political allies.

326.  District Attorney Hynes, the manager of the KCDA, knew of the unlawful policy and custom, failed to supervise or discipline his Assistant District Attorneys and Investigators who committed unlawful and improper acts pursuant to the policy and custom, and remained deliberately indifferent thereto.

327.  As a result of the unlawful policy and custom, O'Hara's constitutional rights were violated.
328.  Therefore, the City of New York is liable for the KCDA's unlawful policy and custom

which the individual defendants acted pursuant to, which resulted in the violation of O'Hara's constitutional rights.

## NINE
## Pendent State Claims – Malicious Prosecution

329.  Plaintiff repeats and realleges the allegations set forth in paragraphs 1-328 as though fully set forth herein.

330.  Defendants initiated, and continued, a criminal proceeding against O'Hara, and did so without probable cause.

331.  Defendants acted maliciously, and for a purpose other than bringing O'Hara to justice.

332.  O'Hara was indicted, arrested, arraigned, and tried three times based upon the false charges filed against him, therefore he was seized and his personal liberty and privacy was infringed upon.

333.  Although O'Hara was indicted by a Grand Jury, the indictment was procured by misconduct undertaken in bad faith, fraud, perjury, misrepresentation and falsification of evidence, withholding of exculpatory evidence, and the failure to make a full and complete statement of facts to the grand jurors.

334.  After twenty years, the criminal proceedings were finally terminated in O'Hara's favor on January 12, 2017.

## TEN
## Pendent State Claims – Conspiracy

335.  Plaintiff repeats and realleges the allegations set forth in paragraphs 1-334 as though fully set forth herein.

336.  Defendants conspired to violate O'Hara's constitutional rights and to deprive him of his civil liberties.

337.  Defendants intentionally entered into an agreement to put an end to O'Hara's political activities, and to punish him for his political acts in opposing the 'Brooklyn Democratic Machine,' by having him prosecuted for crimes he did not commit, in violation of O'Hara's constitutional rights

338.  Each defendant thereafter committed overt acts in furtherance of the conspiracy, and intentionally participated in the furtherance of their agreement.

339.  In furtherance of the conspiracy to procure O'Hara's unlawful indictment and conviction,

ADA Morelli, ADA O'Mara, ADA Amoroso, Investigator Presser, Assemblyman Brennan, Mr. Keefe, and Mr. Carroll entered into further agreements with Lozano and Munos to have them provide false testimony before the Grand Jury that indicted O'Hara, and at O'Hara's three trials, with Vales to provide false testimony at O'Hara's third trial, and with Perez not to testify on O'Hara's behalf at his second and third trial.

340.  As a result of Defendants' agreement to violate O'Hara's constitutional rights, and as a result of the overt acts committed in furtherance of the conspiracy, O'Hara was maliciously prosecuted, wrongfully convicted, and his due process and First Amendment rights were violated.

341.  While under New York law a claim for conspiracy which, other than the conspiracy element, is duplicative of a tort sufficiently plead against a defendant cannot be maintained as such, Plaintiff pleads conspiracy under New York law in the alternative as to each Defendant in the event that the pendent state claims for malicious prosecution cannot be maintained against any particular Defendant.


**ELEVEN**
**Pendent State Claims – Fabricating Evidence**

342.  Plaintiff repeats and realleges the allegations set forth in paragraphs 1-341 as though fully set forth herein.

343.  Defendants fabricated evidence against O'Hara prior to the start of O'Hara's criminal proceedings while they were 'investigating' the case, and continued fabricating evidence while O'Hara's criminal proceedings were pending, by influencing and coercing witnesses to testify falsely against O'Hara.

344.  Defendants fabricated evidence against O'Hara prior to the start of O'Hara's criminal proceedings while they were 'investigating' the case, and continued fabricating evidence while O'Hara's criminal proceedings were pending, by knowingly soliciting false statements and testimony from witnesses.

345.  Defendants fabricated evidence against O'Hara prior to the start of O'Hara's criminal proceedings while they were 'investigating' the case, and continued fabricating evidence while O'Hara's criminal proceedings were pending, by knowingly making false statements and omissions which were material to the proceedings.

346.  The fabricated evidence was the direct and proximate cause of O'Hara's indictment and convictions as he would not have been indicted or convicted if Defendants had not fabricated the evidence against him.

347.  Therefore, each of these fabricated acts were part of the chain of causation which deprived O'Hara of his liberty.

**TWELVE**

**Pendent State Claims – Respondeat Superior/Vicarious Liability**

348.  Plaintiff repeats and realleges the allegations set forth in paragraphs 1-347 as though fully set forth herein.

349.  Defendants District Attorney Hynes, ADA Morelli, ADA O'Mara, ADA Amoroso, Investigator Presser, and the additional investigators who 'investigated' O'Hara but whose identities Plaintiff does not yet know, were at all times acting under color of State law and within the scope of their employment when they violated O'Hara's constitutional rights and committed the various torts against him, as outline above.

350.  As their employer, the City of New York is vicariously liable for their actions pursuant to the doctrine of respondeat superior.

**WHEREFORE**, Plaintiffs request the following relief jointly and severally as against all the defendants:

1. A trial by jury on all issues;

2. An award of compensatory damages in the amount of $21,000,000;

3. An award of punitive damages in the amount of $42,000,000;

4. Disbursements, costs, and attorneys' fees pursuant to 42 U.S.C. § 1988; and

5. Such other and further relief as this Court may deem just and proper.


Dated: Mineola, New York
      August 15, 2017

Respectfully submitted,


Law Offices of Dennis J. Kelly, P.C.
*Attorneys for Plaintiff*
137 Glen Head Road
Glen Head, New York 11545
(516) 686-6768

By:      s/ Dennis Kelly
        Dennis J. Kelly, Esq. (DJK6093)



The Law Office of Anthony M. Grandinette
*Attorneys for Plaintiff*
114 Old Country Road, Suite 420
Mineola, New York 11501
(516) 877-2889

By:      s/ Mirel Fisch
        Mirel Fisch, Esq. (MF7826)
        Anthony M. Grandinette, Esq. (AMG5913)