UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x
JOHN O'HARA

                Plaintiff,                  MEMORANDUM AND ORDER
                                              17-CV-4766

  - against -

CITY OF NEW YORK, DISTRICT ATTORNEY
CHARLES J. HYNES, ASSISTANT DISTRICT
ATTORNEY JOHN P. O'MARA, ASSISTANT
DISTRICT ATTORNEY ANGELO M. MORELLI,
ASSISTANT DISTRCT ATTORNEY DINO AMOROSO,
DISTRICT ATTORNEY INVESTIGATOR ALLEN PRESSER,
ASSEMBLYMAN JAMES F. BRENNAN, JOHN W.
CARROLL, ESQ., JOHN KEEFE, AND JEFFREY WAITE,
ESQ.,

                Defendants.
------------------------------------------------------------x
GLASSER, Senior United States District Judge:

      Plaintiff John O'Hara ("Plaintiff" or "O'Hara") brought this action against Defendants City of New York (the "City"), former District Attorney Charles J. Hynes ("DA Hynes"), Assistant District Attorney John P. O'Mara ("ADA O'Mara"), Assistant District Attorney Angelo M. Morelli ("ADA Morelli"), Assistant District Attorney Dino Amoroso ("ADA Amoroso"), District Attorney Investigator Allen Presser ("Investigator Presser"), (collectively the "DA Defendants"), Assemblyman James F. Brennan ("Assemblyman Brennan"), John Keefe ("Keefe"), Jeffrey Waite, Esq. ("Waite"), (collectively the "State Defendants"), and John W. Carroll, Esq. ("Carroll"), (together with the DA Defendants and State Defendants, the "Defendants"), alleging conspiracy, malicious prosecution, abuse of process, retaliation, supervisory liability, selective prosecution, fabrication of evidence, and *Monell* claims in violation of the First, Fourth, and Fourteenth Amendments to the United States Constitution and the Constitution and laws of the State of New York. (ECF No. 1, "Compl."). The crux of all 12 claims is that Defendants

1

orchestrated a politically motivated conspiracy and baseless prosecution designed to neutralize and punish O'Hara for his political activities against the "Brooklyn Democratic Machine." Pending before the Court are Defendants' motions to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure and O'Hara's motion to strike Defendants' reply briefs. (ECF Nos. 28-30, 47). For the reasons explained below, the parties' motions are **GRANTED IN PART AND DENIED IN PART**.

## BACKGROUND

### The Parties

O'Hara is an attorney who has periodically resided on 61st Street in Brooklyn, New York, since 1980. (Compl. ¶¶ 23, 55). His former girlfriend, Magaly Lucas, owned a brownstone on 47th Street, which is in a different election district, and in October 1992, he moved into the basement apartment of that brownstone. (*Id.* at ¶¶ 56-58). While he maintained his lease on 61st Street because it was a rent stabilized apartment, he changed his address to 47th Street with Chase bank, American Express, the Office of Court Administration, and the New York City Campaign Finance Board. (*Id.* at ¶¶ 58-60). He received mail at the 47th Street address and spent most nights there. (*Id.*). He lived there for approximately one year, until November 1993, when Lucas sold the brownstone to three of her tenants, causing him to move to 4th Avenue for a short period until he eventually moved back to 61st Street. (*Id.* at ¶¶ 63, 108).

O'Hara is a registered Democrat and was a political activist in the 1980's and 1990's. In 1989, he supported DA Hynes in his campaign for the Office of Kings County District Attorney ("KCDA"). (*Id.* at ¶ 24). DA Hynes was in office from 1989 until 2013, when he lost the election to District Attorney Kenneth P. Thompson ("DA Thompson"). As part of his campaign, DA Thompson highlighted certain abuses of DA Hynes' prosecutorial power, including using his

2

power to prosecute O'Hara for election fraud. (*Id.* at ¶ 258). On January 29, 2019, DA Hynes died. (ECF No. 57).

ADA O'Mara, ADA Morelli, and ADA Amoroso were all employed by the KCDA as Assistant District Attorneys while DA Hynes was in office. (*Id.* at ¶¶ 9-11). Investigator Presser was also employed by the KCDA during that period. (*Id.* at ¶ 12). Assemblyman Brennan was a member of the New York State Assembly. (*Id.* at ¶ 13). Carroll was his attorney, (*id.* at ¶ 14), and Keefe was his Chief of Staff. (*Id.* at ¶ 15). Waite was an investigating attorney with the New York State Board of Elections ("BOE"). (*Id.* at ¶ 16).

