UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------------------X
JOHN O'HARA,

                             Plaintiff,

              -against-

CITY OF NEW YORK, DISTRICT ATTORNEY CHARLES J.
HYNES, ASSISTANT DISTRICT ATTORNEY   JOHN P.
O'MARA, ASSISTANT DISTRICT ATTORNEY ANGELO M.
MORELLI, ASSISTANT DISTRICT ATTORNEY DINO
AMOROSO, DISTRICT ATTORNEY INVESTIGATOR ALLEN
PRESSER, ASSEMBLYMAN JAMES F. BRENNAN, JOHN W.
CARROLL, ESQ., JOHN KEEFE, and JEFFREY WAITE, ESQ.,

                            Defendants.
-----------------------------------------------------------------------------------X

            17-cv-4766 (ILG) (SMG)

            MOTION TO

            COMPEL DISCOVERY

      **PLEASE TAKE NOTICE** that upon the accompanying Memorandum of Law, and all prior proceedings in this case, Plaintiff, John O'Hara, will move this Court before the Honorable I. Leo Glasser, U.S.D.J., at the United States District Court for the Eastern District of New York, located at 225 Cadman Plaza East, Brooklyn, New York 11201, for an Order granting the plaintiff's motion to compel for non-party King's County District Attorney's office regarding redacted and withheld documents and for the unsealing of plaintiff's Grand Jury materials.

      **PLEASE TAKE FURTHER NOTICE** that pursuant to Local Civil Rule 6.1(b), opposition papers, if any, must be served within 14 days of the date these moving papers are served—on or before April 19,2024.

Dated: February 26, 2024
West Islip, New York

                             Dennis Kelly, Esq.
                             KELLY, & GROSSMAN, LLP
                             1248 Montauk Highway
                             West Islip, NY 11795

CC: All counsel via ECF

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------------------X
JOHN O'HARA,

                                         17-cv-4766 (ILG) (SMG)

                        Plaintiff,

             -against-

                                    FRCP RULE 37 CERTIFICATION

CITY OF NEW YORK, DISTRICT ATTORNEY CHARLES J.
HYNES, ASSISTANT DISTRICT ATTORNEY JOHN P.
O'MARA, ASSISTANT DISTRICT ATTORNEY ANGELO M.
MORELLI, ASSISTANT DISTRICT ATTORNEY DINO
AMOROSO, DISTRICT ATTORNEY INVESTIGATOR ALLEN
PRESSER, ASSEMBLYMAN JAMES F. BRENNAN, JOHN W.
CARROLL, ESQ., JOHN KEEFE, and JEFFREY WAITE, ESQ.,

                       Defendants.

-------------------------------------------------------------------------------X

      Dennis Kelly, Esq., pursuant to F.R.C.P. 37, affirms: The movant has in good faith conferred with opposing counsel and made a genuine effort to resolve the dispute by determining, without regard to technical interpretation of the language of a request, what the requesting party is actually seeking; what the discovering party is reasonably capable of producing that is responsive to the request; and what specific genuine issues, if any, cannot be resolved without judicial intervention. The attached Affirmation (**Exhibit A**) details the steps taken to resolve the dispute without judicial intervention.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------------------X
JOHN O'HARA,

                                       Plaintiff,

                    -against-

CITY OF NEW YORK, DISTRICT ATTORNEY CHARLES J.
HYNES, ASSISTANT DISTRICT ATTORNEY JOHN P. O'MARA,
ASSISTANT DISTRICT ATTORNEY ANGELO M. MORELLI,
ASSISTANT DISTRICT ATTORNEY DINO AMOROSO,
DISTRICT ATTORNEY INVESTIGATOR ALLEN PRESSER,
ASSEMBLYMAN JAMES F. BRENNAN, JOHN W. CARROLL,
ESQ., JOHN KEEFE, and JEFFREY WAITE, ESQ.,

                                   Defendants.

------------------------------------------------------------------------------------X

17-cv-4766 (ILG) (SMG)


## PLAINTIFF'S MEMORANDUM OF LAW
## IN SUPPORT OF HIS MOTION TO COMPEL


Dennis Kelly, Esq.
KELLY, & GROSSMAN, LLP
1248 Montauk Highway
West Islip, NY 11795
(631)314-4996

## PRELIMINARY STATEMENT

This motion seeks to unseal plaintiff's Grand Jury materials, as these documents are non-prejudicial, it is in the best interest of the public and plaintiff has a particularized compelling interest in these probative documents.  In addition, this motion addresses the production of the non-party Kings County District Attorney (KCDA) in response to the plaintiff's subpoena , a brief overview is presented to give this Court context to the requests for documents, including six specific documents, and how the interactions between the plaintiff, non-party KCDA, Jeffrey Waite, James Brennan, and John Carroll, the parties represented by the Attorney General (State defendants) have affected the production. Of the six documents, five of those documents appear to be Board of Elections documents. What is certain is that the following items were referenced in the KCDA's Conviction Review Unit's (CRU) Report, attached hereto as **Exhibit B**, on the John O'Hara conviction:

1. The complaint by then Assemblyman James Brennan that initiated the investigation;

2. The "Confidential Memo[1]" from defendant Jeffrey Waite to the Board of Commissioners recommending that the Board "investigate the validity of Mr. O'Hara's voter registration" (**Id., pg. 8**);

3. The notes taken by a Board Investigator at a meeting attended by defendants Waite, Brennan and Carrol on August 31, 1995;

4. The motion filed by Waite and the Board of Elections to unseal the trial transcript of the 1994 civil election case against O'Hara, including the transcript itself;

5. Waite's affirmation, attached to the January 27, 1996, motion.

---

[1] As described on pg. 8 of the CRU Report (KCDA 1169)

6. The O'Mara Affirmation. One week following the Supreme Court's decision denying the motion to unseal by Justice Irving Aronin, defendant O'Mara submitted an Affirmation in support of his request for a "So Ordered" subpoena for the trial transcript which contained false information. The Affirmation, according to the CRU Report, was based upon what Carroll and Brennan, both avowed and open political enemies of O'Hara told him.

The aforementioned items have not been produced. The State defendants filed a response to the plaintiff's requests for the documents above with the boiler-plate response: "The State Defendants will produce relevant unprivileged documents responsive to this request to the extent such documents are in their possession, custody, or control".

Plaintiff served a subpoena on the Board of Elections (BOE) seeking document production, including those documents above (**Exhibit C**). When the response failed to include those items, Plaintiff sent a letter to Brian Quall, Esq. of the Board of Elections documenting the Conviction Review Unit (CRU) report (**Exhibit D**). This report references five items, all BOE documents, meaning that the BOE was in possession of the documents at one point. The letter pointed out how the KCDA's CRU referenced them in their Report (**Exhibit B**). He responded, stating: "Per our phone conversation today, November 3, 2022, the State Board of Elections upon receipt of your letter subsequent to our response to your subpoena undertook an additional search and did not find any further responsive records".

On June 6, 2019, plaintiff served the subpoena that is the subject of this motion on the non-party Kings County District Attorney's office, which sought documents from the Conviction Review Unit of the KCDA (**Exhibit E**). In response, on June 22, 2019, KCDA produced seven

hundred eighteen pages (718) of documents (**Exhibit F**). This initiated extensive dialogue between the parties. These discussions resulted in supplemental responses from the non-party KCDA on March 5, 2021, which contained four-hundred nineteen (419) pages (**Exhibit G**) and on March 12, 2021, which contained fifty (50) additional pages (**Exhibit B**). The final KCDA production of documents, which contained seven hundred and forty-one (741) pages and was provided on December 3, 2023 (**Exhibit H).**

The non-party KCDA's CRU report detailed a series of events regarding defendant Carroll. There were a series of phone calls and meetings at Carroll's law offices between defendants Waite and Carroll. The meetings were to gather evidence regarding the plaintiff. The CRU report states that Carroll kept in regular phone contact with KCDA Chief of Investigations Angelo Morelli during the investigation and trials (**Exhibit B**, pg. 14, KCDA 1175).

The KCDA's CRU report contradicts the affidavit filed with this Court by defendant Carroll in support of his motion to dismiss on December 15, 2017. In the Carroll affidavit he states he was never retained or employed by co-defendant Brennan (**Exhibit I**, page 2). The CRU report details a series of meetings with co-defendants Brennan, Carroll, Waite and Waite's investigator at Carroll's law office. Carroll's affidavit states, "I never had any meetings with any of the named defendants in furtherance of prosecuting the plaintiff of any crimes" (**Id**, page 6). But the CRU report states Carroll kept in regular phone contact with the KCDA Chief of Investigations Angelo Morelli (**Exhibit B**, pg. 14, KCDA 1175).

