# EXHIBIT B

**MEMORANDUM**

**TO:**     Acting District Attorney Eric Gonzalez

**FROM:**   Conviction Review Unit by A.D.A. Mark Hale

**RE:**     *People v. John K. O'Hara*, Indictment Number 13525/1996

---

**The Crime**

In 1996, John Kennedy O'Hara, an attorney-at-law, community activist, political campaign organizer and perennially unsuccessful candidate for local office in Sunset Park, Brooklyn, was charged by indictment with Offering a False Instrument for Filing in the First Degree [Penal Law Sec. 175.35], False Voter Registration [Election Law Sec. 17-104] and five counts of Illegal Voting [Election Law Sec. 17-132(3)].

The genus of the indictment charges was O'Hara's claimed residence. Since the early 1980s, O'Hara had leased an apartment and maintained a residence in a multi-unit building at 579 61st Street. O'Hara had duly registered to vote from that address and had stood for office using that address. Until 1992, 579 61st Street was in the 20th Election District of the 51st Assembly District, and, in the 38th Council District for the New York City.

In 1992, redistricting was enacted which placed O'Hara's 61st Street residence outside of the newly drawn lines of the above noted districts where O'Hara had voted, run for office and established community and political connections. On November 2, 1992, O'Hara prepared, signed and filed with the Board of Elections a new voter registration claiming a residence at 553 47th Street, a location still in the Sunset Park neighborhood where O'Hara had personal and political roots, but also back within the newly redrawn lines of the state's 20th Election District, the 51st Assembly District and the city's 38th Council District. O'Hara subsequently voted in five elections (two Democratic primary elections, two general elections and one special election) between November 3, 1992 and November 2, 1993 in those districts pursuant to the registration filed in November, 1992. After the November, 1993 general election, O'Hara again filed a new voter registration, on that occasion claiming 6017 4th Avenue, a location still within the redrawn district lines noted above, as his voting residence. All the while, and throughout the subject period (November, 1992 – November, 1993), O'Hara continued to maintain the lease, landline telephone, utilities and mailing address at the 61st Street location he had claimed as his voting residence prior to redistricting.

KCDA001162

The indictment alleged the claimed 553 47th Street residence was a sham making O'Hara's November, 1992 filing of voter registration a criminally fraudulent act under both the penal and election laws and his votes after the registration illegal.

In total, John O'Hara was tried three times on the indictment. The first trial, in May, 1997 before the Hon. Justice Priscilla Hall, resulted in a jury verdict convicting O'Hara on all counts. That conviction was reversed by the Appellate Division, Second Department, in August, 1998.[1] In January, 1999 before the Hon. Justice Abraham Gerges the case was tried to a hung jury resulting in a mistrial. Finally, in June, 1999, again before Justice Gerges, the case was re-tried and the jury convicted O'Hara on all counts. The trial prosecutor on all three cases was former A.D.A. John O'Mara. Conversely, O'Hara was represented by three different attorneys in the three criminal trials

After a failed CPL Article 330 motion to set aside the verdict (which was denied on procedural grounds without a hearing), O'Hara was sentenced to a period of probation, a fine and a substantial period of community service, all of which were long ago satisfied. He appealed his final conviction all the way up to the New York Court of Appeals which affirmed[2] over a vigorous dissent. In 2005, O'Hara moved to have his verdict set aside pursuant to CPL Article 440. Judge Gerges denied the motion. Failing that, O'Hara instituted a *Habeas Corpus* petition in Federal District Court. That petition was also denied. O'Hara has claimed to have made three separate petitions for a gubernatorial pardon to three governors (Pataki, Spitzer and Patterson) all of which were declined. When O'Hara was convicted of a felony, he was automatically disbarred. In 2009 he was reinstated to the bar by the Appellate Division upon his request and following a hearing before the character and fitness committee.

CRU began investigation into O'Hara's conviction upon O'Hara initiating another CPL 440 Motion to Vacate which is currently pending before the Hon. Judge Miriam Cyrulnik in Supreme Court. The motion has been held in abeyance upon consent pending the completion of this investigation, but is next calendared for December 15, 2016.

**State of the Law**

████████████████████████████████████████
████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

---

[1] *People v. O'Hara*, 253 A.D.2d 560 (2d Dep't., 1998)

[2] *People v. O'Hara*, 96 NY2d 378 (2001). See Exhibit 1.

KCDA001163

JO-426



*(Matter of Bramwell v. Garullo*, 103 Misc.2d 476, 426 NYS2d 395; *Gallagher v.*

---

[3] See, e.g., *Weiss v. Teachout*, 120 A.D.3d 701 (2d Dep't. 2014)(candidate lived in Rhode Island, and tax returns stated that she had lived in New York for "zero months" during pertinent year; she amended her tax returns after the legal challenge commenced; court found that any "ambiguity" in her residence defeated challenger's effort to meet his burden to disqualify her); *Jones v. Blake*, 120 A.D.3d 415 (1st Dep't. 2014)(candidate voted outside the state and also amended his tax returns during his candidacy; court found that inconsistent inferences could be drawn from the evidence, and therefore challenger did not meet burden to invalidate his candidacy).

[4] In the New York Times' editorial on the council race, the paper – "[w]ith reluctance" – endorsed Lasher, but not before stating that Lasher "was caught lying about his real residency in the district."

*Dinkins*, 32 NY2d 839, 841, 346 NYS2d 268[5]; *Bressler v. Holt-Harris*, 30 NY2d 529, 300 NYS2d 379; *Matter of Gladwin v. Power*, 21 AD2d 665, 249 NYS2d 980, aff'd. 14 NY2d 771, 250 NYS2d 807; *Matter of Ferguson v. McNab*, 60 NY2d 598, 467 NYS2d 192; *Williams v. Power*, 21 AD2d 671, 251 NYS2d 297, aff'd. 14 NY2d 774, 250 NYS2d 208; *Laspesa v. Mahoney*, 42 AD2d 1027, 349 NYS2d 239; *Berman v. Weinstein*, 64 AD2d 940, 408 NYS2d 143."



[5] See fn. 6, infra

KCDA001165

JO-428



*Hosley v. Curry*, 85 N.Y.2d 447 (1995)

KCDA001166

JO-429



**Procedural History**

In 2005, Judge Gerges, who had been the presiding justice in O'Hara's second and third trials which resulted in a mistrial (hung jury) and a conviction on all counts, respectively, was considering an application by the defendant to set aside his conviction pursuant to CPL Article 440.[12] Since one of the primary issues was improper selective prosecution, Judge Gerges

---

[10] ███████████████████████████████████████████

[11] According to former A.D.A. John O'Mara, who in 1996 presented the O'Hara matter to a Kings County grand jury and was the trial prosecutor on all three of O'Hara's trials, KCDA, and he personally, was well acquainted with the *Ramos* trial and appellate decisions. As a result, O'Mara claims that the grand jury charge in the O'Hara matter was carefully crafted to avoid the pratfalls of the Bronx prosecution. On this issue, CRU must take O'Mara's word for it as the grand jury minutes recounting both testimony and charge to the grand jury, have been separated from the DA case file and have not been located. Similarly, the original stenographic notes of the proceeding are no longer available, thus the minutes are unrecoverable. What is certain is that the O'Hara trial court, upon a Motion to Inspect and Dismiss, found both the evidence presented and the charge to be proper and legally sufficient.

[12] This was only one in a series of post-conviction motions filed by the defendant O'Hara in both state and Federal court.

KCDA001167

JO-430

solicited from the assistant assigned to the 440, then Executive A.D.A. Anne Gutmann, a recounting of how the action against O'Hara was initiated. █████████████████ ████████ ███████ ████████████████████████████████ The following narrative timeline has been reconstructed from extant documents, reports, transcripts and personal interviews conducted by CRU.

A challenge to O'Hara's residency had been lodged in a 1993 civil election trial.[14] That year he was running for the New York City Council against incumbent Joan McCabe, an elected official allied with Assemblyman Brennan and his election lawyer Jack Carroll. Carroll, representing the incumbent's supporters, commenced an invalidating lawsuit against O'Hara, alleging, inter alia, that the residency he claimed on his designating petition was false.[15] The residence on O'Hara's designating petition was 553 47th Street, Brooklyn, NY – the very same residence at issue in the indictment three years later. However, without the issue being tried, Carroll discontinued the proceeding. Thus, there was no trial, let alone a finding – adverse to O'Hara or otherwise – with respect to his residency.

In 1994, O'Hara ran for the New York State Assembly against incumbent Brennan. Here again, Carroll (with the assistance at trial of Brennan's Chief of Staff John Keefe) represented objectors to O'Hara's designating petitions, alleging, inter alia, that O'Hara's residence at the 47th Street premises – from which O'Hara allegedly moved in late 1993 – was fraudulent.[16] Carroll presented testimony relating to O'Hara's residency at 553 47th Street, but the parties stipulated to settle the case prior to any ruling. Specifically, the parties agreed that O'Hara's designating petition would be withdrawn for lack of sufficient signatures – and the residency issue was

[13] Here reproduced and attached as Exhibit 3, and, hereafter referred to as the Gutmann Letter.

[14] This was not the first go-round for O'Hara in election litigation. For several years prior to 1993 CRU has found that O'Hara and the people he ran against engaged in mutual challenges to each other's candidacy based upon sufficiency of the nomination petitions, fraud and forgery in the nominating petitions and, occasionally, residency fraud, either on the part of the candidate, one or more of the subscribers or one or more of the persons gathering petitions. Sometimes O'Hara sued the other candidate or candidates; sometimes the other candidate or candidates sued O'Hara and, often, they were suing each other in the same election. CRU finds this was business as usual in the thrust-and-parry world of local politics.

[15] Loeb v. O'Hara, Index No. 24298/93 (Sup. Ct. Kings Co. 1993). It should be noted that the residency requirement for the New York City Council is residence in the district on the day of the general election. Nevertheless, a candidate is required to truthfully state his or her residence on the petition; if it is false, the designating petition can be invalidated, irrespective of the residency requirement of the particular office. See, e.g., Bastone v. Cocco, 230 A.D.2d 950 (3d Dep't. 1996), which authoritatively enunciated that principle for the first time. Although Bastone was decided three years after Loeb was commenced, this apparently was Carroll's theory in the Loeb case.

[16] Pol v. The Board of Elections in the City of New York, Index No. 23414/94 (Sup. Ct. Kings Co. 1994). Although O'Hara no longer claimed the 47th Street premises as his residence in 1994, Carroll sought to make it an issue as it related to an Assembly candidate's one-year residency requirement in the district. Whether or not O'Hara's previous residence at 47th Street was even relevant in the 1994 case was never ruled upon by the court.

