# EXHIBIT D

KELLY, GROSSMAN & KERRIGAN, LLP
ATTORNEY AT LAW
1248 MONTAUK HIGHWAY
WEST ISLIP, NEW YORK 11795
Telephone: (631) 314-4996
Facsimile: (516) 686-6771

DENNIS J. KELLY, ESQ.
DAVID GROSSMAN, ESQ.
ROBERT KERRIGAN, ESQ.

5 Penn Plaza, 23rd Floor
New York, New York 10001
(By Appointment Only)

March 21, 2022

**VIA ELECTRONIC MAIL- BRIAN.QUAIL@ELECTIONS.NY.GOV**
Brian L. Quail, Esq.
New York State Board of Elections
40 North Pearl Street, Suite 5
Albany, New York 12207-2109

**Re: O'Hara v. The City of New York, et. al.,
EDNY: 17-CV-4766**

Mr. Quail,

This office represents the plaintiff, John O'Hara, in the above-said action.

Thank you for the prompt response to my subpoena for the file regarding the New York State Board of Elections joint investigation with the Brooklyn District Attorney regarding my client John O'Hara.

On March 11, 2022 we received your response which I have attached for your convenience. (26 pages)

Also, attached is the report from the Brooklyn District Attorney's office, Conviction Review Unit (CRU), which resulted in the plaintiffs' exoneration on January 12, 2017. As the report details the prosecution began with a Complaint filed with this agency by the plaintiff's long-time political opponent, Assemblyman James Brennan. That complaint cc'd Jeff Feldman who was and still is the Executive Director of the Brooklyn Democratic Organization. The Brooklyn District Attorneys CRU report states that Jeff Feldman is well known by the Commissioners of the New York State Board of Elections.

The response you submitted is missing five (5) documents the District Attorney CRU report refers to:

1- The complaint by Assemblyman James Brennan that initiated the investigation.

2- The memorandum by Counsel to the Commissioners by Jeffrey Wait dated June 19, 1995.

3- Notes from Wait about a meeting with the plaintiff's political opponent James Brennan and his attorney John Carroll that occurred at Carroll's law office in Manhattan.

4- Wait's affirmation to the State Supreme Court concerning the joint investigation with the Brooklyn District attorney.

5- A sealed transcript of an election law case that, according to the DA's CRU report, Wait used to prepare his memo to the Commissioners to commence the investigation of my client.

The Brooklyn District Attorney's CRU report determined that Wait withheld exculpatory evidence in his memo to the Commissioners. Therefore, the missing items are relevant documents to the ongoing litigation.

Furthermore, Mr. Wait and a person identified as an "investigator" personally made monthly trips from Albany to the plaintiff's residence in Brooklyn on a dozen occasions from 1995 through 1996. That is a 5 hour drive each way. There are no records of this in your response. The ten-hour drive time to accomplish this surveillance must have been documented, yet, there are no documents provided that reference this extensive investigatory activity.

Kindly review the files in your possession regarding the five (5) items listed above, and, any other material regarding this matter.

Best Regards,

Dennis J. Kelly, Esq.

CC:

Susan P. Schafstein, Esq. (via electronic mail- sscharfs@law.nyc.gov)
Seth J. Farber, Esq. (via electronic mail- seth.farber@ag.ny.gov)
Izabell Lemkhen, Esq. (via electronic mail- ilemkhen@fkbllp.com)
Corey Cohen, Esq. (via electronic mail- ccohen@fkblaw.com)
Asher Kest, Esq. (via electronic mail- akest@fkblaw.com)
James M. Thompson, Esq. (via electronic mail- james.thompson@ag.ny.gov)
Elissa Paulette Fudim, Esq. (via electronic mail- efudim@law.ny.gov)

# EXHIBIT A

# STATE BOARD OF ELECTIONS

**Board of Commissioners Meeting**
**Wednesday, June 25, 1997, 9:00 a.m.**
**Bonnie Castle Year-Round Resort**
**Holland Street**
**Alexandria Bay, New York**

## AGENDA

I. Executive Session - Personnel Matters

II. Minutes of May 14, 1997

III. Agency Monthly Report for April and May - Tom Wilkey

IV. Unit Updates:

| | |
|---|---|
| Legal: | Todd Valentine |
| Election Operations: | Anna Svizzero |
| NVRA/PIO: | Lee Daghlian |
| ITU: | Tom Wilkey |

V. Petition Hearings - Todd Valentine

VI. Policy and Procedure for Reviewing Cover Sheet and Binding Requirements for Petitions - Todd Valentine

VII. Final Adoption: Ballot Order Regulation - Pat Murray

VIII. Post Office Mover Kit - Anna Svizzero

IX. Executive Session

1. Cases

Preliminary Determinations

CMP96-95 Solarchick v. Friends of Steven Chen
Accurso Complaint
CMP96-108 Myers v. Breslin
CMP96-110 Gregg v. Saltarelli
CMP96-119 Schrader et al. v. Committee for the Preservation of Charlton
CMP97-1 Leichter v. New York Republican State Committee
CMP97-3 Davis v. Mulson

CMP97-8 Thompson & Nolan v. Friends of Pataki and/or NY Republican State Committee
CMP97-24 NYS BOE v. Espada Committee
CMP97-25 NYS BOE v. Ariola
CMP96-99/CMP96-100 Brennan v. O'Hara; Brennan v. Ruiz

Complaints Without Preliminary Determination

CMP97-27 Pierce v. Town of German Flatts
CMP97-28 Anonymous v. Ross
CMP97-30 Poleto v. Cholakis

Final Determinations

CMP96-53-SC-24 NYS BOE v. NYC Housing PBA, Inc.
CMP96-45-SC-19 NYS BOE v. Associated Staff Builders, Inc.
CMP96-50-SC-28 Dalsimer v. Village of Hewlett Neck Inspectors
CMP96-66-SC-31 Feuerstein v. Village of Atlantic Beach
CMP95-109 Rule & Fournier v. Election Inspectors, Town of Black Brook, 1st E.D.

Amendment to Approved Minutes of June 25, 1997

The following Preliminary Determination was listed on the June 25, 1997 Agenda and voted on at the Board Meeting, but was inadvertently omitted from the Approved Minutes.

CMP97-3 - Davis v. Mulson - Closed

APPROVED: July 23, 1997

**Minutes of the New York State Board of Elections**
**Wednesday, June 25, 1997**

The meeting of the State Board of Elections was called to order at 9:00 a.m. with an Executive Session, in the Bonnie Castle Resort, Alexandria Bay, New York. Commissioners attending the Executive Session were Chair James Walsh, Vice Chair Carol Berman, Commissioner Helena Donohue and Commissioner Evelyn Aquila. Staff present were Thomas Wilkey and Peter Kosinski. The Executive Session was called for personnel reasons.

The regular meeting was called to order at 9:15. Commissioners present were Chair James Walsh, Vice Chair Carol Berman, Commissioner Helena Donohue and Commissioner Evelyn Aquila. Staff present were Thomas Wilkey, Peter Kosinski, Todd Valentine, Stanley Zalen, Anna Svizzero, Pat Murray, and Lee Daghlian. There were no guests present.

**I.** **Minutes of May 14, 1997:** There were some corrections and clarifications made to the minutes of May 14th. A question arose as to the correctness of including comments by Commissioner Aquila who was connected to the meeting by telephone. The minutes were not accepted and laid aside pending clarification.

**II.** **Agency Monthly Reports for April and May:**

After a few clarifications, the Agency Report was accepted by the commissioners. The commissioners asked for copies of the elected officials list be sent to them.

Commissioner Aquila asked Tom Wilkey about the salary review. He explained that it was the yearly increment plan review, and had just been completed.

**III.** **Unit Updates:**

- Legal Unit: Todd Valentine reported that he prepared and sent to the commissioners in their packet the legislative status update and the legislative proposal status update. Commissioner Aquila praised both reports and thanked Mr. Valentine.

- Election Operations: Anna Svizzero reported that the inspector's manual updates have been keeping her and her staff busy, and will be completed shortly.

- NVRA/PIO: Lee Daghlian reported that web site access is now available to the public to directly input data to fill out a request for a registration form, and that data is inputted directly into the computer and can be accessed by SBOE staff to speed up the process of those requesting registration forms. It took a lot of effort by the ITU staff to get this process working properly.

  - Mr. Daghlian also presented the commissioners with two options for the 1998 sites for SBOE Conference, and the choices were the Gideon

Putnam, Saratoga Springs, for the week of May 6-8, 1998 or the Holiday Inn Turf in Albany for the same week. The choice was made unanimously to go back to Saratoga for 1998.

- ITU: Tom Wilkey (for John Flicker) reported that the computer room has been completely revamped with a new air conditioner system and a new configuration. It makes it much easier on our equipment to operate in a cool room.

  - Mr. Wilkey also reported that John Flicker will report on the continuing efforts to finish the database by July 1, and that report will be made by the next meeting.

IV. **Petition Hearings:** Todd Valentine put together a memorandum regarding the policy and procedures for hearing challenges to petitions. Commissioner Berman asked that Mr. Valentine clarify the procedure by asking that the Deputy Counsel as well as Counsel can be used as staff person at a hearing and that a change be made to reflect that the hearing officer and the counsel are of the opposite party. Those changes made, the petition hearing and procedures were accepted by unanimous vote.

V. **Policy and Procedure for Reviewing Cover Sheet and Binding Requirements for Petitions:** Todd Valentine reported on the section stating that a candidate can make the cure when notified by the SBOE. Commissioner Aquila asked if the designee can also make that cure. Peter Kosinski answered that either may make the cure. Also, the candidate can delegate a person to make that cure. The report was accepted unanimously.

VI. **Final Adoption: Ballot Order Regulation:** Pat Murray reported that she made some changes for the sponsor, answering questions like why a sphere is used and not the dice. Those changes were made and nothing further was heard from the sponsor, so she proposed that the regulations be accepted. Moved and accepted unanimously by the Board.

VII. **Post Office Mover Kit:** Anna Svizzero's presentation was moved to the next commissioners' meeting because Ms. Svizzero was unable to be at this session since she was on the program of the Commissioners' Conference.

**The meeting was adjourned to Executive Session at 9:45 a.m. to review cases.**

1. Cases

**Final Determinations:**

CMP96-53-SC-24 NYS BOE v. NYC Housing PBA, Inc. - Closed. The Board determined that no violation warranting criminal prosecution had occurred and directed Stanley Zalen to close the case. The matter pertained to an excessive corporate contribution.

CMP96-45-SC-19 NYS BOE v. Associated Staff Builders, Inc. - Closed. The Board determined that no violation warranting criminal prosecution had occurred and directed Stanley Zalen to close the case. The matter pertained to an excessive corporate contribution.

CMP96-50-SC-28 Dalsimer v. Village of Hewlett Neck Inspectors - Closed. The Board determined that no violation warranting criminal prosecution had occurred and directed Stanley Zalen to close the case. The matter pertained to alleged irregularities involving write-in votes at a village election.

CMP96-66-SC-31 Feuerstein v. Village of Atlantic Beach - Closed. The Board determined that no violation warranting criminal prosecution had occurred and directed Stanley Zalen to close the case. The matter pertained to alleged irregularities involving write-in votes at a village election.

CMP95-109 Rule & Fournier v. Election Inspectors, Town of Black Brook, 1st E.D. - Closed. The Board determined that no violation warranting criminal prosecution had occurred and directed Stanley Zalen to close the case. The matter pertained to alleged violations of Election Law §17-106 (fraud in execution of official duties) and Election Law §17-130(17) (fraud in use of voting machine).