**The 1990 State Assembly Election**

In 1990, O'Hara ran against incumbent Assemblyman Brennan in the Democratic primary for a seat in the New York State Assembly. (*Id.* at ¶ 25). DA Hynes promised that in exchange for O'Hara's support in his bid for election, he would support O'Hara in his campaign against Brennan. (*Id.* at ¶ 27). However, he later made an agreement with Brennan that would require O'Hara to drop out of the race, leaving Brennan unopposed for the Assembly, and run unopposed for Democratic State Committee District Leader instead. (*Id.* at ¶ 29). ADA Amoroso presented this deal to O'Hara, but O'Hara declined and told ADA Amoroso that he will be running for State Assembly and expected DA Hynes' support as promised. (*Id.* at ¶ 30). He did run without Hynes' support and lost. (*Id.* at ¶ 31).

Over the next several years, O'Hara ran for office five more times against Assemblyman Brennan and supported other candidates running against Brennan and DA Hynes. (*Id.* at ¶¶ 31, 36-46).

**Defendants' Investigation and Prosecution of O'Hara**

O'Hara alleges that after the 1990 election, DA Hynes and Assemblyman Brennan developed a "personal and professional animus" toward him. (*Id.* at ¶ 32). For example, Assemblyman Brennan filed a complaint with the Committee on Character and Fitness opposing O'Hara's admission to the New York State Bar, claiming that O'Hara is "morally depraved." (*Id.* at ¶ 33). He was also quoted by the *New York Times* stating, "John O'Hara is a pathological liar and fraud and a danger to the public because of his fraud." (*Id.* at ¶ 34).

Further, in 1994, Assemblyman Brennan, Keefe, and Carroll hired a private investigator to report on O'Hara's residency and allegedly planned to use that information to eliminate him as a political opponent. (*Id.* at ¶ 65). Because those efforts were ultimately unsuccessful, O'Hara claims that Defendants conspired to retaliate against him by conjuring up an election crime and indicting and prosecuting him for that crime. (*Id.* at ¶¶ 65-68).

In 1996, DA Hynes arranged a meeting at the KCDA with ADA Morelli, ADA O'Mara, Assemblyman Brennan, and Keefe to discuss a plan to prosecute O'Hara for allegedly voting out of a residence in which he did not live, knowing that the charges would be baseless. (*Id.* at ¶¶ 88, 90, 92). Assemblyman Brennan pledged his support for ADA Morelli's Democratic nomination for Supreme Court Justice in 1997 in exchange for ADA Morelli pursuing a criminal prosecution against O'Hara. (*Id.* at ¶ 94). ADA Amoroso and Carroll went along with this plan. (*Id.* at ¶ 89). O'Hara alleges that the DA Defendants and State Defendants falsely claimed that the BOE was investigating O'Hara for violating the election laws, and it wanted the assistance of the KCDA. (*Id.* at ¶ 95). They allegedly induced Waite, an attorney at the BOE, to go along with this plan. (*Id.* at ¶ 97).

4

After Defendants agreed to prosecute O'Hara, he claims that he was under constant surveillance. (*Id.* at ¶ 75). More specifically, a black car registered to the KCDA was frequently parked outside his home, his mail was held at the post office until the KCDA had an opportunity to search through it, the KCDA subpoenaed his bank for his bank records, Investigator Presser and others from the KCDA frequently showed up at his 61st Street address, his parents' home, and his campaign headquarters to ask questions about him, and children who played outside his 61st Street address were threatened that if they did not tell individuals from the KCDA something "bad" about O'Hara, they would be pulled out of their classrooms. (*Id.* at ¶¶ 76-80). O'Hara alleges that these surveillance tactics were orchestrated by ADA O'Mara, Investigator Presser, Assemblyman Brennan, Keefe, and Carroll, (*id.* at ¶ 81), and that they used the New York City Police Department ("NYPD") to aid their surveillance and investigation. (*Id.* at ¶¶ 82-83).

O'Hara also alleges that ADA O'Mara, Waite, and investigators from the KCDA repeatedly intimidated his 83-year-old landlord at his 4th Avenue address by, among other things, going to her coffee shop on the ground floor of the building and harassing her with the intention of eliciting from her that O'Hara did not live there. (*Id.* at ¶¶ 104, 106). The ongoing harassment due to O'Hara's presence caused her to evict him from his 4th Avenue home and force him to move back to his 61st Street address. (*Id.* at ¶ 108).