Furthermore, in Carroll's affidavit he gratuitously brings his family into the politics stating his father was a founder of a "reform" club. Defendant Carroll neglects to mention his wife, Marybeth Carroll, served as co-defendant Brennan's Assembly staffer for 36 years, that his son

Robert Carroll replaced co-defendant Brennan in the State Assembly or that his other son, John Carroll Jr., is the deputy bureau chief of the civil litigation unit at the KCDA's office.

When co-defendant KCDA investigator Allen Presser picked up Carroll's investigation reports and files on the plaintiff O'Hara, the KCDA notes show the address is "416 7th Ave," which is the address for the office of Defendant Carroll's wife, Marybeth Carroll.

Since the last production of the 741-page document (**Exhibit H**), A.D.A Zachary Sneider has indicated he will not produce any additional disclosure asserting Grand Jury secrecy and privilege protections as reasons to withhold further disclosure. As will be discussed in this motion the documents produced by the KCDA contain voluminous portions that are redacted.

On February 25, 2022, the KCDA produced an extensive Privilege Log that detailed hundreds of redacted pages of the one-thousand two-hundred eleven (1953) pages of documents from the previous subpoena (**Exhibit B, F, G, H).** The response included a cover letter that noted the earlier production from the previous subpoena (¶ 10) and identified multiple objections, including procedural defects, vague and overbroad requests, and confidentiality. This motion seeks an Order to Produce pursuant to the 2019 subpoena alone. Following extensive discussions aimed at resolving the discovery issues without Court intervention (Kelly Aff., **Exhibit A**), Plaintiff files this motion seeking an order for production of the documents sought: unsealing of the grand Jury materials and an unredacted CRU report. The non-party KCDA has asserted Work Product and Law Enforcement privileges for a large portion of the redacted material[2]. The

---

[2] There are three assertions of privilege pursuant to CPL § 160.50, 160.58 and two for Attorney-Client privilege that are not the subject of this motion.

KCDA's February 25, 2022, response identifies the specific redactions, all of which will be addressed.

Plaintiff seeks an Order for the KCDA to Produce the documents we know they were in possession of during the pendency of the CRU investigation or, in the alternative, if they claim they are no longer in possession, an affidavit stating the relevant facts regarding how they are no longer in possession and what they did with the documents.

Plaintiff seeks an Order unsealing of the plaintiff's Grand Jury proceeding. On October 20,2023, O'Hara's motion to unseal the Grand Jury proceedings was denied by Hon. Rhona Tomlinson (**Exhibit J**). Plaintiff believes that the correct case law compels the discovery of the Grand Jury material. Included in the documents deemed to be Grand Jury material is the Affirmation of John O'Mara in support of the motion to have the election law case unsealed.

<u>**ARGUMENT**</u>

This action arises out of the various defendants' politically motivated conspiracy to maliciously prosecute Plaintiff, John O'Hara, for crimes they knew he did not commit, in order to neutralize him as a political opponent, and to punish him for his political activities against the "Brooklyn Democratic Machine." See generally DE 1, Complaint.; DE 68 at 1-2, Mem. Here, when O'Hara seeks redress, the KCDA continues the selective treatment by producing hundreds of redacted documents that are routinely published in their entirety.

Here, O'Hara 's twenty-eight (28) page CRU Report, which recommended that the conviction be overturned, contains redactions on seventeen (17) of the twenty-eight (28) pages (**Exhibit B**).

The KCDA lists the entire CRU Memorandum on the Privilege Log, citing Attorney, Work Product and Law Enforcement privileges, with the entire CRU portion including Weight and Sufficiency of the Evidence and the entire Conclusion redacted by the non-party KCDA.

It is not just the report; the entire CRU file and the KCDA discovery are treated similarly. For most of the redacted documents, those privileges are described as Accuprint Reports, which would appear to constitute factual work product; meaning an Accuprint Report would not reveal an attorney's mental process or legal strategy. The plaintiff seeks judicial intervention due to the KCDA asserting these privileges to all requested and redacted documents. The Grand Jury materials requested are material to the instant action and the plaintiff herein requests, based on legal precedents and factual considerations, for these materials to be unsealed.

This motion will address a) Items in KCDA/CRU's possession that were not produced pursuant to the subpoena, including the five items specifically identified above; b) Items in the CRU file that were redacted with claims of privilege from KCDA; c) The CRU Memorandum which led to the conviction being overturned; d) Grand Jury secrecy is not an absolute mandate, an order, pursuant to NY CPL §190 permits unsealing the Grand Jury minutes and documents, thus, unsealing the Grand Jury materials herein is permissible; e) the plaintiff has a compelling and particularized interest for the requested Grand Jury Materials; and f) disclosure of the Grand Jury materials is in the best interest of the public and is necessary for the accountability of public officials.

### a) ITEMS NOT PRODUCED BY KCDA/CRU

1. The one-thousand two-hundred eleven pages produced by KCDA was not the complete file. The CRU Report itself references documents that were used by CRU in their

investigation but were not produced by the KCDA. Following the KCDA production in response to the subpoena, plaintiff recognized several documents that were referenced in the CRU Report, with some quoted extensively, that were not produced pursuant to the subpoena. Plaintiff seeks an Order to produce those unredacted documents and the Grand Jury materials.

2.      The first document is the complaint by then Assemblyman James Brennan that initiated the investigation. The CRU Memo documents that, on June 28, 1994, Brennan wrote to the Board of Elections on his official Assemblyman government stationary asking the Board to investigate O'Hara. Brennan did not disguise the political nature of the investigation as he cc'd Jeff Feldman, the Executive Director of the Kings County Democratic Party. Despite having withdrawn two civil complaints with the Board of Elections without any findings or adjudication from the Court on the residency issue, Brennan made the complaint to the Board of Elections. The Complaint initiating the investigation by Mr. Brennan goes directly to the motivation behind the defendant's actions. Whether the motive was political and whether there was probable cause to believe the prosecution could succeed based upon admissible evidence. That complaint cannot be obtained elsewhere and goes directly to the motives of the investigators. At one time, the Board of Elections had Brennan's complaint, as they had relied on it but have not produced this document to plaintiff. This is despite being subpoenaed to do so, and no privilege having been asserted. As indicated, the attorney for the BOE indicated that they were not in possession of this document.

3.      The second document is the "Confidential Memo[3]" from defendant Jeffrey Waite to the Board of Commissioners recommending that the Board "investigate the validity of

---

[3] As described on pg. 8 of the CRU Report (KCDA 1169)

Mr. O'Hara's voter registration" (**Exhibit, pg. 8**). CRU opines that the memo failed to mention Brennan's conflicts (**Id, pg. 8**), failed to address the legality of the 47[th] St address (**Id, pg.** 9) and misstated the procedural history (**Id, pg. 8, 9**). The "Confidential Memorandum" goes directly to the motives of Brennan and Waite for the prosecution of O'Hara. Plaintiff has alleged Brennan, Keefe and Carroll had pressured Waite to initiate an investigation into O'Hara, thereby creating the impression that the Board of Elections investigation was an independent inquiry. Therefore, all defendants conspired to make it appear that the impetus of the charges against O'Hara came from an independent source –the New York State Board of Elections, when in fact, it was the brainstorm of the conspirators to create a false impression of several inquiries into O'Hara's behavior to mask their true intentions (Complaint, ¶ 40). The Board of Elections has not produced the document. It is in the possession of KCDA and simply not produced pursuant to the subpoena. No claim of privilege has been asserted.

4.      The notes taken by a Board Investigator at a meeting attended by defendants Waite, Brennan and Carrol on August 31, 1995. During that meeting, the notes reveal, Brennan and Carrol misstated the reason for O'Hara's removal from the ballot by claiming it was related to residency, when in fact it was related to petitions, withheld exculpatory evidence regarding credit card and bank statements delivered to the address in question (**Exhibit B, pg. 10, KCDA 1171**) and misstated the procedural history (*Id*). The notes go directly to the motive for prosecuting O'Hara as the investigator took down what the conspirators told him. No attorney-client may be asserted; no privilege has been asserted. The Board of Elections has not produced the document.