KCDA001168
JO-431

dropped. O'Hara had not even put on his case, and the court made no finding with regard to either O'Hara's residency or Carroll's allegation of petition fraud. It was also agreed that the record would be sealed. Carroll agreed to this settlement on the record.

·Despite having withdrawn the 1993 case which raised O'Hara's residency issue, and prior to re-alleging it in the 1994 case (which, as indicated, was also ultimately dropped), Brennan sought the intervention of the New York State Board of Elections. On June 28, 1994, during the time O'Hara was circulating designating petitions to run against him for the Assembly seat, Brennan, on his official New York State Assembly stationery, asked the Board to investigate O'Hara's residency. Although such requests to investigate are not necessarily public matters, this formal request by an Assemblyman on his official government stationery to the Board about a political opponent appears unusual. Moreover, not only did Brennan use his official stationery to seek an investigation, but he also signaled the Board of the political nature of his request: in his letter, he "cc'd" Jeff Feldman, who was then (and still is), the Executive Director of the Kings County Democratic Party County Committee, and undoubtedly well-known to the Board. On July 11, 1994, the Board's Enforcement Counsel wrote back to Brennan, addressed to his legislative office in Albany, acknowledging receipt of the complaint against O'Hara.

A full year went by until the Board, by its Special Deputy Counsel Jeffrey D. Wait, notified Brennan that it would proceed with the investigation of O'Hara's residency at Brennan's request. Pursuant to a "Confidential Memorandum" from Wait to the Board Commissioners, dated June 19, 1995, Wait had recommended that the Board "investigate the validity of Mr. O'Hara's voter registration." To support his recommendation, Wait made the following observations:

> (1) "The Board has received a complaint from Assemblyman James Brennan in which it is alleged that John O'Hara 'has been running for office from false residences.'"
>
> - He did not mention that O'Hara was running against Brennan at the time of the complaint, or that he had a history of running, or supporting others, against Brennan's allies.
> - Nor did he mention that Brennan's counsel, Carroll, had raised the residency issue against O'Hara in a civil election matter in 1993 and 1994, and each time withdrew it.

> (2) Assemblyman Brennan's "stated reason for believing that Mr. O'Hara never really moved [into 553 47th Street] is that his driver's license shows 579 61st Street and that a telephone is listed under his name at that address."
>
> - Wait mentioned later in the memo that "The courts have interpreted the residency statute broadly, and have thereby sanctioned registration from a second residence...[a]s long as there is an actual choice to be made between two addresses, that choice should be honored."

JO-432

- Wait did not discuss whether Brennan's "stated reason" for his belief that O'Hara did not reside at 553 47th Street (O'Hara's driver's license and phone at 61st Street) was probative as to whether he has a second, legitimate residence at 553 47th Street. In fact, it was not probative as to O'Hara's contacts with 553 47th Street, because, as Wait conceded, a candidate or voter could legally have multiple residences.

(3) Wait opined that "some valid basis must exist for the choice [of one of two residences]." He went on to state the law incorrectly: "If the registrant does not, for example, have ties to the community, vote from the address, own or lease the residence, or pay any of the utilities, the registration is likely to be invalid."

- These are but indicia of residency, and none is talismanic. Ironically, however, O'Hara did indeed vote from 553 47th Street – the so-called second residence – and it was this address that was being challenged.

██████████████████████████

(4) Wait concluded, "Here, if the use of the various second addresses was necessary in order for Mr. O'Hara to run for office, and his contact with the residences was negligible, then a fraudulent motive will be readily ascertainable." Wait then footnotes that O'Hara's 1994 petitions were invalidated by a Supreme Court Justice, and O'Hara's treasurer in a 1988 race was found to have been falsely registered from O'Hara's 61st Street address.



Thus, it appears that Brennan had not fully conveyed to Wait all the evidence that had been adduced at the 1994 trial, or that it was settled without any ruling – let alone an adverse one – relating to O'Hara's residency or his petitions.

Having determined to investigate O'Hara on the speculations of a sitting Assemblyman who was a long-time political opponent, Wait met with Brennan and Carroll two months later. On August 31, 1995, Wait met with them in Carroll's law office in Manhattan. A Board investigator was also present. According to the investigator's notes, the purpose of the meeting was "to obtain additional information regarding John O'Hara." The notes reveal that Brennan or Carroll advised Wait that O'Hara had been thrown off the ballot in 1988 for fraudulent petitions (not fraudulent residency), and, according to the investigator, "[t]he main focus was the 1994 petition fraud issue[,] alleg[ing] that O'Hara and his girlfriend circulated petitions and had someone else sign the subscribing witness section." The investigator was further advised that there had been testimony in the 1994 trial by one Roberto Resano [sic][17] that O'Hara had not lived at the 47th Street residence. It does not appear from the investigator's notes that Brennan or Carroll advised Wait that there was also testimony at trial by representatives of American Express and Chemical Bank that O'Hara's residences included 553 47th Street, or that Carroll had consented to drop the 1994 case prior to O'Hara having the opportunity to call any witnesses. It also does not appear from the investigator's notes that Brennan or Carroll advised Wait that they had raised the very same residency issue in a 1993 civil election matter, but dropped the case without even calling a witness. It does appear that Carroll advised Wait that the record in the 1994 case had been sealed, because in a letter to Wait three weeks later, Carroll informed him of the name and Index Number of the 1994 invalidating lawsuit. Indeed, had Wait had the opportunity to review the trial transcript, he would have learned that the residency issue was inconclusive, and, in any event, had not been adjudicated.

A few days later, the Board interviewed one of O'Hara's subscribing witnesses on his petitions, and Wait sought documents from the New York City Board of Elections. The Executive Director of the New York City Board advised Wait that O'Hara's 1994 designating petitions had been "destroyed" by the Board.

It appears from the file that after the beginning of September 1995, neither Wait nor other Board personnel made further requests for interviews or documents in connection with the O'Hara investigation. In that the file does not include messages sent or received by the Board with respect thereto, there is no information as to communications between Brennan or Carroll, and the Board.

The next significant event relating to the Brennan allegation against O'Hara was a motion by the Board to unseal the trial transcript of the 1994 civil election case against O'Hara.

---

[17] CRU assumes he meant Roberto Lozano, who, for a time, lived at 553 47th Street, and testified at the 1994 civil election trial against O'Hara and would testify against O'Hara at all three criminal trials.

JO-434

In or about January 1996, the New York State Board of Elections moved to unseal the record. Although Carroll had originally agreed in open court to have the file sealed, nevertheless, he advised the court that he did not object to the Board's motion. Carroll, in an Affirmation filed with the court in connection with the Board's motion, said the testimony in the case "related to the validity [of] Mr. O'Hara's claimed residency and the validity of numerous signatures that appeared on Mr. O'Hara's petition. With respect to both issues, the testimony demonstrated quite clearly that the petition was substantially tainted by fraud." This was obviously Carroll's view of his own witnesses' testimony, but the evidence relating to 553 47th Street was inconclusive in that there was also evidence connecting O'Hara to the premises. In any event, Carroll did not explicitly state in his Affirmation to the Court that the case was settled without adjudication on O'Hara's residency (or any other allegation of fraud).

Nevertheless, Wait, who filed the motion to unseal, made the following hearsay allegation in his Affirmation, dated January 27, 1996: "In the course of its investigation, the board became aware that most, if not all, of the testimony taken at the hearing before this Court is directly relevant to the Board's investigation." In other words, even though Carroll had agreed to terminate the trial without any finding relating to residency, Wait relied on Carroll's representations as to what the testimony showed.

While the Board's investigation of O'Hara was moving forward, two incidents occurred, unrelated to the residency issue that nevertheless led to his criminal prosecution.

The Board's motion to unseal the 1994 civil election case against O'Hara was heard in Kings County Supreme Court on May 28, 1996. On the same date, Keefe appeared in Kings County Supreme Court in his own case against O'Hara. According to Keefe, at 10 p.m. on the night before, he was followed by a man. When Keefe turned around, the man dashed away, but not before another person several feet behind yelled to the man following Keefe. Keefe did not hear what the person was yelling or see who he was. The next night, on the evening of May 28th, Carroll was reportedly assaulted on the street in Brooklyn with a man carrying a hammer.

Carroll filed a complaint with the 66th Precinct of the New York City Police Department, and was interviewed the next morning by Detectives Messing and Esposito. The interview was held in Carroll's home. Also present were Carroll's wife, who was identified by the detective as a legislative liaison to Brennan, Keefe, and political ally Joan McCabe, the City Council person (whose allies had challenged O'Hara's designating petitions for City Council in 1993). Keefe was also interviewed. Carroll and Keefe expressed the view that O'Hara had instigated the attack on Carroll and the incident with Keefe. The stated basis for their view was that Carroll and Keefe were long-time political opponents of O'Hara and repeatedly brought election proceedings against him in Supreme Court to remove him from the ballot. Keefe advised the

JO-435

detectives that O'Hara "withdrew [his candidacies] for election fraud… and gets records sealed." Keefe said that he believed the man who had approached him from behind was a friend of O'Hara's "who would do this for Mr. O'Hara."[18]

At this meeting with the detectives about the alleged assault, Brennan, Keefe and/or Carroll told the detectives that the Board of Elections was investigating O'Hara's residency. Moreover, either during this interview or at some other time during the same day, the detectives were given the name and telephone number of Wait at the Board of Elections. One of the detectives noted the possibility of putting a "tail" on O'Hara. Needless to say, the Board's investigation of O'Hara's alleged illegal voting was irrelevant to the alleged assault.

Shortly after their meeting with the detectives, Brennan and Keefe went to the District Attorney's office and met with Assistant District Attorney Angelo Morelli about the alleged assault on Carroll. They told Morelli that O'Hara was behind the alleged assault as well as the incident with Keefe. A.D.A. John O'Mara, then Morelli's deputy in the Investigations Bureau and a high ranking executive in the office, joined the meeting and remembers the men's bitter frustration with the police in not arresting O'Hara for the assault.

Then, just as they had inserted the Board's investigation into their conversation with the NYPD detectives, Brennan – meeting with the KCDA about the assault – raised the illegal voting charge: "[Brennan] and/or Mr. Keefe expressed the belief that O'Hara did not, in fact, reside at the address he was claiming on his voter registration…. [and] further stated that a judge who had presided over an Election Law matter involving O'Hara had mentioned that he might refer that matter to the District Attorney for investigation."[19] Of course, their claim to the District Attorney that O'Hara had voted from a false residence had never been proven nor did they indicate that O'Hara had abandoned the disputed address almost three years earlier and had filed a registration claiming yet another Sunset Park location as his voting residence. As indicated above, Carroll had explicitly raised the issue in a civil election matter in 1993 and dropped it; he raised it again in 1994, and again dropped it after inconclusive testimony. There were no findings against O'Hara by the court in either case. And the comment that a Judge said he might refer an election matter concerning O'Hara was not supported by the record in either case.