**The Board reviewed the following preliminary determinations:**

CMP96-95 Solarchick v. Friends of Steven Chen - Closed
Accurso Complaint - Closed
CMP96-108 Myers v. Breslin - Closed
CMP96-110 Gregg v. Saltarelli - Closed
CMP96-119 Schrader et al. v. Committee for the Preservation of Charlton - Closed
CMP97-1 Leichter v. New York Republican State Committee - Commissioner Donohue asked that this case be tabled. It was tabled by a vote 2-2. Laid aside.
CMP97-8 Thompson & Nolan v. Friends of Pataki and/or NY Republican State Committee- Commissioner Donohue asked that this case be tabled. It was tabled by a vote 2-2. Laid aside.
CMP97-24 NYS BOE v. Espada Committee - Tabled
CMP97-25 NYS BOE v. Ariola - Tabled
CMP96-99/CMP96-100 Brennan v. O'Hara; Brennan v. Ruiz - Closed

**The Board reviewed the following complaints without preliminary determinations:**

CMP97-27 Pierce v. Town of German Flatts - Closed
CMP97-28 Anonymous v. Ross - Closed
CMP97-30 Poleto v. Cholakis - Closed

**The Board meeting was recessed by the Chairman at 10:05 a.m.**

Thursday, June 26, 1997

The Executive Session of the June meeting of the Commissioners of the State Board of Elections reconvened at 9:00 a.m. on Thursday, June 26, 1997. Commissioners present were Chair James Walsh, Vice Chair Carol Berman, and Commissioner Evelyn Aquila. Staff present were Tom Wilkey, Peter Kosinski, Stanley Zalen and Lee Daghlian.

Cases Leichter v. New York Republican State Committee and Thompson & Nolan v. Friends of Pataki and/or NY Republican State Committee were presented and moved to open. In both cases, Commissioner Berman and Commissioner Aquila voted to open. Commissioner Walsh voted to close. Commissioner Donohue was not present. Therefore, both cases were closed.

**The meeting was adjourned at 9:20 a.m. by Commissioner Walsh.**

---------------------------------------------x
In the Matter of the Complaints
Against O'Hara & Ruiz
---------------------------------------------x

DETERMINATION
CMP96-99 & CMP96-100

WHEREAS, the New York State Board of Elections (the Board) received a complaint against John K. O'Hara and a complaint against Tanya Ruiz, both of whom were candidates for the Democratic Party nomination for member of the Assembly from the 51st Assembly District in the 1996 primary election, and

WHEREAS, the complaint against Mr. O'Hara alleged that the O'Hara '96 committee failed to report expenditures for campaign materials and for the cost of commencing and prosecuting several Supreme Court proceedings challenging other candidates' petitions, and

WHEREAS, the complaint against Tanya Ruiz alleged that her financial statements failed to disclose payments made to the individuals who circulated her petition sheets, and

WHEREAS, Ms. Ruiz's lack of prior political involvement and her lack of knowledge concerning campaign finance disclosure indicate that prosecution for the alleged failure to report relatively small expenditures would not be warranted, and

WHEREAS, the complaints alleged that Ms. Ruiz's campaign was arranged and directed by Mr. O'Hara, and thus that he was also responsible for Ms. Ruiz's allegedly unlawful conduct, and

WHEREAS, Mr. O'Hara was recently convicted of several felonies in connection with his campaign activities in 1994, and

WHEREAS, the conduct at issue here occurred prior to these felony convictions, and

WHEREAS, the conduct alleged here, if true, constitutes misdemeanors,

NOW, THEREFORE, these complaints are closed without further inquiry.

Jeffrey D. Wait

DATED: July 1, 1997

**APPROVED:** January 28, 1997

Minutes of the New York State Board of Elections
November 20, 1996

The meeting of the State Board of Elections was called to order at 11:30 a.m. in the board room at the offices of the New York State Board of Elections, 3rd floor, Swan Street Building, Suite 201, Albany, New York. Commissioners present were Chair Carol Berman, Vice Chair James Walsh, Commissioner Evelyn Aquila, and Commissioner Helena Donohue. Staff present were Tom Wilkey, Peter Kosinski, Patricia Murray, Stanley Zalen, Jeff Wait, Anna Svizzero, and Lee Daghlian. There were no guests present.

I. **Minutes of October 16, 1996:** The minutes were approved as amended.

II. **Agency Monthly Reports for September and October:** Tom Wilkey reviewed the report with the commissioners. In discussing the Agency monthly reports, Commissioner Berman asked Lee Daghlian not to forget to put on our June 1997 calendar a program for public service announcements. Commissioner Berman also asked that a report be submitted on all the problems with the NVRA through DMV that we've all heard about recently. Tom Wilkey said that we are in the middle of preparing such a report and asking all the local boards to send lists to us of people who have had problems with DMV. Our staff is meeting with the DMV on December 3 to discuss problems and find solutions.

Tom Wilkey announced that Danny DeFrancesco could not give his report today, but he would do so at the December meeting. Commissioner Berman asked if Mr. DeFrancesco, at that time, report on general election problems as well as those that occurred during the primary election.

On the October report, Commissioner Berman asked for clarification of the Yates County statement on page 3. Anna Svizzero clarified that situation, commenting that there were problems with getting workers paid and, therefore, the staffing was not up to par.

III. **Unit Updates:**

- Legal Unit: Peter Kosinski reported that the State Board of Elections was sued by the Justice Department concerning the NVRA. At this time, Mr. Kosinski deferred to Pat Murray, who will put a packet together for the commissioners for the December meeting. Both Mr. Kosinski and Ms. Murray commented that the SBOE knew the suit was coming and had negotiations for weeks with the Justice Department.

  - Representatives from the U.S. Attorney's office attended a meeting with the magistrate assigned to the ACORN case. It was decided that the Department of Justice and ACORN would meet to discuss their concerns about the Department of Social Services and Human Resource Administration. Where those concerns overlap, or are the same, the two parties would work with the State and New York City to negotiate a

settlement of the issues relating to the Department of Social Services and Human Resource Administration only. Issues relating to other agencies in the Department of Justice suit would go to trial.

In a related matter, it was noted that New York City has been sued on the issue of public and private hospitals as NVRA sites. They will be seeking to have that suit joined with the Department of Justice suit, as the latter includes those issues.

We will continue to represent Tom Wilkey in the ACORN action. Another meeting is scheduled with the magistrate for December.

- There was a discussion with Mr. Kosinski and Mr. Wilkey and Commissioners Berman and Aquila concerning representation for these several lawsuits. Mr. Kosinski said that the Attorney General is the lead on defense on the Justice suit and that we are the lead on the ACORN suit. Tom Wilkey asked that we should have our own counsel represented on the Justice suit. All agreed that there should be joint counsel with the Attorney General on the Justice Department suit.

- Election Operations: Anna Svizzero reported that prior to and on Election Day there were many calls from counties concerning paper or affidavit ballots problems with the post office mail check program. Ms. Svizzero reported that she will reconvene the users group that met earlier in the year to review again the forms that are in use. They will work with the post office to try and avert any problems in the future.

- Commissioner Donohue commented that instructions to inspectors in all places were not clear about how to handle people whose names were not in the book. She reported that some Rockland County inspectors told people to call the county board of elections wherein they really should have given those people paper ballots right away. Again, this goes back the list maintenance problems with the post office in many cases. Ms. Svizzero commented that the SBOE offer to help went to all boards of elections to assist them with the postal situations and forms. Some accepted, some did not. In many cases, the problems were created by the post office. They need to do a better job with our forms. Commissioner Berman suggested that these problems probably should be on the Agenda for the April convention. Everyone agreed. Commissioner Aquila commented that since the use of paper and affidavit ballots has increased substantially there needs to be a place set aside in polling places for people to fill out these paper ballots since in many places the quarters are very cramped and there are no tables set aside for such a purpose. This will also be discussed at the users meeting. Commissioner Donohue asked

Ms. Svizzero where should a voter go or who should one talk to at the polls in order to have someone removed for electioneering. Ms. Svizzero said that a law enforcement person can do it or a phone call to one of the local commissioners should take care of it.

- NVRA/PIO: Lee Daghlian (PIO) reported that the Web page activity which was quite busy during the month of October was inadvertently not reported in the Agency report.

  - Mr. Daghlian also reported many calls were taken from the press about the DMV registration.

- ITU - Tom Wilkey reported that the FIDAS system will be updated shortly. It is a huge job and takes quite a while for the staff to complete, but the database will be updated.

  - Commissioner Aquila reported that a judge received a letter from the Finance unit that he had not filed a report, when in fact, he had. She commented that we need to do a better job on the second floor in making sure the Five day letter list is correct. Mr. Wilkey responded that the updating of the FIDAS file and the entire system will help alleviate that problem.

IV. County Board Reports: Anna Svizzero reported that the Final Report for Monroe County was ready and the Commissioners voted 4-0 to accept it.

V. Final Proposed Rule: Agency Assisted Registration: Pat Murray reported that those rules were designed to make sure all the agencies were using the same language and that those changes were made. The commissioners accepted that report 4-0.

VI. Proposed Regulation: Method for Determining Ballot Order: Pat Murray presented the regulation. They were accepted with one comment that the restriction on commissioners being able to officiate at the drawing be taken out at the request of Commissioner Aquila. It was approved 4-0.

A report was given by Jeff Wait on the changes to the non-disclosure forms was presented. Commissioner Aquila asked that this report be tabled until next month so that a more detailed review could be made by herself and the other commissioners. All agreed to table until the next meeting.

Peter Kosinski also reported at this time that a settlement order from the Attorney General on the Rockefeller case had been received. The case concerned attorneys fees and the settlement was that New York State would pay $35,000 from the Attorney General's budget. It was agreed that Carol Berman as Chair of the Board would sign off on the

payment. Also, it was moved and voted 4-0 to pay the $4,813 fee for attorney Henry Berger for preliminary work on the Sequoia Pacific case.

**The Board went into Executive Session at 12:40 p.m. for the purpose of discussing enforcement issue and personnel matters.**

VII. Cases

Final Determinations

CMP95-57SC96-7 Tokasz v. Gaughan - The Board determined that a violation warranting criminal prosecution had occurred and directed Stanley Zalen to refer the matter to Erie County District Attorney. The allegation involved tampering with the ballot placement selection process.

SC95-12 Brennan v. O'Hara - The King's County District Attorney indicted John O'Hara on one count of illegal registration and five counts of illegal voting. Therefore, the Board's file was closed.

CMP95-50-SC96-6 Allen & Montfort v. Kemnitzer - The Board determined that a violation warranting criminal prosecution had occurred and directed Stanley Zalen to refer the matter to the Warren County District Attorney. The allegation involved a forged signature in the witness statement on a petition. .

**The Board reviewed the following preliminary determinations:**

CMP96-44 Thompson v. Prentiss - Closed
CMP96-46 LeBouef v. Brandon - Closed
CMP96-47 Thompson v. Pataki - Closed
CMP96-49 Griffin v. Zetterberg - Closed
CMP96-50 Dalsimer v. Village of Hewlett Neck Inspectors - Open
CMP96-62 Registered Voters Village of Moravia - Open
CMP96-64 Lewis v. NYC Board of Elections - Closed
CMP96-65 Stewart v. Natrella, Fagan & Jeris - Open
CMP96-54 NYS BOE v. Charles O'Shea Funeral Home - Tabled
CMP96-56 NYS BOE v. AJ Contracting Co., Inc. - Closed

**The Board reviewed the folloiwng complaints without preliinary determinations:**

CMP96-102 Brodnick (Zarin) v. Leibell - Closed
CMP96-103 Bloom Complaint - Closed
CMP96-104 Siegel v. James - Closed
CMP96-111 Sheehan Complaint - Closed
CMP96-112 Vaszily v. Lehrman - Closed

CMP96-114 Powers v. Connor - Closed

The meeting was adjourned at 1:20 p.m.