Because those tactics did not produce incriminating evidence, ADA O'Mara, Investigator Presser, Assemblyman Brennan, Keefe, and Carroll agreed to falsify evidence. (*Id.* at ¶ 110). More specifically, they agreed to illicit false testimony from the three men who lived at and eventually purchased the 47th Street brownstone from Lucas, to say that O'Hara never lived there. (*Id.* at ¶¶ 111-118). In exchange for this false testimony, the DA Defendants agreed not to prosecute them for running their own illegal enterprises. (*Id.* at ¶¶ 118-119).

5

O'Hara was arrested in October 1996 and was charged with one count of offering a false instrument for filing in the first degree under Penal Law § 175.35, one count of false registration under Election Law § 17-104(4), and five counts of illegal voting under Election Law § 17-132(3). (*Id.* at ¶¶ 128, 131). O'Hara claims that he was arrested and indicted without probable cause and that ADA O'Mara intentionally failed to present exculpatory evidence to the Grand Jury showing that O'Hara did in fact live in the district from which he was voting. (*Id.* at ¶¶ 133, 135-156).

**O'Hara's Three Criminal Trials**

O'Hara was tried three separate times for election fraud. (*Id.* at ¶ 157). The main issue in each trial was whether O'Hara lived in the basement apartment in the 47th Street brownstone between November 1992 and November 1993. (*Id.* at ¶¶ 157, 160). At O'Hara's first trial, he intended to call Lucas as a witness to testify that she owned the brownstone and that he did live there at that time. (*Id.* at ¶ 167). However, ADA O'Mara threatened that if Lucas testified on O'Hara's behalf, he would prosecute her for an alleged real estate scam involving the three tenants who purchased her brownstone and that she would lose her law license. (*Id.* at ¶ 169). As a result, Lucas did not testify. (*Id.* at ¶ 171). On May 13, 1997, O'Hara was found guilty on all seven felony counts and was sentenced to 5 years of probation, 1,500 hours of community service, and $14,192 in penalties. (*Id.* at ¶ 172). Given this conviction, he was disbarred from the practice of law. (*Id.* at ¶ 173).

In August 1998, the New York Appellate Division, Second Department, reversed O'Hara's conviction because of a missing witness charge. (*Id.* at ¶ 176). In anticipation of O'Hara's second trial, ADA O'Mara intimidated Lucas again to prevent her from testifying. (*Id.* at ¶ 179). After Lucas submitted an affidavit in support of O'Hara's post-conviction motion, ADA O'Mara subpoenaed her tax returns and other financial documents to give the impression that he was going

to prosecute her for something she did not do. (*Id.*). As a result, Lucas refused to testify in the second trial. (*Id.* at ¶ 180). ADA O'Mara also used intimidation tactics on other witnesses, such as threatening to prosecute one witness for perjury, which would cause him to lose his public housing, and to take away an award another witness was going to receive at the KCDA. (*Id.* at ¶¶ 181-190).

O'Hara's second trial resulted in a mistrial, but his third trial resulted in a conviction. (*Id.* at ¶¶ 192, 202). He claims that ADA O'Mara and Investigator Presser not only introduced the same false testimony as they did before, but also created new incriminating evidence. (*Id.* at ¶¶ 195-201). Although DA Hynes sought a 3-5 year prison sentence, (*id.* at ¶ 212), O'Hara was sentenced to a conditional discharge, conditioned on the fact that he "does not get into trouble" for three years, $14,615 in penalties and restitution, $6,000 in fines, and the completion of the 1,500 hours of community service he was sentenced to after his first trial. (*Id.* at ¶ 203). The Second Department and Court of Appeals affirmed his conviction. (*Id.* at ¶¶ 204-205).

**O'Hara's Exoneration**

On October 6, 2009, O'Hara was reinstated to the New York State Bar, which found that it "ha[d] grave doubts that Mr. O'Hara did anything that justified his criminal prosecution." (*Id.* at ¶¶ 256-57). Further, after DA Thompson won the election in 2013, he created a Conviction Review Unit to examine many troubling convictions obtained by DA Hynes, including O'Hara's conviction. (*Id.* at ¶ 259-260). On January 12, 2017, the KCDA vacated O'Hara's conviction because "[t]he People recently discovered that a material witness who testified against Defendant at trial provided false and misleading testimony which was of such character that had the witness testified truthfully, the verdict would have been more favorable to the Defendant." (*Id.* at ¶ 262). The KCDA also moved to dismiss the indictment against him because "it appears to the People

that this case has reasonable doubt in it which we don't believe could or should result in a verdict of guilt beyond a reasonable doubt, and . . . because of that uncertainty, we would posit that justice would not be served by going forward with the trial against Mr. O'Hara . . . ." (*Id.* at ¶ 264). The indictment was dismissed. (*Id.* at ¶ 265).