5.      In the 1996 motion filed by Waite and the Board of Elections to unseal the trial transcript of the 1994 civil election case against O'Hara, which includes:  a) the transcript itself, which was eventually unsealed, and b) the Affirmation made in support of the Motion to Unseal from defendant Carroll. Carroll's Affirmation, pursuant to the CRU Report, failed to state that the case was settled without adjudication on the residency issue or any allegation of fraud, which was the focus of the BOE investigation. It is therefore relevant to the instant claim as it goes directly to the malicious intent of the author towards the plaintiff. It is unavailable from other sources.

6.      Waite's affirmation, attached to the same January 27, 1996, motion which, pursuant to the CRU Report, advises the Court that the testimony was relevant to the Board's investigation, thus affirming its relevance to this claim. It is unavailable from other sources. Attached please find an Affirmation from Kathy J. King, General Counsel to the New York City Board of Elections confirming the BOE's participation in the investigation into O'Hara (**Exhibit K**).

7.      O'Mara's Affirmation, one week following the Supreme Court's decision denying the motion to unseal by Justice Irving Aronin, defendant O'Mara submitted an Affirmation in support of his request for a "So Ordered" subpoena for the same trial transcript which contained false information. The Affirmation, according to the CRU Report, was based upon information by Carroll and Brennan, both avowed political enemies of O'Hara. The CRU Report fails to note whether defendant O'Mara advised the Court of the denial of a similar motion just days earlier. Such was the zeal to take down O'Hara that the defendants resorted to blatant forum shopping to have the transcript unsealed.

8.    All the previously mentioned documents are in the possession of the KCDA, as they are referenced throughout the CRU Report. The KCDA failed to either produce them pursuant to the subpoena or claim's privilege. The documents go directly to the origins and motives for the prosecution as the KCDA continues to withhold documents that would bear witness to the selective and malicious prosecution of the plaintiff.

b) **REDACTIONS**

**Work Product Claims**

9.    The following items refer to the redacted portions of the KCDA production, wherein an overwhelming majority of the redactions claim Work Product privilege and Law Enforcement privilege for what are stated to be Accuprint Reports, which is factual work product.

10.    The weight of authority in the Second Circuit frowns upon allowing a party to redact information from admittedly responsive and relevant documents, "based on that party's unilateral determinations of relevancy." *Cyris Jewels v. Casner,* No. 12-CV-1895, 2016 U.S. Dist. LEXIS 66405, 2016 WL 2962203 (E.D.N.Y. May 20, 2016) (citing cases rejecting defendants' requests for redaction of irrelevant text within relevant documents); *see also Durling v. Papa John's Int'l, Inc.,* No. 16-CV-03592, 2018 U.S. Dist. LEXIS 11584, 2018 WL 557915, (S.D.N.Y. Jan. 24, 2018) ("Redactions on grounds of non-responsiveness or irrelevance are generally impermissible, especially where ... a confidentiality stipulation and order ... is in place."); *John Wiley & Sons. Inc. v. Book Dog Books, LLC,* 298 F.R.D. 184, 186 (S.D.N.Y. 2014) ("[R]edactions of portions of a document are normally impermissible unless the redactions are based on a legal privilege."); *In re State St. Bank & Tr. Co. Fixed Income Funds Inv. Litig.,* No. 08-CV-0333, 2009 U.S. Dist. LEXIS 34967, 2009 WL 1026013, (S.D.N.Y. Apr. 8, 2009) (directing parties not to "redact any

portion of a document on the ground that the portion is non-responsive and irrelevant" because such redactions "breed suspicions" and "may deprive the reader of context"); *In re Restasis (Cyclosporins Opthalmic Emulsion) Antitrust Litig.*, No. 18-MD-2819, 2018 U.S. Dist. LEXIS 100704, 2018 WL 3007926, (E.D.N.Y. June 4, 2018) (party should not be permitted to unilaterally decide to redact portions of a responsive document because it determines that they are competitively sensitive and not relevant)

11.     The KCDA is asserting attorney work product, if a court determines that a document is attorney work product, it must next ask whether the document is "factual" work product, which is "subject to disclosure once plaintiff has demonstrated substantial need," id. at 143, or "core" work product that could reveal an attorney's mental process or legal strategy, which is "entitled to the highest protection afforded by law," *United States v. Jacques Dessange, Inc.*, No. 99-CR-1182 (DLC), 2000 U.S. Dist. LEXIS 3734, 2000 WL 310345, (S.D.N.Y. Mar. 27, 2000). Further, because prosecutors in criminal cases in New York are required to disclose relevant witness statements to the defense, some courts in this district have held that factual work product created by prosecutors "with the expectation that defense attorneys may obtain them as [People v.] Rosario [, 9 N.Y.2d 286, 173 N.E.2d 881, 213 N.Y.S.2d 448 (1961),] material" is not protected. *Schomburg v. Bologna,* 298 F.R.D. 138 (S.D.N.Y. 2014) at 143; see, e.g., *Abdell v. City of New York*, No. 05-CV-8453 (KMK) (JCF), 2006 U.S. Dist. LEXIS 66114, 2006 WL 2664313, (S.D.N.Y. Sept. 14, 2006) (explaining that, where prosecutors "cannot know" at the time witness statements are recorded whether those statements will later have to be turned over in connection with a criminal trial, requiring the prosecutors "to turn over [the statements] during

discovery in [subsequent] civil litigation will not alter their decisions about committing mental impressions to paper").

12.    The decision whether notes and memoranda created in connection with witness interviews constitute protected work product "is highly individualized . . . and inevitably turns on the factual particulars of the case at bar." *Johnson v. Bryco Arms*, No. 02-CV-3029 (JBW), 2005 U.S. Dist. LEXIS 48587, 2005 WL 469612, (E.D.N.Y. Mar. 1, 2005). Compare, e.g., In re John Doe Corp., 675 F.2d 482, 493 (2d Cir. 1982) (finding that notes of employee interviews were factual work product because they "recite in a paraphrased, abbreviated form, statements by Employee A"), with *Jacques Dessange, Inc.*, 2000 U.S. Dist. LEXIS 3734, 2000 WL 310345, (finding notes of witness interviews to be core work product). Moreover, a court must parse the contents of each document. If a particular document contains some factual work product and some core work product, and the requesting party demonstrates substantial need for the former, the proper course is to order disclosure of "factual content — such as statements of . . . witnesses — . . . but permit[] redaction of [counsels'] notations . . . that constitute[] core work product" *Crosby*, 269 F.R.D. at 278.

13.    The CRU of the King's County District Attorney's office is a non-party, and as such they are not entitled to claim the protection against disclosure articulated in Federal Rule of Civil Procedure 26(b)(3). See *Crosby v. City of New York*, 269 F.R.D. 267, 276-77 (S.D.N.Y. 2010) (Scheindlin, J.). Rather, they may benefit from work product protection only if the Court, in its discretion, chooses to apply the broader work product doctrine first articulated in *Hickman* through a Rule 26(c) protection order. See id. In exercising this discretion, courts are guided by the underlying purposes of the work product doctrine, as described in *Hickman*, including: (1)

"protecting an attorney's ability to formulate legal theories and prepare cases"; (2) "preventing opponents from 'free-loading' off their adversaries' work "; and (3) "preventing interference with ongoing litigation." Id. at 277 (citing *Hickman*, 329 U.S. at 510-11, 516) *Rigas v. United States*, 2016 U.S. Dist. LEXIS 113914.

14.    When the Court applies the foregoing standards, the application to the case at bar require disclosure which includes: that (1) when the Documents were created, the prosecutors involved and the CRU had reason to believe that many of the documents might eventually have to be disclosed in connection with either an evidentiary hearing or a criminal retrial, see, e.g., *Crosby*, 269 F.R.D. at 278; (2) there is no risk of interfering with ongoing litigation because the underlying criminal cases are over, see, e.g., *Crosby*, 269 F.R.D. at 278; (3) "[t]he potential economic vice of a less diligent attorney raiding the file of a previously diligent attorney is lacking" — or at least reduced — "in the context of a former criminal defendant, now plaintiff, seeking information from criminal files of a previous prosecution," *Vazquez v. City of New York*, 2014 U.S. Dist. LEXIS 160270; *Ramsey v. NYP Holdings, Inc.*, 2002 U.S. Dist. LEXIS 11728 Doubleday v. Ruh, 149 F.R.D. 601, 607 (E.D. Cal. 1993); accord *Crosby*, 269 F.R.D. at 278 & n.56; (4) "courts have regularly held that in cases of alleged [investigator] misconduct, plaintiffs have a substantial need to discover statements that the [investigators] made to prosecutors see also *Crosby*, 269 F.R.D. at 280 & n.69; and (5) courts have ordered disclosure even where, as here, the relevant materials were not created in connection with the initial investigation or prosecution, but in a later reinvestigation, see, e.g., *Schomburg*, 298 F.R.D. at 143; *Crosby*, 269 F.R.D. at 280.