[19] The quoted recitation is, verbatim, from the Gutmann letter to Judge Gerges. *See* Exhibit 3

JO-436

Soon afterward, presumably at the urging of Brennan, Board counsel Wait called the District Attorney's office and had "several discussions" with the KCDA about his investigation.[20]  Wait also sent his file on O'Hara to the KCDA.[21]  Such file contained voter registration records, as well as Wait's Confidential Memorandum and a Board investigator's interview notes, which, as detailed above, contained an incomplete or incorrect interpretation of evidence in the 1994 trial.

Two events then occurred.  The Supreme Court denied the Board's motion to unseal the 1994 trial record, holding that original parties (specifically, O'Hara) had the right to rely on Carroll's previous consent. Then the KCDA by A.D.A. O'Mara opened a Grand Jury investigation ████████████████████████████████████████
████████

A week after the court's decision, O'Mara, who ultimately prosecuted O'Hara three times at trial, called the County Clerk of Kings County to obtain the record.  In support of his request to obtain a "so ordered" subpoena for the trial transcript, O'Mara submitted an Affirmation to the court.  In it, he said:

> "Petitions filed by Mr. O'Hara in support of his candidacy for the New York State Assembly race in the fall of 1994 were successfully challenged in New York Supreme Court....At the direction of Justice Irving Aronin on August 5, 1994 in the Special Election Part, Mr. O'Hara was removed from the ballot, and records of the proceeding were sealed....I am informed by John W. Carrol {sic}, the attorney who represented the Petitioners in these actions, that a hearing was held, that both documentary and testimonial evidence was submitted, and the residency of Mr. O'Hara was one of the principal issues to which this evidence was directed.  The matter was resolved by the Court directing the removal of Mr. O'Hara from the ballot."

This Affirmation purported to convey that a court had adjudicated O'Hara's residency, and that it was the court that ruled him off the ballot.  As indicated above, this was false. Residency was an issue, but although there was testimony that called it into question (testimony by Roberto Lozano), there was also evidence that linked O'Hara to 553 47th

---

[20] O'Mara detailed one of the contacts with Wait in which Wait, in extreme agitation, called up O'Mara and demanded that O'Mara charge O'Hara with a crime. Wait explained that after having conducted inquiries regarding one of O'Hara's petition collectors and allegations of fraud and/or forgery in the petition signatures, Wait received a telephone call from John O'Hara the substance of which was a threat to do bodily injury to Wait if Wait persisted in his inquiries. Since Wait had received the phone call at his office in Albany and there was no proof it originated in Brooklyn, O'Mara advised Wait he should file his complaint with the authorities in Albany. This, of course, never occurred, but the anecdote is instructive in understanding how much O'Hara's bellicose personality drove the investigation and subsequent prosecution.

[21] Wait recounts these facts in a Confidential Memorandum to the Board's Commissioners dated November 14, 1996.

Street (American Express and Chemical Bank statements, provided through testimony by representatives of those institutions). Moreover, in that the proceeding was settled, the directive by the court to remove O'Hara's name from the ballot was ministerial – it was, after all, based upon the agreement of both parties, not any adverse finding.

Thus, the O'Mara Affirmation was not a full and fair recitation of what had occurred during the 1994 trial. It was, as he conceded, based upon what Brennan and Carroll, both avowed and open political enemies of O'Hara, had told him and his colleagues.[22]

In any event, a full-fledged criminal investigation was undertaken. Carroll, who stayed in touch with the KCDA's chief of investigations, Morelli, and investigating prosecutor, O'Mara, turned over his private investigator's findings from 1994, and provided current information about O'Hara's addresses. Subpoenas were served; neighbors were interviewed; and documents were obtained. At least two neighborhood people said that O'Hara lived at 553 47th Avenue with his girlfriend; bank and credit card records linked him to 553 47th Street; a credit report showed 553 47th Street as one of his residences; he clearly had strong ties to the community throughout his life; and he served on the Community Planning Board that included 553 47th Street in its catchment area. There was, to be sure, testimony by Lozano in the election hearing that O'Hara did not live at 553 47th Street, but the KCDA had records of Lozano's criminal past.[23]



### The Trials

#### *The People's Case*

The prosecution evidence in all three trials, with an exception occurring during the rebuttal phase of the third trial, was essentially the same. A Board of Elections official

---

[22] O'Mara recalled to CRU that he was instructed to open the Grand Jury case ███████████████

[23] See page 17, *infra*, for a discussion of Lozano's criminal history.

JO-438

testified as to the records of the Board indicating O'Hara's signed voter registration in November, 1992 claiming 553 47th Street as his residence and his votes in five elections subsequent to that registration, but preceding a superseding registration which changed O'Hara's residence to 6017 4th Avenue in 1994.[24]

Testimony was also received to establish that, during the charged time period (November 1992 through November 1993), O'Hara had maintained the residence in the apartment at 61st Street, renewed the lease and paid the rent in a timely manner. Testimony also established that the public utilities at 61st Street were in O'Hara's name and he was billed for those utilities at that address. He also had a listed and working telephone at 61st Street before, during and after the indictment period. By contrast, the utility witnesses (like the Board of Elections witness utilizing records maintained by their respective companies) found no gas or electric account in for O'Hara at 553 47th Street, nor the installation or listing of a telephone by O'Hara at that address.[25] The regular mail carrier who delivered for many years to the 61st Street address testified that he had delivered mail to O'Hara at 61st Street long before, during and long after the subject period and that no change of address or forwarding for mailing purposes to 47th Street had been filed with the United States Postal Service.[26]

The two key prosecution witnesses were Rafael (Ralph) Munoz and Roberto (Robert) Lozano. The witnesses were two of the three men (the third being one Quetzal Martinez,

---

[24] From the case file maintained by the Board of Election and the KCDA, as well as conversations with former ADA O'Mara, Brennan, et al, had asserted that the 4th Avenue address was also fraudulent and should give rise to additional charges of false registration and false voting. After investigation revealed the identical connections established by O'Hara at the 47th Street address and the lack of a lease or any utilities in his name for the claimed residence, KCDA declined to indict or prosecute O'Hara concerning the 4th Avenue registration and subsequent votes. The reason, as explained by O'Mara, as distinguished from the indicted situation is that (1) the claimed address was a habitable location and (2) the owners, close friends and political allies of O'Hara, claimed he was granted license to live there and did so.

[25] While extremely commonplace now for a person not to have a landline installation at their residence, 1992-93 preceded by more than a few years the cell phone revolution in which all of one's local, long distance and, indeed, data needs can be satisfied in a small mobile device. As late as the third trial in 1999, O'Mara argued that a telephone was vitally essential in any place one could or would call home and the lack of a telephone was strong indicia of non-residence.

[26] However, investigative notes indicate that KCDA had information from USPS that mail addressed to O'Hara had been delivered to 553 47th Street throughout 1993. ███████████████ In the first instance, O'Hara conceded the residence at 61st Street. More importantly, the jury issue was not whether O'Hara could maintain multiple residences for voting and candidacy purposes ███████████ nor whether 61st Street was more of a residence to O'Hara or superior in nature to the 47th Street location. The only issues were whether the People's evidence could prove beyond a reasonable doubt that the 47th Street location, specifically the basement, was not habitable as a residence, and/or whether O'Hara lacked the significant minimal contacts that he could claim the location as a residence for voting/election purposes thus, in either or both instances, making the location a sham and his registration and voting a fraud.

KCDA 001176

now deceased) who, beginning in November, 1992 purportedly jointly rented all or part of 553 47th Street from owner Magaly Lucas, a former girlfriend and law school classmate of O'Hara who, in turn had purchased the building in 1990. On October 29, 1993 a deed in favor of the three men was executed indicating a completed sale of 533 47th Street from Magaly Lucas.[27] In return, they paid a lump sum of $10,000 and assumed the remainder of the mortgage.

Both men testified that they, along with their third cohort, were seeking a property to purchase when a real estate broker arranged for them to see the 47th Street address in October, 1992. At the time the property was vacant and in need of repair. Subsequently they entered into an arrangement whereby they rented the house for a monthly sum equal to the mortgage payment with the option to buy the premises. They testified that they exercised that option in late 1993, although they disputed whether title had actually been transferred and expressed the belief that they had been defrauded out of the property.[28]

Both men testified that at no time did John O'Hara live at 553 47th Street between the date when they took possession in October or November, 1992 until when they purchased the building in December, 1993. Further, they stated that the basement, the claimed residence by O'Hara, was an unfinished dumping ground, filled with junk and building debris during that entire year. To be sure, the basement area contained a sink and toilet, but the men said these facilities stood in the open (among the junk and debris) and could not be considered a residential bathroom in the traditional sense.[29]

The witnesses further stated that early in their residence at 47th Street they were both, separately and together, approached by O'Hara, who they understood to be a friend and associate of their landlord/homeowner Lucas, on several occasions,. In substance, the testimony was that O'Hara advised them (and the third co-tenant) that he would be

---

[27] A title search of city records indicates the three men as owners of 553 47th Street from November 15, 1993 until September 9, 1997. The former date indicates when the deed was recorded, approximately two weeks after the executed conveyance.

[28] After the sale deed was filed the men made no payments whatever on the outstanding mortgage. The property was foreclosed upon and sold by the bank holding the note and the men evicted, albeit after extensive litigation.

[29] The men indicated that later in their residency they rehabilitated the basement area and turned it into a habitable apartment which they rented out. They claimed the work was professionally done but could not name or recall who it was that performed the work, the length of time taken to complete the work or even an approximate date when the work was started or completed. The assertion that there existed no habitable areas within the house other than those occupied by the three men when they took possession as tenants stands in stark contrast to Lozano's testimony during the 1994 civil election trial. On that occasion, Lozano claims that he was approached by O'Hara at 553 whereupon O'Hara inquired about living in the house. Lozano, as he testified under oath, replied "sure, do you want to rent an apartment?" clearly implying there was, in fact, habitable areas suitable for rental in the house contrary to his testimony at trial. In the civil proceeding, Lozano never said anything about the state of the basement area and its' habitability. At none of the three trials was Lozano ever questioned about his election trial testimony by either party.

receiving mail at the house and could they collect it for him. This they did for a period of time, noting that O'Hara received nothing of substances, just sales circulars and, most notably, the Victoria's Secret lingerie catalog. Both men also said that O'Hara had instructed them to tell "anyone who asked", that he [O'Hara] lived there. This they agreed to do, though nobody ever asked. They also stated that at one point they had been issued sanitation summons for trash and debris left outside the premises. O'Hara, they said, had agreed, upon their request, to "take care of" the tickets, though they were never satisfied.