**APPROVED:** December 9, 1996

**Minutes of the New York State Board of Elections**
**November 20, 1996**

The meeting of the State Board of Elections was called to order at 11:30 a.m. in the board room at the offices of the New York State Board of Elections, 3rd floor, Swan Street Building, Suite 201, Albany, New York. Commissioners present were Chair Carol Berman, Vice Chair James Walsh, Commissioner Evelyn Aquila, and Commissioner Helena Donohue. Staff present were Tom Wilkey, Peter Kosinski, Patricia Murray, Stanley Zalen, Jeff Wait, Anna Svizzero, and Lee Daghlian. There were no guests present.

I. **Minutes of October 16, 1996:** The minutes were approved as amended.

II. **Agency Monthly Reports for September and October:** Tom Wilkey reviewed the report with the commissioners. In discussing the Agency monthly reports, Commissioner Berman asked Lee Daghlian not to forget to put on our June 1997 calendar a program for public service announcements. Commissioner Berman also asked that a report be submitted on all the problems with the NVRA through DMV that we've all heard about recently. Tom Wilkey said that we are in the middle of preparing such a report and asking all the local boards to send lists to us of people who have had problems with DMV. Our staff is meeting with the DMV on December 3 to discuss problems and find solutions.

Tom Wilkey announced that Danny DeFrancesco could not give his report today, but he would do so at the December meeting. Commissioner Berman asked if Mr. DeFrancesco, at that time, report on general election problems as well as those that occurred during the primary election. There were some problems in the Manhattan warehouse concerning preparation and delivery of machines as well as staffing problems.

On the October report, Commissioner Berman asked for clarification of the Yates County statement on page 3. Anna Svizzero clarified that situation, commenting that there were problems with getting workers paid and, therefore, the staffing was not up to par.

III. **Unit Updates:**

- Legal Unit: Peter Kosinski reported that the State Board of Elections was sued by the Justice Department concerning the NVRA. At this time, Mr. Kosinski deferred to Pat Murray, who will put a packet together for the commissioners for the December meeting. Both Mr. Kosinski and Ms. Murray commented that the SBOE knew the suit was coming and had negotiations for weeks with the Justice Department.

    - Representatives from the U.S. Attorney's office attended a meeting with the magistrate assigned to the ACORN case. It was decided that the Department of Justice and ACORN would meet to discuss their concerns about the Department of Social Services and Human Resource Administration. Where those concerns overlap, or are the same, the two

parties would work with the State and New York City to negotiate a settlement of the issues relating to the Department of Social Services and Human Resource Administration only. Issues relating to other agencies in the Department of Justice suit would go to trial.

In a related matter, it was noted that New York City has been sued on the issue of public and private hospitals as NVRA sites. They will be seeking to have that suit joined with the Department of Justice suit, as the latter includes those issues.

We will continue to represent Tom Wilkey in the ACORN action. Another meeting is scheduled with the magistrate for December.

There was a discussion with Mr. Kosinski and Mr. Wilkey and Commissioners Berman and Aquila concerning representation for these several lawsuits. Mr. Kosinski said that the Attorney General is the lead on defense on the Justice suit and that we are the lead on the ACORN suit. Tom Wilkey asked that we should have our own counsel represented on the Justice suit. All agreed that there should be joint counsel with the Attorney General on the Justice Department suit.

- Election Operations: Anna Svizzero reported that prior to and on Election Day there were many calls from counties concerning paper or affidavit ballots problems with the post office mail check program. Ms. Svizzero reported that she will reconvene the users group that met earlier in the year to review again the forms that are in use. They will work with the post office to try and avert any problems in the future.

Commissioner Donohue commented that instructions to inspectors in all places were not clear about how to handle people whose names were not in the book. She reported that some Rockland County inspectors told people to call the county board of elections wherein they really should have given those people paper ballots right away. Again, this goes back the list maintenance problems with the post office in many cases. Ms. Svizzero commented that the SBOE offer to help went to all boards of elections to assist them with the postal situations and forms. Some accepted, some did not. In many cases, the problems were created by the post office. They need to do a better job with our forms. Commissioner Berman suggested that these problems probably should be on the Agenda for the April convention. Everyone agreed. Commissioner Aquila commented that since the use of paper and affidavit ballots has increased substantially there needs to be a place set aside in polling places for people to fill out these paper ballots since in many places the quarters are very cramped and there are no tables set aside for such a purpose. This

will also be discussed at the users meeting. Commissioner Donohue asked Ms. Svizzero where should a voter go or who should one talk to at the polls in order to have someone removed for electioneering. Ms. Svizzero said that a law enforcement person can do it or a phone call to one of the local commissioners should take care of it.

- NVRA/PIO: Lee Daghlian (PIO) reported that the Web page activity which was quite busy during the month of October was inadvertently not reported in the Agency report.

  - Mr. Daghlian also reported many calls were taken from the press about the DMV registration.

- ITU - Tom Wilkey reported that the FIDAS system will be updated shortly. It is a huge job and takes quite a while for the staff to complete, but the database will be updated.

  - Commissioner Aquila reported that a judge received a letter from the Finance unit that he had not filed a report, when in fact, he had. She commented that we need to do a better job on the second floor in making sure the Five day letter list is correct. Mr. Wilkey responded that the updating of the FIDAS file and the entire system will help alleviate that problem.

IV. County Board Reports: Anna Svizzero reported that the Final Report for Monroe County was ready and the Commissioners voted 4-0 to accept it.

V. Final Proposed Rule: Agency Assisted Registration: Pat Murray reported that those rules were designed to make sure all the agencies were using the same language and that those changes were made. The commissioners accepted that report 4-0.

VI. Proposed Regulation: Method for Determining Ballot Order: Pat Murray presented the regulation. They were accepted with one comment that the restriction on commissioners being able to officiate at the drawing be taken out at the request of Commissioner Aquila. It was approved 4-0.

A report was given by Jeff Wait on the changes to the non-disclosure forms was presented. Commissioner Aquila asked that this report be tabled until next month so that a more detailed review could be made by herself and the other commissioners. All agreed to table until the next meeting.

Peter Kosinski also reported at this time that a settlement order from the Attorney General on the Rockefeller case had been received. The case concerned attorneys fees and the settlement was that New York State would pay $35,000 from the Attorney General's

budget. It was agreed that Carol Berman as Chair of the Board would sign off on the payment. Also, it was moved and voted 4-0 to pay the $4,813 fee for attorney Henry Berger for preliminary work on the Sequoia Pacific case.

**The Board went into Executive Session at 12:40 p.m. for the purpose of discussing enforcement issue and personnel matters.**

VII. Cases

Final Determinations

CMP95-57SC96-7 Tokasz v. Gaughan - The Board determined that a violation warranting criminal prosecution had occurred and directed Stanley Zalen to refer the matter to Erie County District Attorney. The allegation involved tampering with the ballot placement selection process.

SC95-12 Brennan v. O'Hara - The King's County District Attorney indicted John O'Hara on one count of illegal registration and five counts of illegal voting. Therefore, the Board's file was closed.

CMP95-50-SC96-6 Allen & Montfort v. Kemnitzer - The Board determined that a violation warranting criminal prosecution had occurred and directed Stanley Zalen to refer the matter to the Warren County District Attorney. The allegation involved a forged signature in the witness statement on a petition.

**The Board reviewed the following preliminary determinations:**

CMP96-44 Thompson v. Prentiss - Closed
CMP96-46 LeBouef v. Brandon - Closed
CMP96-47 Thompson v. Pataki - Closed
CMP96-49 Griffin v. Zetterberg - Closed
CMP96-50 Dalsimer v. Village of Hewlett Neck Inspectors - Open
CMP96-62 Registered Voters Village of Moravia - Open
CMP96-64 Lewis v. NYC Board of Elections - Closed
CMP96-65 Stewart v. Natrella, Fagan & Jeris - Open
CMP96-54 NYS BOE v. Charles O'Shea Funeral Home - Tabled
CMP96-56 NYS BOE v. AJ Contracting Co., Inc. - Closed

**The Board reviewed the folloiwng complaints without preliminary determinations:**

CMP96-102 Brodnick (Zarin) v. Leibell - Closed
CMP96-103 Bloom Complaint - Closed
CMP96-104 Siegel v. James - Closed
CMP96-111 Sheehan Complaint - Closed

CMP96-112 Vaszily v. Lehrman - Closed
CMP96-114 Powers v. Connor - Closed

The meeting was adjourned at 1:20 p.m.

-----------------------------------x
Complaint Against
John K. O'Hara
-----------------------------------x

DETERMINATION
SC95-12

WHEREAS, the New York State Board of Elections (the Board) received a complaint in which it was alleged that John K. O'Hara registered to vote, and voted, from an address at which he did not reside, and

WHEREAS, the Board commenced an investigation of these allegations, and

WHEREAS, during the course of the Board's investigation, the Kings County District Attorney's office began an investigation of Mr. O'Hara in connection with unrelated allegations, and

WHEREAS, the Board and the district attorney's office coordinated various activities in connection with the respective investigations, and

WHEREAS, on October 22, 1996, a Kings County Grand Jury indicted Mr. O'Hara on one felony count of illegal registration and five felony counts of illegal voting,

NOW, THEREFORE, this matter is closed.

Jeffrey D. Wait

DATED: November 26, 1996

APPROVED: July 31, 1995

**Minutes of New York State Board of Elections**
**June 26, 1995**

The meeting was called to order at 12:40 p.m., at the offices of the New York State Board of Elections, 3rd Floor, Swan Street Building, Core 1, 6 Empire State Plaza, Albany, New York. **Commissioners present:** Chairman Owen Smith, Commissioner Evelyn Aquila and Commissioner Helena Donohue. **Staff present:** Tom Wilkey, Tom Zolezzi, Peter Kosinski, Stanley Zalen, Pat Murray, Jeff Wait and Anna Svizzero. **Guests present:** Karen Sheard (Senator Serphin Maltese's Office), Richard Weber (NYS Senate Research), Aimee Allaud (League of Women Voters), and Carol Berman.

I. **Minutes of May 31, 1995 Meeting:** Following a review by the commissioners, a motion was made to approve the minutes. The motion was seconded, and the minutes were approved.

II. **Monthly Report:** Following a review of the report by Tom Wilkey, Commissioner Aquila requested a copy of the correspondence from the Justice Department concerning preclearance of agency assisted rules and regulations.

III. **Unit Reports:** Commissioner Aquila requested that unit updates be provided in writing, as part of the packet.

Legal Unit:

Peter Kosinski reviewed court actions currently pending, including Republican State Committee (campaign disclosure filing), and Independence Fusion Party (downstate v. upstate).

Several bills have passed, including the constitutional amendment and Presidential Primary bills. Mr. Kosinski reported the passage of others, including ineligibility of candidates to serve as voting machine custodians or technicians, ineligibility of election inspectors who are immediate family members of candidates, and the bill concerning acceptances and declinations for village petitions.