O'Hara was a convicted felon for 20 years, during which he was subject to probation supervision, 1,500 hours of community service, over $20,000 in fines and penalties, $375,000 in costs and attorneys' fees, a loss of the right to vote, and was disbarred. (*Id.* at ¶ 252). He also claims that he suffered anxiety, stress, difficulty sleeping, nightmares when he did sleep, extreme humiliation, and permanent damage to his reputation. (*Id.* at ¶ 280).

## **LEGAL STANDARD**

A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft* v. *Iqbal*, 556 U.S. 662, 663 (2009) (quoting *Bell Atlantic Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. In deciding a Rule 12(b)(6) motion, the Court must accept the non-moving party's factual allegations as true and draw all reasonable inferences in its favor. *ATSI Commc'ns, Inc. v. Shaar Fund, LTD.*, 493 F.3d 87, 98 (2d Cir. 2007). The Court may consider, in addition to the facts stated in the complaint, "any written instrument attached to the complaint," as well as "documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." *Id.*

# DISCUSSION

## I. Statute of Limitations

Carroll and the State Defendants argue that all of O'Hara's claims, except for his malicious prosecution claim, are time-barred. All parties agree that the statute of limitations for claims brought under 42 U.S.C. § 1983 and the related state law claims is three years from the date the cause of action accrues. *Smith v. Campbell*, 782 F.3d 93, 100 (2d Cir. 2015). While the statute of limitations for Section 1983 claims is determined by state law, "the accrual date of a [Section] 1983 cause of action is a question of federal law that is *not* resolved by reference to state law." *Id.* (emphasis in original). "It is the standard rule that accrual occurs when the plaintiff has a complete and present cause of action, that is, when the plaintiff can file suit and obtain relief." *Id.*

"Not every [Section] 1983 claim that arises out of a criminal case requires that the underlying criminal process reach a favorable determination . . . . Unlike malicious prosecutions, many violations of constitutional rights, even during the criminal process, may be remedied without impugning the validity of a conviction." *Smith v. Campbell*, 782 F.3d 93, 101 (2d Cir. 2015). Here, many of O'Hara's claims were actionable either at the time of his arrest in 1996, his first conviction in 1997, or his final conviction in 1999. *See DeMartino v. New York*, No. 12-CV-3319 (SJF), 2013 WL 3226789, at *13 (E.D.N.Y. June 24, 2013), *aff'd*, 586 F. App'x 68 (2d Cir. 2014) (a claim for abuse of process "accrues at such time as the criminal process is set in motion against the plaintiff . . . or when the plaintiff becomes aware that such process was employed for an inappropriate collateral objective."); *Smith*, 782 F.3d at 101 ("Just as in a false arrest claim, the [retaliatory prosecution claim] accrues when all of the elements necessary to state the claim are present, even though later developments in a related criminal action may ultimately effect the viability of the claim and a stay of the § 1983 action may be appropriate while the criminal action

9

pends."); *McDonough v. Smith*, 898 F.3d 259, 266 (2d Cir. 2018), *cert. granted*, No. 18-485, 2019 WL 166879 (U.S. Jan. 11, 2019) ("A fabrication of evidence claim accrues (1) when a plaintiff learns of the fabrication and it is used against him . . . and (2) his liberty has been deprived in some way."). Specifically, his abuse of process and retaliation claims accrued in 1996 when the "criminal process [was] set in motion" and he was arrested for the sole purpose of retaliation. His selective prosecution and fabrication of evidence claims accrued in 1997 when Defendants prosecuted him for a violation of election laws that historically have never been enforced, Defendants offered false testimony at trial, he was found guilty as a result of that false testimony, and he was deprived of his liberty through his probation supervision sentence. The Court recognizes that O'Hara was subject to three criminal trials, and the alleged violations of his constitutional rights continued until his final conviction in 1999. Nevertheless, because and he did not bring this action until 2017, well after the three-year statute of limitations period, his abuse of process, retaliation, selective prosecution, and fabrication of evidence claims are time-barred.

The parties do not dispute that O'Hara's malicious prosecution claims are timely. Regarding O'Hara's conspiracy claims, those "fail[] as a matter of law where there is no underlying constitutional violation." *Mitchell v. Cty. of Nassau*, 786 F. Supp. 2d 545, 564 (E.D.N.Y. 2011). Accordingly, to the extent his conspiracy claims are based on his malicious prosecution claims in violation of the Fourth Amendment, those are not time-barred. (Compl. ¶ 285) (alleging that Defendants "conspire[ed] to procure [his] unlawful indictment and conviction.").