15.    Therefore, the defendants should no longer be permitted to withhold the requested documentation herein insofar as the Work Product privilege does not protect these documents and the Grand Jury materials.

**Law Enforcement Privilege**

16.    The purpose of the Law Enforcement privilege "is to prevent disclosure of law enforcement techniques and procedures, to preserve the confidentiality of sources, to protect witness and law enforcement personnel, to safeguard the privacy of individuals involved in an investigation, and otherwise to prevent interference with an investigation." *In re Dep't of Investigation of City of New York*, 856 F.2d 481, 484 (2d Cir. 1988) (citing *Aspin v. Dep't of Defense*, 160 U.S. App. D.C. 231, 491 F.2d 24, 29-30 (D.C. Cir. 1973), and *Frankel v. Securities and Exch. Comm'n*, 460 F.2d 813, 817 (2d Cir. 1972)); see also *Tuite v. Henry*, 181 F.R.D. 175, 176 (D.D.C. 1998) ("The Federal Law Enforcement privilege is a qualified privilege designed to prevent disclosure of information that would be contrary to the public interest in the effective functioning of law enforcement. The privilege serves to preserve the integrity of law enforcement techniques and confidential sources . . . ."), aff'd 340 U.S. App. D.C. 183, 203 F.3d 53 (D.C. Cir. 1999). "'In order to assert a claim of privilege against disclosure of police materials to a plaintiff raising federal civil rights claims . . ., the officers or the police department must do more than alert the court to the [relevant privilege] or the generalized policies which support it. The police must make a substantial threshold showing that there are specific harms likely to accrue from disclosure of specific materials . . . .'" *Fountain v. City of New York*, No. 03 Civ. 4526 (RWS), 2004 U.S. Dist. LEXIS 7539, 2004 WL 941242, at *3 (S.D.N.Y. May 3, 2004) (quoting *King v. Conde*, 121 F.R.D. 180, 189 (E.D.N.Y. 1988) (Weinstein, J.)) (additional internal quotation marks and citation omitted); accord

*MacWade v. Kelly,* 230 F.R.D. 379, 381 (S.D.N.Y. 2005) ("To sustain the invocation of such a privilege . . ., [the party invoking the privilege] must make a clear showing of harm if the information is disclosed.") (quoting *Galvin v. Hoblock*, No. 00 Civ. 6058 (MHD), 2003 U.S. Dist. LEXIS 16704, 2003 WL 22208370, (S.D.N.Y. Sept. 24, 2003)). This initial burden must be discharged by presenting "those facts that are the essential elements of the privileged relationship" and not "'by mere conclusory or ipse dixit assertions.'" *In re Grand Jury Subpoena Dated Jan. 4, 1984*, 750 F.2d 223, 224-25 (2d Cir. 1984) (quoting In re Bonanno, 344 F.2d 830, 833 (2d Cir. 1965)) (additional internal citations omitted).

    17.    However, "[a]n investigation need not be ongoing for the Law Enforcement Privilege to apply as 'the ability of a law enforcement agency to conduct future investigations may be seriously impaired if certain information is revealed.'" *Nat'l Congress for Puerto Rican Rights v. City of New York*, 194 F.R.D. 88, 95 (S.D.N.Y. 2000) (citing *Morrissey v. City of New York,* 171 F.R.D. 85, 90 (S.D.N.Y. 1997)) (additional internal citation omitted) (emphasis added); see also *Black v. Sheraton Corp. of Am.*, 184 U.S. App. D.C. 46, 564 F.2d 531, 546 (D.C. Cir. 1977) (noting that the privilege may apply after the conclusion of an investigation where "the investigative techniques of the investigating body would be disclosed to the general public"). Thus, the Law Enforcement Privilege applies where the defendant demonstrates that the disclosure of information, such as law enforcement "techniques and protocols," would "jeopardize future criminal investigations." *Commonwealth of Puerto Rico v. United States*, 490 F.3d 50, 64 (1st Cir. 2007); see *Morrissey*, 171 F.R.D. at 91 (applying the privilege where disclosure of the items at issue "would seriously compromise future law enforcement investigations ("[The] law enforcement investigative privilege is based primarily on the harm to law enforcement

efforts which might arise from public disclosure of investigatory files.") (internal quotation marks and ellipse omitted); cf. *In re United States Dep't of Homeland Sec.*, 459 F.3d 565, 569 (5th Cir. 2006) (recognizing the Law Enforcement privilege in the Fifth Circuit and observing that "in today's times the compelled production of government documents could impact highly sensitive matters relating to national security").

18.     Both the deliberative process and Law Enforcement privileges are qualified privileges and, therefore, "when the existence of [the] privilege is established, there is a need to balance the public interest in nondisclosure against the need of the particular litigant for access to the privileged information." *United States v. United States Currency in Sum of Twenty-One Thousand Nine Hundred Dollars,* No. 98 Civ. 6168 (SJ), 1999 WL 993721, (E.D.N.Y. Sept. 21, 1999) (citing *Friedman v. Bache Halsey Stuart Shields*, 238 U.S. App. D.C. 190, 738 F.2d 1336, 1341 (D.C. Cir. 1984), and *Raphael v. Aetna Cas. & Sur. Co.*, 744 F. Supp. 71, 74-75 (S.D.N.Y. 1990)) (additional internal citation omitted).

19.     Thus, in assessing the government's assertion of privilege, "[t]he court must balance the interests favoring and disfavoring disclosure, keeping in mind that the burden of persuasion rests on the party seeking to prevent disclosure. The court must also consider the value of appropriate protective orders and redactions." *King v. Conde*, 121 F.R.D. 180 (E.D.N.Y. 1988)  ; see also *Kitevski v. City of New York*, No. 04 Civ. 7402 (RCC) (RLE), 2006 U.S. Dist. LEXIS 11017, 2006 WL 680527, (S.D.N.Y. March 16, 2006) ("Whether the showing of relevance and need rises to the requisite level is a discretionary determination that must necessarily be made on a case-by-case basis."); *United States v. Sawinski*, No. 00 Crim. 0499 (RPP), 2000 U.S. Dist. LEXIS

16536, 2000 WL 1702032, at *3 (S.D.N.Y. Nov. 14, 2000) (citing *In re Sealed Case*, 272 U.S. App. D.C. 314, 856 F.2d 268, 272 (D.C. Cir. 1988)).

20.    In his oft-cited opinion in *King v. Conde*, the Honorable Jack B. Weinstein, District Judge, set forth various factors that courts should consider when deciding whether to compel disclosure of privileged information from the government.

21.    Among the interests that may favor non-disclosure, Judge Weinstein cited (1) the threat to police officers' safety, (2) the invasion of police officers' privacy, such as through disclosure of officers' personnel records, (3) the weakening of law enforcement programs, and (4) the chilling of police internal investigative candor. (Id. at 191-93). In evaluating the factors disfavoring disclosure, the Court should consider the following facts: first, disclosure of the materials requested would not place police officers' safety in danger since the cases at issue are approximately at least twenty (20) years old. Second, the potential harm and an invasion of police officer's privacy, such as personal records could be mitigated through exclusion of such documents. Third, the potential for weakening of law enforcement programs is nonsensical, since these programs would have likely been updated in the last twenty years. The fourth element is the chilling of police internal investigative candor, and the lapse time since the investigative period at issue favors disclosure of the requested materials. Finally, it is the defendant's burden to show that there exists a potential for harm in the disclosure requested; in the instant cases there is no potential for harm for any defendants and any potential harm could still be mitigated through exclusion or redaction, after the defendants establishes that a potential harm exists from the requested disclosure.