Both men were heavily impeached upon their criminal records. Lozano had a string of burglary related misdemeanors, though the last had been committed in 1986. Munoz' record was much more recent and more violent including the criminal possession of a loaded firearm for which he was initially sentenced to probation but subsequently sent to upstate penal detention for violation of that probation, and Assault in the First Degree (reduced for plea purposes from Attempted Murder) for shooting another with a handgun. Munoz was sentenced on the latter offense to incarceration as a predicate violent felon and had only been released to parole within the year before coming to 553 47th Street as an renter/buyer in 1992.[30]

Another item of impeachment was introduced on cross examination of these witnesses. All three men – Lozano, Munoz and Martinez – had, on the same day in April, 1992, obtained drivers' licenses from the state of Virginia, a state in which they admittedly had never lived, claiming residence at a non-existent address. Both of the testifying witnesses admitted falsifying the residence information and stating in the license application their driving privileges were not suspended in any other state despite the warning that the information provided was being received and recorded under penalty of perjury. Both Lozano and Munoz possessed suspended New York State licenses and explained they needed "clean" licenses to operate an off-the-books ice cream truck and freight hauling truck which were their means of livelihood and so engineered the Virginia license fraud.[31]

---

[30] The third man, Martinez, also had an extensive criminal record, including an open matter at the time of the first trial in 1997. Prosecutor O'Mara used Martinez' long and active criminal history as a rationale to not call him as a trial witness. At the same time O'Mara argued, successfully, that the testimony of Martinez would be cumulative to that of Munoz and Lozano, thus avoiding a missing witness adverse inference charge. Martinez never testified in any proceeding, nor is there an extant statement of Martinez on the O'Hara matter so there is no proof, one way or the other, as to whether Martinez would have supported the testimony of his cohorts.

[31] CRU was asked by the Defendant to ascertain whether the prosecution witnesses received any undisclosed benefit for their testimony. Although CRU could find no such benefit, it is clear that the three men were never prosecuted by Virginia for the license application fraud, nor did KCDA make any recommendation to Virginia concerning the license falsification. It is ironic, to say the least, that the chief accusers of O'Hara for a purported false and fraudulent filing of an official document having to do with residence were themselves guilty of a similar offense, also related to claimed residence, beyond all doubt.

Both men also admitted to defaulting on the mortgage they assumed upon exercising the option to buy on 553 47th Street. Records indicated that no payments were made at all and a foreclosure sale and eviction proceeding followed during which time the three men stayed in residence until compelled to leave some two-and-one-half years later. Lozano and Munoz, in turn, claimed, that they made no payments because they felt they had been defrauded out of their bargain for the home by the previous owner, the broker (who, according to their testimony, had been rumored to be involved in other scams), the bank and even their own lawyer; had never signed the transfer and never received a copy of the deed.[32] Out of their murky explanation of the house sale and subsequent default, both men also expressed open hostility toward O'Hara who they believed, as stated in their testimony, was actively in league with the previous owner, Lucas, the real estate broker and the closing attorney in conspiring to defraud them out of the house and the purchase money they had paid toward the sale.

### The Defense Case

O'Hara presented a defense in all three trials and he testified in his own behalf in the second and third proceedings.

The defense evidence, much like the prosecutions proof, can be grouped in two broad categories. The first consisted of documentary evidence from fixed historical business records. The second comprised the recollections of persons making observations at the relevant times.

With regard to the former, O'Hara presented evidence of his Chemical Bank checking account statements and billings which had been mailed to 553 47th Street beginning in early 1993; his American Express account statements which used the 47th Street address for billing and mailing at around the same time; his Office of Courts Administration registration renewal in which O'Hara claimed 553 47th Street in March, 1993 and the voluminous mailings he received at 47th from the local community board, on which he sat, the local action committees in which he participated, the Campaign Finance Board, assisting in O'Hara's 1993 City Council candidacy and the Democratic Party for which he voted and ran for office.[33] This evidence, served not only to establish legitimate

---

[32] Under New York law, it is the seller only who signs the transfer; buyers who purchase subject to the mortgage lien do not own free and clear and the deed is kept by the bank which holds the mortgage and, in any event, the deed in their favor was on file with the County Clerk from whom the men could have obtained a certified copy at any time.

[33] All of these accounts and mailings had, in 1994, been changed to O'Hara's subsequent claimed voting address on 4th Avenue within the same election districts and general Brooklyn neighborhood. All of these contacts were well known prior to the initial election action against O'Hara claiming false residence in 1993 and some had even been presented in the partial election trial in 1994

contacts with the address but to rebut the testimony of Lozano and Munoz that O'Hara received nothing of importance there.[34]

Another bit of documentary evidence also substantially rebutted another part of the Lozano/Munoz proof. The sanitation tickets which the two men had claimed that O'Hara promised to pay as a *quid-pro-quo* for their maintaining the charade of his residence at 533 47th Street were not issued until mid-1994, long after O'Hara had abandoned 47th Street as a voting residence and had established himself on 4th Avenue.

The recollections of many people, mostly friends, neighbors, political connections and even family members who had seen O'Hara in or around the 47th Street address during the subject period and believed him to live there were presented by the defense. Not all of the defense witnesses testified at all the trials and, indeed, O'Hara himself only testified at the last two trials. Among the witnesses were a longtime family friend who testified as to helping O'Hara move items using the witness's car from the 61st Street apartment to the 47th Street address on Halloween Day, 1992 [first trial only]; a political rival and fellow community activist who met with O'Hara several times outside the 47th Street address in the summer and fall of 1993 [first trial only], a grade school principal who had owned (and still owns) the house two door down from 553 since 1974, knew all of the people who had owned and/or rented in 553, was familiar with the house inside and out and met with O'Hara, who she knew from community boards, several times at the house and believed him to live there during the period charged in the indictment [all three trials]; a next door neighbor who was concerned about damage being done to her property as a result of the intermittent construction at 553 during the subject period and complained to O'Hara in person at 553 believing him to live at and have an ownership interest in the house [first and third trial]; a fellow committee man on the local board who met with O'Hara numerous times at the 47th Street house during the subject period [third trial only], and, the aunt and mother of John O'Hara who testified as to visiting O'Hara numerous times in the finished basement apartment at 553 [second and third trials]. Both the neighbors, Yvette Aguierre (the school principal) and Grace Phillips (the neighbor next door aggrieved by the construction, now deceased) testified to their friendship and association with the Vales family who owned 553 47th Street before Magaly Lucas, and remembered having seen Mr. Vales complete the renovation of the basement into a habitable area with drywall and flooring over the pre-existing concrete, a working kitchenette and enclosed half-bath. This renovation, they said, took place in the mid-1980s and both had been in the basement living area many times when the Vales' used the area to entertain friends.

---

[34]The evidence upon observation today most definitively establishes O'Hara's receipt of the mailings at the location. By looking at both billing statements one can see charges made to AMEX which are noted as paid by check in the subsequent month's Chemical Bank checking account statement. In those days before electronic billing and payment, it is conclusive evidence that O'Hara received the items by hand at 47th Street.

The salient feature distinguishing the defense witnesses from those called by the prosecution is that none had a criminal record nor had they committed any actionable fraud. All either had or were retired from "real" jobs as opposed to making an undocumented income "off the books." To be sure the timelines they testified to did not always conform to each other or known events, but no more so than the prosecution witnesses; both sides recalling events that even by the first trial were becoming remote in time. In the main, the defense witnesses were impeached, as argued by the trial prosecutor, because of their association with and personal affinity for John O'Hara. Some had gone as far as supporting O'Hara, either financially or by volunteer work in his campaigns for various offices. Some even carried nominating petitions for him door-to-door in the neighborhood. These activities and associations, it was argued by the prosecutor, evinced bias in favor of O'Hara on the part of the witnesses thus making them unworthy of belief.[35]

A significant defense witness who did not testify was Magaly Lucas, the former girlfriend of O'Hara and owner of record of 553 47th Street during the time period O'Hara claimed residence there. In the first trial, counsel for O'Hara opened his case promising Lucas as a defense witness. He said that Lucas would testify that she had given O'Hara license to stay in the basement apartment at 553 47th Street and that he did in fact live there. In the course of the trial Lucas refused to testify. O'Mara, for the prosecution sought and obtained a missing witness/adverse inference charge to the jury. This charge was the basis for the reversal of O'Hara's conviction in the first trial, the Appellate Division holding that the charge was not properly given, and that even though the witness was available and compellable (counsel declined the issuance of a material witness order), she did not stand in such a relationship to the defendant that she should have been expected to testify favorably for him.[36]

As noted above John O'Hara testified in his own behalf in the second and third trials. He freely admitted that he moved to the 47th Street address for the purpose of establishing a

---

[35] This argument went beyond the four corners of the courthouse with regard to one witness. As related by prosecutor O'Mara, so firm was, and still is, his belief that Ms. Aguirre committed perjury in support of O'Hara at trial that he communicated with the School Chancellor's office and the Board of Education concerning Ms. Aguirre's fitness to be employed as a school principal. No action was taken against the witness and she testified at both the second and third trials. Another more petty, but not insignificant action was taken against Ms. Aguirre. Somewhere along the course of the trials against O'Hara, KCDA publically announced that a number of school principals, among them Ms. Aguirre, would be honored by KCDA for their role in their respective school's exemplary achievement in the office's Legal Lives/Adopt-a-School Program. Sometime after the announcement, Ms. Aguirre was contacted at her school by Executive A.D.A. Dino Amoroso who told her that, in light of her participation in the O'Hara trials, KCDA was withdrawing the award to her and that she should "understand" the office's position.

[36] The missing witness charge instructs the jury to draw a permissive inference that had the witness testified her testimony would have been adverse to the party's position at trial. The practical effect of the charge in the O'Hara case was to shift the burden of proof to the defendant and, for all intents and purposes, to direct a verdict of guilty.

voting/election address within the newly re-drawn district lines of his former election districts so that he could continue his political ambitions. He stated that Magaly Lucas, a former girlfriend, and the owner of the building since 1990, allowed him to stay there free of charge while she worked out completing a sale of the building. He testified that the basement where he took up residence was a finished area with kitchenette and enclosed half-bath. He stated he moved a bed, table and chairs and lamps into the basement and stayed there overnight more often than not during the end of 1992 through 1993. He admitted registering to vote using that address, to vote from that address, and voting a number of times in that district before moving out in November, 1993. He stated his reason for moving out was Lucas's completion of the sale to Munoz, Lozano and Martinez in November of 1993. Upon the sale, he felt he longer had the license to stay in the building, and had no right to squat on the new owners. He then moved to another location on 4th Avenue still within the same election district to continue his political activities there. All the while he maintained his previous apartment on 61st Street, which was the address on the his driver's license,[37] where he had a written lease and paid monthly rent, paid utilities and received part of his mail and which he used as his residence for income tax purposes. O'Hara said he was loathe to give up the very economical rent controlled apartment and continued to use it part-time as a residence, an office and a place for relatives to stay when in town. O'Hara's testimony disputed that of Lozano and Munoz and confirmed the various accounts given by the defense witnesses about personal contacts with them at the 47th Street address.