Election Operations:

Anna Svizzero reviewed unit activities including ongoing NCOA project, revised affidavit envelope, digitization contract approval in revised affidavit envelope, digitization contract approval in St. Lawrence and Madison counties, and acceptance testing of punch card absentee ballot system on Oswego county.

ITU:

Tom Zolezzi reported that details are being finalized with respect to the Office of Court Administration's submission of information concerning felony convictions and declarations of mental incompetence, which is to be used for cancellation purposes by our county boards.

He also advised that an initial session of the Task Force on Record Retention and Archives was conducted with several county commissioners and state board staff participating.

IV. **County Board Reports:** Anna Svizzero submitted in draft form reviews of the Broome and Dutchess board operations.

Commissioners approved the final submission of the Allegany Board review, provided a full 30-day comment period has expired.

Ms. Svizzero reviewed the procedure for county boards to comment on reviews, and how those comments are handled. In instances when documents have crossed, the comments are provided to the State Board's commissioners, and an amended report, if necessary, is sent to appropriate individuals, with the comments attached. If no amendments are made, the comments alone are forwarded with a letter of explanation. With specific reference to Schoharie county, Ms. Svizzero will send a letter advising the board that it may submit comments at this time, if it so chooses.

V. **Request by the NYC Campaign Finance Board to allow the use of its forms at the NYC Board of Elections:** Following considerable discussion, the matter failed, due to a lack of a motion.

VI. **Advisory Opinion #95-3:** Following a review and discussion, the advisory opinion was withdrawn by staff. Initial conversation included a request from Commissioner Aquila to provide a copy of the letter or memorandum which prompts the need for Advisory Opinions. With respect to this specific topic, Chairman Smith suggested memoranda on how the matter is dealt with by both the Federal Elections Commission and other states.

VII. **1995 Formal Opinion #2:** Following review and discussion the Opinion was withdrawn by staff.

At 1:30 p.m. there was a motion to go into executive session for the purpose of discussing cases and personnel matters. The motion was approved.

VIII. Cases:

**Final Determinations:**

James Curry (Allen Dunham) v. Stuart, SC94-24 - The Board determined that no violation warranting criminal prosecution had occurred, and directed Stanley Zalen to close the case and include a letter of admonishment. The matter pertained to residency. Additionally, Mr. Zalen recommends the matter be referred to the Election Operations Unit for clarification with the Commissioners of Hamilton County.

**The Board reviewed the following preliminary determinations:**

Wolf v. Rivera - Closed
CMP95-28 NYSBOE v. Glenn Babbush - Closed
Brennan v. O'Hara - Closed

**The Board reviewed the following complaints without preliminary determinations:**

CMP95-37 Shapiro v. Hikind **
CMP95-38 Cahn v. Schwadron **
CMP95-40 Moskovitz v. Tanner **

** Matters were remanded to staff for preliminary determinations.

IX. **Personnel Matters**

**Following the executive session, the meeting was adjourned at 2:30 p.m.**

Peter S. Kosinski
Co-Chair

Anthony J. Casale
Commissioner

Todd D. Valentine
Co-Executive Director




40 NORTH PEARL STREET, SUITE 5
ALBANY, N.Y. 12207-2109
Phone: 518/474-8100 Fax: 518/486-4068
http://www.elections.ny.gov

Douglas A. Kellner
Co-Chair

Andrew J. Spano
Commissioner

Kristen Zebrowski Stavisky
Co-Executive Director

March 9, 2022

**Dennis Kelly, Esq.**
1248 Montauk Highway
West Islip, New York 11795

*Re:* *Matter of O'Hara v The City of New York, et al.*
*(U.S. Dist. Court [EDNY] 17-cv-4766)*

Dear Mr. Kelley:

Pursuant to the civil subpoena issued by your office on or about February 11, 2022 and received by the New York State Board of Elections on or about February 15, 2022, (subpoena attached) in the *Matter of O'Hara v The City of New York, et al.* (U.S. Dist. Court [EDNY] 17-cv-4766), please find enclosed all responsive documents found pursuant to a diligent and reasonable search of the records of the New York State Board of Elections.

As a custodian of these records, kept in the usual course of the business of the agency, I AFFIRM PURSUANT TO THE CPLR AND DO CERTIFY that these records are true reproductions of the originals of such documents possessed by the New York State Board of Elections.

Very Truly Yours,

Brian L. Quail, Esq.
Counsel

UNITED STATE DISTRIT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------X

JOHN O'HARA,

Plaintiff,

-against-

THE CITY OF NEW YORK, PATRICIA L. HYNES, as Administrator of the Estate of Charles J. Hynes, ASSISTANT DISTRICT ATTORNEY JOHN P. O'MARA, ASSISTANT DISTRICT ATTORNEY ANGELO M. MORELLI, ASSISTANT DISTRICT ATTORNEY DINO AMOROSO, DISTRICT ATTORNEY INVESTGATOR ALLEN PRESSER, ASSEMBLYMAN JAMES F. BRENNAN, JOHN W. CARROLL, ESQ., JOHN KEEFE and JEFFREY WAITE, ESQ.

Defendant.
--------------------------------------------------------------X

17-cv-4766 (ILG) (SMG)

SUBPOENA DUCES TECUM

THE PEOPLE OF THE STATE OF NEW YORK

To: New York State Board of Elections
40 North Pearl Street
5th Floor
Albany, NY 12207

To the Person Summoned: You are commanded to make available the documents and tangible items designated and described below:

a. Any and all documents related to: reports, worksheets, vouchers, indexes, memo book entries, logs, bulletins, correspondence, emails, audiotapes, videotapes, transcripts, notes, memoranda, receipts, witness statements, and other records maintained and prepared by the New York State Board of Elections and any record generated by the New York State Board of Elections in the possession, custody and control of the New York State Board of Elections regarding the investigation by the Board of Elections into the activities of John O'Hara.
b. Any correspondence, memos, emails, letters sent to the New York State Board of Elections regarding John O'Hara, including but not limited to a June 28, 1994, letter from Assemblyman John Brennan to the New York City Board of Elections and a July 11, 1994 correspondence from the Board of Elections Council to Brennan.

RECEIVED - NYSBOE
FEB 15 '22 PM12:34

c. Any and all notes, memos, correspondence from or to Special Deputy Counsel Jeffrey Waite, including but not limited to a "Confidential Memorandum" from Waite to the Board of Commissioners dated June 19, 1995.

d. Any and all notes, memo's, correspondence provided at a meeting between Wait, an unknown Board investigator, Brennan and Jack Carroll on August 31, 1995.

e. Any and all papers, motions or petitions, including but not limited to a motion to unseal an election case involving John O'Hara on or about January 27, 1996 including but not limited to affirmations and affidavits supporting any claims or petitions.

f. Waite's correspondence sending his file to the Kings County District Attorney's office including contents of said file including but not limited to a confidential memorandum to the Board of Commissions dated November 14, 1996.

g. Any and all documents, emails, etc pertaining to communications concerning Jeffrey Waite, John Carroll, James Brennan, John O'Mara, John Keefe, Jean Keefe, Charles Hynes and Allen Presser.

At the law offices of Kelly, Grossman & Kerrigan, LLP, located at 1248 Montauk Highway, West Islip, NY 11795 on March 11, 2022 to permit such party or someone acting in his or her behalf to inspect and copy, test or sample such tangible things in your possession, custody or control.

This Subpoena Duces Tecum is issued by the attorney for and on behalf of John O'Hara.

Dennis Kelly, Esq.
Name of Attorney

2205151
New York State Bar Number

1248 Montauk Highway
Office Address

631-314-4996
Telephone Number

West Islip, NY 11795
City, State & Zip Code

516-686-6771
Facsimile Number of Attorney

February 11, 2022
Date Issued

dkelly@kgkfirm.com
Email Address of Attorney

[signature]
Signature of Attorney

**To the Person Summoned:**

If you are served with this subpoena less than 14 days prior to the date that compliance with this subpoena is required, you may object by notifying the party who issued the subpoena of your objection in writing and describing the basis of your objection in that writing.

FAILURE TO COMPLY with this subpoena is punishable as contempt of court and shall make you liable to the person on whose behalf this subpoena was issued for a penalty not to exceed fifty dollars and all damages sustained by reason of your failure to comply.

Dated: West Islip, New York
February 11, 2022

Dennis Kelly, Esq.
Kelly, Grossman & Kerrigan, LLP
Attorney for Defendant
1248 Montauk Highway
West Islip, New York 11795
(631) 314-4996

# EXHIBIT B

MEMORANDUM

TO: Acting District Attorney Eric Gonzalez

FROM: Conviction Review Unit by A.D.A. Mark Hale

RE: *People v. John K. O'Hara*, Indictment Number 13525/1996

---

**The Crime**

In 1996, John Kennedy O'Hara, an attorney-at-law, community activist, political campaign organizer and perennially unsuccessful candidate for local office in Sunset Park, Brooklyn, was charged by indictment with Offering a False Instrument for Filing in the First Degree [Penal Law Sec. 175.35], False Voter Registration [Election Law Sec. 17-104] and five counts of Illegal Voting [Election Law Sec. 17-132(3)].

The genus of the indictment charges was O'Hara's claimed residence. Since the early 1980s, O'Hara had leased an apartment and maintained a residence in a multi-unit building at 579 61st Street. O'Hara had duly registered to vote from that address and had stood for office using that address. Until 1992, 579 61st Street was in the 20th Election District of the 51st Assembly District, and, in the 38th Council District for the New York City.

In 1992, redistricting was enacted which placed O'Hara's 61st Street residence outside of the newly drawn lines of the above noted districts where O'Hara had voted, run for office and established community and political connections. On November 2, 1992, O'Hara prepared, signed and filed with the Board of Elections a new voter registration claiming a residence at 553 47th Street, a location still in the Sunset Park neighborhood where O'Hara had personal and political roots, but also back within the newly redrawn lines of the state's 20th Election District, the 51st Assembly District and the city's 38th Council District. O'Hara subsequently voted in five elections (two Democratic primary elections, two general elections and one special election) between November 3, 1992 and November 2, 1993 in those districts pursuant to the registration filed in November, 1992. After the November, 1993 general election, O'Hara again filed a new voter registration, on that occasion claiming 6017 4th Avenue, a location still within the redrawn district lines noted above, as his voting residence. All the while, and throughout the subject period (November, 1992 – November, 1993), O'Hara continued to maintain the lease, landline telephone, utilities and mailing address at the 61st Street location he had claimed as his voting residence prior to redistricting.

The indictment alleged the claimed 553 47th Street residence was a sham making O'Hara's November, 1992 filing of voter registration a criminally fraudulent act under both the penal and election laws and his votes after the registration illegal.

In total, John O'Hara was tried three times on the indictment. The first trial, in May, 1997 before the Hon. Justice Priscilla Hall, resulted in a jury verdict convicting O'Hara on all counts. That conviction was reversed by the Appellate Division, Second Department, in August, 1998.[1] In January, 1999 before the Hon. Justice Abraham Gerges the case was tried to a hung jury resulting in a mistrial. Finally, in June, 1999, again before Justice Gerges, the case was re-tried and the jury convicted O'Hara on all counts. The trial prosecutor on all three cases was former A.D.A. John O'Mara. Conversely, O'Hara was represented by three different attorneys in the three criminal trials

After a failed CPL Article 330 motion to set aside the verdict (which was denied on procedural grounds without a hearing), O'Hara was sentenced to a period of probation, a fine and a substantial period of community service, all of which were long ago satisfied. He appealed his final conviction all the way up to the New York Court of Appeals which affirmed[2] over a vigorous dissent. In 2005, O'Hara moved to have his verdict set aside pursuant to CPL Article 440. Judge Gerges denied the motion. Failing that, O'Hara instituted a *Habeas Corpus* petition in Federal District Court. That petition was also denied. O'Hara has claimed to have made three separate petitions for a gubernatorial pardon to three governors (Pataki, Spitzer and Patterson) all of which were declined. When O'Hara was convicted of a felony, he was automatically disbarred. In 2009 he was reinstated to the bar by the Appellate Division upon his request and following a hearing before the character and fitness committee.