## II. **Immunity**

The DA Defendants argue that they are (1) immune from suit in their official capacities under Sovereign Immunity, (2) immune from suit in their individual capacities under absolute prosecutorial immunity, or alternatively, (3) entitled to qualified immunity because it was

reasonable for them to investigate and prosecute O'Hara for voting out of district, as evidenced by the indictment against him. The State Defendants argue that Assemblyman Brennan and Keefe are entitled to legislative immunity and Waite is entitled to prosecutorial or semi-judicial immunity.

Where the plaintiff sues both the municipality and a municipal official in his official capacity, courts consistently dismiss the official capacity claim as "duplicative" of the claim against the municipality. *Perfetto v. City of New York*, No. 14 CIV. 2682 (ILG), 2015 WL 590205, at *3 (E.D.N.Y. Feb. 11, 2015). Because O'Hara has sued the City, his claims against the individual Defendants in their official capacities are dismissed as duplicative and the Court need not address the DA Defendants' sovereign immunity argument. The Court will address the rest of the immunity arguments below.

 a. *Absolute Prosecutorial Immunity*

DA Defendants and Waite argue that they are entitled to absolute prosecutorial immunity.[1] They are wrong. In determining whether particular actions of government officials satisfy the prerequisites of absolute immunity or only the perquisites of qualified immunity, the courts apply a "functional approach, which looks to the nature of the function performed, not the identity of the

---

[1] DA Defendants argue that they are entitled to prosecutorial immunity based on this Court's decision in *Perfetto v. City of New York*, No. 14-cv-2682 (ILG), 2015 WL 590205 (E.D.N.Y. Feb. 11, 2015). In that case, the KCDA filed a criminal complaint against Perfetto for the unauthorized practice of law when he appeared before the Brooklyn Criminal Court on behalf of a family member without a law license. *Id.* at *1. Perfetto brought suit for selective prosecution, alleging that Hynes and the KCDA only filed a criminal complaint to eliminate him as a political opponent. *Id.* The Court held that Hynes and the ADA defendants were entitled to absolute prosecutorial immunity because Perfetto's claims arose "entirely out of [the defendants'] decision to initiate and pursue the criminal proceeding against him." *Id.* at *3. This case is plainly distinguishable because O'Hara alleges investigatory conduct dating years prior to DA Defendants' initiation of the prosecution against him. Notably, there was no dispute in *Perfetto* that Perfetto did in fact appear in court without a law license.

actor who performed it." *Buckley v. Fitzsimmons*, 509 U.S. 259, 269 (1993) (internal citations omitted). While some conduct outside the courtroom that is "fairly within the prosecutor's function as an advocate," is entitled to absolute immunity, a prosecutor's administrative duties and those investigative functions that "do not relate to an advocate's preparation for the initiation of a prosecution . . . are not." *Id.* at 272-73. In other words, when a prosecutor "performs the investigative functions normally performed by a detective or police officer," he is only entitled to qualified immunity. *Id.* at 273. The official seeking absolute immunity bears the burden of showing that such immunity is recognized for the function in question. *Id.* at 269.

Moreover, as to the DA Defendants here, "[a] prosecutor neither is, nor should consider himself to be, an advocate before he has probable cause to have anyone arrested." *Id.* at 274. "A prosecutor may not shield his investigative work with the aegis of absolute immunity merely because, after a suspect is eventually arrested, indicted, and tried, that work may be retrospectively described as 'preparation' for a possible trial; every prosecutor might then shield himself from liability for any constitutional wrong against innocent citizens by ensuring that they go to trial." *Id.* at 276.

Neither the DA Defendants nor Waite is entitled to absolute prosecutorial immunity. O'Hara alleges that the DA Defendants acted as investigators, rather than advocates when they (i) orchestrated a conspiracy to neutralize O'Hara's political activities and to punish him for prior activities (Compl. ¶ 68), (ii) placed O'Hara under constant surveillance before he was indicted (Compl. ¶¶ 75-81), (iii) intimidated and harassed multiple witnesses (Compl. ¶¶ 104, 162, 169, 179, 181, 186, 189), (iv) induced witnesses to testify falsely at all three of O'Hara's trials (Compl. ¶ 162), (v) agreed to create false incriminating evidence (Compl. ¶ 110), (vi) intentionally withheld exculpatory evidence from the Grand Jury (Compl. ¶¶ 135-144), and (vii) agreed to prosecute

12

O'Hara without probable cause (Compl. ¶¶ 90, 92). O'Hara also alleges that Waite (i) was induced by the other Defendants to initiate the investigation and went along with their plan to prosecute him (Compl. ¶ 97), and (ii) coordinated with ADA O'Mara to harass O'Hara's former landlord. (Compl. ¶ 106). Because "the functions of [the] prosecutors and detectives [were] the same . . . the immunity that protects them is also the same" and the Defendants are only entitled to qualified immunity.[2] *Buckley*, 509 U.S. at 276.