22.    As to the interests that may favor disclosure, Judge Weinstein cited, inter alia, (1) the relevance of the requested materials to the plaintiff's case, (2) the importance of the materials to the plaintiff's case, including the availability of the information from alternative sources, (3) the strength of the plaintiff's case (although, "at the discovery stage," doubts relating to this consideration "must be resolved" in the plaintiff's favor), and (4) the importance to the public interest, which is "the interest that . . . looms largest," as it "giv[es] force to the federal civil rights laws." Id. at 193-95. Furthermore, Judge Weinstein noted that, in light of "[t]he great weight of the policy in favor of discovery in civil rights" actions and "the normal presumption in favor of broad discovery," defendants' case for non-disclosure or restricted disclosure "must be extremely persuasive." Id. at 195; *accord Nat'l Congress,* 194 F.R.D. at 96; *Morrissey v. City of New York*, 171 F.R.D. 85, 92 (S.D.N.Y. 1997); *Kinoy v. Mitchell,* 67 F.R.D. 1, 12 (S.D.N.Y. 1975) *Macnamara v. City of New York*, 249 F.R.D. 70. In the instant action, the materials requested are relevant since they are directly related to the plaintiff's complaint. The materials are highly important insofar as they display the lack of probable cause that led to the plaintiff being originally arrested. It is plaintiff's position that this case is strong and has merit. Moreover, the strength of plaintiff's case is for this Court to decide, however, any doubts on this factor for disclosure, the Court must find in favor for the plaintiff. The fourth element is the public interest in transparency; this clearly favors the plaintiff due to the public interest in keeping public officials honest and accountable for their misconduct.

23.    Therefore, based on all the aforementioned factors, for and against disclosure, in *King v Conde,* this Court should find that disclosure of all the documents requested is appropriate.

21

**Specific Redactions in the KCDA/CRU File**

24.     The following is a page-by-page response to the KCDA/CRU redactions. In order to present the plaintiff's argument that the redactions and claims of privilege were inappropriate and that the items sought are discoverable, each and every claim is required to be addressed. The blanket assertions of privilege, many for what the KCDA describes as Accuprint Reports[4], which appear to be third party generated reports, would certainly be factual work product as they would have no bearing on an attorney's mental process or legal strategy and would not reveal techniques and protocols. Moreover, the onus is on the respondent to identify a clear showing of specific harm to assert the Law enforcement privilege. The KCDA, an non-party, has asserted the Work Product and the Law Enforcement privileges (**Exhibit L**). The Work Product and Law Enforcement privileges have been repetitively asserted to the redactions mentioned herein. However, as thoroughly explained herein, the plaintiff seeks documents that are not protected or covered under these privileges and should justifiably be provided.

25.     The first redaction is pages KCDA 3-12[5] appear to be the Special Investigation Division of the Kings County District Attorney's office (S.I.D.) file on witness Yvette Aguirre. Ms. Aguirre was a grade school principal and owned the house located two doors down from 553 47th Street. She was familiar with the residents living at 553 47th Street and knew O'Hara from community boards. She was also a friend of the previous owner and had visited the

---

[4] It is unknown if the KCDA is referring to Accurint Reports, which are the most widely accepted locate-and-research tool available to government, law enforcement and commercial customers and locates neighbors, associates and possible relatives; links more than 132 million individuals to businesses and includes information such as business addresses, phone numbers, and possible dates of employment and helps find individuals when only old
or fragmented data is available.
[5] The KCDA 3-12 refers to the Bates Stamped numbers. The documents are Bates Stamped KCDA00001 - KCDA001121. The KCDA portion will not be referenced for each page going forward for brevity.

house often. Further she believed O'Hara to live at 553 47th Street, during the period charged in the indictment [all three trials]. The CRU Report chronicles the witness intimidation and vindictiveness of the KCDA toward her in their selective prosecution of O'Hara. Further it notes the treatment of Ms. Aguirre: "As related by prosecutor O'Mara, so firm was, and still is, his belief that Ms. Aguirre committed perjury in support of O'Hara at trial that he communicated with the School Chancellor's office and the Board of Education concerning Ms. Aguirre's fitness to be employed as a school principal. No action was taken against the witness, and she testified at both the second and third trials. During the course of the trials against O'Hara, KCDA publicly announced that a number of school principals, among them Ms. Aguirre, would be honored by KCDA for their role in their respective school's exemplary achievement in the office's Legal Lives/Adopt-a-School Program. After this announcement, Executive A.D.A. Dino Amoroso told Ms. Aguirre that, considering her participation in the O'Hara trials, the KCDA would withdraw the award to her and that she should "understand the office's position" (CRU Report, pg. 20). This file appears to contain factual work product and would be relevant to the selective prosecution of the plaintiff. It illustrates the lengths the defendant investigators and the KCDA took to "neutralize" O'Hara. Additionally, this file may contain material relating to the Investigator's pattern of witness intimidation and provide the basis for O'Mara's certainty that the witness perjured herself[6]. Here, respondent's Law Enforcement privilege assertions are unfounded without a showing of harm or, let alone as required, clear showing of specific harm.

26.     Pages 14-17 appear to be the Special Investigation Division of the Kings County District Attorney's office (S.I.D.) file on witness Brendan Gill. Brendan Gill was a neighbor

---

[6] CRU Report, pg. 20 (KCDA1181) Footnote 35

who lived at 566 47th Street. in 2016, Gill told Conviction Review investigators that he didn't know if O'Hara lived at 553 47th Street. It is hard to imagine an extensive file being created for a witness who did not know if O'Hara lived at the address in question. The Gill file will detail steps taken by the defendants, including any attempt to discourage Gill from testifying. This file appears to contain factual work product and would be relevant to the selective prosecution of the plaintiff, including any attempt to discourage Gill from testifying. Here, respondent's Law Enforcement privilege assertions are unfounded insofar as they have not presented a clear showing of specific harm due to disclosure of these materials.

27.    Pages 19-27 appear to be the Special Investigation Division of the Kings County District Attorney's office (S.I.D.) file on Mr. O'Hara's attorney, James McCall. These pages were redacted to avoid disclosing the investigation steps taken while investigating and interviewing the plaintiff's own attorney. This file appears to contain factual work product and would be relevant to the selective prosecution of the plaintiff. The non-party has not identified any basis for any protective order which would keep information gleaned plaintiff's own attorney.

28.    Pages 29-30 appear to be the Special Investigation Division of the Kings County District Attorney's office (S.I.D.) file on Juan Perez. Juan Perez failed to testify in the second and third trial after he was intimidated by defendant O'Mara. In 1992, Perez ran for the same seat as O'Hara in the 51st District of the New York State Assembly. In 1993, they would canvass together for various candidates. Perez testified in the first trial for O'Hara, telling the Jury O'Hara lived at 553 47th Street. He was prepared to testify in the second trial when Defendant ADA O'Mara appeared unannounced at his home early one morning, told Perez that if he testified

24

for O'Hara - "I would go down with him[7]", he would be charged with perjury and would lose his Section 8 housing. This is documented in his Affidavit see **Exhibit M** The KDCA asserts the same privileges unjustifiably to circumvent disclosure of relevant documents to the instant action. The file appears to contain factual work product and would be relevant to plaintiff's selective prosecution. This includes defendant O'Mara's intimidation of Perez from testifying.

      29.     Pages 32-44 appear to be the Special Investigation Division of the Kings County District Attorney's office (S.I.D.) file on O'Hara's girlfriend, Vicki-Lynn Guveiyian. In September 1996, Defendant John Keefe was arrested and charged with Assault and Sexual Abuse after a violent attack on Ms. Guveiyian.[8] While the case was pending, an unprecedented investigative step occurred; ADA Ronnie Jaus, the Head of the Kings County District Attorney's Sex Crimes Unit, along with three officers, appeared unannounced at Ms. Guveiyan's office ninety-four (94) miles away from Brooklyn. Ms. Guveiyian was threatened in an attempt to stop her from continuing to press charges for the violent attack. She was told by Jaus[9] that she could lose everything if Keefe was acquitted and sued. Three weeks later, O'Hara was indicted. The KCDA instilled such fear in Ms. Guveiyian, for her career and safety, that she did not testify on O'Hara's behalf at any of his three trials. This file appears to contain factual work product and would be relevant to the plaintiff's selective prosecution; including any attempt to discourage Ms. Guveiyian from testifying.

---

[7] Magaly Lucas was the owner of the residence in question while O'Hara lived there, prior to Lozano. She has asserted under oath that O'Mara used those exact words – "I would go down with him" to threaten her (Exhibit ??).

[8] Keefe pled guilty to lesser charges on November 6, 1997.

[9] O'Mara admitted speaking to Jaus prior to the visit in a Harper magazine interview.