In the third and last trial only, the prosecution put on a rebuttal case consisting of one witness, Josephine Vales. Josephine Vales was the owner, along with her husband, of 553 47th Street prior to conveying the brownstone to Magaly Lucas in 1990 and moving to New Jersey. Ms. Vales was asked directly: had she and her husband constructed an apartment in the basement of the building while they lived there, and had they done so to accommodate an adult son who was moving back to the house with his partner and newly born child?[38] Her answer was no, the basement consisted of a large open area, a separate enclosed laundry area, a sink and a bathroom. Significantly, Vales was never asked whether they had made improvements like flooring over the concrete floor, drywall over the concrete block walls or drop ceilings under the beams supporting the upper floors. She did say she would never have allowed her son and his family to stay there even if they wanted to because the area was not vented to the central heat. Instead, she installed them in one of the upstairs bedrooms.

---

[37] When the license came for up renewal, he changed the address to the 4th Avenue address he claimed as a voting residence after leaving 47th Street.

[38] Yvette Aguirre had testified that the Vales' had rehabilitated the basement to accommodate the young couple and the child.

Prosecutor O'Mara used the Vales testimony to great effect in his summation saying, in substance, the evidence, coming from a truly independent witness who knew neither the defendant O'Hara nor the accusers who had succeeded Lucas in tenancy and eventual ownership of the building, confirmed the testimony of Munoz and Lozano; the basement was not an apartment nor anything that could be considered as a residence. It did not matter that O'Hara could legally have multiple residences, or a residence for election purposes, or that he had established contacts with the address, or that people had seen him at or around the house, he couldn't claim the place as a residence because it was not habitable as a residence. The people who said otherwise were lying for O'Hara's benefit because of their strong association with him and the billings which came to the address were not legitimate contacts established by but attempts to cover up his criminal conduct. Using the "unimpeachable" testimony of Vales, jurors were encouraged to overlook the obvious deficiencies in the credibility of the prosecution witnesses and convict because Vales' testimony made the prosecution witnesses truth tellers and the defense witnesses, including the defendant himself, liars.

After the conviction in the third trial, the defendant challenged the verdict, and specifically the Vales testimony in a CPL Article 330 Motion to Vacate. O'Hara presented numerous sworn affidavits, including one from Magaly Lucas, to the effect that there was a finished basement at 553 47th Street, suitable in all respects for use as a residence. The court rejected the motion without a hearing, ruling that none of the evidence was newly discovered, that it could have been ascertained with due diligence and could have been presented in a timely fashion at the just concluded trial, thus presenting a procedural bar to the court considering the evidence in a Motion to Vacate

**CRU Investigation and Analysis`**

*Weight and Sufficiency of the Evidence*

[redacted]

JO-446



JO-447



### Habitability of the Premises

CRU sought out and located Josephine Vales living in the western United States to resolve whether the basement of 553 47th Street was habitable, an issue which CRU deems decisive in the conviction of O'Hara at his third and final trial. Ms. Vales, now widowed and aged, was very cooperative with CRU investigators. When asked about the basement area of 455 (without reference to her testimony), Ms. Vales stated that when they first bought the house in the 1970s, it was unfinished with concrete floors and



JO-448

cinderblock walls and exposed ceiling. She stated that sometime in the 1980s her husband, who was very handy, had finished out the basement, creating a separate utility area for washer/dryer, tiling over the floor, installing drywall walls over the cinderblock, and putting in a drop ceiling, a kitchenette with counter, sink, stove and refrigerator. He also enclosed a preexisting commode and installed a shower and sink making a fully functioning half-bath. Ms. Vales explained that the improvements were made when the Vales' also installed an above ground swimming pool, providing a party and entertainment area directly adjacent to the pool, which they used often and was used often by their children who were then teen agers.

When confronted with her trial testimony, Ms. Vales stated (correctly) that she never said the area was uninhabitable or not suited for habitation. She stated that they had never created an apartment (which was the question she was asked). She never considered the area an apartment and the Vales never sought to rent the area out as such, they having their own use for it.[40] Ms. Vales said she had merely answered the questions put to her to the best of her ability. She had been contacted by prosecution investigators and came to court on short notice and with virtually no preparation by the A.D.A. She said that her testimony was correct when she stated that the basement was not improved to provide a living area for her son, his girlfriend and their new born infant, the improvements had been done long before that event.[41] She did say that her son had wanted to move his family into the basement, seeking some privacy and independence but that she had vetoed the idea saying the child's health was delicate and the basement was insufficiently heated for use during the winter months.

Asked if she was trying to create the impression that the basement was unimproved and not suitable for habitation, she stated certainly not; she was just answering questions.[42]

CRU finds Ms. Vales to be truthful both in her present statement and in her somewhat ambiguous trial testimony. The problem is in how her testimony was limited and "spun," attorneys for both sides believing she had supported the testimony of Lozano and Munoz that the basement was not habitable. As this was a key in the jury finding the address to be a sham residence, CRU believes there is now newly discovered (or newly clarified) evidence which raises significant reasonable doubt as to this issue.

---

[40] A record of an appraisal completed upon the sale of the house from Vales to Lucas describes the area as a possible residential rental.

[41] Yvette Aguirre testified for the defense that the son's family's residence was the reason that the basement was renovated by Mr. Vales.

[42] Indeed, on cross examination, counsel asked if Aguirre had said the basement was renovated so that the son and his family could move in would Aguirre be lying? Vales responded, noting that while Aguirre was a close friend that statement was not correct. She was never asked, on direct or cross whether the basement was habitable at all.

## *Selective Prosecution*

The defense has raised the issue of impermissible selective prosecution under the Equal Protection clauses of the New York and United States constitutions. Certainly, in a one-of-a-kind prosecution such as this in which no one before or since has been prosecuted for the same offense, and in which others have not be prosecuted for the same or similar conduct, it is almost self-evident that O'Hara was singled out for purposes other than flagrant criminal conduct which demanded redress.



KCDA001187

JO-450

## Conclusion and Recommendation



KCDA001188

JO-451



JO-452



Cornell University Law School (http://www.lawschool.cornell.edu/)

Search Cornell (https://www.cornell.edu/search/)

(https://www.cornell.edu)

# 2 No. 78
# The People &c.,
# Respondent,
# v.
# John O'Hara,
# Appellant.

### 2001 NY Int. 78

### June 14, 2001

This opinion is uncorrected and subject to revision before publication in the New York Reports.

Steve S. Efron, for appellant.
Monique Ferrell, for respondent.
The League of Women Voters of New York City; New York Civil Liberties Union, *amici curiæ*.

## WESLEY, J.:

Defendant John O'Hara, an attorney and frequent candidate for elective office, was convicted of seven crimes arising from his fraudulent filing of a false voter registration form and voting in five separate elections in an election district in which he did not

JO-453

reside. On appeal, defendant contends that the definition of voting residence contained in the Election Law is at odds with our recognition that in today's society, a person can have more than one residence. This case, however, turned on whether a second residence actually existed, not a choice between two. The court's charge correctly reflects the state of New York law and did not, as defendant now contends, direct a verdict against him.

Defendant has lived in a multi-unit apartment building at 579 61st Street in Brooklyn since the 1980s. Until 1992, he registered to vote using the 61st Street address, which was within the 20th Election District and part of the 51st State Assembly District and the 38th Council District of the City of New York. Following redistricting in 1991-1992, 579 61st Street was no longer situated within these districts.

On November 2, 1992, defendant prepared, signed and filed a new voter registration form specifying that he resided at 553 47th Street. This address was located within the newly-redrawn borders of the 20th Election District, the 51st State Assembly District and the 38th Council District of the City of New York. Using the 47th Street address, defendant voted in those districts on five occasions -- November 3, 1992; May 4, 1993; September 14, 1993; September 28, 1993 and November 2, 1993.

Defendant was charged with one count of offering a false instrument for filing in the first degree (Penal Law § 175.35), one count of false registration (Election Law § 17 (/nyctap-cgi/ez-nylaw?ELN+17)- 104[4]) and five counts of illegal voting (Election Law § 17 (/nyctap-cgi/ez-nylaw?ELN+17)- 132 [3]). Defendant was tried and convicted on all counts of the indictment in 1997. On appeal, the Appellate Division reversed the judgment and ordered a new trial due to an improper missing witness charge, and rejected defendant's remaining contentions as unpreserved or without merit (253 2 560). The second trial ended in a deadlocked jury.

During opening statements of the third trial, defense counsel argued that the only basis for the People's charges rested on the assertion that defendant never lived at 553 47th Street. According to defense counsel, the evidence would establish that, contrary to the People's position, defendant had in fact

taken up residence at 553 47th Street. Defense counsel submitted that ultimately the case would turn on the credibility of the witnesses.

At trial, the People called several witnesses. An employee for the phone company testified that defendant maintained a phone at the 61st Street address. There was, however, no record of any telephone service at the 47th Street address. In addition, the owner of 579 61st Street testified that defendant was a tenant at that address from 1990 to 1993.

Raphael Munoz and Roberto Lozano testified that they, along with another individual, moved into 553 47th Street in 1992, with the intent of purchasing the building from Magaly Lucas, the owner, which they eventually did. According to Munoz and Lozano, when the three men first moved in, nobody else was living in the building, the apartment was in shambles and the basement was uninhabitable. Each man testified that some time after moving in, defendant approached them, told them that he was receiving mail at that address and asked them to hold it for him.

Defendant presented the testimony of an employee of the Office of Court Administration who stated that in 1993 defendant's attorney registration form listed 553 47th Street as his home address. Defendant further proffered the testimony of an American Express employee that defendant's billing statements listed the 47th Street address. Several neighbors who had participated in defendant's political campaigns testified that they had on occasion observed him walking into the 47th Street house and that they had understood that he lived there with his former girlfriend, Lucas. One neighbor testified that Josephine and Raymond Vales _- the owners of the house prior to Lucas -- had at some time renovated the basement into a complete apartment. Defendant's mother and aunt also testified that defendant resided at the 47th Street address.

Finally, defendant testified that he moved into the 47th Street address because his ex-girlfriend, Lucas, owned the house. He stated that he kept the 61st Street address for his relatives and used it as an office. When he and Lucas separated, she moved to Manhattan and allowed him to stay in the basement apartment at 47th Street free of charge. Defendant further

KCDA001192
JO-455

Case 1:17-cv-04766-LDH-RML   Document 145-3   Filed 02/26/24   Page 33 of 51 PageID #: 3816

testified that he never changed his driver's license to the 47th Street address and that he used the 61st Street address for all State and Federal tax forms.