CRU began investigation into O'Hara's conviction upon O'Hara initiating another CPL 440 Motion to Vacate which is currently pending before the Hon. Judge Miriam Cyrulnik in Supreme Court. The motion has been held in abeyance upon consent pending the completion of this investigation, but is next calendared for December 15, 2016.

**State of the Law**



[1] *People v. O'Hara*, 253 A.D.2d 560 (2d Dep't., 1998)

[2] *People v. O'Hara*, 96 NY2d 378 (2001). See Exhibit 1.



(*Matter of Bramwell v. Garullo*, 103 Misc.2d 476, 426 NYS2d 395; *Gallagher v.*

[1] See, e.g., *Weiss v. Teachout*, 120 A.D.3d 701 (2d Dep't. 2014)(candidate lived in Rhode Island, and tax returns stated that she had lived in New York for "zero months" during pertinent year; she amended her tax returns after the legal challenge commenced; court found that any "ambiguity" in her residence defeated challenger's effort to meet his burden to disqualify her); *Jones v. Blake*, 120 A.D.3d 415 (1st Dep't. 2014)(candidate voted outside the state and also amended his tax returns during his candidacy; court found that inconsistent inferences could be drawn from the evidence, and therefore challenger did not meet burden to invalidate his candidacy).

[2] In the New York Times' editorial on the council race, the paper - "[w]ith reluctance" - endorsed Lasher, but not before stating that Lasher "was caught lying about his real residency in the district."

*Dinkins*, 32 NY2d 839, 841, 346 NYS2d 268[5]; *Bressler v. Holt-Harris*, 30 NY2d 529, 300 NYS2d 379; *Matter of Gladwin v. Power*, 21 AD2d 665, 249 NYS2d 980, aff'd, 14 NY2d 771, 250 NYS2d 807; *Matter of Ferguson v. McNab*, 60 NY2d 598, 467 NYS2d 192; *Williams v. Power*, 21 AD2d 671, 251 NYS2d 297, aff'd, 14 NY2d 774, 250 NYS2d 208; *Laspesa v. Mahoney*, 42 AD2d 1027, 349 NYS2d 239; *Berman v. Weinstein*, 64 AD2d 940, 408 NYS2d 143."



[5] See fn. 6, infra



*Hosley v. Curry*, 85 N.Y.2d 447 (1995)

"

[7]

[8]

[9]



[redacted]

[redacted]

[redacted]

## Procedural History

In 2005, Judge Gerges, who had been the presiding justice in O'Hara's second and third trials which resulted in a mistrial (hung jury) and a conviction on all counts, respectively, was considering an application by the defendant to set aside his conviction pursuant to CPL Article 440.[12] Since one of the primary issues was improper selective prosecution, Judge Gerges

---

10 [redacted]

11 According to former A.D.A. John O'Mara, who in 1996 presented the O'Hara matter to a Kings County grand jury and was the trial prosecutor on all three of O'Hara's trials, KCDA, and he personally, was well acquainted with the *Ramos* trial and appellate decisions. As a result, O'Mara claims that the grand jury charge in the O'Hara matter was carefully crafted to avoid the pratfalls of the Bronx prosecution. On this issue, CRU must take O'Mara's word for it as the grand jury minutes recounting both testimony and charge to the grand jury, have been separated from the DA case file and have not been located. Similarly, the original stenographic notes of the proceeding are no longer available, thus the minutes are unrecoverable. What is certain is that the O'Hara trial court, upon a Motion to Inspect and Dismiss, found both the evidence presented and the charge to be proper and legally sufficient.

12 This was only one in a series of post-conviction motions filed by the defendant O'Hara in both state and Federal court.

solicited from the assistant assigned to the 440, then Executive A.D.A. Anne Gutmann, a recounting of how the action against O'Hara was initiated.[13] The following narrative timeline has been reconstructed from extant documents, reports, transcripts and personal interviews conducted by CRU.

A challenge to O'Hara's residency had been lodged in a 1993 civil election trial.[14] That year he was running for the New York City Council against incumbent Joan McCabe, an elected official allied with Assemblyman Brennan and his election lawyer Jack Carroll. Carroll, representing the incumbent's supporters, commenced an invalidating lawsuit against O'Hara, alleging, inter alia, that the residency he claimed on his designating petition was false.[15] The residence on O'Hara's designating petition was 553 47th Street, Brooklyn, NY – the very same residence at issue in the indictment three years later. However, without the issue being tried, Carroll discontinued the proceeding. Thus, there was no trial, let alone a finding – adverse to O'Hara or otherwise – with respect to his residency.

In 1994, O'Hara ran for the New York State Assembly against incumbent Brennan. Here again, Carroll (with the assistance at trial of Brennan's Chief of Staff John Keefe) represented objectors to O'Hara's designating petitions, alleging, inter alia, that O'Hara's residence at the 47th Street premises – from which O'Hara allegedly moved in late 1993 – was fraudulent.[16] Carroll presented testimony relating to O'Hara's residency at 553 47th Street, but the parties stipulated to settle the case prior to any ruling. Specifically, the parties agreed that O'Hara's designating petition would be withdrawn for lack of sufficient signatures – and the residency issue was

---

[13] Here reproduced and attached as Exhibit 3, and, hereafter referred to as the Gutmann Letter.

[14] This was not the first go-round for O'Hara in election litigation. For several years prior to 1993 CRU has found that O'Hara and the people he ran against engaged in mutual challenges to each other's candidacy based upon sufficiency of the nomination petitions, fraud and forgery in the nominating petitions and, occasionally, residency fraud, either on the part of the candidate, one or more of the subscribers or one or more of the persons gathering petitions. Sometimes O'Hara sued the other candidate or candidates; sometimes the other candidate or candidates sued O'Hara and, often, they were suing each other in the same election. CRU finds this was business as usual in the thrust-and-parry world of local politics.

[15] *Loeb v. O'Hara*, Index No. 24298/93 (Sup. Ct. Kings Co. 1993). It should be noted that the residency requirement for the New York City Council is residence in the district on the day of the general election. Nevertheless, a candidate is required to truthfully state his or her residence on the petition; if it is false, the designating petition can be invalidated, irrespective of the residency requirement of the particular office. See, e.g., *Bastone v. Cocco*, 230 A.D.2d 950 (3d Dep't. 1996), which authoritatively enunciated that principle for the first time. Although *Bastone* was decided three years after *Loeb* was commenced, this apparently was Carroll's theory in the *Loeb* case.

[16] *Pol v. The Board of Elections in the City of New York*, Index No. 23414/94 (Sup. Ct. Kings Co. 1994). Although O'Hara no longer claimed the 47th Street premises as his residence in 1994, Carroll sought to make it an issue as it related to an Assembly candidate's one-year residency requirement in the district. Whether or not O'Hara's previous residence at 47th Street was even relevant in the 1994 case was never ruled upon by the court.

dropped. O'Hara had not even put on his case, and the court made no finding with regard to either O'Hara's residency or Carroll's allegation of petition fraud. It was also agreed that the record would be sealed. Carroll agreed to this settlement on the record.

Despite having withdrawn the 1993 case which raised O'Hara's residency issue, and prior to re-alleging it in the 1994 case (which, as indicated, was also ultimately dropped), Brennan sought the intervention of the New York State Board of Elections. On June 28, 1994, during the time O'Hara was circulating designating petitions to run against him for the Assembly seat, Brennan, on his official New York State Assembly stationery, asked the Board to investigate O'Hara's residency. Although such requests to investigate are not necessarily public matters, this formal request by an Assemblyman on his official government stationery to the Board about a political opponent appears unusual. Moreover, not only did Brennan use his official stationery to seek an investigation, but he also signaled the Board of the political nature of his request: in his letter, he "cc'd" Jeff Feldman, who was then (and still is), the Executive Director of the Kings County Democratic Party County Committee, and undoubtedly well-known to the Board. On July 11, 1994, the Board's Enforcement Counsel wrote back to Brennan, addressed to his legislative office in Albany, acknowledging receipt of the complaint against O'Hara.

A full year went by until the Board, by its Special Deputy Counsel Jeffrey D. Wait, notified Brennan that it would proceed with the investigation of O'Hara's residency at Brennan's request. Pursuant to a "Confidential Memorandum" from Wait to the Board Commissioners, dated June 19, 1995, Wait had recommended that the Board "investigate the validity of Mr. O'Hara's voter registration." To support his recommendation, Wait made the following observations:

(1) "The Board has received a complaint from Assemblyman James Brennan in which it is alleged that John O'Hara 'has been running for office from false residences.'"

- He did not mention that O'Hara was running against Brennan at the time of the complaint, or that he had a history of running, or supporting others, against Brennan's allies.
- Nor did he mention that Brennan's counsel, Carroll, had raised the residency issue against O'Hara in a civil election matter in 1993 and 1994, and each time withdrew it.

(2) Assemblyman Brennan's "stated reason for believing that Mr. O'Hara never really moved [into 553 47th Street] is that his driver's license shows 579 61st Street and that a telephone is listed under his name at that address."

- Wait mentioned later in the memo that "The courts have interpreted the residency statute broadly, and have thereby sanctioned registration from a second residence…[a]s long as there is an actual choice to be made between two addresses, that choice should be honored."

- Wait did not discuss whether Brennan's "stated reason" for his belief that O'Hara did not reside at 553 47th Street (O'Hara's driver's license and phone at 61st Street) was probative as to whether he has a second, legitimate residence at 553 47th Street. In fact, it was not probative as to O'Hara's contacts with 553 47th Street, because, as Wait conceded, a candidate or voter could legally have multiple residences.

(3) Wait opined that "some valid basis must exist for the choice [of one of two residences]." He went on to state the law incorrectly: "If the registrant does not, for example, have ties to the community, vote from the address, own or lease the residence, or pay any of the utilities, the registration is likely to be invalid."

- These are but indicia of residency, and none is talismanic. Ironically, however, O'Hara did indeed vote from 553 47th Street -- the so-called second residence -- and it was this address that was being challenged. [redacted]

(4) Wait concluded, "Here, if the use of the various second addresses was necessary in order for Mr. O'Hara to run for office, and his contact with the residences was negligible, then a fraudulent motive will be readily ascertainable." Wait then footnotes that O'Hara's 1994 petitions were invalidated by a Supreme Court Justice, and O'Hara's treasurer in a 1988 race was found to have been falsely registered from O'Hara's 61st Street address.

- [redacted]
- [redacted]



Thus, it appears that Brennan had not fully conveyed to Wait all the evidence that had been adduced at the 1994 trial, or that it was settled without any ruling – let alone an adverse one – relating to O'Hara's residency or his petitions.