### b. *Qualified Immunity*

"Under [qualified] immunity, government officials are not subject to [] liability for the performance of their discretionary functions when their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Buckley*, 509 U.S. at 268. In addition to the allegations described above, O'Hara also alleges that the State Defendants (i) filed a complaint with the Committee on Character and Fitness opposing his admission to the Bar (Compl. ¶ 33), (ii) said negative things about O'Hara in the media, damaging his reputation (Compl. ¶ 34), (iii) hired a private investigator to oppose his candidacy for certain political roles and illegally obtained confidential records (Compl. ¶¶ 65-66), (iv) made a deal with DA Hynes that provided for the prosecution of O'Hara in exchange for political pledges (Compl. ¶¶ 70, 94), and (v) led challenges against O'Hara's validating positions in court (Compl. ¶¶ 37-39, 43, 45). The Court finds that no reasonable government official would believe that these

---

[2] State Defendants' argument that "if the Court concludes the State Defendants are not absolutely immune, then they could not have been acting under color of state law," is flawed. (ECF No. 46 at 8). As O'Hara points out, if that were the case, then a public official who is not entitled to immunity could never be found liable under Section 1983, which defies common sense and established precedent. *West v. Atkins*, 487 U.S. 42, 49-50 (1988) ("State employment is generally sufficient to render the defendant a state actor . . . [and] a defendant in a § 1983 suit acts under color of state law when he abuses the position given to him by the State.").

actions did not violate clearly established statutory or constitutional rights and therefore, the Defendants are not entitled to qualified immunity.

### c. *Legislative Immunity*

State Defendants argue that Assemblyman Brennan and Keefe are entitled to legislative immunity. They note that the two factors relevant in determining whether a defendants' acts are within the "sphere of legitimate legislative activity" are (1) "whether the defendants' actions were legislative in form *i.e.*, whether they were integral steps in the legislative process," and (2) "whether defendants' actions were legislative in substance, *i.e.* whether the actions bore all the hallmarks of traditional legislation," including whether they "reflected . . . discretionary policymaking decisions implicating the budgetary priorities of the government and the services the government provides to its constituents." *State Employees Bargaining Agent Coal v. Rowland*, 494 F.3d 71, 89 (2d Cir. 2007). O'Hara's allegations compel the conclusion that the State Defendants' were strangers to legitimate legislative activity in form and in substance. Accordingly, these Defendants are not entitled to legislative immunity.

### d. *Judicial Immunity*

Waite also argues that he is entitled to quasi-judicial immunity, which applies to "administrative officials performing discretionary acts of a judicial nature." *Wetzel v. Town of Orangetown*, No. 06-CV-6117 (SCR), 2010 WL 743039, at *15 (S.D.N.Y. Mar. 2, 2010). Because Waite's alleged conduct, i.e. investigating O'Hara's residence and intimidating a witness, was not judicial in nature, he is not entitled to judicial immunity.

### III. O'Hara's Malicious Prosecution Claims

To determine whether a plaintiff has pleaded a Section 1983 claim against a state actor for malicious prosecution, the Court looks to the elements of that claim under New York law, which

are: "(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions." *Manganiello v. City of New York*, 612 F.3d 149, 160–61 (2d Cir. 2010). Each of these elements are addressed below.

Under New York law, "[a] criminal action is commenced by the filing of an accusatory instrument with a criminal court." N.Y. Crim. P. Law § 100.05. "[A] person who does not file a complaint commencing a criminal proceeding may be found to have instituted the proceeding for malicious prosecution purposes when the person plays an active role in the initiation and continuation of criminal proceedings against [the] plaintiff." *Mazza v. City of New York*, No. 98-CV-2343 (ILG), 1999 WL 1289623, at *6 (E.D.N.Y. July 13, 1999). The Court finds that O'Hara sufficiently alleged that all Defendants played an active role in the initiation and continuation of the criminal proceedings against him.[3] The Court also finds that the proceedings were terminated in a manner indicating O'Hara's innocence when his conviction was vacated and his indictment was dismissed. *Lanning*, 908 F.3d at 29.