30.    Pages 46-88 appear to be the Special Investigation Division of the Kings County District Attorney's office (S.I.D.) file on Grace Phillips. Ms. Phillips was a neighbor of 533 47th Street and testified in the first trial that she saw the basement apartment in "perfect" condition with a working kitchenette and enclosed half-bath.  Additionally, she saw O'Hara at 533 47th Street regularly. Ms. Phillips is now deceased[10]. The CRU folder on Ms. Phillips is forty pages long and Ms. Phillips did not testify at the 2nd or 3rd trial. As she is deceased, the information is not available elsewhere. This file appears to contain factual work product and would be relevant to the selective prosecution of the plaintiff, including any attempt to discourage Phillips from testifying, as has been O'Mara's pattern. Here, respondent's Law Enforcement privilege assertions are unfounded insofar as they have not presented a clear showing of specific harm from disclosure of these materials.  pages 152-171 appear to be the Special Investigation Division of the Kings County District Attorney's office (S.I.D.) file containing Deeds for the property located at 553 47th St. These documents are relevant as O'Mara told the jury the transfer of the property in question was a real estate scam, while in possession of evidence of a proper real estate transfer, the Deeds. The privileges asserted, both Work Product and Law Enforcement privileges simply do not apply to documents of this nature as they have no bearing on an attorney's mental process or legal strategy and would not reveal law enforcement techniques or protocols.

31.    Pages 173-180 appear to be the contents of a folder titled 553 47th Street. The non-party's assertion of Work Product privilege and Law Enforcement privileges cannot stand.

---

[10] CRU Report, pg. 19

32.    Just as the previously titled folder, the folder on pages 182-191 is labeled Owner 553 47th St., Brooklyn, New York and the simple assertions of privileges should not stand absent a showing of harm from such potential disclosure.

33.    Pages 193-225 follows a cover sheet for a folder named Megaly Lucas. Ms. Lucas was an ex-girlfriend of O'Hara at the time, she owned the building in question and allowed O'Hara to live there rent free. A KCDA Investigator contacted her about the building. Ms. Lucas told the investigator that she allowed O'Hara to live there. Defendant O'Mara told her she could get in trouble for lying to the investigator. While in Court and ready to testify, O'Mara told her "if you testify and he goes down, you'll go down[11]". Ms. Lucas feared O'Mara "would try to indict me for something the way they did Mr. O'Hara" (Lucas Statement, **Exhibit N**). Ms. Lucas told the judge about the threats, but she was dismissed. Her affidavit states: "If not for the DA's threats, I would have testified to the fact that he did reside at the 47th Street house beginning in October 1992" (**Id**). This file appears to contain factual work product and would be relevant to the selective prosecution of the plaintiff. This includes any attempt to discourage Lucas from testifying, and further displays O'Mara's pattern of misconduct.

34.    Pages 228-250 follows a cover sheet for a folder entitled Rafael Munoz. Munoz was a violent felon, released from prison within the year he moved into the building in question. He falsely applied for an out of State license and failed to make a single mortgage payment as had been agreed when he moved in. The CRU file's opening page insists that Munoz "doesn't want to get involved again". Yet, this file is twenty-three pages long. The file will contain efforts by the defendant investigators to influence testimony, as has been O'Mara's pattern of

---

[11] O'Mara used the same threat to Juan Perez, supra.

misconduct and these documents are unavailable elsewhere. This file appears to contain factual work product and would be relevant to the selective prosecution of the plaintiff, including any attempt to influence Munoz' testimony.

35.     Pages 252 – 254 are portions of a folder entitled Roberto Lozano. Mr. Lozano had a string of burglary-related offenses prior to living in the building in question on 47th Street. He testified in the first trial that there was no apartment in the basement (TT, pg. 177), which is directly contradicted by the portion of notes that are not redacted by the KCDA. Those notes state: "he lived there-there is a basement apartment at the location" (pg. 254) and "a tenant lived there- for a short time" (pg. 252). It also states he does not want to speak any further. The redacted portion of the file will contain efforts by the defendant investigators to influence Lozano's testimony, as has been O'Mara's pattern and these documents are unavailable elsewhere. The Lozano file, 255-261, has also been thoroughly redacted. This file appears to contain factual work product and would be relevant to the selective prosecution of the plaintiff, including any attempt to influence Munoz' testimony, as has been O'Mara's pattern.

36.     Pages 354-358 follow a folder entitled Quetzal Martinez. Martinez, now deceased, lived at the building in question with Lozano and Munoz. The first page of redactions appears to be notes taken, either by CRU or by the investigators at the time of trial. In any event, they are not Accuprint Reports as improperly asserted. This file appears to contain factual work product and would be relevant to the plaintiff's selective prosecution, including any attempt to influence Munoz' testimony, as has been O'Mara's pattern.

37.     Page 359 contains an email from Jessica Wilson of CRU to Patrick Lanigan, with the subject matter labeled as "John Graham". The redactions are labeled as handwritten

notes providing confidential identifiers, presumably about John Graham. The following one-hundred six pages (360-465) are redacted, with the KCDA claiming Work Product and Law Enforcement privileges absent any further reasonable identification of the page's contents. This file appears to contain factual work product regarding John Graham, who is unknown to the plaintiff. Without further identification of the contents, the KCDA cannot redact and assert privilege. Here, respondent's Law Enforcement privilege assertions are unfounded insofar as they have not presented a clear showing of specific harm from disclosure of these materials.

38.    Pages 469-475 appear to contain a file on Josephine Vales. Ms. Vales was the owner of the building in question prior to selling it to Megaly Lucas in 1990. She did not testify in the first two and was called as a surprise witness in the third trial. Ms. Vales testimony was described by CRU as "somewhat ambiguous" (pg. 25) and appeared to support the testimony of Lozano and Munoz. When the CRU interviewed her, Ms. Vales acknowledged the area was, in fact, habitable. Had that testimony been elicited at trial, Mr. O'Hara would not have been convicted. The District Attorney's file on Ms. Vales may disclose why she was not called for the first two trials; it may explain why she came to court on short notice with virtually no preparation and whether O'Mara's improper zeal for prosecuting O'Hara led to her being intimidated into testifying. This could explain the "ambiguous" testimony that was later acknowledged false, and which led to the conviction. This file appears to contain factual work product and would be relevant to the plaintiff's selective prosecution, including any attempt to influence Vales' testimony, as has been O'Mara's pattern.

39.    Pages 488-565 follows Vale's testimony in the third trial and a receipt for airline tickets for CRU's Detective Patrick Lanigan to Las Vegas, where Ms. Vales was questioned.

The redactions precede an Investigative Report from Lanigan regarding the Vales interview. The KCDA has consistently described the redacted pages for most of the potential witnesses as Accuprint Reports and are approximately ten pages long. Here, the excessive blanket redactions total eighty-eight pages. The Investigative Report following the redactions describes the living space in question as livable, which is contrary to Ms. Vales' testimony. These redacted pages likely contain factual work product and would be relevant to the plaintiff's selective prosecution, including any attempt to influence Vales' testimony, as has been O'Mara's pattern.

40.    Pages 566-608 is described by KCDA as "Criminal Background check research on potential witnesses". Which witness(es) was/were not disclosed. Here, KCDA does not assert work product privilege, only Law Enforcement privilege. No such assertions have been presented in the forty-three-page document(s), which precedes an Investigative Report from Patrick Lanigan describing an interview of Ms. Vales.

41.    Pages 615-616 are described as Accuprint Reports: Background Check research on potential witnesses and follows Investigative Reports on Ms. Vales, Ms. Phillips, Ms. Giveiyian, Ms. Lucas, Mr. Martinez and Ms. Aguirre. This file appears to contain factual work product and would be relevant to the selective prosecution of the plaintiff.

c)    **CONVICTION REVIEW MEMORANDUM**

42.    The following redacted pages refer to the CRU Memorandum from ADA Mark Hale of CRU to Attorney General Eric Gonzalez, which led to Mr. O'Hara's conviction being overturned. Next, pages 1141-1161 are described as a memorandum of law analyzing purported election law violations in the O'Hara case. A legal conclusion that the indictment of O'Hara was

in contravention of existing law would provide direct evidence of malice. Thus, this material would be relevant to the matter at issue.

43.     On pages 1163-1167 under the heading: State of Law. The entire section is redacted except for case citations. This analysis is pertinent to the case at bar since the decision to prosecute O'Hara had to include a specific analysis of the case law defining residency. At the time, and through today, the decisions reflect an exceptionally broad interpretation as to what constitutes residency. The conclusions and opinions developed by CRU will directly correlate to whether or not the decision to prosecute O'Hara was a reasonable one consistent with the prevailing case law or, if contrary to the established precedents, represents an ulterior motive to silence a political opponent.