On redirect, the People called Josephine Vales, who testified that when she and her husband owned the 47th Street building they never renovated the basement into a habitable apartment.

During the charge conference, the trial court indicated that it would define residency to the jury as follows:

> "According to the law a residence is that place where a person maintains a fixed, permanent and principal home and to which he wherever temporarily located always intends to return.

> "Additionally, a candidate who has two residences may choose one to which he has the legitimate, significant and continuing attachment as his residence for purpose of the [E]lection [L]aw. It is for the candidate to decide which address is to be his voting and campaign address.

Case 1:17-cv-04766-LDH-RML    Document 145-3    Filed 02/26/24    Page 34 of 51 PageID #: 3817

"However, the address chosen by the defendant as his residence must comport with the definition of residence as I have previously given it to you."

Defense counsel objected to the charge, indicating that he agreed with the court's use of the definition of "residence" found in Election Law § 1 (/nyctap-cgi/ez-nylaw?ELN+1)-104 (22) and that a candidate can choose between multiple residencies. As defense counsel noted, "I don't have a problem with that definition of residency [the charge language involving multiple residencies] being attached to the first definition of residency [the charge language taken directly from Election Law § 1-104(22)]." Defense counsel limited his objection "strictly to the fact that after these two portions of residency are read, the Court refers the jurors back to Election Law Section 1-104 sub 22." According to counsel, "I think that might be somewhat confusing."

Defense counsel further objected to use of the Election Law's definition of residence in reference to the first count of the indictment, which charged defendant with filing a false instrument. Counsel asserted that the only definition which should be used in that regard was that a candidate who has two residences may choose one to which he has a legitimate, significant and continuing attachment. The court did not change its charge.

The jury convicted defendant on all counts of the indictment. The Appellate Division affirmed.

Defendant now argues that the Election Law definition of "residence" cannot be applied literally in a case of dual residency and that a literal application of Election Law § 1 (/nyctap-cgi/ez-nylaw?ELN+1)- 104(22) is unconstitutional. Defendant further maintains that the indictment should be dismissed because the Election Law definition of "residence" is vague. However, during the jury charge conference, defendant did not object to the specific language of the charge, nor did he raise any of the constitutional issues he now asserts. Thus, those issues are unpreserved (*see*, *People v Cadorette*, , 56 NY2d 1007 (/nyctap/nyctap.cgi?56+1007), 1009; *People v Whalen*, , 59 NY2d 273 (/nyctap-cgi/nyctap.cgi?59+273), 279-280).

Defendant did, however, object to the trial court's second reference to the Election Law definition of "residence" on the ground that it "might be somewhat confusing" for the jury. According to defendant, under the court's charge, his failure to relinquish the 61st Street apartment compromised his assertion that the 47th Street apartment also was his residence for purposes of registration and voting, and therefore, in essence dictated a guilty verdict. We disagree.

In this case, all the counts of the indictment stem from defendant's affirmation in his voter registration form that 553 47th Street was his place of residence pursuant to the Election Law during 1992-1993 for voting purposes. A person commits the offense of "false registration" under the Election Law when he or she "[k]nowingly gives a false residence within the election district when registering as an elector" (Election Law § 17 (/nyctap-cgi/ez-nylaw?ELN+17)-104[4]). "Illegal voting" is committed when a person "[v]otes or offers or attempts to vote at an election, * * * in an election district or from a place where he does not reside" (Election Law § 17 (/nyctap-cgi/ez-nylaw?ELN+17)-132 [3]). Finally, a person violates Penal Law § 175.35 (/nyctap-cgi/ez-nylaw?PEN+175.35) "when, knowing that a written instrument contains a false statement or false information, and with intent to defraud the state * * * he offers or presents it to a public office * * * with the knowledge or belief that it will be filed with, registered or recorded in or otherwise become a part of the records" of that public office.

The Election Law defines residence as "that place where a person maintains a fixed, permanent and principal home and to which he, wherever temporarily located, always intends to return" (Election Law § 1 (/nyctap-cgi/ez-nylaw?ELN+1)-104 [22]). Thus, to be a resident of a place, a person must be physically present with the intent to remain for a time (see, *Matter of Palla v Suffolk County Bd. of Elections*, , 31 NY2d 36 (/nyctap-cgi/nyctap.cgi?31+36), 47; see also, *Williams v Salerno*, 792 F2d 323, 327 [2d Cir]). The definition of "residence" comes from traditional notions of domicile (*Matter of Palla, supra*, 31 NY2d, at 47; seealso, *Matter of Hosley v Curry*, , 85 NY2d 447 (/nyctap-cgi/nyctap.cgi?85+447), 451, *rearg denied* , 85 NY2d 1033 (/nyctap-cgi/nyctap.cgi?85+1033)). The determination of an individual's residence is dependent upon an individual's expressed intent and conduct (*Matter of Palla, supra*, 31 NY2d, at 47).

KCDA001195

New York courts have recognized that in this modern and mobile society, an individual can maintain more than one bona fide residence (*see, e.g., Matter of Gallagher v Dinkins*, 41 AD2d 946, *affd* , 32 NY2d 839 (/nyctap-cgi/nyctap.cgi?32+839); *Matter of Gladwin v Power*, 21 AD2d 665, *affd* , 14 NY2d 771 (/nyctap-cgi/nyctap.cgi?14+771); *Matter of Chance v Power*, 14 AD2d 595, *affd* , 10 NY2d 792 (/nyctap-cgi/nyctap.cgi?10+792)). However, for the purposes of the Election Law, one cannot create an address solely for the purpose of circumventing residency requirements (*Matter of Hosley v Curry*, 207 AD2d 116, 118 *revd on other grounds* , 85 NY2d 447 (/nyctap-cgi/nyctap.cgi?85+447), *supra; see also, Matter of Lemishow v Black*, 104 AD2d 460, *affd* , 63 NY2d 684 (/nyctap-cgi/nyctap.cgi?63+684), 685).

The crucial determination whether a particular residence complies with the requirements of the Election Law is that the individual must manifest an intent, coupled with physical presence "without any aura of sham" (*Matter of Gallagher, supra*, 41 AD2d at 947). As this Court has stated, an individual having two residences may choose one to which she has "legitimate, significant and continuing attachments as her residence for purposes of the Election Law" (*Matter of Ferguson v McNab*, , 60 NY2d 598 (/nyctap-cgi/nyctap.cgi?60+598), 600). Generally, where there is no reason to assume that a residence has been asserted merely for the purposes of voting, where no fraud or deception has been practiced and where there is a history of the residence employed, the courts have upheld a fact-finder's determination of residency (*Matter of Gallagher, supra*, 41 AD2d at 947; *see also, Matter of Ferguson*, 96 AD2d 916 *affd* , 60 NY2d 598 (/nyctap-cgi/nyctap.cgi?60+598), *supra; Matter of Gladwin, supra; Matter of Chance, supra*).

Here, the jury was not asked, as defendant claims, to determine whether as between two residences, defendant picked the more appropriate one. The sole issue here was whether defendant genuinely took up residence at 553 47th Street for voting purposes. In considering whether 553 47th Street was a bona fide residence from which defendant could vote, the jury needed to be informed of the Election Law's definition of residence. The jury was not instructed to convict defendant if it found that he actually maintained two residences. The charge, when read as a whole, was not

confusing as a matter of law. It instructed the jury on how to determine whether 553 47th Street could be considered defendant's residence for voting purposes, and it informed the jury that if the proof established that defendant had two residences he could pick one as long as the "residence" he picked (553 47th Street) was indeed a residence of his, and not a sham. The jury applied that instruction to the facts it found, and convicted defendant on all counts of the indictment.

We respond to the dissent with three points. First, the arguments it addresses overwhelmingly are unpreserved; they were not made before the Trial Judge. Second, we cannot agree with the dissent's foundation premise that the Election Law and case law definitions of residence cannot stand side-by-side (an argument plainly not made to the Trial Judge). Finally, the dissent points out that defendant's own testimony, "if credited," would have been sufficient to establish residency under our own Election Law cases (Dissent, at 6). The jury, however, also heard -- and by its verdict credited -- testimony from the phone company employee that defendant had telephone service at 61st Street but not 47th Street; the 61st Street landlord that defendant was a tenant there; and the owners of the 47th Street premises that the basement where defendant says he resided was uninhabitable.

Accordingly, the order of the Appellate Division should be affirmed.


## Rosenblatt, J. (dissenting):

Defendant was arrested after he registered to vote and voted in five elections using an apartment on 47th Street in Brooklyn as his legal voting residence. He was indicted on one count of false registration under Election Law § 17 (/nyctap-cgi/ez-nylaw?ELN+17)-104(4), five counts of illegal voting under Election Law § 17 (/nyctap-cgi/ez-nylaw?ELN+17)-132(3) and one count of offering a false instrument for filing under Penal Law § 175.35. Convictions for such felonies are punishable by up to four years in prison (Penal Law § 55.10 (/nyctap-cgi/ez-nylaw?PEN+55.10)[1][b]). Because defendant acknowledged that he had listed the 47thStreet apartment as his residence, the only fact issue at trial was whether that apartment was his "residence" within the meaning of the Election Law.

What qualifies as a voter's "residence" in New York, however, is far from crystal clear. Election Law § 22 (/nyctap-cgi/ez-nylaw?ELN+22)) defines "residence" as "that place where a person maintains a *fixed, permanent and principal* home and to which he, wherever temporarily located, always intends to return" (emphasis added). Under the statutory definition, residence is the equivalent of domicile (*see, Palla v Suffolk Cty Bd of Elections*, , 31 NY2d 36 (/nyctap-cgi/nyctap.cgi?31+36), 47). Over the last several decades, however, this Court has not adhered to the strict, literal meaning of this statutory definition.

In *Gladwin v Power* (21 AD2d 665), a candidate for assembly had a family home outside her assembly district. She also rented space within the district, which she used as an office and "for occasional living." A rival primary candidate brought an action to invalidate her designating petition. The Appellate Division held that "[t]he evidence establishes satisfactorily the current intention and the persisting intention over a number of years of [the candidate] to maintain a legal residence" in the district (*Gladwin v Power, supra*, at 665). We affirmed without opinion (14 2 771).

Similarly, in *Bressler v Holt-Harris* (37 AD2d 898), a voter lived in a house with his family outside the City of Albany. At the same time, to remain eligible to run for citywide elected office, he kept a studio apartment in the City, for which his law firm paid the rent. He kept a few personal items in the apartment and had eaten and slept there *once* in seven years. He also had his political mail sent there. A rival candidate brought an application to strike the voter from the City's registry. Applying an identically-worded election law statute, the Appellate Division concluded that the voter had established residence by showing a "continuity of conduct * * * for many years evincing an intention to be and remain a resident of the City * * * as well as a continuous voting record from said address for several years last past" (*Bressler v Holt-Harris, supra*, at 898). This Court affirmed on the Appellate Division's opinion (, 30 NY2d 529 (/nyctap-cgi/nyctap.cgi?30+529)).