Having determined to investigate O'Hara on the speculations of a sitting Assemblyman who was a long-time political opponent, Wait met with Brennan and Carroll two months later. On August 31, 1995, Wait met with them in Carroll's law office in Manhattan. A Board investigator was also present. According to the investigator's notes, the purpose of the meeting was "to obtain additional information regarding John O'Hara." The notes reveal that Brennan or Carroll advised Wait that O'Hara had been thrown off the ballot in 1988 for fraudulent petitions (not fraudulent residency), and, according to the investigator, "[t]he main focus was the 1994 petition fraud issue[,] alleg[ing] that O'Hara and his girlfriend circulated petitions and had someone else sign the subscribing witness section." The investigator was further advised that there had been testimony in the 1994 trial by one Roberto Resano [sic][17] that O'Hara had not lived at the 47th Street residence. It does not appear from the investigator's notes that Brennan or Carroll advised Wait that there was also testimony at trial by representatives of American Express and Chemical Bank that O'Hara's residences included 553 47th Street, or that Carroll had consented to drop the 1994 case prior to O'Hara having the opportunity to call any witnesses. It also does not appear from the investigator's notes that Brennan or Carroll advised Wait that they had raised the very same residency issue in a 1993 civil election matter, but dropped the case without even calling a witness. It does appear that Carroll advised Wait that the record in the 1994 case had been sealed, because in a letter to Wait three weeks later, Carroll informed him of the name and Index Number of the 1994 invalidating lawsuit. Indeed, had Wait had the opportunity to review the trial transcript, he would have learned that the residency issue was inconclusive, and, in any event, had not been adjudicated.

A few days later, the Board interviewed one of O'Hara's subscribing witnesses on his petitions, and Wait sought documents from the New York City Board of Elections. The Executive Director of the New York City Board advised Wait that O'Hara's 1994 designating petitions had been "destroyed" by the Board.

It appears from the file that after the beginning of September 1995, neither Wait nor other Board personnel made further requests for interviews or documents in connection with the O'Hara investigation. In that the file does not include messages sent or received by the Board with respect thereto, there is no information as to communications between Brennan or Carroll, and the Board.

The next significant event relating to the Brennan allegation against O'Hara was a motion by the Board to unseal the trial transcript of the 1994 civil election case against O'Hara.

[17] CRU assumes he meant Roberto Lozano, who, for a time, lived at 553 47th Street, and testified at the 1994 civil election trial against O'Hara and would testify against O'Hara at all three criminal trials.

In or about January 1996, the New York State Board of Elections moved to unseal the record. Although Carroll had originally agreed in open court to have the file sealed, nevertheless, he advised the court that he did not object to the Board's motion. Carroll, in an Affirmation filed with the court in connection with the Board's motion, said the testimony in the case "related to the validity [of] Mr. O'Hara's claimed residency and the validity of numerous signatures that appeared on Mr. O'Hara's petition. With respect to both issues, the testimony demonstrated quite clearly that the petition was substantially tainted by fraud." This was obviously Carroll's view of his own witnesses' testimony, but the evidence relating to 553 47th Street was inconclusive in that there was also evidence connecting O'Hara to the premises. In any event, Carroll did not explicitly state in his Affirmation to the Court that the case was settled without adjudication on O'Hara's residency (or any other allegation of fraud).

Nevertheless, Wait, who filed the motion to unseal, made the following hearsay allegation in his Affirmation, dated January 27, 1996: "In the course of its investigation, the board became aware that most, if not all, of the testimony taken at the hearing before this Court is directly relevant to the Board's investigation." In other words, even though Carroll had agreed to terminate the trial without any finding relating to residency, Wait relied on Carroll's representations as to what the testimony showed.

While the Board's investigation of O'Hara was moving forward, two incidents occurred, unrelated to the residency issue that nevertheless led to his criminal prosecution.

The Board's motion to unseal the 1994 civil election case against O'Hara was heard in Kings County Supreme Court on May 28, 1996. On the same date, Keefe appeared in Kings County Supreme Court in his own case against O'Hara. According to Keefe, at 10 p.m. on the night before, he was followed by a man. When Keefe turned around, the man dashed away, but not before another person several feet behind yelled to the man following Keefe. Keefe did not hear what the person was yelling or see who he was. The next night, on the evening of May 28th, Carroll was reportedly assaulted on the street in Brooklyn with a man carrying a hammer.

Carroll filed a complaint with the 66th Precinct of the New York City Police Department, and was interviewed the next morning by Detectives Messing and Esposito. The interview was held in Carroll's home. Also present were Carroll's wife, who was identified by the detective as a legislative liaison to Brennan, Keefe, and political ally Joan McCabe, the City Council person (whose allies had challenged O'Hara's designating petitions for City Council in 1993). Keefe was also interviewed. Carroll and Keefe expressed the view that O'Hara had instigated the attack on Carroll and the incident with Keefe. The stated basis for their view was that Carroll and Keefe were long-time political opponents of O'Hara and repeatedly brought election proceedings against him in Supreme Court to remove him from the ballot. Keefe advised the

detectives that O'Hara "withdrew [his candidacies] for election fraud… and gets records sealed." Keefe said that he believed the man who had approached him from behind was a friend of O'Hara's "who would do this for Mr. O'Hara."[18]

At this meeting with the detectives about the alleged assault, Brennan, Keefe and/or Carroll told the detectives that the Board of Elections was investigating O'Hara's residency. Moreover, either during this interview or at some other time during the same day, the detectives were given the name and telephone number of Wait at the Board of Elections. One of the detectives noted the possibility of putting a "tail" on O'Hara. Needless to say, the Board's investigation of O'Hara's alleged illegal voting was irrelevant to the alleged assault.

Shortly after their meeting with the detectives, Brennan and Keefe went to the District Attorney's office and met with Assistant District Attorney Angelo Morelli about the alleged assault on Carroll. They told Morelli that O'Hara was behind the alleged assault as well as the incident with Keefe. A.D.A. John O'Mara, then Morelli's deputy in the Investigations Bureau and a high ranking executive in the office, joined the meeting and remembers the men's bitter frustration with the police in not arresting O'Hara for the assault.

Then, just as they had inserted the Board's investigation into their conversation with the NYPD detectives, Brennan – meeting with the KCDA about the assault – raised the illegal voting charge: "[Brennan] and/or Mr. Keefe expressed the belief that O'Hara did not, in fact, reside at the address he was claiming on his voter registration.... [and] further stated that a judge who had presided over an Election Law matter involving O'Hara had mentioned that he might refer that matter to the District Attorney for investigation."[19] Of course, their claim to the District Attorney that O'Hara had voted from a false residence had never been proven nor did they indicate that O'Hara had abandoned the disputed address almost three years earlier and had filed a registration claiming yet another Sunset Park location as his voting residence. As indicated above, Carroll had explicitly raised the issue in a civil election matter in 1993 and dropped it; he raised it again in 1994, and again dropped it after inconclusive testimony. There were no findings against O'Hara by the court in either case. And the comment that a Judge said he might refer an election matter concerning O'Hara was not supported by the record in either case.

[18] 

[19] The quoted recitation is, verbatim, from the Gutmann letter to Judge Gerges. *See* Exhibit 3

Soon afterward, presumably at the urging of Brennan, Board counsel Wait called the District Attorney's office and had "several discussions" with the KCDA about his investigation.[20] Wait also sent his file on O'Hara to the KCDA.[21] Such file contained voter registration records, as well as Wait's Confidential Memorandum and a Board investigator's interview notes, which, as detailed above, contained an incomplete or incorrect interpretation of evidence in the 1994 trial.

Two events then occurred. The Supreme Court denied the Board's motion to unseal the 1994 trial record, holding that original parties (specifically, O'Hara) had the right to rely on Carroll's previous consent. Then the KCDA by A.D.A. O'Mara opened a Grand Jury investigation [redacted]

A week after the court's decision, O'Mara, who ultimately prosecuted O'Hara three times at trial, called the County Clerk of Kings County to obtain the record. In support of his request to obtain a "so ordered" subpoena for the trial transcript, O'Mara submitted an Affirmation to the court. In it, he said:

> "Petitions filed by Mr. O'Hara in support of his candidacy for the New York State Assembly race in the fall of 1994 were successfully challenged in New York Supreme Court....At the direction of Justice Irving Aronin on August 5, 1994 in the Special Election Part, Mr. O'Hara was removed from the ballot, and records of the proceeding were sealed....I am informed by John W. Carrol [sic], the attorney who represented the Petitioners in these actions, that a hearing was held, that both documentary and testimonial evidence was submitted, and the residency of Mr. O'Hara was one of the principal issues to which this evidence was directed. The matter was resolved by the Court directing the removal of Mr. O'Hara from the ballot."

This Affirmation purported to convey that a court had adjudicated O'Hara's residency, and that it was the court that ruled him off the ballot. As indicated above, this was false. Residency was an issue, but although there was testimony that called it into question (testimony by Roberto Lozano), there was also evidence that linked O'Hara to 553 47th



[20] O'Mara detailed one of the contacts with Wait in which Wait, in extreme agitation, called up O'Mara and demanded that O'Mara charge O'Hara with a crime. Wait explained that after having conducted inquiries regarding one of O'Hara's petition collectors and allegations of fraud and/or forgery in the petition signatures, Wait received a telephone call from John O'Hara the substance of which was a threat to do bodily injury to Wait if Wait persisted in his inquiries. Since Wait had received the phone call at his office in Albany and there was no proof it originated in Brooklyn, O'Mara advised Wait he should file his complaint with the authorities in Albany. This, of course, never occurred, but the anecdote is instructive in understanding how much O'Hara's bellicose personality drove the investigation and subsequent prosecution.

[21] Wait recounts these facts in a Confidential Memorandum to the Board's Commissioners dated November 14, 1996.

Street (American Express and Chemical Bank statements, provided through testimony by representatives of those institutions). Moreover, in that the proceeding was settled, the directive by the court to remove O'Hara's name from the ballot was ministerial -- it was, after all, based upon the agreement of both parties, not any adverse finding.