"In the context of a malicious prosecution claim, probable cause under New York law is the knowledge of facts, actual or apparent, strong enough to justify a reasonable man in the belief that he has lawful grounds for prosecuting the defendant in the manner complained of." *DiBlasio v. City of New York*, 102 F.3d 654, 659 (2d Cir. 1996). Based on O'Hara's allegations, which the Court must accept as true at this stage, the Court finds that Defendants had no probable cause to arrest, indict, or prosecute O'Hara for voting out of residence, when he did, in fact, live at the 47th

---

[3] Carroll claims that he cannot be found liable for any of O'Hara's Section 1983 claims because he is not a state actor. Although a successful Section 1983 claim requires evidence of state action, liability may be imposed upon private individuals pursuant to a conspiracy theory, which O'Hara has alleged. *Mitchell v. Cty. of Nassau*, 786 F. Supp. 2d 545, 564 (E.D.N.Y. 2011); *See* Compl. ¶¶ 37-39, 43, 45, 65-66, 68, 74, 75-81, 90, 92, 110.

Street address between November 1992 and November 1993. Defendants' lack of probable cause is further supported by Lucas, a key witness who was intimidated by Defendants' before O'Hara's trials and whose statements were ultimately relied on to vacate O'Hara's conviction in 2017. While Defendants are correct that an indictment creates a presumption of probable cause, that presumption can be rebutted if, as alleged here, the indictment was obtained by falsifying evidence or withholding exculpatory evidence from the Grand Jury. *Savino v. City of New York*, 331 F.3d 63, 72 (2d Cir. 2003) (noting that the presumption may be rebutted "by evidence that the indictment was procured by fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith.").

Regarding the last element, the Court finds that O'Hara sufficiently alleged that Defendants acted with malice. In this context, malice means "that the defendant must have commenced the criminal proceeding due to a wrong or improper motive, something other than a desire to see the ends of justice served." *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 573 (2d Cir. 1996). In most cases, the lack of probable cause "tends to show that the accuser did not believe in the guilt of the accused, and malice may be inferred from the lack of probable cause." *Id.* Here, the Court will infer malice from the lack of probable cause and O'Hara's allegation that the Defendants prosecuted him "to neutralize [his] political activities and to punish him for prior political activities." (Compl. ¶ 68). Accordingly, Defendants' motion to dismiss O'Hara's malicious prosecution claims is denied.

### IV. O'Hara's Conspiracy Claims

To plead a Section 1983 conspiracy claim, the plaintiff must allege: "(1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing

16

damages." *Fiedler v. Incandela*, 222 F. Supp. 3d 141, 165 (E.D.N.Y. 2016). O'Hara sufficiently alleged that Defendants (i) orchestrated and conspired to neutralize O'Hara's political activities and to punish him for his prior activities (Compl. ¶ 68), (ii) agreed to prosecute O'Hara for voting out of a residence in which he did not live, knowing that the charges were baseless (Compl. ¶¶ 90, 92), (iii) agreed to create false incriminating evidence (Compl. ¶ 110), and (iv) agreed to exchange O'Hara's prosecution for political support (Compl. ¶ 94). He also specifically alleged many overt acts in furtherance of the conspiracy in addition to damages. Accordingly, Defendants' motion to dismiss his conspiracy claims is denied.

## V. O'Hara's Supervisory Liability Claims

O'Hara's supervisory liability claim under Section 1983 must be dismissed. *Iqbal*, 556 U.S. at 676-77 ("[A] plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."). His state law *respondeat superior* claim against the City is dismissed. The City cannot be held liable on a *respondeat superior* theory; instead, O'Hara must allege that Defendants implemented or executed the unlawful action pursuant to governmental policy or custom. *Monell v. Department of Social Services*, 436 U.S. 658 (1978). O'Hara has done so, and the Court will address that claim below.

## VI. O'Hara's *Monell* Claim

O'Hara also asserts a *Monell* claim against the City, which is derived from the Supreme Court's decision in *Monell v. Department of Social Services* (*supra*) and requires a plaintiff to establish three elements: "(1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Martin v. City of New York*, 627 F. Supp. 892, 895 (E.D.N.Y. 1985) (citing *Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983)). A custom or policy may be found in policy statements, ordinances, regulations, or decisions "officially

adopted and promulgated by that body's officers." *Monell*, 436 U.S. at 690. Second Circuit precedent plainly teaches that the City may be held liable under *Monell* for the alleged KCDA conduct at issue. *Bellamy v. City of New York*, No. 17-CV-1859 (JMW), 2019 WL 347201, at *21 (2d Cir. Jan. 29, 2019).