44.     On page 1168, the CRU Report documents discussions about a letter sent by ADA Ann Guttman to Judge Gerges explaining how the prosecution of O'Hara was initiated. The next sentence, which would explain the origins of the investigation is redacted. The crux of the O'Hara claim involves the motive for proceeding against him. The Guttman letter reveals that the initial explanation as to why defendants Carroll, Brennan and O'Keefe were in the District Attorney's office. It involved an allegation that O'Hara was responsible for an attack upon Carrol and the frustration of these three defendants that there was no prosecution of O'Hara for this assault. Any discussions or deliberations concerning the lack of progress on the assault charge is relevant and constitutes an illegal motivation to prosecute and convict O'Hara.

45.     On page 1170, the redactions seem to be related to the information defendant Waite provided to the DA's office which led to the indictment. The CRU determined that Waite deliberately withheld certain exculpatory materials and information regarding the

residency issue. The Report neglects to mention that all this withheld information was readily available to O'Mara prior to the Grand Jury presentation. Defendant O'Mara willfully chose to ignore it. The information redacted seems to be the missteps of defendant Waite related to factual allegations and therefore should not be redacted.

46.      On page 1173, footnote 18 relates to the allegations of an assault and the defendant's attempt to charge O'Hara without evidence in the assault. It is therefore relevant to the defendant's motivations to proceed with the prosecution of O'Hara.

47.      On page 1174, the CRU Report indicates that defendant O'Mara opened the investigation that in mid-sentence, there is a redaction. It seems clear that the remainder of the sentence is a factual recitation of what O'Mara did or was instructed to do and therefore cannot be subject to any privilege.

48.      On page 1175, the memo discusses the witness Lozano. The memo is redacted seemingly over Lozano's testimony and/or factual information revealed to the CRU. Additionally footnote 22 states that O'Mara was "instructed to open the Grand Jury case", but the individual's name who gave the green light to indict is redacted. The decision to proceed with and motivations as to the reasons behind the prosecution and the motivations to do so is pivotal to the current lawsuit and this redacted footnote clearly will inform all parties who was responsible for commencing this politically motivated prosecution. Summarily in footnote 22, the KCDA chose to redact information that would identify who instructed defendant O'Mara to proceed with O'Hara's prosecution. The factual work product would be relevant to the selective prosecution of the plaintiff.

49.     On pages 1183-1185, under the heading of CRU Investigation and Analysis Weight and Sufficiency of Evidence, the entire section is redacted. This analysis is instructive as to the reasonableness of the instigation of the prosecution of O'Hara. The factual work product would be relevant to the plaintiff's selective prosecution plaintiff.

50.     On pages 1187-1189, the Selective Prosecution Section begins discussing the fact that this was a one-of-a-kind prosecution begins with the statement that O'Hara was "singled out for purposes other than flagrant criminal conduct which demanded redress", yet the entire discussion is then redacted. Based upon the tenor and format of the memo the redacted material appears again to be more factual than privileged for any reason. Finally, the section entitled Conclusion and Recommendation is redacted. The factual work product would be relevant to the selective prosecution of the plaintiff.

51.     As stated previously, documents where the Court find that either the documents or redactions include factual work product, these documents should be rightfully disclosed. Here, respondent's Law Enforcement privilege assertions are unfounded insofar as they have not presented a clear showing of specific harm from disclosure of these materials. Thus, the aforementioned documents requested should be disclosed since these documents are not exempt from disclosure due to the Work Product and Law Enforcement privileges as they are not applicable herein.

### d) GRAND JURY SECRECY IS NOT ABSOLUTE

52.     The standards for disclosure once a need is shown makes clear the secrecy of Grand Jury evidence is not absolute. Pursuant to Federal Rules of Criminal Procedure Rule 6: (e) The court may authorize disclosure—at a time, in a manner, and subject to any other

conditions that it directs—of a grand-jury matter... Further, New York Criminal Procedure Law 190.25(4)(a) authorizes the disclosure of otherwise secret grand jury "...testimony, evidence, or any other decision, result or other matter attending to a grand jury proceeding" by order of the Court. It is a firmly settled rule that the question of disclosure rests with the sound discretion of the trial Court (See, e.g. *Matter of Quinn [Guion], 293 N.Y. 787, affg. 267 App. Div. 913; Matter of Temporary State Comm. Of Investigation, 47 Misc 2d 11, 14; People v. Behan, 37 Misc 2d 911, 918; Matter of City of New Rochelle, 35 Misc 2d 254,256; Matter of Third, Dec., 1959 Grand Jury, 20 Misc 2d 475, 476.)* In exercising this discretion, the court must balance the competing interests involved, the public interest in disclosure against that of secrecy. The Court of Appeals discussed "(t)hose (arguments) most frequently mentioned by courts and commentators (in support of secrecy) are: (1) prevention of flight by a defendant who is about to be indicted; (2) protection of the grand jurors from interference from those under investigation; (3) prevention of subornation of perjury and tampering with prospective witnesses at trial to be held as a result of any indictment the grand jury returns; (4) protection of an innocent accused from unfounded accusations if in fact no indictment is returned; and (5) assurance to prospective witnesses that their testimony will be kept secret so that they will be willing to testify freely. *People v. DiNapoli,* 27 N.Y.2d 229, 238 (1970).

53.    Applying these criteria to the case before us, disclosure is warranted, and the materials requested should be disclosed.  Currently, more than twenty-seven years have elapsed since O'Hara's three trials and six years after the dismissal of the charges. There is no danger of the flight of persons who may be indicted as the case was dismissed by the KCDA, with no intention to retry this matter. There can be no interference with the grand jury's freedom to

deliberate as there will be no further grand jury activity. Finally, there is no danger of subordination of perjury as there will not be any further criminal litigation and no need to protect an innocent accused person other than Mr. O'Hara.

54.    The plaintiff cannot obtain comparable evidence from separate and independent sources as the Grand Jury materials cannot be located and the official court file is devoid of the O'Mara affirmation to unseal the 1994 election case. Some of this evidence may include not only actual testimony but also the interview notes and statements of witnesses procured during this subsequent investigation. Both the testimony and statements should be made available to Plaintiff for purposes of impeachment as well (-- use of a witness' grand jury testimony for impeachment purposes – is commonplace and perfectly proper, ( See *People v. Jaglom, 17 N.Y. 2d 162, 164*)

### e) A COMPELLING AND PARTICULARIZED NEED FOR THE GRAND JURY MATERIAL

55.    "Pursuant to CPL 190.25(4)(a), grand jury proceedings are secret. As such, '[a] strong resumption of confidentiality applies to Grand Jury proceedings'"" (Matter of Perryman v. Gennaro, 147 AD3d 852, 852, 47 N.Y.S.3d 382, quoting *Robertson v. City of New York*, 163 AD2d 291, 291, 557 N.Y.S.2d 431.

56.    Here, there is a compelling and particularized need for the Grand Jury materials as the materials presented to and/or withheld from the Grand Jury are central to the allegations of a nearly thirty-year conspiracy to eliminate a political opponent by bringing false charges against him and wrongfully convicting him. The presentment to the Grand Jury is the fulfillment of the defendant's conspiracy to prosecute and convict O'Hara for an unlawful purpose. The materials presented to the Grand Jury are unavailable from other sources as the

CRU Report (**Exhibit B**) indicates the original stenographic notes are unavailable; thus, the minutes are unrecoverable. The CRU Report notes the one-of-a-kind nature of the grand jury indictment, concluding: "it is almost self-evident that O'Hara was singled out for purposes other than flagrant criminal conduct which demanded redress" (**Exhibit B, pg.26**). The compelling and particularized need requirement has been established and the materials requested are unavailable elsewhere.