In both cases, as in numerous others, the alleged "residence" located inside the voting district was by no means "a fixed, permanent and principal home" to which the candidate "always intend[ed] to return." As New York appellate courts have repeatedly refused to invalidate candidacies based on failures

to comply strictly with statutory residency requirements, an alternative, judicially-created test for residence has crept into the jurisprudence. Candidates may now have two "residences," providing that they "choose one to which [they] ha[ve] *legitimate, significant and continuing attachments*" (*Ferguson v McNab*, , 60 NY2d 598 (/nyctap-cgi/nyctap.cgi?60+598), 600 [citing *Gallagher v Dinkins*, 41 AD2d 946, *affd without opinion*, , 32 NY2d 839 (/nyctap-cgi/nyctap.cgi?32+839)]; *see also*, *Isabella v Hotaling*, 207 AD2d 648; *Geller v Lasher*, 196 AD2d 613; *Umland v Board of Elections of City of New York*, 143 AD2d 240).

The narrower statutory definition of residence cannot logically be read compatibly with the dual residency authorized by *Ferguson*. A voter cannot have two "fixed, permanent and principal homes." "Principal" is defined as "first, highest, or foremost in importance, rank, worth, or degree, chief" (*see*, American Heritage College Dictionary, at 1088 [3d ed]). It is not possible to have two living quarters both of which are "first, highest or foremost in importance."

In Election Law cases involving more than one residence, courts have endeavored to reconcile this incompatibility by deeming the narrow statutory definition of residence satisfied when a candidate has "legitimate, significant and continuing" attachments to the particular residence chosen for Election Law purposes (*see*, *Ferguson v McNabb*, *supra*). Thus, a residence chosen by the voter and satisfying the *Ferguson* standard essentially has been held to constitute that candidate's "fixed, permanent and principal" residence even though such a residence objectively might not satisfy the narrow statutory definition.

The charge in this case did not instruct the jury that a residence satisfying the *Ferguson* standard is deemed to be a "fixed, permanent and principal" residence for purposes of the Election Law. The judge instructed the jury that it must determine whether defendant's 47th Street apartment satisfied the statutory definition of residence, then noted that a candidate could have two residences under the *Ferguson v McNab* formulation, and finally reiterated that the defendant's residence "must comport with" the statutory definition. Defense counsel objected, claiming that the charge as a whole was confusing.[1] It was.

KCDA001199
JO-462

Case 1:17-cv-04766-LDH-RML    Document 145-3    Filed 02/26/24    Page 40 of 51 PageID #: 3823

A jury, upon hearing the entire charge, "must be able to gather from its language the correct rules which should be applied in arriving at decision" (*People v Ladd*, , 89 NY2d 893 (/nyctap-cgi/nyctap.cgi?89+893), 895 [quoting *People v Russell*, 266 NY 147, 153]). A party is entitled to "an unambiguous instruction of the pertinent law" (*see*, *Schafer v Norwood Equip. Corp.*, 277 App Div 933, 934). It is not sufficient to excerpt portions of statutes or holdings in the abstract without adequately explaining them in a manner understandable to a lay person (*see*, *Stryzinski v Arnold*, 285 App Div 780, 782-783).

Here, the court's instruction on the issue of defendant's residence -- two terse paragraphs -- was the crucial charge which would definitively guide the jury in determining guilt or innocence. It was confusing in two ways. First, the jury could have understood the charge as requiring defendant to meet *both* the statutory definition *and* the *Ferguson* dual- residence qualification. As we have demonstrated, however, the literal Election Law definition and the *Ferguson* standard cannot stand side-by-side. The charge failed to synthesize the statutory definition with the *Ferguson* formulation. It charged both without any further explanation. In essence, the court asked the twelve jurors to do the impossible: integrate and comprehend two facially incompatible formulations of residence. This should not be countenanced in a felony prosecution. We cannot fathom the rule that would apply in this case if a voter's chosen residence had to qualify under both *Ferguson* and the literal statutory definition. Nor could a jury.

Moreover, the instruction also could readily have been interpreted as subordinating the *Ferguson* dual-residence standard to the stringent statutory residence test. Viewed in that light, the jury was told, in effect, that it could acquit defendant only if the 47th Street apartment was in fact his "principal" residence -- *i.e.*, the home that was "first, highest and foremost in importance." This was a clear departure from the dual- residence jurisprudence of civil Election Law cases involving the same statutory definition.

Defendant testified that he moved to the 47th Street apartment in 1993 with the "intent to set up residency" there. He further testified that he moved his clothes and lamps to that apartment, where he initially stayed overnight "all the time" until construction work on the building began, after

which he "stayed there a lot." This testimony, if credited, certainly would have been sufficient to establish residency under the *Ferguson* formulation as applied in our civil Election Law jurisprudence. Indeed, these facts are far stronger than those in *Bressler v Holt-Harris*, where the voter's one-room apartment was held to satisfy the Election Law definition of residence even though the voter regularly lived with his wife in a two-story house outside the City and could remember eating and sleeping at the apartment only once in seven years. Clearly, under the court's charge, the jury, in this criminal prosecution, could have returned a guilty verdict on facts indistinguishable from those held sufficient to establish a legal residence in *Bressler* -- a civil case.[2]

Historically, the "residence" issue has been addressed in the context of civil election appeals. In those cases, members of the Board of Election and appellate judges have determined on a case-by-case basis whether the connection between a particular voter and the asserted voting residence is sufficient. Central to each determination is a full understanding of relevant authority, which allows a comparison between the facts of the case at bar to the facts of cases that have already been decided.

This, however, was a criminal prosecution, and a unique one at that. So far as we can discern, defendant is the only person ever brought to trial in New York on a charge of this kind.[3] If politically-charged disputes such as this and questions of "residence" are going to be resolved in the criminal arena and decided by juries, with the possibility of criminal conviction and incarceration, we should ensure that the definition of residence is plainly fixed and easily understood.

Accordingly, we would reverse the conviction and order a new trial.

Order affirmed. Opinion by Judge Wesley. Chief Judge Kaye and Judges Smith, Ciparick and Graffeo concur. Judge Rosenblatt dissents and votes to reverse in an opinion in which Judge Levine concurs.

Decided June 14, 2001

# Footnotes

<u>1</u>  The majority correctly points out that defense counsel "ha[d] no problem" with the court charging just the statutory definition and then the *Ferguson* formulation. It was, however, the court's reiteration of the statutory definition that rendered the charge as a whole "confusing." The majority holds that defense counsel, by withholding his objection until after the reiteration of the statutory standard, somehow is foreclosed from arguing that asking the jury to apply both formulations simultaneously was confusing as a matter of law. We disagree. Counsel obviously viewed the *Ferguson* standard as *modifying* the statutory definition and therefore had no objection to the charge until the court erroneously engrafted the statutory definition back onto the *Ferguson* formulation. Counsel's objection at that point unambiguously alerted the trial court to his assertion that, objectively, the statutory definition and *Ferguson* formulation cannot abide one another and thus could not be charged conjunctively.

<u>2</u>  We cannot agree that the jury must have credited the testimony that contradicted defendant's position that he resided at the 47th Street apartment. It is impossible to tell what testimony the jury actually credited because the erroneous charge would have allowed the jury to return a guilty verdict even if it fully credited defendant's testimony.

<u>3</u>  Defendant is one of two persons who have been criminally prosecuted for the failure to establish legal residence inside a voting district (*see*, *People v Ramos*, slip op [Sup Ct, Bronx Cty, Nov 9, 1999], *affd*, 223 AD2d 495). There, the defendant was prosecuted criminally for using his inlaws' Bronx County apartment as his legal residence. The prosecutor instructed the grand jury on the issue of residence using only the statutory definition. The Supreme Court dismissed the indictment, holding that "it was not enough to simply read the Election Law definition of residence to the grand jury. Such an instruction did not convey the applicable law in a manner that fairly apprised the grand jury of the issue it had to decide" (slip op at 4). The Appellate Division affirmed.

Toolbox

Stay Involved

LII Announce Blog (http://blog.law.cornell.edu/)

LII Supreme Court Bulletin
(http://www.law.cornell.edu/supct/cert)
MAKE A DONATION
(HTTP://WWW.LAW.CORNELL.EDU/DONORS)
CONTRIBUTE CONTENT
(HTTP://WWW.LAW.CORNELL.EDU/LII/HELP_OUT/CREATE)
BECOME A SPONSOR
(HTTP://WWW.LAW.CORNELL.EDU/LII/HELP_OUT/SPONSOR)
GIVE FEEDBACK
(HTTP://WWW.LAW.CORNELL.EDU/LII/CONTACT)

All lawyers
(https://lawyers.law.cornell.edu/lawyers/locate/)

ABOUT LII
(/LII/ABOUT/ABOUT_LII)

CONTACT US
(/LII/ABOUT/CONTACT_US)

ADVERTISE HERE (/LII/HELP_OUT/SPONSOR)

HELP
(/LII/HELP)

TERMS OF USE
(/LII/TERMS/DOCUMENTATION)

PRIVACY
(/LII/TERMS/PRIVACY_POLICY)

KCDA001203

JO-466

[ L I I ] (/)

KCDA001204

JO-467

45

S.C. CRIM. NO. 41          SUPREME COURT                    ORDER
  (Rev. 6/75)                 OF THE
                          STATE OF NEW YORK

          PART ___46___ COUNTY __BRONX__

----------------------------------------x    Indictment Number __5993 1994__

THE PEOPLE OF THE STATE OF NEW YORK,     :   Motion for: __OMNIBUS__

          -against-                      :   _____

BENJAMIN RAMOS,                          :   Submitted_____19___

                    Defendant.           :

----------------------------------------x    Present:

                                             Hon. Phylis Skloot Bamberger
                                                        J.S.C.

                                             :   Papers Numbered   :
                                             :                     :
Notice of Motion and Affidavit Annexed..........:.................:
Order to Show Cause and Affidavits Annexed......:.................:
Answering Affidavits............................:.................:
Replying Affidavits.............................:.................:
Exhibits........................................:.................:
Stenographer's Minutes..........................:.................:
Stipulation.....................................:.................:

     Upon the foregoing papers this motion is decided as follows.

     The motion to inspect the grand jury minutes is granted.  This Court

has inspected the transcript of the grand jury proceedings and it holds

that an error in the instructions to the grand jury impaired the integrity

of the grand jury proceedings and prejudiced the defendant.  C.P.L.

§§190.30(7), 210.20(1)(c), 210.35(5).  Accordingly, the motion to dismiss

the indictment is granted.  The People are given leave to re-present the

case to another grand jury and the case is adjourned to December 22, 1994.