Thus, the O'Mara Affirmation was not a full and fair recitation of what had occurred during the 1994 trial. It was, as he conceded, based upon what Brennan and Carroll, both avowed and open political enemies of O'Hara, had told him and his colleagues.[22]

In any event, a full-fledged criminal investigation was undertaken. Carroll, who stayed in touch with the KCDA's chief of investigations, Morelli, and investigating prosecutor, O'Mara, turned over his private investigator's findings from 1994, and provided current information about O'Hara's addresses. Subpoenas were served; neighbors were interviewed; and documents were obtained. At least two neighborhood people said that O'Hara lived at 553 47th Avenue with his girlfriend; bank and credit card records linked him to 553 47th Street; a credit report showed 553 47th Street as one of his residences; he clearly had strong ties to the community throughout his life; and he served on the Community Planning Board that included 553 47th Street in its catchment area. There was, to be sure, testimony by Lozano in the election hearing that O'Hara did not live at 553 47th Street, but the KCDA had records of Lozano's criminal past.[23]

[redacted]

## The Trials

### *The People's Case*

The prosecution evidence in all three trials, with an exception occurring during the rebuttal phase of the third trial, was essentially the same. A Board of Elections official

---

[22] O'Mara recalled to CRU that he was instructed to open the Grand Jury case [redacted]

[23] See page 17, *infra*, for a discussion of Lozano's criminal history.

testified as to the records of the Board indicating O'Hara's signed voter registration in November, 1992 claiming 553 47th Street as his residence and his votes in five elections subsequent to that registration, but preceding a superseding registration which changed O'Hara's residence to 6017 4th Avenue in 1994.[24]

Testimony was also received to establish that, during the charged time period (November 1992 through November 1993), O'Hara had maintained the residence in the apartment at 61st Street, renewed the lease and paid the rent in a timely manner. Testimony also established that the public utilities at 61st Street were in O'Hara's name and he was billed for those utilities at that address. He also had a listed and working telephone at 61st Street before, during and after the indictment period. By contrast, the utility witnesses (like the Board of Elections witness utilizing records maintained by their respective companies) found no gas or electric account in for O'Hara at 553 47th Street, nor the installation or listing of a telephone by O'Hara at that address.[25] The regular mail carrier who delivered for many years to the 61st Street address testified that he had delivered mail to O'Hara at 61st Street long before, during and long after the subject period and that no change of address or forwarding for mailing purposes to 47th Street had been filed with the United States Postal Service. [26]

The two key prosecution witnesses were Rafael (Ralph) Munoz and Roberto (Robert) Lozano. The witnesses were two of the three men (the third being one Quetzal Martinez,

---

[24] From the case file maintained by the Board of Election and the KCDA, as well as conversations with former ADA O'Mara, Brennan, et al, had asserted that the 4th Avenue address was also fraudulent and should give rise to additional charges of false registration and false voting. After investigation revealed the identical connections established by O'Hara at the 47th Street address and the lack of a lease or any utilities in his name for the claimed residence, KCDA declined to indict or prosecute O'Hara concerning the 4th Avenue registration and subsequent votes. The reason, as explained by O'Mara, as distinguished from the indicted situation is that (1) the claimed address was a habitable location and (2) the owners, close friends and political allies of O'Hara, claimed he was granted license to live there and did so.

[25] While extremely commonplace now for a person not to have a landline installation at their residence, 1992-93 preceded by more than a few years the cell phone revolution in which all of one's local, long distance and, indeed, data needs can be satisfied in a small mobile device. As late as the third trial in 1999, O'Mara argued that a telephone was vitally essential in any place one could or would call home and the lack of a telephone was strong indicia of non-residence.

[26] However, investigative notes indicate that KCDA had information from USPS that mail addressed to O'Hara had been delivered to 553 47th Street throughout 1993. [redacted] In the first instance, O'Hara conceded the residence at 61st Street. More importantly, the jury issue was not whether O'Hara could maintain multiple residences for voting and candidacy purposes [redacted] nor whether 61st Street was more of a residence to O'Hara or superior in nature to the 47th Street location. The only issues were whether the People's evidence could prove beyond a reasonable doubt that the 47th Street location, specifically the basement, was not habitable as a residence, and/or whether O'Hara lacked the significant minimal contacts that he could claim the location as a residence for voting/election purposes thus, in either or both instances, making the location a sham and his registration and voting a fraud.

now deceased) who, beginning in November, 1992 purportedly jointly rented all or part of 553 47th Street from owner Magaly Lucas, a former girlfriend and law school classmate of O'Hara who, in turn had purchased the building in 1990. On October 29, 1993 a deed in favor of the three men was executed indicating a completed sale of 533 47th Street from Magaly Lucas.[27] In return, they paid a lump sum of $10,000 and assumed the remainder of the mortgage.

Both men testified that they, along with their third cohort, were seeking a property to purchase when a real estate broker arranged for them to see the 47th Street address in October, 1992. At the time the property was vacant and in need of repair. Subsequently they entered into an arrangement whereby they rented the house for a monthly sum equal to the mortgage payment with the option to buy the premises. They testified that they exercised that option in late 1993, although they disputed whether title had actually been transferred and expressed the belief that they had been defrauded out of the property.[28]

Both men testified that at no time did John O'Hara live at 553 47th Street between the date when they took possession in October or November, 1992 until when they purchased the building in December, 1993. Further, they stated that the basement, the claimed residence by O'Hara, was an unfinished dumping ground, filled with junk and building debris during that entire year. To be sure, the basement area contained a sink and toilet, but the men said these facilities stood in the open (among the junk and debris) and could not be considered a residential bathroom in the traditional sense.[29]

The witnesses further stated that early in their residence at 47th Street they were both, separately and together, approached by O'Hara, who they understood to be a friend and associate of their landlord/homeowner Lucas, on several occasions,. In substance, the testimony was that O'Hara advised them (and the third co-tenant) that he would be

[27] A title search of city records indicates the three men as owners of 553 47th Street from November 15, 1993 until September 9, 1997. The former date indicates when the deed was recorded, approximately two weeks after the executed conveyance.

[28] After the sale deed was filed the men made no payments whatever on the outstanding mortgage. The property was foreclosed upon and sold by the bank holding the note and the men evicted, albeit after extensive litigation.

[29] The men indicated that later in their residency they rehabilitated the basement area and turned it into a habitable apartment which they rented out. They claimed the work was professionally done but could not name or recall who it was that performed the work, the length of time taken to complete the work or even an approximate date when the work was started or completed. The assertion that there existed no habitable areas within the house other than those occupied by the three men when they took possession as tenants stands in stark contrast to Lozano's testimony during the 1994 civil election trial. On that occasion, Lozano claims that he was approached by O'Hara at 553 whereupon O'Hara inquired about living in the house. Lozano, as he testified under oath, replied "sure, do you want to rent an apartment?" clearly implying there was, in fact, habitable areas suitable for rental in the house contrary to his testimony at trial. In the civil proceeding, Lozano never said anything about the state of the basement area and its' habitability. At none of the three trials was Lozano ever questioned about his election trial testimony by either party.

receiving mail at the house and could they collect it for him. This they did for a period of time, noting that O'Hara received nothing of substances, just sales circulars and, most notably, the Victoria's Secret lingerie catalog. Both men also said that O'Hara had instructed them to tell "anyone who asked", that he [O'Hara] lived there. This they agreed to do, though nobody ever asked. They also stated that at one point they had been issued sanitation summons for trash and debris left outside the premises. O'Hara, they said, had agreed, upon their request, to "take care of" the tickets, though they were never satisfied.

Both men were heavily impeached upon their criminal records. Lozano had a string of burglary related misdemeanors, though the last had been committed in 1986. Munoz' record was much more recent and more violent including the criminal possession of a loaded firearm for which he was initially sentenced to probation but subsequently sent to upstate penal detention for violation of that probation, and Assault in the First Degree (reduced for plea purposes from Attempted Murder) for shooting another with a handgun. Munoz was sentenced on the latter offense to incarceration as a predicate violent felon and had only been released to parole within the year before coming to 553 47th Street as an renter/buyer in 1992.[30]

Another item of impeachment was introduced on cross examination of these witnesses. All three men – Lozano, Munoz and Martinez – had, on the same day in April, 1992, obtained drivers' licenses from the state of Virginia, a state in which they admittedly had never lived, claiming residence at a non-existent address. Both of the testifying witnesses admitted falsifying the residence information and stating in the license application their driving privileges were not suspended in any other state despite the warning that the information provided was being received and recorded under penalty of perjury. Both Lozano and Munoz possessed suspended New York State licenses and explained they needed "clean" licenses to operate an off-the-books ice cream truck and freight hauling truck which were their means of livelihood and so engineered the Virginia license fraud.[31]

---

[30] The third man, Martinez, also had an extensive criminal record, including an open matter at the time of the first trial in 1997. Prosecutor O'Mara used Martinez' long and active criminal history as a rationale to not call him as a trial witness. At the same time O'Mara argued, successfully, that the testimony of Martinez would be cumulative to that of Munoz and Lozano, thus avoiding a missing witness adverse inference charge. Martinez never testified in any proceeding, nor is there an extant statement of Martinez on the O'Hara matter so there is no proof, one way or the other, as to whether Martinez would have supported the testimony of his cohorts.

[31] CRU was asked by the Defendant to ascertain whether the prosecution witnesses received any undisclosed benefit for their testimony. Although CRU could find no such benefit, it is clear that the three men were never prosecuted by Virginia for the license application fraud, nor did KCDA make any recommendation to Virginia concerning the license falsification. It is ironic, to say the least, that the chief accusers of O'Hara for a purported false and fraudulent filing of an official document having to do with residence were themselves guilty of a similar offense, also related to claimed residence, beyond all doubt.

Both men also admitted to defaulting on the mortgage they assumed upon exercising the option to buy on 553 47th Street. Records indicated that no payments were made at all and a foreclosure sale and eviction proceeding followed during which time the three men stayed in residence until compelled to leave some two-and-one-half years later. Lozano and Munoz, in turn, claimed, that they made no payments because they felt they had been defrauded out of their bargain for the home by the previous owner, the broker (who, according to their testimony, had been rumored to be involved in other scams), the bank and even their own lawyer; had never signed the transfer and never received a copy of the deed.[32] Out of their murky explanation of the house sale and subsequent default, both men also expressed open hostility toward O'Hara who they believed, as stated in their testimony, was actively in league with the previous owner, Lucas, the real estate broker and the closing attorney in conspiring to defraud them out of the house and the purchase money they had paid toward the sale.

*The Defense Case*

O'Hara presented a defense in all three trials and he testified in his own behalf in the second and third proceedings.

The defense evidence, much like the prosecutions proof, can be grouped in two broad categories. The first consisted of documentary evidence from fixed historical business records. The second comprised the recollections of persons making observations at the relevant times.

With regard to the former, O'Hara presented evidence of his Chemical Bank checking account statements and billings which had been mailed to 553 47th Street beginning in early 1993; his American Express account statements which used the 47th Street address for billing and mailing at around the same time; his Office of Courts Administration registration renewal in which O'Hara claimed 553 47th Street in March, 1993 and the voluminous mailings he received at 47th from the local community board, on which he sat, the local action committees in which he participated, the Campaign Finance Board, assisting in O'Hara's 1993 City Council candidacy and the Democratic Party for which he voted and ran for office.[33] This evidence, served not only to establish legitimate

[32] Under New York law, it is the seller only who signs the transfer; buyers who purchase subject to the mortgage lien do not own free and clear and the deed is kept by the bank which holds the mortgage and, in any event, the deed in their favor was on file with the County Clerk from whom the men could have obtained a certified copy at any time.

[33] All of these accounts and mailings had, in 1994, been changed to O'Hara's subsequent claimed voting address on 4th Avenue within the same election districts and general Brooklyn neighborhood. All of these contacts were well known prior to the initial election action against O'Hara claiming false residence in 1993 and some had even been presented in the partial election trial in 1994

contacts with the address but to rebut the testimony of Lozano and Munoz that O'Hara received nothing of importance there.[34]

Another bit of documentary evidence also substantially rebutted another part of the Lozano/Munoz proof. The sanitation tickets which the two men had claimed that O'Hara promised to pay as a *quid-pro-quo* for their maintaining the charade of his residence at 533 47th Street were not issued until mid-1994, long after O'Hara had abandoned 47th Street as a voting residence and had established himself on 4th Avenue.