Although "official policy" often refers to formal rules or customs that intentionally establish "fixed plans of action" over a period of time, when a municipality "chooses a course of action tailored to a specific situation," this may also "represent an act of official government policy as that term is commonly understood." *Montero v. City of Yonkers, New York*, 890 F.3d 386, 403 (2d Cir. 2018). Such policies need not be authorized or ratified by multiple decisionmakers of the municipality; "even a single action by a decisionmaker who possesses final authority to establish municipal liability with respect to the action ordered may deprive the plaintiff his or her constitutional rights." *Id.* However, when a non-decisionmaker committed the constitutional violation, "the plaintiff must show that the decisionmaker ordered or ratified such a subordinate's conduct or was aware of a subordinate's unconstitutional actions, and consciously chose to ignore them, effectively ratifying the actions." *Id.*

O'Hara alleges that DA Hynes acted as a New York City policymaker and that through him, the KCDA "maintained an unlawful policy and custom of conducting illegal and unethical acts, including fabricating evidence, harassing, intimidating and bribing witnesses to provide false testimony, and filing false criminal charges against political opponents of DA Hynes and his political allies." (Compl. ¶ 325). He further alleges that in addition to instituting this policy, DA Hynes, "knew of the unlawful policy and custom, failed to supervise or discipline his Assistant District Attorneys and Investigators who committed unlawful and improper acts . . . and remained deliberately indifferent thereto." (*Id.* at ¶ 326). His Complaint provides many specific examples

18

supporting those allegations. (Compl. ¶¶ 236-251). Accordingly, the City's motion to dismiss O'Hara's *Monell* claim is denied.

VII. **O'Hara's Motion to Strike Defendants' Reply Briefs**

O'Hara moved to strike new arguments made and new documents presented in Defendants' reply papers. (ECF Nos. 44-46). The DA Defendants' reply brief is 50 pages, twice as many pages as their moving brief, and contains new arguments and attaches new documents, namely excerpts from O'Hara's 50-h deposition testimony and court documents from other matters. (ECF No. 44). The State Defendants' reply brief is a less offensive 23 pages, but it also includes new excerpts from O'Hara's 50-h deposition testimony and pages from the 1991 New York Red Book, which appears to be a biography of Assemblyman Brennan. (ECF No. 46). Finally, Carroll's reply brief is 21 pages, but does not include any new documents. (ECF No. 45).

Many of the arguments in the opening and reply briefs are based on O'Hara's deposition taken by the City pursuant to General Municipal Law § 50-h. The Court did not consider that testimony in deciding Defendants' motions to dismiss. The Court may consider "documents possessed by or known to the plaintiff *and* upon which it relied in bringing the suit," *ATSI Commc'ns,* 493 F.3d at 98 (emphasis added). While O'Hara mentioned in his Complaint that his 50-h deposition occurred, (Compl. ¶ 20), he stated nothing more. Accordingly, O'Hara did not rely on his 50-h deposition.

Given the length of the DA Defendants' reply brief and the fact that it contains new arguments and attaches new documents, the Court will strike it in its entirety. *Ernst Haas Studio, Inc. v. Palm Press, Inc.*, 164 F.3d 110, 112 (2d Cir. 1999) (noting that the reply brief was almost three times as long as the main brief and declining to "entertain" the new theories posed within it); *United States v. Townsend*, No. 15-CR-653 (DLI), 2016 WL 3562055, at *3 (E.D.N.Y. June 23,

19

2016). New arguments do not appear to be made in the State Defendants' or Carroll's reply briefs, so the court considered those briefs, but not any new documents attached to them. Accordingly, O'Hara's motion to strike is granted in part and denied in part.

## **CONCLUSION**

For the reasons set forth above, Defendants' motion to dismiss O'Hara's abuse of process, retaliation, fabrication of evidence, and selective prosecution claims is **GRANTED** as time-barred, Defendants' motion to dismiss O'Hara's supervisory liability claims is **GRANTED**, Defendants' motion to dismiss O'Hara's conspiracy, malicious prosecution, and *Monell* claims is **DENIED**, and O'Hara's motion to strike Defendants' reply briefs is **GRANTED IN PART AND DENIED IN PART**.

SO ORDERED.

Dated:	Brooklyn, New York
	May 31, 2019

/s                                          
I. Leo Glasser                              U.S.D.J.