57.    Further, the Grand Jury material in this case is central to the plaintiff's action wherein the then defendants conspired to bring charges against John O'Hara to eliminate him as a political opponent. The charges and information presented to the Grand Jury in the O'Hara matter had no basis in law. The defendant Brennan initiated the investigation into O'Hara with a letter to the Board of Elections misstating the law on residency for a candidate such as O'Hara by claiming he was "running for office from false residences" (**Exhibit O**). The claim was false as  any the residences listed would have been legal for a candidate to run for the Assembly in the 51st Assembly District as established previously in Berger v. Lasher 24296/93 (**Exhibit P**), where the Court held: "there is no rule which prohibits a candidate for public office from having two residences ... it is for him to decide which address he considers as his voting address". The defendants, who were described in the CRU Report as "avowed and open political enemies of O'Hara" (**Exhibit B, pg.14**), filed multiple civil claims against O'Hara during the early 1990's. Defendant ADA O'Mara claimed publicly that the criminal complaints began only when "[O'Hara] was not deterred by the civil actions against him" (**Exhibit Q**). The fraudulent investigation produced extensive amounts of exculpatory evidence, including records from Chase bank,

American Express, the office of Court Administration, and the New York City Campaign Finance Board – all reflecting a legal address, which would obviate the claims asserted in the indictment.

58.     *Lasher* wasn't the only case to destroy the false residency premise upon which O'Mara relied on when he brought O'Hara's case to the grand Jury. In People v. Placencia, 157 Misc. 2d 397,597 N.Y.S. 2d 572, N.Y. Sup. Ct. March 16, 1993) (**Exhibit R**), the Defendant was charged with one count of offering a false instrument for filing, two counts of election law violations, one count of criminal possession of a forged instrument and one count of conspiracy. The charges were in connection with the defendant's participation in the procurement and submission of allegedly fraudulent nominating petitions in a primary election. The Court held that the integrity of the Grand Jury proceedings was impaired, and the defendant prejudiced by cumulative weight of the errors and improprieties. One glaring error included calling the previous defendant Carroll as an election law expert even though he was retained by the incumbent candidate, he filed the objections to the petition and instituted the civil proceedings challenging the petitions which were in issue in the case. The Court's recitation of the multiple irregularities by the defendant's in Placencia is illuminating. The case was thrown out, but the damage has been done. As with O'Hara, Porfirio Placencia spent years defending himself against the machine, ending his political career.

59.     In People v. Ramos, 223 A.D.2d 495, (N.Y. App. Div. 1st Dep't. January 30, 1996) (**Exhibit S**), the defendant was indicted for offering a false instrument for filing in the first degree (three counts), falsifying business records in the first degree (three counts), false voter registration, and illegal voting (four counts). The First Department held the defendant was prejudiced by the impairment of the integrity of the Grand Jury proceedings as the

defendants/conspirators did not provide the Grand Jury "enough information to enable it intelligently to decide whether a crime has been committed and to determine whether there exists legally sufficient evidence to establish the material elements of the crime".

60.    The defendant A.D.A. O'Mara, who presented the O'Hara matter to the Grand Jury, told CRU he was personally well acquainted with *Ramos* trial and appellate decisions. As a result, A.D.A. O'Mara claimed to CRU investigators that the grand jury charge in the O'Hara matter was carefully crafted to avoid the pratfalls of *Ramos* prosecution, which was thrown out on the issue of residency.

61.    Therefore, the plaintiff has a substantial need for the Grand Jury Materials, which would expose whether A.D.A O'Mara relied on the discredited residency issue and/or informed the Grand Jury of the extensive amount of exculpatory evidence in the KCDA's possession, including records from Chase bank, American Express, the Office of Court Administration, and the New York City Campaign Finance Board. Courts in the Second Circuit have held that "[a] substantial need exists 'where the information sought is "essential" to the party's defense, is "crucial" to determination of whether the defendant could be held liable for the acts alleged or carries great probative value on contested issues." *Gucci Am., Inc. v. Guess?, Inc.*, 271 F.R.D. 58 (S.D.N.Y. 2010) at 74-75 (quoting Nat'l Cong for Puerto Rican Rights v. City of New York, 194 F.R.D. 105, 110 (S.D. N.Y.2000)). The documents must "have a unique value apart from those already in the movant's possession." *FTC Boehringer Ingelheim Pharms., 778 F.3d 142, 155-156, 414 U.S. App. D.C. 188(D.C. Cir. 2015).*

62.    Insofar as the testimony, the charge to the grand jury and the original notes may be unavailable (according to the CRU Report), Grand Jury materials would be crucial

as it would illustrate whether defendant A.D.A O'Mara was intending to bring the case to a Grand Jury on the discredited residency issue and whether the conspirators intended to present false testimony regarding plaintiff being removed from the ballot for fraud. The CRU report states the defendant Waite falsely told NYS Board of Elections commissioners, who were conducting the joint investigation with the D.A., that O'Hara had been removed from the ballot three times for fraud. A.D.A. O'Mara stated in an interview with Harper's Magazine that the reason for the prosecution was the civil cases failed to deter him, thereby acknowledging he had an ulterior motive for bringing charges without probable cause.

### f) THE PUBLIC INTEREST WEIGHS IN FAVOR OF DISCLOSURE

63.    In addition to plaintiff's compelling need for the grand jury documents, the public interest in this case also compels disclosure. In short, the balancing of interest in this case favors disclosure of the investigative files of the District Attorney including any grand jury "documents" for use in this federal §1983 civil lawsuit, as courts have repeatedly found in other civil rights actions. See, e.g. *In re Quinn*, 47 N.Y.S. 2d 66 (2d Dept. 1994) (reversing district court order denying production of grand jury minutes to a group of citizens seeking to remove receiver of taxes from public office for misconduct); *People v. Carignan*, 76 Misc. 2d 515 (N.Y. Sup. Albany County 1973) (ordering disclosure of grand jury minutes to assist civil defendant to defend against suit alleging she caused false arrest of plaintiff); *People v. Cipolla*, 184 Misc. 2d 880 (County Court, Rensselaer County 2000) (directing unsealing of the entire grand jury record where plaintiffs, after being acquitted of criminal charges, brought federal civil rights lawsuit alleging defendants presented false evidence to the grand jury and at trial, causing their wrongful prosecution); *People v. Lindsay*, 188 Misc. 2d 757 (County Court, Cattaraugus County 2001) (over

objection of the district attorney, granting disclosure of grand jury minutes on 65 year-old capital case to assist in production of film about case, where trial was lost).

64.     In the case at bar, as in *DiNapoli*, there are compelling public interests involving disclosure. *DiNapoli*, like the instant action involved allegations of a conspiracy, which are often shrouded in secrecy and difficult to prove. As stated by the Court in *DiNapoli*, "In exercising this discretion, the court must balance the competing interest involved, the public interest in disclosure against that in secrecy. It is *235 our view that the Special Term and the appellate Division properly found that the public interest would best be served by allowing inspection by the Commission. As the interest in disclosure, we need but note that charges to consumers arising from the decade-long conspiracy, involving millions of dollars, may depend upon the agency's ascertainment of the degree of Consolidated Edison's -- and Brooklyn Union's -- involvement in the criminal conspiracy. Moreover, only by obtaining a complete record will the Commission be able to take steps to prevent similar victimization of utilities and their customers in the future."

65.     There is a strong public interest in exposing and holding extensive public corruption accountable that which silenced, accused and convicted a political opponent. Justice and public accountability far outweigh any need for continued secrecy of the District Attorney's investigation. The District Attorney's office has no intention of disclosing any records voluntarily, as they have opposed the disclosure of substantial records related to this action absent Court orders. Moreover, even when the District Attorney's office has provided documents related to the instant action, the heavy redaction of these documents has made its' disclosure pointless, insofar as the information conveyed is not remotely coherent enough to decipher. The

motivation behind the objections to disclosure is questionable, given the Conviction Review Unit's recommendations to vacate O'Hara's conviction and dismiss the case. It would indeed be quite ironic if the District Attorney's outrage, which resulted in the exoneration of Mr. O'Hara, worked to defeat O'Hara's pursuit of justice and civil redress.

66.    The People of Kings County and the State of New York have an overriding interest in determining just how a young man, whose most serious wrong was to vote in a neighborhood he grew up in, was tried and convicted as a felon. There is an absolute need to ensure that those who swore to uphold the laws of the State of New York are not permitted to rise above those very laws. This Court should further permit the public to discern, from the instant action, that there exists no two-tiered system of justice. If, as it is becoming progressively clear, these individuals lied about the true events of this case and conspired to arrest an innocent victim to promote their political agenda, it is imperative that they are exposed, thereby helping to deter such serious misconduct.

### CONCLUSION

WHEREFORE, your affirmant respectfully prays for relief requested in the Notice of Motion, a Court order for the disclosure of the Grand Jury records and testimony and for such other and further relief as this Court may deem just and proper in the premises.

Dated: February 26,2024
West Islip, New York

Dennis Kelly, Esq.

41