The People may advance the case, on notice to the defendant, to an earlier

date if they obtain another indictment.

JO-468                                                                 0001

46

The defendant is charged with three counts of offering a false instrument for filing in the first degree, three counts of falsifying business records in the first degree, one count of false registration and four counts of illegal voting. All of these charges share the common allegation that the defendant claimed to but did not in fact reside at 1307 E. L. Grant Highway, apartment 5D, in the period between October 6, 1992, and November 2, 1993. Apartment 5D was leased by Emilio Garcia and his wife, Carmen Diaz-Garcia. The Garcias are the defendant's wife's parents. The defendant and the Garcias both testified that the defendant lived in the E. L. Grant apartment and also maintained a residence in New Jersey, which he used on the weekends and in the summer time. There was other evidence that suggested the defendant lived in New Jersey during the period in question. Therefore, the grand jury was presented with a clearly raised question of fact[1] and the definition of residency, the legal principle on which the grand jury's determination of the fact question had to be based, was crucial to whether an indictment would be voted.

When instructing the grand jury on the issue of residency, the prosecutor stated:

> Okay. Also, I am going to read the definition of residence as stated in the Election Laws. That comes from section 1.104, subsection two-twenty:

---

[1]    In response to the omnibus motion, the prosecutor asserted that the evidence before the grand jury "clearly" established that the defendant did not have any residence in the Bronx. On November 9, 1994, this Court heard argument on whether the indictment should be dismissed and the prosecutor conceded during this proceeding that there was evidence that the defendant lived at 1307 E. L. Grant Highway. The prosecutor's assertion that this evidence was not believable is not relevant because it is the grand jury's evaluation of the evidence that is controlling. See People v. Jennings, 69 N.Y.2d 103, 114 (1986); People v. Warner-Lambert Co., 51 N.Y.2d 295, 298-99, 305 (1980).

2

A. 7

JO-469

47

> The term residence shall be deemed to mean that place a person maintains a fixed, permanent and principle home, and to which he, whereever temporary located, [sic] always tends [sic] to return.

Although the grand jury need not be instructed with the same degree of precision as the petit jury, People v. Darby, 75 N.Y.2d 449, 454 (1990), it must be given enough information to enable it to intelligently to decide whether a crime has been committed, People v. Calbud, Inc., 49 N.Y.2d 389, 394-95 (1980). In this case, the prosecutor's instruction concerning residency was incomplete and did not place before the grand jury the true issue that was critical to the question at issue.

Under the case law, a candidate for public office may have more than one residence and when both residences are places where the candidate maintains significant and legitimate attachments, it is for the candidate to decide which address he considers as his voting address. Gallagher v. Dinkins, 41 A.D.2d 946, 946 (2d Dept. 1973). A place of residence is based upon express intent coupled with physical manifestations. As long as a residence is not a sham, the candidate is free to choose that residence for voting purposes even if the candidate lives there only occasionally. Id.; Gladwin v. Power, 21 A.D.2d 665 (1st Dept.), affirmed without opinion, 21 N.Y.2d 771 (1964). The prosecutor's instruction on residence did not discuss the possibility of having two residences or the need to determine that a residence is a sham in order to void the defendant's choice of 1307 E. L. Grant Highway as his voting residence.[2] On the facts presented to

---

2    Although this fact is not essential to this decision, the Court notes that the District Attorney is apparently aware of this case law concerning residency. At argument on the motion to dismiss, the defendant relied upon a press release from the Bronx District Attorney's office that announced the District Attorney's decision not to prosecute Gerard Esposito, who was recently elected to the Supreme Court in Bronx County but

3

JO-470

0003

48

the grand jury, these principles were crucial to an intelligent evaluation of the evidence. Thus, it was not enought to simply read the Election Law definition of residence to the grand jury. Such an instruction did not convey the applicable law in a manner that fairly apprised the grand jury of the issue it had to decide and it undermined the grand jury's function of deciding whether a crime had been committed and whether the evidence submitted was legally sufficient to support an indictment.

The motion to dismiss is granted.³ This decision constitutes the order of the Court.

Dated _____November 9, 1994_____     _____/S/_____
                                              J.S.C.

Briefs:  People ___Mark Schein___     Defendant ___Solomon Kaplan___

---

whose principle residence was said to be in Westchester County. When explaining the announcement, the District Attorney's office implicitly acknowledged the difficulties associated with prosecuting someone who has more than one residence and it recommended that the Legislature "consider amending the definition to require that if a person maintains more than one residence, the premises with which he or she has the most significant actual contact shall be deemed his or her voting residence."

3    In light of the order dismissing the indictment, the defendant's motion concerning discovery is denied without prejudice to renew if he is indicted a second time.

4

A.9

KCDA001208

Goldfeder, Jerry 6/6/2016
For Educational Use Only

People v. Ramos, 223 A.D.2d 495 (1996)
637 N.Y.S.2d 93

223 A.D.2d 495
Supreme Court, Appellate Division,
First Department, New York.

The PEOPLE of the State of New York, Appellant,
v.
Benjamin RAMOS, Defendant–Respondent.

Jan. 30, 1996.

The Supreme Court, Bronx County, Bamberger, J., dismissed, with leave to represent, indictment charging defendant with offering false instrument for filing in the first degree, falsifying business records in the first degree, false voter registration, and illegal voting, and appeal was taken. The Supreme Court, Appellate Division, held that indictment was properly dismissed on ground that defendant was prejudiced by impairment of integrity of grand jury proceedings.

Affirmed.

West Headnotes (1)

[1]   Grand Jury
        Charge

      Indictment and Information
        Grand or petit jury irregularities

      Indictment charging defendant with offering false instrument for filing in the first degree, falsifying business records in the first degree, false voter registration, and illegal voting was properly dismissed, with leave to represent, on ground that defendant was prejudiced by impairment of integrity of the grand jury proceedings; while determination of charges by grand jury hinged upon definition of the term "residence," prosecutor's instructions to grand jury in that regard did not provide it with enough information to enable it intelligently to decide whether crime had been committed and to determine whether there existed legally sufficient evidence to establish material elements of the crime. McKinney's CPL § 210.35, subd. 5.

5 Cases that cite this headnote

Attorneys and Law Firms

**93 S. Levy, for appellant.

D. Fusco, for defendant-respondent.

Before ROSENBERGER, J.P., and WALLACH, NARDELLI, WILLIAMS and TOM, JJ.

Opinion

*495 MEMORANDUM DECISION.

Order, Supreme Court, Bronx County (Phylis Skloot Bamberger, J.), entered November 9, 1994, which dismissed, with leave to represent, the indictment charging defendant with offering a false instrument for filing in the first degree (three counts), falsifying business records in the first degree (three counts), false voter registration, and illegal voting (four counts), unanimously affirmed.

While determination of the charges herein by the Grand Jury hinged upon the definition of the term "residence", the prosecutor's instructions to the Grand Jury in that regard did not provide it "with enough information to enable it intelligently to decide whether a crime has been committed and to determine whether there exists legally sufficient evidence to establish the material elements of the crime" (People v. Calbud, Inc., 49 N.Y.2d 389, 394-395, 426 N.Y.S.2d 238, 402 N.E.2d 1140). Thus, the indictment was properly dismissed, with leave to re-present, on the **94 ground that defendant was prejudiced by the impairment of the integrity of the Grand Jury proceedings (CPL 210.35 [5]; see, People v. Darby, 75 N.Y.2d 449, 455, 554 N.Y.S.2d 426, 553 N.E.2d 974).

All Citations

223 A.D.2d 495, 637 N.Y.S.2d 93



OFFICE OF THE DISTRICT ATTORNEY, KINGS COUNTY

RENAISSANCE PLAZA at 350 JAY STREET
BROOKLYN, N.Y. 11201-2908
(718) 250-2500

CHARLES J. HYNES
*District Attorney*

Anne Gutmann
Assistant District Attorney
(718) 250-2134

July 7, 2005

The Honorable Abraham Gerges
Justice of the Supreme Court
Kings County

Re:     People v. John O'Hara
        Kings County Indictment Number
        13525/96

Dear Justice Gerges:

In response to your directive concerning the origins of the investigation of the defendant in the referenced matter, please be advised that:

- At the end of May or beginning of June of 1996, Assistant District Attorney Angelo Morelli, Chief of the Investigations Bureau, met with Assemblyman Brennan and his staff member John Keefe concerning a recent assault on Mr. Jack Carroll, an election lawyer who had served as counsel to the Assemblyman and his campaign committee. Mr. Carroll had filed a complaint with the NYPD.

- At the meeting, both Assemblyman Brennan and Mr. Keefe expressed the belief that John O'Hara was involved in the assault on Mr. Carroll. They were also not completely satisfied with the investigation conducted by the Police Department. Mr. Keefe stated that he feared that he also might have been targeted, because he believed that someone had been following him on the night of the attack on Mr. Carroll. A.D.A. John O'Mara, of the Investigations Bureau, joined the meeting. The possible motive for the attack was discussed. There was speculation that O'Hara had been motivated by the fact that Jack Carroll had successfully represented challengers to O'Hara's petitions for candidacy for public office. In fact, earlier in the day of the attack on Carroll,

JO-473

People v. John O'Hara
Page 2

O'Hara had verbally confronted Carroll in the hallway of the Supreme Courthouse at 360 Adams Street.

- During this meeting, the Assemblyman and Mr. Keefe expressed the belief that O'Hara did not, in fact, reside at the address he was claiming on his voter registration. They further stated that a judge who had presided over a civil Election Law matter involving O'Hara had mentioned that he might refer that matter to the District Attorney for investigation. No such referral was made.

- Approximately mid-June 1996, A.D.A. O'Mara was advised by A.D.A. Morelli to return the call of Mr. Jeff Waite, an investigating attorney with the State Board of Elections. A.D.A. O'Mara spoke to Mr. Waite and learned that the Board of Elections was pursuing an investigation, and had collected evidence, of voter-residence fraud involving O'Hara and sought the assistance of the District Attorney's Office in pursuing the investigation of O'Hara's possible violation of the election law. Mr. Waite subsequently forwarded documents relating to the investigation.

- The investigation was commenced.

Finally, in response to your inquiry concerning First Assistant District Attorney Dino Amoroso, I have verified that he joined the District Attorney's staff on February 15, 1990. On or about June 20, 2005, Richard Brown, the Queens District Attorney, announced that his office had concluded that A.D.A. Amoroso had lawfully registered to vote from a residence in Queens County.

Sincerely,

Anne Gutmann
Assistant District Attorney

Cc by FAX and mail:
Barry M. Fallick
Rochman Platzer Fallick Sternheim Luca & Pearl, LLP
Attorney for John O'Hara
666 Third Avenue –17th Floor
New York, New York 10017