The recollections of many people, mostly friends, neighbors, political connections and even family members who had seen O'Hara in or around the 47th Street address during the subject period and believed him to live there were presented by the defense. Not all of the defense witnesses testified at all the trials and, indeed, O'Hara himself only testified at the last two trials. Among the witnesses were a longtime family friend who testified as to helping O'Hara move items using the witness's car from the 61st Street apartment to the 47th Street address on Halloween Day, 1992 [first trial only]: a political rival and fellow community activist who met with O'Hara several times outside the 47th Street address in the summer and fall of 1993 [first trial only], a grade school principal who had owned (and still owns) the house two door down from 553 since 1974, knew all of the people who had owned and/or rented in 553, was familiar with the house inside and out and met with O'Hara, who she knew from community boards, several times at the house and believed him to live there during the period charged in the indictment [all three trials]; a next door neighbor who was concerned about damage being done to her property as a result of the intermittent construction at 553 during the subject period and complained to O'Hara in person at 553 believing him to live at and have an ownership interest in the house [first and third trial]; a fellow committee man on the local board who met with O'Hara numerous times at the 47th Street house during the subject period [third trial only], and, the aunt and mother of John O'Hara who testified as to visiting O'Hara numerous times in the finished basement apartment at 553 [second and third trials]. Both the neighbors, Yvette Aguierre (the school principal) and Grace Phillips (the neighbor next door aggrieved by the construction, now deceased) testified to their friendship and association with the Vales family who owned 553 47th Street before Magaly Lucas, and remembered having seen Mr. Vales complete the renovation of the basement into a habitable area with drywall and flooring over the pre-existing concrete, a working kitchenette and enclosed half-bath. This renovation, they said, took place in the mid-1980s and both had been in the basement living area many times when the Vales' used the area to entertain friends.

[34] The evidence upon observation today most definitively establishes O'Hara's receipt of the mailings at the location. By looking at both billing statements one can see charges made to AMEX which are noted as paid by check in the subsequent month's Chemical Bank checking account statement. In those days before electronic billing and payment, it is conclusive evidence that O'Hara received the items by hand at 47th Street.

The salient feature distinguishing the defense witnesses from those called by the prosecution is that none had a criminal record nor had they committed any actionable fraud. All either had or were retired from "real" jobs as opposed to making an undocumented income "off the books." To be sure the timelines they testified to did not always conform to each other or known events, but no more so than the prosecution witnesses; both sides recalling events that even by the first trial were becoming remote in time. In the main, the defense witnesses were impeached, as argued by the trial prosecutor, because of their association with and personal affinity for John O'Hara. Some had gone as far as supporting O'Hara, either financially or by volunteer work in his campaigns for various offices. Some even carried nominating petitions for him door-to-door in the neighborhood. These activities and associations, it was argued by the prosecutor, evinced bias in favor of O'Hara on the part of the witnesses thus making them unworthy of belief.[35]

A significant defense witness who did not testify was Magaly Lucas, the former girlfriend of O'Hara and owner of record of 553 47th Street during the time period O'Hara claimed residence there. In the first trial, counsel for O'Hara opened his case promising Lucas as a defense witness. He said that Lucas would testify that she had given O'Hara license to stay in the basement apartment at 553 47th Street and that he did in fact live there. In the course of the trial Lucas refused to testify. O'Mara, for the prosecution sought and obtained a missing witness/adverse inference charge to the jury. This charge was the basis for the reversal of O'Hara's conviction in the first trial, the Appellate Division holding that the charge was not properly given, and that even though the witness was available and compellable (counsel declined the issuance of a material witness order), she did not stand in such a relationship to the defendant that she should have been expected to testify favorably for him.[36]

As noted above John O'Hara testified in his own behalf in the second and third trials. He freely admitted that he moved to the 47th Street address for the purpose of establishing a

---

[35] This argument went beyond the four corners of the courthouse with regard to one witness. As related by prosecutor O'Mara, so firm was, and still is, his belief that Ms. Aguirre committed perjury in support of O'Hara at trial that he communicated with the School Chancellor's office and the Board of Education concerning Ms. Aguirre's fitness to be employed as a school principal. No action was taken against the witness and she testified at both the second and third trials. Another more petty, but not insignificant action was taken against Ms. Aguirre. Somewhere along the course of the trials against O'Hara, KCDA publically announced that a number of school principals, among them Ms. Aguirre, would be honored by KCDA for their role in their respective school's exemplary achievement in the office's Legal Lives/Adopt-a-School Program. Sometime after the announcement, Ms. Aguirre was contacted at her school by Executive A.D.A. Dino Amoroso who told her that, in light of her participation in the O'Hara trials, KCDA was withdrawing the award to her and that she should "understand" the office's position.

[36] The missing witness charge instructs the jury to draw a permissive inference that had the witness testified her testimony would have been adverse to the party's position at trial. The practical effect of the charge in the O'Hara case was to shift the burden of proof to the defendant and, for all intents and purposes, to direct a verdict of guilty.

voting/election address within the newly re-drawn district lines of his former election districts so that he could continue his political ambitions. He stated that Magaly Lucas, a former girlfriend, and the owner of the building since 1990, allowed him to stay there free of charge while she worked out completing a sale of the building. He testified that the basement where he took up residence was a finished area with kitchenette and enclosed half-bath. He stated he moved a bed, table and chairs and lamps into the basement and stayed there overnight more often than not during the end of 1992 through 1993. He admitted registering to vote using that address, to vote from that address, and voting a number of times in that district before moving out in November, 1993. He stated his reason for moving out was Lucas's completion of the sale to Munoz, Lozano and Martinez in November of 1993. Upon the sale, he felt he longer had the license to stay in the building, and had no right to squat on the new owners. He then moved to another location on 4th Avenue still within the same election district to continue his political activities there. All the while he maintained his previous apartment on 61st Street, which was the address on the his driver's license,[37] where he had a written lease and paid monthly rent, paid utilities and received part of his mail and which he used as his residence for income tax purposes. O'Hara said he was loathe to give up the very economical rent controlled apartment and continued to use it part-time as a residence, an office and a place for relatives to stay when in town. O'Hara's testimony disputed that of Lozano and Munoz and confirmed the various accounts given by the defense witnesses about personal contacts with them at the 47th Street address.

In the third and last trial only, the prosecution put on a rebuttal case consisting of one witness, Josephine Vales. Josephine Vales was the owner, along with her husband, of 553 47th Street prior to conveying the brownstone to Magaly Lucas in 1990 and moving to New Jersey. Ms. Vales was asked directly: had she and her husband constructed an apartment in the basement of the building while they lived there, and had they done so to accommodate an adult son who was moving back to the house with his partner and newly born child?[38] Her answer was no, the basement consisted of a large open area, a separate enclosed laundry area, a sink and a bathroom. Significantly, Vales was never asked whether they had made improvements like flooring over the concrete floor, drywall over the concrete block walls or drop ceilings under the beams supporting the upper floors. She did say she would never have allowed her son and his family to stay there even if they wanted to because the area was not vented to the central heat. Instead, she installed them in one of the upstairs bedrooms.

---

[37] When the license came for up renewal, he changed the address to the 4th Avenue address he claimed as a voting residence after leaving 47th Street.

[38] Yvette Aguirre had testified that the Vales' had rehabilitated the basement to accommodate the young couple and the child.

Prosecutor O'Mara used the Vales testimony to great effect in his summation saying, in substance, the evidence, coming from a truly independent witness who knew neither the defendant O'Hara nor the accusers who had succeeded Lucas in tenancy and eventual ownership of the building, confirmed the testimony of Munoz and Lozano; the basement was not an apartment nor anything that could be considered as a residence. It did not matter that O'Hara could legally have multiple residences, or a residence for election purposes, or that he had established contacts with the address, or that people had seen him at or around the house, he couldn't claim the place as a residence because it was not habitable as a residence. The people who said otherwise were lying for O'Hara's benefit because of their strong association with him and the billings which came to the address were not legitimate contacts established by but attempts to cover up his criminal conduct. Using the "unimpeachable" testimony of Vales, jurors were encouraged to overlook the obvious deficiencies in the credibility of the prosecution witnesses and convict because Vales' testimony made the prosecution witnesses truth tellers and the defense witnesses, including the defendant himself, liars.

After the conviction in the third trial, the defendant challenged the verdict, and specifically the Vales testimony in a CPL Article 330 Motion to Vacate. O'Hara presented numerous sworn affidavits, including one from Magaly Lucas, to the effect that there was a finished basement at 553 47th Street, suitable in all respects for use as a residence. The court rejected the motion without a hearing, ruling that none of the evidence was newly discovered, that it could have been ascertained with due diligence and could have been presented in a timely fashion at the just concluded trial, thus presenting a procedural bar to the court considering the evidence in a Motion to Vacate

**<u>CRU Investigation and Analysis'</u>**

***Weight and Sufficiency of the Evidence***





***Habitability of the Premises***

CRU sought out and located Josephine Vales living in the western United States to resolve whether the basement of 553 47th Street was habitable, an issue which CRU deems decisive in the conviction of O'Hara at his third and final trial. Ms. Vales, now widowed and aged, was very cooperative with CRU investigators. When asked about the basement area of 455 (without reference to her testimony), Ms. Vales stated that when they first bought the house in the 1970s, it was unfinished with concrete floors and

[19]

cinderblock walls and exposed ceiling. She stated that sometime in the 1980s her husband, who was very handy, had finished out the basement, creating a separate utility area for washer/dryer, tiling over the floor, installing drywall walls over the cinderblock, and putting in a drop ceiling, a kitchenette with counter, sink, stove and refrigerator. He also enclosed a preexisting commode and installed a shower and sink making a fully functioning half-bath. Ms. Vales explained that the improvements were made when the Vales' also installed an above ground swimming pool, providing a party and entertainment area directly adjacent to the pool, which they used often and was used often by their children who were then teen agers.

When confronted with her trial testimony, Ms. Vales stated (correctly) that she never said the area was uninhabitable or not suited for habitation. She stated that they had never created an apartment (which was the question she was asked). She never considered the area an apartment and the Vales never sought to rent the area out as such, they having their own use for it.[40] Ms. Vales said she had merely answered the questions put to her to the best of her ability. She had been contacted by prosecution investigators and came to court on short notice and with virtually no preparation by the A.D.A. She said that her testimony was correct when she stated that the basement was not improved to provide a living area for her son, his girlfriend and their new born infant, the improvements had been done long before that event.[41] She did say that her son had wanted to move his family into the basement, seeking some privacy and independence but that she had vetoed the idea saying the child's health was delicate and the basement was insufficiently heated for use during the winter months.

Asked if she was trying to create the impression that the basement was unimproved and not suitable for habitation, she stated certainly not; she was just answering questions.[42]

CRU finds Ms. Vales to be truthful both in her present statement and in her somewhat ambiguous trial testimony. The problem is in how her testimony was limited and "spun," attorneys for both sides believing she had supported the testimony of Lozano and Munoz that the basement was not habitable. As this was a key in the jury finding the address to be a sham residence, CRU believes there is now newly discovered (or newly clarified) evidence which raises significant reasonable doubt as to this issue.

[40] A record of an appraisal completed upon the sale of the house from Vales to Lucas describes the area as a possible residential rental.

[41] Yvette Aguirre testified for the defense that the son's family's residence was the reason that the basement was renovated by Mr. Vales.

[42] Indeed, on cross examination, counsel asked if Aguirre had said the basement was renovated so that the son and his family could move in would Aguirre be lying? Vales responded, noting that while Aguirre was a close friend that statement was not correct. She was never asked, on direct or cross whether the basement was habitable at all.

*Selective Prosecution*

The defense has raised the issue of impermissible selective prosecution under the Equal Protection clauses of the New York and United States constitutions. Certainly, in a one-of-a-kind prosecution such as this in which no one before or since has been prosecuted for the same offense, and in which others have not be prosecuted for the same or similar conduct, it is almost self-evident that O'Hara was singled out for purposes other than flagrant criminal conduct which demanded redress.



Conclusion and Recommendation



