# EXHIBIT G

# LAW OFFICES OF JOEL B. RUDIN, P.C.

600 FIFTH AVENUE
10TH FLOOR
NEW YORK, NEW YORK 10020

TELEPHONE: (212) 752-7600
FACSIMILE: (212) 980-2968
E-MAIL: jbrudin@rudinlaw.com

JOEL B. RUDIN

STEVEN R. AQUINO

GEORGE R. GOLTZER
(Of Counsel)
JABBAR COLLINS
(Legal Analyst)

December 11, 2015

Mark Hale
Chief, Conviction Review Unit
Kings County District Attorney's Office
Renaissance Plaza
350 Jay Street
Brooklyn, New York 11201

Re:   *People v. John O'Hara*
      Ind. No. 13525/96

Dear Mr. Hale:

Following up on our recent meeting, I am writing to provide information that I believe will assist in your re-investigation of the factual basis for John O'Hara's conviction (even though I believe we already have presented a compelling basis to overturn his conviction for selective prosecution). I understand you now have all three trial transcripts. If this is not the case, please let me know and I'll forward to you any missing transcripts that are in my possession. I am meanwhile forwarding to you the transcript of the civil proceedings in *Dennis L. Pol, et al., v. The Board of Elections of the City of New York and John O'Hara*, Index No. 23414/94 (Sup. Ct., Civ. Term, Part 15) (Aronin, J.S.C.) – the election law hearing, brought by allies of Assemblyman Brennan, which concerned, in part, the bona fides of Mr. O'Hara's residency on 47th Street. My client and I appreciate that you wish to dig into the merits of the underlying criminal prosecution and conviction, and to that end provide the following:

## Affirmative Evidence of Innocence

John O'Hara, now 54 years of age, is an attorney who was never convicted of any crime except for this case. He lived in the same

KCDA001049

JO-003

LAW OFFICES OF JOEL B. RUDIN, P.C.

Mark Hale
December 11, 2015
Page 2

neighborhood in Brooklyn, near where his grandparents settled after emigrating from Ireland almost 100 years ago, drove a cab to put himself through law school, volunteered for and served on his local community board until he was convicted, and was constantly involved in political affairs in his community. He battled for years on behalf of Judge John Phillips, whose estate was plundered by friends of District Attorney Hynes, opposed Hynes and his allies for years, and paid a dear price, suffering three trials on the false residence charges and ultimately a felony conviction that cost him his career in law and in politics. After his law license was restored, he worked without fee as part of a successful effort to overturn the wrongful conviction of David McCallum. Although his career has been crippled, he now wishes to clear his name and cleanse his record.

As you know, the People, during the third trial, argued the theory that Mr. O'Hara did not legitimately reside at the 47th Street address at all – that the basement there was uninhabitable, that his claim that he lived there during 1992-93 was a sham, and that he really lived at a 61st Street rent-stabilized apartment that he maintained in his name. This theory was supported by two witnesses who lived upstairs at the 47th Street building, Rafael Munoz and Robert Lozano, and a rebuttal witness, Josephine Vales. The entire case came down to their credibility. However, their testimony was false. Numerous credible witnesses testified, at this trial (and the previous trials), that they saw Mr. O'Hara at the 47th Street basement apartment under circumstances suggesting he was living there, and O'Hara himself testified he lived there for most of one year, candidly acknowledging his purpose in doing so was to establish bona fide residency in the election district following a redistricting – conduct that was lawful.

Meanwhile, there are important witnesses who did not testify, apparently because they were intimidated by the D.A.'s office into fearing for their liberty or livelihood if they did so, and also because of the way in which the prosecution sprung on the defense, without warning, the *false* rebuttal testimony of Ms. Vales. Meanwhile, the jury did not hear of the People's abusive tactics in investigating this case and trying to discourage defense-favorable witnesses from testifying – tactics (all too familiar from the Hynes

LAW OFFICES OF JOEL B. RUDIN, P.C.

Mark Hale
December 11, 2015
Page 3

era) which had great bearing on the integrity of the overall prosecution. Had the jury heard all the relevant witnesses (and had the conduct of the prosecution been more responsible), the result of the trial likely would have been different. The witnesses I urge you to contact include the following:

1. **Vicki Lynn Guveiyian**
   10 Rook Court
   Egg Harbor Township, New Jersey 08234
   (609) 226-2644 (cell)

Ms. Guveiyian has been O'Hara's girlfriend since 1990, and she will cooperate with you. As I understand it, she will confirm that she was in the 47th Street house on multiple occasions during 1992-93 and that O'Hara was living there. She was assaulted and improperly touched by Assemblyman Brennan's chief of staff, John Keefe, on September 10, 1996, following which she received medical treatment and Keefe was arrested and charged with a series of misdemeanors (he ultimately pleaded guilty to a reduced charge of harassment as part of a deal reached with Hynes' office). Approximately two weeks later, ADA Ronnie Jaus, Hynes' Sex Crimes Bureau Chief, showed up unannounced with several others at Ms. Guveiyian's office at a casino in Atlantic City and warned that if the case against Keefe went forward it could affect Ms. Guveiyian's gaming license.[1] (Of course, as discussed below, there was quite a history between O'Hara and Brennan, and Brennan was a moving force behind O'Hara's prosecution.) About a month later O'Hara was indicted. Ms. Guveiyian never testified at his trials because of fear she would lose her license and source of income based upon her relationship with O'Hara and out of fear of the D.A.'s vindictiveness.

---

[1] Ms. Guveiyian requests that her own case not be publicly discussed as it involved a sex crime against her.

JO-005

LAW OFFICES OF JOEL B. RUDIN, P.C.

Mark Hale
December 11, 2015
Page 4

     2.  **Magaly Lucas**
        226 East 54th Street
        New York, N.Y. 10022
        (212) 486-7738

    Magaly Lucas was O'Hara's girlfriend through 1990. They lived together at the 61st Street apartment while they were in law school from 1985 through 1990. In 1990 she bought the house on 47th Street. During that year, they broke up. She owned the 47th Street house from 1990 through November 1993. In 1992 she rented the upstairs to Munoz, Lozano, and Quetzal Martinez, in exchange for payments that equaled her monthly mortgage obligation, and the basement apartment to O'Hara, with whom she remained on good terms, in exchange for his agreement to assist her in collecting rent from the other tenants and in watching the property. She sold the building to the three men in November 1993 in exchange for their agreement to pay off her mortgage. The deed conveying the property to them was publicly filed. Exh. A, attached hereto. At the time of the closing, O'Hara moved out.

    Following the closing, and during the next few years, Munoz, Lozano and Martinez made no mortgage payments and allowed the house to deteriorate. (Munoz and Lozano, in their testimony, admitted that, upon closing on the house, they immediately stopped making mortgage payments, using as an excuse that they never received the deed. However, as O'Hara established at the first trial, the deed was on file at the County Clerk's Office, and was readily available to the men). Ms. Lucas's lender initiated a foreclosure action in May 1994, under Index No. 17589/94. It sued Ms. Lucas as well as Munoz, Lozano and Martinez, attached the property through a lis pendens, and then refiled the foreclosure action in 1996. Excerpts of the foreclosure papers are attached as Exh. B. Lozano testified that the men continued to live there (for free) at least through 1997. Third Trial Tr. 198.

    The DA's office, crediting Lozano's claims that he and his friends had purchased the property in 1992 and were the owners during the period O'Hara claimed residency there, did not contact Magaly Lucas until October

LAW OFFICES OF JOEL B. RUDIN, P.C.

Mark Hale
December 11, 2015
Page 5

21, 1996, which is the day the D.A.'s Office arrested O'Hara. She told D.I. Allan Presser that O'Hara had lived at 47th Street while she owned it and that she had not conveyed the property until November 1993. However, as she later explained in the first of her two affidavits, which was submitted to the court as part of a post-trial motion to vacate O'Hara's first conviction in 1997, she was intimidated by the D.A.'s Office into not testifying. *See* Exh. C.

The last time O'Hara spoke with ex-girlfriend Magaly Lucas (until now) was after his initial conviction was reversed in 1998 and he was facing a retrial. She was upset that the D.A.'s Office had just subpoenaed her tax returns, was still smarting from the Office's intimidating tactics during the first trial, and understandably didn't want to be involved with his case anymore. She was away when the third trial occurred. However, after O'Hara again was convicted, she gave another affidavit, dated September 22, 1999 (attached as Exh. D), in support of another 330 motion. This affidavit refuted the false trial testimony of Josephine Vales, a last-minute People's rebuttal witness, who claimed the cellar or basement space was never occupied and was uninhabitable.

Attached to Ms. Lucas's affidavit was an appraisal report on file with her original mortgage lender, Green Point Saving Bank, noting that there were three apartments: a duplex, a second floor, and a *"potential rentable in cellar."* Exh. D (emphasis added). (O'Hara also submitted the affidavit of Denise Murray, *see* Exh. E, who swore -- contrary to Mrs. Vales' false testimony -- that the basement apartment had been renovated and that Ms. Murray would eat dinners there with Mrs. Vales' son and daughter-in-law before Vales sold the house to Ms. Lucas. The circumstances of the defense obtaining the Lucas and Murray affidavits after trial are explained in counsel's 330 motion papers, which are in your file. The court denied O'Hara's 330 motion on procedural grounds.)

O'Hara recently called Ms. Lucas, after not being in touch with her for 17 years, to see whether she would be willing to speak with you. At present, she teaches and practices law. She apparently is still wary of any involvement with your office but I believe you may be able to coax her to

LAW OFFICES OF JOEL B. RUDIN, P.C.

Mark Hale
December 11, 2015
Page 6

cooperate with you based upon your track record of independently reviewing convictions obtained under the previous District Attorney's administration.

> 3. **Yvette Aguirre**
> 559 47th Street
> Brooklyn, N.Y. 11220
> (718) 435-0091 (home)

Mrs. Aguirre was O'Hara's next door neighbor at 47th Street. Her house was two doors away. She testified at all three trials.

Mrs. Aguirre is a retired school principal who knew O'Hara from the community board and local politics. She usually supported his opponents. She testified at all three trials that she saw him coming and going from the house, and once came to the house to invite him to a party for her daughter and he came out of the basement apartment. She wasn't in the apartment while O'Hara lived there but had been there previously when Josephine Vales owned the house and knew – contrary to her false testimony – it was habitable.

At his sentencing, Mr. O'Hara alleged that, after his first conviction was reversed by the Appellate Division in 1998, Mrs. Aguirre was scheduled to receive an award from District Attorney Hynes at some event, but Dino Amoroso, counsel to District Attorney Hynes, called to threaten her that if she testified again for O'Hara she wouldn't get the award, and sure enough, although her name was printed on the program, she didn't get it. She testified anyway. But Mr. Amoroso's tactics were highly revealing of how political this case was and of the lengths the Office was willing to go to ensure a conviction.

JO-008

LAW OFFICES OF JOEL B. RUDIN, P.C.

Mark Hale
December 11, 2015
Page 7

### 4. Juan Perez
500 Ave L, NW Apartment 1010
Winter Haven, Florida 33881
(646) 226-8620

Juan Perez testified at O'Hara's first trial, even though he was a former political opponent. He came to the 47th Street house on Election Day in November 1993. They were campaigning that day for David Dinkins' re-election as Mayor.

Mr. Perez was scheduled to testify at O'Hara's second trial, but my understanding is that ADA O'Mara warned him that he was subject to prosecution for perjury and as a result he didn't show up. O'Hara recently spoke to him and he indicated he was willing to speak with your office.

### 5. Grace Phillips (we have no contact information).

She was the next door neighbor at 47th Street and testified at the first trial about seeing O'Hara at the house. She said that construction by the new upstairs occupants damaged the house and that she saw dozens of crack vials outside it (after O'Hara had left) (*see* First Trial Tr. 359-71). She testified that, shortly before Magaly Lucas purchased the house and she saw O'Hara apparently living in it, the basement apartment was in "perfect" condition (Third Trial Tr. 246-261). (This was consistent with the affidavit of Denise Murray, Exh. E.)

### 6. James McCall
8701 Shore Road – Apt: 136
Brooklyn, New York 11209
(718) 833-0111

He was O'Hara's election law attorney in 1993 and visited him at the 47th Street residence during that time. My understanding is the defense did not call him out of fear that the prosecution would insinuate fraud allegations in cross-examination which would prejudice the defense even though they

KCDA001055

JO-009

LAW OFFICES OF JOEL B. RUDIN, P.C.

Mark Hale
December 11, 2015
Page 8

weren't true. He can explain as well the election law litigation that O'Hara was immersed in during this period.

> 7. **Denise Murray** (deceased in 2014)

Her affidavit, see Exh. E, together with the affidavit of Magaly Lucas and the appraisal report, refutes the false rebuttal testimony of Josephine Vales that the D.A.'s Office used to convict O'Hara at the third trial. Vales' testimony that the basement was never habitable as an "apartment" also is contradicted by the testimony during the first trial of People's witness Munoz, who acknowledged that the basement was "an apartment" and included a stove, refrigerator, sink and bathroom (Tr. 226-27), and by his testimony during the 1994 civil proceeding (Tr. 37) (responding, when asked "[h]ow many units are in the building," that "[t][here's three floors and the basement" and that he rented them out).

> 8. **Other witnesses.**

Any of the other witnesses who testified in O'Hara's favor at the three trials.

> 9. **Documentary Evidence showing residency at 47**[th] **Street** (page references are to the first trial):

American Express monthly statements from February to September 1993 mailed to 47th Street, introduced at trial as Exh. F and attached hereto also as Exh. F (*see* T. 350-352);

Monthly Chase bank statements from February to September 1993 mailed to 47th Street crime scene, introduced at trial as Exh. G and attached hereto also as Exh. G (*see* T. 341-345);

LAW OFFICES OF JOEL B. RUDIN, P.C.

Mark Hale
December 11, 2015
Page 9

OCA attorney registration with change of residence to 47th Street during normal biennial registration date of March 1993, introduced at trial as Defense Exh. D and attached here as Exh. H (*see* T. 475-77);

Documents from NYC Campaign Finance Board listing 47th Street as O'Hara's residence, introduced at trial as Exh. B and reproduced here as Exh. I (*see* T. 411- 414); and

Testimony of Eugene Moore, District Manager from the local Community Board, that notices of meetings were mailed to O'Hara at the 47th Street residence (1st trial, pp. 434-43).

## Facts to Consider About the Veracity and Integrity of the People's Case

This case, as the records of your Office establish, resulted from a complaint to the State Elections Board, and then to the D.A.'s Office, by John O'Hara's political and personal rival, James Brennan, and his staff member, James Keefe. Brennan and his allies, and O'Hara, had been challenging each other's election petitions and candidacies for years. In 1994, Brennan retained a private investigator to investigate O'Hara's residence, filed a complaint with the Elections Board, initiated the civil proceeding challenging O'Hara's candidacy for the Assembly, and then complained to the D.A.'s Office, which used the information Brennan spoon fed it to build a criminal case against O'Hara.

As a document in your Office's files, entitled "People v. John K. O'Hara, Preparation for Grand Jury Presentation," indicates, *see* Exh. J, the People's theory, given to them by Brennan, was that O'Hara really was living only at 579 61st Street, a rent-stabilized apartment, all along, and his claimed residencies at 553 47th Street, and then 6017 4th Avenue, were false in order to qualify him to run for office in particular election districts (see "Objective: Proof that O'Hara registered and voted from false addresses. ... Subsidiary

LAW OFFICES OF JOEL B. RUDIN, P.C.

Mark Hale
December 11, 2015
Page 10

proof of 6017 4th Avenue address as possible false residence beginning in
1993.") Indeed, this had been the claim in the civil proceeding – that both
claimed residences were false. But the problem with this theory, which the
D.A.'s Office ultimately abandoned, is that investigation showed that O'Hara
really was living, as of January 1994, at the 4th Avenue location. If he was
really living there, why wouldn't he previously have established an actual
occupancy at 47th Street?

Numerous law-abiding, respectable individuals testified, or gave
affidavits under oath establishing, that O'Hara really did establish an actual
residency, during 1992-93, at the 47th Street location, and as the defense
documentary exhibits showed, he gave that listing to various government
entities and businesses and received mail there. (*See, e.g.,* Exh. K, D.A.'s
Chronological Data Sheet, noting that DIs' investigation of 553 47th Street
had revealed that "postal carrier states mail for O'Hara presently being
delivered @ this location."). Why would these legitimate individuals have
perjured themselves at all, let alone at a time when Hynes' Office was so
powerful and would regularly use heavy-handed tactics with witnesses? If
they knew O'Hara really wasn't living there, wouldn't they have feared
prosecution for lying? What was the evidence proving O'Hara had
orchestrated a sham residence and recruited all these individuals to lie for
him? It was the testimony of two fraudsters with criminal records who had a
substantial motivation to lie, Munoz and Lozano, and the surprise, last-
minute testimony of Ms. Vales.

ADA O'Mara continually portrayed Munoz, Lozano, and their co-
resident, Quetzal Martinez, as poor, pathetic dupes who had somehow been
tricked into buying the 47th Street house from O'Hara's former girlfriend
Magaly Lucas, and made it seem as if O'Hara was in on the fraud. Martinez
had a very substantial criminal record, including current cases, and was not
called to testify, even though he was in court. Munoz, too, had a serious
felony record for a shooting assault and had just been released from four
years in prison when he moved into the house. Lozano admittedly was
operating his ice cream truck business without a valid driver's license, which
subjected him to potential arrest and the loss of his principal source of

KCDA001058

JO-012

LAW OFFICES OF JOEL B. RUDIN, P.C.

Mark Hale
December 11, 2015
Page 11

income. All three men admittedly defrauded the State of Virginia by certifying they were residing there, to illegally obtain drivers' licenses, when they were in fact residing in New York. As Ms. Lucas can tell you, they falsely claimed to be brothers and they admitted at the third trial having used those false Virginia drivers' licenses as identification to deceive her into entering into the contract with her. None of the men's criminal acts from Virginia to New York were of any interest to the Brooklyn D.A.'s Office under Mr. Hynes, which had just one mission: to convict John O'Hara.

### The People Manufacture A Real Estate Scam
### To Deflect Attention From Their Witnesses' Own Deceit

The prosecution at each trial insisted, based upon their two witnesses' testimony, that the men had never received a deed for the 47th Street house and somehow they had been defrauded. At the first trial, ADA O'Mara referred to the house transaction as a "scam" and accused O'Hara and Magaly Lopez of taking the men for a "ride" (T. 688). At the second trial, O'Mara elicited from Munoz that his signature was not on the deed, as if that supported his claim he had been scammed. Tr. 129. This led the defense, anticipating a similar sleight-of-hand at the third trial, to introduce expert testimony that only the seller signs such a deed, not the buyer. Tr. 236. Still, at the third trial, Roberto Lozano again claimed he never received a deed and believed he was being "gypped" (Tr. 197-98). Before a jury that included 11 black people, ADA O'Mara then compared O'Hara's alleged complicity in fraud with Ms. Lucas to those of a murderer and slave trader, invoking the biblical story of Joseph:

> "I remember the story of Joseph. Now Joseph had a multi layered coat and he was preferred by his father and that upset his brothers and the brothers, the older brothers took him out to the field and they were going to kill him so the inheritance would go to them, but they got greedy. So, they didn't kill him. They sold him into slavery and took the money, but as long

LAW OFFICES OF JOEL B. RUDIN, P.C.

Mark Hale
December 11, 2015
Page 12

> as he was alive the inheritance didn't go back to
> them. When they went back to the father, they took
> goat's blood and spread it on the coat so they would
> get the inheritance. Fooled the father for a little
> while until Joseph appeared again because he wasn't
> dead. That's just a superficial effort to try to fool
> people. Ask yourselves if that is not what happened
> here ..." (T. 464).

In fact, it was the three men who scammed Ms. Lucas. They induced
Ms. Lucas to trust them, claiming they were hard-working "brothers" with
valid Virginia drivers' licenses, except they weren't brothers, they had serious
criminal records, and their Virginia licenses were fraudulent. They exercised
their option to buy the house without any down payment, just an agreement
to assume the mortgage payments, only to then not make a single payment
while simultaneously earning rental income. *See* Third Trial Tr. at pp. 198-
99 (Lozano admits making no payments on the building while collecting rent
from tenants). Meanwhile, they ran the house into the ground; neighbors
found large numbers of crack vials outside the house. The deed they claimed
had been fraudulently withheld from them was publicly filed at the County
Clerk's Office. *See* third trial tr., pp. 231-36, and Exh. A. It had been easily
available all along. All they had to do was ask their attorney for it. The
prosecution knew this. Yet they used their witnesses to shamelessly
manipulate the jury.

These three men – in and out of criminal trouble, defrauding the State
of Virginia into issuing false drivers' licenses, operating an unlawful ice
cream truck business without a valid driver's license, violating a purchase
agreement that they had induced the previous owner to enter into through
fraud, and facing foreclosure – had every reason to please an influential
Assemblyman, and then the D.A.'s Office, when they were approached to lend
their assistance in making a case against John O'Hara.

LAW OFFICES OF JOEL B. RUDIN, P.C.

Mark Hale
December 11, 2015
Page 13

Lozano and Munoz gave demonstrably false statements and testimony about crucial issues bearing upon not only their credibility but about the charges against Mr. O'Hara. One such false statement, described above, was their false claim that they didn't make mortgage payments because they didn't receive a deed. Another was their false statements concerned when they obtained ownership of the 47th Street house. At the 1994 civil proceeding brought against O'Hara, Lozano erroneously testified that he obtained ownership of the building in 1992, but then was shown the New York City records showing the conveyance to him and his partners in November, 1993, and corrected himself. Civil Tr. 32-33. Notwithstanding his awareness that the conveyance occurred in November 1993, he repeated his false statement to the D.A.s Office, when he was interviewed, that the conveyance occurred in 1992. *See* Exh. K, D.A.'s Chronological Data Sheet "DIs' confirmed Lazano [sic] lives at location and owns building since 1992..."). As the purported owner from 1992 on, his claim that he knew O'Hara didn't live there during 1992-93 might have seemed credible to prosecutors single-mindedly trying to make a case against O'Hara, and they would have had little reason to check with the previous owner, Ms. Lucas. This may explain why she wasn't interviewed until *after* O'Hara was indicted.

Also relevant to the two witnesses' credibility was Lozano's false story at the first two trials that their reason for agreeing to go along with O'Hara's story that he was living at the 47th Street house was O'Hara's promise, like some Tammany Hall fixer, to take care of their "sanitation" or "garbage" tickets. *See* Lozano's testimony at first trial, pp. 160-61 ("He said he would take care of it") and second trial, pp. 135-37 ("[H]e said, 'Look, I'll take care of those tickets, don't worry about it..."). Lozano and the People dropped this claim at the third trial after O'Hara proved, at the second trial, that no such ticket for that location was issued until 1994 – after O'Hara moved out – at which point 11 such tickets were issued (evidently because it was then that the new owners made the house into an unlivable construction zone). *See* Second Trial Tr., at 168-75 (testimony of Bob Delasalla). It is difficult to understand how anyone could credit their testimony then (or now) in view of

LAW OFFICES OF JOEL B. RUDIN, P.C.

Mark Hale
December 11, 2015
Page 14

Lozano's fundamental lie about their purported reason for going along with
O'Hara's alleged fraud.[2]

After indicting O'Hara and, no doubt under pressure from District
Attorney Hynes to continue this prosecution regardless of the inconvenient
facts undercutting the men's credibility, ADA O'Mara succeeded in blunting
the impact of the men's fraudulent involvement in the house conveyance, and
their false statements. He did so by creating the untrue impression that
O'Hara had somehow been involved in defrauding *them.* Through this tactic,
the prosecution succeeded in diverting attention from their star witnesses'
deceitful, manipulative tactics, obscured the true facts, and unfairly used the
situation to disparage O'Hara.

As for Josephine Vales, her surprise, last-minute testimony that the
basement area wasn't inhabitable when she sold the house to Ms. Lucas in
1990, shocked the defense, which had no ability to challenge it, as it came

---

[2] Significantly, at the third trial, the People dropped any effort to have the jury infer,
based upon utility and postal records, that O'Hara did not establish a residency at 47th
Street, relying instead entirely on the credibility of its two initial and one rebuttal witnesses. O'Hara
had shown at the first two trials, and also proved as part of his defense in the third trial, that the
overwhelming documentary evidence on this point was in his favor. The difficulty of using
records to establish that O'Hara did or did not establish a residency at 47th Street was illustrated
by the Brooklyn Union Gas records, for example, which showed the absence of any account for
Lozano at 47th Street before December 28, 1992, whereas Magaly Lucas's account continued at
least through November 30, 1992. (There was no account in Munoz's name until February,
1995.) One could infer from this evidence that O'Hara was living there in November, as he
testified, whereas Lozano did not move in until the end of December, contrary to the testimony
of Lozano and Munoz that they moved in during October. Thus, it could further be inferred, they
weren't in a position to know whether O'Hara was there in November, when he registered to
vote from that residence – the basis for several of the counts of conviction. *See, e.g.,* Testimony
of Washington Donoso, Brooklyn Union Gas Company, Second trial, pp. 140-41. Significantly,
Mr. Donoso acknowledged that he could not tell whether the meter on the first floor might have
also covered a gas line into the basement, further undercutting the significance of the
documentary evidence with respect to whether the basement apartment was occupied by Mr.
O'Hara. Tr. 141-42.

JO-016

LAW OFFICES OF JOEL B. RUDIN, P.C.

Mark Hale
December 11, 2015
Page 15

immediately before summations. Her testimony was important to buttress the otherwise questionable testimony of Lozano and Munoz. The defense was given no prior notice of her testimony before she appeared, for the first time, as a rebuttal witness for the People during the third trial. What brought about her testimony is known only to her, ADA O'Mara, and perhaps the D.I.s who found her, but certainly, at least after the end of the trial, it was apparent she had lied.

The defense 330 motion showed that the cellar or basement area she claimed had never been used as an apartment and was essentially uninhabitable in fact was a rentable apartment, according to the bank appraisal conducted in 1990 at the time she sold the house, as well as the detailed affidavits of Magaly Lucas and Denise Murray. Indeed, it also was contradicted by Lozano's own admission in the civil proceeding in 1994: when asked "[h]ow many units are in the building," he answered: "There's three floors and *the basement*." Tr. 37 (emphasis added). The D.A.'s Office prevailed upon the court to deny the defense 330 motion on the theory that the testimony of these witnesses could have been presented at trial, even though the defense had not known that Ms. Vales, after not having testified at either of the first two trials, suddenly would emerge as a last-minute rebuttal witness and would lie. The CRU is not so constrained and can take another look at her testimony and investigate what may have led her to give it. There were rumors in the neighborhood after the trial that she may have been motivated by the vulnerability of her son, David Vales, who had a criminal record and had filed for bankruptcy. O'Hara's attorney's affirmation in support of his 330 motion noted rumors in the community that David Vales had a truck hijacking charge. While we haven't been able to substantiate this rumor, you would have superior access to law enforcement records, including any proceeding that may have been dismissed and sealed. You also may be able to determine if Ms. Vales had any other reason to lie. Even if her motivation cannot be uncovered (perhaps she simply responded to pressure by the D.A.'s Office), the weight of the evidence shows that her testimony was untruthful.

LAW OFFICES OF JOEL B. RUDIN, P.C.

Mark Hale
December 11, 2015
Page 16

## Other Things To Investigate

Exh. K, the Chronological Data Sheet, upon information and belief, was never disclosed to the defense. It contains *Rosario* material – Lozano's false statement that he owned the house since 1992, which he apparently made to the D.A.'s Office even though it was brought to his attention at the 1994 civil proceeding and he acknowledged that the conveyance occurred in November 1993 – and *Brady* material – the statement by the postal carrier that he had delivered mail to O'Hara at the location.     The only postal carrier who testified at trial was in another district and had no knowledge of mail deliveries on 47th Street.[3]

---

[3] This does not appear to be the only *Rosario/Brady* violation committed by the D.A.'s office in this prosecution. During the first trial, ADA O'Mara tried to smear O'Hara by asking a defense witness if she was "aware" that O'Hara's petitions to get on the ballot as a candidate for the Assembly had been invalidated for "fraud." O'Hara had not put his character in evidence, nor was there any evidence that he was personally responsible for any defective, let alone fraudulent, petitions. When O'Hara's counsel objected that this was a distortion of what had occurred, ADA O'Mara represented that he had the "actual transcript of the proceedings. What occurred is this: There was a challenge to the petitions, including those by the way of the person who was up on the stand. There is substantial testimony taken. The Judge began to issue a ruling concerning Mr. O'Hara's residency and also concerning the petitions, and, in fact, had verbally said he was disqualifying them..." First Trial Tr. 404-05. However, ADA O'Mara did not disclose the transcript to the defense until 1999, shortly before the second trial, when the defense demanded it. It contained the testimony of People's witnesses Lozano (pp. 30-38) and Parras (pp. 18-30), and plainly constituted (at least) *Rosario* material. (ADA O'Mara had obtained it through a subpoena notwithstanding that it was sealed; it had not been available to the defense.)

The civil transcript also shows that Mr. O'Mara's representations to the court were inaccurate. Most of the testimony at the hearing concerned whether there were insufficient valid petition signatures to sustain O'Hara's candidacy -- whether campaign workers had obtained some signatures that they did not personally witness or which were otherwise technically defective -- but little or no evidence of fraud, and none of the failings were shown to have been known to or caused by O'Hara. At no time did the judge indicate he was going to make a finding that O'Hara's residency was fraudulent, or that the petitions were fraudulent. In the end, O'Hara agreed to withdraw his petitions and to end his candidacy, "without admitting any of the

LAW OFFICES OF JOEL B. RUDIN, P.C.

Mark Hale
December 11, 2015
Page 17

Handwritten notes from the case file indicate that the Office considered offering O'Hara an ACD, evidently because it "would foreclose [a] lawsuit for malicious prosecution." Exh. L. It would be interesting to learn who wrote this and why.

Finally, we wonder about whether there was any undisclosed financial, law enforcement, or other consideration given Lozano and Munoz, each of whom testified at no less than three trials even though, they claimed, they had no interest in this matter. Interestingly, their friend and co-purchaser of the 47th Street house, Quetzal Martinez, had an extensive criminal record, including a drug use history, and it is possible his friends were motivated to testify by their knowledge, expectation, or hope that not only would they obtain law enforcement consideration for themselves, but that Martinez would as well. After the third trial, he was arrested and indicted on two separate burglary charges, Ind. Nos. 8472/2000 and 8865/2000, was diverted into a treatment program, and repeatedly, over seven years, violated the requirements of the program and of the plea agreement by leaving the program and being rearrested, yet the D.A.'s Office never asked for any adverse consequences and ultimately his conviction was expunged. I have more than 50 transcripts for his court appearances if you would be interested in examining them as part of a further inquiry. I could find no reference to this case, but that does not mean that the District Attorney's attitude wasn't influenced by his and his friends' cooperation against John O'Hara.

Please let me know if I can assist your re-investigation in any other

---

allegations ... based on an insufficient number of [valid] signatures in the petition," nothing more. Tr. 322-24.

# LAW OFFICES OF JOEL B. RUDIN, P.C.

Mark Hale
December 11, 2015
Page 18

way.  I look forward to hearing from you.

Sincerely yours,

Joel B. Rudin

JBR/tp
Encls.

JO-020

# EXHIBIT A

KCDA001067

JO-021

## CITY REGISTER RECORDING AND ENDORSEMENT PAGE
### - KINGS COUNTY -
*(This page forms part of the instrument)*

k(s) _757_

s) _54_

_553 47th St._

Record & Return to: Carlo F Rodriguez Anselo, Esq.
5503 5th Ave, Bklyn, NY, 11220

Title/Agent Company name: A.R.S. ABSTRACT, LTD.

Title Company number: _SECK 1522_

REEL 3155 PG 1132

**THE FOREGOING INSTRUMENT WAS ENDORSED FOR THE RECORD AS FOLLOWS:**

Examined by (✓): _____

City Register Serial Number: **59402**

Mtge Tax Serial No.: _____

Mtge Amount: $ _____

Taxable Amount: $ _____

Indexed By (✓): | Verified By (✓): ✓

Block(s) and Lot(s) verified by (✓):

Address ✓ | Tax Map ____

Extra Block(s) ____ | Lot(s) ____

Exemption (✓) _____ YES ☐ NO ☐

Type: [339EE] [ 255 ] [OTHER ____]

Dwelling Type: [1 2] [ 3 ] [4 to 6] [OVER 6]

Recording Fee $ A21

Affidavit Fee (C) $

TP-584/582 Fee (Y) $

RPTT Fee (R) $ 25

HPD-A ☒ | HPD-C ☐

**TAX RECEIVED ON ABOVE MORTGAGE ▼**

County (basic) _____ $

City (Add'l) _____ $

Spec. Add'l _____ $

TASF _____ $

MTA _____ $

New York State Real Estate Transfer Tax ▼
$ 224

Serial Number ➡ 004816

New York City Real Property Transfer Tax
Serial Number ➡ 14288

TOTAL TAX _____ $

Apportionment Mortgage (✓) YES ☐ NO ☐

New York State Gains Tax Serial Number ➡

Joy A. Bobrow, City Register



**RECORDED IN KINGS COUNTY OFFICE OF THE CITY REGISTER**

1993 NOV 15 A 9: 30

Witness My Hand and Official Seal

City Register

CRGFM89K.BPG 1/93

KCDA001068
A. 169

CONSULT YOUR LAWYER BEFORE SIGNING THIS INSTRUMENT — THIS INSTRUMENT SHOULD BE USED BY LAWYERS ONLY.

THIS INDENTURE, made the 27 day of October, 1993

BETWEEN

MAGALY X. LUCAS, residing at 326 W. 45th Street, Suite 1F, New York, New York

party of the first part, and

QUETZAL MARTINEZ, ROBERTO LOZANO and RAFAEL MUNOZ all residing at 553 47th Street, Brooklyn, New York

party of the second part,

WITNESSETH, that the party of the first part, in consideration of _____ dollars paid by the party of the second part, does hereby grant and release unto the party of the second part, the heirs, or successors and assigns of the party of the second part forever.

ALL that certain plot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in the Borough of Brooklyn, County of Kings, City and State of New York, bounded and described as follows;

BEGINNING at a point on the northerly side of 47th Street, distant 240 feet westerly from the corner formed by the intersection of the northerly side of 47th Street with the westerly side of 6th Avenue;

RUNNING THENCE northerly parallel with 6th Avenue, and part of the distance through a party wall, 92 feet to the southerly side of land formerly of Thomas Hunt, deceased;

THENCE westerly along said land of Hunt, 20 feet 1/2 of an inch;

THENCE southerly again parallel with 6th Avenue, and part of the distance through another party wall, 90 feet 9 inches to the northerly side of 47th Street;

THENCE easterly along the northerly side of 47th Street, 20 feet to the point or place of BEGINNING.

Said premises being known as and by 553 47th Street, Brooklyn, New York.

Sec: 3
Block: 757
Lot: 54

TOGETHER with all right, title and interest, if any, of the party of the first part in and to any streets and roads abutting the above described premises to the center lines thereof; TOGETHER with the appurtenances and all the estate and rights of the party of the first part in and to said premises; TO HAVE AND TO HOLD the premises herein granted unto the party of the second part, the heirs or successors and assigns of the party of the second part forever.

AND the party of the first part covenants that the party of the first part has not done or suffered anything whereby the said premises have been encumbered in any way whatever, except as aforesaid.

AND the party of the first part, in compliance with Section 13 of the Lien Law, covenants that the party of the first part will receive the consideration for this conveyance and will hold the right to receive such consideration as a trust fund to be applied first for the purpose of paying the cost of the improvement and will apply the same first to the payment of the cost of the improvement before using any part of the total of the same for any other purpose. The word "party" shall be construed as if it read "parties" whenever the sense of this indenture so requires.

IN WITNESS WHEREOF, the party of the first part has duly executed this deed the day and year first above written.

IN PRESENCE OF:

_____

Magaly C. Lucas

Form 2290

KCDA001069

JO-023

A 170

STATE OF NEW YORK, COUNTY OF  KINGS                    ss:

On the  2 ½  day of  October  19 93 , before me
personally came   Magaly C. Lucas

to me known to be the individual      described in and who
executed the foregoing Instrument, and acknowledged
that   she  executed the same.

_Carol Lee Flitt_

CAROL LEE FLITT
NOTARY PUBLIC, State of New York
No. 24-4634600
Qualified in Kings County
Commission Expires December 31, 19 94

STATE OF NEW YORK, COUNTY OF                           ss:

On the      day of           19    , before me
personally came
to me known, who, being by me duly sworn, did depose and
say that   he resides at                                ;

that   he is the
of
                            , the corporation described
in and which executed the foregoing Instrument; that   he
knows the seal of said corporation; that the seal affixed to said
Instrument is such corporate seal; that it was so affixed by
order of the board of directors of said corporation, and
that   he signed h    name thereto by like order.

STATE OF NEW YORK, COUNTY OF                           ss:

On the      day of           19    , before me
personally came

to me known to be the individual      described in and who
executed the foregoing instrument, and acknowledged
that      executed the same.

STATE OF NEW YORK, COUNTY OF                           ss:

On the      day of           19    , before me
personally came
the subscribing witness to the foregoing Instrument, with
whom I am personally acquainted, who, being by me duly
sworn, did depose and say that   he resides at

                            ; that      he knows
                            to be the individual
described in and who executed the foregoing Instrument;
that   he, said subscribing witness, was present and saw

            execute the same; and that   he, said witness,
at the same time subscribed h    name as witness thereto.

---

## BARGAIN AND SALE DEED

### WITH COVENANT AGAINST GRANTOR'S ACTS

Title No.  SECK1522

Magaly C. Lucas

TO

Quetzal Martinez,
Roberto Lozano and
Rafael Munoz

A.B.S. ABSTRACT LTD.,
36-12 34th Av-43PKB
Commonwealth.
Land Title Insurance Company

SECTION    3
BLOCK     757
LOT       54
COUNTY OR TOWN   Kings
STREET ADDRESS   553 47th Street
                 Brooklyn, NY

Recorded at Request of
COMMONWEALTH LAND
TITLE INSURANCE COMPANY

RETURN BY MAIL TO

CASTO F. RODRIGUEZ ARBELO, ESQ.
5403 5th Avenue
Brooklyn, New York 11220

KCDA001070
A. 171

JO-024

# EXHIBIT B

KCDA001071

JO-025

05/24/96

MORTG NO : CI-50801126

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS

## FORECLOSURE

```
------------------------------------------------x
OCI MORTGAGE CORPORATION                          :  NOTICE OF
                                                  :  MOTION FOR
                                Plaintiff,         :  JUDGMENT OF
                                                  :  FORECLOSURE
                                                  :  AND SALE
           -against-                              :
                                                  :  INDEX NO.
                                                  :  17589/94
                                                  :
                                                  :  ASSIGNED TO
                                                  :  JUSTICE
MAGALY LUCAS                                       :  Gloria Aronin
QUETZAL MARTINEZ                                   :
ROBERTO LOZANO                                     :
RAFAEL MUNOZ                                       :
ALLAN LEE                                          :
NEW YORK CITY PARKING VIOLATIONS BUREAU            :
NEW YORK CITY TRANSIT AUTHORITY, TRANSIT           :
     ADJUDICATION BUREAU                           :
                                                  :
                                Defendants.        :
------------------------------------------------x
```

SIRS:

PLEASE TAKE NOTICE that upon the summons and verified

complaint; notice of pendency of action;and upon all papers

already on file herein; the annexed affirmation of LISA B.

SINGER dated May 24, 1996 and upon the annexed referee's

computation dated June 27, 1995, the undersigned will move this

court at an IAS part 72 Supreme Court State of New York, County

of KINGS at 360 Adams Street Brooklyn, NY 11201 on **JUN 2 7 1996**

_____ at 9:30 a.m. in the forenoon of that day, or as soon

thereafter as counsel may be heard, for confirmation of the

referee's report, for a Judgment of Foreclosure and Sale and

for other and further relief as this Court may deem just and

KCDA001072

JQ-026

proper.

PLEASE TAKE FURTHER NOTICE, that pursuant to CPLR 2214(b) answering affidavits, if any, are required to be served upon the undersigned at least seven (7) days before the return date of this motion.

Dated: May 24 , 1996

Yours, etc.
CULLEN AND DYKMAN
Garden City Center
100 Quentin Roosevelt Blvd.
Garden City, NY 11530
(516) 357-3600

TO:
MAGALY LUCAS
DEFENDANT
403 West 38TH STREET, #3E
NEW YORK, NY 10018

QUETZAL MARTINEZ
DEFENDANT
553 47TH STREET
BROOKLYN, NY 11220

ROBERTO LOZANO
DEFENDANT
553 47TH STREET
BROOKLYN, NY 11220

RAFAEL MUNOZ
DEFENDANT
553 47TH STREET
BROOKLYN, NY 11220

ALLAN LEE
DEFENDANT
2001 GERRITSEN AVENUE
BROOKLYN, NY 11229

ALAN S. ROTH, ESQ
ATTORNEY FOR DEFENDANT
NEW YORK CITY PARKING VIOLATIONS BUREAU
770 BROADWAY, 15TH FLOOR
NEW YORK, NY 10003

NEW YORK CITY TRANSIT AUTHORITY, TRANSIT
     ADJUDICATION BUREAU

KCDA001073

JO-027

DEFENDANT
505 FULTON STREET
BROOKLYN, NY 11201

WE ARE ATTEMPTING TO COLLECT A DEBT
ANY INFORMATION OBTAINED WILL BE USED
FOR THAT PURPOSE

KCDA001074

JO-028

05/24/96                         MORTG NO : CI-50801126

                        At an IAS part 72 of the Supreme Court held
                        for the County of KINGS at the Courthouse
                        thereof, 360 Adams Street, Brooklyn, NY
                        11201 on May ___, 1996.

DIST.
00000
            P R E S E N T :          HON.
SEC.                                 JUSTICE.                          FORECLOSURE
000         --------------------------------------------------x

BLOCK       OCI MORTGAGE CORPORATION                        : JUDGMENT OF
00757                                                       : FORECLOSURE
                                          Plaintiff,        : AND SALE
LOT
054                                                         :
                                                            :
Lis                      -against-                          : INDEX NO.
Pendens                                                     : 17589/94
Filed       MAGALY LUCAS                                    :
06/14/94    QUETZAL MARTINEZ                                :
            ROBERTO LOZANO                                  :
            RAFAEL MUNOZ                                    :
            ALLAN LEE                                       :
            NEW YORK CITY PARKING VIOLATIONS BUREAU         :
            NEW YORK CITY TRANSIT AUTHORITY, TRANSIT        :
                ADJUDICATION BUREAU                         :

                                      Defendants.           :
            --------------------------------------------------x

        On the reading of the following, all now duly filed in

the office of the Clerk of KINGS and on all the proceedings

thereon particularly the:

        Summons and Verified Complaint filed on May 31, 1994 and

on all the affidavits of service and notices of appearance,

showing that each and all of the defendants herein have been

personally served with said summons and complaint;, or have

voluntarily appeared herein by their respective attorneys; and

upon the

        Notice of Pendency of Action filed 06/14/94; and upon the

KCDA001075

JO-029

Order of Reference and Amendment dated April 12, 1995; appointing a referee to compute the amount due the plaintiff upon the bond (note) and mortgage set forth in the verified complaint and to examine and report whether or not the mortgaged premises can be sold in parcels; and upon the

Oath and Report dated June 27, 1995 in which it appears that the sum of $206,542.20 was due thereon at the date of said report; and that the mortgaged premises cannot be sold in parcels without material injury to the parties interested; and that the whole amount secured by said bond (note) has become due; and upon the

Notice of Motion for Judgment of Foreclosure and Sale dated 05/24/96; and upon the

Affirmations of Regularity and Legal Services each dated 05/24/96 of LISA B. SINGER, an associate of Cullen and Dykman attorneys for plaintiff,proving that more than thirty days had elapsed since such service upon said defendants was completed and since said defendants appeared, as aforesaid, and that none of the defendants had served an answer to said verified complaint, moved with respect thereto, nor had their time to do so been extended; and that no necessary defendant is an infant, incompetent, absentee or in the military; and that said defendants are in default,

NOW, on motion of CULLEN AND DYKMAN, plaintiff's attorneys it is

ORDERED that the plaintiff's motion is hereby granted, and it is further

KCDA001076

JO-030

ORDERED, ADJUDGED AND DECREED, that the said report of KAREN B. ROTHENBERG, ESQ the said referee is in all respects ratified and confirmed, and it is further

ORDERED, ADJUDGED AND DECREED, that the plaintiff is hereby awarded judgment herein for the sum of $206,542.20 together with interest at the rate set forth in the note and mortgage from the date specified in the referee's report, together with legal interest from the date of entry hereof, together with advances from the date specified in said report, plus the sum of $_____ to be taxed by the Clerk of the Court and inserted herein is hereby adjudged to the plaintiff for costs and disbursements of this action, with interest thereon from the date of entry hereof, together with an additional allowance of $_____ hereby awarded to plaintiff in addition to costs and disbursements, with interest thereon from the date of entry hereof, and it is further

ORDERED, ADJUDGED AND DECREED that the mortgaged premises described in the complaint in this action, as hereinafter set forth, be sold at public auction in one parcel on the foot of the Courthouse steps, facing Adams Street at the Kings County Courthouse, 360 Adams Street, Brooklyn, NY 11201 __ _____ by: _____ _____, who is hereby appointed referee for that purpose. That said referee give public notice of the time and place of sale, according to law and the course and practice of this Court, by publishing notice of sale in the _____ _____

_____; that the plaintiff or any other party
to this action may become the purchaser or purchasers at such
sale; that said referee execute to the purchaser or purchasers
on such sale a deed of the premises sold; that said referee on
receiving the proceeds of sale forthwith pay therefrom the
taxes, assessments and water and sewer rents which are, or may
become liens on the premises at the time of sale and any such
payments shall be allowed to the plaintiff and applied by said
referee upon the amounts due to the plaintiff as specified
above in item marked "THIRD."  That said referee then deposit
the amount received at sale in _____

_____  _____

_____("Depository") and shall thereafter make the following
payments:

First: The statutory fees of said referee, in the amount
of $_____.

Second: Expenses of sale and advertising expenses as
shown on the bill(s) presented and certified by the referee to
be correct.  Duplicate receipts shall be annexed to the Report
of Sale.

Third: Said referee shall also pay to the plaintiff or
its attorneys, the sum of $206,542.20 together with interest at
the rate set forth in the note and mortgage from the date
specified in the referee's report, together with legal interest
from the date of entry hereof, together with advances from the
date specified in said report, plus the sum of $_____
adjudged to the plaintiff for costs and disbursements in this
action to be taxed by the Clerk of the Court and inserted

herein, with interest thereon from the date of entry hereof,
together with an additional allowance of $_____ ; hereby
awarded to plaintiff in addition to costs and disbursements
with interest thereon from the date of entry hereof, or so much
as the purchase money of the mortgaged premises will pay of the
same.  The referee shall take a receipt therefor, and file it
with the referee's report of sale.

And said referee shall pay to the plaintiff a reasonable
sum for preservation of the property upon presentation of
receipts for such expenditures to said referee.

And said referee shall pay to plaintiff an attorney's
fee as authorized by the said mortgage in the amount of $3,205.

Fourth:  If such referee intends to apply for a further
allowance for his fees, he may leave upon deposit such amount
as will cover such additional allowance to await the further
order of this Court thereon after application duly made.

Fifth:  That in case the plaintiff be purchaser of said
mortgaged premises at said sale, or in the event that the
rights of the purchaser at said sale and the terms of sale
under this Judgment shall be assigned to and be acquired by the
plaintiff, and a valid assignment thereof filed with the said
referee, said referee shall not require the plaintiff to pay in
cash the entire amount bid at said sale, but shall execute and
deliver to the plaintiff a deed or deeds of the premises sold
upon the payment to said referee of the amounts specified above
in items marked "FIRST" and "SECOND" and the amounts of the
aforesaid taxes, assessments and water and sewer rents, and
interest or penalties thereon, or in lieu of the payment of

JO-033

said last mentioned amounts, upon filing with said referee receipts of the proper municipal authorities showing the payment thereof that the balance of the amount bid, after deducting therefrom the aforesaid amounts paid by the plaintiff, for preservation of the property, referee fees, expenses of sale, and taxes, assessments and water and sewer rents shall be allowed to the plaintiff and applied by said referee upon the amounts due to the plaintiff as specified above in item marked "THIRD"; that if after so applying the balance of the amount bid, there shall be a surplus over and above the said amounts due to the plaintiff, the plaintiff shall pay to said referee, upon delivery to it of said referee's deed, the amount of surplus; that said referee on receiving said several amounts from plaintiff shall forthwith pay therefrom said taxes, assessments, water and sewer rents and interest or penalties thereon, unless the same have already been paid, and shall then deposit the balance in said Depository.

Sixth:  That said referee take the receipt of the plaintiff or its attorneys for the amounts paid as herein before directed in item marked "THIRD", and file it with the referee's report of sale; that said referee deposit the surplus moneys, if any, with the Clerk of the court within five days after the same shall be received and be ascertainable, to the credit of this action, to be withdrawn only on the order of the Court, signed by a Justice of the Court; that the said referee make a report of such sale and file it with the Clerk of KINGS County within thirty days of completing the sale and executing

KCDA001080

a proper conveyance to the purchaser; and that the purchaser or purchasers at such sale be let into possession on production of the referee's deed or deeds.

AND IT IS FURTHER ORDERED, ADJUDGED AND DECREED that if the proceeds of said sale be insufficient to pay the amount so reported due the plaintiff, with the expenses of sale, interest, cost and allowance, as aforesaid, the said referee shall specify the amount of such deficiency in the referee's report of sale; that the plaintiff recover of the defendant MAGALY LUCAS, the whole deficiency or so much thereof as the Court may determine to be just and equitable of the residue of the mortgage debt remaining unsatisfied after a sale of the mortgaged premises and the application of the proceeds thereof, provided a motion for a deficiency judgment shall be made as prescribed by Section 1371 of the Real Property Actions and Proceedings Law within the time limited therein, and the amount is determined and awarded by an order of this Court as provided for in said section; and that the purchaser or purchasers at such sale be let into possession of the premises sold to them on production of the referees deed or deeds of said premises.

AND IT IS FURTHER ORDERED, ADJUDGED AND DECREED, that each and all of the defendants in this action and all persons claiming through or under them, or any or either of them, after the filing of such notice of pendency of this action, are hereby forever barred and foreclosed of all right, claim, lien, title, interest and equity of redemption in the said mortgaged premises and each and every part thereof.

Annexed hereto as Schedule "A" is a description of the

said mortgaged premises hereinbefore mentioned;

SUBJECT to covenants, reservations, easements and restrictions contained in prior deeds and/or instruments and agreements of record, if any, to the extent that they are presently enforceable; to any state of facts an accurate survey and physical inspection may show; to conditional bill of sale contracts and/or financing statements of record, if any; to orders and/or notices of violations filed in Municipal, State or U.S. Governmental departments; to zoning restrictions and regulations and any amendments thereof; and to rights, if any, of occupants, to the extent only that said rights may be controlling.

                                        E N T E R

                              _____
                              JUSTICE, SUPREME COURT

KCDA001082

JO-036

SCHEDULE A

ALL that certain plot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in the Borough of Brooklyn, County of Kings, City and State of New York, bounded and described as follows:

BEGINNING at a point on the Northerly side of 47th Street, distant 240 feet westerly from the corner formed by the intersection of the northerly side of 47th Street with the westerly side of 6th Avenue:

RUNNING THENCE Northerly parallel with 6th Avenue and part of the distance through a party wall, 92 feet to the southerly side of land formerly of Thomas Hunt, deceased;

THENCE Westerly along said land of Hunt, 20 feet 1/2 of an inch:

THENCE Southerly again parallel with 6th Avenue and part of the distance through another party wall, 90 feet 9 inches to the northerly side of 47th Street;

THENCE Easterly along the northerly side of 47th Street, 20 feet to the point or place of BEGINNING.

PREMISES KNOWN AS: 553 47th Street, Brooklyn, New York.

KCDA001083

T-36-Plaintiff's Costs:  on Foreclosure or other Real Property

MORTG NO : CI-50801126

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS

```
---------------------------------------------------x
OCI MORTGAGE CORPORATION                           : COSTS OF
                                                   : PLAINTIFF
                                 Plaintiff,         :
                                                   :
              -against-                             :
                                                   : INDEX NO.
                                                   : 17589/94
MAGALY LUCAS                                        :
QUETZAL MARTINEZ                                    :
ROBERTO LOZANO                                      :
RAFAEL MUNOZ                                        :
ALLAN LEE                                           :
NEW YORK CITY PARKING VIOLATIONS BUREAU            :
NEW YORK CITY TRANSIT AUTHORITY, TRANSIT           :
       ADJUDICATION BUREAU                          :
                                                   :
                                 Defendants.        :
---------------------------------------------------x
```

## COSTS

```
Costs before note of issue CPLR 8201 subd. 1  ........ $200.00
Motion costs CPLR 8202 .............................
Allowance by statute CPLR 8302(a)(b) ..................
Percentage on $_____ at 10% (not exceeding $200.00)..   20.00
Additional $_____ at 5% (not exceeding $800.00).....   40.00
Additional $_____ at 2% (not exceeding $2,000.00)...   40.00
Additional $_____ at 1% (not exceeding $5,000.00)...   50.00
Additional allowance CPLR 8302(d) ....................   50.00

                       COSTS....................... $400.00
```

## DISBURSEMENTS

```
Fee for index number CPLR 8018(a) 8301(a)(12) ........ $170.00
Referee's fees CPLR 8301(a)1 8003(b) .................  200.00
Clerk's filing notice of pendency CPLR 8021(a)10
                              8301(a)(12) ......   15.00
Paid for searches CPLR 8301(a)10 ... ................  275.00
Serving copy summons & complaint CPLR 8011(c)1
                              8301(d) ..........  280.00
Paid referee's report CPLR 8301(a) 8003(a)(1) .......   50.00
Postage CPLR 8301(a)12 ...............................   15.00
Sheriff's fees on execution CPLR 8011(b) 8012 .......
Fees for publication CPLR 8301(a)3 ..................
Request for Judicial Intervention CPLR 8020(a) ......   75.00
```

DISBURSEMENTS................... $ 1050.00

TOTAL............................ $ 1480.00

STATE OF NEW YORK
COUNTY OF NASSAU                    Attorney's Affirmation

    The undersigned admitted to practice in the court of this
state affirms that affirmant is an attorney for Cullen and
Dykman, the attorneys of record for plaintiff in the above
entitled action: that the foregoing disbursements have been or
will necessarily be made or incurred in this action and are
reasonable in amount; and that copies of documents or papers as
charged herein were actually and necessarily obtained for use.

    The undersigned affirms that the foregoing statements are
true, under the penalties of perjury.

_____
LISA B. SINGER

Dated May 24     , 1996

KCDA001085

JO-039

MORTG NO : CI-50801126

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS

--------------------------------------------------------x
OCI MORTGAGE CORPORATION                 : AFFIRMATION
                                            : OF

DIST.                        Plaintiff,       : REGULARITY
00000

SEC.             -against-              :
000      MAGALY LUCAS                   : INDEX NO.
       QUETZAL MARTINEZ           : 17589/94

BLOCK   ROBERTO LOZANO            :
00757   RAFAEL MUNOZ               :
       ALLAN LEE                    :

LOT      NEW YORK CITY PARKING VIOLATIONS BUREAU  :
054      NEW YORK CITY TRANSIT AUTHORITY, TRANSIT  :
           ADJUDICATION BUREAU             :

Lis                                         :
Pendens
Filed                    Defendants.     :
06/14/94 --------------------------------------------------x

        LISA B. SINGER, the undersigned an attorney admitted to

practice in the courts of this state, affirms under penalty of

perjury as follows:

        1.    Affirmant is associated with the firm of CULLEN AND

DYKMAN, plaintiff attorneys in the above entitled action, which

was brought to foreclose a mortgage affecting real property

situated in KINGS County, State of New York, and affirmant is

familiar with the details thereof.

        2.    The summons and duly verified complaint was filed in

the Office of the Clerk of KINGS County. That thereafter a

notice of pendency of action in due form and containing

correctly and truly all the particulars required by law to be

stated in such notices was duly filed in the Office of the

Clerk of said County on the dates indicated in the left margin
herein.

3.    This action was commenced by the filing of the
summons and complaint in the Office of the Clerk of said county
on May 31, 1994.

4.    All of the necessary parties defendant have been
duly served herein with summons and verified complaint in
accordance with all applicable laws and statutes, or have
voluntarily appeared herein by their respective attorneys.

5.    This action was commenced because of the non-payment
of monthly installments of principal and interest and
mortgagor(s)'s deposits which became due and payable on January
1, 1994 and on the first day of each subsequent month. Based
upon this default in payment under the terms of the subject
mortgage, plaintiff elected to exercise its option under the
mortgage to declare the unpaid principal and interest
immediately due and payable.

6.    Since the filing of the summons and verified
complaint, and notice of pendency of action, the complaint has
not been amended in any manner whatsoever.

7.    All of the necessary defendants are of full age and
sound mind and that no necessary defendant is an absentee,
prior encumbrancer or in the military.

8.    More than thirty days have elapsed since the
completion of service of process in this action.

9.    No defendant has answered the complaint or moved
with respect thereto and the time to do so has expired

KCDA001087

JO-041

including the time granted pursuant to any extension thereof.

    10.   The following defendant has appeared in this action:

Defendant    : NEW YORK CITY PARKING VIOLATIONS BUREAU

Def. attorney: ALAN S. ROTH, ESQ

             770 BROADWAY, 15TH FLOOR

             NEW YORK, NY  10003

    11.   The whole amount secured by said mortgage is due and
payable.

    12.   All the proceedings in this action have been regular
and in accordance with the rules and practice of this Court.

    13.   On April 12, 1995 an Order of Reference and
Amendment was signed.

    14.   The referee appointed herein computed the amount due
plaintiff and issued the oath and report which is annexed
hereto as Exhibit A.

    14A.   That a prior Application for a Judgment of Foreclosure
and Sale was submitted.  That at the appearance on November
2, 1995, Deborah Bryant, Esq. of this firm and Defendant Raphael
Munoz were present.  At said appearance, the defendant requested
an adjournment to obtain counsel.  It was agreed that the case
would be adjourned until December 14, 1995 and marked final.

    14B.   However, on December 14, 1995 said case was not
on the calendar call and plaintiff's attorney was told that the
court had no recollection of this case.

14C.   Thereafter, upon a search of the court file, it was discovered that this case was marked off the calendar on November 2, 1995.

15.   No previous application has been made for a Judgment of Foreclosure and Sale other than the above-mentioned application.

WHEREFORE, plaintiff asks for Judgment for the relief demanded in the complaint in the form annexed hereto as Exhibit B, and for such other and further relief as to the Court may deem just and proper.

_Lisa B. Singer_

LISA B. SINGER


DATED: _May 24_____, 1996
        Garden City, New York

KCDA001089

JO-043

# EXHIBIT C

KCDA001090

JO-044

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS
----------------------------------------x

THE PEOPLE OF THE STATE OF NEW YORK        :

                    -against-               :        Indictment No. 13525-96

JOHN K. O'HARA,                             :        AFFIRMATION

                              Defendant.    :

----------------------------------------x

STATE OF NEW YORK, COUNTY OF KINGS


         MAGALY LUCAS, an attorney duly admitted to practice
before the courts of the State of New York, affirms under penalty
of perjury, as follows:


         1. I submit this affirmation in connection with the case
of People v. John O'Hara, the trial of which ended on May 13, 1997.
I was scheduled to testify in that trial -- to be called by the
defense -- but I refused to do so because I had been threatened by
the prosecutor, Mr. O'Mara, that if I testified and John O'Hara
"went down", I would "go down with him".

         2. Sometime in 1990 I bought the building at 553 47th
Street, Brooklyn, New York. I also lived there until November 30,
1992 -- one month after Mr. O'Hara moved in to an apartment in the
same building. After I moved out others moved in on December 1,
1992, rented for a period of time and then, about a year later,
purchased the building.

         3. Mr. O'Hara said he wanted to move in to that building
because it was in the district in which he wanted to run for


KCDA001091

JO-045

assemblyman. I agreed to permit him to live rent free because he had permitted me to live rent free in his apartment when we were living together in 1990. He agreed, at my request, to make sure my renters paid their rent to the bank.

4.    On October 21, 1996 I was contacted for the first time by Allen Presser, an investigator from the Brooklyn District Attorney's office. He left a post-it note on my door asking me to call him and I did so the next day and we spoke. He called me *when?* again on October 29 and he questioned me again thereafter. Our conversations concerned my ownership of the building on 553 47th Street in Brooklyn and John O'Hara's residence in that building in 1992 and 1993.

5.    In March of 1997, I was served with a subpoena to bring certain records *limited* to court, which I did, and ADA O'Mara copied what he wanted. However, Mr. O'Mara told me that I could get in big trouble for what I told Mr. Presser.

6.    Some weeks later I was asked to come to court by Mr. O'Hara's attorney, Mr. Meyers. I appeared in court ready to testify at trial. But the trial was adjourned and the Judge told me to come back another day. At that time, Mr. O'Mara told me, that he was not going to call me and that "If you testify and he goes down, you'll go down" and "and we're not giving you any immunity."

7.    I started to complain to the Judge about what Mr. O'Mara said, but she cut me off, telling me it was not her jurisdiction. I assumed she had heard most, if not all, of what he

- 2 -

had threatened.

8.  Thereafter I told Mr. Meyers I would not testify, in view of the DA's threats.  I was frightened, that the District Attorney's Office would get on my case, would try to indict me for something (the way they did with Mr. O'Hara), that they might do something to affect my license to practice law.  I do not practice criminal law.  No one told me and I did not know that I could get immunity if I appeared and claimed my fifth amendment privilege, despite what Mr. O'Mara said -- and that I could not be forced to testify unless I got immunity.  Had I been told that, I would not have refused to appear.

9.  If not for the DA's threats, I would have testified at John's trial to the fact that he did reside at the 47th Street house beginning in October 1992.

Dated July _23rd_ 1997
New York, New York

Magaly Lucas

- 3 -

# EXHIBIT D

KCDA001094

JO-048

SUPREME COURT OF THE STATE OF NEW YORK
KINGS COUNTY :    PART 17
-------------------------------------------------------x
THE PEOPLE OF THE STATE OF NEW YORK

                                      Indictment No. 13525/96

        against-

                                        AFFIRMATION

JOHN KENNEDY O'HARA,

                    Defendant.
-------------------------------------------------------x

STATE OF NEW YORK) ss: KINGS COUNTY)

        MAGALY LUCAS, an attorney duly admitted to practice before the courts of the State of New York, affirms under penalty of perjury, as follows:

1. That, in late June of 1999 during the course of a conversation with Mr. Carlos Ferreiro, a client and friend, Mr. Ferreiro, informed me that Mr. Hernandez was trying to urgently get in touch with me. At the time that Mr. Hernandez was looking for me I was employed by the New York City Board of Education and worked as a teacher at P.S. 128, which is located on Audubon Avenue and 169th street in Manhattan.;

2. I recall the specifically date of my conversation with Mr. Ferreiro because it was just after 5th grade graduation. Mr. Ferreiro informed me that Mr. Hernandez had called about two weeks prior on several occasions.

3. After the graduation, which took place June 25, 1999, I went on vacation with my family to Cape May, New Jersey. My family had planned this vacation to coincide with the end of the school year and my sister's arrival from Zimbabwe.

4. I returned from my vacation after the Fourth of July weekend, and began to work on a special project at the district 6 main office. About a week latter I contacted Mr. Hernandez, who informed me that he wanted me to testify at Mr. O'Hara's trial. However the trial had already taken place. At that time he informed me of the outcome of the trial and specifically discussed the testimony of Mrs. Josephine Vales. He stated that Mrs. Vales had disavowed the existence of a finished basement at 553 47th street, Brooklyn, New York. I told Mr. Hemandez that statement was untrue and that I recall an appraiser's report which referred to the apartment in the basement of that building;

EXHIBIT A

KCDA004095

5. Finding the document was difficult because I had recently moved from 319 West 47th Street, New York to 40-74[th] Street, Apt. 2B, North Bergen, New Jersey.  My correspondence was forwarded to my office located at 403 West 38th Street, New York, New York.  My voice mail was also forwarded to that address.  I have worked primarily as a teacher, since the spring of 1997.   During the spring and early summer of 1999 I seldom return to the 38th Street office/apartment;

6. Sometime in late August I found the appraiser's report on the 553 47th Street property. The report had been prepared by the GreenPoint Savings Bank in 1990.  I gave the report to Mr. Hernandez.  The report indicates that there was a finished basement at 553 47th street, Brooklyn, New York  at the time that I purchased the property from Mr. and Mrs. Vales in 1990.

7. In 1991 I decided to sell the building and moved to a subleased apartment on West 45th Street in Manhattan, N.Y.  At that point in time I permitted John O'Hara to live in the basement apartment in return for his commitment to supervise the work and payment of the mortgage by Messrs. Lozano, Munoz and Martinez pending the closing of the property. These three individuals signed a lease with an option to buy the property within a year.

Dated: September 22, 1999
    New York, New York



_____
Magaly Lucas

KCDA001096

JO-050



MORTGAGE APPRAISAL
Telephone (718) 670-7597

**41-00 MAIN STREET ◦ FLUSHING, N.Y. 11355-3820**

MAGALY LUCAS
45 DANNER AVENUE
HARRISON, NY 10528

                                    Re:    PRUCHASE
                              Premises:    553 47 STREET
                                           BROOKLYN, NY 11220

        We have received your request for a copy of an appraisal report
of the above stated premises.
        Enclosed please find your copy.

                                    Sincerely,

                                    Mortgage Appraisal Department

        Enc.

KCDA001097
EXHIBIT C

crofiche No:
PLACEMENT VALUE :                                    VALUATION

**RUSH**

Application No.    00000900002 85

d  20 × 90 ʳᵐ   Range of Sales :
Lot Size @ Value of :                                          $  80,000

ROVEMENTS
36000        Squarest
Cubic ft.  @ $  5/0    Per Sq. Foot
Per Cube        183600

00  % Depreciation                                                    $ 146880        Garage

al Depreciated Value                        36840
146880                  Total $  036 880

APPRAISAL                      ASSESSED VALUE        FIRE INSURANCE REQUIRED (90 ft)

$  80000
mts $  45000              $  2400          Struct: A $
$  035000              $                  B $
1.9.90                $  12000          C $
Year        Taxes $  1140    Total $  150000

I hereby certify that I have examined the above property and according to my best judgement the value is as stated above and
mmend a loan in the amount of $ ...........................................................
12⁴⁵-1
Appraiser

KCDA001098

JO-053

BAY RIDGE | 8 14

Commitment issued ________
Mortgage number 184042-0-14 5-4-90 FEB 13 1990
Map Section 3 Block 157 Lot 54
SMSA ________
Quadrant 10 B15
DATE 1-9-90

ADDRESS A: 553 47 ST BROOKLYN 11220
ADDRESS B:
COUNTY: KINGS LOT SIZE: 20X90.75 IRR AREA 1827 sq. ft. ZONING Residential / Commercial
STRUCTURE(S): No. of Stories 2+BASE Type BROWNSTONE + BRICK 2 FAMILY
[ ] Detached [ ] Semi-Detached [+] Attached Year Built ABT 1910

DIMENSIONS:
Main 20 X 45 Ext. 7x6 VEST (R) Ext.
Ext. Ext. 4x2 2+BASEBAY(F) Ext.
Ext. Ext. Courts

Layout: RENT

| | | |
|---|---|---|
| Level | | |
| Level | | |
| Level | | |
| 2nd Level | 5R·B | 450 NL |
| 1st Level | 4R·B | OWNER |
| Basement | 3R·B | |
| Cellar | 3R·B·Boil 5'8" | |

Total No. Apts. 2 Total Rooms 15
Total Baths 4 Total Bedrooms 6
Total Kitchens 3 Other Boil
Garage: Att-Det: NONE
Driveway: Common-Pvt. NONE
Monthly Rent: $ OWNER+450 Ann. Rent $ O+ 5400

NEIGHBORHOOD:
GOOD RESIDENTIAL / COMMERCIAL AREA. SIMILAR AND VARIOUS TYPE DWELLINGS ON BLOCK.
S OF 39 ST
E OR 4TH AV
AVERAGE INCOME GROUP.

NEIGHBORHOOD FACILITIES: Schools 2 BL Churches 2 BL Stores ON BL Other
Transportation BUS Utilities [+] water [+] electric [+] gas [+] sewers [ ] cesspools [ ]

| EXTERIOR | E G F P | | INTERIOR | E G F P | |
|---|---|---|---|---|---|
| GENERAL CONDITION | | | GENERAL CONDITION | | |
| PAVEMENT | | [+] mas [ ] asph [ ] | FLOORS | | [+] hw [ ] pk [ ] ply [ ] |
| SIDEWALKS & CURBS | | [+] conc [ ] slate [ ] | WALLS | | [+] dry/wall [+] pl [ ] |
| DRIVEWAY | | [ ] conc [ ] mas [ ] | CEILINGS | | [+] dry/wall [+] pl [ ] |
| ROOF | | [ ] asph [+] rubb [ ] | KITCHENS-FLOORS | | [+] vl [ ] lino [ ] cer [ ] crpt [ ] |
| CHIMNEYS | | [+] bk [ ] galv [ ] | CABINETS | | [+] wd [ ] form [ ] met [ ] |
| LEADERS & GUTTERS | | [ ] alum [+] coop [+] galv [ ] | SINKS | | [+] s/d [ ] d/d [+] s/s [ ] porc [ ] |
| FIRE ESCAPES | | [ ] YES [+] NO | APPLIANCES | | [+] refrig [ ] d/w [ ] wsh/mch [ ] |
| PAINT | | WORK REQUIRED: [ ] YES [ ] NO | RANGES | | [+] gas [ ] elec [+] 4 [ ] wo [ ] |
| STOOP | | [ ] asph [ ] slate [+] wd [+] MET | BATHS-FLOORS | | [+] cer [ ] vl [ ] lino [ ] crpt [ ] |
| FOUNDATION | | [+] cone [ ] CB [ ] stone [ ] | WALLS | | [+] cer [+] dry/wall [ ] pl [ ] |
| FRONT WALL | | [ ] bk [ ] alum [ ] stucco [ ] wd/sh | TUBS | | [+] cibl [ ] bl [ ] legs [ ] |
| | | [ ] asb/sh [ ] asph/sh [+] B'STONE | SHOWERS | | [+] st [ ] stall [ ] |
| SIDE & REAR WALLS | | [+] bk [ ] alum [ ] stucco [ ] wd/sh | BASINS | | [+] vanity [ ] hang [ ] ped [ ] |
| | | [ ] asb/sh [ ] asph/sh [ ] | FUEL/FUEL CAPACITY | | [+] gas [+] oil [ ] elec [ ] GALS |
| FRAME AND SASH | | [+] trim [ ] slide [ ] case [+] d/h | HEATING SYSTEM | | [+] steam [ ] hw [ ] hot air [ ] |
| | | [+] alum [+] wd [ ] vinyl [ ] | HOT WATER SUPPLY | | [ ] ind [ ] oil [ ] elec [+] tnkles [ ] auto |
| PORCH | | [ ] EP [ ] OP [ ] Scr/P [ ] | AIR CONDITIONING | | YES [ ] NO [ ] [ ] cntrl [ ] wall [ ] window |
| GARAGE | | | PLUMBING | | [ ] brass [+] st [+] galv [ ] |
| MISCELLANEOUS | | | MISCELLANEOUS | | (DORMER (B) |

46 ST
5
AV
6
AV
N
47 ST

AIANS PROP IRVS
BUYERS TO OCCUP 1ST OWNER
CZL ACTION TEAM SOLD NET NA
60'S KITCH + 60'S BATH IN DUPLEX
-1 70'S KITCH + 20'S BATH 2ND FL
POTENTIAL RENTABLE IN CELLAR NO
PRIVATE ENTRANCE - SMALL ROOMS
RECENT EXTERIOR NONE

KCDA001099

# EXHIBIT E

KCDA001100

JO-054

SUPREME COURT OF THE STATE OF NEW YORK
KINGS COUNTY :    PART 17
----------------------------------------------------------x
THE PEOPLE OF THE STATE OF NEW YORK

     against-

JOHN O'HARA,

               Defendant.
----------------------------------------------------------x

Indictment No. 13525/96

**AFFIDAVIT**

STATE OF NEW YORK) ss: KINGS COUNTY)

**DENISE MURRAY**, being duly sworn, deposes and says:

1. I am familiar with the matters hereinafter set forth. This affidavit is submitted in support of the above-named defendant's motion for an order pursuant to Criminal Procedure Law § 330.30, to set aside the verdict;

2. I lived at 563 47th street, Brooklyn, New York, a two- family residential brownstone, for approximately 29 years. I moved from that locale in 1991. I currently reside at 89 Bard Avenue, Staten Island, New York, 10301, apartment 2R. I am 38 year old and on disability retirement from the U.S. Postal Service;

3. The area of 47th street where I lived was and still is very a family oriented neighborhood. During my 29 years living at 563 47th street I became well acquainted with most of my neighbors. This included the Vales, who lived a few houses down at 553 47th street. In the late summer of 1989 I was invited to live with the Vales in their home at 553 47th street. I lived with them for approximately 4 months. I lived on the second floor of their brownstone. It was my practice to often have meals in the basement apartment with, David and Rebecca, Mrs. Vales' son and daughter-in-law. We were childhood friends and contemporaries. All our meals were made, served and eaten in the basement. The basement had one large studio room, a small parlor, a functional kitchen and separate bathroom;

4. I am also aware that the Vales had renovated and finished the basement apartment of the 553 47th street location in the early/ mid-1980's to accommodate their older son Mark, whose wife Debbie had given birth to a son, Mark, Jr. They lived in the basement prior to David, his wife Rebecca and their two young daughters, Christie and Michele. .

EXHIBIT Q

5. During my stay at the Vales I often helped Rebecca tend to her young daughters. Christie was two at the time, and Michele, was a newborn. This also took place in the basement apartment of David and Rebecca located at 553 47th street location;

6. I became aware of Mrs. Josephine Vales' testimony in a passing conversation with an old neighborhood friend, Grace Phillips. She asked me whether or not I had not once lived with the Vales. This conversation occurred in late August. At that time I informed her that I would be willing to speak the Mr. O'Harn's attorney. I called his office in the first week of September. I do not personally know Mr. O'Hara.


*Denise F Murray*
DENISE MURRAY

*Denise Murray*
(Print Name)


On September __18__, 1999, before me personally came Denise Murray, to me known to be the person described in and who executed the foregoing instrument. Such person duly swore to such instrument before me and duly acknowledged that she executed the same.

*Charles D. Parisi Jr.*
Notary Public
Commission Expires: April 22, 2000
NYS Driven License 762-486-345

Charles D. Parisi Jr.
Notary Public, State of New York
Registration #02PA5059032
Qualified in Richmond County
My Commission Expires
April 22, 2000

KCDA001102

JO-056

# EXHIBIT F

KCDA001103

JO-057

# Statement of Account

ARTXXXVIII
1365

0021/0026

09 7

TERMS - PAYMENT DUE IN FULL. PLEASE PAY BY 10/04/93.

| Account Number | Pay By | Total Amount Due |
|---|---|---|
| 3711-012515-22006 | 10-04-93 | $424.55 |

JOHN KENNEDY OHARA
553 47TH STREET
BROOKLYN NY   11220-1310

MAIL PAYMENT TO:
AMERICAN EXPRESS
P.O. BOX 2853
NEW YORK NY   10116-2853

11012515526 0000424550000424558

# Summary of Account

| Cardmember Name | Account Number | Closing Date |
|---|---|---|
| JOHN KENNEDY OHARA | 3711-012515-22006 | 09-18-93 |

For fast balance and payment information, call our automated service line at
1-800-292-AMEX using a touch tone phone. Please have your account number ready.
If you have a question about your account, call 1-800-528-4800 (24 hours/7 days).

Page 1 of 2

| Previous Balance | Credits/Payments | New Charges | New Balance |
|---|---|---|---|
| $535.26 | $535.26 | $424.55 | $424.55 |

| Amex Ref. No | Item No | Listing of Charges and Credits | | Charges | Credits |
|---|---|---|---|---|---|
| 835249-0 | | PAYMENT RECEIVED - THANK YOU | 09/06 | | 535.26 |
| 007250-2 | 001 | ACHILLEUS OE, ATHENS GREECE | | | |
| | | 26,900 GREEK DRACHMA   BILLED AS | | | |
| 501250-2 | 002 | DITMARS FLOWER SHOP ASTORIA        NY | | 117.45 | |
| | | 025012833 FLOWERS/PLANTS NY144530 09/07/93 | | | |
| 501253-2 | 003 | MEDICI SHOES        NEW YORK        NY | | 173.20 | |
| | | 360425876 MEN/WOMENS APPAREL/ACC 09/09/93 | | | |
| 501257-2 | 004 | TUTTA PASTA BROOKLYN NY | | 86.60 | |
| | | 000392474 FOOD AND BEVERAGE     09/14/93 | | | |
| 501260-2 | 005 | HARRY HASSON & SON F ATLANTIC CITY  NJ | | 17.80 | |
| | | 26000505  FLOWERS              09/16/93 | | 29.50 | |
| | | | ACCOUNT TOTAL | $424.55 | $535.26 |

*Dept F in Evid*
*Santo, Acc*
*5/27/99*

To serve you better, we are making changes to the Cardmember newsletter.
Watch for a new look coming soon!

KCDA001104

92
001 02
(02) (A)



JO-058

# Statement of Account

0019/0026

08 7    2

YOUR ACCOUNT IS 30 DAYS PAST DUE. PAYMENT MUST BE RECEIVED
BY 09/00/93 TO AVOID A DELINQUENCY CHARGE.

| Account Number | Closing Date | Total Amount Due |
|---|---|---|
| 3711-012515-22006 | 08-18-93 | $535.26 |

JOHN KENNEDY OHARA
553 47TH STREET
BROOKLYN NY   11220-1310

MAIL PAYMENT TO:
AMERICAN EXPRESS
P.O. BOX 2853
NEW YORK NY  10116-2853

1101251526 0005352600002283499

# Summary of Account

| Cardmember Name | Account Number | Closing Date |
|---|---|---|
| JOHN KENNEDY OHARA | 3711-012515-22006 | 08-18-93 |

For fast balance and payment information, call our automated service line at
1-800-292-AMEX using a touch tone phone. Please have your account number ready.
If you have a question about your account, call 1-800-528-4800 (24 hours/7 days).

Page 1 of 2

| Previous Balance | Credits/Payments | New Charges | New Balance |
|---|---|---|---|
| $306.87 | $.00 | $228.39 | $535.26 |

| Amex Ref No | Item No | Listing of Charges and Credits | Charges | Credits |
|---|---|---|---|---|
| 090229-2 | 001 | LAPIS, ATHENS | | |
| | | GREECE | | |
| | | 53,500 GREEK DRACHMA   BILLED AS | 228.39 | |
| | | ACCOUNT TOTAL | $228.39 | $.00 |

We are pleased to announce that Car Rental Loss and Damage Insurance (CRLDI) continues
to be available for rentals from all agencies that accept the Card, both domestically
and internationally (except rentals in Italy and New Zealand). This supersedes the program
materials restricting coverage to only fifteen rental companies.

001 0Z
(12 31 )



JO-059

# Statement of Account

0017/0C26

07  7        1

TERMS - PAYMENT DUE IN FULL.  PLEASE PAY BY 08/03/93

| Account Number | Pay By | Total Amount Due |
|---|---|---|
| 3711-012515-22006 | 08-03-93 | $306.87 |

JOHN KENNEDY OHARA
553 47TH STREET
BROOKLYN NY   11220-1310

MAIL PAYMENT TO:
AMERICAN EXPRESS
P.O. BOX 2853
NEW YORK NY  10116-2853

1101251526 000306870000306875

# Summary of Account

| Cardmember Name | Account Number | Closing Date |
|---|---|---|
| JOHN KENNEDY OHARA | 3711-012515-22006 | 07-18-93 |

For fast balance and payment information, call our automated service line at
1-800-292-AMEX using a touch tone phone.  Please have your account number ready.
If you have a question about your account, call 1-800-528-4800 (24 hours/7 days)

Page 1 of 2

| Previous Balance | Credits/Payments | New Charges | New Balance |
|---|---|---|---|
| $2,677.17 | $2,677.17 | $306.87 | $306.87 |

| Amex Ref. No. | Item No | Listing of Charges and Credits | | Charges | Credits |
|---|---|---|---|---|---|
| 835175-0 | | PAYMENT RECEIVED - THANK YOU | 06/24 | | 1,200.00 |
| 832183-2 | | PAYMENT RECEIVED- AMEX OFFICE | 07/02 | | 1,477.17 |
| 552195-2 | 001 | BRITTANIA BEACH HTL NASSAU BAHAMAS | | | |
| | | REFER TO CHARGE FROM NASSAU BAHAMAS | | 38.89 | |
| 052196-2 | 002 | DOLLAR RENT A CAR BROOKLYN NY | | 136.46 | |
| | | INV#376320 | | | |
| 501170-2 | 003 | VICTORIA SECRET CAT COLUMBUS | OH | 131.52 | |
| | | 684961071 CATLG MDSE 800-888-1500 06/18/93 | | | |
| | | **ACCOUNT TOTAL** | | **$306.87** | **$2,677.17** |

Travel smart this summer and get your Travelers Cheques the easy way, call 1-800-ORDER-TC
24 hours a day and get your Travelers Cheques in any of seven currencies delivered right to your
door.  First Class Mail delivery is FREE and you pay only the customary 1% transaction fee.
Order with the Optima Card or use a personal check (so have your checkbook handy).
To order your Travelers Cheques, call 1-800-ORDER-TC.

# Statement of Account

0015/0026

06 7    2

YOUR ACCOUNT IS 30 DAYS PAST DUE. PAYMENT MUST BE RECEIVED
BY 07/06/93 TO AVOID A DELINQUENCY CHARGE.

| Account Number | Closing Date | Total Amount Due |
|---|---|---|
| 3711-012515-22006 | 06-17-93 | $2,677.17 |

JOHN KENNEDY OHARA
553 47TH STREET
BROOKLYN NY ·11220-1310

MAIL PAYMENT TO:
AMERICAN EXPRESS
P.O. BOX 2855
NEW YORK NY  10116-2855

1101251526 002677170001004836

# Summary of Account

| Cardmember Name | Account Number | Closing Date |
|---|---|---|
| JOHN KENNEDY OHARA | 3711-012515-22006 | 06-17-93 |

For fast balance and payment information, call our automated service line at
1-800-292-AMEX using a touch tone phone. Please have your account number ready
If you have a question about your account, call 1-800-528-4800 (24 hours/7 days).

Page 1 of 2

| Previous Balance | Credits/Payments | New Charges | New Balance |
|---|---|---|---|
| $1,672.34 | $.00 | $1,004.83 | $2,677.17 |

| Amex Ref. No. | Item No | Listing of Charges and Credits | | | Charges | Credits |
|---|---|---|---|---|---|---|
| 501147-2 | 001 | APPLE VACATIONS | NEWTOWN SQUARE | PA | | |
| | | 000459233 TOURS/TICKETS | | 05/26/93 | 644.00 | |
| 501156-2 | 002 | COMFORT INN | EDGEWATER | NJ | | |
| | | 015630781 LODGING | | 06/03/93 | 44.52 | |
| 501160-2 | 003 | BALLY'S PARK PLACE | ATLANTIC CITY | NJ | | |
| | | 001330970 LODGING | | 06/07/93 | 225.76 | |
| 501162-2 | 004 | BRIDGE CAFE | NEW YORK | NY | | |
| | | 016210827 FOOD/BEV | | 06/10/93 | 90.55 | |
| | | | ACCOUNT TOTAL | | $1,004.83 | $.00 |

001 07

JO-061



Case 1:17-cv-04766-LDH-RML    Document 145-8    Filed 02/26/24    Page 61 of 421
PageID #: 4682

# Statement of Account

0013/0026

05 7 1

TERMS - PAYMENT DUE IN FULL. PLEASE PAY BY 06/03/93.

| Account Number | Pay By | Total Amount Due |
|---|---|---|
| 3711-012515-22006 | 06-03-93 | $1,672.34 |

JOHN KENNEDY OHARA
553 47TH STREET
BROOKLYN NY  11220-1310

MAIL PAYMENT TO:
AMERICAN EXPRESS
P.O. BOX 2855
NEW YORK NY  10116-2855

⑂101251526 0016723400016723⑂9

# Summary of Account

| Cardmember Name | Account Number | Closing Date |
|---|---|---|
| JOHN KENNEDY OHARA | 3711-012515-22006 | 05-18-93 |

For fast balance and payment information, call our automated service line at
1-800-292-AMEX using a touch tone phone. Please have your account number ready
If you have a question about your account, call 1-800-528-4800 (24 hours/7 days).

Page 1 of 2

| Previous Balance | Credits/Payments | New Charges | New Balance |
|---|---|---|---|
| $1,009.87 | $1,009.87 | $1,672.34 | $1,672.34 |

| Amex Ref. No | Item No | Listing of Charges and Credits | | Charges | Credits |
|---|---|---|---|---|---|
| 832132-2 | | PAYMENT RECEIVED- AMEX OFFICE | 05/12 | | 1,009.87 |
| 873118-2 | 001 | HOLIDAY INN CROWN PLAZA SAN JUAN PR INV#415539 | | 162.60 | |
| 872124-2 | 002 | DISCOUNT RENT A CAR SANTURCE PR INV#596461 | | 149.75 | |
| 663111-2 | 003 | TRANS WORLD AIRLINES BROOKLYN NY TKT# 01515085486601 | 04/05 | 358.00 | |
| 501116-2 | 004 | WINDOWS ON THE WORLD NEW YORK NY D1160721 FOOD-BEV | 04/25/93 | 45.18 | |
| 501119-2 | 005 | HOTEL CARIB INN ISLA VERDE PR 0428 LODGING | 04/29/93 | 703.55 | |
| 501124-2 | 006 | RAM'S HEAD INN #3 ABSECON NJ 000597575 FOOD AND BEVERAGE | 05/01/93 | 193.39 | |
| 501124-2 | 007 | RAM'S HEAD INN #3 ABSECON NJ 000292560 FOOD AND BEVERAGE | 05/01/93 | 59.87 | |
| | | ACCOUNT TOTAL | | $1,672.34 | $1,009.87 |

001 02
(12L 4 )

KCDA001108



JO-062

# Statement of Account

0011/0026                                           04 7    12  0  1

TERMS - PAYMENT DUE IN FULL. PLEASE PAY BY 05/03/93

| Account Number | Pay By | Total Amount Due |
|---|---|---|
| 3711-012515-22006 | 05-03-93 | $1,009.87 |

JOHN KENNEDY OHARA
553 47TH STREET
BROOKLYN          NY
11220-1310

MAIL PAYMENT TO:
AMERICAN EXPRESS
P.O. BOX 2855
NEW YORK NY  10116 2855

1101251526 0010009870001009872

# Summary of Account

| Cardmember Name | Account Number | Closing Date |
|---|---|---|
| JOHN KENNEDY OHARA | 3711-012515-22006 | 04-17-93 |

For fast balance and payment information, call our automated service line at
1-800-292-AMEX using a touch tone phone. Please have your account number ready.
If you have a question about your account, call 1-800-528-4800 (24 hours/7 days).

Page 1 of 2

| Previous Balance | Credits/Payments | New Charges | New Balance |
|---|---|---|---|
| $1,136.55 | $1,136.55 | $1,009.87 | $1,009.87 |

| Amex Ref No. | Item No | Listing of Charges and Credits | | Charges | Credits |
|---|---|---|---|---|---|
| 835091-0 | | PAYMENT RECEIVED - THANK YOU | 04/01 | | 1,136.55 |
| 501095-2 | 001 | ST MAGGIE'S CAFE NEW YORK NY 000108899 FOOD AND BEVERAGE | 04/02/93 | 92.75 | |
| 501095-2 | 002 | LA SERRE RESTAURANT ALBANY NY 000611195 FOOD AND BEVERAGE | 04/05/93 | 300.85 | |
| 501096-2 | 003 | OMNI ALBANY NEW YORK ALBANY NY 29550          LODGING | 04/06/93 | 163.79 | |
| 603098-2 | 004 | TRANS WORLD AIRLINES MARLTON NJ TKT# 0159200124444 | 03/05 | 452.48 | |
| | | ACCOUNT TOTAL | | $1,009.87 | $1,136.55 |

The Purchase Protection(sm) Plan and Lemon Assurance have been extended
through July 31, 1993. Watch for the June statement insert for changes effective August 1, 1993.
The Purchase Protection Plan is underwritten by Insurance Company of North America,
a CIGNA company. Coverage is subject to the terms, conditions and exclusions of the policy.

JO-063



# Statement of Account

0009/0026

03 7   12  0  1

TERMS - PAYMENT DUE IN FULL. PLEASE PAY BY 04/03/93.

| Account Number | Pay By | Total Amount Due |
|---|---|---|
| 3711-012515-22006 | 04-03-93 | $1,136.55 |

JOHN KENNEDY OHARA
553 47TH STREET
BROOKLYN          NY
11220-1310

MAIL PAYMENT TO:
AMERICAN EXPRESS
P.O. BOX 2855
NEW YORK NY   10116-2855

1101251526 0011365500012697215

# Summary of Account

| Cardmember Name | Account Number | Closing Date |
|---|---|---|
| JOHN KENNEDY OHARA | 3711-012515-22006 | 03-18-93 |

For fast balance and payment information, call our automated service line at
1-800-292-AMEX using a touch tone phone. Please have your account number ready
If you have a question about your account, call 1-800-528-4800 (24 hours/7 days).

Page 1 of 2

| Previous Balance | Credits/Payments | New Charges | New Balance |
|---|---|---|---|
| $256.14 | $388.80 | $1,269.21 | $1,136.55 |

| Amex Ref No | Item No | Listing of Charges and Credits | | Charges | Credits |
|---|---|---|---|---|---|
| 501048-2 | | BALLY'S PARK PLACE    ATLANTIC CITY    N | 02/15 | | 388.80 |
| | | 001358860 LODGING | | | |
| 501048-2 | 001 | BALLY'S PARK PLACE    ATLANTIC CITY    NJ | 02/15/93 | 388.80 | |
| | | 001358940 LODGING | | | |
| 501048-2 | 002 | BALLY'S PARK PLACE    ATLANTIC CITY    NJ | 02/15/93 | 388.80 | |
| | | 001358900 LODGING | | | |
| 501049-2 | 003 | SHORT RIBS RSTR BROOKLYN NY | 02/17/93 | 25.00 | |
| | | 000500533 FOOD AND BEVERAGE | | | |
| 501055-2 | 004 | WINDOWS ON THE WORLDNEW YORK    NY | 02/18/93 | 34.69 | |
| | | D0550258 FOOD-BEV | | | |
| 501056-2 | 005 | MACY'S HERALD SQUARENEW YORK    NY | 02/24/93 | 431.92 | |
| | | 011616038 JEWELRY | | | |
| | | **ACCOUNT TOTAL** | | **$1,269.21** | **$388.80** |

Look in this month's Newsletter for valuable information on the
Benefits and Services available exclusively to Cardmembers.

KCDA001110

JO-064

# Statement of Account

0007/0026                                          02 7    12  0  1

TERMS - PAYMENT DUE IN FULL. PLEASE PAY BY 03/04/93.

| Account Number | Pay By | Total Amount Due |
|---|---|---|
| 3711-012515-22006 | 03-04-93 | $256.14 |

JOHN KENNEDY OHARA
553 47TH STREET
BROOKLYN              NY
11220-1310

MAIL PAYMENT TO:
AMERICAN EXPRESS
P.O. BOX 2853
NEW YORK NY  10116-2853

1101251526 000256140000256144

# Summary of Account

| Cardmember Name | Account Number | Closing Date |
|---|---|---|
| JOHN KENNEDY OHARA | 3711-012515-22006 | 02-16-93 |

For fast balance and payment information, call our automated service line at
1-800-292-AMEX using a touch tone phone. Please have your account number ready.
If you have a question about your account, call 1-800-528-4800 (24 hours/7 days).

Page 1 of 2

| Previous Balance | Credits/Payments | New Charges | New Balance |
|---|---|---|---|
| $88.68 | $88.68 | $256.14 | $256.14 |

| Amex Ref. No | Item No | Listing of Charges and Credits | | Charges | Credits |
|---|---|---|---|---|---|
| 835026-0 | | PAYMENT RECEIVED - THANK YOU | 01/26 | | 88.68 |
| 822017-2 | | ANNUAL MEMBERSHIP FEE JOHN KENNEDY OHARA | | | |
| | | PERIOD 03/93  THRU 02/94 | | 55.00 | |
| 063021-2 | 001 | BRONX ACURA BRONX NY        INV#112541 | | 50.00 | |
| 501021-2 | 002 | TROPWORLD          ATLANTIC CITY   NJ | | | |
| | | 000000668 LODGING | 01/20/93 | 33.55 | |
| 501029-2 | 003 | CAFE IGUANA         NEW YORK       NY | | | |
| | | D0294780 FOOD-BEV | 01/28/93 | 29.25 | |
| 501029-2 | 004 | CAFE IGUANA         NEW YORK       NY | | | |
| | | D0294783 FOOD-BEV | 01/27/93 | 16.00 | |
| 501029-2 | 005 | ST MAGGIE'S CAFE NEW YORK NY | | | |
| | | 000302038 FOOD AND BEVERAGE | 01/29/93 | 48.40 | |
| 501033-2 | 006 | WINDOWS ON THE WORLD NEW YORK   NY | | | |
| | | D0330377 FOOD-BEV | 01/28/93 | 23.94 | |
| | | ACCOUNT TOTAL | | $256.14 | $88.68 |

Read the enclosed "For Members Only" newsletter for information
on the financial planning benefits of the American Express® Card.
KCDA001111



# EXHIBIT G

KCDA001112

JO-066



May 25,1999

NYS Supreme Court
CIVIC CENTER Part 10
360 Adams Street
Subpoena Records Dept.-rm 436
Brooklyn NY 11201

RE:    People V. John O'Hara

Dear Sir/Madam:

Enclosed please find photocopies of documents you had requested responsive to the above referenced  summons  served upon Chase  Bank. .

The enclosed documents are true and accurate records kept by Chase in its

normal course of business.

I trust that this will  comply with any evidentiary rules of the court.  This information is provided in compliance with the subpoena, but in lieu of appearance.

Very truly yours,

Ona Weiner
212 552-2707

Enc.
FILE:  29050

*Dept G in Evrl
Sonti, Acc
5/27/99*

KCDA001113

JO-067

**Chemical Bank**

S30323001575309       OORTCVC1 01 00000000001575309    0000501810311    A

```
            MR. JOHN K O'HARA                          661
            553 47TH STREET                            018
            BROOKLYN NY 11220-4636
```

PAGE   1 OF   2

| Statement Period | | Enclosures | Account Number |
|---|---|---|---|
| FEB 25 - MAR 23,1993 | | 5 | 001-575309 |
| Previous Balance | 954.19 | 2 Credits | 2,896.89 |
| Closing Balance | 2,847.24 | 11 Debits | 1,003.84 |

| Balances | |
|---|---|
| Date | Amount |

BASIC CHECKING

DEPOSITS AND CREDITS

| | | | | Date | Amount |
|---|---|---|---|---|---|
| | | | | FEB 26 | 2,282.64 |
| FEB 26 | 1,448.45 MONTCLARE&GUA | AS OF 02-26 | | MAR | |
| | SALARY DEP  ECS PM# 08263 | | | 2 | 2,228.64 |
| MAR 15 | 1,448.44 MONTCLARE&GUA | AS OF 03-15 | | 4 | 2,171.16 |
| | SALARY DEP  ECS PM# 08263 | | | 8 | 2,071.16 |
| | | | | 10 | 1,771.16 |
| | CHECKS AND DEBITS | | | 15 | 3,153.34 |
| | | | | 17 | 3,073.34 |
| FEB 26 | 120.00 ATM-4600  WITHDWL CARD# 00046658377 | | | 18 | 2,973.34 |
| | WORLD TRADE  23272 | AS OF  2-25 | | 19 | 2,852.74 |
| | NEW YORK CITY,NY NYCE | SEQ-100534 | | 23 | 2,847.24 |
| MAR 08 | 100.00 ATM-2301  WITHDWL CARD# 00046658377 | | | | |
| | BALLY PARK PLACE 3 | AS OF  3-06 | | | |
| | ATLANTIC CITY,NJ NYCE | SEQ-112590 | | | |
| MAR 17 | 80.00 ATM-6611  WITHDWL CARD# 00046658377 | | | | |
| | 52 BROADWAY | AS OF  3-16 | | | |
| | N.Y.C.        ,NY CBNY | SEQ-004246 | | | |
| MAR 18 | 100.00 ATM-8883  WITHDWL CARD# 00046658377 | | | | |
| | 401 FLATBUSH AVE. | AS OF  3-18 | | | |
| | B'KLYN        ,NY CBNY | SEQ-008643 | | | |
| MAR 19 | 100.00 ATM-7461  WITHDWL CARD# 00046658377 | | | | |
| | 260 COLUMBUS AVE. | AS OF  3-18 | | | |
| | N.Y.C.        ,NY CBNY | SEQ-003986 | | | |
| MAR 23 | 5.50 MONTHLY SERVICE CHARGE | | | | |
| | $4.00 MAINT + 75¢ CHK/WTHDWL/PURCH | | | | |

| DATE | CK.NO. | AMOUNT | DATE | CK.NO. | AMOUNT |
|---|---|---|---|---|---|
| MAR 02 | 320 | 54.00 | MAR 15 • | 363 | 66.26 |
| MAR 04 | 321 | 57.48 | MAR 19 | 364 | 20.60 |
| MAR 10 • | 324 | 300.00 | | | |

• INDICATES SKIP IN CHECK SEQUENCE

SERVICE CHARGES

YOUR SERVICE CHARGE THIS STATEMENT PERIOD WAS  $   5.50.

** T 3**

JO-068

**ChemicalBank**

§30323001575309          OORTCYC1 01 00000000001575309      0000501810311    A
                                                                           661
              MR. JOHN K O'HARA                                            018
              553 47TH  STREET
              BROOKLYN  NY 11220-4636

| PAGE 1 OF 2 | | | Enclosures | Account Number | | Balances | |
|---|---|---|---|---|---|---|---|
| Statement Period | | | 5 | 001-575309 | | Date | Amount |
| FEB 25 - MAR 23,1993 | | | 2 Credits | 2,896.89 | | | |
| Previous Balance | 954.19 | | 11 Debits | 1,003.84 | | | |
| Closing Balance | 2,847.24 | | | | | | |

BASIC CHECKING

|  |  | FEB | |
|---|---|---|---|
|  |  | 26 | 2,282.64 |
|  |  | MAR | |

### DEPOSITS AND CREDITS

| | | | | | | |
|---|---|---|---|---|---|---|
| FEB 26 | 1,448.45 MONTCLARE&GUA | | AS OF 02-26 | 2 | 2,228.64 | |
|  | SALARY DEP  ECS PM# 08263 | | | 8 | 2,171.16 | |
| MAR 15 | 1,448.44 MONTCLARE&GUA | | AS OF 03-15 | 10 | 2,071.16 | |
|  | SALARY DEP  ECS PM# 08263 | | | 15 | 1,771.16 | |
|  |  | | | 17 | 3,153.34 | |
|  |  | | | 18 | 3,073.34 | |
| | | | | 19 | 2,973.34 | |
| | | | | 23 | 2,852.74 | |
| | | | | | 2,847.24 | |

### CHECKS AND DEBITS

FEB 26      120.00 ATM-4600  WITHDWL CARD# 00046658377
            WORLD TRADE  23272        AS OF  2-25
            NEW YORK CITY,NY NYCE     SEQ-100534
MAR 08      100.00 ATM-2301  WITHDWL CARD# 00046658377
            BALLY PARK PLACE 3        AS OF  3-06
            ATLANTIC CITY,NJ NYCE     SEQ-112590
MAR 17       80.00 ATM-6611  WITHDWL CARD# 00046658377
            52 BROADWAY               AS OF  3-16
            N.Y.C.        ,NY CBNY    SEQ-004246
MAR 18      100.00 ATM-8883  WITHDWL CARD# 00046658377
            401 FLATBUSH AVE.         AS OF  3-18
            B'KLYN        ,NY CBNY    SEQ-008643
MAR 19      100.00 ATM-7461  WITHDWL CARD# 00046658377
            260 COLUMBUS AVE.         AS OF  3-18
            N.Y.C.        ,NY CBNY    SEQ-003986
MAR 23        5.50 MONTHLY SERVICE CHARGE
            $4.00 MAINT + 75¢ CHK/WTHDWL/PURCH

| DATE | CK.NO. | AMOUNT | DATE | CK.NO. | AMOUNT |
|---|---|---|---|---|---|
| MAR 02 | 320 | 54.00 | MAR 15 * | 363 | 66.26 |
| MAR 04 | 321 | 57.48 | MAR 19 | 364 | 20.60 |
| MAR 10 * | 324 | 300.00 | | | |

                    * INDICATES SKIP IN CHECK SEQUENCE

### SERVICE CHARGES

YOUR SERVICE CHARGE THIS STATEMENT PERIOD WAS  $   5.50,

                                                        ** T 3**

**ChemicalBank**

§30323001575309          OORTCYC1 01 00000000001575309      0000501810311    A
                                                                           661
              MR. JOHN K O'HARA    KCDA001114                              018

** T 3**

**ChemicalBank**
9303230G1575309      OORTCVC1 01 00000000001575309    0000501810311   A
                  MR. JOHN K O'HARA                    661
                  553 47TH STREET                      D18
                  BROOKLYN  NY  11220-4636

| PAGE  2 OF  2 | | | |
|---|---|---|---|
| Statement Period FEB 25 - MAR 23, 1993 | Enclosures 5 | Account Number 001-575309 | Balances |
| Previous Balance | Credits | | Date    Amount |
| Closing Balance | Debits | | |

* 4.00 MAINTENANCE PLUS 75¢ PER CHECK, PURCHASE AND
WITHDRAWAL FROM CHEMICAL, NYCE, MAC OR $AM CASH MACHINES.

PLEASE EXAMINE AT ONCE. EXCEPT FOR ELECTRONIC TRANSFERS,
ACCOUNT WILL BE CONSIDERED CORRECT IF NO REPORT IS

** U 3**

JO-070

ChemicalBank

930423001575309      OORTCVC1 01 00000000001575309      0000901810311    A
MR. JOHN K O'HARA                      661
553 47TH STREET                        018
BROOKLYN NY 11220-4636

PAGE    1 OF   2

| Statement Period | | Enclosures | Account Number | | |
|---|---|---|---|---|---|
| MAR 24 - APR 23,1993 | | 9 | 001-575309 | | |
| Previous Balance | 2,847.24 | 2 Credits | 2,896.91 | Balances | |
| Closing Balance | 2,653.53 | 15 Debits | 3,090.62 | Date | Amount |

BASIC CHECKING

DEPOSITS AND CREDITS

| | | | | MAR | |
|---|---|---|---|---|---|
| | | | | 26 | 2,415.28 |
| | | | | 29 | 2,195.28 |
| MAR 31 | 1,448.45 MONTCLARE&GUA | AS OF 03-31 | | 31 | 3,553.73 |
| | SALARY DEP  ECS PM# 08263 | | | APR | |
| APR 15 | 1,448.46 MONTCLARE&GUA | AS OF 04-15 | | 2 | 2,207.18 |
| | SALARY DEP  ECS PM# 08263 | | | 6 | 2,193.18 |
| | | | | 7 | 1,809.37 |
| | | | | 12 | 1,759.37 |
| CHECKS AND DEBITS | | | | 14 | 1,548.44 |
| | | | | 15 | 2,921.90 |
| MAR 29 | 50.00 ATM-6617  WITHDWL CARD# 00046658377 | | | 19 | 2,661.28 |
| | 52 BROADWAY | AS OF  3-29 | | 23 | 2,653.53 |
| | N.Y.C.          ,NY CBNY | SEQ-009180 | | | |
| MAR 29 | 170.00 ATM-7462  WITHDWL CARD# 00046658377 | | | | |
| | 260 COLUMBUS AVE. | AS OF  3-27 | | | |
| | N.Y.C.          ,NY CBNY | SEQ-003128 | | | |
| MAR 31 | 90.00 ATM-6613  WITHDWL CARD# 00046658377 | | | | |
| | 52 BROADWAY | AS OF  3-31 | | | |
| | N.Y.C.          ,NY CBNY | SEQ-005840 | | | |
| APR 02 | 210.00 ATM-7461  WITHDWL CARD# 00046658377 | | | | |
| | 260 COLUMBUS AVE. | AS OF  4-02 | | | |
| | N.Y.C.          ,NY CBNY | SEQ-005122 | | | |
| APR 06 | 14.00 CHECKBOOK CHARGE | | | | |
| | | AS OF 02-93 | | | |
| APR 23 | 7.75 MONTHLY SERVICE CHARGE | | | | |
| | $4.00 MAINT + 75¢ CHK/WTHDWL/PURCH | | | | |

| DATE | CK.NO. | AMOUNT | DATE | CK.NO. | | AMOUNT |
|---|---|---|---|---|---|---|
| MAR 26 | 325 | 383.81 | APR 07 | * | 370 | 383.81 |
| MAR 26 * | 365 | 48.15 | APR 14 | | 371 | 47.43 |
| APR 02 | 366 | 1,136.55 | APR 14 | * | 373 | 163.50 |
| APR 15 | 367 | 75.00 | APR 19 | | 374 | 260.62 |
| APR 12 | 368 | 50.00 | | | | |

* INDICATES SKIP IN CHECK SEQUENCE

SERVICE CHARGES

** 023 **

ChemicalBank

OORTCVC1 01 00ROCAMODA1575309      0000901810311    A

ChemicalBank

930423001575309      OORTCVC1 01 00000000001575309    0000901810311    A
                MR. JOHN K O'HARA                     661
                553 47TH STREET                       018
                BROOKLYN NY 11220-4636

| PAGE 2 OF 2 | | Enclosures | Account Number | | Balances | |
| --- | --- | --- | --- | --- | --- | --- |
| Statement Period | | | | | | |
| MAR 24 - APR 23,1993 | | 9 | 001-575309 | | | |
| Previous Balance | | Credits | | Data | Amount | |
| Closing Balance | | Debits | | | | |

YOUR SERVICE CHARGE THIS STATEMENT PERIOD WAS $ 7 75,
$ 4.00 MAINTENANCE PLUS 75¢ PER CHECK, PURCHASE AND
WITHDRAWAL FROM CHEMICAL, NYCE, MAC OR ±AM CASH MACHINES.

PLEASE EXAMINE AT ONCE. EXCEPT FOR ELECTRONIC TRANSFERS,
ACCOUNT WILL BE CONSIDERED CORRECT IF NO REPORT IS
RECEIVED WITHIN 14 DAYS. DIRECT ALL INQUIRIES TO (212)
935-9935 OR WRITE 52 BROADWAY, NY, NY 10004

•• P23••

ChemicalBank                    KCDA001117..

JO-072

ChemicalBank
930525001575309      OORTCVC1 01 00000000001575309      0000701810311    A
     MR. JOHN K O'HARA                                       661
     553 47TH STREET                                         018
     BROOKLYN  NY  11220-1310

| PAGE   1 OF   2 | | | |
|---|---|---|---|
| Statement Period | Enclosures | Account Number | |
| APR  24 - MAY  25,1993 | 7 | 001-575309 | Balances |
| Previous Balance       2,653.53 | 1Credits | 1,000.00 | Date      Amount |
| Closing Balance        1,527.53 | 13Debits | 2,126.00 | |

BASIC CHECKING

DEPOSITS AND CREDITS

MAY 13        1,000.00 DEPOSIT

CHECKS AND DEBITS

APR 27        150.00 ATM-4900  WITHDWL CARD# 00046658377
              BPPR EXP. SAN JUAN        AS OF  4-27
              PR&AN JUAN   ,PR NYCE     SEQ-002325
APR 28        100.00 ATM-4900  WITHDWL CARD# 00046658377
              CARIBE HILTON SAN         AS OF  4-27
              SAN JUAN   ,P NYCE        SEQ-005320
MAY 10        100.00 ATM-2598  WITHDWL CARD# 00046658377
              5323 5TH AVENUE           AS OF  5-08
              BROOKLYN   ,NY NYCE       SEQ-017743
MAY 11         60.00 ATM-0031  WITHDWL CARD# 00046658377
              BLKHR8E/ENG CK 397        AS OF  5-10
              PLEASANTVILLE,NJ NYCE     SEQ-026518
MAY 14         20.00 ATM-2301  WITHDWL CARD# 00046658377
              BALLY PARK PLACE 3        AS OF  5-14
              ATLANTIC CITY,NJ NYCE     SEQ-101185
MAY 25          7.00 MONTHLY SERVICE CHARGE
              $4.00 MAINT + 75¢ CHK/WTHDWL/PURCH

| DATE | CK.NO. | AMOUNT | DATE | CK.NO. | AMOUNT |
|---|---|---|---|---|---|
| MAY 05 | 376 | 40.00 | MAY 12 | 504 | 1,009.87 |
| MAY 04 | 377 | 51.44 | MAY 14 | 505 | 19.55 |
| MAY 12 * | 502 | 460.57 | MAY 14 | 506 | 45.00 |
| MAY 17 | 503 | 62.57 | | | |

* INDICATES SKIP IN CHECK SEQUENCE

SERVICE CHARGES

YOUR SERVICE CHARGE THIS STATEMENT PERIOD WAS  $   7.00,
$  4.00 MAINTENANCE PLUS 75¢ PER CHECK, PURCHASE AND
WITHDRAWAL FROM CHEMICAL, NYCE, MAC OR $AM CASH MACHINES.

| | |
|---|---|
| APR | |
| 27 | 2,503.53 |
| 28 | 2,403.53 |
| MAY | |
| 4 | 2,352.09 |
| 5 | 2,312.09 |
| 10 | 2,212.09 |
| 12 | 2,152.09 |
| 12 | 681.65 |
| 13 | 1,681.65 |
| 14 | 1,597.10 |
| 17 | 1,534.53 |
| 25 | 1,527.53 |

** J24**

ChemicalBank
930525001575309      OORTCVC1 01 00000000001575309      0000701810311    A
   MR. JOHN K O'HARA      KCDA001118                              661
   553 47TH STREET                                                018

•• J24••

Chemical Bank
930525001575309      OORTCVC1 01 00000000001575309    0000701810311    A
MR. JOHN K O'HARA                        661
553 47TH STREET                          018
BROOKLYN  NV  11220-1310

| PAGE  2 OF  2 | | | |
| Statement Period | Enclosures | Account Number | Balances |
| APR  24 - MAY  25,1993 | 7 | 001-575309 | |
| Previous Balance | Credits | | Date | Amount |
| Closing Balance | Debits | | | |

PLEASE EXAMINE AT ONCE, EXCEPT FOR ELECTRONIC TRANSFERS,
ACCOUNT WILL BE CONSIDERED CORRECT IF NO REPORT IS
RECEIVED WITHIN 14 DAYS. DIRECT ALL INQUIRIES TO (212)
935-9935 OR WRITE 52 BROADWAY, NY, NY 10004

•• K24••

JO-074

ChemicalBank
930623001575309        0ORTCVC1 01 00000000001575309      0000601810311    A
MR. JOHN K O'HARA                                661
553 47TH STREET                                  018
BROOKLYN  NY  11220-1310

PAGE   1 OF   1

| Statement Period | | Enclosures | Account Number | | |
|---|---|---|---|---|---|
| MAY  26 - JUNE 23,1993 | | 6 | 001-573309 | | |
| Previous Balance | 1,527.53 | 1 Credits | 1,200.00 | Balances | |
| Closing Balance | 1,504.67 | 7 Debits | 1,222.86 | Date | Amount |

BASIC CHECKING

| | | | MAY | |
|---|---|---|---|---|
| | DEPOSITS AND CREDITS | | 27 | 1,490.31 |
| | | | JUNE | |
| JUN 23 | 1,200.00 CASH DEPOSIT | | 3 | 1,087.31 |
| | | | 9 | 917.31 |
| | | | 16 | 833.67 |
| | CHECKS AND DEBITS | | 18 | 808.67 |
| | | | 23 | 1,504.67 |
| JUN 23 | 4.00 MONTHLY SERVICE CHARGE | | | |
| | $4.00 MAINT + 75¢ CHK/WTHDWL/PURCH | | | |

| DATE | CK.NO. | AMOUNT | DATE | CK.NO. | AMOUNT |
|---|---|---|---|---|---|
| MAY 27 | 507 | 37.22 | JUN 18 | 512 | 25.00 |
| JUN 03 | 508 | 403.00 | JUN 23 | 513 | 500.00 |
| JUN 09 • | 511 | 170.00 | JUN 16 • | 526 | 83.64 |

• INDICATES SKIP IN CHECK SEQUENCE

SERVICE CHARGES

YOUR SERVICE CHARGE THIS STATEMENT PERIOD WAS $   4.00.
$  4.00 MAINTENANCE PLUS 75¢ PER CHECK, PURCHASE AND
WITHDRAWAL FROM CHEMICAL, NYCE, MAC OR SAM CASH MACHINES.

PLEASE EXAMINE AT ONCE, EXCEPT FOR ELECTRONIC TRANSFERS,
ACCOUNT WILL BE CONSIDERED CORRECT IF NO REPORT IS
RECEIVED WITHIN 14 DAYS. DIRECT ALL INQUIRIES TO (212)
935-9935 OR WRITE 52 BROADWAY, NY, NY 10004

•• K13••

ChemicalBank
930623001575406        0ORTMBP  01 00000000001575406      0000001840211    A
REDACTED                                         661

JO-075

ChemicalBank
930726001575309      OORTCVCI 01 00000G00001575309    0000701810311    A
              MR. JOHN K O'HARA                         661
              553 47TH STREET                           018
              BROOKLYN  NY  11220-1310

              L.

| PAGE  1 OF  1 | | | |
| Statement Period | Enclosures | Account Number | |
| JUNE 24 - JULY 26,1993 | 7 | 001-575309 | |
| Previous Balance | 1,504.67 | 1 Credits | 400.00 | Balances |
| Closing Balance | 231.21 | 90ebits | 1,673.46 | Date | Amount |

BASIC CHECKING

| | | JUNE | |
| | | 25 | 275.02 |
DEPOSITS AND CREDITS | | JULY | |
| | | 14 | 254.08 |
JUL 20    400.00 CASH DEPOSIT | | 16 | 234.08 |
| | | 19 | 120.30 |
CHECKS AND DEBITS | | 20 | 520.30 |
| | | 22 | 461.91 |
JUL 16    20.00 ATM-6611  WITHDWL CARD# 00046650377 | 26 | 231.21 |
          52 BROADWAY              AS OF  7-15
          N.Y.C.            ,NY CBNY  SEQ-009258
JUL 26    4.00 MONTHLY SERVICE CHARGE
          MAINTENANCE CHARGE              4.00

| DATE | CK.NO. | AMOUNT | DATE | CK.NO. | AMOUNT |
|---|---|---|---|---|---|
| JUN 25 | 514 | 29.65 | JUL 22 | 518 | 33.39 |
| JUN 25 | 515 | 1,200.00 | JUL 14 * | 527 | 20.94 |
| JUL 22 | 516 | 25.00 | JUL 19 | 528 | 113.78 |
| JUL 26 | 517 | 226.70 | | | |

          * INDICATES SKIP IN CHECK SEQUENCE

                SERVICE CHARGES

PLEASE EXAMINE AT ONCE. EXCEPT FOR ELECTRONIC TRANSFERS,
ACCOUNT WILL BE CONSIDERED CORRECT IF NO REPORT IS
RECEIVED WITHIN 14 DAYS. DIRECT ALL INQUIRIES TO (212)
935-9935 OR WRITE 52 BROADWAY, NY, NY 10004

                                        •• M16••

ChemicalBank
930726001575406      OORTMBP  01 0000G00001575406    0000001840211    A
                                                      661

**Chemical Bank**

930824001575309        OORTCVC1 01 00000000001575309     0000101810311    A
              MR. JOHN K O'HARA                              661
              553 47TH STREET                                018
              BROOKLYN NY 11220-1310

PAGE    1 OF    1

| Statement Period | | Enclosures | Account Number | | Balances | |
|---|---|---|---|---|---|---|
| JULY 27 - AUG 24,1993 | | 1 | 001-575309 | | | |
| Previous Balance | 231.21 | 0Credits | .00 | | Date | Amount |
| Closing Balance | 202.21 | 2Debits | 29.00 | | | |

BASIC CHECKING

CHECKS AND DEBITS

AUG 24        4.00 MONTHLY SERVICE CHARGE
              MAINTENANCE CHARGE           4.00

| DATE | CK.NO. | AMOUNT | DATE | CK.NO. | AMOUNT |
|---|---|---|---|---|---|
| AUG 03 | 520 | 25.00 | | | |

SERVICE CHARGES

| AUG | |
|---|---|
| 3 | 206.21 |
| 24 | 202.21 |

PLEASE EXAMINE AT ONCE. EXCEPT FOR ELECTRONIC TRANSFERS,
ACCOUNT WILL BE CONSIDERED CORRECT IF NO REPORT IS
RECEIVED WITHIN 14 DAYS. DIRECT ALL INQUIRIES TO (212)
935-9935 OR WRITE 52 BROADWAY, NY, NY 10004

** D 6**

**Chemical Bank**

930824001575406        OORTMDP 01 00000000001575406     0000001840211    A
              MR. ALAN N ALPERN R/OR   OORTDA001122         661

JO-077

**CHEMICAL**

**STATEMENT COPY**

CHEMICAL
STATEMENT

STATEMENT PERIOD 08-25-93 TO 09-24-93

YOUR ACCOUNTS AT A GLANCE...

ACCOUNT
BASIC CHECKING                001-575309

KCDA001123

JO-078



CHEMICAL

STATEMENT COPY

0015313D9000199305U

DR. JOHN K. O'HARA    001-E001140-2017-001NO    -000-01-03-00

RETAIL
STATEMENT

STATEMENT PERIOD 030-08325-7R1-01-03-03
STATEMENT PERIOD 08325 (R1-STATE)
ACCOUNT NUMBER 001-595308 PAGE 2 OF 2

DEPOSITS/CREDITS
DATE    DESCRIPTION                                      AMOUNT
09-05   DEPOSIT                                          700.00
                                                      $ 700.00

WITHDRAWALS/FEES/DEPOSIT/CREDIT
DATE    DESCRIPTION                                      AMOUNT
09-24   MONTHLY MAINTENANCE FEE                          4.00
        WITHDRAWALS/FEES                               $ 4.00

CHECKS                   * = DENOTES A GAP IN CHECK SEQUENCE
CHECK    DATE    AMOUNT    CHECK    DATE    AMOUNT    CHECK    DATE    AMOUNT
521      09-07   $35.26    522      09-15   $50.00
                                                            $ 185.26

DAILY BALANCE
DATE     BALANCE          DATE     BALANCE          DATE     BALANCE
09-07    356.95           09-15    212.95           09-24    212.95

CHECKS BALANCE AS OF 09-24

KCDA001124

# EXHIBIT H

KCDA001125

JO-080

OFFICE OF COURT ADMINISTRATION
P.O. BOX 2806 CHURCH ST. STATION
NEW YORK, N.Y. 10008

PAGE 82

2    1706   03-08-1993   2362536
Y    AD

40193                    1    300.00
                      TOTAL    300.00

JOHN KENNEDY OHARA ESQ.
MONTCLARE & GUAY
51 BROADWAY
10TH FLOOR SUITE 1000
NEW YORK, NY 10006

FOR THE BIENNIAL REGISTRATION
PERIOD 1993-94

NOTICE OF REQUIREMENT
TO REREGISTER    02/10/93

---

Section 468-a of the Judiciary Law and the Rules of the Chief Administrator of the Courts call for the biennial registration of all attorneys. As of May 21, 1990 the fee for such registration is $300 (sixty dollars of which shall be deposited in the Lawyers' Fund for Client Protection, and the remainder of which shall be deposited in the Attorney Licensing Fund), except that no fee shall be required from an attorney who certifies that he or she is retired from the practice of law as defined in 22 NYCRR 118.1 (g) (see reverse side).

The information that this office has on file is shown below. To reregister, you must (A) complete any information missing from this form, (B) annotate any information that should be corrected or changed, (C) sign both the Affirmation of Compliance (if applicable) and the affirmation on the bottom of this page, (D) Enclose a check or money order payable to "NYS Office of Court Administration" (No Cash Please) for $300 or sign the certification that you are retired from the practice of law, (E) mail to: NYS Office of Court Administration, P.O. Box 2806, Church Street Station, New York, N.Y., 10008

**************************************************************************************************

Affirmation of Compliance required by the Rules of the 1st and 2d Departments:

I affirm that I have read DR 9-102 of the lawyer's code of professional responsibility as adopted by the New York State Bar Association, as amended, and am in compliance therewith, and with §603.15 (1st Dept.) or §691.12 (2d Dept.) of the Rules of the Appellate Division, governing the Conduct of Attorneys, which requires an attorney to preserve the identity of funds and property entrusted to him or her and to maintain certain records relative thereto.

Signature _____

**************************************************************************************************

Retirement Certification (only if applicable): I certify that I am retired from the practice of law as defined in 22 NYCRR 118.1 (g) and therefore am not required to pay the $300 fee

Signature _____    _____ Date _____

---

2362536/070291/3/2/4668* * * * * * * * * * * * * * * * * * * * *

| 1-LAST NAME | FIRST NAME | MIDDLE NAME | 2-DATE OF BIRTH |
|---|---|---|---|
| OHARA | , JOHN | KENNEDY | 03/24/61 |

3-NAME WHEN ADMITTED TO NYS BAR (IF DIFFERENT):
LAST            FIRST            MIDDLE

4-YEAR ADMITTED TO
NYS BAR: 1991

5-HOME ADDRESS:

~~477 51ST STREET~~
553 - 47TH STREET
BROOKLYN, NY 11220

6-COUNTY OF RESIDENCE
KINGS

7-BUSINESS NAME AND ADDRESS

MONTCLARE & GUAY

61 BROADWAY
10TH FLOOR SUITE 1000

NEW YORK, NY 10006

8-COUNTY OF BUSINESS
NEW YORK

9-BUSINESS TELEPHONE
(212)509-3900

10-NYS JUDICIAL DEPARTMENT
OF BUSINESS: FIRST

11-NYS JUDICIAL DEPARTMENT
OF ADMISSION: SECOND

12-LAW SCHOOL GRADUATED:
CUNY

AFFIRMATION: I AFFIRM THAT THE STATEMENTS CONTAINED HEREIN ARE TRUE TO
THE BEST OF MY KNOWLEDGE AND BELIEF:

SIGNATURE _____    DATE: 3-3-93

KCDA001126

# EXHIBIT I

KCDA001127

JO-082

PAGE _1_ OF _1_

**CFB**

# NEW YORK CITY
# CAMPAIGN FINANCE BOARD

40 Rector Street, 7th Floor, New York, New York 10006    (212) 306-7100    FAX: (212) 306-7143/44



## CANDIDATE CERTIFICATION
## 1993 ELECTIONS

### 1. CANDIDATE NAME

LAST *Ohata*    FIRST *John*    M.I. *K*

### 2. HOME ADDRESS

STREET ADDRESS *553 - 47th Street*    APT. NO. *House*    CFB USE ONLY *CD*

CITY *Bklyn*    STATE *NY*    ZIP CODE *11220*    TELEPHONE ( )  -

### 3. EMPLOYMENT

EMPLOYER NAME *Katz Katz + Blaisier*

STREET ADDRESS *110 Wall Street*

CITY *New York*    STATE *NY*    ZIP CODE *10005*    TELEPHONE *(212) 227 - 0601*

### 4. PREVIOUS ELECTIONS

Have you been a candidate previously for any office or political party position?  yes [X]  no [ ]  If yes, please specify your most recent elections below:

| DATE OF ELECTION MONTH | YEAR | OFFICE OR PARTY POSITION SOUGHT | DISTRICT | PARTY PRIMARY ENTERED |
|---|---|---|---|---|
| 9 | 90 | NYS Assembly | 51 AD | Democrat |
| 9 | 91 | NYC Council | 38 CD | Democrat |
| 9 | 92 | NYS Assembly | 51 AD | Democrat |

### 5. CERTIFICATION

I hereby verify that I have not accepted, and I agree not to accept, any contribution or contributions from any one contributor for the 1993 elections that exceed(s) the contribution limit applicable to the office I am seeking, pursuant to Section 3-703(1)(f) of the New York City Campaign Finance Act ("Act"); that I have not made, and agree not to make, expenditures in excess of the expenditure limits applicable to the office I am seeking, pursuant to Section 3-706 of the Act, for each election (except as otherwise provided in the Act); that I have not used, and I agree not to use, my personal funds or property (or that of my spouse or unemancipated children) for these elections, except as contributions that do not exceed the applicable limit; and that I agree to abide by all other applicable requirements of the Act and the New York City Campaign Finance Board Rules ("Rules"), including requirements for campaign finance disclosure statements and recordkeeping.

I understand that I, the political committees I authorize, and my agents are required to abide by the requirements of the Act and the Rules applicable to the 1993 elections for which this Certification is submitted, regardless whether I: meet the requirements of law to have my name appear on the official ballot for those elections; meet the threshold for eligibility for public funds; accept public funds; or am otherwise not eligible to receive public funds.

I understand that this Certification is a condition for qualifying to receive public funds in these elections and that the other conditions specified in the Act and the Rules must be satisfied before I may receive public funds pursuant to the Act.

I understand that my home address as provided above is the address to which legal notices, including correspondence and legal papers, should be sent. I further understand that if it becomes necessary to update this address, I am responsible for promptly notifying the Board, in writing, of the new address.

I understand that failure to abide by the requirements of the Act or the Rules may result in the imposition of such penalties as are provided in Section 3-711 of the Act and any other applicable law. I verify that the information in this Certification is true and complete to the best of my knowledge and belief.

This Certification does not apply to special elections held to fill vacancies.

SWORN TO ME THIS
_29th_ DAY OF
_April_, 1993

_Elaine Naccache_
NOTARY PUBLIC

ELAINE NACCACHE
Notary Public, State of New York
No. 41-4772422
Qualified in Queens County
Certificate Filed in New York County
Commission Expires 10/31/1994

CANDIDATE SIGNATURE

KCDA001128

Def Exhibit B Evid. 5/26/44

# EXHIBIT J

KCDA001129

JO-084

<u>PEOPLE v. JOHN K. O'HARA</u>
Preparation for Grand Jury presentation


<u>OBJECTIVE</u>: Proof that O'Hara registered and voted from false addresses. Proof to concentrate on use of a fictitous address at 553 47th Street from 1992 to end of 1993. Subsidiary proof of 6017 4th Avenue address as possible false residence beginning in 1993.


<u>SUBPOENAS</u>:
-DMV RECORDS SHOWING CHANGES IN ADDRESS & ANY VEHICLES REGISTERED TO O'HARA 1990-PRESENT.
-POSSIBLE NJ DMV? (subjects girlfriend and some associates live in Atlantic City area).
-PVB RECORDS 1990-1996.
-POST OFFICE CHANGE OF ADDRESS FORMS 1990-1996.
-TRW & CREDIT CARD REPORTS: BANKS. OBTAIN FULL FINANCIAL PROFILE OF O'HARA, SUBPOENA ALL BANK RECORDS AND CREDIT CARD INFORMATION FROM PERIOD IN QUESTION.
-O.C.A. RECORDS & REGISTRATION.
-CON EDISON BILLS AND SUBSCRIBER INFORMATION FOR JOHN K. O'HARA, AND FOR ADDRESSES AT 47TH STREET AND 4TH AVENUE 1992 TO PRESENT.
-CABLE TV BILLS, SAME AS ABOVE.
-B.U.G BILLS
-NYNEX BILLS
BOARD OF ELECTIONS BUFF CARDS FOR O'HARA


<u>CANVASSES</u>
INTERVIEW & OBTAIN RECORDS AT 579 61ST ST.
INTERVIEW & OBTAIN RECORDS AT 553 47TH STREET
INTERVIEW & OBTAIN RECORDS AT 6017 4TH AVENUE
Speak to individual who may confirm or refut presence of O'Hara as visitor or tenant. Speak to any owners or supers. Be aware that O'Hara has friends/family/associates at 61st Street and 4th Avenue, do not disclose exact purpose of investigation to them - ask general questions as to residency of O'Hara. There is a good probability that they will belive that purpose of probe is recent election and they may therefore not be prepared to lie about prior residences. Make sure to keep good records of their reponses as they may change story as case progresses and O'Hara becomes aware of subject of probe.

-2-

**INTERVIEWS**:Review purpose of investigation, interview further witnesses as evidence develops - concentrate most on Lozano and Parras, they are essential and must testify in the Grand Jury - note that they previiously testified in 1994 civili proceeding.

**ROBERTO LOZANO  553 47TH STREET**
Owner occupant of building, previously testified that O'Hara did not reside at location in 1992-1994, and that O'Hara asked him to hold mail and lie if asked if O'har lived there.

**SANDRA HELVERSON 430 OGDEN·AVENUE APT. 8**
**JERSEY CITY N.J.** d.o.b. 1/26/67
Assisted O'Hara in 1994 campaign, may be estranged and in fear, interview concerning circumstances.

**IMMACULATA PELLICCIO   Hostile witness |**
**6017 4TH AVENUE**
Owner/ occupant of building where O'Hara claims to reside. Testified that she is lifelong friend of O'Hara and that in fact he did begin living there. There are two apartments above the shop owned by the Pelicanos. One is occupied by **EMILY MASSA** (Pellicano's daughter) - interview her on a separate occassion. Ask when adnd circumstances of O'Hara moving into building.

**QUERUBIN PARRAS 348 HIGHBROOK AVENUE PELHAM N.Y.**
Landlord of building at 579 61st Street in 1994. Leases & knowledge of O'Hara residence 1982- ?. O'Hara still occupied in 1994.

**MAUREEN STEFFENSEN 519 47TH STREET   Hostile witness|**
Close associate/friend of O'Hara, has led petition drives for O'Hara in past and assisted Tanya Ruiz candidacy this time. Should know residencies of O'Hara.

# EXHIBIT K

KCDA001132

JO-087

JO-088

CHRONOLOGICAL DATA SHEET (2)

TITLE — CASE NO. OHARA

DATE — A.D.A. OHARA

ACTION

6 - Regarding 553/47TH ST. DI'S spoke TO TENNENTS (WHO ARE NEW) AND DID NOT KNOW OHARA.

7- ~~DID~~ DI'S MADE 3 ATTEMPTS TO SPEAK W/ ~~LAZZA~~ LAZANO, NOT, DI'S CONFIRMED LAZANO LIVES AT LOCATION AND OWNS BUILDINGING SINCE 1992 MAGGIE LUCAS PREVIOUS OWNER.

8- CABLE CHECK of 553 47 ST. 3 CUSTOMS IN LAST 5 YEAR NONE of WHICH ARE OHARA. Coles check, NO LISTING FO A OHARA. POSTAL, NO ~~LISTING~~ POSTAL CHANGE of ADDRESS FORMS for OHARA POSTAL CARRIER STATES MAIL for OHARA Recently BEING DELIVERED @ THIS LOCATION.

9- 6017 4TH AVE. Coles check NO LISTING FROM 1992-1994, 1995 - OHARA LISTED AS A NEW LISTING TO THE PRESENT.

Dec. 1994 CABLE Changed from TINA PELLICCIO TO JOHN OHARA

10- OHARA RECIEVED 3 MOVING VIOLATIONS DI'S CHECKING on WHAT VEHICLE HE WAS DRIVING

DI'S OBTAINED DMV MATERIAL on OHARA & HIS MOTHER.

KCDA001133

CHRONOLOGICAL DATA SHEET    ③

TITLE                          CASE NO.   OHARA

DATE                           A.D.A.     OMARA

ACTION

11- CON ED - SUBPOENAED , BUG - SUBPOENAED,
CABLE TV COMPLETED , NYNEX SUBPOENAED,
12- BUFF CARDS - OMARA HAS
13. CAVASSES, DI'S CANVASSED - 47th ST.
DI'S TO CANVASS LOCATION NOT ALREADY
CAVASSED - SEE REPORTS

INTERVIEWS:
1- LOZANO (PARRIS) - DI'S INTERVIEWED &
OBTAINED LEASE AGREEMENT.
2- SANDRA HELVERSON - DANNY McCLEAN
HAS TRACKED HER TO A PO ON THE
JERSEY Shore AND is CONTINUING HIS
INVESTIGATION.
3- LOZANO - DI'S CONFIRMED THAT LOZANO
LIVES @ 47TH St ADDRESS AND will
ATTEMPT TO INTERVIEW in THE Am on 10/10/96
4- IMMACULATA PELLICCIO - DI'S To CONFER
WITH OMARA.
5- MAUREEN STEFFENSEN /Home PHONE
845-6666, DI'S McCLEAN AND PRESSER
Spoke W/HUSBAND JOHN W/HO STATED
MAUREEN NOT Home AND will FoT call
DIS.

14- DAOK FINACIAL INVESTIGATORS-Chief Bob
Buxton - DOING FINACIAL INVESTIGATION

KCDA001134

## CHRONOLOGICAL DATA SHEET

(4)

| TITLE | | CASE NO. |
|---|---|---|
| DATE | | A.D.A. |

### ACTION

AND DRAWING SUBPOENA TO TWR
JOHN OMARA TO OBTAIN SUBPOENA from
BURTIN, SIGN IT AND SEND IT.

15- SUBPOENA TO Office of COURT ADM.
OMARA TO REVIEW AND DI BAUER
will SEARVE.

KCDA001135

JO-090

# EXHIBIT L

KCDA001136

JO-091



KCDA001137

JO-092



B525-96

John O'Hara

| | DESCRIPTION | CT DATE | ADA | A S | R A | ANS | DATE DEC. | REC. ORDER | JUDGE & DISPOSITION | N E |
|---|---|---|---|---|---|---|---|---|---|---|
| 7/9/01 | CA Order + a Judges that order's affirmed | | Ferrell | | | | | | | |
| 7/7/01 | Atty's motion to vacate | | Bruffee | | | 9/14/01 | | | | |
| 11/14/01 | SCSNY Atty's motion For Evidentiary Hearing Memorandum of Law | | | | | | | | | |

KCDA001138

JO-093

O'Mara ☺

frequently, may have
consulted me

O'Hara did not
mention offer
urges to let L.
confused offer still on table

frequently —
believe —
(in chambers)

"very active"

'I'm the
client
not going
to discuss
it
going to trial

Mr. Hernandez
(212) 663-1555

M.L was
frequent
relating to
case
associate

O'Hara
discussed it ?/
it before trial

going to trial

— want ad to
embarrass
Mr. Hynes

a lot of
conversations
not a passive

KCDA001139

JO-094

13525/96          John O'HARA

| DESCRIPTION | CT DATE | ADA | A S | R A | ANS | DATE DEC. | REC. ORDER | JUDGE & DISPOSITION | N E |
|---|---|---|---|---|---|---|---|---|---|
| Rec'd D'APPLANT'S Reply Brief | | Ferrell | | | | | | | |
| 2nd M/M TO File AMICUS Curie Brief (Atty's) | | ferrell | | | | 2/1/00 | 2/1/00 | granted on w/ before 4-5-2000 | |
| atty's M/M EXT. STAY of Judgment | | ferrell | | | | 4/11/00 | 4/11/00 | Denied as nantenus after prefutes w/18-99 | |
| atty's amicus Curie Brief + appendix | | ferrell | | | 4/6/00 | 7/17/00 | 7/17/00 | returned agunt w/ S.C.E. fa Judgbylaw'd | 7/24/00 |
| CA JUDGE Assig. Hon. Wesley | | ferrell | | | | 9/29/00 | 10/3/00 | | |
| atty's CA Leave Application. | | ferrell | | | | | | Granted | |
| atty's motion request Disclosure of Case | | ferrell | | | | | | | |
| CA Jurisdictio Statement | | ferrell | | | | | | | |

JO-095

**CONVICTION REVIEW UNIT**
**REQUEST FOR ASSIGNMENT OF DETECTIVE / DETECTIVE**
**INVESTIGATOR**

DATE:       5/17/16

ADA:  Mark Hale

BUREAU: Conviction Review Unit

SUPERVISOR:       Mark Hale

CASE NAME AND NUMBER:  People v. John O'Hara 12525/96

    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*
BRIEF DESCRIPTION OF CASE:  John O'Hara was prosecuted three times for election
fraud by the Hynes administration in what is being characterized as malicious prosecution
of a political rival. In addition, the defense has alleged the prosecution was based on
factual inaccuracies and the use of unreliable witness testimony.

INVESTIGATION NEEDED: DI Lanigan has been assisting to locate the approximately
10 witnesses that need to be interviewed.

    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*
DETECTIVE / DETECTIVE INVESTIGATOR:

SUPERVISOR:

DATE ASSIGNED:

DATE COMPLETED:

KCDA001045

JO-096

1

1

2   SUPREME COURT OF THE STATE OF NEW YORK
    COUNTY OF KINGS:   CIVIL TERM - PART 15
3   ------------------------------------------X
    DENNIS L. POL, LISA T. LOPEZ, and
4   FELIX W. ORTIZ,

5                                   Petitioners,

6

7                      -against-

8   THE BOARD OF ELECTIONS In The CITY
    OF NEW YORK and JOHN K. O'HARA,
9

10                                 Respondents
    ------------------------------------------X
11  Index # 23414/94
    ------------------------------------------X
12  In the Matter of the Application of
    ANN ENGLISH,
13
                            Objector-Petitioner,
14

15                      - against -

16  JOHN K. O'HARA, Member of the Assembly
    From the 51st Assembly District, Kings
17  County, New York State,

18                                  Candidate

19                      - and -

20  BOARD OF ELECTIONS IN THE CITY OF NEW
    YORK,
21

22                                 Respondents
    ------------------------------------------X

23                            360 Adams Street
                              Brooklyn, New York
24                            August 3, 4 and 5, 1994

25
                       (Continued on the following page.)

KCDA000719

JO-097

2

1

2

3   B E F O R E:

4                        HONORABLE IRVING S. ARONIN,

5                                              Justice

6

7   A P P E A R A N C E S:

8           WOLFSON & CARROLL
            233 Broadway
9           New York, New York
            BY:  JOHN W. CARROLL, ESQ.
10          For Petitioners Pol, Lopez and Ortiz

11

12          ROBERT MEYERS, ESQ.
            15 Maiden Lane
            New York, New York  10038
13          Attorney for John K. O'Hara

14

15                        MARK L. BOWIN
                  Official Court Reporter
16                  -   -   -   -   -

17          MR. CARROLL:  John Carroll, for the

18   Petitioners, Pol, Lopez and Ortiz.

19          Mr. Ortiz is also an aggrieved candidate.

20          Your Honor, this is an invalidate proceeding.

21   We are proceeding to invalidate Mr. O'Hara on two

22   theories.  Theory number one is a residence

23   theory.  Theory number two is a fraud theory having

24   to do with fraud by subscribing witnesses.

25          We believe that we will establish sufficient

KCDA000720

3

1          Proceedings

2      grounds on both theories to invalidate.

3          We also believe -- assuming this Court did not

4      rule that the petition was invalid merely on the

5      basis of the fraud -- that the fraud that has been

6      committed by particular subscribing witnesses will

7      result in the count coming --

8          THE COURT:  Permiation.

9          MR. CARROLL:  Permiation.

10         And also the count coming below five hundred.

11     Five hundred is required, in this particular case.

12         There were a couple of motions that Mr. Meyers

13     made before Judge Garry, first having to deal with

14     the sufficiency of the bill of particulars.  Judge

15     Garry ruled the bill of particulars was

16     sufficient.  And having to do with a motion to

17     disqualify myself and Mr. Dunbar as counsel in the

18     case, and Judge Garry ruled that neither of us

19     would be disqualified.

20         Mr. Meyers can speak to his grounds on those

21     things.  I believe that's where we are,

22     procedurally.

23         THE COURT:  Well, if there's been a ruling on

24     that, that's already been determined.

25         MR. CARROLL:  I believe, procedurely, your

JO-099

4

Proceedings

1

2      Honor, we need to have a trial on the fraud and

3      residency theories.  We'd like to simultaneously

4      conduct the line-by-line at the Board of

5      Elections.  We did not get a final count, as is

6      often the case.  We'd like to have crews working

7      there under the supervision of a referee --

8              THE COURT:  Hasn't that been done yet?

9              MR. CARROLL:  It has not been done yet.

10             THE COURT:  It may not be necessary, I

11     understand.

12             MR. CARROLL:  That's exactly right.

13             THE COURT:  Because the call that I received

14     was this was based on residency.

15             MR. CARROLL:  Residence and subscribing

16     witness fraud, Judge, which may very well go back

17     to the candidate.  It's fraud and residency and

18     that's all set forth in the bill of particulars.

19             THE COURT:  Come up.

20             (Discussion at the bench off the record.)

21             THE COURT:  You're from the Board.  You have

22     the original petitions.

23             They'll be returned to the Board of

24     Elections.  We're going to use the copies here.

25     Even if we need them for the fraud, we'll use them

FORM C-100 - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

JO-100

5

1          Proceedings

2    here based on the fraud.  They're going to start

3    the line-by-line.  They'll have a crew starting the

4    line-by-line tomorrow morning.

5          We stand in recess until 2 o'clock.

6          (Present are attorneys Carroll and Meyers.)

7          THE COURT:  Arrangements have been made for

8    tomorrow morning at 9:15 you can go to the Board of

9    Elections; see Mr. Fenchel, Sherwin Fenchel

10   (phonetic).  He is in charge of the operation,

11   checking petitions at the at the Board of

12   Elections.

13         Okay.  Are we ready to proceed?

14         MR. CARROLL:  The petitioners are ready, your

15   Honor.

16         THE COURT:  Respondent?

17         MR. MEYERS:  We're ready, your Honor.

18         While we're waiting for the clerk, could we

19   take care of one or two preliminary matters?

20         (Whereupon, the Clerk entered the

21   courtroom.)

22         THE COURT:  We have two proceedings.

23         MR. CARROLL:  Yes, and they're for joint

24   trial, and I'll be putting in evidence with respect

25   to both proceedings.  I'm taking the lead on it.

FORM C-100 · LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

JO-101

6

1              Proceedings

2        Mr. Dunbar is on trial before Mr. Justice Garry on

3        another matter.

4              THE COURT:  I see.  And you originally were

5        the attorney representing who?  Pol or English?

6              MR. CARROLL:  Pol.

7              THE COURT:  So Mr. Dunbar was representing

8        English?

9              MR. CARROLL:  Ms. English, that's correct.

10             MR. MEYERS:  Your Honor, if I may.

11             THE COURT:  Yes.

12             MR. MEYERS:  According to the

13       petitioners' -- both Petitioners' bill of

14       particulars and offers of proof, there are a large

15       number of people who they have intent or believe

16       that they will subpoena and, in fact, there are

17       witnesses who were subpoenaed in this courthouse

18       today.

19             I would like to request -- and I think that

20       the petitioner will consent -- that during this

21       proceeding, that all subpoenaed witnesses, except

22       for parties, be excluded from the courtroom.

23             THE COURT:  Certainly.  You're entitled to

24       that.

25             MR. MEYERS:  Thank you, your Honor.

7

1          Proceedings

2          THE COURT:  If there are any witnesses in this

3     proceeding other than the parties to the

4     proceeding, please wait until you're called to be

5     witnesses.

6          MR. CARROLL:  The only witness in the room,

7     your Honor, is Mr. Parras.  He's the first

8     witness.

9          THE COURT:  Okay.  That we'll understand.

10          MR. MEYERS:  That's fine, your Honor.

11          THE COURT:  Where is the bill of particulars?

12          MR. CARROLL:  I have a copy, your Honor, but

13     it is my working copy.  It is the big two volumes

14     of paper.  This is the bill of particulars

15     (indicating).  This is the aggrieved candidate

16     spec.  This is where the aggrieved candidate

17     supplemented the specifications of the Board and

18     this is the bill of particulars (indicating).

19          THE COURT:  Who made the exmarks on here?

20          MR. CARROLL:  On the petitions, Judge?

21          THE COURT:  Yes.

22          MR. CARROLL:  What those indicate is that

23     those are potential witnesses from those pages.

24          We're limiting ourselves to calling these

25     people, should it prove necessary; not all of the

JO-103

8

```
 1              Proceedings
 2      people in the petition, just the ones with an X on
 3      their name.
 4              THE COURT:  Are we ready to proceed?
 5              MR. CARROLL:  Year.  Ready to proceed, your
 6      Honor.
 7              THE COURT:  Anybody wish to make an opening
 8      statement or are you ready to proceed with your
 9      first witness?
10              MR. CARROLL:  We would like to make an opening
11      statement.
12              Would you like me to exclude Mr. Parras while
13      I make my opening statement?
14              THE COURT:  Please do.
15              MR. CARROLL:  Mr. Parras, will you step
16      outside while I make my opening statement.
17              (Mr. Parras left the courtroom.)
18              MR. CARROLL:  Your Honor, the portion of this
19      matter that is before the Court at this moment --
20      understanding that we're going to recommence the
21      line-by-line tomorrow -- deals with two theories,
22      each of which we believe invalidates the candidacy
23      of John K. O'Hara for Assembly in the 51st Assembly
24      District.
25              Theory number one is a residence theory.
```

JO-104

9

```
 1              Proceedings
 2          The New York State Constitution provides that
 3      for someone to be qualified to be elected to the
 4      New York Legislature, they have to be a resident of
 5      the political subdivision for one year prior to
 6      election.  That means that as of November of this
 7      year, when the general election takes place,
 8      Mr. O'Hara will have to have been a resident of the
 9      51st Assembly District for a year.
10          We will establish, through the testimony that
11      we're going to introduce, that Mr. O'Hara was not a
12      resident of the 51st Assembly District for the
13      requisite one-year period, that, in fact, he does
14      not reside in the First Assembly District; that the
15      address set forth on his petition, which I believe
16      is 6017 Fourth Avenue, is in fact a fictitious
17      address; that he does not reside there; that he has
18      no substantial contacts with that address.
19          We will also establish, your Honor, that
20      Mr. O'Hara has run for public office four or five
21      times in the last five or six years; that each time
22      he runs, he runs from a different address; that he
23      has had no contacts with these addresses and, in
24      fact, he has had ongoing contacts with an address
25      that has nothing to do with any of these districts,
```

KCDA000727

FORM C-100 - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

JO-105

10

1    Proceedings

2    and that this is, in fact, his fixed, permanent

3    place of abode, his domicile, not located in the

4    district that he is running and that that address

5    is an address on Sixth Avenue, I believe -- On 61st

6    Street in Brooklyn, excuse me, your Honor --

7        And that that is an address on 61st Street in

8    Brooklyn which is not in the 51st Assembly

9    District.

10        Also having to do with the residence part of

11   the case, your Honor, but also having fraud

12   overtones, fraud overtones that go to the question

13   of the candidate's veracity is the information he

14   has consistently supplied to the Board of

15   Elections.

16        Mr. O'Hara contends that he moved into the

17   address on his petition or he reregistered at the

18   address on his petition last January, January 20,

19   1994.

20        Mr. O'Hara moved into the address that he has

21   set forth on his petition in the 51st Assembly

22   District, which is 6017 Fourth Avenue in Brooklyn,

23   reregistered there on January 20th, 1994.

24        At the time of his reregistration -- we will

25   be introducing the buff cards shortly -- at the

FORM C-100 - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

KCDA000728

JO-106

11

1        Proceedings

2        time of his reregistration, he indicated that he

3        had lived there for three months before he

4        reregistered to vote.  He voted from -- the address

5        he voted from previously was an address on 47th

6        Street in Brooklyn, not inside the 51st Assembly

7        District.

8            THE COURT:  Did that overlap the previous

9        election date?

10           MR. CARROLL:  It does overlap the previous

11       election date, your Honor.  I'm informed by

12       Mr. Keefe that I am wrong when I say it is not in

13       the 51st Assembly District.  It is in the 51st

14       Assembly District, that previous address, but the

15       interesting thing, your Honor, is this goes to the

16       question of the validity of his registration and

17       enrollmentment is that we will produce evidence

18       here that he never resided at all under any

19       circumstances whatsoever at that previous address,

20       that he had no contacts with it at all and that,

21       therefore, this Court can make no conclusion based

22       upon that on how long he has, in fact, been in the

23       51st Assembly District, number one, and, number

24       two, that the information he supplied to the Board

25       of Elections as to his prior residence is false;

JO-107

12

| | |
|---|---|
| 1 | Proceedings |
| 2 | that it was a material false statement in his |
| 3 | statement in his registration form provided by him, |
| 4 | that this is a felony under two provisions of the |
| 5 | Election Law; it voids his enrollment and I suggest |
| 6 | is sufficient in and of itself to invalidate his |
| 7 | candidacy. |
| 8 | Moving from the residence dimensions of this |
| 9 | case to the fraud dimensions -- remember, there is |
| 10 | a fraud dimension to the residency area as well but |
| 11 | in this case, we will be producing testimony from a |
| 12 | series of individuals whose signatures were taken |
| 13 | and whose subscribing witnesses subscribed for, and |
| 14 | these individuals will testify that they did not |
| 15 | sign the petition for the subscribing witness who |
| 16 | witnessed the petition. |
| 17 | And, what's more, your Honor, they will |
| 18 | testify that the person who took their signature |
| 19 | but did not witness it on the petition was the |
| 20 | candidate.  Once again, candidate fraud. |
| 21 | That is where we are going in this case. |
| 22 | We are prepared to begin producing our |
| 23 | witnesses now. |
| 24 | THE COURT:  How many do you allege -- how many |
| 25 | signatures do you allege were involved in the |

JO-108

FORM C-100 - LASER REPORTERS PAPER & MFG. CO.  800-626-6313

13

1          Proceedings

2    subscribing witness not taking them?

3          MR. CARROLL:  We'll be able to produce proof

4    as to fifteen, twenty, thirty; I'm not sure exactly

5    how many we can get in here.  But the collective

6    number of signatures witnessed by these subscribing

7    witnesses -- who, I suggest to the Court, after the

8    proof comes in, that they did not take these

9    signatures; it would be impossible to give credence

10   to any of their signatures -- will run into the

11   hundreds, your Honor; hundreds and hundreds.

12          That's where I indicated that it might very

13   well get to the point, when we begin knocking out

14   subscribing witnesses, that we need to know what

15   the count is.

16          THE COURT:  Okay.  Come up, counselors.

17          (Discussion at the bench off the record.)

18          MR. MEYERS:  Your Honor, before we begin, may

19   I make a motion?

20          THE COURT:  You certainly may.

21          MR. MEYERS:  Thank you, sir.

22          Your Honor, earlier, prior to being sent to

23   this part, I made a motion in front of Judge Garry

24   to have Jerry Dunbar and Jack Carroll removed --

25   disqualified.

14

| | |
|---|---|
| 1 | Proceedings |
| 2 | THE COURT:  Who? |
| 3 | MR. MEYERS:  Jerry Dunbar -- |
| 4 | MR. CARROLL:  Mr. Dunbar is the attorney |
| 5 | representing Miss English in the other proceeding. |
| 6 | THE COURT:  Who's Mr. Dunbar?  Is he here? |
| 7 | MR. CARROLL:  He's the one who's on trial |
| 8 | before Judge Garry. |
| 9 | MR. MEYERS:  He's turned this case over to |
| 10 | Mr. Carroll to try today.  I made that motion based |
| 11 | on the fact that Mr. Dunbar represented Mr. O'Hara |
| 12 | last year before this Court. |
| 13 | I now would like to make a motion for |
| 14 | reargument on that based on the opening statements |
| 15 | of Mr. Carroll, since Mr. Carroll stated that part |
| 16 | of his case will consist of an alleged |
| 17 | falsification of his prior residence, not the |
| 18 | residence that he's claiming on these petitions but |
| 19 | his residence prior to these petitions, that |
| 20 | counsel be removed because -- |
| 21 | THE COURT:  Which counsel? |
| 22 | MR. MEYERS:  Both counsel, your Honor.  And |
| 23 | I'll explain why -- |
| 24 | MR. CARROLL:  Your Honor, I have never had |
| 25 | anything to do -- |

KCDA000732

FORM C-100 - LASER   REPORTERS PAPER & MFG. CO   800-626-6313

JO-110

15

1          Proceedings

2          THE COURT:  Which counsel are you talking

3      about?

4          MR. MEYERS:  Both Mr. Dunbar and Mr. Carroll.

5          THE COURT:  He's not trying the case in front

6      of me, is he?

7          MR. MEYERS:  Your Honor, if you'll give me one

8      moment to explain.

9          Mr. Dunbar represented Mr. O'Hara in an issue

10     involving the previous address last year in this

11     Court.  From what I understand, though I don't have

12     the case in front of me, Mr. Carroll informs me

13     that that case was withdrawn.

14         MR. CARROLL:  That is correct.

15         THE COURT:  So it wasn't tried.

16         MR. MEYERS:  It was not tried, but there is an

17     attorney-client privilege which exists --

18         THE COURT:  I was not questioning whether

19     there was an attorney-client privilege.

20         MR. MEYERS:  The Canons of Ethics, actually

21     Canon Number Four, prohibits an attorney from

22     representing someone against a former client,

23     especially when it is in a situation that is

24     identical or close to that which he represented

25     that client.

KCDA000733

JO-111

16

Proceedings

There are numerous cases from the Court of Appeals as late as --

THE COURT: What did Judge --

MR. MEYERS: Judge Garry denied it, but there's a new element here because Mr. Carroll in his opening statement stated that they intend to prove that the previous address was false.

THE COURT: Counsel, I heard.

MR. MEYERS: Now, your Honor, that canon goes to not only the attorney who represented but associate members of the firm, etcetera, that are involved with that.

By joining this trial and by Mr. Carroll taking the lead in this trial and by Mr. Dunbar not appearing here, Mr. Carroll has become an associate of Mr. Dunbar and is privy to information that would not normally be allowed to be disclosed due to the attorney-client privilege.

MR. CARROLL: Your Honor, may I be heard on that?

THE COURT: Yes, you may.

MR. CARROLL: Point number one, I have never represented Mr. O'Hara on any matter, under any circumstances.

JO-112

17

1          Proceedings

2          Point number two.  This case has been

3   independently developed by my office.  We have

4   independently interviewed the witnesses.  In fact,

5   if you will examine the bills of particulars,

6   Mr. Dunbar adopted my bill of particulars and

7   incorporated it by reference.  Any evidence which

8   is adduced, I can assure the Court, was developed

9   by me independently.

10          Merely because of the vagaries of the trial

11   schedules here and the Election Justice, Garry,

12   ordered Mr. Dunbar to trial in another matter;

13   since these trials both involve the same issues --

14          THE COURT:  And there were two independent

15   petitions involved?

16          MR. CARROLL:  Absolutely totally independent,

17   Judge.

18          THE COURT:  Okay.  Anything else?

19          MR. MEYERS:  No, sir.

20          THE COURT:  Well, I can understand your motion

21   regarding Mr. Dunbar, and I think that Mr. Dunbar

22   will not be able to represent the petitioners in

23   this matter.

24          However, I find no such encumbrance on

25   Mr. Carroll, and Mr. Carroll will be able to --

KCDA000735

FORM C-100 - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

18

```
 1              Proceedings
 2              MR. CARROLL:  Thank you, your Honor.
 3              THE COURT:  -- continue as counsel in this
 4         case.
 5              MR. MEYERS:  Please note my exception.
 6              THE COURT:  You have your exception, Counsel.
 7              MR. MEYERS:  Thank you.
 8              MR. CARROLL:  Your Honor, our first witness is
 9         Mr. Parras.
10              THE COURT:  Call your first witness.
11              Counselor, you don't want to have an opening
12         statement?
13              MR. MEYERS:  Your Honor, I'd like to reserve
14         my opening statement for the beginning of my case.
15              THE COURT:  You certainly may.
16    Q U E R U B I N   P A R R A S, called as a witness by the
17         Petitioners, residing at 348 Highbrook Avenue,
18         Pelham, New York 10803, having been duly sworn,
19         testified as follows:
20              THE CLERK:  State your name for the record,
21         please.
22              THE WITNESS:  My name is Querubin,
23         Q-u-e-r-u-b-i-n, is first name, Parras,
24         P-a-r-r-a-s.
25              THE CLERK:  Mr. Parras, would you state your
```

KCDA000736

FORM C-100 · LASER   REPORTERS PAPER & MFG CO.  800-626-6313

19

```
 1                    Parras - Direct/Carroll
 2              address for the record, please.
 3                    THE WITNESS:  Yeah, my address from where I
 4              live?
 5                    THE CLERK:  Yes.
 6                    THE WITNESS:  348 Highbrook Avenue, Pelham,
 7              New York.  Code area 10803.
 8                    THE COURT:  Okay.  You may proceed.
 9   DIRECT EXAMINATION
10   BY MR. CARROLL:
11        Q    Thank you for coming, Mr. Parras.
12             Did you receive a subpoena asking you to produce
13   various documents when you came to court today?
14        A    Yes, I received a notice.
15        Q    And have you brought those documents with you?
16        A    Yes, I have all of them with me.
17        Q    May I see them, sir?
18        A    Yes.  Here is all together and this I -- all the
19   information from here I put all together in that binder
20   (handing).
21        Q    Mr. Parras, are you the owner of any real estate in
22   the Borough of Brooklyn?
23        A    Yes, sir.
24        Q    Do you own a property on 61st Street in Brooklyn?
25        A    579 61st Street.
```

1                          Parras - Direct/Carroll

2        Q    You are the owner of that building?

3        A    I am the owner of 44-family apartment building.

4        Q    Are you familiar with a gentleman by the name of

5   John K. O'Hara?

6        A    He's one of my tenant.

7        Q    At what building is he a tenant?

8        A    In the 579 61st Street.

9        Q    How long have you known Mr. O'Hara?

10       A    I think that he first -- according to the record I

11  have there, the first movement was in November 1982 until

12  this time.

13       Q    And he is still a resident of that apartment?

14       A    He still having the apartment.

15       Q    What sort of building is this?  Is this a

16  residential building?

17       A    Residential.

18       Q    Are there any businesses in this building?

19       A    No business.  No commercial.

20       Q    No commercial at all.

21       A    No.

22       Q    Does anyone maintain offices in this building?

23       A    No.

24       Q    So it's a purely residential apartment building?

25       A    Yeah, all of them.

FORM C-100 - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

JO-116

21

1                      Parras - Direct/Carroll

2        Q    Have you had a lease with Mr. O'Hara during that

3    whole period?

4        A    I have all the leases from the beginning from 1982.

5        Q    I would ask you to look at this document which I

6    asked you to produce.  Are these the leases for Mr. O'Hara

7    for that apartment?

8        A    Yes, all of these there.

9        Q    Included in these are from 1982 until the present?

10       A    From 1982 until this time, 1994.

11            MR. CARROLL:  Can we have this marked as

12       Petitioners' --

13            THE COURT:  Hold it; hold it.

14            MR. CARROLL:  Thank you, your Honor.

15            (Handing to Mr. Meyers.)

16            MR. MEYERS:  Your Honor, I object to this

17       evidence being admitted.  This evidence -- these

18       leases purport -- well, there's a conflict,

19       actually, on some of these leases as to the dates,

20       but the latest expires in 1992, and that's not a

21       year that's in issue here, your Honor.

22            THE COURT:  Let me see it, please.

23       Q    Do you have a lease for the period 1992 through the

24    present with Mr. O'Hara?

25            THE WITNESS:  1992 has to be there, on the

JO-117

22

1                        Parras - Direct/Carroll

2            record is there.

3        Q    Would you check through there, sir.

4        A    Yes.

5        Q    Have you in fact entered into a lease with

6   Mr. O'Hara for that period?

7        A    Pardon me.  I'm no very well English speaker.  Ask

8   me the question slow, please.

9        Q    Have you entered into a lease with Mr. O'Hara for

10  the period 1992 through the present -- through 1994?

11       A    Yes.  Yes, I think is -- what happen is we send a

12  notification to him and he probably will be receiving or the

13  super have the white copy, the original one.

14       Q    Do you have a copy of the lease for 1992?

15       A    Should be, should be.

16            THE COURT:  Take a look.

17            THE WITNESS:  It should be.  You check over

18            there to see.  Have to be there.

19       Q    I certainly will.

20       A    Sometime he was a little delayed sending the

21  leases, the copy back.

22            THE COURT:  Well, it wouldn't be two years.

23            THE WITNESS:  It's not here.  Have to be the

24            white part of this one, the blue one (indicating).

25       Q    Mr. Parras, are you familiar with the tenants

KCDA000740

JO-118

23

Parras - Direct/Carroll

1

2  currently in occupancy at your building at 44th Street -- or

3  at 61st Street?

4      A    If I am?  Repeat the question?  If I am familiar?

5      Q    Are you familiar with the tenants at your building

6  on 61st Street?

7      A    I am familiar with all of them.

8      Q    Is Mr. John Kennedy O'Hara still residing at the

9  building at 579 61st Street?

10     A    Yes, sir.  He's still there, living there.

11     Q    Do you receive rent payments from him?

12     A    He pay direct to the super.  He's up to date with

13 the rent.

14     Q    Okay.  Does the super notify you if she doesn't or

15 he doesn't receive rent payments?

16     A    The super notify me when somebody no pay.

17     Q    Has the super notified you that John Kennedy O'Hara

18 has not paid his rent?

19     A    No.

20     Q    As far as you know, as the owner of the building,

21 he continues to make payments?

22     A    Yes, sir.

23     Q    When was the last time you were at the building,

24 sir?

25     A    The last time I was in the building was a couple

KCDA000741

JO-119

24

1                    Parras - Direct/Carroll

2    weeks ago.

3        Q    When was the last time you saw John Kennedy O'Hara

4    at the building?

5        A    Its more than six months.  I do not see very

6    frequently him there.

7        Q    But you've seen him within the last five or six

8    months?

9        A    Right.

10       Q    Sometime in 1994, you have seen him at 579 61st

11   Street, within the last five or six months?

12       A    Yes, sir.  I see him in the beginning of 1994.

13       Q    Now, we asked you, pursuant to subpoena, to produce

14   the leases up through today, correct?

15       A    (Nodding.)

16       Q    And you believe that Mr. O'Hara was given a lease;

17   is that correct?

18       A    Yes.  Have to be someplace.

19       Q    But you did not produce it today?

20       A    I cannot produce it today.

21              MR. CARROLL:  We would ask you to produce that

22              at some future date, sir.  But we have no further

23              questions of this witness.

24              THE COURT:  Will you please produce that

25              lease.

FORM C-100 · LASER · REPORTERS PAPER & MFG. CO.  800-826-6313

JO-120

25

Parras - Direct/Carroll

1

2      THE WITNESS:  I will make all the step for

3   find the --

4      THE COURT:  Are you offering that

5   (indicating)?

6      MR. CARROLL:  I am offering these copies of

7   the leases for the last ten years into evidence,

8   your Honor, and he we will be producing the 1994

9   lease.

10      MR. MEYERS:  Your Honor, I move those not be

11   accepted into evidence.  They're not --

12      THE COURT:  We'll mark it for identification

13   as Plaintiff's Exhibit 1 in light of the fact that

14   the witness has testified that Mr. O'Hara still

15   lives there, with or without a lease.  However, he

16   testified that there is a lease and that he will

17   produce it.

18      I'm going to mark it in evidence as

19   Petitioners' Exhibit 1.

20      You have your exception.

21      MR. CARROLL:  Thank you, your Honor.

22      (So marked.)

23      THE COURT:  You may inquire, sir.

24      MR. MEYERS:  Thank you, your Honor.

25   CROSS-EXAMINATION

FORM C-100 - LASER   REPORTERS PAPER & MFG. CO.  800-626-6313

JO-121

26

1                    Parras - Direct/Carroll

2    BY MR. MEYERS:

3        Q    Good afternoon, Mr. Parras.

4             Mr. Parras, you said that the last time that you

5    were at your building was two weeks ago; is that correct?

6        A    Two weeks ago.

7        Q    And how often do you visit your building?

8        A    I -- we -- very frequently.  There a couple time in

9    the week but this time -- the last time I was was a couple

10   of weeks ago.

11       Q    When you go to your building, what do you normally

12   do there?

13       A    Beg your pardon?

14       Q    When you go to your building, what do you normally

15   do when you're there?

16       A    I'm the person that do maintenance with my worker

17   because I have other building, too.  And because I have some

18   other building, I have two men that working continually with

19   me for giving maintenance.

20       Q    Do you visit individual apartments?

21       A    Individual apartments?  I visit individual

22   apartment when they have some complaint that have to correct

23   something.

24       Q    Have you ever been in the apartment that you allege

25   is Mr. John O'Hara's?

FORM C-100 - LASER   REPORTERS PAPER & MFG CO   800-626-6313

KCDA000744

JO-122

27

Parras - Cross/Meyers

1

2      A      I have not been for the beginning when he moved to

3  that apartment, 2-I.

4      Q      You haven't been there since then?

5      A      I haven't been there.

6      Q      And you say that he first moved in in 1982?

7      A      First he was living in the apartment 3-H.  And from

8  3-H he moved to the 2-I.

9      Q      In 1982?

10      A      2-I, he moved later in I think '91 or something

11  like that.  1991.

12              THE COURT:  Excuse me.  When did he move from

13              2-I --

14      A      He move in 2-I -- here the lease.

15              THE COURT:  To 2-H.

16              MR. CARROLL:  3-H to 2-I.

17              THE COURT:  From 3-H to 2-I, when did he

18              move?

19              THE WITNESS:  He move, I think, in 1992.

20              THE COURT:  In 19 --

21              THE WITNESS:  1992.

22              THE COURT:  1992?

23              THE WITNESS:  Yes, sir.

24              THE COURT:  I see.

25      Q      Have you been in either of those two apartments

JO-123

28

                              Parras - Cross/Meyers

1
2    since 1982, either 3-H or 2-I?

3        A    In 3-H -- in the 3-H, I have been before.

4        Q    When were you last in 3-H?

5        A    About three years ago, three or four years ago.

6        Q    Okay.

7        Q    When was the last time you were in apartment 2-I?

8        A    When we was repairing completely for rented to him

9    for the first time the 2-I.

10       Q    But you haven't been there since?

11       A    After that, I no make inside of the apartment.

12       Q    So you don't have any idea what's inside of that

13   apartment?

14       A    No.

15       Q    Have you ever seen Mr. O'Hara --

16            Strike that.

17            THE COURT:  Anything else?

18            MR. MEYERS:  Yes, your Honor, I'm just

19            checking something on these leases.

20       Q    You had mentioned that the last time you saw

21   Mr. O'Hara was approximately five months ago; is that

22   correct?

23       A    On the beginning of January, I think, 1994.

24       Q    And prior to that, do you remember when the last

25   time you saw him was?

KCDA000746

29

1                     Parras - Cross/Meyers

2       A    I have no been seeing him.

3       Q    So within the last two years, you've only seen him

4   in January of 1994 at your building?

5       A    Before 1994, I saw him a couple time in the 1993.

6       Q    You saw him a couple of times in 1993.  When in

7   1993 did you see him?

8       A    I no remember exactly the date.  But I saw him a

9   couple time in the building.

10              MR. MEYERS:  At this time, your Honor, I have

11          no further questions.

12              THE COURT:  Anything else?

13              MR. MEYERS:  Not at this time, your Honor

14   REDIRECT EXAMINATION

15   BY MR. CARROLL:

16       Q    Mr. Parras, you don't live at 579 61st Street, do

17   you?

18       A    I do not live there.

19       Q    And you're not there on a daily basis, are you?

20       A    No very frequently.

21       Q    Mr. Parras, I'm going to show you two checks and

22   ask you to examine them and examine the endorsements on them

23   and tell me if you recognize those checks.

24              MR. MEYERS:  Your Honor, I'm going to object.

25          If this is redirect, this is beyond what he was

JO-125

30

1              Parras - Redirect/Carroll

2        questioning before.

3              THE COURT:  I'm going to sustain the

4        objection.

5    A    The --

6              MR. CARROLL:  The question is withdrawn.

7              I have no further questions.

8              THE COURT:  You may step down, sir.

9              MR. PARRAS:  Excuse me, sir.  Can I have a

10       receipt for that binder?  I have to leave.

11             MR. CARROLL:  Your Honor, I have undertaken,

12       with Mr. Parras -- I told him these will be

13       introduced in evidence, and I will tell him on the

14       record, I will undertake to return them after the

15       trial.

16             THE COURT:  Mr. Parras, you said you will get

17       the lease?

18             MR. PARRAS:  I will try to.

19             MR. CARROLL:  We will speak to you.  It's very

20       important.  We will make arrangements for it.  You

21       will check with your superintendent.

22             THE COURT:  Call your next witness.

23   R O B E R T O   L O Z A N O, residing at 553 47th Street,

24       Brooklyn, New York, called as a witness by the

25       Petitioners, having been duly sworn, testified as

KCDA000748

JO-126

31

                    Parras - Redirect/Carroll

1

2          follows:

3              THE CLERK:  May I have your full name and

4          address for the record.

5              THE WITNESS:  Roberto Lozano, L-o-z-a-n-o, 553

6          47th Street.  Roberto, R-o-b-e-r-t-o.

7              THE CLERK:  Do you have a zip code on that?

8              THE WITNESS:  Two two zero.

9   DIRECT EXAMINATION

10  BY MR. CARROLL:

11      Q   Mr. Lozano, thank you for coming.

12          You've stated that you live at 553 47th Street; is

13  that correct?

14      A   Yes.

15      Q   How long have you lived there?

16      A   Lived there for about two years now.

17      Q   Two years now?

18      A   Yes.

19      Q   When did you first move in?

20      A   November '92, I think.

21      Q   November 1992.

22      A   Yes.

23      Q   Okay.  Do you know who the owner of that property

24  is?

25      A   Was Magaly Lucas.

FORM C-100 · LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

JO-127

32

Lozano - Direct/Carroll

1

2   Q    Who is the owner at this point?

3   A    We are.

4   Q    When you say "we are," who is "we"?

5   A    Well, there's myself, Quesal Martinez and Ralph

6   Munoz.

7            THE COURT:  Is he a lawyer, Ralph Munoz?

8            THE WITNESS:  No.

9            THE COURT:  Go ahead.

10  Q    We'll go back to where we were, sir.

11       You and a group of individuals are currently the

12  owner of that building.

13  A    Yes.

14  Q    When did you buy the building?

15  A    Proceedings were -- we started in 1990, I think it

16  was, and that's when we started, like, moving in and stuff.

17  We gave the final --

18            THE COURT:  Please speak up, sir.  The

19            question was, when did you buy the building?

20            THE WITNESS:  We bought the building.  We

21            finished -- when we finally gave the rest of the

22            money in was -- when was it? -- November of '92.

23            Yeah, November '92.

24  Q    Mr. Lozano, I'm going to show you a printout from

25  the New York City Department of Finance regarding transfers

KCDA000750

JO-128

33

Lozano - Direct/Carroll

1

2  of business records, and I ask you to look at the line

3  relating to the transfer from Magaly Lucas to you and your

4  partners and the date and ask if that refreshes your

5  recollection as to the date that you purchased the property

6  (indicating).

7      A    Yeah.  I think so.

8      Q    What is the date that you purchased the property?

9      A    '93.

10     Q    Is that November of 1993?

11     A    Yeah.

12     Q    And was there a period of time before you

13  transferred the property or purchased the property that you

14  lived at the building?

15     A    Yes.

16     Q    And how long was that?

17     A    That was about a year before that.

18     Q    So you moved in in November of 1992?

19     A    Yes.

20     Q    You were a tenant of Ms. Lucas and then you

21  purchased the building in November of 1993?

22     A    Yes.  We rented with option to buy.  That's the way

23  it was.

24     Q    So you have been in that building continuously

25  since November 1992?

34

1                    Lozano - Direct/Carroll

2        A    Yes, sir.

3        Q    Are you familiar with all of the people who have

4   resided at that building since November 1992?

5        A    Yes.

6        Q    Do you know an individual named John Kennedy

7   O'Hara?

8        A    Yes.

9        Q    Has Mr. O'Hara resided in that building since

10  November 1992?

11       A    No.

12       Q    Did he reside in the building while you were a

13  tenant?

14       A    No.

15       Q    Has he resided in the building since you have been

16  the owner of the building?

17            MR. MEYERS:   Objection, your Honor.

18       A    No.

19            THE COURT:   Overruled.

20            MR. MEYERS:   This is not an address that he's

21       even discussed.

22            MR. CARROLL:   It most assuredly is.

23            THE COURT:   Objection's overruled.

24       Q    Did there ever come a time when you had a

25  conversation with Mr. O'Hara regarding his association with

JO-130

35

Lozano - Direct/Carroll

1

2      the building?

3            Did Mr. O'Hara ever speak to you about the

4      building?

5        A    He told me that he --

6        Q    Did he ever speak to you about the building?

7        A    No.

8        Q    Did he ever come to you and talk to you --

9      Mr. O'Hara?

10       A    Yeah.  We spoke a few times.

11       Q    What did he say to you regarding the building, the

12     address?

13       A    That if his mail comes there, can I have it.  I say

14     yeah, you could have your mail.

15       Q    Did he ever state anything to you about how you

16     should respond if somebody asked if he lived there?

17       A    He said, "If somebody asks I live here, tell them I

18     live here."

19       Q    And how did you respond to that?

20       A    I said, "Well, if you want an apartment -- if you

21     want to rent a room, you could always rent a room."

22       Q    And did he ever rent a room?

23       A    No, sir.

24            MR. CARROLL:  I have no further questions of

25            this witness -- individual.

JO-131

36

1              Lozano - Direct/Carroll

2              THE COURT:  You may inquire.

3              MR. MEYERS:  Thank you, your Honor.

4    CROSS-EXAMINATION

5    BY MR. MEYERS:

6        Q    Mr. Lozano, how do you know Mr. O'Hara?

7        A    Well, he came by.  He came by, talked to the people

8    on the block.

9        Q    And the first time you met him was when?  Do you

10   remember?

11       A    I don't exactly remember the date.

12       Q    Would you say that it was five years ago?

13       A    No.  I don't know five years ago.  I didn't live

14   there five years ago.

15       Q    Would you say it was three years ago?

16       A    No, sir.

17       Q    Well, approximately when was the first time you met

18   Mr. O'Hara?

19       A    When I -- about '93 or '92, he came around.  He

20   looked -- he started talking to the people in the

21   neighborhood.

22       Q    Do you remember what he was talking about?

23       A    Yeah, he just -- I guess he was campaigning around

24   the neighborhood, and he told me if any mail's there for

25   him, and there was some mail there.  I gave it to him.

KCDA000754

JO-132

37

1                    Lozano - Cross/Meyers

2       Q     Did Mr. O'Hara know any of the other owners of this

3    property?

4       A     He knew Magaly Lucas, maybe.

5       Q     Did any of your fellow co-owners ever talk to you

6    about Mr. O'Hara?

7       A     No.  We might have a conversation in the

8    neighborhood, but that's about it.  I mean, you know,

9    conversation, you walk down the street and say, "What's up?

10   How you doing?"  And that was it.

11      Q     How many units are in the building?  Do you know?

12      A     There's three floors and the basement.

13      Q     And how many units are in the building?

14      A     There's one, two, three, four, five, six.

15      Q     Six units?

16      A     Six or seven, yes.

17      Q     Do you rent those unit out?

18      A     Yes.

19      Q     How many of those units are rented?

20      A     Right now, all of them.

21      Q     You live there also as well?

22      A     Yes.  That's including myself.

23      Q     What's including yourself?

24      A     Seven units, including myself.

25            MR. MEYERS:  Your Honor, at this time, I don't

KCDA000755

JO-133

38

1                    Lozano - Cross/Meyers

2          have any further questions.

3              THE COURT:  Do you have anything further?

4              MR. CARROLL:  I have nothing further.

5              THE COURT:  You may step down, sir.

6              MR. CARROLL:  Our next witness, we have a lady

7          from Brooklyn Union Gas, your Honor, who I said I

8          would get in and out as quickly as I could.

9              If you could bring in the lady from Brooklyn

10         Union Gas.

11  J O A N   K L E P A C K I, 2502 East 19th Street, Brooklyn,

12         New York, called as a witness by the Petitioners,

13         having been duly sworn, testified as follows:

14              THE CLERK:  May I have your full name and

15         address for the record.

16              THE WITNESS:  Joan Klepacki, 2502 East 19th

17         Street, Brooklyn, New York, 11235.

18  DIRECT EXAMINATION

19  BY MR. CARROLL:

20      Q    Thank you for coming, Miss Klepacki.

21           Are you employed?

22      A    Yes.

23      Q    By whom?

24      A    Brooklyn Union.

25      Q    How long have you worked for them?

FORM C-100 - LASER  REPORTERS PAPER & MFG. CO  800-626-6313

JO-134

39

Klepacki-Direct/Carroll

1

2      A      Twenty-two years.

3      Q      What are your your responsibilities?

4      A      I'm an accounting clerk.

5      Q      In your capacity as an accounting clerk, are you

6  familiar with the books and records of Brooklyn Union Gas?

7      A      Yes.

8      Q      And did I -- are you responding to a subpoena

9  today?

10     A      Yes.

11     Q      And were certain documents asked to be produced

12 pursuant to that subpoena?

13     A      Yes.

14     Q      May I see them, ma'am?

15     A      Sure.

16            (Mr. Carroll hands to Mr. Meyers.)

17            MR. MEYERS:  Your Honor, at this time I have

18            no objection.  I reserving the right to object

19            after I see where counsel is going with this

20            information.

21            THE COURT:  I haven't heard anything yet.

22            MR. MEYERS:  Thank you, your Honor.

23            THE COURT:  Let me hear it.

24            MR. CARROLL:  Could we have these marked for

25            identification.

JO-135

40

Klepacki-Direct/Carroll

1

2          THE COURT:  Mark it as Petitioners' Exhibit 2

3      for identification.

4          MR. CARROLL:  Consisting of 19 pages.

5          (Petitioner's Exhibit 2 for identification, so

6      marked.)

7    Q    Miss Klepacki, I'm going to you to show you the

8  documents which you just provided me and have been marked

9  for identification as Petitioners' Exhibit 2.

10         I believe you've already testified you're familiar

11 with the records of the Brooklyn Union Gas; is that correct?

12   A    Yes.

13   Q    Are these particular documents -- are these

14 particular documents part of the books and records of

15 Brooklyn Union Gas Company?

16   A    Yes, they are.

17   Q    And were these particular documents kept in the

18 normal course of business?

19   A    Yes.

20   Q    And were these particular records produced in the

21 normal course of business?

22   A    Yes.

23         MR. CARROLL:  Your Honor, I would move the

24      introduction of these documents.

25         MR. MEYERS:  Again, your Honor, I still

JO-136

41

Klepacki-Direct/Carroll

1

2          haven't heard where counsel's going with this.  I

3          won't object at this time.

4              THE COURT:  Without objection, mark it

5          Petitioners' Exhibit 2 in Evidence.

6              (Whereupon, Petitioners' Exhibit 2 for

7          identification was received in evidence.)

8      Q    Miss Klepacki, in the subpoena, we asked you to

9  research the service that was provided by Brooklyn Union Gas

10  at various addresses -- is that not correct -- and under

11  various account names; is that correct?

12     A    Right.  Uh-huh.

13     Q    And is that what these books and records report?

14     A    Yes.

15     Q    Is one of the addresses that we asked you to

16  research that of John Kennedy O'Hara at 579 61st Street,

17  Brooklyn, New York?

18          You're permitted to look at the document.

19     A    We have it listed as "John K. O'Hara" at 579 61st

20  Street, apartment 2-I in Brooklyn.

21     Q    And do your records indicate that Mr. O'Hara has an

22  account with Brooklyn Union Gas at that address?

23     A    Yes.  Uh-huh.

24     Q    And is that a currently valid account?

25     A    Yes, it's an active account.

KCDA000759

JO-137

42

Klepacki-Direct/Carroll

1

2   Q    When did Mr. O'Hara first open his account with

3   Brooklyn Union Gas at 579 61st Street?

4   A    February 19th, 1990.

5   Q    Is that for apartment 2-I?

6   A    Yes.

7   Q    Did he have any previous accounts at that address,

8   for 579 61st Street?

9              MR. MEYERS:  Objection.

10             THE COURT:  Overruled.

11             THE WITNESS:  That means I answer or I don't?

12             THE COURT:  You may answer.

13  A    No.

14  Q    Do you have any records of an apartment 3-H at 579

15  61st Street?

16  A    Is the question do I have them here with me?

17  Q    Do you have records which indicate the existence of

18  an account at apartment 3-H at 579 61st Street or any other

19  accounts in the name of Mr. O'Hara at 579?

20  A    No.

21  Q    But you have just brought the records with respect

22  to apartment 2-I; is that correct?

23  A    Yes.

24  Q    We would ask you to, when you return to your

25  office, to research other apartments at 579 61st Street.

FORM C-100 · LASER REPORTERS PAPER & MFG. CO.  800-828-6313

JO-138

43

1                    Klepacki-Direct/Carroll

2          But let me me go back to the other addresses.

3          Did we ask you to look for account information

4    regarding John Kennedy O'Hara at -- or John K. O'Hara at 553

5    47th Street?

6      A    Yes.

7      Q    And did your records reveal any accounts for

8    Mr. O'Hara at 553 47th Street?

9      A    No.

10     Q    Did we ask you to look for account information with

11   respect to Mr. O'Hara at 6017 -- six-zero-seventeen --

12   Fourth Avenue?

13     A    Yes.

14     Q    And did your research indicate any accounts for him

15   at that address?

16     A    No.

17     Q    Did we ask you to research any accounts for

18   Mr. O'Hara at 5617 Sixth Avenue?

19     A    Yes.

20     Q    And did your research indicate any accounts for him

21   at that address?

22     A    No.

23     Q    Finally, ma'am, we did also request that you

24   research an account for an individual other than Mr. O'Hara,

25   did we not?

KCDA000761

JO-139

44

Klepacki-Direct/Carroll

1

2      A    Yes.

3      Q    And that was a Ms. Sandra Helverson,

4    H-e-l-v-e-r-s-o-n, at 519 47th Street; isn't that correct?

5      A    Yes.

6      Q    Did your research indicate any accounts for

7    Ms. Helverson?

8      A    No.

9            THE COURT:  519 47th?

10            MR. CARROLL:  Five-one-nine 47th Street.

11      Q    Regarding Mr. O'Hara's account at 579 61st Street,

12    which is the only account you found for him, is he current

13    in his payments with Brooklyn Union Gas?

14      A    Yes.  He has no balance due.  He's all paid up to

15    date.

16            MR. CARROLL:  Thank you very much.  I have no

17            further questions.

18            MR. MEYERS:  May I see the exhibit, please,

19            your Honor.

20            THE COURT:  Surely.

21            (Witness hands.)

22            MR. MEYERS:  This is the exhibit?

23            THE WITNESS:  Yes.

24            MR. MEYERS:  Thank you.

25    CROSS-EXAMINATION

FORM C-100 - LASER  REPORTERS PAPER & MFG. CO  800-626-6313

JO-140

45

1                    Klepacki-Direct/Carroll

2    BY MR. MEYERS:

3        Q    Miss Klepacki, these records that you produced

4    today, I notice that there is a certification at the

5    bottom.

6        A    Right.

7        Q    And it's dated 8/2/94.

8        A    Right.

9        Q    Were these documents printed on 8/2/94?

10       A    Yes.

11       Q    Did this come off of a computer?

12       A    Yes.

13       Q    Computer search?

14       A    Yes.

15       Q    Were there any manual records that you went

16   through?

17       A    No.

18       Q    Can you tell me how you obtained these records.

19            What did you physically have to do in order to

20   obtain them?

21       A    I scanned the records on our main-frame computer

22   and print them on the laser printer.

23       Q    So you type -- did you type in Mr. O'Hara's name

24   into a computer?

25       A    I typed in a search for the addresses requested.

KCDA000763

FORM C-100 • LASER  REPORTERS PAPER & MFG. CO.  800-826-6313

JO-141

46

1                    Klepacki-Cross/Meyers

2     Q    And I notice there are pages in here which bear

3     Mr. O'Hara's name specifically.  How did pages, such as this

4     one, appear (indicating)?

5     A    Once I reach the account number for Mr. O'Hara at

6     that address, I access the computer for billing information.

7     Q    And when you did that, this is what came up?

8     A    Uh-huh.

9     Q    Are you familiar with the billing practices and

10    with the way of opening up an account and closing an account

11    with -- it still says "Brooklyn Union Gas" on it, but

12    Brooklyn Union?

13    A    Yes.

14    Q    How would one go about opening up an account with

15    Brooklyn Union Gas, if they moved into an apartment?

16              MR. CARROLL:  Objection as to relevance.

17              THE COURT:  Oh, I'll take it.

18    A    They'd call the general information number and --

19    I'm not really sure.  I haven't done that job for a long

20    time and there may have been a change in procedures.  But

21    the last I heard, they'd call and --

22              THE COURT:  If you don't know, please don't

23              guess.  That's all I want to say.

24              THE WITNESS:  Okay.  I don't know.

25              THE COURT:  Okay.

KCDA000764

JO-142

47

Klepacki-Cross/Meyers

1

2    Q    How would one terminate their service with Brooklyn

3    Union Gas?

4    A    They'd call the general service telephone number

5    and request service disconnected at a certain date and give

6    instructions on how the serviceman can gain access to the

7    basement to turn off the meter; and they give us a

8    forwarding address for the final bill.

9    Q    Okay.  If Brooklyn Union Gas were never to receive

10   a request to cancel the Brooklyn Union Gas service, would

11   Brooklyn Union Gas, on its own, discontinue service -- I'm

12   not talking about for nonpayment; I mean just stop their

13   service for any reason?

14   A    Well, if there were a gas leak or some kind of

15   safety problem, they could turn the service off.

16   Q    So, hypothetically, someone could no longer reside

17   at a specific residence, but as long as Brooklyn Union Gas

18   was receiving checks, that name would still appear on the

19   billing information; is that correct?

20   A    Yes.

21   Q    Is there -- I'm going to hand you back these

22   records for a moment.

23        Is there any indication on here as to what type of

24   residence that is, whether it's a commercial, residence or

25   or office?  Or anything of that nature?

JO-143

48

1                        Klepacki-Cross/Meyers

2        A    Yes, it's listed as an apartment in a multi-family

3   dwelling.

4        Q    Okay.  But is there any indication as to what the

5   actual use of that apartment is, from the records?

6                  MR. CARROLL:  Objection.

7                  I believe she's testified that it's a

8             residence.

9        A    Yes, this coding rate and "S.A." here, rate:  "8"

10  means residence and "80" means use for range only, cooking

11  range only.

12       Q    To the best of your knowledge, is it possible that

13  there could be a multi-family residence which there would

14  not be the name of every resident in that building obtaining

15  Brooklyn Union Gas service or having --

16                  MR. CARROLL:  Objection.

17                  THE COURT:  Objection sustained.

18       Q    To the best of your knowledge, is if possible that

19  in a multiple-dwelling someone would not receive a bill from

20  Brooklyn Union Gas?

21                  MR. CARROLL:  Objection.

22                  THE COURT:  Objection sustained.

23                  Anything else, Counselor?

24                  MR. MEYERS:  I'm just searching through the

25             evidence, your Honor, to see if there are any other

49

1              Klepacki-Cross/Meyers

2         questions.

3              The pages are not numbered, your Honor.  Let

4         me try to describe this document.

5              THE COURT:  It's in evidence.

6              MR. MEYERS:  It's in evidence.

7              THE COURT:  Show it.

8    Q    I show you one of the pages from this, and it

9    indicates a closing of an account.

10             Can you please explain why there's a closing date

11   on that?

12             THE COURT:  Whose account?

13             MR. MEYERS:  Of John O'Hara.

14             THE COURT:  All right.

15   A    You're referring to this account here

16   (indicating)?

17   Q    Yes.

18   A    Okay.  Our records indicate that John O'Hara

19   originally occupied apartment 2-I at 579 61st Street on

20   February 19th, 1990; and that account was closed on

21   June 13th, 1991 and then another account was opened for him

22   at the same premises on October 24th, 1991.

23             THE COURT:  Is that the same apartment?

24             THE WITNESS:  The same apartment, right.  So

25        there was a gap of about four months.

50

1                    Klepacki-Cross/Meyers

2       Q     From what you've produced today, is there a listing

3   for Sandra Helverson in here, other than what your statement

4   is?

5       A     No, I found nothing for her in our records at that

6   address, at 519 47th Street.

7                    THE COURT:  The gap of four months was between

8              what dates, ma'am, according to that?

9                    THE WITNESS:  Between June 13, '91.

10                   THE COURT:  June 13, 1991 and?

11                   THE WITNESS:  October 24, 1991.

12                   THE COURT:  October 24th, 1991.  And

13             reinstated when?

14                   THE WITNESS:  It was reinstated on

15             October 24th, 1991.

16                   THE COURT:  Okay.

17                   MR. MEYERS:  I have no further questions at

18             this time, your Honor.

19                   THE COURT:  What apartment was that again that

20             you said, 2-I?

21                   THE WITNESS:  Right.  Apartment 2-I.

22                   MR. CARROLL:  I have no further questions of

23             this witness.

24                   THE COURT:  You may step down.

25                   (Whereupon, the witness was excused.)

JO-146

51

1                    Klepacki-Cross/Meyers

2                    THE COURT:  Next witness.

3                    MR. CARROLL:  Yes, your Honor.

4                    Your Honor, our next witness is Ms. Ann

5              English.  She is a party.

6                    Ms. English.

7    A N N    E N G L I S H, a Petitioner herein, residing at 220

8              25th Street, Brooklyn, New York, called as a

9              witness by the petitioners, having been duly sworn,

10             testified as follows:

11                   THE COURT:  You may proceed.

12   DIRECT EXAMINATION

13   BY MR. CARROLL:

14        Q    Ms. English, are you a resident of the 51st

15   Assembly District?

16        A    Yes, I am.

17        Q    Do you, in fact, hold a party position in the 51st

18   Assembly District?

19        A    Yes, I do.

20        Q    What is that position?

21        A    Democratic State Committeewoman.

22        Q    51st Assembly District is the district that an

23   individual named John K. O'hara is running for; is that

24   correct?

25        A    That's correct.

KCDA000769

JO-147

52

English-Direct/Carroll

1

2     Q    Do you know Mr. O'Hara?

3     A    Yes, I do.

4     Q    How long have you known Mr. O'Hara?

5     A    Actually, it was, I believe, 1984, right in this

6  building.

7     Q    That you met him?

8     A    Yes.

9     Q    So you've known him for ten years.

10    A    Yes.

11    Q    When was the last time you saw Mr. O'Hara?

12    A    Sometime in 1993, either in -- it may have been in

13  November of '93 in San Juan, I think he was there.

14    Q    Ms. English, I'm going to show you -- well, first

15  I'm going to show it to my adversary (handing).

16            MR. MEYERS:  Does counsel want to admit this

17        as evidence?

18            MR. CARROLL:  Yes.

19            MR. MEYERS:  I'm going to object, your Honor.

20            MR. CARROLL:  Let's see if Miss English can

21        identify it.

22    Q    Miss English, do you recognize this photograph?

23    A    Yes, I do.

24    Q    And who is the male in that photograph?

25    A    That's John O'Hara.

1                   English-Direct/Carroll

2    Q    And is that a fair and accurate portrayal of

3    Mr. John O'Hara?

4    A    Absolutely.

5    Q    And you have known Mr. O'Hara for how many years?

6    A    Ten years.

7              MR. CARROLL:  Your Honor, I would move the

8              introduction of the photograph:

9              THE COURT:  Show it to counsel.

10             MR. MEYERS:  I object, your Honor.

11             I don't know what the purpose of introducing a

12             photograph of Mr. O'Hara is.

13             THE COURT:  It's for purposes of

14             identification.

15             MR. CARROLL:  It's for identification

16             purposes, your Honor.

17             THE COURT:  Is there anything other than a

18             photograph there?

19             MR. CARROLL:  We will be identifying the other

20             person in the photograph as well, your Honor.

21             MR. MEYERS:  I'm going to object, your Honor.

22             THE COURT:  Other than the people to be

23             identified, is there anything, any writing or

24             anything?

25             MR. CARROLL:  Absolutely not.

54

1                    English-Direct/Carroll

2                    MR. MEYERS:  There's nothing in here.

3                    I object, your Honor.

4                    THE COURT:  Let me see.

5                    THE COURT:  Mark it Petioners' Exhibit 3 in

6           evidence, over objection.

7                    You have your exception, Counselor.

8                    MR. MEYERS:  Thank you, your Honor.

9                    THE COURT:  That's only as to the

10          identification of Mr. O'Hara?

11                   MR. CARROLL:  Mr. O'Hara.  That is correct,

12          your Honor.

13                   (So marked.)

14     Q    Miss English, do you know the lady that is in the

15     photograph with Mr. O'Hara?

16                   MR. MEYERS:  Objection.

17                   THE COURT:  Overruled.

18     A    Yes, I do.

19     Q    And what is her name?

20     A    Her name is Vicki Lynn Guveiyian.  I believe I can

21     provide the spelling.  Guveiyian, G-u-v-e-i-y-i-a-n, Vicki,

22     L-y-n-n.

23     Q    How did you come to meet Ms. Guveiyian?

24     A    I met her through John O'Hara.

25     Q    Did Mr. O'Hara introduce you to her?

JO-150

1                    English-Direct/Carroll

2        A    Yes, he did.

3        Q    Did he identify her to you?

4        A    Yes, he did.

5        Q    What did he tell you about her?

6        A    "This is my girlfriend Vicki."

7        Q    Are you familiar with the appearance of Vicki

8    Guveiyian?

9        A    Yes, I am.

10       Q    Is this photograph a fair and accurate portrayal of

11   Vicki Guveiyian?

12       A    It certainly is.

13            MR. CARROLL:  Your Honor, we would move the

14            introduction as to Ms. Guveiyian as well.

15            MR. MEYERS:  Objection.

16            THE COURT:  Overruled.

17            Mark it, both photographs.  But they're marked

18            under one exhibit, Petitioner's Exhibit 3 in

19            evidence.

20            THE REPORTER:   It was already so marked your

21            Honor.

22            MR. CARROLL:  Mr. Meyer (handing).

23            MR. MEYERS:  (handing).

24       Q    Ms. English, I'm going to hand you a photograph and

25   I'll ask you to examine it.

JO-151

56

1                    English-Direct/Carroll

2         Do you recognize the lady on my left in that

3    photograph?

4              MR. MEYERS:  Objection, your Honor.

5         Relevance.

6    A    Yes, I do.

7              MR. CARROLL:  Subject to --

8              MR. MEYERS:  Your Honor, there's been no

9         foundation for this.

10             THE COURT:  I don't know what the purpose is,

11        so I'm going to let him go.

12   Q    Who is that individual?

13   A    That is Maureen Steffenson.

14   Q    How long have you known Maureen Steffenson?

15   A    Off and on, five, six years.

16             THE COURT:  Let's hold it just for a moment.

17             How many people are you going to identify in

18        that?  Just her?

19             MR. CARROLL:  Just her.  We can identify the

20        others, but she's the only relevant one.

21             THE COURT:  She's the only relevant one?

22        Okay.  I wanted to know so we don't have to waste

23        time.

24             MR. CARROLL:  That's fine.

25             THE COURT:  Maureen who?

FORM C-100 - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

JO-152

57

1                    English-Direct/Carroll

2                    THE WITNESS:  Steffenson.

3        Q    Is that photograph a fair and accurate portrayal of

4    Ms. Steffenson?

5        A    Yes, it is.

6                    MR. CARROLL:  I would move the introduction of

7              that photograph with respect to Miss Steffenson.

8                    MR. MEYERS:  Objection.

9                    THE COURT:  Objection is overruled.

10                   Mark it Petioners' Exhibit 4 in evidence over

11             objection, and you have your exception, sir.

12                   MR. MEYERS:  Thank you, your Honor.

13                   (So marked.)

14                   THE COURT:  Which one did you identify?

15                   THE WITNESS:  The red-haired lady, far left

16             (indicating).

17                   THE COURT:  I see.  Miss Steffenson is

18             identified -- would you kindly put an X on the body

19             you identified so we'll know who it is.

20                   THE WITNESS:  (Complies) There.

21                   THE COURT:  Thank you.

22             May I see it please.

23                   THE WITNESS:  Sure (handing).

24                   THE COURT:  Okay (handing).

25                   MR. CARROLL:  Thank you, your Honor.

JO-153

58

```
 1                English-Direct/Carroll
 2          I have no further questions of Ms. English.
 3          THE COURT:  You may inquire.
 4          MR. MEYERS:  Your Honor, I have no questions
 5     at this time.
 6          THE COURT:  You may step down.
 7          (Whereupon, the witness was excused.)
 8          MR. CARROLL:  Your Honor, I have some
 9     documents I'd like to put in.
10          THE COURT:  Let's get them all in.  Go ahead.
11          What do you have?
12          MR. CARROLL:  Your Honor, this is our copy of
13     the petition pursuant to your instructions this
14     morning.  We brought a copy in.
15          This is Democratic Party Designating Petition
16     of John Kennedy O'Hara showing a residence address
17     of 6017 Fourth Avenue.
18          THE COURT:  Designating petition of O'Hara.
19          What's the address?
20          MR. CARROLL:  6017 Fourth Avenue, Brooklyn,
21     11220.
22          Mr. Meyers, I'll show it to you.
23          I'd like to you to stipulate that that is the
24     petition or a copy of the petition.  The original
25     is with the Board of Elections.
```

JO-154

59

1          Proceedings

2          MR. MEYERS:  Your Honor, I haven't looked at

3     every single page, obviously, but I will take

4     Mr. Carroll's representation that this is a true

5     and accurate copy of the Democratic Party petition

6     in the 51st Assembly District for the candidate

7     John O'Hara.  And as discussed with your Honor

8     earlier in this morning's session, we'll stipulate

9     that this copy, while the line-by-line is being

10    performed at the Board, may be used for questioning

11    of witnesses in this matter.

12          However, I would like to reserve that in the

13    event that a dispute should arise as to any of the

14    photocopies in here, that that witness be held

15    until the actual petitions may be produced.

16          THE COURT:  With that understanding, we'll

17    mark it Petitioner's Exhibit 5 in evidence.

18          (So marked.)

19          THE COURT:  Next.

20          MR. CARROLL:  Your Honor, I have a series of

21    buff cards.  They are all certified by the Board of

22    Elections as being records of Mr. O'Hara's buff

23    cards.

24          THE COURT:  How many buff cards?

25          MR. MEYERS:  I have a series of four buff

JO-155

60

1          Proceedings

2    cards.

3          THE COURT:  Buff cards, four.  You want to

4    mark it as one exhibit?

5          MR. CARROLL:  1A through D?

6          THE COURT:  Mark it 6-A, B, C and D.

7          MR. CARROLL:  And just for the record, 6-A --

8          THE COURT:  Petitioners' Exhibit 6-A in

9    evidence.

10         MR. CARROLL:  -- Is 6017 Fourth Avenue.

11         THE COURT:  6017 Fourth Avenue.

12         MR. CARROLL:  And it indicates that Mr. O'Hara

13   registered there on January 20th, 1994.

14         THE COURT:  Hold it.  O'Hara's registration,

15   what date?

16         MR. CARROLL:  January 20, 1994.

17         THE COURT:  Okay.

18         MR. CARROLL:  And that his previous address

19   was 553 47th Street.

20         THE COURT:  Previous address -- what was --

21   five?

22         MR. CARROLL:  553 47th Street.

23         MR. CARROLL:  6-B is a buff card for

24   553 47th Street and it indicates that he registered

25   on November 2, 1992.  And that his prior address

KCDA000778

61

1          Proceedings

2    was 579 61st Street.

3          MR. CARROLL:  The third buff card is 5617

4    Sixth Avenue.

5          THE COURT:  That's 6-C in evidence.  What was

6    that address?

7          MR. CARROLL:  5617 Sixth Avenue.  And he

8    registered a registered at that address on June

9    20th, 1991.

10          THE COURT:  6/20/91.

11          MR. CARROLL:  And that also indicates his

12    previous address as 579 61st Street.  And 6-D is

13    579 61st Street, at which he registered on

14    December 14th, 1982.

15          THE COURT:  Registered what, 11 --

16          MR. CARROLL:  12/14/82.

17          THE COURT:  December.  December 14, '82 from

18    previous address?

19          MR. CARROLL:  It indicates a previous address

20    of 231 73rd Street.

21          THE COURT:  Is that it?

22          MR. MEYERS:  Your Honor, I might have an

23    objection.

24          THE COURT:  What objection could you have, if

25    these are buff cards from the Board of Elections,

FORM C-100 - LASER    REPORTERS PAPER & MFG. CO.    800-626-6313

JO-157

62

1          Proceedings

2    unless you want somebody from the Board of

3    Elections to come in --

4          MR. MEYERS:  Your Honor, my objection is not

5    as to the veracity of these documents on their

6    face; it is to the relevance of these documents for

7    the time period that's involved.

8          Buff card C and D are admittedly -- and on the

9    face of these documents from -- dated 6/20/91, well

10   beyond the period that this trial encompasses and

11   also not at an address which is a claimed address

12   within the bill of particulars or within the

13   opening statement of Mr. Carroll.

14         MR. CARROLL:  They are clearly, most

15   assuredly, in the bill of particulars and Judge

16   Garry has already ruled on that.

17         But more importantly, your Honor, the case law

18   is absolutely clear, the residence for voting

19   purposes is your domicile, the place -- no matter

20   how often you might be absent from -- you intend

21   always to return to.  We intend to prove and

22   believe we've gone very far toward doing it; that

23   that is the Sixth Avenue address.

24         THE COURT:  Very well.

25         Anything else?

KCDA000780

63

1          Proceedings

2          Objection is overruled, Counselor.

3          MR. MEYERS:  Please note my exception, your

4    Honor.

5          THE COURT:  You have your exception.

6          (Petitioners' Exhibits 6-A, B, C and D, in

7    evidence.)

8          MR. CARROLL:  Your Honor, the next document I

9    would like to introduce is a certified copy of the

10   Election Administration System voting history of

11   Mr. John O'Hara from the Board of Elections for the

12   last two -- four -- five elections, indicating

13   Mr. O'Hara voting from 553 47th Street at each

14   election from 11/3/92 through 11/2/93 during the

15   period in which the owner of the building says he

16   was not present at the building.

17        And this is a certified record of the Board of

18   Elections.

19        MR. MEYERS:  Your Honor, may I see

20   Petitioners' Exhibit 6-A through D to compare with

21   this evidence because it seems to be duplicative,

22   if it is what it purports to be.

23        MR. CARROLL:  Your Honor, it's not duplicative

24   because under the new scribe system, they no longer

25   sign the back of the buff card.  Now it is

FORM C-100 · LASER  REPORTERS PAPER & MFG. CO  800-626-6313

JO-159

64

1           Proceedings

2    necessary to get that document as opposed to just

3    looking at the buff card.

4           THE COURT:  Yes, I believe so.

5           MR. MEYERS:  Note my objection.

6           THE COURT:  Over objection, received as

7    Petitioners' Exhibit 7 in evidence.

8           MR. CARROLL:  Your Honor, would you like to

9    see it?

10          THE COURT:  Yes, I would.

11          MR. CARROLL:  Your Honor, I believe the

12   elections that they're talking about are two

13   general elections, a primary and a School Board

14   election.  I believe that's apparent from the

15   dates.

16          MR. KEEFE:  There's one more.  There's the

17   runoff for controller last year.

18          MR. CARROLL:  And the runoff for the

19   controller last year.

20          THE COURT:  The special election.

21          MR. CARROLL:  Correct, your Honor.

22          THE COURT:  All right.  Mark it Petitioner's

23   Exhibit 7.

24          (So marked.)

25          MR. CARROLL:  I have a certified copy of the

JO-160

65

1              Proceedings

2    abstract of Mr. O'Hara's driving record which I'd

3    like to introduce indicating an address of 579 61st

4    Street; certified from New York State Department of

5    -- whatever -- Motor Vehicles.

6              MR. CARROLL:  Your Honor, I just want the

7    record to reflect that this document, it claims to

8    have been printed on 7/30, 1994, which was a

9    Saturday.

10             THE COURT:  What else is new?

11             MR. MEYERS:  I don't believe that the

12   Department of Motor Vehicles is in operation on

13   that day, so I don't know of the veracity of this

14   document.  So, therefore, I place an objection to

15   this document on the record.

16             MR. CARROLL:  Your Honor, it is a certified

17   copy of a document --

18             THE COURT:  Let me see it.

19             MR. CARROLL:  I don't know when it was

20   printed, but it is certified (handing to Judge.)

21             THE COURT:  They printed it at 3:41 on that

22   date, but it's a certified copy.  Therefore, since

23   it's a certified copy --

24             MR. MEYERS:  Is there a stamp on it, your

25   Honor, other than what's printed on the bottom?

JO-161

66

1           Proceedings

2           THE COURT:  Only what's printed on the bottom,

3      plus a certification stamp here.

4           MR. MEYERS:  Is it a raised stamp, your

5      Honor?

6           THE COURT:  Yes.

7           MR. MEYERS:  I maintain my objection.

8           THE COURT:  You have your exception.

9           We'll mark it in evidence as Petitioner's

10     Exhibit 8.

11           (Petitioner's Exhibit 8 so marked.)

12           MR. CARROLL:  Your Honor, I have a certified

13     copy of the buff card of Ms. Sandra Helverson.

14     This is an individual who ultimately -- is a

15     subscribing witness, and it will ultimately become

16     relevant.

17           Mr. Meyers (handing.)

18           She is also a lady that the Brooklyn Union Gas

19     representative testified about.

20           MR. MEYERS:  No objection, your Honor.

21           THE COURT:  Without objection, mark it

22     Petitioner's Exhibit 9.

23           May I just take a look at it, please.

24           MR. CARROLL:  It shows a registration sometime

25     in June of this year, I believe, your Honor.

JO-162

67

1              Proceedings

2          THE COURT:  Mark it.

3          Is that it?

4          MR. CARROLL:  That's it for today, Judge.

5          THE COURT:  Recess until tomorrow morning,

6      9:45.

7          MR. MEYERS:  Thank you, your Honor.

8          (Whereupon, the hearing was adjourned to

9      August 4, 1994.)

10          (Continued on the following page.)

68

```
1

2    SUPREME COURT OF THE STATE OF NEW YORK
     COUNTY OF KINGS:  CIVIL TERM - PART 15
3    ---------------------------------------X
     DENNIS L. POL, LISA T. LOPEZ, and
4    FELIX W. ORTIZ,

5                        Petitioners,

6
                    -against-
7

8    THE BOARD OF ELECTIONS In The CITY
     OF NEW YORK and JOHN K. O'HARA,
9
                        Respondents
10   ---------------------------------------X
     Index # 23414/94        Hearing
11   ---------------------------------------X
     In the Matter of the Application of
12   ANN ENGLISH,

13                    Objector-Petitioner,

14
                    - against -
15

16   JOHN K. O'HARA, Member of the Assembly
     From the 51st Assembly District, Kings
17   County, New York State,

18                        Candidate

19                  - and -

20   BOARD OF ELECTIONS IN THE CITY OF NEW
     YORK,
21
                        Respondents,
22   ---------------------------------------X

23                    360 Adams Street
                      Brooklyn, New York
24                    August 4, 1994

25
                (Continued on the following page.)
```

KCDA000786

69

1

2

B E F O R E:

3                              HONORABLE IRVING S. ARONIN,

4                                              Justice

5

6           (Appearances same as previously noted.)

7                              MARK L. BOWIN

8                         Official Court Reporter
                          -  -  -  -  -

9

10          THE COURT:  Ready to proceed?

11          MR. CARROLL:  We are ready to proceed, your

12     Honor.

13          MR. MEYERS:  I'm ready, your Honor.  Your

14     Honor, before we begin, I just have two requests.

15          THE COURT:  Go ahead.

16          MR. MEYERS:  First yesterday there were three

17     witnesses -- four witnesses, one of them being a

18     party, and I would like to see the subpoenas that

19     were issued to the witnesses that testified.  I

20     don't know if Mr. Carroll turned them over to the

21     Court.

22          THE COURT:  I don't have them.

23          MR. CARROLL:  I didn't turn them over to the

24     Court.  They produced themselves pursuant to

25     subpoena, and I don't see what the relevance is.

JO-165

69

1

2

B E F O R E:

3

HONORABLE IRVING S. ARONIN,

4

Justice

5

6

(Appearances same as previously noted.)

7

MARK L. BOWIN

8

Official Court Reporter

- - - - -

9

10      THE COURT:  Ready to proceed?

11      MR. CARROLL:  We are ready to proceed, your

12  Honor.

13      MR. MEYERS:  I'm ready, your Honor.  Your

14  Honor, before we begin, I just have two requests.

15      THE COURT:  Go ahead.

16      MR. MEYERS:  First yesterday there were three

17  witnesses -- four witnesses, one of them being a

18  party, and I would like to see the subpoenas that

19  were issued to the witnesses that testified.  I

20  don't know if Mr. Carroll turned them over to the

21  Court.

22      THE COURT:  I don't have them.

23      MR. CARROLL:  I didn't turn them over to the

24  Court.  They produced themselves pursuant to

25  subpoena, and I don't see what the relevance is.

KCDA000788

JO-166

70

1          Proceedings

2     They produced themselves and they testified.

3          THE COURT:  So apparently you don't have them

4     with you.

5          MR. CARROLL:  I don't have them.

6          THE COURT:  So let's proceed.

7          MR. MEYERS:  My second request, your Honor,

8     pursuant to Judge Garry's order, I have subscribing

9     witnesses here today in the Court.  Two of them,

10    Rebecca Velez and Elizabeth Galarza, are here with

11    children; and I don't want to tell Mr. Carroll how

12    to try his case, but I just wanted to request they

13    go as soon as possible.

14         THE COURT:  Can you get to them as early as

15    possible?

16         MR. CARROLL:  I will take those two first,

17    your Honor.

18         THE COURT:  Okay.  Let's get the next witness,

19    then.

20         MR. CARROLL:  If we could have, I guess,

21    Elisabeth Galarza and anybody who is a witness --

22         THE COURT:  Is there anybody in the courtroom

23    who is a witness?  If you are, please wait

24    outside.

25    E L I S A B E T H   G A L A R Z A, residing at 441

KCDA000789

JO-167

71

```
 1              Proceedings
 2         48th Street, Brooklyn, New York, called as a
 3         witness by the Petitioners, having been duly
 4         sworn, testified as follows:
 5              THE CLERK:  Please state your name and address
 6         for the record.
 7              THE WITNESS:  Elisabeth, E-l-i-s-a-b-e-t-h,
 8         Galarza, 441 48th Street, Brooklyn, New York.
 9  DIRECT EXAMINATION
10  BY MR. CARROLL:
11              THE COURT:  You may proceed.
12    Q    Thank you for coming, Miss Galarza.
13         Do you know a gentleman by the name of
14  John K. O'Hara?
15    A    Yes, I do.
16    Q    Could you speak up.
17    A    Yes, I do.
18    Q    And how do you know him?
19    A    I met him at a barbecue.
20    Q    How long ago?
21    A    (No response.)
22    Q    Was it this year?
23    A    Yes.
24    Q    It was this year.  It was a barbecue.
25         Does that mean it was in the warm weather?
```

72

1                    Galarza-Direct/Carroll

2    A    Yes, it was.

3    Q    April?  May?  June?

4    A    No, it was in June.

5    Q    In June.  Okay.  And you met Mr. O'Hara for the

6    first time in June of 1994.

7    A    Uh-huh.

8    Q    Did there come a time when you decided to carry

9    Democratic Party designating petitions for Mr. O'Hara?

10        Did you circulate a Democratic Party petition for

11    Mr. O'Hara, go door to door or --

12    A    Yes, I did.

13    Q    And who asked you to do this?

14    A    Nobody asked me.  It was something I wanted to do.

15    Q    Did Mr. O'Hara ask you to do it?

16    A    No.

17    Q    How did you come to volunteer to collect the

18    petition signatures?

19    A    Through a friend.

20    Q    Who was that friend?

21    A    Maureen Steffenson.

22    Q    Maureen Steffenson.  Ma'am, do you have any idea

23    how many signature you collected for Mr. O'Hara?

24    A    About 100, 130.

25              MR. MEYERS:  Your Honor, I can't --

KCDA000791

73

Galarza-Direct/Carroll

1

2    THE COURT:  Miss Galarza, you'll have to speak

3    up so that everybody can hear.  Please.

4    THE WITNESS:  Okay.

5  Q   And what was your practice when you went out to

6  collect signatures?  Did you go out during the day?  Did you

7  go out during the the evening or did you do both?

8  A   Both.

9  Q   Went out during the day and during the evening.

10  A   Yes.

11  Q   Now, I see you brought your children with you today

12  to court.  Did they go with you when you were petitioning?

13  A   Yes.

14  Q   They did.  So they went --

15  A   Sometimes.

16      (A woman entered the courtroom.)

17  Q   Sometimes they did, okay.

18    I'm going to show you a series of sheets in a

19  document which has been marked as Petitioners' Exhibit 5 in

20  evidence, okay, and I'm going to ask you a few questions

21  about those sheets, if you don't mind, ma'am.

22    MR. MEYERS:  Can we have the page numbers,

23    sir?

24    MR. CARROLL:  Yes, I'm going to give you the

25    page numbers; certainly.

FORM C-100-LASER  REPORTERS PAPER & MFG. CO  800-626-6313

JO-170

74

1                    Galarza-Direct/Carroll

2        Q    The first page I'd like you to look at,

3    Miss Galarza, is page 51 of Petitioner's Exhibit 5

4    (handing), and I ask you to take a look at that sheet.

5             Is that your signature at the bottom of the page?

6             MR. MEYERS:  Objection, your Honor.

7             Your Honor, the bill of particulars submitted

8        by petitioner includes one, two, three, four

9        sheets, none of which is the sheet which he's

10        presenting now.

11            Let me just clarify.  Four sheets that bear

12        the name of Elizabeth Galarza, none of which is the

13        sheet which counsel purports to show to

14        Miss Galarza right now.

15            MR. CARROLL:  All right.  We'll restrict

16        ourselves to those four sheets listed in the bill

17        of particulars.

18            MR. CARROLL:  Miss Burnett, witnesses are not

19        permitted to sit in the courtroom until they give

20        testimony.  Thank you.

21            (Whereupon, a woman left the courtroom.)

22            MR. CARROLL:  Would you bear with me a second,

23        Judge.

24        Q    Miss Galarza, I'm going to show you in Exhibit

25    Number 5 in evidence, petition page 90, and I ask you to

JO-171

75

1                    Galarza-Direct/Carroll

2    take a look at that sheet.

3              Do you recognize it?

4      A      Uh-huh.

5      Q      Is that your signature at the bottom of the page?

6      A      Yes, it is.  Yes.

7      Q      Okay.  And on what day did you collect these

8    signatures?

9      A      On June 10th.

10     Q      And did you witness it on the same day?

11     A      Yes, I did.

12     Q      What was the procedure in terms of witnessing it?

13   How did you go about filling out the bottom?  Did anyone

14   assist you in doing that?

15     A      I was explained in the beginning how to do the

16   forms and how to go about doing the petitions.

17     Q      And who explained this to you?

18     A      One of the people that does the petitions.

19              MR. MEYERS:  Your Honor, I can't hear the

20              witness.

21              THE COURT:  Can you kindly speak up, please,

22              so everybody can hear you.

23              THE WITNESS:  Okay.

24     A      One of the people that was in charge of the

25   petitions.

JO-172

76

1                       Galarza-Direct/Carroll

2        Q    And who was that?

3        A    I can't recall how to say the name.  First, last

4   name.  Her first name is Kathy.

5        Q    It's a woman, obviously?

6        A    Uh-huh.

7        Q    Was it a young woman or an older woman?

8        A    Young woman.

9        Q    Okay.  You say you can't remember how to pronounce

10  her name.  Do you know how to spell it?  Would you know how

11  to spell her name?

12       A    I don't know how to say her name.

13       Q    Phonetically?  Do you know what the first letter of

14  her last name was?

15       A    I don't know -- P, probably.

16       Q    Now, I see that there are signature here collected

17  on 16th Street in Brooklyn.  Do you remember being on that

18  block?

19       A    Yeah.

20       Q    Do you remember where it was?

21       A    Yes.

22       Q    Where on 16th Street was this?

23       A    Fifth -- 300 -- it's between -- was it Fifth and

24  Sixth and -- between Fifth and Sixth.  The numbers are

25  different.  They run differently.

FORM C-100 · LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

JO-173

77

Galarza-Direct/Carroll

1

2      Q    All right.  The last two signatures on the page,

3      lines 9 and 10?

4      A    Uh-huh.

5      Q    Do you remember the individuals who signed those

6      signatures?  Do you remember taking those two signatures?

7      A    I remember taking all the signatures that I signed

8      for, but I --

9      Q    Well, do you remember that Carroro and Ben Carroro

10     (phonetic)?

11     A    I won't remember what they -- it's been so many

12     people I've seen, I don't remember what they looked like.

13     Q    Were there, in fact, two separate people, ma'am?

14     A    Yes, they were.

15     Q    You're sure it wasn't one person signing for the

16     other on Carroro?

17     A    No.

18     Q    So you saw two separate people; that's your

19     testimony.

20     A    Uh-huh.

21          MR. MEYERS:  Objection.

22          Asked and answered.

23          THE COURT:  We'll take it.  It's cross.  It's

24          a hostile witness.

25     Q    Ma'am, I'd like to take you to page number 227 of

FORM C-100 · LASER   REPORTERS PAPER & MFG. CO.  800-626-6313

JO-174

78

1                    Galarza-Direct/Carroll

2    this petition.

3                    THE COURT:  May I see that petition, please.

4                    MR. CARROLL:  Sure.  This is page number 90.

5                    THE COURT:  That's the one I want to see.

6                    THE COURT:  Go ahead.

7        Q    Page 227, ma'am, of Exhibit number 5; is that your

8    signature at the bottom?

9        A    Yes, it is.

10                   THE COURT:  June 27?

11                   MR. CARROLL:  June 27.

12       Q    And do you recall collecting those signatures?

13       A    Yes, I do recall.

14       Q    And is it your testimony that each and every one of

15   the people on this page appeared before you, before you

16   signed that petition?

17       A    Yes.

18       Q    In terms of filling out the witness statement, when

19   was the information that is set forth in the statement of

20   witness -- other than your signature -- filled out?  Was

21   that filled out before you signed it?

22       A    I filled out everything there.

23       Q    So that's all in your your hand (indicating)?

24       A    Yes, it is.

25       Q    I'd like you to take a look, ma'am, at page 229 of

79

| | |
|---|---|
| 1 | Galarza–Direct/Carroll |
| 2 | this petition.  Once again, is that your signature at the |
| 3 | bottom of the page? |
| 4 | A    Yes.  Yes, it is. |
| 5 | Q    And it's your testimony that you filled out the |
| 6 | witness statement? |
| 7 | A    Yes. |
| 8 | Q    Is that your handwriting in the witness statement? |
| 9 | A    Yes, it is. |
| 10 | Q    Now, on 229, ma'am, I'd like you to look |
| 11 | specifically at lines 6 and lines 8.  First at line 6. |
| 12 |     Do you recall this individual signing for you |
| 13 | (indicating)? |
| 14 | A    Yes. |
| 15 | Q    And what is that gentleman's name? |
| 16 | A    Steven Day (phonetic). |
| 17 | Q    And on line 9, ma'am, do you recall that gentleman |
| 18 | signing for you? |
| 19 |     And I won't even try to ask you what the name is. |
| 20 |         MR. MEYERS:  Objection. |
| 21 |         Your Honor, there's no signature on there. |
| 22 | A    There's no signature there. |
| 23 |         MR. CARROLL:  Excuse me.  Line 8 |
| 24 |     (indicating). |
| 25 | A    Lucy Fagaro (phonetic). |

JO-176

FORM C-100 · LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

80

1                    Galarza-Direct/Carroll

2    Q    And do you remember her signing for you, ma'am?

3    A    Yes.

4    Q    And it's your testimony that that is the testimony

5    (sic) of Lucy Fagaro?

6    A    Yes.

7    Q    Okay.

8              MR. CARROLL:   (Handing to Court.)

9              THE COURT:   Okay (handing).

10   Q    Now, with respect to line number 8, ma'am, would it

11   surprise you to learn that that individual's name is not

12   Lucy Fagaro but Lucy Figueroa (phonetic)?

13             MR. MEYERS:   Objection.

14   A    I might say it differently.

15             THE COURT:   Hold it.

16             Objection sustained.

17             MR. CARROLL:   Withdraw the question, your

18        Honor.

19   Q    Okay.   Let's turn to page 230.

20        Once again, ma'am, this is your signature at the

21   bottom of the page?

22   A    Yes.

23   Q    And, specifically, had I ask you to take a look at

24   signatures on lines 2, line 3 and line 4?

25   A    Uh-huh.

KCDA000799

JO-177

81

1                     Galarza-Direct/Carroll

2     Q    Do you recall collecting those signatures?

3     A    Yes.

4     Q    And whose is the signature on line two

5    (indicating)?  If you can recognize it.

6     A    It looks -- I don't know.

7     Q    But you specifically recall collecting the

8    signatures on lines 2, 3 and 4.

9     A    Yes.

10    Q    And you witnessed this petition on the same day you

11   collected the signatures?

12    A    Yes.

13    Q    And that day was July 8th.

14    A    Right.

15              MR. CARROLL:  Okay.  Thank you, ma'am.

16              I have no further questions of this witness.

17              THE COURT:  Any other questions?

18              MR. MEYERS:  I have no questions, your Honor.

19              THE COURT:  No questions.

20              You may step down, ma'am.

21              (Witness excused.)

22              MR. MEYERS:  Your Honor, the other S.W. that

23         has children here is Rebecca Vales.

24              MR. WEISS:  (Speaking from gallery.) Your

25         Honor, for the record, one of the objectors, Anne

FORM C-100 - LASER  REPORTERS PAPER & MFG. CO.  800-628-6313

JO-178

82

1                      Galarza-Direct/Carroll

2      English -- my name is Peter Weiss.  My address is

3      112 Marlboro Road, Brooklyn, New York, 11226.

4              She understands that yesterday a motion was

5      made to disqualify her attorney, Mr. Dunbar, and

6      she asked me this morning to act as her counsel in

7      this matter.

8              THE COURT:  I see.  I was under the impression

9      that we were proceeding on one of the petitions at

10     this time -- one of the petitioners at this time

11     was proceeding on the petition -- Pol -- we're

12     proceeding on Pol.  They're being tried together, I

13     guess.

14             MR. WEISS:  I believe these two matters were

15     joined for trial purposes by Judge Garry, and since

16     Mr. Dunbar wasn't here when that motion was made

17     and his motion was originally made before and he

18     denied it.

19             THE COURT:  That motion was made originally

20     before Judge Garry?

21             MR. WEISS:  It was.  She called me and asked

22     me to step in as her counsel in this matter.  I

23     will agree that Mr.  --

24             THE COURT:  Do you have any objections to

25     that.

KCDA000801

83

1    Proceedings

2    MR. MEYERS:  Your Honor, I have no objections

3    to Mr. Weiss being present, though I would object

4    to his participation in this matter, since it had

5    already been agreed when trial thirty started with

6    Mr. Carroll being the counsel.

7    MR. WEISS:  Lead counsel.  I have no objection

8    with Mr. Carroll being lead counsel, but there may

9    be a point --

10   THE COURT:  I think we'll permit him to do so,

11   in light of the fact that Judge Garry at first

12   denied the motion and also in light of the fact

13   that Mr. Dunbar wasn't here at the time the motion

14   was made.  It was basically done on consent.

15   However, if the Petitioner does want

16   representation, I think she should be entitled to

17   it.  So you may assist.

18   But let's understand this; that the lead

19   counsel, I suspect, on both cases will be

20   Mr. Carroll.

21   MR. WEISS:  That's true, your Honor.

22   THE COURT:  And if there's any questions you

23   want to pose, why don't you do it through

24   Mr. Carroll and make it easier.

25   MR. WEISS:  Fine.

FORM C-100 · LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

KCDA000802

JO-180

84

1           Proceedings

2               MR. MEYERS:  Thank you, your Honor.  That's

3       agreeable to me.

4               THE COURT:  Pull up a chair.

5               MR. WEISS:  I'm going to Judge Garry, your

6       Honor.

7               THE COURT:  I'm glad you substituted.

8               MR. WEISS:  I'll be back.

9               (Whereupon, Mr. Weiss left the courtroom.)

10  R E B E C C A    V A L E S, residing at 454 Third Avenue,

11      Brooklyn, New York, called as a witness by the

12      Petitioners, having been duly sworn, testified as

13      follows:

14              THE CLERK:  State and spell your name for the

15      record.

16              THE WITNESS:  My name is Rebecca,

17      R-e-b-e-c-c-a, Vales, V-a-l-e-s, 454 Third Avenue,

18      Brooklyn, New York.

19              THE COURT:  You may proceed, Counselor.

20              MR. CARROLL:  Thank you, your Honor.

21              Thank you for coming, Miss Vales.

22  DIRECT EXAMINATION

23  BY MR. CARROLL:

24      Q    Do you know an individual named John O'Hara?

25      A    Yes, I do.

KCDA000803

85

1                        Vales-Direct/Carroll

2       Q    And how did you come to meet Mr. O'Hara?

3       A    I was petitioning for a friend, name is Kathy, and

4    I was petitioning for her and she came by one day with the

5    kit, to bring me over the kit for the signatures, and he

6    happened to be in the car and I met him that day.

7       Q    Who is this Kathy?

8       A    Kathy Verte is a friend of mine.  I was next-door

9    neighbors with her.

10      Q    She's the one who asked you to petition for

11   Mr. O'Hara?

12      A    Yes.

13      Q    Now, Miss Verti is the one who asked you to carry

14   the petitions for Mr. O'Hara?

15      A    Yes, she did.

16      Q    And you had never met Mr. O'Hara before?

17      A    No.

18      Q    Do you know how many signatures you collected for

19   Mr. O'Hara?

20      A    Maybe about a hundred or so.

21      Q    Did you do this as a volunteer?

22      A    Yes, Kathy's a very good friend of mine.

23      Q    Were you paid anything for collecting signatures?

24      A    No.

25      Q    Ma'am, I'm going to show you a series of pages in a

FORM C-100 - LASER   REPORTERS PAPER & MFG  CO   800-626-6313

JO-182

86

1                        Vales-Direct/Carroll

2    Democratic Party designating petition that has been marked

3    as Petitioners' Exhibit 5 in evidence, okay.

4            Ma'am, the first page I'm going to to show you is

5    page number 81.  And before we get to that, what was your

6    practice in terms of collecting signatures?  When did you go

7    out to get them?

8        A    I went out every chance I could, like, after work

9    and stuff on the weekend.

10       Q    Do you work during the day, usually?

11       A    Yes.

12       Q    You have a job?  What are your normal hours in your

13   job?

14       A    Nine to five.

15       Q    So you would have had to collect the signatures in

16   the evening when you came home from work.

17       A    Right.

18       Q    Unless it was a weekend.

19       A    Right.

20       Q    Now, the first page I'm going to ask you to look

21   at, ma'am, is page number 81 of the petition, and I ask you

22   to take a look at that petition and tell me whether or not

23   you recall -- first whether or not you're the individual who

24   witnessed the petition.

25       A    Yes, I am.

JO-183

87

1                    Vales-Direct/Carroll

2        Q    And do you recall collecting those signatures?

3        A    Yes, I do.

4        Q    And could you just tell me the date on which they

5    were collected?

6        A    June 28th.

7        Q    And that's the day you witnessed the petition as

8    well.

9        A    Right.

10       Q    Who filled out the information in the statement of

11   witness?

12       A    I did.

13       Q    That's all your handwriting.

14       A    Yes.

15       Q    Let's take a look at page 117 of the petition.

16   Okay.  This is also one of your petitions that you

17   witnessed?

18       A    Yes, sir.

19       Q    And the date that that was collected is also

20   June 28th, isn't it?

21       A    Yes, it is.

22       Q    And the number of signatures on this page is how

23   many?  Is it ten?

24       A    Ten.

25       Q    And just for the record, back on page 81, which we

KCDA000806

JO-184

88

1                    Vales-Direct/Carroll

2    spoke about before, how many signatures are on that page?

3        A    Ten.

4        Q    Now, let's turn to page 107, if we could.

5                    THE COURT:  The last page was 117?

6                    MR. CARROLL:  117, Judge.

7                    MR. MEYERS:  Objection, your Honor.

8                    It's not in the bill of particulars.

9                    MR. CARROLL:  It is in the bill of

10                   particulars.  But we'll come back to it --

11                   MR. MEYERS:  117 or 107?

12                   MR. CARROLL:  107 is what I said.  We'll come

13                   back to it in a second.  Page number 136 -- I think

14                   it's in the bill of particulars in another

15                   location.  We'll show you.

16                   MR. MEYERS:  I apologize.

17                   THE COURT:  136?

18                   MR. CARROLL:  136.

19       Q    Page number 136.  Are those your signatures, again?

20       A    Yes, it is.

21       Q    And the day you collected those signatures, that's

22   also June 28th, isn't it?

23       A    Right.

24       Q    And you witnessed them again on June 28th?

25       A    Right.

KCDA000807

FORM C-100 - LASER REPORTERS PAPER & MFG. CO.  800-626-6313

89

1                         Vales-Direct/Carroll

2        Q    And how many signatures are on that page?

3        A    Ten.  You got to consider also --

4        Q    I'm just going to ask you some questions, ma'am,

5   okay?

6        A    All right.

7        Q    Let's go down to page number 160.  Page number

8   160.  Is that one of your sheets again, ma'am?

9        A    Yes, it is.

10       Q    And all of those signatures were witnessed on

11  June 28th also, weren't they?

12       A    Yes.

13       Q    And how many signatures are on that page?

14       A    Ten.

15       Q    And let's go to page number 180.  Page number 180.

16  Those your signatures again, ma'am?

17       A    Yes, it is.

18       Q    And how many signatures are on that page?

19       A    Ten.

20       Q    And they're all collected on June 28?

21       A    June 28.

22       Q    And there are ten signatures once again?

23       A    Ten signatures.

24       Q    Let's go to page number 188.  Number 188, 6/28

25  again, correct?

90

Vales-Direct/Carroll

1

2     A     Uh-huh.

3     Q     Are those your signatures?

4     A     Yes, it is.

5     Q     You witnessed that page.

6     A     Yes.

7     Q     And the number of signatures on that page?

8     A     Ten.

9     Q     Ten again.

10          Now, let's just focus for a second on all of these

11    signatures that you collected on 6/28.

12          On page number 188, we have a series of addresses

13    from 16th Street, 17th Street, Prospect Avenue and then one,

14    two, three, four, five addresses from Seventh Avenue.

15    A     Right.

16    Q     How did you collect these signatures, did you go

17    door to door?

18    A     Door to door.

19    Q     Door to door.

20          Okay.  Let's go back to page number 180.  Okay.

21          Once again, did you collect these signatures door

22    to door?

23    A     Uh-huh.

24    Q     Door to door.

25    A     Door to door.

KCDA000809

JO-187

91

1                    Vales-Direct/Carroll

2      Q    Back to page number 160.  Page number 160.

3           Once again, if you'd like at those addresses, how

4    did you collect those?

5      A    I went door to door.

6      Q    Door to door.  Okay.

7           Page number 136, once again, if you'd look at those

8    addresses; is that door to door, also?

9      A    Door to door.

10     Q    Page number 117.  Would you look at those

11   addresses.

12     A    Uh-huh.

13     Q    How did you collect those, ma'am?

14     A    Door to door.

15     Q    Door to door.  Okay.  Then page number 81.  How did

16   you collect those, ma'am?  Look at the addresses.

17     A    Door to door.

18     Q    Once again, door to door.  So, ma'am, on page

19   number 81 on June 28th, you collected ten signatures door to

20   door.

21          On page number 117, on June 28th you collected ten

22   signatures door to door.

23          On page number 136 on June 28th, you collected ten

24   signatures door to door.

25          On page numbered 160 --

KCDA000810

JO-188

92

1           Vales-Direct/Carroll

2           MR. MEYERS:  Objection.

3           Your Honor, the document speaks for itself.

4           THE COURT:  Not only it speaks for itself;

5      she's testified.  You don't have to repeat it.

6   Q   Ma'am, you've testified you're employed?

7   A   Yes.

8   Q   And you work nine to five?

9   A   Yes, I do.

10  Q   Do you know what day of the week June 28th was?

11  A   It was on a Wednesday or a Thursday.

12  Q   Did you collect these all in the evening?

13  A   No, during the day.

14  Q   You took that day off to collect signatures?

15  A   No, I was on vacation till about July the 8th.

16          THE COURT:  Anything else?

17          MR. CARROLL:  Oh, yes, absolutely, your

18      Honor.

19  Q   On page number 3 of in petition dated 6/27.

20  A   Uh-huh.

21  Q   That is your signature at the bottom?

22  A   Yes.

23  Q   I ask you to look specifically at line number 1.

24  Do you recall getting that signature?

25      A   Yes, I did.

KCDA000811

93

1                    Vales-Direct/Carroll

2      Q    From a Mr. Lauderbach (phonetic)?

3      A    Yes, I did.

4      Q    I ask you also to look at signatures number two and

5  three from a Mary Elizabeth Leo (phonetic) and a Vito John

6  Leo (phonetic).

7           Do you recall getting those two signatures?

8      A    Yes, I do.

9      Q    Did two people actually sign or was it one signing

10  for the other?

11      A    It was two people.

12      Q    It's two separate people who signed that petition.

13      A    Right.

14           MR. CARROLL:  Your Honor, may I show the Court

15           those signatures.

16           THE COURT:  Yes.  I'll look at them.

17           MR. CARROLL:  On lines 2 and 3 (handing).

18           THE COURT:  Okay.

19      Q    Ma'am, if we could turn to page 10 of the petition,

20  now, these are the signatures of a Michael or -- and Barbara

21  Vale (phonetic); that's on line 6 and 7.  If you could look

22  at lines 6 and 7 of the petition.

23           These individuals are not related to you in any

24  way, are they?

25      A    No.

FORM C-100 - LASER  REPORTERS PAPER & MFG. CO   800-626-6313

JO-190

94

1                      Vales-Direct/Carroll

2       Q    Do you recall getting those two signatures?

3       A    Yes, I do.

4       Q    They were two separate individuals who signed?

5       A    Yes, this is the project. I went with people. I

6    didn't go on my own.

7       Q    When you say you went with people, tell me how you

8    did that.

9       A    Actually, I went on my own. It was a Saturday

10   morning. It was about twelve o'clock.

11      Q    You were there alone --

12      A    I was heading headed towards the project. It was a

13   Saturday morning, okay. I figured: Let me get some

14   signatures now. Went up towards the project. That's right

15   up the block from where I am, on Tenth. I live on Ninth. I

16   went up the block to get signatures from the people in the

17   the project.

18           I met a friend Ray and his wife coming out of the

19   building. He said: What am I doing here? I said I'm

20   collecting signatures for John O'Hara, because there's a lot

21   of people in the projects; I figured I'd get a lot of

22   signatures.

23           He said, you shouldn't be up in the projects on

24   your own.

25           I got a little nervous, you know, projects, so he

KCDA000813

95

1                          Vales-Direct/Carroll

2    went around with me and he knocked on the doors.  I stood

3    with his wife and we were talking and he was getting

4    signatures.

5        Q    Were you physically present when these signatures

6    were collected?

7        A    Yes, I was.

8        Q    Where were you?

9        A    If the door was here, I was, like, right here

10   talking with his wife.

11       Q    Now, do you recall Mr. and Mrs. Vale (phonetic)

12   signing this petition?

13       A    Yes, I do.  Can't remember the people on all the

14   floors.  I can't actually remember --

15       Q    It's your testimony this is in fact two different

16   people signing this petition and not one person signing for

17   another?

18       A    Two people.

19            MR. CARROLL:  Your Honor, may I show these

20            signatures to the Court.  That's on lines 6 and 7

21            (handing).

22            THE COURT:  (Handing).

23       Q    Let's move to page 107, ma'am, if you can.  Excuse

24   me.  To page 43.

25            THE COURT:  Page what?

96

1                           Vales-Direct/Carroll

2                   MR. CARROLL:  43, Judge.

3        Q    Once again, this is one of your sheets; is it not?

4        A    Yes, it is.

5        Q    Once again, I ask you to take a look at lines 6

6   and 7.

7        A    Right.

8        Q    And I believe one is a Patricia Kenny (phonetic)

9   and the other is a --

10       A    Patrick.

11       Q    Patrick Kenny.

12            And is it your testimony that two separate people

13   signed that petition?

14       A    Yes, they did.

15            MR. CARROLL:  May we show those to the Court

16            as well, your Honor?

17            THE COURT:  Go ahead.

18            MR. CARROLL:  Thank you.

19       Q    Ma'am, I'm going to show you page number 107 of

20   this petition.  And, first, this is another one of your

21   pages; is it not?

22       A    Yes.

23       Q    And if you would, ma'am, would you take a look at

24   lines 6 and 7 of that petition.

25            Do you recall these people signing?

KCDA000815

97

1                    Vales-Direct/Carroll

2       A    Yes.

3       Q    And that's what looks like a Cecilia and Joseph

4   Tragoli (phonetic.)

5       A    Yes.

6       Q    And it's your testimony that two separate people

7   signed --

8       A    Yes.

9               MR. MEYERS:  Objection.

10              Line 6 and 7 are not marked as evidence to be

11              produced at this trial by petitioner.

12              THE COURT:  Is the sheet marked?

13              MR. MEYERS:  The sheet is here but --

14              THE COURT:  I'll take it.

15              MR. MEYERS:  Note my exception.

16              MR. CARROLL:  Your Honor, may I show the

17              signatures on line 6 and 7, Tragoli (indicating)?

18              THE COURT:  Okay.  Get the buff cards.

19              MR. CARROLL:  We will.

20      Q    Ma'am, I also would like you to look at this

21  particular sheet -- that's page 107 at lines 9 and 10 --

22  Camilla and Hazelawn (phonetic) Griffith, and I'd like you,

23  while you're looking at those signatures, also to look at

24  page 172 of the petition, line 1.

25              THE COURT:  Which one are you looking at now?

KCDA000816

JO-194

98

Vales-Direct/Carroll

1

2          MR. CARROLL:  We're looking at page 107 and

3          172, Judge.

4                  THE COURT:  We already looked at 107.

5          MR. CARROLL:  We have two more signatures on

6          107, lines 1, 9 and 10.  And I would like those to

7          be looked at in connection with line 1 of page

8          172.

9     Q    Now, ma'am, page 107 was collected by you on 6/27;

10    is that correct?

11    A    Yes.

12    Q    And page 172 was also collected by you on 6/27,

13    correct?

14    A    Right.

15    Q    And you took the signatures of Camilla and Hazelawn

16    Griffith at 412 Prospect Avenue at the bottom of page 107;

17    that's lines 9 and 10, right; and a third member of the

18    Griffith family at the top of page 172 -- is that correct --

19    line number 1, Oliver Griffith, correct?

20    A    Right.

21    Q    Is it your testimony, ma'am, that three separate

22    people signed all three of those signatures or did one

23    person sign those signatures?

24    A    Three separate people.

25                  MR. CARROLL:  May I show those to the Court,

KCDA000817

JO-195

99

Vales-Direct/Carroll

1

2      your Honor?

3              THE COURT:  Yes (indicating).

4              We'll go over them all with the buff cards.

5              MR. MEYERS:  We have two signatures at the

6      bottom of page -- we have two signatures at the

7      bottom of 107, I believe.  Is that the page,

8      Judge?  Yes, 107.  And then the signature at the

9      top of page 172.

10              THE COURT:  You saw three people sign this?

11              THE WITNESS:  A lot of times I gave them the

12      ballot --

13              THE COURT:  I didn't ask that.

14              You saw three people sign this?

15              THE WITNESS:  Yes.

16      Q    You were starting to say a lot of times --

17      A    They ask for the person and they take the ballot.

18  I would never go into the house.

19      Q    They took the petitions into their house?

20      A    Yes.  I would never go into the house.

21      Q    These signatures were not signed in your presence?

22      A    I didn't actually see every person sign it if they

23  walked in with the ballot.

24      Q    If somebody asked you to walk into the house with

25  their petition, would you let them it do it?

100

1                    Vales-Direct/Carroll

2        A    I would let them take the petition if they have to

3    lean on a table or something.

4        Q    Then you wouldn't be able to see them sign?

5        A    Right.

6        Q    And you don't know if one person signed or three

7    persons signed, do you?

8        A    No.  But I would never walk in the house.

9        Q    Let's stay on page 172 for a second, ma'am.

10            THE COURT:  Off the record.

11            (Discussion off the record.)

12       Q    Ma'am, I would like you to look at page 172.  And I

13   believe we've already established that this is, in fact, one

14   of your sheets.

15       A    Yes.

16       Q    And you've already testified with respect to the

17   Griffiths --

18            MR. MEYERS:  Objection.

19            What she already testified to is in the

20            record.

21            MR. CARROLL:  That's fine.

22       Q    If you would take a look at lines 3 and 4 of the

23   petition, ma'am.  Is it your testimony that these

24   signatures -- this is a Loretta and Joseph Brezinsky?

25       A    Brezinsky.

KCDA000819

JO-197

101

1                    Vales-Direct/Carroll

2                    MR. MEYERS:  Objection.

3      Q    Is it your testimony that two people signed this

4  petition?

5      A    Yes, as far as to my recollection.

6      Q    Do you recall whether or not you gave them the

7  petition and they took it inside?

8      A    Some people did take it inside and some didn't.

9  There are so many people --

10     Q    And you can't remember --

11                   MR. MEYERS:  Objection.

12                   He's leading the witness, your Honor.

13     Q    Ma'am, I'm going to show you lines nine and ten.

14                   MR. MEYERS:  Objection, your Honor.

15                   They're also not marked as being part of the

16                   record.

17                   THE COURT:  Is the sheet marked?

18                   MR. MEYERS:  The sheet is made part of it,

19                   your Honor, but it specifically states in the bill

20                   of particulars that the only evidence that

21                   they're --

22                   MR. CARROLL:  We'll move on beyond lines 9 and

23                   10.

24     Q    I'm going to take you to page number 188, ma'am.

25                   (Person entered courtroom.)

KCDA000820

JO-198

102

1                     Vales-Direct/Carroll

2                     THE COURT:  Is that a witness?

3                     MR. CARROLL:  No, she's not, Judge.

4                     THE COURT:  Do you have a page on that?

5                     MR. CARROLL:  188, Judge.

6       Q    Okay, ma'am, we have -- I'd like you to take a look

7    at lines number 9 and 10 on page 180.

8            Is it your testimony that these two people signed?

9       A    Yes.

10      Q    Do you recall whether you -- whether they took the

11   petition inside or do you recall if you saw both of them?

12      A    I don't recall.

13      Q    So you don't recall if you saw both of them.

14      A    No.  I don't remember the peoples' faces with the

15   names.

16      Q    And those two people are Lillian and Alfred Monaco

17   (phonetic); is that correct?

18      A    Right.  Monaco.

19      Q    I ask you, ma'am, to look at -- and that is one of

20   your sheets.

21      A    Right.

22      Q    And it's dated 6/28?

23      A    Uh-huh.

24      Q    I'd ask you to take a look at page 180 of your

25   petition as well, ma'am, and look at lines number 8 and 9.

FORM C-100 - LASER  REPORTERS PAPER & MFG CO  800-526-6313

JO-199

103

Vales-Direct/Carroll

1

2    Are those also the signatures of Lillian and Alfred

3    Monaco?

4    A    (No response.)

5    Q    What do they appear to be?

6    A    Alfred Monaco and --

7    Q    No.  Above.  Is that not Lillian Monaco?

8    A    Right.

9    Q    And isn't that dated 6/28?

10   A    Yes.

11   Q    And isn't that at 483 Seventh Avenue?

12   A    Yes.

13   Q    And on page 188 -- also dated 6/28 -- you have the

14   signatures of Lillian and Alfred Monaco from 483 Seventh

15   Avenue?

16   A    Right.

17   Q    The signatures aren't the same, are they?

18   A    No, they're not.

19   Q    And they're both signed the same date; are they

20   not?

21   A    Uh-huh.

22        MR. MEYERS:  Objection.

23   Q    Do you have any explanation for that?

24   A    No.

25        MR. CARROLL:  May I show these two to the

KCDA000822

JO-200

104

1                    Vales-Direct/Carroll

2          Court, your Honor?

3                    THE COURT:  Were there two different Alfred

4          Monacos and Lillian Monacos at that address?

5                    THE WITNESS:  It's the same address.

6                    THE COURT:  Do you recall, were two different

7          Lillian and Alfred Monacos at that address?

8                    THE WITNESS:  No.

9                    THE COURT:  You don't recall?

10                   THE WITNESS:  No, I don't.

11                   THE COURT:  You don't recall -- were they

12         taken at the same time?

13                   THE WITNESS:  Yes.

14    Q    So you had them sign the petition twice at the same

15    time?

16    A    I might have, and I might have not recalled.  And

17    maybe somebody else answered.  I don't know.

18                   THE COURT:  Were were you alone at that time

19         or with somebody?

20                   THE WITNESS:  On Seventh Avenue, I might have

21         been.  A couple times I went with friends.

22                   THE COURT:  Do you remember with whom you went

23         with on that date?

24                   THE WITNESS:  Maybe once or twice, I went with

25         Maureen.  Maybe another friend from the

JO-201

105

1                    Vales-Direct/Carroll

2          neighborhood.

3     Q     Is it possible that somebody else took these

4   signatures?

5     A     No.

6     Q     No.  So it's your testimony that on the same day,

7   you went back to the same address twice and got the

8   signatures of the same people twice, but their signatures

9   are different?

10    A     I might have, but I don't recall.

11             THE COURT:  Let me see those.

12             MR. CARROLL:  (Handing to Judge.)

13             We, in fact, have Alfred Monaco signing three

14          times, Judge.  It's 6/28, 6/28, 6---

15             THE COURT:  Same petition, same S.W.

16             MR. CARROLL:  Same S.W.

17             THE COURT:  One's an Alfred Monaco, Jr.  One

18          is an Alfredo Monaco.

19             MR. MEYERS:  One's an Alfred Monaco.

20    Q     Now, ma'am, you said --

21             THE COURT:  Ma'am, 17th Street, is that near

22          Prospect Avenue?

23             THE WITNESS:  Yes, it is.

24             THE COURT:  And 16th Street, is that near

25          Prospect Avenue?

KCDA000824

106

Vales-Direct/Carroll

1

2       THE WITNESS:  Yes, it is.

3       THE COURT:  And 21st Street, is that near

4   Prospect Avenue?

5       THE WITNESS:  No, it's not.  It's about four

6   blocks away.

7       THE COURT:  And Seventh Avenue, is that near

8   Prospect Avenue?

9       THE WITNESS:  Yes, it is.

10      THE COURT:  And did you say on sheet number

11  188, you went from door to door?

12      THE WITNESS:  Yes, I did, but I didn't get

13  corresponding -- like, I had two or three sheets I

14  let them sign.

15      MR. CARROLL:  We're going to get to that,

16  Judge.

17  Q   Ma'am, you testified you had two or three sheets

18  that you let people sign, and you also testified that you

19  were going door to door?

20  A   Right.

21  Q   And you further testified that on this date, 6/28,

22  you were out with Kathy, correct?

23  A   Kathy or either Maureen.  I can't recollect --

24  Q   How many people did you go out with on these days?

25  A   I went with my sister.  I went with friends.

KCDA000825

107

1              Vales-Direct/Carroll

2      Q    When you went out on 6/28, do you remember how many

3  people you went out with; one other person or two other

4  people?

5      A    Just one other person.

6      Q    And is it possible that one of those other people

7  was carrying one of these sheets?

8      A    No.  The sheets were in my hand.

9      Q    But yet you were going door to door --

10     A    With another person.

11     Q    And the addresses are not sequential on the sheets,

12  are they?

13              MR. MEYERS:  Objection.

14     A    No.

15              THE COURT:  Overruled.

16     Q    Now, on 6 --

17              THE COURT:  Is it your testimony you went to

18              17th Street, then you went to 16th Street, and then

19              you went to Prospect Avenue --

20              THE WITNESS:  Right.

21              THE COURT:  And then you went to 21st Street?

22              THE WITNESS:  Right.  I walked around the

23              neighborhood, stop to drink soda.  I'm not going to

24              go door to door.

25              THE COURT:  Did you go door to door or get it

FORM C-100 - LASER   REPORTERS PAPER & MFG. CO.  800-626-6313

JO-204

108

1                    Vales-Direct/Carroll

2          in the street?

3                    THE WITNESS:  I went door to door, knocked on

4          peoples' doors.

5                    THE COURT:  That's how you went from 17th

6          Street to 16th Street to Prospect --

7                    THE WITNESS:  16 and 17 are adjacent to each

8          other.

9                    THE COURT:  Then you went to 21st Street?

10                   THE WITNESS:  Right.

11                   THE COURT:  Then you went back to Seventh

12         Avenue?

13                   THE WITNESS:  Yes, I did.

14                   THE COURT:  Okay.

15    Q     Now, ma'am, on 6/28, who was with you?  Was it a

16    man or a woman?

17    A     A woman.

18    Q     And the identity of that woman was?

19    A     Maureen; my friend.

20                   MR. CARROLL:  We have no further questions of

21         this witness, your Honor.

22                   THE COURT:  All right.

23         You may inquire, Counselor.

24                   MR. MEYERS:  Thank you, your Honor.

25                   If I just may have one moment.

FORM C-100 - LASER   REPORTERS PAPER & MFG  CO   800-626-6313

JO-205

109

1                    Vales-Direct/Carroll

2    CROSS-EXAMINATION

3    BY MR. MEYERS:

4        Q    Miss Vales, at any time during your collection of

5    these petitions, did anyone sign your petitions whose door

6    you did not go in front of that maybe you ran into in the

7    street that said they lived in the neighborhood or the

8    district?

9        A    I might have.

10       Q    Is it possible --

11       A    There were some people from my neighborhood that

12   the sheets are not there, from where I live, Democrats.

13       Q    I'm sorry?

14       A    There are people also from my area that are not

15   there.

16       Q    What do you mean --

17       A    That are neighbors that signed.

18       Q    Okay.  Is it possible that on sheet number 188,

19   that you might have taken the signature of these signators

20   not at their door but maybe in the street?

21       A    It could be.

22       Q    Do you have any specific recollection of that

23   particular signature?

24       A    No, I don't.

25       Q    Or the signatures on that page?

KCDA000828

JO-206

110

1                    Vales-Cross/Meyers

2    A    No.

3               MR. MEYERS:  Thank you.

4          I have no further questions, your Honor.

5               MR. CARROLL:  I have no further questions,

6    Judge.

7               THE COURT:  You may step down, ma'am.

8               (Witness excused.)

9               THE COURT:  How many more witnesses do we

10   have?

11              MR. CARROLL:  I think they're probably stacked

12   up outside.

13              THE COURT:  Did we ever get that lease back?

14              MR. CARROLL:  No, not yet.  We're trying.

15   M A U R A   B U R N E T T, residing at 301 16th Street,

16        Brooklyn, New York, called as a witness by the

17        Petitioners, having been duly sworn, testified as

18        follows:

19              THE CLERK:  Have a seat.

20              State and spell your name.

21              THE WITNESS:  Maura, M-a-u-r-a, Burnett,

22   B-u-r-n-e-t-t.

23              THE CLERK:  Where do you live?

24              THE WITNESS:  301 16th Street?

25              THE CLERK:  In Brooklyn?

KCDA000829

JO-207

111

Vales-Cross/Meyers

1

2          THE WITNESS:  Yes.

3          THE CLERK:  Thank you.

4   DIRECT EXAMINATION

5   BY MR. CARROLL:

6      Q    Thank you for coming, Ms. Burnett.

7          I'm going to show you a Democratic Party

8   designating petition that has been marked in evidence as

9   Petitioners' Exhibit 5, and I'm going to ask you to take a

10  look at page 125 of that petition and specifically at line

11  7.

12          Is that your signature, ma'am?

13     A    Yes.

14     Q    And do you remember the circumstances around the

15  signing of that petition?

16     A    Yes.

17     Q    When did you sign it?

18     A    I don't recall the exact date.

19     Q    You don't recall the exact date?

20     A    Uh-huh.

21     Q    Would the date alongside your name refresh your

22  recollection?  Was it around June 8?

23     A    It was around June 8, yes.

24     Q    Do you remember signing for Mr. O'Hara as the

25  potential candidate?

FORM C-100 · LASER  REPORTERS PAPER & MFG CO  800-626-6313

JO-208

112

1                    Burnett-Direct/Carroll

2       A    Yes, I do.

3       Q    What time of the day was it?

4       A    I don't remember exactly, but I would say it was

5  early evening.

6       Q    Early evening.  You work?

7       A    Yes.

8       Q    Okay.  And it was after work?

9       A    Yes.

10      Q    Did someone come to your front door?

11      A    Yes.

12      Q    How many people came to your front door?

13      A    Two people.

14      Q    And what were their sexes?

15      A    Male and female.

16      Q    And the male, did you recognize the male?

17      A    I had never seen him before.

18      Q    Do you know who the male is?

19      A    He identified himself as John O'Hara.

20      Q    So he identified himself to you as John O'Hara.

21      A    Uh-huh.

22      Q    Would you recognize Mr. O'Hara if you saw him?

23      A    Yes.

24      Q    Do you recognize anyone in the courtroom who might

25  be John O'Hara?

KCDA000831

JO-209

113

Burnett-Direct/Carroll

1

2    A    Yes.

3    Q    Was that, in fact, the individual who came to your

4    door?

5    A    Yes.

6    Q    Now, someone else came to your door.

7    A    That night.  Yes.

8    Q    Who was that?

9    A    I do not know her name.

10    Q    It was a woman?

11    A    Yes.

12    Q    Could you describe her to us?

13    A    I would say she was of medium build.  Her age was

14    approximately in the thirties; it could have been the high

15    twenties; it could have been low forties; but I would say

16    thirties, as an average; medium complexion with brown hair,

17    shoulder length.

18    Q    Was she slender or heavier or -- do you recall

19    that?

20    A    Medium build, leaning towards slender.

21    Q    I'm going to show you a photograph that has been

22    marked in evidence as Plaintiff's Exhibit -- excuse me -- as

23    Petitioners' Exhibit 4 in evidence.  And I ask you to take a

24    look at the lady on the extreme left of the photo

25    (handing).

KCDA000832

114

1                    Burnett-Direct/Carroll

2          Was that the individual who came to your door?

3     A    No, it was not.

4     Q    And you're confident it was not that individual.

5     A    Yes.

6     Q    Thank you very much.

7          Could you just identify the person who has signed

8     that sheet of the petition?

9     A    You mean, just read it?

10    Q    Just read it.

11    A    Maureen Steffenson.

12              MR. CARROLL:  Thank you very much.

13              I have no further questions.

14              MR. MEYERS:  May I see the photograph,

15          please?

16              MR. CARROLL:  Sure (handing).

17              THE COURT:  You may inquire.

18              MR. MEYERS:  I have no further questions, your

19          Honor.

20              THE COURT:  You may step down.

21              (Witness excused.)

22              THE COURT:  Let's take a break.

23              (Whereupon, there was a recess.)

24              THE COURT:  Let's go.

25    E D M O N D    G A R A B E D I A N,

FORM C-100 - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

JO-211

115

Garabedian-Direct/Carroll

1    Residing at 94-30 86th Street, Woodhaven, New

2    York called as a witness by the Petitioner,

3    having been duly sworn, testified as follows:

4    THE CLERK:  State and spell your name, for the

5    record.

6    THE WITNESS:  Edmond, E-d-m-o-n-d, Garabedian,

7    G-a-r-a-b-e-d-i-a-n.

8    THE CLERK:  Where do you live, sir?

9    THE WITNESS:  Woodhaven, New York.

10    THE CLERK:  Where, exactly?

11    THE WITNESS:  94-30 86th Street, Woodhaven,

12    New York.

13    THE CLERK:  Thank you.

14    THE COURT:  You may proceed.

15

16  DIRECT EXAMINATION

17  BY MR. CARROLL:

18    Q    It's Mr. Garabedian?

19    A    Yes, it is, sir.

20    Q    Mr. Garabedian, are you employed?

21    A    Yes.

22    Q    By whom are you employed?

23    A    American Express Travel Related Services.

24    Q    And what do you do for American Express?

25    A    I am the custodian of records for American Express.

116

Garabedian-Direct/Carroll

1

2    Q    And are you here responding to a subpoena?

3    A    Yes.

4    Q    Could you show me the documents that you have

5    produced, sir?

6    A    Sure (handing).

7    Q    Mr. Meyers, may I show you these documents?

8         THE COURT:  This, I think, is yours.

9         MR. CARROLL:  No.  This is in evidence.

10        THE COURT:  I don't need it now.

11        MR. CARROLL:  It is, in fact, our copy, but

12   it's in evidence.

13        MR. MEYERS:  Your Honor, I am going to object

14   to every portion of this document, except for those

15   portions which indicate Mr. O'Hara's address.

16        I specifically wish to exclude any

17   identification numbers, any expenditures or

18   anything of a personal nature to Mr. O'Hara, except

19   for the addresses which this document purports to

20   show.

21        THE COURT:  Any problem?

22        MR. CARROLL:  Your Honor, I don't have any

23   problem with redacting the records.

24        THE COURT:  We'll redact the record and have

25   the records admitted merely for the purpose of

KCDA000835

117

Garabedian-Direct/Carroll

1    showing the address of Mr. O'Hara.

2         MR. CARROLL:  Well -- and I believe there's

3    the record of another individual there as well, and

4    I would give the same stipulation for that.

5         THE COURT:  Same stipulation for the other

6    individual as well.

7         Mark it Petitioners' Exhibit -- where are we?

8         THE CLERK:  Ten, according to this list.

9         MR. MEYERS:  Your Honor, this would be

10   Petitioners' Number 10.

11        THE COURT:  Yes, 10 and 11.  Now, whose is

12   Number 10?

13        MR. CARROLL:  Number 10 will be Mr. O'Hara.

14        THE COURT:  Petitioner's Exhibit 10, O'Hara.

15        THE CLERK:  Counsel, let me have those.

16        MR. CARROLL:  Exhibit 11 is Sandra Helverson.

17        THE COURT:  What did you say?  Sandra?

18        MR. CARROLL:  Sandra Helverson (phonetic).

19   H-e-l-v-e-r-s-o-n, I believe.

20        THE COURT:  That's the AmEx record?

21        MR. CARROLL:  That's correct.

22        THE COURT:  As redacted.

23        You'll redact everything else before we put it

24   in as evidence.

JO-214

118

1        Garabedian-Direct/Carroll

2            MR. MEYERS:  Thank you, your Honor.

3            THE COURT:  What I will suggest is we make

4    photostatic copies and redact everything but the

5    addresses of the persons involved.  I don't want to

6    know whether you pay your bill or don't.

7            MR. MEYERS:  And the dates, your Honor.  We

8    can leave in the dates as well.

9            THE COURT:  Pardon me?

10           MR. MEYERS:  We can leave the dates in as

11   well.

12           THE COURT:  Dates?  Fine.

13           THE COURT:  Counsel, what I will suggest is

14   you both take it and redact those portions you both

15   consent to be redacted and that you both consent to

16   be admitted into evidence.  Okay?

17           MR. CARROLL:  We can do that.

18           THE COURT:  During lunch hour, you can do it.

19           MR. MEYERS:  Sure.

20           (So marked, Petitioners' Exhibits 10 and 11 in

21   evidence.)

22           THE COURT:  Do you need them for any other

23   purpose?

24           MR. CARROLL:  Do I need this gentleman for any

25   other purpose?

JO-215

119

1                    Garabedian-Direct/Carroll

2              THE COURT:  Yes.

3              MR. CARROLL:  I'd like him to identify the

4         addresses at which he located the various

5         accounts.

6              THE COURT:  Go ahead.

7    DIRECT EXAMINATION

8    BY MR. CARROLL:

9         Q    Mr. Garabedian, did we ask you -- pursuant to that

10   subpoena, were you asked to research specific addresses for

11   Mr. O'Hara?

12        A    Yes.

13        Q    Does the report indicate addresses at which

14   Mr. O'Hara opened an account?

15        A    Yes.

16        Q    What does the report indicate with respect to that?

17        A    In 1990, the address for Mr. O'Hara was 579 61st

18   Street, Brooklyn, New York, 11220.

19        Q    And did there come a time, pursuant to your

20   records, that Mr. O'Hara changed his address?

21              THE COURT:  Did you say in 1990?

22              THE WITNESS:  Yes, sir.

23              THE COURT:  Go ahead.

24              THE WITNESS:  Yes, the address was changed

25         once in 1993.

KCDA000838

JO-216

120

Garabedian-Direct/Carroll

1

2     THE COURT:  What date?

3     THE WITNESS:  In February of 1993.

4     THE COURT:  2/93.  To where?

5     THE WITNESS:  To 553 47th Street, Brooklyn,

6     New York.

7     THE COURT:  And?

8     THE WITNESS:  And subsequently it was changed

9     in February of 1994 to 6017 Fourth Avenue,

10    Brooklyn, New York.

11    Q    And is 6017 Fourth Avenue where it's currently at?

12    A    Yes.

13    Q    And February '94 is when that address was changed.

14    A    Correct.

15    Q    I'd ask you to look at Exhibit 11 in evidence.

16    A    Yes, sir.

17    Q    And does that indicate the addresses at which an

18    account existed for a Miss Sandra Helverson?

19    A    Yes.

20    Q    And what does that indicate?

21    A    In 1993 --

22    THE COURT:  Is that when it was opened?

23    THE WITNESS:  That's when I was asked to

24    produce these documents from.

25    THE COURT:  Okay.

FORM C-100 - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

KCDA000839

JO-217

121

Garabedian-Direct/Carroll

1

2        THE WITNESS:  In 1993, the address for

3    Miss Helverson was listed as 1225 Pine Street, San

4    Francisco, California; and in February of 1994, the

5    address was changed to 430 Ogden Avenue -- that's

6    O-g-d-e-n Avenue, Jersey City, New Jersey.  And

7    that is the address that's on our records at the

8    present time.

9    Q    Do you have any account for Ms. Helverson at

10   519 47th Street, Brooklyn, New York?

11   A    No.

12   Q    Okay.  Did you check that address at our request?

13   A    The only account that American Express -- that I

14   was able to locate for Miss Helverson, based on the

15   information I had, was this account that I have the records

16   for, and that is the only address that I have listed.

17   Q    And that is currently at Ogden Avenue in Jersey

18   City?

19   A    Yes.

20        THE COURT:  And that was changed February

21   '94?

22        THE WITNESS:  Correct.

23        THE COURT:  Is the date the same as the change

24   in the O'Hara one, February '94, to 6017 Fourth

25   Avenue?

122

1                    Garabedian-Direct/Carroll

2              THE WITNESS:  It's the same month, your Honor.

3              THE COURT:  Same month.  I know that.  What

4         about the date?

5              THE WITNESS:  I don't know the exact dates it

6         was changed.

7              THE COURT:  Okay.

8              MR. CARROLL:  We have no further questions of

9         this witness, your Honor.

10             THE COURT:  Questions?

11             MR. MEYERS:  I'd like to see the Helverson

12        exhibit, please.  I believe that's Petitioners'

13        11.

14   CROSS-EXAMINATION

15   BY MR. MEYERS:

16        Q    Sir, can you please indicate to me on here where it

17   says what her latest address is.

18        A    The latest statement with a closing date -- cut off

19   date of July 22, 1994 has the 430 Ogden Avenue address.

20        Q    When you conduct these searches, how do you do

21   them?  Is it by name only?

22        A    It's by name or Social Security numbers.

23        Q    And in this instance, what did you have to go with?

24        A    Social Security and the name.

25        Q    Social Security number?

KCDA000841

JO-219

123

                    Garabedian-Cross/Meyers

1

2    A    Yes.

3            MR. MEYERS:  I have no further questions, your

4    Honor.

5            Thank you, sir.

6            THE COURT:  Are you finished with this

7    witness?

8            MR. MEYERS:  I'm finished with this witness,

9    Judge.

10           THE COURT:  Thank you, sir.

11           (Whereupon, the witness was excused.)

12   J O A N   K L E P A C K I, 2502 East 19th Street, Brooklyn,

13   New York, recalled as a witness by the Petitioners,

14   having been duly sworn, resumed the stand and

15   continued testimony as follows:

16           MR. CARROLL:  Your Honor, if you will recall,

17   yesterday afternoon I asked Miss Klepacki to check

18   another apartment number at 579 61st Street.

19           THE COURT:  That's correct.

20           MR. CARROLL:  And to respond as to whether or

21   not an account was at that particular apartment

22   number.

23           THE COURT:  Go ahead.

24   FURTHER DIRECT EXAMINATION

25   BY MR. CARROLL:

KCDA000842

JO-220

124

Garabedian-Cross/Meyers

1

2    Q   Miss Klepacki, did you check the books and records

3  of Brooklyn Union Gas pursuant to my request yesterday

4  afternoon?

5    A   Yes.

6    Q   What did you find, ma'am?

7    A   I found that John K. O'Hara was the customer of

8  record at 579 61st Street apartment 3-H, Brooklyn, New York,

9  11220 from December 7th, '81 to February 19th, 1990.

10           THE COURT:  Give me those dates?  Apartment

11         3-H from when?

12           THE WITNESS:  December 7, 1981.

13           THE COURT:  12/7/81 to --

14           THE WITNESS:  2/19/90.

15    Q   And at that point, ma'am, if my recollection is

16  correct, the records indicate that he switched service to

17  another apartment, apartment 2-I; is that not correct?

18    A   That's correct.

19           MR. CARROLL:  Your Honor -- well, we need to

20         show it to Mr. Meyers but I would move to

21         supplement the exhibit that was introduced by

22         Brooklyn Union Gas (handing).

23           MR. MEYERS:  I have no objection, your Honor.

24           THE COURT:  We can make that a part of --

25           MR. CARROLL:  At the Court's pleasure.  We

FORM C-100 - LASER REPORTERS PAPER & MFG. CO.  800-626-6313

JO-221

125

Klepacki-Direct/Carroll

1

2    could make it a part of Exhibit Number 2 in

3    evidence.

4         MR. MEYERS:  I have no objection.

5         THE COURT:  Without objection, make it part of

6    Exhibit 2.

7         (So marked.)

8         MR. CARROLL:  I have no further questions of

9    the witness.

10        THE COURT:  Any other questions of this

11   witness?

12        MR. MEYERS:  No, I don't.

13        THE COURT:  Thank you.  You're excused.

14        (Whereupon, the witness was excused.)

15        THE COURT:  How many pages are added to this?

16   How many pages of this exhibit that were added?  We

17   had originally nineteen pages.

18        THE CLERK:  Four more pages, Judge.

19        THE COURT:  Plus four pages.

20   A U R O R A   L O P E Z, residing at 189-A 31st Street,

21        Brooklyn, New York, called as a witness by the

22        Petitioners, having been duly sworn, testified as

23        follows:

24        THE CLERK:  State and spell your name so

25   everyone in the room can hear you.

JO-222

126

                    Lopez-Direct/Carroll

1

2                    THE WITNESS:  My name is Aurora, A-u-r-o-r-a,

3            Lopez.

4                    THE CLERK:  Where do you live, ma'am?

5                    THE WITNESS:  189-A 31st Street, Brooklyn, New

6            York.

7     DIRECT EXAMINATION

8     BY MR. CARROLL:

9        Q     Thank you for coming, Miss Lopez.

10               I'm going to show you a Democratic Party

11    designating petition which has been marked in evidence as

12    Petitioners' Exhibit Number 5 and I'd like you to take a

13    look at page 2 of that petition, okay.

14               First, could you read who the witness on that

15    petition sheet is.  Could you read that name?

16       A     Maureen Steffenson.

17       Q     Maureen Steffenson.  And I'd like you to take a

18    look specifically at line 6 of this sheet.

19               First of all, what is your address, ma'am?

20       A     189-A 31st Street.

21       Q     And is that the address that is set forth alongside

22    the signature on line 6?

23       A     Yes, it is.

24       Q     And would you look at the name on line 6.  What is

25    that name?

FORM C-100 · LASER  REPORTERS PAPER & MFG. CO  800-626-6313

KCDA000845

JO-223

127

1                    Lopez-Direct/Carroll

2    A    The name is Aurora Lopez.

3    Q    How many Aurora Lopezes live at that address?

4    A    Just me.

5    Q    Is that your signature, ma'am?

6    A    No, it isn't.

7              MR. CARROLL:  I have no further questions of

8         this witness.

9              THE COURT:  You may inquire.

10             MR. MEYERS:  Thank you, your Honor.

11   CROSS-EXAMINATION

12   BY MR. MEYERS:

13   Q    Ms. Lopez, do you recall anyone ringing your

14   doorbell to ask you to sign a petition?

15   A    No.

16   Q    No one ever came to your door?

17   A    No.

18             MR. MEYERS:  I have no further questions, your

19        Honor.

20             THE COURT:  You may step down.

21             (Witness excused.)

22             MR. MEYERS:  Your Honor, the witness is still

23        present in the room.

24             THE COURT:  She's already testified.

25             MR. MEYERS:  I don't know if she's going to be

JO-224

128

Lopez-Cross/Meyers

1
2          recalled.

3              MR. CARROLL:  She's not.

4  Y A M I L E T   G U T T I E R R E Z,

5          residing at 189-A 31st Street, Brooklyn, New York,

6          called as a witness by the Petitioners, having been

7          duly sworn, testified as follows:

8              THE CLERK:  Have a seat.

9              State and spell your name for the record so

10         everyone can hear you.

11             THE WITNESS:  Yamilet, Y-a-m-i-l-e-t,

12         Guttierrez, G-u-t-t-i-e-r-r-e-z.

13             THE CLERK:  And where do you live?

14             THE WITNESS:  189-A 31st Street.

15             THE CLERK:  In Brooklyn?

16             THE WITNESS:  Yes.

17             THE CLERK:  Thank you.

18  DIRECT EXAMINATION

19  BY MR. CARROLL:

20      Q   Thank you for coming, Miss Guttierrez.  Is that

21  correct?

22      A   Yes.

23      Q   Thank you.  First, could you tell us how old you

24  are, ma'am?

25      A   Fifteen.

KCDA000847

JO-225

129

1                    Guttierrez-Direct/Carroll

2    Q    You're fifteen years old?

3    A    Yes.

4    Q    And you live at 189-A 31st Street, right?

5    A    Yes.

6    Q    And do you know a Ms. Aurora Lopez?

7    A    My sister.

8    Q    That's your big sister, right?

9    A    Yeah.

10   Q    I'm going to show you a Democratic Party

11   designating petition which is marked in evidence as

12   Petitioners' Exhibit 5, okay.  And specifically I'm going to

13   ask you to look at page 2, line 6.

14        First of all, you live at 189-A 31st Street; is

15   that correct?

16   A    Yes.

17   Q    And and your sister lives there, too, doesn't she?

18   A    Yes.

19   Q    Do you recognize that signature on line 6?

20   A    My signature.

21   Q    It's okay.

22   A    Her name but my signature.

23   Q    It's your signature on the page.

24   A    Yes.

25   Q    Did somebody come to your door to collect the

KCDA000848

JO-226

130

Guttierrez-Direct/Carroll

1

2    signature?

3        A    Yes.

4        Q    What did they say to you?

5        A    They asked me if the owner of the house was there,

6    and I told them "No."

7             And they asked me if I wanted to sign for her, for

8    the owner of the house.  And I said "No," 'cause I

9    couldn't.  And she told me that it really wasn't the

10   signature that counted; it was that they needed as many

11   names as they could.

12       Q    And she asked you to sign the petition, even though

13   she knew it wasn't you?

14       A    Uh-huh.

15       Q    How many people came to your door?

16       A    Two.

17       Q    Do you remember what their sex was?

18       A    I think it was a woman and a guy.

19       Q    Do you remember what the woman looked like?

20       A    No.

21       Q    You don't?  Do you remember what the guy looked

22   like?

23       A    No.  I don't remember.

24       Q    I'm going to show you a photograph that has been

25   marked in evidence as Petitioners' Exhibit 4, and

KCDA000849

131

1                     Guttierrez-Direct/Carroll

2   specifically I'd like you to take a look at the lady on the

3   extreme left-hand-side of the photograph.

4           Do you recall if it was that lady who came to your

5   door?

6       A   I --

7       Q   Only if you recall.

8       A   No, I just remember her having glasses.  That's all

9   I remember.

10          MR. CARROLL:  Okay.  That's fine.  I have no

11          further questions of this witness.

12          THE COURT:  Any questions?

13          MR. MEYERS:  I have no questions, your Honor.

14          THE COURT:  You may step down.

15          MR. CARROLL:  Thank you for coming, ma'am.

16          (Whereupon, the witness was excused.)

17   J O H N    M A R C    G R O H,

18          called as a witness by the Petitioners, residing at

19          252 16th Street, Brooklyn, New York, having been

20          duly sworn, testified as follows:

21          THE CLERK:  State and spell your name for the

22          record?

23          THE WITNESS:  John Marc Groh, G-r-o-h,

24          M-a-r-c.

25          THE CLERK:  Where do you live, sir?

KCDA000850

FORM C-100-LASER REPORTERS PAPER & MFG. CO. 800-626-6313

JO-228

132

1                         Groh-Direct/Carroll

2                    THE WITNESS:  252 16th Street, Brooklyn.

3                    MR. CARROLL:  Thank you for coming, Mr. Groh.

4    DIRECT EXAMINATION

5    BY MR. CARROLL:

6         Q    I'm going to show you a Democratic Party

7    designating petition that's been marked in evidence as

8    Petitioners' Exhibit 5, and specifically I'd like you to

9    look at page 143 of that petition, line 3.

10             Is that your signature, sir?

11        A    Yes.

12        Q    And you signed that petition?

13        A    Yes, that's how I print my name.

14        Q    That is your signature?

15        A    Yes.

16        Q    That's the way you sign.  Okay.  And do you recall

17   signing that petition?

18        A    Yes, I do.

19        Q    Do you recall the circumstances surrounding it?

20        A    Yes.

21        Q    Well, was it on or about the 8th day of June; is

22   that correct?

23        A    As I recall, yes.

24        Q    What time of the day was it?

25        A    Early evening; 6, 7, something like that.

FORM C-100 - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

JO-229

133

Groh-Direct/Carroll

1

2    Q    Did someone come to your home?

3    A    Yes.

4    Q    How many people came to your home?

5    A    Two.

6    Q    Did those people identify themselves to you when

7    they came to your door?

8    A    The gentleman did; said --

9    Q    Who did he say he was?

10    A    Said he was Mr. O'Hara or John Kennedy O'Hara.

11    Q    John Kennedy O'Hara.  And is that individual in

12    fact in the courtroom right now?

13    A    Yes, he is.

14    Q    And he came to your door with the petition --

15         THE COURT:  Is that the individual sitting at

16    the table?

17         THE WITNESS:  Yes, on my left (indicating).

18    Q    And who was holding the petition, do you recall?

19    A    I don't recall.

20    Q    Okay.  The lady who came to the door, was it a

21    gentleman and a lady?

22    A    Yes.

23    Q    And the lady who came to the door, did she identify

24    herself to you?

25    A    No, not that I recall.

KCDA000852

JO-230

134

Groh-Direct/Carroll

1

2    Q    Do you remember what she looked like?

3    A    Youngish, dark hair and that's -- darkish hair,

4    dark brown.  Not black but dark brown.

5    Q    And a younger woman.

6    A    Yes.

7    Q    Slight build, medium build?

8            MR. MEYERS:  Objection.

9            THE COURT:  Overruled.

10           MR. MEYERS:  It's his witness.

11           THE COURT:  Go ahead.  You may proceed.

12   Q    Do you recall what her build was?

13   A    Not particularly heavy but not, you know, model

14   slender.

15   Q    Okay.  I'm going to show you a photograph, sir,

16   which has been marked into evidence as Petitioners' Exhibit

17   4 and I ask you specifically to focus on the lady who is at

18   the extreme left-hand side of the photograph.

19           I always get my right and left confused.

20           Was that the lady who came to your door?

21   A    No, it's not.

22   Q    And just for the record, sir, would you read who

23   witnessed that petition sheet?

24   A    Maureen Steffenson.

25           MR. CARROLL:  Thank you.

KCDA000853

135

1                    Groh-Direct/Carroll

2                    I have no further questions.

3                    THE COURT:  You may inquire.

4    CROSS-EXAMINATION

5    BY MR. MEYERS:

6        Q    Mr. Groh, do you recall, specifically, the

7    events -- was that the evening?

8        A    Yes, it was.

9        Q    Do you recall, specifically, the events of that

10   evening?

11       A    Other than them coming to my door?

12       Q    Uh-huh.  Just all of the surrounding things that

13   hand.

14       A    I was upstairs with my wife and my two children.

15   Someone rang the doorbell at 6:30, 7 o'clock.  I believe it

16   was after we'd had supper.  It's a rather unusual occurrence

17   for people to ring our doorbell, so I went down and answered

18   it; and Mr. O'Hara and a woman were at the door, said they

19   wanted my signature on a petition for them to become part of

20   the ballot.

21       Q    How long would you say the entire encounter lasted?

22       A    Not more than two or three minutes.

23       Q    Is this a private house?

24       A    Yes.

25       Q    Can you describe the front of the house where the

KCDA000854

JO-232

136

Groh-Cross/Meyers

1

2  door is, the front door?

3      A    It's -- you take two steps, two small steps down to

4  the door.  It's got a pink door, which is somewhat unusual

5  on the block.  And ---

6      Q    When you open the door, does it open in or out?

7      A    It opens in.

8      Q    And is there a stoop?

9      A    No.  You have to take two steps down.  I mean, you

10  walk in the metal gate, and then there are two steps down to

11  the door.

12      Q    When you walk through the metal gate, is that right

13  up against the sidewalk?

14      A    Yes.

15      Q    And how far is it from the gate to the front door?

16      A    Oh, seven feet.

17      Q    When you answered the door, did you step out into

18  the front area or did you stay in the house?

19      A    I opened the door in towards myself and then stood

20  at the door and they were -- as I recall, one was up on the

21  top step.  I believe Mr. O'Hara was down on the step by the

22  door.

23      Q    Okay.  But you didn't come out beyond the doorway?

24      A    Well, I mean, not -- it's difficult for two people

25  to be in -- at the bottom step, there's not enough room.

FORM C-100 · LASER · REPORTERS PAPER & MFG. CO.  800-626-6313

JO-233

137

1                    Groh-Cross/Meyers

2     Q     Would it be possible that there was a third person

3  present?

4     A     No.

5     Q     Why is that?

6     A     They would have had to be standing -- well, for me

7  not to see them, they would have had to be standing about

8  fifteen or twenty feet in either direction up the street.

9     Q     So from your door, you could see up and down the

10  street?

11    A     I can see up and down --

12    Q     Fifteen feet?

13    A     Fifteen to twenty feet, yes.

14              MR. MEYERS:  Okay.  Thank you.

15              I have no further questions.

16              MR. CARROLL:  I have no further questions of

17        this witness.

18              THE COURT:  You may step down.

19              MR. CARROLL:  Mr. Groh, thank you for coming.

20              (Whereupon, the witness was excused.)

21              MR. MEYERS:  Your Honor, I've just been

22        informed that the referee took lunch on the

23        line-by-line.  I'm just informing the Court.

24              THE COURT:  Off the record.

25              (Discussion off the record.)

KCDA000856

JO-234

138

1                    Groh-Cross/Meyers

2    J O S E P H   Z O T T O,

3            residing at 20-69 46th Street, Astoria, New York,

4    called as a witness by the Petitioners, having been

5    duly sworn, testified as follows:

6            THE CLERK:  State your name for the record,

7    please.

8            THE WITNESS:  Joseph Zotto, Z-o-t-t-o.

9            THE CLERK:  Where do you live?

10           THE WITNESS:  At 20-69 46th Street, Astoria,

11   New York.

12   DIRECT EXAMINATION

13   BY MR. CARROLL:

14       Q    Thank you, Mr. Zotto, for coming.

15            Are you employed?

16       A    Yes, I am.

17       Q    By whom are you employed?

18       A    The parent company's name is Time-Warner Cable of

19   New York City.

20       Q    And does it have subsidiaries?

21       A    Yes, it does.

22       Q    Does one of those subsidiaries serve parts of

23   Brooklyn?

24       A    Yes, it does.

25       Q    And does one of those subsidiaries serve the areas

KCDA000857

JO-235

139

Zotto-Direct/Carroll

1

2    at the addresses of 659 61st Street?

3        A    I'm sorry.  That wasn't the address I was given.

4        Q    679 -- excuse me -- 675 61st Street?

5        A    Actually, I have 579, if that's the one you're

6    referring to.

7                    MR. CARROLL:  My apologies, Judge.

8                    There are so many addresses involved.

9        Q    579 61st Street?

10       A    Yes, we do service that address.

11       Q    And does BQ Cable also serve the area covering

12   6017 -- six-zero-seventeen -- Fourth Avenue?

13       A    Yes, we do.

14       Q    Pursuant to a subpoena, were you requested to

15   research cable service at those two addresses?

16       A    Yes, I was asked to look for records pertaining to

17   a certain individual.

18       Q    At those two addresses?

19       A    At those two addresses.

20       Q    Are those records kept by Brooklyn-Queens Cable in

21   the normal course of business?

22       A    Yes, they are.

23       Q    And is it the noral course of business of

24   Brooklyn-Queens Cable to maintain those records?

25       A    Yes, it is.

KCDA000858

140

Zotto-Direct/Carroll

1

2  Q    And you have brought those records with you?

3  A    Yes.

4  Q    May I see them, sir?

5  A    Of course (handing).

6        MR. CARROLL:  Mr. Meyers, I show these to

7  you.

8        MR. MEYERS:  Your Honor, I don't have any

9  objection.

10        I have no objection, your Honor.

11        THE COURT:  All right.  Without objection,

12  mark it Petitioners' Exhibit -- what is it?  Give

13  me the number.

14        THE CLERK:  12.

15        THE COURT:  Petitioners' Exhibit 12.  That's

16  the cable records.  In evidence.

17        (So marked.)

18  Q    Sir, do these records indicate the provision of

19  cable service to a John K. O'Hara at 579 61st Street?

20  A    Yes, they do.

21  Q    And when was that service commenced?

22  A    Service was requested on December 8th, 1993 and

23  service was installed on January 27th, 1994.

24  Q    January 27, 1994 at 579 61st Street?

25  A    Correct.

FORM C-100 · LASER REPORTERS PAPER & MFG. CO.  800-626-6313

JO-237

141

Zotto-Direct/Carroll

1

2          THE COURT:  One/27/94.  Go ahead.

3      Q    Did you also check your service records with

4  respect to an address of 6017 Fourth Avenue?

5      A    Yes, we did.

6      Q    Is there service provided there?

7      A    There is, to one customer.

8      Q    Is that customer John K. O'Hara?

9      A    No, it is not.

10      Q    There is no service to Mr. O'Hara at that address?

11      A    No, there was no record of any service ever having

12  been provided to a John O'Hara at that address.

13      Q    At 6017 Fourth Avenue.

14      A    Correct.

15          THE COURT:  Anything else?

16      Q    Is Mr. O'Hara's cable service still in effect at

17  579 61st Street?

18      A    Yes, it is.

19          MR. CARROLL:  I have no further questions.

20  CROSS-EXAMINATION

21  BY MR. MEYERS:

22      Q    Sir, at the Fourth Avenue address, does it state

23  where the service was being given, which portion of the

24  premises?

25      A    These documents do not show that.  I recollect it

JO-238

142

```
 1              Zotto-Cross-Redirect
 2   as being a first floor apartment.
 3              MR. MEYERS:  Okay.  Thank you.
 4              I have no further questions.
 5              THE COURT:  You may step down.
 6              MR. CARROLL:  Your Honor, if I might.
 7              I have no further questions, your Honor.
 8              MR. MEYERS:  Nothing further.
 9              THE COURT:  You may step down.  Next.
10              (Whereupon, the witness was excused.)
11   N E A L   D e S I M O N E,
12              residing at 600 Carroll Street, Brooklyn, New York,
13              called as a witness by the Petitioners, having been
14              duly sworn, testified as follows:
15              THE CLERK:  State your name for the record,
16   sir.
17              THE WITNESS:  Neal, N-e-a-l, DeSimone,
18   D-e-S-i-m-o-n-e.
19              THE CLERK:  Where do you live, sir?
20              THE WITNESS:  600 Carroll Street, Brooklyn
21   DIRECT EXAMINATION
22   BY MR. CARROLL:
23       Q    I missed your name.  Sorry.
24       A    Neal DeSimone.
25       Q    Mr. DeSimone, thank you for coming.
```

FORM C-100 - LASER REPORTERS PAPER & MFG. CO.  800-626-6313

KCDA000861

JO-239

143

DeSimone-Direct/Carroll

1    Are you employed?

2    A    Yes, I am.

3    Q    By whom?

4    A    Con Edison.

5    Q    What do you do for Con Ed?

6    A    Right now, I work with their legal department.  My
7    title is senior customer service representative.

8    Q    In your capacity as a senior customer service
9    representative, are you familiar with the books and records
10   of Consolidated Edison?

11   A    The billing accounts of Con Edison, yes.

12   Q    And you're here responding to a subpoena; is that
13   correct?

14   A    Yes, sir.

15   Q    And I asked you to research certain addresses and
16   names in that subpoena; did I not?

17   A    Yes, sir.

18   Q    Have you done that?

19   A    Yes, sir.

20   Q    And is the information you've obtained from the
21   books and records of Con Edison?

22   A    From the computer system of Con Edison, yes, sir.

23   Q    And these books and records are kept by Con Edison
24   in the normal course of business?

FORM C-100 - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

JO-240

DeSimone-Direct/Carroll

1

2    A    Yes.

3    Q    And it is the normal course of Con Edison's

4    business to maintain these books and records; is it not?

5    A    Yes, sir.

6    Q    May I see the records that you've produced, sir?

7    A    (Handing).

8    Q    All right.  And these are broken out by different

9    addresses that we asked you to research; is that not the

10   case?

11   A    Yes.

12        MR. CARROLL:  Mr. Meyers, I would show you the

13   four folders marked at four separate addresses.

14        MR. MEYERS:  Thank you, Mr. Carroll.

15        No objection, your Honor.

16        THE COURT:  Are you offering them in

17   evidence?

18        MR. CARROLL:  If I could, your Honor, I would

19   like to introduce them as Petitioner's --

20        THE COURT:  How many are there?

21        MR. CARROLL:  There are four.  Perhaps we

22   could do A, B, C and D.

23        THE COURT:  Go ahead.  That would be

24   Petioners' 13-A B C and D.  You'll give me the

25   addresses of each.

FORM C-100 - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

145

DeSimone-Direct/Carroll

1

2    MR. CARROLL:  I will, Judge.

3    MR. CARROLL:  Petitioners 13-A is 553 47th

4    Street.

5    Petitioners 13-B is 519 47th Street.

6    THE COURT:  519 47th.

7    MR. CARROLL:  Petitioners 13-C is 6017 Fourth

8    Avenue.

9    THE COURT:  6017 Fourth.

10   MR. CARROLL:  And Petitioner's 13-D is 579

11   61st Street.

12   THE COURT:  579 61st Street.  Okay.  Let's

13   go.

14   (Petitioner's Exhibits 13-A through 13-D in

15   Evidence, so marked.)

16   Q   Sir, let's start with Petitioners' Exhibit 13-B.

17   Okay.

18   THE COURT:  Why don't you go in order --

19   MR. CARROLL:  13-B actually relates to the

20   Helverson individual, your Honor, as opposed to

21   Mr. O'Hara.

22   THE COURT:  All right.  Go ahead.

23   Q   I'm going to show you this document (handing).

24   Did we ask you to research a particular name at

25   that address?

KCDA000864

JO-242

146

DeSimone-Direct/Carroll

1

2    A    Yes, sir.

3    Q    And what was the name that we asked you to check?

4    A    It's John O'Hara.

5    Q    Did you check also on a Sandra Helverson?

6    A    Yes, I did.

7    Q    Is there service provided at that address, which is

8    519 47th Street, to a Sandra Helverson?

9    A    No, sir.

10   Q    How far back do your records -- when you do one of

11   these checks, how far back does the check go?

12   A    Well, the computer itself holds the date that the

13   account was opened.  We started putting the dates on the

14   account around 1962.

15   Q    So if a Miss Sandra Helverson had service there

16   from 1962 to the present, it would turn up on the search?

17   A    No.  The account -- one account was opened in May

18   of '75.  The other account was opened March of 1964.

19   Q    And are either of those accounts in the name of

20   Sandra Helverson?

21   A    None of them are.

22   Q    And these are the only two accounts at that

23   location?

24   A    Yes, sir.

25   Q    What are the names on those accounts?

KCDA000865

FORM C-100 · LASER REPORTERS PAPER & MFG. CO.  800-626-6313

147

1                    DeSimone-Direct/Carroll

2      A    William McCormack, M-c C-o-r-m-a-c-k.    The

3  apartment number is marked:  "first and second floor."  The

4  other name is John Steffenson, S-t-e-f-f-e-n-s-o-n.    The

5  apartment is marked "third floor."

6      Q    Okay.  Thank you, sir.

7           Are each of those accounts active accounts at this

8  time?

9      A    Yes.

10     Q    And there is no other service being provided in

11 that building?

12     A    No.  We only have two accounts, two meters.

13     Q    I'm going to ask you to take a look at Petioners'

14 13-A with respect to address 553 47th Street.

15     A    Okay.

16     Q    How many accounts are in that building?

17     A    We have two accounts, two meters in that building.

18     Q    Two meters in that building, all right.

19          What are the current names on those accounts?

20     A    First and second floor, we have a Roberto,

21 R-o-b-e-r-t-o; last name is L-o-z-a-n-o.

22     Q    Lozano.

23     A    Lozano.  That account was opened December 1, 1992.

24     Q    December 1, 1992, Mr. Lozano started having

25 service.

FORM C-100 · LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

JO-244

148

DeSimone-Direct/Carroll

1

2          Is there another account in that building?

3     A    Yes, sir.

4     Q    And who is that?

5     A    The third floor account under the name of Quetzal,

6  Q-u-e-t-z-a-l, Martinez, M-a-r-t-i-n-e-z.

7     Q    And when was that opened?

8     A    That account was opened on 12/1/92.

9          THE COURT:  Also 12/1 --

10    Q    That's the same date as Mr. Lozano; is it not?

11    A    Yes, sir.

12    Q    In your search of these records, was there ever an

13  account at that address in the name of John K. O'Hara?

14         Check your records, sir.

15    A    I didn't see one.

16    Q    Not according to the records of Con Edison?

17    A    Not according to the records.

18    Q    Prior to Mr. Quetzal and Lozano opening their

19  accounts, were there other people in that building?

20    A    Yes, sir.

21    Q    Could you identify them?

22    A    For the first floor account, a customer was Magaly,

23  M-a-g-a-l-y, Lucas, L-u-c-a-s.  That account was opened on

24  May the 11th, 1990.  It was closed on December 1, 1992.

25    Q    So Ms. Lucas left that account on December 1,

KCDA000867

149

DeSimone-Direct/Carroll

1

2  1992.

3     A    It was closed on that day, yes.

4     Q    By her.  Okay.

5     A    Prior to Miss Lucas, we had a Raymond,

6  R-a-y-m-o-n-d, last name was Vales, V-a-l-e-s.  That account

7  was opened on July 10th, 1971 and it was closed on May 9,

8  1990.

9     Q    I think that's far enough.

10        Now, when Ms. Lucas was there, was there one

11  account for the entire building?

12    A    No, we always had two accounts.

13    Q    Okay.  Who else had an account there when Ms. Lucas

14  had an account?

15    A    Well, now, you go to the third floor; that's the

16  other account.

17    Q    Okay.  Would you give me that information.

18    A    The customer on the third floor prior to

19  Mr. Martinez was a Magaly, M-a-g-a-l-y, Lucas, L-u-c-a-s.

20  That account was opened on 10/1 of '92.  And it was closed

21  on 12/1 of '92.

22        The prior customer was Mr. Jose Luis, L-u-i-s,

23  Augustin, A-u-g-u-s-t-i-n, and that account was opened on

24  10/1 of '90 and closed on 9/2 of '92.

25    Q    Okay.  I think that's enough, sir.

FORM C-100 - LASER  REPORTERS PAPER & MFG  CO  800-626-6313

JO-246

150

DeSimone-Direct/Carroll

1

2      I'd like you to look at Petioners' Number C which

3   relates to the address, 6017 Fourth Avenue.

4      Could you tell me if your records indicated an

5   electric account in the name of Mr. O'Hara at any point at

6   that address?

7      A    No, we don't have an account under that name.

8      Q    At that particular address?

9      A    At 6017 Fourth Avenue, yes.

10     Q    And how far back did your search go?

11     A    Well, we have four accounts there, four meters.

12     Q    Right.

13     A    We have an account that supplies the halls and

14   cellar under the name of Anthony and Tina, T-i-n-a; last

15   name is P-e-l-l-i-c-c-i-o.

16     Q    Pelliccio?

17     A    Pelliccio.  That account was opened March 31,

18   1967.

19         We have a store meter under the name of Anthony

20   Pelliccio doing business as Pelliccio Bakery.  That account

21   was opened on February 22nd 1980.

22     Q    Okay.

23     A    We have a second floor meter under the name of

24   Anthony Pelliccio.  That account was opened prior to 1962.

25   Now we have a third floor meter under the name of Emily

KCDA000869

FORM C-100 · LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

JO-247

151

DeSimone-Direct/Carroll

1

2    Massa, M-a-s-s-a, and that account has been in effect since

3    May 31, 1970.

4        Q    Finally, sir, I'd like you to take a look at

5    Petioners' D which relates to the address 579 61st Street.

6        Did you uncover any accounts in the name of

7    John K. O'Hara at 579 61st Street?

8        A    I found two accounts in the name of John O'Hara.

9        Q    John O'Hara.  And would you give me the information

10   on each of those accounts, sir?

11       A    The current account is under the name of John

12   O'Hara.  That account was opened on October the 24th, 1991.

13   It's still active.

14       Q    Okay.

15            THE COURT:  What date was that?  October --

16            THE WITNESS:  24th, 1991.

17            THE COURT:  October 24th, 1991.

18       Q    And it's still active?

19       A    Yes, sir.

20       Q    Does it say what apartment that goes into?

21       A    Apartment number 2-I.

22       Q    And you said there's another account under

23   Mr. O'Hara's name.

24       A    Well, the previous account -- this account was

25   under the name of Holt, H-o-l-t, last name is McCallany.

KCDA000870

JO-248

152

DeSimone-Direct/Carroll

1

2    Q    Is this in apartment 2-I?

3    A    This was apartment 2-I.

4         That account was opened on June 13, 1991 and it was

5    closed on October 24th, 1991.

6    Q    Now, did you have another account in that building

7    for Mr. O'Hara?

8    A    Previous to that account, we had a John O'Hara.

9    That account was opened on February 1, 1990.  And that was

10   closed on June 13, 1991.

11   Q    And anything prior to that?

12   A    No, that's all.  That's as far back as we go with

13   these records here.

14   Q    As far as you go with those records.  So starting

15   in 1990, you have records on him?

16   A    (Nodding.)

17   Q    Tell me, does Con Edison, to your knowledge, have

18   different classes of service?  Are the rates for service

19   different for residential customers as opposed to commercial

20   customers?

21   A    Yes.

22   Q    Can you tell me what type of service is provided to

23   Mr. O'Hara at 579 61st Street?

24   A    Residential service.

25   Q    It's residential service?

FORM C-100 - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

JO-249

153

DeSimone-Direct/Carroll

1

2      A     It's a residential rate.

3              MR. CARROLL:   I have no further questions of

4         this witness.

5              THE COURT:  You may inquire.

6              MR. MEYERS:  Thank you, sir.

7   CROSS-EXAMINATION

8   BY MR. MEYERS:

9      Q     Let's go back for a moment to Petioners' 13-A,

10  referring to 47th Street, 553 47th Street.  Is there any

11  indication in your records, sir, that showed how many

12  dwelling units there are on that premises?

13     A     No, we only have two meters listed as first and

14  second floor and the other one is listed as the third floor.

15     Q     If there were more than that number of units there,

16  would you know about it?

17     A     No.

18     Q     So you only know according to how many meters there

19  are in the building?

20     A     That's correct.

21     Q     Would the same be true for the Fourth Avenue

22  address?

23     A     Yes.

24     Q     Would that be true for every address?

25     A     Yes.

154

DeSimone-Cross/Meyers

1

2     Q     And for every account that you have?

3     A     Yes.

4     Q     So it is possible that there are other units within

5 the dwelling that would fall under the same meter?

6     A     That are registered on the same meter.  Yes, sir.

7          MR. MEYERS:  Thank very much.

8          No further questions.

9          MR. CARROLL:  I have no further questions.

10          THE COURT:  You may step down.

11          (Whereupon, the witness was excused.)

12          THE COURT:  Anything else now?

13          The reporter needs a break.  I think we'll

14     break for lunch now.

15          (Whereupon, there was a luncheon recess.)

16          (Continued on the following page.)

17

18

19

20

21

22

23

24

25

JO-251

155

1    Proceedings

2    AFTERNOON SESSION

3    THE COURT:  Case on trial.

4    MR. CARROLL:  Your Honor, the first request

5    that I have is with respect to a subscribing

6    witness who was mentioned in the testimony this

7    morning, I believe, by Ms. Galarza, as being a

8    person who had induced her to collect signatures

9    and is herself a witness for some 299 signatures, a

10    Ms. Kathy Vetere, and I would request that the

11    respondent be directed to to produce Miss Vetere.

12    MR. MEYERS:  Your Honor, I will make the same

13    diligent effort to obtain the appearance of Kathy

14    Vetere (phonetic) as I have with the other

15    witnesses in this case and which are outside today.

16    MR. CARROLL:  I thank Mr. Meyers for that.

17    The second thing, your Honor, has to do with

18    our bill of particulars.

19    One of the items that we identify in our bill

20    of particulars as being an element of proof is item

21    number 4, which references Exhibit B, and it deals

22    with a detailed list of alleged forgeries.

23    We also --

24    THE COURT:  Alleged forgeries?

25    MR. CARROLL:  Forgeries in the forgeries of

FORM C-100 - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

KCDA000874

JO-252

156

1          Proceedings

2    signatures.  We identify an expert witness that we

3    intend to call, a Mr. Donald (phonetic).  I am

4    advised that Mr. Frangiapani is unavailable, will

5    not be able to come in.  I would like to substitute

6    a different expert but he will still be confined to

7    testifying to the signatures identified in the bill

8    of particulars and the different expert would be a

9    Mr. Paul Osborn.

10        THE COURT:  Do you have any objections to

11   that?

12        MR. MEYERS:  I didn't know they had Donald

13   Frangiapani coming here.

14        THE COURT:  Okay.

15        MR. MEYERS:  I have no objection.

16        MR. CARROLL:  We can proceed with witnesses,

17   if that's your pleasure.

18        THE COURT:  Before you take the stand, may I

19   see counsel, please.

20        (Discussion at the bench off the record.)

21   M I C H E L L E   R A M K I S H U N,

22        residing at 208-A 31st Street, Brooklyn, New York,

23   called as a witness by the People, having been duly

24   sworn, testified as follows:

25        THE CLERK:  State and spell your name for the

KCDA000875

JO-253

157

1              Proceedings

2       record, but we all have to hear you.

3              THE WITNESS:  Michelle, M-i-c-h-e-l-l-e,

4       Ramkishun, R-a-m-k-i-s-h-u-n.

5              THE CLERK:  Where do you live?

6              THE WITNESS:  208 31st Street.

7              THE CLERK:  In Brooklyn?

8              THE WITNESS:  Yes.  208-A.

9              THE COURT:  You may proceed.

10  DIRECT EXAMINATION

11  BY MR. CARROLL:

12      Q    Ms. Ramkishun, I'm going to show you -- and thank

13  you for coming, ma'am.

14           I'm going to show you a Democratic Party

15  designating petition that has been marked in evidence as

16  Petitioners' Exhibit 5 and I'd like you to take a look at

17  this petition and particularly at page 2 line 10 of that

18  petition, okay.

19              MR. MEYERS:  Your Honor, I'm going to make my

20              objection again in that page 2, line 10 is not

21              marked in Petitioners' bill of particulars as being

22              a signator that would be placed in evidence at this

23              trial.

24              THE COURT:  Counselor?

25              MR. CARROLL:  We're going to check, your

JO-254

Ramkishun-Direct/Carroll

1 | Honor.  I do in fact believe it is marked in

2 | another place.

3 | MR. MEYERS:  Your Honor, I withdraw that

4 | because I found -- there are indeed two pages.

5 | THE COURT:  Let's go.

6 | Q   Ma'am, is this your signature on line 10?

7 | A   Yes.

8 | Q   Do you recall the circumstances surrounding --

9 | THE COURT:  What page is that?  Excuse me.

10 | MR. CARROLL:  Page 2, line 10 of the

11 | petition.

12 | Q   Do you recall the circumstances surrounding your

13 | signature of the petition?

14 | A   You mean when she came to me to sign it?

15 | Q   Yes.  Do you recall that?

16 | A   Uh-huh.

17 | Q   How many people came to your home?

18 | A   One.

19 | Q   And was that person a man or a woman?

20 | A   A woman.

21 | Q   Do you recall what the woman looked like?

22 | A   Yes, I do.

23 | Q   Could you describe the woman for us, please?

24 | A   She was like between 35 and 40 and she was average

FORM C-100-LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

159

Ramkishun-Direct/Carroll

1
2  height, average build.  She had, like, blondish-brown hair.
3  And she was white.
4      Q    Was there a man with her?
5      A    She said it was her husband who was across the
6  street.
7      Q    Across the street.
8          I'm going to show you a photograph that is marked
9  as Petitioners' Exhibit Number 4 in evidence.  I'm going to
10 ask you to take a look at the lady on the extreme left of
11 the photograph.  Was that the lady who came to your door?
12     A    No.
13     Q    That was not the lady.
14     A    No.
15     Q    And just for the record, would you tell us who
16 signed -- who witnessed the sheet that your signature is on;
17 what her name is?  Can you read that?  Right there
18 (indicating)?
19     A    Maureen Steffenson.
20              MR. CARROLL:  Thank you very much.
21              I have no further questions of
22       Miss Ramkishun.
23 CROSS-EXAMINATION
24 BY MR. MEYERS:
25     Q    Could you please tell me again what color hair she

FORM C-100 · LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

JO-256

160

Ramkishun-Cross/Meyers

1    had?

2    A    It was like a blondish-brown or brownish-blond.  It

3    was, like, mixed.

4    Q    Was it light colored?

5    A    It was, like, brown but it had blond in it.

6    MR. MEYERS:  Okay.

7    MR. CARROLL:  I have no further questions.

8    THE COURT:  You may inquire.

9    MR. MEYERS:  He already said he didn't --

10   MR. CARROLL:  I thought you were finished.

11   MR. MEYERS:  Oh, no, that's okay.  I have no

12   further questions.

13   Thank you.

14   THE COURT:  You may step down.

15   (Whereupon, the witness was excused.)

16   J U A N I T A    G I L L U S,

17   residing at 260 Clinton Avenue, Brooklyn, New York,

18   called as a witness by the Petitioners, having been

19   duly sworn, testified as follows:

20   THE CLERK:  State and spell your name, for the

21   record.

22   THE WITNESS:  Juanita Gillus.

23   THE COURT:  Can you speak up, please, so that

24   we can all hear.

FORM C-100 - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

JO-257

161

Ramkishun-Cross/Meyers

1    THE WITNESS:  Okay.  I'm sorry.

2    J-u-a-n-i-t-a, G-i-l-l-u-s.

3    THE CLERK:  What's your address?

4    THE WITNESS:  260 Clinton Avenue, Brooklyn,

5    New York.

6    THE COURT:  You may proceed, Counsel.

7    MR. CARROLL:  Thank you, your Honor.

8

9    DIRECT EXAMINATION

10   BY MR. CARROLL:

11   Q    Thank you for coming, Miss Gillus.

12   Are you employed?

13   A    Yes, I am.

14   Q    Who do you work for?

15   A    I work for New York Law School, registrar's office.

16   Q    And how long have you worked there?

17   A    Over a year.  Since January '93.

18   Q    Now, in your capacity as a worker in the

19   registrar's department at New York Law School, are you

20   familiar with the books and records of New York Law School?

21   A    Yes, I am.

22   Q    And are those books and records kept in the normal

23   course of business?

24   A    Yes, they are.

25   Q    Did I serve you with a subpoena or have you been

162

1                    Gillus-Direct/Carroll

2   served with a subpoena pursuant to which you produced

3   certain records?

4       A    Yes.

5       Q    Do you have those with you, ma'am?

6       A    Yes.

7       Q    May I see them, please.

8       A    Yes (handing.)

9       Q    Are these records part of the records of Brooklyn

10  Law School --

11      A    New York Law School.

12      Q    Excuse me.  New York Law School.  That are kept in

13  the normal course of business?

14      A    Yes.

15      Q    And is it the normal course of business of New York

16  Law School to maintain these records?

17      A    Yes.

18           MR. CARROLL:  Mr. Meyers, I show you these

19           records (handing).

20           MR. MEYERS:  Thank you, Mr. Carroll.

21           Okay.  I have no objections, your Honor.

22           THE COURT:  Without objections, you're marking

23           that into evidence?

24           MR. CARROLL:  Into evidence, your Honor, if we

25           may.

KCDA000881

FORM C-100 · LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

JO-259

163

1            Gillus-Direct/Carroll

2            THE COURT:  Mark the Petitioners' Exhibit 14

3    in evidence without objection, 8 pages.  That's New

4    York Law School record.

5            THE COURT:  May I see them, please.

6            (Court Officer hands.)

7            COURT OFFICER:  Should we staple them, your

8    Honor?

9            THE COURT:  Yes, I think we should staple

10   them.

11           (Court Officer complies.)

12           THE COURT:  Thank you.

13           (Court Officer hands to Judge.)

14           THE COURT:  Okay.

15           COURT OFFICER:  Do you want me to show this to

16   the witness?

17           MR. CARROLL:  Please.

18   Q    Now, ma'am, do these records relate to a particular

19   individual?

20   A    Yes, they do.

21   Q    And what is the name of that individual?

22   A    Sandra Helverson.

23   Q    And do the records indicate the address at which

24   Miss Helverson resides as a student at New York Law School?

25   A    Yes, they do.

KCDA000882

JO-260

164

Gillus-Direct/Carroll

1

2    Q    What is the address Miss Helverson resides at?

3    A    430 Ogden Avenue, apartment number 8, Jersey City,

4    New Jersey, 07307.

5    Q    Just for the record, do the records also indicate

6    the date of births of Miss Helverson?

7    A    Yes, they do.

8    Q    What is the date of birth?

9    A    Her date of birth is January 26, 1967.

10           MR. CARROLL:  I have no further questions of

11           this witness.

12           THE COURT:  Any questions?

13           MR. MEYERS:  Yes, your Honor.

14   CROSS-EXAMINATION

15   BY MR. MEYERS:

16   Q    Miss Gillus, the records that you provided today,

17   does it indicate what year Miss Helverson is in at New York

18   Law School?

19   A    Yes, they do.

20   Q    Can you tell us what year?

21           Was she a first year, second year, third-year law

22   student?

23   A    Okay.  She was a visiting student and attended our

24   law school for one whole year.  I don't know if it's ended

25   because she may be coming back in the fall.

KCDA000883

FORM C-100 - LASER REPORTERS PAPER & MFG. CO.  800-626-5313

165

Gillus-Cross/Meyers

1

2    Q    Is there any indication as to whether or not she

3    graduated?

4    A    No, there isn't.

5    Q    What is the latest document that you have which

6    indicates an address for Miss Helverson?

7    A    The latest document that I have?

8    Q    Uh-huh.

9    A    That would have to be -- that would have to be this

10   document that I have, her change of address request.

11   Q    And when was that?

12   A    September 1993.

13   Q    And what was the address change?

14   A    From or to?

15   Q    From and to.

16   A    It was changed from P.O. Box 26, Avalon, New

17   Jersey, to the address that I had given.

18   Q    The Ogden Avenue address?

19   A    Yes.

20   Q    And there's nothing after that; is that correct?

21   A    No.  All of her mail is going to that Ogden Avenue

22   address.

23   Q    Is there any indication as to whether or not she

24   may have graduated?

25   A    No, she was visiting from another law school.

KCDA000884

166

Gillus-Cross/Meyers

1

2    Q    So you wouldn't have those records to indicate

3  whether she had graduated already?

4    A    No, I would not.

5    Q    Do you know what school she is visiting from?

6    A    Yes, Golden Gate University.

7    Q    Where is that?  Is that in California?

8    A    I have no idea.

9    Q    Okay.  Have you dealt with records pertaining to

10  visiting students before?

11    A    Yes.

12    Q    And don't these records, to the best of your

13  knowledge, ever -- are they ever updated after the visiting

14  student is no longer visiting with the school?

15    A    No.  Unless they stay leave and come back.

16            MR. MEYERS:  No further questions, your Honor.

17            THE COURT:  Anything else?

18            MR. CARROLL:  One question your Honor

19  REDIRECT EXAMINATION

20  BY MR. CARROLL:

21    Q    Do the records indicate when Ms. Helverson was last

22  a student at New York Law School?

23    A    Yes.

24    Q    When was she last a student there?

25    A    She was last a student during the spring of 1994

KCDA000885

JO-263

167

1           Gillus

2 semester, which ended May the 17th, 1994.

3           MR. CARROLL:  Thank you very much.

4           I have no further questions.

5           THE COURT:  May what?

6           THE WITNESS:  May the 17th.

7           THE COURT:  Thank you.

8           THE WITNESS:  You're welcome.

9           MR. MEYERS:  I have nothing further, your

10 Honor.

11          THE COURT:  You may step down.

12          (Whereupon, the witness was excused.)

13 A N N E   M A R I E   C A R B O N E,

14          residing at 20 Conselyea Street, Brooklyn, New

15 York, called as a witness by the People, having

16 been duly sworn, testified as follows:

17          THE CLERK:  State and spell your name, for the

18 record.

19          THE WITNESS:  Anne Marie, A-n-n-e , M-a-r-i-e,

20 Carbone, C-a-r-b-o-n-e.

21          THE CLERK:  Where do you live, ma'am?

22          THE WITNESS:  20 Conselyea, C-o-n-s-e-l-y-e-a,

23 Street, Brooklyn, New York.

24 DIRECT EXAMINATION

25 BY MR. CARROLL:

KCDA000886

168

1                    Carbone-Direct/Carroll

2    Q    Thank you for coming, Miss Carbone.

3         Are you employed?

4    A    Yes, I am.

5    Q    By whom are you employed?

6    A    Chemical Bank.

7    Q    And what do you do for Chemical Bank?

8    A    I'm a legal assistant for the subpoena compliance

9    group.

10                   THE COURT:  Which branch?

11                   THE WITNESS:  Head office at 270 Park Avenue.

12   Q    In your capacity as a subpoena compliance official

13   for Chemical Bank, are you familiar with the books and

14   records of Chemical Bank?

15   A    Yes, I am.

16   Q    Are those books and records kept in the normal

17   course of business?

18   A    Yes, they are.

19   Q    And pursuant to a subpoena, have you produced

20   certain records of Chemical Bank here today?

21   A    Yes.

22   Q    Are those the documents in front of you?

23   A    Yes, they are.

24   Q    And are these particular documents maintained by

25   Chemical Bank in the regular course of its business?

KCDA000887

JO-265

169

Carbone-Direct/Carroll

1

2    A    Yes, they are.

3    Q    May I see them, ma'am?

4    A    Sure (handing.)

5        MR. CARROLL:  Mr. Meyers, may I show you these

6    documents?

7        MR. MEYERS:  Thank you, Mr. Carroll.

8        MR. MEYERS:  Your Honor, at this time I'm

9    going to object only to those portions which

10   indicate Mr. O'Hara's personal identification

11   numbers on his accounts, the amounts that are

12   listed and any other information which may be

13   deemed personal and not related to this matter;

14   this matter being only -- for the purposes of this

15   matter, that being only the name of Mr. O'Hara, the

16   address and the dates of each statement.

17       MR. CARROLL:  Your Honor, I have no objection

18   to redacting.

19       THE COURT:  Except for the dates of any

20   deposits and/or withdrawals, too, without any

21   indication of the amounts.  I'm not concerned with

22   that.

23       MR. MEYERS:  Just that it's an active

24   account.

25       THE COURT:  That's correct.  Together with the

JO-266

170

Carbone-Direct/Carroll

1
2          dates of deposits and dates of withdrawals.

3              MR. MEYERS:  No problem with that.

4              THE COURT:  And whatever dates may be
5          pertinent to the issue here.

6              MR. CARROLL:  Thank you, your Honor.

7              THE COURT:  So you gentlemen will take care of
8          the redaction.  You'll consent to it but if you
9          cannot agree on something as being the direction of
10         the Court, you will present to me and I'll make the
11         determination.  But I'm sure you'll be able to
12         agree to everything that you're directed to do.

13             How many pages are there?

14             MR. CARROLL:  In a moment, your Honor.

15             THE COURT:  I'd and I'd like to see it.

16             MR. CARROLL:  I believe there are 48 pages,
17         your Honor.

18             THE COURT:  Exhibit 15 in evidence.

19             That's Chemical Bank?

20             MR. CARROLL:  The Chemical Bank records, your
21         Honor.

22             THE COURT:  Chemical Bank, 48 pages.  Subject
23         to redaction.

24             (Whereupon, Petitioners' Exhibit 15 was
25         received in evidence.)

KCDA000889

JO-267

171

Carbone-Direct/Carroll

1

2      THE COURT:  Okay.

3      Q    Miss Carbone, do these records relate to a

4  particular individual?

5      A    Yes, it does.

6      Q    And what is the name of that individual?

7           THE COURT:  It speaks for itself.

8      A    John K. O'Hara.

9      Q    John K. O'Hara.

10     A    Yes.

11     Q    Do the records indicate the address at which

12  Mr. O'Hara opened his account at Chemical Bank?

13     A    Yes.

14     Q    Could you provide that to us, please.

15     A    Well, it's -- when he opened the account as of

16  June 10th of '91, he was at the address of 5617 Sixth Avenue

17  in Brooklyn.

18     Q    Was the account's address subsequently changed to

19  another address?

20     A    Yes, it was.

21          THE COURT:  When was it changed.

22          THE WITNESS:  We have a change request,

23      October 10th, '91.

24          THE COURT:  You had a request for change from

25      Mr. O'Hara?

JO-268

172

Carbone-Direct/Carroll

1

2          THE WITNESS:  Yes, October 10th, '91.

3          THE COURT:  October 10th, '91.  To what

4      address?

5          THE WITNESS:  579 61st Street, Brooklyn.

6          THE COURT:  579 --

7          THE WITNESS:  61st Street.

8          THE COURT:  Go ahead.

9      Q    And was the address subsequently changed again?

10     A    I don't think so.  I don't have another change of

11 address.

12     Q    Would you check the statements?

13     A    I'll check the statement.

14          Well, the statement, 11/25/93 to 12/23/93, it was

15 at the address of 579 61st Street in Brooklyn.

16          THE COURT:  Wait.  The statement of what?

17          THE WITNESS:  Dated 11/25/93.

18          THE COURT:  Is that a bank statement?

19          THE WITNESS:  Yes, a bank statement.

20          THE COURT:  Statement date is what?

21          THE WITNESS:  11/25/93.

22          THE COURT:  Where does that go to?

23          THE WITNESS:  To 12/23/93.

24          THE COURT:  To -- what?

25          THE WITNESS:  12 -- December 23, 1993.

KCDA000891

JO-269

173

1         Carbone-Direct/Carroll

2              THE COURT:  To 12/23/93.  Where did that go

3      to?

4              THE WITNESS:  The address was 579 61st

5      Street.

6    Q    And was there a change after that, ma'am?

7    A    Yes.  Statement of 12/24/93 to January 26 of '94.

8              THE COURT:  12/24/93 to when?

9              THE WITNESS:  1/26/94.  It went to the address

10     of 6017 Fourth Avenue, Brooklyn.

11    Q    Now, ma'am, it was for the period 12/26/93 to

12     1/24/94?

13    A    Uh-huh.

14    Q    That means it was mailed after 1/24/94; is that

15     correct?

16    A    Yes.  Well, it was dated from the date 12/24.

17              MR. CARROLL:  I have no further questions of

18     this witness.

19              THE COURT:  Well, when you say "dated," that's

20     the statement date?

21              THE WITNESS:  That's the statement date.

22              THE COURT:  For the period of 12/24/93 to

23     1/26/94?

24              THE WITNESS:  Yes.

25              THE COURT:  And that was changed to 6017

FORM C-100 - LASER   REPORTERS PAPER & MFG. CO.  800-626-6313

KCDA000892

JO-270

174

1          Carbone-Direct/Carroll

2    Fourth Avenue; is that right?

3          THE WITNESS:  Uh-huh.

4          THE COURT:  Where did you get that change of

5    address?  Do you have an application there for it?

6          THE WITNESS:  No, I don't.  No, I don't have

7    an application for that change of address.

8          THE COURT:  So there was a change between

9    12/23/93 to after --

10         THE WITNESS:  Actually, a day, if you really

11   look at it.  12/23, it was 579 61st Street; and

12   then the day after, the 24th or the 25th -- no, I'm

13   sorry, the 23rd, the same day, it was changed to --

14   the 25th, right.

15         THE COURT:  Well, how was that change

16   effected, if you know?

17         THE WITNESS:  I just see it on the statement.

18   Not that I know it.

19         THE COURT:  Well, prior you testified that

20   there were applications for a change of address.

21         THE WITNESS:  Right.

22         THE COURT:  Isn't that correct?

23         THE WITNESS:  Yes.

24         THE COURT:  Would it be necessary to have an

25   application to change an address?

FORM C-100 - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

JO-271

175

1          Carbone-Direct/Carroll

2               THE WITNESS:  Yes.

3               THE COURT:  Well, then how was the

4          effective --

5               THE WITNESS:  Well, he could have ordered his

6          checks and changed it on his order for the checks.

7               THE COURT:  Do you know if he did?

8               THE WITNESS:  I don't know.  I couldn't say.

9               MR. MEYERS:  Thank you, your Honor.

10              May I see this, please.

11              (Witness handed to Mr. Meyers.)

12  CROSS-EXAMINATION

13  BY MR. MEYERS:

14      Q    Miss Carbone, earlier you testified that on

15  October 10th, 1991 that the address was charged to 579 61st

16  Street in Brooklyn.  And then you stated right after that

17  that at 11/25/93 there was a statement that also said 579

18  61st Street in Brooklyn.

19      A    Right.

20      Q    Would you please take a look at this statement,

21  which is part of the 48 pages which you presented today

22  pursuant to Mr. Carroll's subpoena (handing).

23      A    Okay.  That's another address.

24      Q    Can you please read the date on this address -- the

25  date on that statement and the address?

FORM C-100 · LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

KCDA000894

JO-272

176

Carbone-Cross/Meyers

1

2    A   It's February 25th to March 23rd, 1993.

3        THE COURT:  Wait.  February 25th, '93?

4        THE WITNESS:  To March 23.

5        THE COURT:  To March 23, '93.

6        THE WITNESS:  The address is 553 47th Street,

7   Brooklyn.

8        THE COURT:  The address is what?

9        THE WITNESS:  553 47th Street, Brooklyn.

10       THE COURT:  Is that the only statement for

11   that address?

12    Q   Could you please read the next statement

13 (indicating).

14    A   March 24th to April 23rd, '93; it's the same

15 address.

16       THE COURT:  3/24 to April what?

17       MR. MEYERS:  To April 23.

18       THE WITNESS:  April 23.

19       THE COURT:  Go ahead.

20       Anything else?

21       THE WITNESS:  April 24th to May 25th, '93,

22   also the same address.

23       THE COURT:  April 24th to May 25th.

24   Go ahead, now, after that.

25       MR. MEYERS:  Excuse me a second, your Honor.

FORM C-100 · LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

JO-273

177

Carbone-Cross/Meyers

1

2  Q   Is there any way on here to determine if it's an

3  active account?

4  A   The active account is the balance --

5  Q   Is there any indication whether there were deposits

6  or withdrawals?

7  A   Yes.

8  Q   Were there deposits?

9  A   No, just withdrawals.

10      MR. MEYERS:  I'm sorry to interrupt, your

11      Honor.  I just wanted to establish that for the

12      record.

13  Q   If you'd please read that one.

14  A   May 26 - June 23rd, 1993, the same address.

15  Q   Was there any activity in that account?

16  A   Yes, there was.

17  Q   Okay.

18  A   June 24th to July 26th, '93.  Also the same

19  address.

20  Q   Was there any activity on that account?

21  A   Yes, there was.

22      July 27 to August 24th of '93, same address.

23  Q   Was there any activity in that account?

24  A   Yes, there was.

25  Q   Am I correct; is that the last of those kind of

KCDA000896

JO-274

178

1                    Carbone-Cross/Meyers

2  statements?

3      A    Yes, they are.

4      Q    I notice there's a different type of statement.

5  Why is that?  This is a different --

6      A    No, it's just --

7      Q    This is not a statement?

8      A    Yes, this is a statement.  It's a summary

9  statement.

10      Q    What is the difference between this kind of

11  statement and this kind of statement?

12      A    Just different forms.  It's the same thing.

13      Q    Okay.  Please read that.

14           MR. MEYERS:  It's a little different form,

15      your Honor.

16           THE COURT:  Go ahead.

17      A    Okay.  This is August 25th, '93 to September 24th

18  of '93, also the same address.

19      Q    Is there any activity shown in that account?

20      A    Yes, there is.  Activity, shows a balance.

21      Q    These will only show you balances; it won't show

22  you whether checks are cashed or deposits?

23      A    This is a summary copy (indicating.) This is the

24  statement (indicating.)

25      Q    We just turned the page on the same August through

179

1                    Carbone-Cross/Meyers

2  September --

3       A    Right, this was page two --

4       Q    The second page shows any activity on that account?

5       A    Yes, it does.

6       Q    Do you see any indication there was activity in

7  that account?

8       A    Yes.

9       Q    Okay.  Now then, we're back to what you testified

10  to previously.

11       A    Right.

12            MR. MEYERS:  Okay.

13            THE COURT:  There's nothing -- no statement

14            from 9/25 to 11/25; is that correct?

15            MR. MEYERS:  I thought she testified to that,

16            your Honor.

17            THE COURT:  No, I have up to 9/24.

18            MR. MEYERS:  You're right.  Let's find those.

19       Q    Okay.  Is this the one you had read previously?

20       A    Yes, I did.

21       Q    Did you put these yellow tabs in here?

22       A    I didn't, Jackie Grant, who's handling the case.  I

23  just came in to testify for her.  She couldn't come.

24       Q    I notice those are the only two yellow tabs that

25  are in there.  Is there any reason --

KCDA000898

JO-276

180

1                       Carbone-Cross/Meyers

2      A    That's the only two address changes she noticed.  I

3  guess she really didn't go through the other ones.  Those

4  are the only two that I guess go with the signature card

5  that she found.

6      Q    Where do you have to go to get these records?

7      A    We go to our retrieval center.

8      Q    Where is that?

9      A    They're on tape.

10     A    It's in Pawling, New York.

11     Q    Did you have to go there?

12     A    No, we computerize it; put a request in for an

13 order and then we had the messenger pick them up so we could

14 bring them here today.

15     Q    You could tell us about those (handing).

16     A    This is September 25th, '93 to October 26, '93.

17 The address is 579 61st Street in Brooklyn.

18                THE COURT:  What was that?  What address?

19                THE WITNESS:  579 61st Street.

20                THE COURT:  From September what?

21                THE WITNESS:  25th, '93 to October 26th of

22           '93.

23                THE COURT:  And that goes to where?

24                THE WITNESS:  579 61st Street.

25                THE COURT:  And thereafter?

181

1          Carbone-Cross/Meyers

2          THE WITNESS:  October 27, '93 to 11/24/93,

3    also goes to 579 61st Street.

4          THE COURT:  And then it goes up to 12/23; is

5    that correct?

6          THE WITNESS:  12/23, right.

7          THE COURT:  And that's the the same address,

8    579 61st Street?

9          THE WITNESS:  Right.

10         THE COURT:  And then it goes to Fourth

11   Avenue?

12         THE WITNESS:  Yes.

13         THE COURT:  Okay.

14   Q    Now, can you please tell me what this document is,

15   ma'am (handing)?

16   A    Okay.  This is a printout of his balance as of

17   August 1st, 1994, that the account is open.

18   Q    What address is that account listed at?

19   A    6017 Fourth Avenue, Brooklyn Brooklyn.

20         MR. MEYERS:  I have no further questions, your

21   Honor.

22         THE COURT:  Anything else?

23         MR. CARROLL:  Just to clarify a couple of

24   things, your Honor?

25         THE COURT:  Sure.

JO-278

182

Carbone-Cross/Meyers

1

2 REDIRECT EXAMINATION

3 BY MR. CARROLL:

4     Q    Just so that I can get my dates straight, the

5 address at which this account was opened is which address,

6 ma'am?

7               MR. MEYERS:  Objection.

8               Asked and answered, your Honor.

9               This is going over the same testimony.  She's

10         already --

11               THE COURT:  6/10/91?

12               MR. CARROLL:  Fine.

13               THE COURT:  That was 5617 Sixth Avenue,

14         right?

15               THE WITNESS:  Right.

16               THE COURT:  10/10/91, it went to 579 61st

17         Street.

18               THE WITNESS:  Right.

19               THE COURT:  Then --

20     Q    From 61st Street it went to where, ma'am?

21     A    Fourth Avenue, 6017 Fourth Avenue.

22               THE COURT:  And it stayed at 61st Street from

23         '91 through December of '93.

24               THE WITNESS:  Yes.

25               THE COURT:  Okay.

KCDA000901

JO-279

Carbone-Redirect/Carroll

1

2       MR. MEYERS:  Your Honor, again for

3   clarification --

4       MR. CARROLL:  She's left out that it was for

5   a -- It appears that it was for the period from

6   2/25/93 through 9/24/93; am I correct?

7       MR. MEYERS:  That's correct.

8       MR. CARROLL:  At 47th.  2/25/93 to --

9       THE COURT:  2/25/93, right, to 9/24/93, she

10  was at 47th Street.

11      MR. MEYERS:  That's correct.

12  Q   And then, ma'am, for the period 9/25/93 through

13  December 25, '93 it was back to 61st Street; is that

14  correct?

15  A   Yes.

16      MR. MEYERS:  She's testified to that.

17      THE COURT:  That's it.

18  Q   And then to Fourth Avenue, correct?

19  A   Yes.

20      MR. CARROLL:  I have no further questions.

21      MR. MEYERS:  Nothing further, your Honor.

22      THE COURT:  All right.

23      Leave that, ma'am.

24      MR. CARROLL:  Your Honor, the next witness is

25  coming.  I've just been informed that on the

FORM C-100 · LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

JO-280

1       Carbone-Redirect/Carroll

2   line-by-line across the street, they -- for some

3   reason -- have not been able to locate a copy of

4   the updated specs. The Court has a copy. May we

5   provide the Board of Elections --

6       THE COURT: It's all right with me.

7       MR. MEYERS: I have no objection, your Honor.

8       THE COURT: What happened to them?

9       MR. CARROLL: Beats me. It's something we're

10  not going to handle here in the courtroom. This is

11  literally the updated line-by-line.

12      THE COURT: We don't need it. It's not in

13  evidence, is it?

14      MR. CARROLL: No, it's not. It's marked. It

15  was filed per Judge Garry's instructions.

16      Do you object if I give it to one of my

17  people to carry over there?

18      MR. MEYERS: Absolutely not. Go right ahead,

19  Mr. Carroll. Immacolata Pelliccio

20  I M M A C O L A T A   P E L L I C C I O,

21  residing at 6017 Fourth Avenue, Brooklyn, New York,

22  called as a witness by the Petitioners, having been

23  duly sworn, testified as follows:

24      THE CLERK: Have a seat. You have to speak

25  loudly. Tell us what your name is and spell it for

185

1                    Carbone-Redirect/Carroll

2          us.

3                    THE WITNESS:  Immacolata Pelliccio,

4          I-m-m-a-c-o-l-a-t-a, P-e-l-l-i-c-c-i-o.

5                    THE CLERK:  Where do you live, ma'am?

6                    THE WITNESS:  6017 Fourth Avenue, Brooklyn.

7                    THE COURT:  You may proceed.

8                    MR. CARROLL:  Thank you, your Honor.

9                    THE COURT:  How many more witnesses do you

10         have outside?

11                   MR. CARROLL:  A couple more, Judge.

12                   THE COURT:  Let's go.

13    DIRECT EXAMINATION

14    BY MR. CARROLL:

15         Q    Miss Pelliccio, thank you for coming.

16              Where do you reside, ma'am?

17         A    6017 Fourth Avenue.

18         Q    How long have you lived there?

19         A    Maybe close forty years.

20         Q    Forty years.

21         A    Forty.

22         Q    Four-zero.

23         A    That's it.

24         Q    Do you live there with your husband?

25         A    My husband's dead.  I live there before my husband

FORM C-100 · LASER REPORTERS PAPER & MFG. CO.  800-826-6513

JO-282

186

1                    Pelliccio-Direct/Carroll

2    dies.  I live alone.

3        Q     Are there other members of your family in that

4    building?

5        A     I have one of my daughters upstairs.

6        Q     Could you describe the building for us.

7        A     It's two-family and a store.

8        Q     How many stories is it?

9        A     The two stories and a store.  Two apartments and a

10   store.

11       Q     So the first floor is a store?

12       A     Yeah.  The second floor is me.

13       Q     And what is the name of that store?

14       A     Tina Coffee Shop.  Used to be Pelliccio Bakery

15   before my husband died.

16       Q     Now it's Tina's Coffee Shop?

17       A     Yes.

18       Q     Who is Tina?

19       A     Me.

20       Q     So you own the coffee shop?

21       A     Yes.

22       Q     Do you live in one of the apartments?

23       A     Yes.

24       Q     Which apartment do you live in, ma'am?

25       A     The first apartment.

JO-283

187

                    Pelliccio-Direct/Carroll

1

2    Q    So that's one of the two apartments?

3    A    One of the two apartments.

4    Q    What sort of street is this?

5    A    Huh?

6    Q    Is this a commercial street?

7    A    Commercial street.

8    Q    So there are stores on the street, correct?

9    A    Yes.

10   Q    There is another unit in that building, is there

11   not?  There is another apartment, you testified, in that

12   building?

13   A    It's my daughter upstairs, another apartment.

14   Q    And what is your daughter's name?

15   A    Emily Massa.

16   Q    So you live in one of the units and your daughter

17   Emily Massa lives in the other unit.

18   A    Yeah.

19   Q    And there are no other apartments in the building?

20   A    No.

21   Q    Do you know a Mr. John O'Hara?

22   A    I know Mr. John O'Hara all his life.

23   Q    Okay.  Does Mr. O'Hara live in your building?

24   A    Yes, in the apartment where I live.

25   Q    In the apartment where you live?

FORM C-100 - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

JO-284

188

1                    Pelliccio-Direct/Carroll

2      A    Because I moved upstairs to my daughter's apartment

3    because she's a very sick girl, and I could not leave the

4    apartment, go up and down all the time.

5      Q    And how long has Mr. O'Hara lived there?

6      A    Oh, I think it's around September.

7      Q    Since around September of when?

8      A    '93.

9      Q    September of '93.  And in the time that Mr. O'Hara

10   has lived there, has he paid you any rent?

11     A    Yes.

12     Q    Okay.

13     Q    How does he pay you?  Does he pay you by check?

14     A    No.  Cash.

15     Q    He pays you by cash.

16          How much does he pay you?

17     A    Four hundred.

18     Q    $400.  Does Mr. O'Hara have a lease?

19     A    No, because I don't need any lease.  I know John

20   O'Hara for so many years.

21     Q    So he has no lease?

22     A    No lease.

23     Q    Do you have gas service at this apartment?

24     A    Yes.

25     Q    Okay.  In whose names do the bills come?

KCDA000907

JO-285

189

Pelliccio-Direct/Carroll

1

2    A    Still under my name.  Still come under my husband's

3  name.

4    Q    Do you have electric service in this apartment?

5    A    Yes.

6    Q    Who does the electric bill come in?

7    A    Pelliccio name.

8    Q    Now, is there cable service in this building?

9    A    Yes.

10    Q    Where does the cable go?

11    A    In the apartment, mine.

12    Q    Where you live?

13    A    Yes.

14    Q    Is that the apartment with your daughter?

15    A    No, it's in the apartment where John O'Hara lives.

16    Q    It's in the apartment where John O'Hara lives.

17    A    Yes.

18    Q    In whose name is the cable service?

19    A    The cable service is under my name because it was

20  there before.

21    Q    So Mr. O'Hara -- you've known Mr. O'Hara all your

22  life, right?

23    A    That's right.

24    Q    And Mr. O'Hara moved into your building in

25  September of 1993, right?

FORM C-100 - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

KCDA000908

JO-286

190

Pelliccio-Direct/Carroll

1

2    A    Yes.

3    Q    You don't have a lease with him, right?

4    A    No.

5    Q    You don't have -- you didn't change any of the

6    utility accounts with him, right?

7    A    But he pays the utility by cash.

8    Q    Oh, he pays the utilities by cash.

9    A    He gives me the money and I mail the check, my own

10   checking account.

11   Q    Do you give him any receipts for this stuff?

12   A    Yeah, I think I have a few, but I couldn't find

13   them all because, you know.  This is the only thing I could

14   find (handing).

15   Q    Okay.  You have three receipts here that are marked

16   September 1, '93, April 6, '94?

17   A    Yeah, that's what -- I couldn't find the others.

18   Q    Let me ask you ask you a question.

19        If you're giving these receipts to Mr. O'Hara, why

20   do you have them?

21   A    No, that's the copy.

22   Q    That's the copy.  Okay.

23        MR. CARROLL:  I have no further questions.

24        THE COURT:  How many receipts did you give

25   Mr. O'Hara?  Do you give him a receipt every

KCDA000909

FORM C-100 - LASER  REPORTERS PAPER & MFG. CO.  800-628-6313

JO-287

191

Pelliccio-Direct/Carroll

1  

2 month?

3      THE WITNESS: Yeah. But that's all I can find

4 the receipt. I misplaced them.

5      THE COURT: You give him a receipt every

6 month, right? Please. Do you give him a receipt

7 every month?

8      THE WITNESS: Yes.

9      THE COURT: Is that right?

10      THE WITNESS: Yes.

11      THE COURT: Okay. For how much?

12      THE WITNESS: Four hundred.

13      THE COURT: And do you give him a receipt for

14 the utilities?

15      THE WITNESS: No. I don't give him a

16 receipt. He pay cash. He give me the cash and I

17 pay with my check.

18      THE COURT: You pay with your check?

19      THE WITNESS: Yeah, because they come under my

20 name.

21      THE COURT: What difference does it make? Why

22 can't you use his check?

23      THE WITNESS: Because I receive under my name,

24 the bill.

25 DIRECT EXAMINATION

192

Pelliccio-Direct/Carroll

BY MR. CARROLL:  (Cont'g)

Q    Do you put your account number on the check that you mail to the utility company?

A    Sure.

MR. CARROLL:  I have no further questions.

THE COURT:  You may inquire.

MR. MEYERS:  Thank you, sir.

CROSS-EXAMINATION

BY MR. MEYERS:

Q    Ma'am, did you say that the gas and electric is still in your husband's name?

A    That's right.

Q    And your husband is deceased?

A    Oh, yeah.

Q    How long ago did he pass away?

A    About fifteen years.

Q    Fifteen years.  Okay.

THE COURT:  So the utilities aren't in your name; it's in your husbands name?

THE WITNESS:  Yes.  I never change it since he die.

Q    Do you know if Mr. O'Hara ever paid any of the utilities or the cable for you at any time?

A    Yes, he did.

KCDA000911

JO-289

193

1                    Pelliccio-Cross/Meyers

2      Q    And how would that occur?  Would he give you a

3  check?

4           Do you recognize the handwriting on this check,

5  ma'am (handing)?

6      A    Yes, that's John O'Hara.

7      Q    Did he write this part (indicating)?

8      A    Yes.

9      Q    And that's his signature?

10     A    Yes.

11     Q    Does Mr. O'Hara have a telephone at that residence?

12     A    Yes.

13          THE COURT:  Whose name is that in?

14          MR. MEYERS:  If you know.

15          THE WITNESS:  John O'Hara.

16          THE COURT:  When was it put in?

17          THE WITNESS:  I don't know.  About October;

18  something like that.  I don't remember exactly.

19          THE COURT:  Well, let's see if you could try

20  to remember --

21          THE WITNESS:  I'm not that young to remember

22  things anymore.  I forget things one moment to the

23  other.

24          THE COURT:  So sometimes he paid by check and

25  sometimes he paid in cash, right?

KCDA000912

JO-290

194

1       Pelliccio-Cross/Meyers

2       THE WITNESS:  Yes.

3       MR. MEYERS:  I'm sorry, your Honor, what was

4   that?

5       THE COURT:  Sometimes he paid by check and

6   sometimes he paid in cash; is that right?

7       THE WITNESS:  Not the rent.  The rent is

8   always --

9       THE COURT:  The rent he always paid you in

10  cash, right?

11      THE WITNESS:  Yes.

12      THE COURT:  But utilities, sometimes by check

13  and sometimes by cash?

14      THE WITNESS:  Sometimes he gave me cash and I

15  make my own check.

16      MR. MEYERS:  I have no further questions, your

17  Honor.

18      THE COURT:  Any other questions?

19      MR. CARROLL:  I have no questions of this

20  witness, your Honor.

21      THE COURT:  You may step down.

22      MR. MEYERS:  Thank you, ma'am.

23      THE WITNESS:  Do I take this or leave it

24  here?

25      MR. CARROLL:  It's not in evidence.

FORM C-100 - LASER  REPORTERS PAPER & MFG. CO  800-626-6313

JO-291

195

Pelliccio-Cross/Meyers

1

2    MR. MEYERS:  You can take it.

3    (Whereupon, the witness was excused.)

4    THE COURT:  Next witness.

5    MR. CARROLL:  Your Honor, our next witness I

6    believe will be Miss Steffenson, and I believe she

7    has stepped away.  I believe she'll be here

8    shortly.

9    THE COURT:  All right.  We'll take a brief

10    recess.

11    (Whereupon, there was a brief recess.)

12    M A U R E E N    S T E F F E N S O N,

13    residing at 519 47th Street, Brooklyn, New York,

14    called as a witness by the Petitioners, having been

15    duly sworn, testified as follows:

16    THE CLERK:  State and spell your name for the

17    record.

18    THE WITNESS:  Maureen, M-a-u-r-e-e-n,

19    Steffenson, S-t-e-f-f-e-n-s-o-n.

20    THE CLERK:  Where do you live, ma'am?

21    THE WITNESS:  519 47th Street.

22    THE CLERK:  Brooklyn?

23    THE WITNESS:  Right.

24    THE CLERK:  Okay.

25    DIRECT EXAMINATION

FORM C-100 - LASER  REPORTERS PAPER & MFG. CO  800-626-6313

JO-292

196

Steffenson-Direct/Carroll

BY MR. CARROLL:

Q    Miss Steffenson, thank you for coming.

A    You're welcome.

Q    First, Miss Steffenson, just as for a matter of
clarification, I'm going to show you a photograph which has
been marked in evidence as Plaintiff's Exhibit Number 4.
Okay.  And I'd just ask you to take a look at that
photograph and particularly the lady standing on the left.
That is, in fact, you, isn't it?

A    Yes, it is.

Q    When was that photograph taken?

A    It was at a policeman's -- an affair that we had.

Q    And that was earlier this year; was it not?

A    Oh, a few months ago, I guess.  Not even.  That's
me.

MR. CARROLL:  Thank you very much.

Q    Miss Steffenson, do you know an individual by the
name of John K. O'Hara?

A    Yes, I do.

Q    And how long have you known Mr. O'Hara?

A    On and off through the community -- through
community work.

Q    Sure.

A    That's all.

JO-293

197

1                    Steffenson-Direct/Carroll

2        Q    A couple of years?  Five years?  Ten years?

3        A    He goes back a way, yes.

4        Q    Mr. O'Hara's running for the legislature this year;

5    is he not?

6        A    That's right.

7        Q    You've helped him in his campaign; is that not also

8    the case?

9        A    Yes.

10       Q    In fact, you did collect quite a few signatures on

11   a designating petition for Mr. O'Hara, didn't you?

12       A    Yes, I did.

13       Q    I'm going to show you a document which has been

14   marked in evidence as Plaintiff's Exhibit or Petitioners'

15   Exhibit Number 5 and this is in fact the designating

16   petition of Mr. O'Hara; and I ask you to focus on the

17   section of the petition under the name of the candidate,

18   okay.  The part of the petition that's called the Committee

19   on Vacancies.

20            Are you one of Mr. O'Hara's Committee on

21   Vacancies?  Are you on his Committee on Vacancies?

22       A    Yes, I am.

23       Q    And who asked you to become a member of the

24   Committee on Vacancies?

25       A    John O'Hara.

JO-294

198

1                    Steffenson-Direct/Carroll

2       Q    How active have you been in Mr. O'Hara's campaign?

3       A    Pretty active.  Very active, I'd say.

4       Q    Did Mr. O'Hara himself ask you to get involved in

5    the campaign?

6       A    Yes, he did.

7       Q    Do you hold any position in the campaign?

8       A    No.

9       Q    Okay.  Are you an officer of the campaign in any

10   way?

11      A    No.

12      Q    Okay.  Have you appeared in Mr. O'Hara's campaign

13   literature?

14      A    Yes.

15      Q    As a matter of fact, I'm going to show you a piece

16   of Mr. O'Hara's campaign literature, and I ask you to take a

17   look at this.

18           Do you recognize this document?

19      A    Yes, I do.

20           MR. CARROLL:  And can I show this to you,

21           Mr. Meyers.

22           MR. MEYERS:  Thank you.

23           MR. CARROLL:  Could we have this marked and I

24           would like to introduce this into evidence, if we

25           might.  Can we have it marked?

KCDA000917

JO-295

199

1                    Steffenson-Direct/Carroll

2              MR. MEYERS:  No objection, your Honor.

3              THE COURT:  Without objection, mark it as

4         Petitioners' Exhibit what?

5              COURT OFFICER:  16.

6              THE COURT:  16.

7              THE CLERK:  16.

8              (So marked.)

9    Q    Now, in Petitioners' Exhibit 16 in evidence, there

10   are a series of quotations attributed to various people in

11   the piece.  I believe there are four quotations?

12             MR. MEYERS:  Objection.

13             Irrelevant.

14             THE COURT:  It's in evidence.  The whole

15        thing's in evidence, Counselor.

16   Q    Is one of those four quotations from you?

17   A    Yes.

18   Q    Where do you reside, ma'am?

19   A    519 47th Street.

20   Q    Could you describe that building for me.

21   A    It's a brownstone.

22   Q    Three stories?

23   A    Yes, three floors.

24   Q    How many apartments in it?

25   A    Two family.

KCDA000918

JO-296

200

1                    Steffenson-Direct/Carroll

2      Q    It's a two-family building.  And do you own the

3  building?

4      A    Yes.

5      Q    What portions of the building do you and your

6  family occupy?

7      A    The first and second floor.

8      Q    And is there a tenant on the third floor?

9      A    Yes.

10     Q    And who is that tenant?

11     A    Luz Class, C-l-a-s-s.  L-u-z is the nickname.

12              THE COURT:  Your address is?

13              THE WITNESS:  519 47th Street.

14     Q    Do you have any other tenants in that building,

15  other than Miss Class?

16     A    Yes.

17     Q    What other tenants do you have there?

18     A    I have a Sandra.

19     Q    Sandra.  Do you know her last name?

20     A    Yes, I do.  Halverson.

21     Q    And you were looking at something, ma'am.  What was

22  that that you were looking at to determine that?

23     A    Oh, councilman Joan McCabe (phonetic) asked me to

24  bring this to court.  She did.  It's an American Express

25  card.

KCDA000919

JO-297

1                    Steffenson-Direct/Carroll

2      Q     Is that addressed to Miss Helverson?

3      A     Yes, it is.

4      Q     Now, how long has Miss Helverson lived at that

5  address?

6      A     Not long.

7            THE COURT:  How long?

8            THE WITNESS:  Oh, she moved in in May.

9            THE COURT:  Of what year?

10           THE WITNESS:  1994.

11     Q     Do you remember specifically when in May?

12     A     No.

13     Q     What sort of apartment do you rent to her?

14     A     A furnished room.

15     Q     Where is that furnished room located?

16     A     On the second floor.

17     Q     How much rent to do you charge her?

18     A     $200 a month.

19     Q     How does she pay that rent?

20     A     Cash.

21     Q     Does she ever give you checks?

22     A     No.

23     Q     Does she have a telephone there?

24     A     No.

25     Q     Does she have any sort of utility services --

FORM C-100 - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

JO-298

202

1              Steffenson-Direct/Carroll

2      A    No.

3      Q    Sandra Helverson -- who introduced you to Sandra

4   Helverson?

5      A    John O'Hara.

6      Q    Is Ms. Helverson involved in Mr. O'Hara's campaign

7   as well, to your knowledge?

8      A    To my knowledge, yes.

9      Q    What is her function in Mr. O'Hara's campaign?

10     A    As far as I know, she's a volunteer like myself.

11     Q    Do you know if she's being paid by Mr. O'Hara's

12  campaign?

13     A    I have no idea.

14     Q    Do you know whether or not she's been working full

15  time in Mr. O'Hara's campaign?

16     A    I have no idea.

17     Q    Has Miss Helverson said anything to you about her

18  employment?  Do you know where she might be employed?

19     A    I don't know if she was employed.  I don't know too

20  much about the girl.

21     Q    But she rents a room in your house?

22     A    That's right.

23     Q    When was the last time you saw her?

24     A    When would I see her?  Just before -- this is what,

25  August?

KCDA000921

FORM C-100 - LASER  REPORTERS PAPER & MFG. CO  800-626-6313

JO-299

203

Steffenson-Direct/Carroll

1

2      Q     Right.

3      A     I saw her just -- when the petition was ending,

4    when we signed the last day --

5      Q     Was that in mid July?

6      A     It was the last day before or the day before the

7    petitioning was over because we were all so exhausted, I

8    remember.

9      Q     So that was sometime in July.

10     A     Right.   That's right.

11     Q     So it's been several weeks since since you saw

12   Miss Helverson?

13     A     That's right.

14     Q     She hasn't come to her room during that period?

15     A     Not that I know of.

16     Q     Before that, how often had you seen Miss Helverson

17   between when she moved in in May and the end of petitioning?

18     A     Oh, quite a bit because we were working together on

19   Mr. O'Hara's campaign.

20     Q     Let's draw a distinction.

21           How often did you see her at your home, at the

22   brownstone?

23     A     I would have to say at least four or five times.

24     Q     Four or five times.  And -- tell me about where her

25   rented room is.  Where is this room?

FORM C-100 · LASER    REPORTERS PAPER & MFG. CO    800-626-6313

JO-300

204

1        Steffenson-Direct/Carroll

2    A    It's on the second floor.  It's -- I don't know if

3 you're familiar with brownstones.  They're railroad rooms

4 and then off to every floor, there's always a hall room and

5 off the hall room would would be a kitchen or a room.

6    Q    On that second floor, there are other rooms; are

7 there not?

8    A    Yes.

9    Q    Who occupies those rooms?

10    A    I do.  My husband.

11    Q    Are they your bedrooms?

12    A    And my son, yes.

13    Q    And your son's bedroom?

14    A    Yes.

15    Q    So her bedroom is on the same floor; is that

16 correct?

17    A    Yes.

18    Q    I do know something about brownstones.  Is there a

19 bathroom?

20    A    Yes, it's in the hall.

21    Q    Does Miss Helverson share that bathroom with you?

22    A    Yes, she does.

23    Q    Between May 4 and the middle of July when

24 petitioning ended, you saw her four or five times at the

25 apartment; is that correct?

205

1                    Steffenson-Direct/Carroll

2      A    If not more, at least.

3      Q    But you said four or five times?

4      A    Yes.

5      Q    Did you see her more than ten times?

6      A    More than ten times?  I would have to say ten

7  times.  Not more.

8      Q    Okay.  Not more than ten times?

9      A    Not more than ten times.

10     Q    And her bedroom is on the same floor as your

11  bedroom and your son's bedroom?

12     A    That's right.

13     Q    And she shares a bathroom with your family?

14              MR. MEYERS:  Objection.

15              Asked and answered.

16              THE COURT:  That's since May of '94?

17              THE WITNESS:  Yes.

18     Q    All right.  Now, did Mr. O'Hara ask you to rent a

19  room to Miss Helverson?

20     A    No.

21     Q    How did you come to rent the room to

22  Miss Helverson?

23     A    How it came about was he introduced me to her as

24  going to be working in the campaign and wanting to move into

25  the neighborhood and could I help her find an apartment.

KCDA000924

JO-302

206

1           Steffenson-Direct/Carroll

2                I said to her I had a hall room available, if she

3      wanted to stay there for awhile, and then I could help get

4      her an apartment for her and her boyfriend.

5                     THE COURT:  For her and who?

6                     THE WITNESS:  Her boyfriend.  She said she had

7           a boyfriend.

8                     THE COURT:  Was he there, too?

9                     THE WITNESS:  No, I never saw him.

10                    THE COURT:  You never saw her boyfriend?

11                    THE WITNESS:  No.

12     Q     Now, has Ms. Helverson ever signed a lease with

13     you?

14     A     No.

15                    THE COURT:  Does she get mail there?

16                    THE WITNESS:  Yes.

17                    THE COURT:  That's the only mail you brought

18          for her.

19                    THE WITNESS:  She collected her other mail.

20          This is the one she didn't collect.

21                    THE COURT:  She she has a mail box?

22                    THE WITNESS:  Yes.

23                    THE COURT:  She had her own mailbox?

24                    THE WITNESS:  It's one outside; we all get the

25          mail and bring it to each other.

JO-303

207

1                    Steffenson-Direct/Carroll

2        Q    So there's one mailbox for the building.

3             Now, your testimony is you haven't seen Miss

4    Helverson since the end of petitioning, correct?

5        A    Right.

6        Q    The only mail that's accumulated since then is that

7    one piece that you brought with you today?

8        A    That's -- yes.  All the rest of the mail, she's

9    collected.  I haven't seen her since then.

10        Q    But you haven't seen her since --

11        A    -- petitioning was over.

12        Q    Ma'am, I'm going to take you through this

13    Democratic Party designating petition and you, in fact, were

14    a substantial witness in this petition, were you not?

15        A    Uh-huh.

16        Q    And I'd like to focus your attention on particular

17    sheets.

18             The first sheet I'd like you to take a look at is

19    page number 1 of the petition.  That is, in fact, your

20    signature on the petition?

21        A    Yes.

22        Q    And you collected these signatures, correct?

23        A    Yes.

24        Q    How were these signatures collected?  Did you do

25    that door-to-door?

KCDA000926

208

1                   Steffenson-Direct/Carroll

2        A    Yes.

3        Q    And is it your testimony that you saw each and

4    every one of these people --

5        A    Yes.

6        Q    -- who signed this petition?

7        A    Yes.

8        Q    I'd like to take you to page number 2 of the

9    petition.  Is that your signature on that page?

10       A    Yes, it is.

11       Q    And this signature or these signatures were

12   collected on 7/1; is that correct?

13       A    That's what it says.

14       Q    Now, you saw each and every one of the people who

15   signed this petition?

16       A    Yes.

17       Q    I'd like you to specifically look at line number 6

18   on this page.

19       A    Yes.

20       Q    Can you read the name of the person who signed

21   there?

22       A    Aurora Lopez.

23       Q    Possibly Aurora Lopez?

24       A    Yes.

25       Q    Is it your testimony you saw Aurora Lopez and she

KCDA000927

FORM C-100 · LASER REPORTERS PAPER & MFG CO.  800-626-6313

JO-305

```
 1                    Steffenson-Direct/Carroll
 2    signed that petition?
 3        A    Yes.
 4        Q    How old is Aurora Lopez; do you recall?
 5        A    No.  I couldn't even identify her if I had to.
 6        Q    Okay.
 7                 THE COURT:  Were you with anybody?
 8                 THE WITNESS:  On this date?  This is 7 -- I
 9             could have been -- 7/1.
10                 THE COURT:  Well, who did you go with?
11                 THE WITNESS:  I went with all different people
12             at different times.
13                 THE COURT:  Name who you went with.
14                 THE WITNESS:  Okay.  I went with, sometimes,
15             John O'Hara, Rebecca and Sandy.
16        Q    Rebecca who?
17        A    I don't know last names.
18        Q    And "Sandy"; is that Sandra Helverson?
19        A    Right.
20        Q    Is Rebecca perhaps Rebecca Vales?
21        A    Yes, the one who came to court today with the baby.
22        Q    That's one of the ladies you went out with?
23        A    Yes.
24        Q    And Sandra Helverson is the lady who you rent your
25    room to?
```

KCDA000928

JO-306

210

1                    Steffenson-Direct/Carroll

2        A    Yes.

3        Q    And Mr. O'Hara, who's the candidate?

4        A    Yes.

5        Q    On line 10 of this petition -- we're still on page

6    2, Miss Steffenson, page 2, line 10 -- the lady who signed

7    there, do you recognize that name?  Do you know what that

8    is?

9        A    Michelle whatever.

10       Q    Ramkishun.

11       A    Whatever.

12       Q    Do you recall taking her signature?

13       A    I have to.  It's there, yes.

14       Q    And it's your testimony that you took her

15   signature.

16       A    Yes.

17       Q    Now, I'm going to skip to -- well, let's just go

18   through all the pages that you collected.  Page 16 of the

19   petition, ma'am.  Okay.  That's collected on 6/14.  And you

20   collected five signatures that day?

21       A    Uh-huh.

22       Q    And it's your position that you collected all of

23   those signatures?

24       A    Yes.

25       Q    And that, in fact, is your signature there?

KCDA000929

211

Steffenson-Direct/Carroll

1

2      A    That's right.

3      Q    And on page 17 of the petition, that is also your

4   signature?

5      A    Yes, it is.

6      Q    And you collected one signature on that day.

7      A    Yes.

8      Q    Page --

9           THE COURT:  What date was the five on page

10          16?

11          MR. CARROLL:  6/14.

12          THE COURT:  And the one on page 17?

13          MR. CARROLL:  6/8.

14     Q    Okay.  Now, on page number 18, you checked those

15   signature on July 1; is that not correct?

16     A    Excuse me?

17     Q    July 1.

18     A    Yes.

19     Q    And there are ten signatures on that page.

20     A    Yes.

21     Q    And you collected all of those signatures as well.

22     A    Yes.

23     Q    And on page 34.  That's 6/10 again; is it not?

24          THE COURT:  How many --

25     Q    On page 34, there are five signatures.  And that's

KCDA000930

JO-308

1                    Steffenson-Direct/Carroll

2    on June 10, correct?

3        A    Uh-huh.

4        Q    And you collected all those signatures?

5        A    Yes, I did.

6        Q    And on page 35, that's on June 26th, correct?

7        A    Uh-huh.

8        Q    And you collected three signatures?

9        A    Yes.

10       Q    And you collected all of those signatures?

11       A    Yes.

12       Q    Page 37; that's on July 1?

13       A    Yes.

14       Q    Ten signatures?

15       A    Right.

16       Q    And they're all yours?

17       A    Yes.

18       Q    Page 50, ten signatures?

19       A    Yes.

20       Q    June 8th again.

21       A    Yes.

22       Q    And they're all yours.

23       A    Yes.

24       Q    Page 52, once again, July 1, ten signatures.

25       A    Yes.

1              Steffenson-Direct/Carroll

2       Q    All yours, ma'am?

3       A    Yes.

4       Q    Page 68, your signatures once again?

5       A    Yes.

6       Q    June 9th?

7       A    Uh-huh.  Yes.  Sorry.

8       Q    Excuse me.  They were collected on June 7th; is

9    that correct?

10      A    Yes.

11      Q    And there are two signatures on that page?

12      A    Right.

13      Q    69, June 16th?

14      A    Yes.

15      Q    69 -- that's page 69, June 16th, ten signatures,

16   correct?

17      A    Let me go back here to -- I see 6/7 and 6/9.

18      Q    Well, you collected them on 6/7?

19           MR. MEYERS:  Your Honor, the document speaks

20           for itself, as far as the number of signatures and

21           the dates.

22      Q    And on page 70, ma'am?

23      A    Yes.

24      Q    That's on June 7th again; am I correct?

25      A    Yes.

KCDA000932

214

1                         Steffenson-Direct/Carroll

2         Q     And it's ten signatures.

3         A     Right.

4         Q     Page 71; that's on July 6th.

5         A     Yes.

6         Q     Is that correct?

7         A     Correct.

8         Q     And there are ten signatures there.

9         A     Right.

10        Q     Now, I see that some of these signatures are

11   collected on 33rd Street; some are collected on 10th Street

12   or I guess one is collected on 33rd Street.   Seven are

13   collected at 341 Tenth Street?

14        A     Uh-huh.

15        Q     And the last two were collected on Ninth Street, at

16   two addresses on Ninth Street.

17        A     Right.

18        Q     Do you know the individual on 33rd Street who

19   signed that petition?

20        A     No.   I don't know them other than as they came to

21   the door.

22        Q     You went to 341 Tenth Street.   Are you familiar

23   with that building?

24        A     No.

25        Q     Do you recall it?

215

1                    Steffenson-Direct/Carroll

2      A    No.

3      Q    Do you recall if it was an apartment?  Store?

4      A    Tenth Street.

5      Q    341 Tenth Street.

6      A    That was, like, a big building.  That's a very

7  large building, yes.  It reminds me -- not the projects,

8  co-ops.  Very nice building.

9      Q    Did you go through there alone or were you with

10 somebody?

11     A    I'm sure I was with somebody.

12     Q    Do you recall who it was?

13     A    No.  When I went out of the neighborhood, I was

14 always with somebody.

15     Q    But it would have been Rebecca Vales or Sandra or

16 Mr. O'Hara, correct?

17     A    Yes.

18     Q    Now, on page 88 of the petition, once again, your

19 signatures?

20     A    Yes.

21     Q    And that's also on 6/8; is that correct?

22     A    That's right.

23              THE COURT:  After 71, you went to what?

24              MR. CARROLL:  88, your Honor.

25     Q    And there are ten signatures on that page --

KCDA000934

JO-312

216

Steffenson-Direct/Carroll

MR. CARROLL:  June 8, your Honor.

THE COURT:  6/8?  Go ahead.

A    Yes.

Q    On page 105, once again, your signatures, ma'am?

A    That's right.

Q    They were collected on June 11th?

A    Right.

Q    And there are five signatures on that page.

A    Right.  I remember that night, yes, very well.

Q    I ask you specifically to look at lines 3 and 4.

Do you recognize those names?

A    No.  461 -- that's between fourth and Fifth.

Q    461 47th Street.

A    Yes.

Q    Can you read those names?  Thomas and and Antoinette --

A    No, I can't.  I'm sorry.

Q    Is it your testimony that there in fact were two separate people who came and signed that petition?

A    (Nodding.)

Q    Tell me, when you went to the door and someone answered --

A    I know all the people on that block very well.

Q    Who are these two people?

217

1          Steffenson-Direct/Carroll

2      A    461.  That would be the odd side of the street,

3  which would be --

4      Q    Well, Thomas and Antoinette Chrisland (phonetic) --

5      A    Whatever, yes.  461.

6      Q    Do you remember going to that house?

7      A    Yes.

8      Q    Is it possible that Thomas signed for Antoinette?

9      A    I don't know -- no, never, never.  I know they look

10  very similar, but I never would have permitted it.  Never.

11     Q    Okay.

12     Q    Move to --

13     A    What's their name?  Oh, God, I know who that is

14  now.  That's Mary -- oh, yes, oh, I went down there at the

15  last minute because I didn't -- I recall now, your Honor,

16  yes, I do.  I know these people very, very well.  They're

17  friends of my son's.

18     Q    What is their name, ma'am?

19     A    Antoinette and Tom.  Yes, very good.  Nice people.

20     Q    I can read Antoinette and Thomas.  It's the last

21  name we're having trouble with.  Do you recognize that?

22     A    The last name?

23     Q    The last name.

24     A    No, I don't.  And I know them twenty-five years.

25     Q    Really.

KCDA000936

JO-314

218

1                    Steffenson-Direct/Carroll

2       A    Twenty-five years I know them, your Honor.

3       Q    And even though they look alike, you're confident

4  it's two people?

5       A    Yes, she's a little woman, and I know the son very

6  well.  Good friends of the family.  That was on the last

7  twenty minutes before I quit and ripped up all my green

8  sheets.  I had to go down for an address to be filled and I

9  didn't realize it wasn't filled in.  It was very light at

10  night and I went down to get the signatures.

11      Q    You ripped up the green --

12      A    I was glad it ended.  I ripped up all the blanks.

13  This was the last day, the last minute and the last hour.

14      Q    You remember it vividly.  That was the last day of

15  petitioning?

16      A    For me it was, I think.

17      Q    What is the date on that?

18      A    June 11th.

19      Q    When did petitioning end?

20      A    I don't know.  The 13th.

21      Q    Didn't you say you met Sandra right around the last

22  day of petitioning?

23      A    Close to it, yes.

24      Q    Wasn't that in the middle of July?

25      A    I don't know what you're saying.

KCDA000937

219

Steffenson-Direct/Carroll

1

2       Q     We'll move on, ma'am.

3       A     Okay.

4       Q     But you vividly remember taking these signatures?

5       A     Oh, I could put my hand on the Bible ten times

6   over.  I remember.  I could describe them to you, even if

7   you had to bring them in.

8       Q     Let's move to page 106, okay.  These signatures

9   collected by you, right (indicating)?

10      A     Yes.

11      Q     These signatures were collected on June 16th, were

12  they not?

13      A     Yes.

14      Q     And there are ten signatures on this page, are

15  there not?

16      A     Yes.

17      Q     And you collected all of those?

18      A     Yes.

19      Q     Now, let's turn to page 125.

20            THE COURT:  How many were on 106?  I'm sorry.

21            Ten?

22            MR. CARROLL:  106 is ten, your Honor.

23      Q     Let's turn to page 125.  Excuse me just a second.

24            Let's look first at line 7 of that petition; this

25  is page 125.  That's dated 6/8; is it not, again?

KCDA000938

220

1                    Steffenson-Direct/Carroll

2      A    Yes.

3      Q    You collected quite a few signatures on 6/8.

4      A    Yes.

5      Q    And line 7 is the signature of an individual at 301

6   Sixteenth Street?

7      A    Yes.

8      Q    Do you recognize that signature?

9      A    No.  16th Street.  No.

10     Q    Would it refresh your recollection if I told you

11  that that name is Maura Burnett?

12     A    Maura Burnett.  Maura.  That's the woman that was

13  here this morning, I believe.

14     Q    Yes.  That is one of the women who was here this

15  morning.

16     A    Yes.  She gave us a hard time when she came to the

17  door.  I didn't even think she was going to sign she gave us

18  such a hard time.  I remember her.

19     Q    It's your testimony that you remember Miss Burnett?

20     A    Yes, I do.

21     Q    Would it it surprise you that Miss Burnett doesn't

22  remember you?

23     A    No.

24     Q    Let's look at lines 3, 4 and 5 on that page as

25  well, okay.  The Corraro (phonetic) family.  Now, is it your

KCDA000939

JO-317

221

1                    Steffenson-Direct/Carroll

2    testimony that that is three separate members of the Corraro

3    family that signed that petition?

4        A    Yes.

5        Q    Okay.  Now, specifically, I ask you to look at the

6    signature of Benjamin Corraro.

7        A    Uh-huh.

8        Q    Did Mr. Benjamin Corraro come to the door?

9        A    I would assume he did.  I can't recall.  I mean if

10   they came to the door, I took their signature.  I never went

11   inside anybody's home.

12       Q    But you saw Benjamin Corraro sign.  Is it possible

13   somebody took the paper inside to Mr. Corraro to have him

14   sign it?

15       A    No, because we were told that we have to witness

16   it.

17       Q    Okay.  Let's move on ma'am --

18       A    In fact, a few people had mentioned -- ?

19       A    I said if they can't come out, I can't have the

20   signature.  I recall that specifically.

21       Q    On page 143, also on June 8th -- is that not

22   correct?

23       A    Right.

24       Q    Ten signatures?

25       A    Right.

KCDA000940

JO-318

222

Steffenson-Direct/Carroll

1

2    Q    You collected all of those signatures.

3    A    Right.

4              THE COURT:  Number what?

5              MR. CARROLL:  June 8th.

6              THE COURT:  What number?

7              MR. CARROLL:  Page 143, your Honor.

8    Q    Now, would you take a look at line 3 on that page.

9    A    Yes.

10   Q    Do you recognize that name?

11   A    It says Marc something, Gro?  G-r-o.

12   Q    Do you recall getting Mr. Groh's signature?

13   A    No.  No.

14   Q    But it's your testimony that you saw Mr. Groh.

15   A    Yes.

16   Q    Do you have any recollection of what Mr. Groh looks

17   like?

18   A    No.

19   Q    Do you have any recollection of the type of house

20   he lives on?

21   A    When I went outside the community, I couldn't

22   really swear swear to --

23   Q    Do you recall being on 16th Street?

24   A    Yes.

25   Q    What sort of street is 16th Street?

KCDA000941

JO-319

223

1               Steffenson-Direct/Carroll

2       A    16th Street.  They're more like frame houses.

3  They're cut in -- I couldn't -- no, I couldn't say -- I

4  wouldn't want to hang anybody on my testimony.

5       Q    You were outside the community, so somebody was

6  with you; is that correct?

7       A    Oh, yes.

8       Q    And do you recall who was with you that day?

9       A    No.  June 8th, no.

10      Q    Let's turn to page 170, ma'am.  This is dated

11 June 16th.

12      A    Yes.

13      Q    And you've signed it?

14      A    Yes.

15      Q    And you collected these signatures?

16      A    Yes.

17      Q    On page 215, ma'am, this is dated July 1 and are

18 these your signatures as well?

19      A    Yes, they are.

20           THE COURT:  How many?

21      Q    There are ten signatures on that page.

22           Did you fill out out this witness statement?

23      A    Yes.

24      Q    Is this your handwriting throughout the witness

25 statement?

KCDA000942

JO-320

224

Steffenson-Direct/Carroll

2    A    Yes, it is.

3    Q    Tell me, did you fill in the E.D.'s on this

4  petition, the numbers on the side?

5    A    I don't recall that.  I don't know.  I don't

6  remember.

7    Q    Is that your handwriting?  Do you recognize that

8  (indicating)?

9    A    It's my handwriting, but I don't recall having put

10  the E.D.'s.

11    Q    You don't recall putting in the E.D.'s?

12    A    No.

13    Q    How about the number of signatures; is that your

14  handwriting, ma'am?

15    A    Yes, it is.

16    Q    Let's turn to page 220, ma'am, once again, dated

17  July 1.  Your signature?

18    A    Yes.

19    Q    And there are ten signatures on this page.

20    A    Yes.

21    Q    Now -- and it's your testimony that you collected

22  all of these; is this correct?

23    A    That's right.

24         THE COURT:  How many were there?

25         MR. CARROLL:  Ten signatures, your Honor.

KCDA000943

JO-321

225

THE COURT:  Date?

MR. CARROLL:  July 1.

A    Very hot night.  I remember that.  It was terrible.  In fact, if I recall that night and these addresses for some reason, I could have been -- I know who was with me at that time, yes.

Q    Now, I'd like you specifically to take a look at lines 9 and 10 of this petition.

A    Yes.

Q    Colombine (phonetic) and Peter Antonio; is that correct?

A    Yes.  I don't know --

Q    Do you recall taking their signatures?

A    Yes, if they're there, I had to take them.

Q    Had to take them.  Did you, in fact, see both of them sign that petition?

A    Yes.

Q    And it's your testimony that two people signed that petition and not one.

A    Yes.

Q    Let's turn to page 222.  That's dated 6/14.

A    Uh-huh.

Q    And there are three signatures on that page?

A    Right.

KCDA000944

JO-322

226

1                    Steffenson-Direct/Carroll

2        Q    And these are your signatures; you collected this

3    petition.

4        A    Yes.

5        Q    And then finally on 6/13, page 228, there are eight

6    signatures on this page, correct?

7        A    Yes.

8        Q    And you collected all eight of those?

9        A    Yes.

10       Q    Now, ma'am, you collected some 186 signatures; is

11   that correct?

12       A    Yes.  That's about right.

13       Q    And on June 8th, you collected 41 signatures?  Does

14   that seem right?

15       A    Yes, it does.  I remember.

16       Q    How did you go about getting these signatures?

17            What time of the day did you start collecting

18   them?

19       A    Late in the afternoon.  Not that late.  I would

20   have to say sometime, two, three; it depends upon the

21   weather.

22            It was constantly hot, so I would wait until

23   that peak of the day when the sun was almost trying to come

24   down.

25       Q    So you started, what, about two or three in the

JO-323

227

Steffenson-Direct/Carroll

2    afternoon?

3       A    Yes.

4       Q    What time did you work to that day?

5       A    Till the end; till it got dark.  Till I was

6    embarrassed to ring bells anymore.

7       Q    About what time?

8       A    Ten o'clock I would say; at least nine o'clock.

9       Q    And all of these signatures were collected door to

10   door?

11      A    Yes.

12      Q    Now, on 6/8 --

13      A    Can I take that back for a minute because sometimes

14   I sat on my stoop and I would see my neighbors go up and

15   down.  I didn't make it to the house.  I would catch them

16   coming from work.

17            I'd say, "Come over here.  I missed you.  Sign my

18   petition."  Very close neighbors.

19      Q    On 6/8 you were on on Webster Place, 16th Street

20   and Jackson place; is that correct?

21      A    Right.

22      Q    And all those signatures were collected

23   door-to-door, ma'am?

24      A    Yes, they were.

25            MR. MEYERS:  What sheet is he showing her?

KCDA000946

JO-324

228

1              Steffenson-Direct/Carroll

2              MR. CARROLL:  Excuse me.  We're looking at

3          page 50.

4              THE COURT:  Anything else?

5              MR. CARROLL:  Just a second, your Honor.

6     Q    Now, Miss Steffenson, in addition to the 41 that

7     you collected on June 8th, you collected 60 on July 1; is

8     that correct?

9     A    Yes.

10    Q    And were those also collected door-to-door?

11    A    Yes.

12    Q    Do you recall what time you started collecting

13    signatures that day?

14    A    Early.  It would have to be to get that many

15    signatures.  Bright and early.

16    Q    It was very hot, very hot day?

17    A    Very hot day.  I never want to do it again.

18    Q    I understand.  Now, you must be in pretty good

19    shape.

20    A    I lost ten pounds.  It helps, my sense of humor.

21             MR. CARROLL:  We have no further questions of

22         this witness.

23             MR. MEYERS:  Thank you, your Honor.

24    CROSS-EXAMINATION

25    BY MR. MEYERS:

KCDA000947

JO-325

1                    Steffenson-Cross/Meyers

2        Q    Miss Steffenson, let me go back to something that

3    Mr. Carroll asked you earlier.

4             You said that you have a tenant that you rent a

5    room to named Sandra Helverson; is that correct?

6        A    Yes.

7        Q    Now, do you know -- other than volunteering for

8    Mr. O'Hara's campaign -- what she does?

9        A    Well, she's told me she was a law student.

10       Q    Do you know if Miss Helverson was taking the bar

11   exam this year?

12       A    Yes, she said she was.

13       Q    Do you know when the bar exam was or is?

14       A    It was right after petitioning.

15       Q    Okay.  In fact, the bar exam was last Tuesday and

16   Wednesday; were you aware of that?

17       A    Yes.

18       Q    And did Miss Helverson tell you, after petitioning

19   was over, that she would be studying for the bar exam?

20       A    Excuse me?

21       Q    Did she tell you she would be studying for the bar

22   exam?

23       A    Oh, yes.

24       Q    Did she ever mention that -- strike that.  You say

25   she receives mail at that address?

230

Steffenson-Cross/Meyers

1

2 A Yes.

3 Q Did you say that Joan McCabe sent her a letter --

4 A No.  Joan McCabe asked me to bring this letter as

5 proof that she lived here.

6 Q Can I see that, please?

7  Who is Joan McCabe?

8 A She's a Councilwoman -- Councilman friend of mine.

9 That's the last bit of mail that she received.

10  They asked me:  Did she live there, too?  And I

11 said, "Yes."

12 Q I'm going to show this to Mr. Carroll (handing.)

13  Miss Steffenson, could you please tell us what this

14 is.

15 A It's an American Express card.  That's who sent it,

16 according to the corner of the envelope.

17   THE COURT:  American Express card?

18   THE WITNESS:  That says "cards."  American

19   Express cards.  That's what it says.  It's local, I

20   guess.

21 A (Cont'g) Your question is, who it was addressed

22 to?

23  Sandra Helverson.

24 Q And the address?

25 A 519 47th Street.

KCDA000949

JO-327

231

1              Steffenson-Cross/Meyers

2              MR. MEYERS:  Your Honor, I'd like to admit

3       this in evidence as Respondent's Exhibit 1.

4              MR. CARROLL:  No objection.

5              THE COURT:  Without objection.

6              (Respondent's Exhibit A in evidence, so

7       marked.)

8              THE COURT:  Who gave this to you?

9              THE WITNESS:  The mailman.

10             THE COURT:  The mailman gave this to you?

11             THE WITNESS:  No; we have a box.  It goes in.

12      It goes in the mailbox.  We have only one mailbox.

13      All the mail goes in the one mailbox.

14             THE COURT:  And this is the only mail that's

15      been there since July 25th; is that right?

16             THE WITNESS:  For her, yes.

17             THE COURT:  Yes.

18             THE WITNESS:  Yes, yes.

19      Q    Was there other mail?

20      A    Me, I get my bills.

21      Q    Other mail for Miss --

22      A    No, I hold her mail to put under her door if I see

23      her or something, no.

24      Q    Did any other mail, other than --

25             THE COURT:  When did you see her last?

FORM C-100 - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

JO-328

232

1           Steffenson-Cross/Meyers

2           THE WITNESS:  Right after petitioning was

3    over, your Honor.

4           THE COURT:  You haven't seen her since?

5           THE WITNESS:  No.

6           THE COURT:  She doesn't sleep there now?

7           THE WITNESS:  I haven't seen her.

8           THE COURT:  When's her rent up?

9           THE WITNESS:  Next month.

10          THE COURT:  When do you collect rent?

11          THE WITNESS:  The first of the month.

12          THE COURT:  Did you collect rent for August?

13          THE WITNESS:  Yes, I did.

14          THE COURT:  How?

15          THE WITNESS:  When she paid her rent.

16          THE COURT:  How?

17          THE WITNESS:  She gave it to me in advance,

18    your Honor.

19          THE COURT:  When?

20          THE WITNESS:  When she took the apartment,

21    your Honor.

22          THE COURT:  Wait, wait, wait, wait, wait.

23          Let me understand this.

24          She gave you how many months rent in advance?

25          THE WITNESS:  Three months, your Honor.

KCDA000951

JO-329

233

Steffenson-Cross/Meyers

1

2          THE COURT:  She just took the apartment for

3     three months?

4          THE WITNESS:  No, one was security and the

5     other was towards the rent.

6          THE COURT:  When did she move in?

7          THE WITNESS:  She came at the end of May.

8          THE COURT:  June, July; and one is security.

9          THE WITNESS:  Yes.

10          THE COURT:  So she didn't pay August rent.

11          THE WITNESS:  Well, I have her security.

12          THE COURT:  I didn't say that.

13     She didn't pay August rent, did she?

14          THE WITNESS:  No.

15     Q    Did she move out?

16     A    Not that I know of.  She said she would let me

17 know, because I was helping to look for an apartment for

18 her.  I have her name in three real estates with very good

19 friends of mine.  She wants very much to live in Sunset

20 Park.

21          THE COURT:  Do you know she lives in Jersey?

22          THE WITNESS:  So I'm told.

23          THE COURT:  Don't you know?

24          THE WITNESS:  No, she lives in my house.

25          THE COURT:  Didn't she tell you?

KCDA000952

234

1                    Steffenson-Cross/Meyers

2              THE WITNESS:  No, she lives in my house.

3              THE COURT:  She never told you she had a

4       Jersey address?

5              THE WITNESS:  No.

6              THE COURT:  Okay.

7              Anything else?

8              MR. MEYERS:  Yes, sir.

9       Q    I'm going to direct your attention to one of the

10      pages in the Democratic Party petition that you had looked

11      at earlier with Mr. Carroll, page number 105.

12             Do you remember looking at this earlier with

13      Mr. Carroll?

14      A    Yes, I do.

15      Q    Did you read the witness statement?

16      A    What do you mean?  Did I read what?

17      Q    Your statement on the bottom.

18      A    Oh, yes.

19      Q    Did you note the date that you took those

20      signatures?

21      A    Yes.

22      Q    Does this refresh your recollection as to the

23      occurrences when you took those signatures?

24      A    Excuse me?

25      Q    Does this refresh your recollection?

JO-331

235

Steffenson-Cross/Meyers

1

2      A    Oh, I remember Tom and Antoinette very well that

3 night.

4      Q    You remember taking their signatures?

5      A    Yes, I do.

6      Q    And when did you take their signatures?

7      A    May, June -- let me think now.  May -- let me

8 think.  The petitioning started -- let me think -- May -- I

9 have to think now.  This is June 11th.  Yes, okay.

10          THE COURT:  "Yes" what?

11          When did you take their signatures?

12          THE WITNESS:  On June 11th, your Honor.

13          THE COURT:  Didn't you see the date there?

14          THE WITNESS:  Yes.  But I have to --

15          THE COURT:  Did you put the dates in?

16          THE WITNESS:  I have to think.  In my mind, I

17      have to think --

18          THE COURT:  Did you put the dates in?

19          THE WITNESS:  Yes.

20      Q    You wrote these in -- are these -- on lines one

21 through five, is that your handwriting in the date section?

22      A    No.

23      Q    Who put the dates in the date section?

24      A    This isn't my handwriting right here.  This isn't

25 my handwriting (indicating).

FORM C-100 - LASER REPORTERS PAPER & MFG. CO.  800-626-6313

JO-332

236

1

2    Q    Did you put the date on the bottom --

3    A    Yes, I did.

4    Q    Let me finish the question.

5        In your "statement of witness" section --

6    A    Yes.

7    Q    Okay.

8    A    But you could bring those two people in and they

9 would testify to it; don't worry.

10    Q    Now, you had earlier mentioned that you went

11 petitioning sometimes with Sandra Helverson.

12    A    Yes.

13    Q    And with Mr. O'Hara and with Rebecca Vales; is that

14 correct?

15    A    Yes.

16    Q    Was there anyone else that you may have gone out

17 with, gone petitioning with?

18    A    (No response.)

19    Q    Did you go out in pairs or did you go out with three

20 people or a large group?

21    A    No, the most I ever went out with was three people.

22    Q    When you went out with three people, who did you go

23 with?

24    A    Mr. O'Hara, his girlfriend and myself.

25    Q    And what's his girlfriend's name?

237

1                   Steffenson-Cross/Meyers

2       A    Vicki.

3       Q    Do you know her last name?

4       A    No.

5       Q    I show you page 125 of the petition.  Do you know

6   the date is June 8th?

7       A    Yes.

8       Q    Do you remember if you were by yourself or if you

9   were with anybody else on that day when you were collecting

10  signatures?

11      A    That far down, I had to be be with someone.  16th

12  Street.  That's out of my neighborhood.  I can't recall

13  right now who it was, but I can tell from just the address

14  that I was not there by myself.

15      Q    Okay.  Do you know if you were with one other

16  persons or two other people?

17      A    Well, I remember -- it would be -- I don't know,

18  because -- no, I don't recall.  I don't want to -- --

19  know --

20                  (Mr. Weiss enters the courtroom).

21                  MR. MEYERS:  Your Honor, at this time I have

22          no further questions for this witness.

23                  THE COURT:  Anything else?

24                  MR. CARROLL:  Very briefly, your Honor.

25                  THE COURT:  Could I see that page, 105,

KCDA000956

JO-334

238

1                     Steffenson-Cross/Meyers

2          please?

3                (Pause in proceedings.)

4                THE COURT:  I think I've got the wrong one

5          here.

6                Okay.  You may proceed.

7    REDIRECT EXAMINATION

8    BY MR. CARROLL:

9      Q    Miss Steffenson, on page 105 you testified that the

10   signatures -- excuse me -- that the dates on the signature

11   lines alongside the signatures were not filled in by you; is

12   that correct?

13     A    No, this was not filled in by me, no (indicating).

14     Q    Do you know who did fill that in?

15     A    Tom.

16     Q    Tom who?

17     A    I can't pronounce his last name.

18     Q    Are you testifying that it's only with respect to

19   that line that the date was not filled in by you?

20     A    That's definitely not my way of writing, that's

21   right.

22     Q    How about on line number 1?

23     A    That's me.

24     Q    That's you.

25                Line number 2?

239

1                    Steffenson-Redirect/Carroll

2       A     That's me.

3       Q     Line number 3 is not you.

4       A     No.

5       Q     But you think it's Tom?

6       A     Yes.

7       Q     But you can't remember his last name?

8       A     I know the man twenty-five years, and I don't

9    remember his last name.

10      Q     Now, you testified that whenever you went out in a

11   group of three, the person who was with you was Mr. O'Hara

12   and his girlfriend Vicki, correct?

13      A     That's right.

14      Q     That's whenever you went out in a group of three.

15      A     That's right.

16      Q     What does Vicki look like?

17      A     Very nice, pretty girl.  Young.

18      Q     Just how old, would you say?

19      A     Oh, you're asking the wrong one.  I put you in your

20   grave -- I'd say in her thirties.

21      Q     In her thirties.

22            Dark hair?

23      A     Yes.

24      Q     Okay.  I'm going to show you a photograph.  Is

25   this, in fact -- that's already in evidence as Petitioners'

JO-336

240

1                    Steffenson-Redirect/Carroll

2  Exhibit Number 3.  Is that, in fact, Vicki?

3     A    Yes, it is.

4     Q    And that's a fair and accurate portrayal of Vicki?

5     A    Oh, yes, that's her.

6     Q    So she's in her thirties, normal build, has dark

7  hair.

8     A    Very nice figure.

9          MR. CARROLL:  Good.  I have no further

10         questions.

11         THE COURT:  Anything else?

12         MR. MEYERS:  No, sir.

13         THE COURT:  You may step down.

14         (Whereupon, the witness was excused.)

15         THE COURT:  Is that it for today?

16         MR. CARROLL:  Your Honor, I would just like

17         to, as a housekeeping matter, to introduce a

18         certified copy of a New Jersey -- State of New

19         Jersey Division of Motor Vehicles abstract of

20         driver history record for Sandra Helverson.

21         It is a certified copy of the record

22         (handing).

23         MR. MEYERS:  Thank you, Mr. Carroll.

24         MR. MEYERS:  No objection, your Honor.

25         THE COURT:  Without objection, mark it

FORM C-100 - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

JO-337

241

1        Steffenson-Redirect/Carroll

2   Petitioners' Exhibit 17.

3        MR. CARROLL:  Your Honor, if I might, for the

4   record, note that it shows an address of 430 Ogden

5   Avenue, Jersey City, New Jersey.

6        THE COURT:  I'd have been surprised if it

7   didn't.

8        (So marked, Petitioners Exhibit 17 in

9   Evidence.)

10        THE COURT:  Anything else?

11        MR. CARROLL:  Nothing further this afternoon,

12   your Honor.

13        THE COURT:  Thank you, gentlemen.  We'll

14   resume tomorrow.

15        (Whereupon, the hearing was adjourned to

16   August 5, 1994.)

17        (Continued on the following page.)

18

19

20

21

22

23

24

25

KCDA000960

JO-338

242

1

2  SUPREME COURT OF THE STATE OF NEW YORK
   COUNTY OF KINGS:  CIVIL TERM - PART 15
3  ----------------------------------------X
   DENNIS L. POL, LISA T. LOPEZ, and
4  FELIX W. ORTIZ,

5                      Petitioners,

6

7                 -against-

8  THE BOARD OF ELECTIONS In The CITY
   OF NEW YORK and JOHN K. O'HARA,
9
                             Respondents
10 ----------------------------------------X
   Index # 23414/94
11 ----------------------------------------X
   In the Matter of the Application of
12 ANN ENGLISH,

13                 Objector-Petitioner,

14

15              - against -

16 JOHN K. O'HARA, Member of the Assembly
   From the 51st Assembly District, Kings
17 County, New York State,

18                      Candidate

19          - and -

20 BOARD OF ELECTIONS IN THE CITY OF NEW
   YORK,
21
                      Respondents,
22 ----------------------------------------X
                  Hearing
23
                      360 Adams Street
24                    Brooklyn, New York
                      August 5, 1994
25
              (Continued on the following page.)

KCDA000961

JO-339

243

1

2

3      B E F O R E:

4                          HONORABLE IRVING S. ARONIN,

5                                              Justice

6

7             (Appearances same as previously noted.)

8                          MARK L. BOWIN
9                     Official Court Reporter
                       -   -   -   -   -

10            THE COURT:  Good morning.  Are we ready to

11     proceed?

12            MR. CARROLL:  I think we are.

13            THE COURT:  Who is the next witness?

14            MR. CARROLL:  It is Mr. Soto, but I do need

15     Mr. Keefe, if we could just have one moment.

16            THE COURT:  How many witnesses do you have

17     today?

18            MR. CARROLL:  We have several people here

19     pursuant to subpoena.

20            THE COURT:  I didn't ask that.  I only asked

21     how many.

22            MR. CARROLL:  If you don't hold me to a

23     number, at least a half dozen.

24            THE COURT:  That's your whole case?

25            MR. CARROLL:  If everybody has come in, yes,

JO-340

244

1                    Proceedings

2              Judge, but if everybody has not come in ---

3                    THE COURT:  I see.

4                    MR. CARROLL:  It's my understanding we're

5              going over to Monday, anyway.  I'm trying to get

6              everybody in today, Judge.

7                    THE COURT:  All right.

8    R A L P H    S O T O,

9              residing at 29 Jackson Place, Brooklyn, New York,

10             called as a witness by the Petitioners, having been

11             duly sworn, testified as follows:

12                   THE CLERK:  State and spell your name for the

13             record.

14                   THE WITNESS:  Ralph, R-a-l-p-h, Soto, S-o-t-o.

15                   THE CLERK:  Where do you live?

16                   THE WITNESS:  29 Jackson Place, Brooklyn, New

17             York.

18                   THE COURT:  You may proceed.

19                   MR. CARROLL:  Thank you, your Honor.  We're

20             identifying Mr. Soto's signature.

21   DIRECT EXAMINATION

22   BY MR. CARROLL:

23        Q    Thank you for coming, Mr. Soto?

24        A    Thank you.

25        Q    Bear with me a second.  I keep popping this clip.

245

Soto-Direct/Carroll

1

2      Mr. Soto, I'm going to show you a document which

3  has been already marked into evidence as Petitioners'

4  Exhibit 5 and which is a Democratic Party designating

5  petition for Mr. J. K. O'Hara.

6      I'd ask you to take a look at page 88 of that

7  petition, sheet number 88, and specifically at line 4 of the

8  petition and ask you if you recognize the signature.

9      A    Yes, I do.

10     Q    And is that your signature, sir?

11     A    Yes, it is.

12     Q    Do you recall the circumstances surrounding the

13  taking of that signature?

14     A    Vaguely, yes.

15     Q    Was it at your home?

16     A    Yes, it was.

17     Q    Did somebody come to your front door?

18     A    Yes.

19     Q    How many people came to your front door?

20     A    I'm not sure.  Two people.

21     Q    Two people, you believe?

22     A    I believe.

23     Q    And what were their sexes?

24     A    One male; one female.

25     Q    Do you know who the male was?

JO-342

246

Soto-Direct/Carroll

1

2     A    Yes.

3     Q    Who was the male?

4     A    Mr. O'Hara.

5     Q    Who was hold holding the petition when they came to

6     your door?  Do you remember?

7     A    I believe the lady was holding the petition.

8     Q    You said there was a woman who came to the door as

9     well.  Do you remember what the woman looked like?

10    A    I don't see a clear picture of her.

11    Q    Was she young or old?

12    A    She was maybe about my age.

13    Q    About your age.  How old is that, sir?

14    A    Forty.

15    Q    Do you remember what color hair she had?

16    A    Black hair.

17    Q    Mr. Soto, I'm going to show you a photograph, which

18    has been marked into evidence as Plaintiff's Exhibit Number

19    4; and I'd ask you to take a look at the lady on the extreme

20    left of the photo, that lady there (indicating).

21         Was it that lady who came to your door with

22    Mr. O'Hara?

23    A    I don't remember --

24         No.

25    Q    It was not that lady.  And could you just take a

FORM C-100 - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

KCDA000965

JO-343

247

1
2    look at the bottom of the petition and tell us who the

3    witness is there.  Just read her name.

4    A    Maureen Steffenson.

5    Q    Now, sir, I'd also like you to take a look at line

6    number 5 of the petition, I think it is, the signature right

7    under yours.  That's a Pat Harrigan?

8    A    Harrigan.

9    Q    Do you know Miss Harrigan?

10    A    Yes, I do.

11    Q    Who is Miss Harrigan?

12    A    She's my wife.

13    Q    And were you there when your wife signed that

14    petition?

15    A    Yes, she was -- I was.

16    Q    Could you tell me what the circumstances were

17    surrounding your wife signing that signature?

18                    MR. MEYERS:  Objection.

19                    THE COURT:  Overruled.

20                    THE COURT:  You may answer.

21    A    I took the petition in.  I asked her to sign it.

22    Q    And you took it into the house to her?

23    A    Yes.

24    Q    Was Mr. O'Hara there when she signed the petition?

25    A    He was in the vestibule.

JO-344

248

1                              Soto-Direct/Carroll

2        Q    But this was inside the house?

3        A    Inside the house.

4        Q    Could the people see in from the vestibule into the

5    house to where your wife signed it?

6        A    If they tried hard enough.

7        Q    Could they see into the house?

8        A    The door was open.  They could see into the house.

9             MR. CARROLL:  Okay.  I have no further

10            questions of this witness.

11            THE COURT:  You may inquire.

12            MR. MEYERS:  Thank you, your Honor.

13   CROSS-EXAMINATION

14   BY MR. MEYERS:

15       Q    Mr. Soto, did you enter into any conversations with

16   any of the people who came to your door?

17       A    Yes, I did.

18       Q    Who did you enter into a conversation with?

19       A    With Mr. O'Hara.

20       Q    How long would you say Mr. O'Hara was at your door?

21       A    About fifteen minutes.  We got into a nice

22   discussion.

23       Q    Did you talk to anybody else?  Did you talk to the

24   other person or persons?

25       A    I said "hello" to the other lady.  There was

FORM C-100 - LASER  REPORTERS PAPER & MFG  CO  800-826-6313

249

1                    Soto-Cross/Meyers

2     activity throughout the block also.

3        Q    Okay.  When you say that, were there other people

4     that came and went during this fifteen minutes while you

5     were at the front door?

6        A    There were people canvassing the block.

7        Q    Okay.  The woman that you saw --

8                THE COURT:  Canvassing the block.

9                Were you inside your house?

10               THE WITNESS:  No, I had stepped outside of the

11               house.  We were having the discussion on our front

12               stoop.

13               THE COURT:  I see.

14       Q    The woman that was shown to you in the photograph

15    by Mr. Carroll, was that one of the people -- do you

16    recognize her as being one of the people that came back and

17    forth while you were talking to Mr. O'Hara?

18       A    I can't remember who they were.  There were more

19    than one that I remember.

20               MR. MEYERS:  I have no further questions, your

21               Honor.

22               THE COURT:  Anything else?

23    REDIRECT EXAMINATION

24    BY MR. CARROLL:

25       Q    Mr. Soto, you say you were outside on your front

JO-346

250

1                    Soto-Redirect/Carroll

2    porch?

3        A    Yes, the stoop.

4        Q    Is that where Mr. O'Hara was standing when you

5    brought the petition into the house?

6        A    No, I invited him into the vestibule.

7        Q    Okay.

8        A    And I said:  Hold on a minute.  She she might not

9    be decent.  She was.  She was sitting there watching TV and

10   she signed it there.

11              THE COURT:  Did the lady come in also?

12              THE WITNESS:  No.  I remember Mr. O'Hara

13          coming in.

14              THE COURT:  Just Mr. O'Hara?

15              THE WITNESS:  Yes.  Into the vestibule area.

16       Q    Only Mr. O'Hara.  Thank you.

17       A    I think so.  It's a small vestibule.

18              THE COURT:  Anything else?

19       Q    Sir, let me -- when you signed your petition, your

20   signature, where were you?

21       A    Outside.

22       Q    You were outside?

23       A    Yes.

24       Q    When you came inside, only Mr. O'Hara came in or

25   did someone else come in as well?

KCDA000969

JO-347

251

1                    Soto-Redirect

2       A     Mr. O'Hara came in; like, was standing by the door

3   in the vestibule and the other lady may have been right

4   behind him.  It's a small vestibule, so.

5       Q     So she may have been in there?

6       A     She could have been in the vicinity.  We've got big

7   window, anyway.

8       Q     So someone could have seen in through the window?

9       A     Yes, it's an "L" shaped --

10               THE COURT:  Please, let's not speculate.

11               Did you see see the lady in the vestibule?

12          Yes or no?

13               THE WITNESS:  She was not in the vestibule.

14               THE COURT:  She was where --

15               THE WITNESS:  At the window -- right there in

16          the front of the house.

17               THE COURT:  Before the vestibule?

18               THE WITNESS:  Right.

19               THE COURT:  Could she see into where your wife

20          was from where she was.

21               THE WITNESS:  Yes, she could see in.  There's

22          a big picture window there.

23               THE COURT:  If she looked looked through the

24          window.

25               THE WITNESS:  If she looked looked through the

JO-348

252

1                    Soto-Redirect

2          window.

3                    MR. MEYERS:  No further questions.

4                    MR. CARROLL:  Thank you, sir.

5                    (Whereupon, the witness was excused.)

6    R O N    M I T K O W S K I,

7          residing at 296 16th Street, Brooklyn, New York

8          called as a witness by the Petitioners, having been

9          duly sworn, testified as follows:

10                   THE CLERK:  State your name, for the record,

11         sir.

12                   THE WITNESS:  Ron Mitkowski.

13                   THE CLERK:  Where do you live, sir.

14                   THE WITNESS:  296 16th Street, Brooklyn, New

15         York.

16   DIRECT EXAMINATION

17   BY MR. CARROLL:

18      Q    Thank you for many coming, Mr. Mitkowski.

19           I'm going to show you a Democratic Party

20   designating petition, which is Petitioner's Exhibit 5, and

21   that is in fact a petition from Mr. John O'Hara; and I would

22   like you to take a look at page 125 of the petition and

23   specifically at line number two.

24      A    Right.

25      Q    Do you recognize that signature?

KCDA000971

JO-349

253

2      A    Yeah.  That's mine.

3                  THE COURT:  That's number what?

4                  MR. CARROLL:  Line number 2.

5                  THE COURT:  Page what?

6                  MR. CARROLL:  125.

7      Q    That is your signature, sir?

8      A    Yes.

9                  MR. MEYERS:  Objection, your Honor, 125,

10          unless it's in a separate location, Mr. Carroll,

11          it's not marked in the bill of particulars.  It's

12          probably duplicated somewhere.  I apologize if it's

13          in there.  Where is it?

14                  MR. KEEFE:  In the group with the signatures

15          on 6/8.

16                  MR. CARROLL:  It is in fact there.

17                  May I show you?

18                  MR. MEYERS:  It is.  I withdraw that, your

19          Honor.

20                  THE COURT:  Let's go.

21      Q    Mr. Mitkowski, do you recall the circumstances of

22    your signing the petition?

23      A    Yes.

24      Q    Did somebody come to your home?

25      A    Yes.

FORM C-100 - LASER  REPORTERS PAPER & MFG  CO   800-626-6313

254

Mitkowski-Direct/Carroll

1

2      Q      How many people came to your home?

3      A      Two.

4      Q      And what sexes were these people?

5      A      Male and female.

6      Q      Do you know who the male was?

7      A      I believe it was Mr. O'Hara, sitting right there.

8      Q      The is the gentleman sitting at the table,

9  Mr. O'Hara?

10     A      Yes.

11     Q      And the female, do you remember who the female

12 was?  Could you describe her?

13     A      I could describe what I remember.

14     Q      What did she look like?

15     A      Thirtyish, medium build and brunette.  That's what

16 I believe I remember.

17     Q      I'm going to show you a photograph, sir, which has

18 been marked already into evidence as Petitioner's Exhibit

19 Number 4.  And I ask you to take a look at that photograph.

20            The lady on the extreme left hand side of the

21 petition, was that the lady who was with Mr. O'Hara?

22     A      I don't recognize that lady.

23     Q      So --

24     A      I would say no.

25     Q      That was not the lady with Mr. O'Hara.  Now, sir,

FORM C-100 - LASER  REPORTERS PAPER & MFG. CO  800-626-6313

JO-351

255

Mitkowski-Direct/Carroll

1

2    who was holding the petition when they came to your door?

3        A   The man.

4        Q   Mr. O'Hara?

5        A   Yes.

6            MR. CARROLL:  I have no further questions of

7            this witness.

8            THE COURT:  Any questions?

9            MR. MEYERS:  Yes, sir.

10   CROSS-EXAMINATION

11   BY MR. MEYERS:

12       Q   Mr. Mitkowski, do you remember how long the

13   encounter was with these people at the door?

14       A   I would say no more than three minutes.

15       Q   Is this a private house or an apartment?

16       A   Yes.

17       Q   Private house --

18       A   Yes.

19       Q   -- or an apartment.

20           Did they ring the doorbell?

21       A   Yes.

22       Q   Did you invite them in or did they you step

23   outside?

24       A   I stepped on the threshold of the front doors.

25       Q   From the threshold of the front doors, could you

JO-352

256

1                    Mitkowski-Cross/Meyers

2    see out on to the street?

3        A    Sure.

4        Q    Can the people on the street see where you are?

5        A    Yes.

6        Q    Do you recall whether there was anybody on the

7    street, other than the two people that were with you?

8        A    No.

9        Q    Did you look around to see if there was anybody

10   else on the streets or were you just engaged in conversation

11   with Mr. O'Hara?

12       A    I did not look.

13       Q    You didn't look.

14       A    Right.

15       Q    Okay.  Thank you.  No further questions.

16               THE COURT:  Anything else?

17               MR. CARROLL:  No, your Honor.

18               THE COURT:  You may step down, sir.

19               (Whereupon, the witness was excused.)

20   I S A B E L L A   M A R T I N,

21           residing at 27 Jackson Place, Brookyn, New York,

22           called as a witness by the Petitioners, having been

23           duly sworn, testified as follows:

24               THE CLERK:  State your name for the record,

25           please.

KCDA000975

JO-353

257

1                    Mitkowski-Cross/Meyers

2                    THE WITNESS:  Isabella, I-s-a-b-e-l-l-a,

3               Martin, M-a-r-t-i-n.

4                    THE CLERK:  Where do you live, ma'am?

5                    THE WITNESS:  27 Jackson Place.

6                    THE CLERK:  In Brooklyn?

7                    THE WITNESS:  In Brooklyn.

8    DIRECT EXAMINATION

9    BY MR. CARROLL:

10       Q    Thank you for coming, Miss Martin.

11            I'm going to show you a Democratic Party

12   designating petition, which has already been marked into

13   evidence as Petitioners' Exhibit 5, and specifically I'd

14   like you to take a look at page 88 of that petition.  And

15   this is a petition for John K. O'Hara.

16            And if you would look at line 6 of that petition,

17   ma'am, if you would.  Is that your signature?

18       A    Yes.

19       Q    Do you recall signing that petition?

20       A    Yes.

21       Q    And the circumstances surrounding your signature?

22       A    Mr. O'Hara came --

23       Q    Do you recall who came to your door?

24       A    Yes.

25       Q    How many people?

JO-354

258

1                    Martin-Direct/Carroll

2    A    Two.

3    Q    And who were they?

4    A    Mr. O'Hara and a woman.

5    Q    Do you know the name of the woman?

6    A    No.

7              THE COURT:  Hold it just a moment, please.

8              What petition is that, 88?

9              MR. CARROLL:  This is page number 88, your

10        Honor.

11             THE COURT:  Line what?

12             MR. CARROLL:  Line 6.

13   Q    Do you remember what the lady looked like?

14   A    Not really, no.

15   Q    I'm going to show you a photograph that has been

16   marked into evidence as Petitioners' Exhibit No. 4 and

17   specifically I'd like you to take a look at the lady on the

18   extreme left-hand side of that photograph, this lady right

19   here.

20             Have you ever seen that lady before?

21   A    She does not look familiar:  But I really don't

22   recall.

23   Q    You really don't recall.  But she doesn't look

24   familiar?

25   A    No.

JO-355

259

                        Martin-Direct/Carroll

1

2    Q    Okay.  I have no further questions of Miss Martin.

3              THE COURT:  Anything else?

4              MR. MEYERS:  No, I have no questions, your

5         Honor.

6              THE COURT:  You may step down.

7              MR. CARROLL:  Thank you, ma'am.

8              THE WITNESS:  Sure.

9              (Whereupon, the witness was excused.)

10             MR. CARROLL:  Your Honor, Ms. English is in

11        the hall.  May I have two minutes to speak with

12        her?

13             THE COURT:  Yes.

14             We'll take a brief recess.

15             (Whereupon, there was a recess.)

16             THE COURT:  All right.  Who's your next

17        witness?

18             MR. CARROLL:  Miss Griffith.

19   C A M I L L A   G R I F F I T H,

20        residing at 412 Prospect Avenue Brooklyn, New York,

21        called as a witness by the Petitioners, having been

22        duly sworn, testified as follows:

23             THE CLERK:  State and spell your name for the

24        record.

25             THE WITNESS:  Camilla Griffith.

FORM C-100 - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

260

Martin-Direct/Carroll

1

2          THE CLERK:  Where do you live?

3          THE WITNESS:  412 Prospect Avenue.

4          THE CLERK:  In Brooklyn?

5          THE WITNESS:  Yes.

6    DIRECT EXAMINATION

7    BY MR. CARROLL:

8        Q    Thank you for coming Miss Griffith.  I'm going to

9    show you a Democratic designating petition which may be

10   marked in evidence as Petitioners' Exhibit 5, and I'm going

11   to ask you to take a look at some signatures in that

12   petition.

13            On page 107, ma'am; I'd like you to take a look at

14   line number 9 of that petition.  Is that your signature?

15       A    Yes, it is.

16       Q    Do you remember the circumstances surrounding your

17   signing of the petition?

18       A    Well --

19       Q    Did somebody come to your home?

20       A    Yes, somebody came to my home.

21       Q    And how many people came to your door?

22       A    When I got downstairs -- because I live on the

23   second floor --

24            When I got downstairs, there was a tall white male.

25       Q    A tall white man?

KCDA000979

JO-357

261

```
1   Griffith-Direct/Carroll
2   A   Male.  Approximately between six-two and six-four.
3   Q   Right.  Was there anybody with him?
4   A   No.
5   Q   There was nobody with him?
6   A   Not at my door.
7   Q   Not at your door.
8   A   But across the street, there was a lady between
9       five-seven and five-nine.
10  Q   But she was taking signatures across the street?
11  A   Across the street.
12  Q   And the person who took your signature was a tall
13      white male?
14  A   Yes.
15  Q   And would you look at the name of the person who
16      signed this particular petition.  What's the name there?
17  A   Rebecca Vales.
18  Q   Vales?
19  A   Vales.
20  THE COURT:  Who, Rebecca Vales?
21  MR. CARROLL:  Rebecca Vales.
22  Q   I'd also like you to take a look -- you say you
23      came down from the second floor to sign the petition.
24  A   Yes.
25  Q   Other members of your family live in the house with
```

FORM C-100 · LASER  REPORTERS PAPER & MFG. CO  800-626-6313

262

1                    Griffith-Direct/Carroll

2   you?

3        A    Yes.

4        Q    Did they come down from the second floor?

5        A    Well, my third -- my second daughter, because I

6   have a daughter, then a son then another daughter, she was

7   home -- she wasn't working.  She was off so she was

8   basically, like, coming down the stairs to go on the first

9   floor because that's where my mother and father lives.

10       Q    Did she come out and sign the petitioner or did you

11  bring it in to her to sign?

12       A    No.  So she was ahead of me, okay.  She signed

13  before I did, and that's her name.

14       Q    That's on line number 8.

15       A    Yes.

16       Q    And her name is?

17       A    Arlene Griffith.

18       Q    And she also signed for the tall white male?

19       A    Yes.

20       Q    And how about on line number 10, Hazelawn Griffith

21  (phonetic).  Who is that?

22       A    That's my oldest daughter.

23       Q    Was she home that day?

24       A    That day, yes, she was home.  But she was on the

25  first floor.

JO-359

263

Griffith-Direct/Carroll

1

2    Q    Okay.  How did Hazelawn's signature get taken?

3    A    Okay.

4    Q    Did she come to the door?

5    A    When she came to the door, that was after I

6    signed.  Because I was going into the first floor to talk to

7    my mother, my father and --

8    Q    Once again, was this the tall white male?

9    A    Yeah, he was there.

10    Q    And the lady was across the street?

11    A    Yeah.  Because I didn't see no face.

12    Q    Now, how about on line -- page 172, I believe it

13    is.

14              THE COURT:  Just a moment.

15              Page 172.

16              MR. CARROLL:  172, line 1.  Okay.

17    Q    Is that another member of your family, ma'am?

18    A    Yes, that's my father.

19    Q    And he was down on the first floor also; is that

20    correct?

21    A    Yes, but he has limited vision.  So he said, you

22    know, "Would you sign for me?"

23    Q    So you signed for him.

24    A    Yes.

25    Q    And was the tall white man there when you signed

JO-360

264

1                    Griffith-Direct/Carroll

2   for him?

3       A    Yes.

4              MR. CARROLL:  Okay.  Thank you very much,

5          ma'am.

6              MR. MEYERS:  Miss Griffith, I just have a

7          couple of questions for you.

8              THE COURT:  Go ahead.

9   CROSS-EXAMINATION

10  BY MR. MEYERS:

11      Q    Miss Griffith, do you remember how long that person

12  was at your door, this tall white man?

13      A    Let me see.  He was there for, like, between two to

14  five minutes.

15      Q    Did you talk to him?

16      A    No, he just asked me if I could sign the petition.

17      Q    Did you look at him?

18      A    I caught a glimpse of him, yes.

19      Q    Would you recognize him if you saw him again?

20      A    I could describe him.

21      Q    Why don't you describe him.

22      A    Okay.  He was between six-two to six-five.  He was

23  wearing a T-shirt -- a faded white T-shirt.  He had faded

24  shorts; a little above the knees it ended.  He had sneakers,

25  a dirty pair of sneakers he had.

KCDA000983

JO-361

265

1               Griffith-Cross/Meyers

2    Q    Was he heavy?

3    A    Yeah, he was -- let me see.  He was very tall -- my

4    son is, like, six - six-one, and I had to look up to him so

5    he was very, very tall.

6    Q    Do you see that gentleman in this courtroom

7    anywhere?

8         Take a good look around.  Do you see the gentleman

9    anywhere in in this courtroom?  I'll move over to the side

10   so you can look at everybody here.

11   A    No.

12              MR. MEYERS:  No further questions, your

13        Honor.

14              THE COURT:  Anything else?

15              MR. CARROLL:  Just one question.

16   REDIRECT EXAMINATION

17   BY MR. CARROLL:

18   Q    All of these signature were signed in front of the

19   tall white male; is that correct?

20   A    Yeah.

21   Q    Could I just ask you, for the record, to read the

22   name of the individual who witnessed petition sheet 172?

23   A    Rebecca Vales.

24   Q    And that's the signature that you signed for your

25   father, right?

JO-362

266

Griffith-Cross-Redirect

1

2    A    Yes, yes.

3    Q    Thank you very much.

4         MR. MEYERS:  Your Honor, I just have one more

5         question.

6         THE COURT:  Go ahead.

7    RECROSS-EXAMINATION

8    BY MR. CARROLL:

9    Q    Ma'am, when you signed the petition, were you

10   inside or outside the premises?

11   A    I was inside the house, but I was between the outer

12   door to the step and the inner door.  That portion is where

13   the letter box is.  And the outer door was open.

14   Q    Okay --

15   A    And the inner door was open.

16   Q    Did you at any time step all the way out of the

17   house?

18   A    No.

19   Q    Is it possible that someone could have been outside

20   of the house and you might not have seen him?

21        THE COURT:  We're not dealing with

22        possibilities.

23        Go ahead.

24   Q    Do you know if there was anybody else with the

25   male?

KCDA000985

JO-363

267

1              Griffith-Recross/Meyers

2      A    No, because I didn't step outside.

3            MR. MEYERS:  No further questions, your Honor.

4            MR. CARROLL:  No further questions.

5            (Whereupon, the witness was excused.)

6  Z O R A I H A   R I V E R A,

7            residing at 390 Prospect Avenue, Brooklyn, New

8            York, called as a witness by the Petitioners,

9            having been duly sworn, testified as follows:

10            THE CLERK:  State and spell your name, please.

11            THE WITNESS:  Zoraiha Rivera.

12            THE CLERK:  Your address, please.

13            THE WITNESS:  390 Prospect Avenue, Brooklyn,

14      New York.

15  DIRECT EXAMINATION

16  BY MR. CARROLL:

17      Q    Thank you for coming, ma'am.

18      A    I'm going to show you Petitioner's Exhibit Number

19  5, and I'd like you to take a look at page 172 of that

20  petition, and specifically at line number 6.

21            Do you recognize that signature?

22      A    Yes.  This one here?  Mine.

23      Q    Line number 6.  And that's your name, Zoraiha?

24      A    Yes.

25      Q    Thank you.

KCDA000986

JO-364

268

1                    Rivera-Direct/Carroll

2              Do you remember the circumstances surrounding your

3    signing of that signature?  Did somebody come to your door?

4         A    Yes, a man came to my door and he explained why.  I

5    signed.

6         Q    Was anybody with the man?

7         A    No, he was alone.

8         Q    He was alone.  Okay.  Could you describe that man

9    for me?

10        A    He was stocky build, blond hair.

11        Q    Blond hair?  How tall was he?  Do you remember?

12        A    I can't remember that.  Could be --

13        Q    But the man was there alone.  Nobody was with him.

14        A    No.

15        Q    Did you see anybody else in the vicinity of your

16   house?

17        A    No, because my apartment -- when I opened the door

18   towards the back of the building, I can't see the front of

19   the house.

20        Q    But it was in the back of the building that you

21   signed the petition?

22        A    In front of my door, yes.

23        Q    Could you just read who signed -- who's the witness

24   on that sheet?  The name right there, ma'am.

25        A    Rebecca.

269

1                    Rivera-Direct/Carroll

2        Q    Rebecca Vales?

3        A    Vales, yes.

4        Q    I'd like you to take a look at the next signature

5    on that page.

6        A    Yvette Rivera.

7        Q    Do you know her?

8        A    My daughter.

9        Q    Your daughter.  How old is Yvette?

10       A    Twenty-one.

11       Q    She's twenty-one?

12       A    Yes.

13       Q    Did she also sign in front of the stocky white

14   male?

15       A    Yvette wasn't in the house at the time.  The man

16   told me that my seventeen year old -- I told him --

17   explained to him she's underage.  I didn't told him the age.

18       Q    Let me ask you something.  Did Yvette sign this or

19   did somebody else sign that?

20       A    My daughter signed it, my younger daughter.

21       Q    Your seventeen year old daughter signed for your

22   twenty-one year old daughter?

23       A    Yes.

24       Q    Did you explain that to the man?

25       A    Yes, I explain him.  I didn't told him the age of

KCDA000988

JO-366

270

Rivera-Direct/Carroll

1

2   my younger daughter.  I just told him she's underage.

3       Q    Did he tell you to sign anyway?

4       A    Yeah, he told me wasn't any problem at all.

5            MR. CARROLL:  I have no further questions.

6            THE COURT:  Any questions?

7            MR. MEYERS:  Yes, your Honor.

8       Q    Miss Rivera, can you describe the doorway of your

9   apartment?

10      A    My apartment has two doors.  I use the door for

11  entering, the back of the door, the kitchen.  I live in the

12  second floor.  In order for me to see the front of the

13  house, I have to go one flight of stairs.

14      Q    How many floors are in this building?

15      A    Four.

16      Q    There are four floors.  And you live on the entire

17  second floor --

18      A    No, there are eight apartments in the building.

19  They're side by side.

20      Q    And when you responded to the doorbell, did you

21  have to take that one flight down?

22      A    No, because I don't know who let the person in the

23  building.  He knock on my door.

24      Q    So he was in the hallway?

25      A    Yes.

KCDA000989

271

Rivera-Direct/Carroll

1

2    Q    Did you step out into the hallway?

3    A    No.  I just in front of my door.

4    Q    You were in front of your door.

5    A    Yeah.

6    Q    Were you able to see up and down the hallway from

7 where you were standing?

8    A    Yes, I could.

9    Q    You could?

10    A    The second floor.

11    Q    You were able to see the entire second floor from

12 where you were?

13    A    Yes.

14    Q    Did you see anybody else?

15    A    No.

16    Q    The man who came to your door, can you describe him

17 to me.

18    A    Stocky build; light hair.  I think it was blond.  I

19 can't remember that good.

20    Q    How long did you talk to this person?

21    A    About three or two minutes, only.

22    Q    Would you remember him again if you saw him?  If

23 you saw him again, would you recognize him?

24    A    I'm not sure.  Maybe if I see him.

25    Q    Did he identify himself to you by name?

FORM C-100 - LASER   REPORTERS PAPER & MFG   CO.   800-626-6313

JO-368

272

1                    Rivera-Direct/Carroll

2       A     Yes.

3       Q     What did he say his name was?

4       A     I can't remember the name.

5       Q     Do you see that gentleman anywhere in this

6    courtroom at all?

7       A     No.

8             MR. MEYERS:  Okay.  I have no further

9         questions, your Honor.

10            THE COURT:  Anything else?

11            MR. CARROLL:  No further questions.

12            THE COURT:  You may step down.

13            (Whereupon, the witness was excused.)

14   L O R E T T A   B R E Z I N S K Y,

15            residing at 398 Prospect Avenue, called as a

16            witness by the Petitioners, having been duly sworn,

17            testified as follows:

18   DIRECT EXAMINATION

19   BY MR. CARROLL:

20      Q     Miss Brezinsky, thank you very much for coming.

21            I'm going to show you a Democratic Party

22   designating petition which has been already marked into

23   evidence as Exhibit No. 5 -- Petitioner's Exhibit No. 5 --

24   and I'd like you to take a look at page 172 of that petition

25   and specifically take a look at line number 3.

FORM C-100 · LASER REPORTERS PAPER & MFG. CO.  800-626-6313

JO-369

273

Brezinsky-Direct/Carroll

1

2     A    Yes, that's my signature.

3     Q    Is that your signature there?

4     A    That's my signature.

5     Q    Do you remember signing the petition?

6     A    Yes, I remember signing it.

7     Q    How many people came to your door?

8     A    That I don't remember.  I think it was one.  I'm

9  not sure now.

10    Q    Do you remember if it was a man or a woman?

11    A    I thought it was a woman.

12    Q    You thought it was a woman.  Okay.

13         Could you describe this woman that you think came

14  to your door?

15    A    Just, I'd say about my height and I figure about

16  thirty-five - forty years old, something like that.

17    Q    Was she slim or heavy?

18    A    No, she was sort of a little heavier than I am, I

19  think.

20    Q    She was a little heavier than I am?

21    A    Yes.

22    Q    What color was her hair?

23    A    It was dark, but I'm not sure.  I think.  I'm not

24  sure.

25         MR. CARROLL:  I don't have any further

KCDA000992

FORM C-100 - LASER  REPORTERS PAPER & MFG. CO.  800-828-4313

JO-370

274

1          Brezinsky-Direct/Carroll

2     questions.

3          MR. MEYERS:  I have no questions.

4          THE COURT:  No cross.

5          You may step down.

6          (Whereupon, the witness was excused.)

7          MR. CARROLL:  Your Honor, could we have a

8     brief break?  My expert witness is here.  He just

9     showed up.  I want to speak with him.

10          THE COURT:  We'll take a brief recess.

11          (Recess.)

12          THE CLERK:  Case on trial.

13          MR. MEYERS:  Your Honor, I just want to say

14     for the record that yesterday this Court ordered

15     that Kathy Verti be produced.  She's a S.W. on

16     Mr. O'Hara's petitions.  I just want the Court to

17     be informed that Miss Verti is present in the Court

18     outside.

19          MR. CARROLL:  Call Mr. Paul Osborn.

20  P A U L   A.   O S B O R N,

21     residing at 30 Lakewood Avenue, Cedar Grove,

22     New Jersey, called as a witness by the Petitioner,

23     having been duly sworn, testified as follows:

24          THE CLERK:  State and spell your name for the

25     record.

JO-371

275

Osborn-Direct/Carroll

1

2          THE WITNESS:  Paul N. Osborn, O-s-b-o-r-n, 30

3      Lakewood Avenue, Cedar Grove, New Jersey.

4  DIRECT EXAMINATION

5  BY MR. CARROLL:

6      Q    Mr. Osborn, how old are you?

7      A    I'm in my sixties.

8      Q    And what is your profession?

9      A    I'm a forensic document examiner, more commonly

10 termed a handwriting and typewriting identification expert.

11     Q    And how long have you practiced this profession?

12     A    I've devoted all of my time to this field of

13 identification since 1954.

14     Q    So that's forty years; is it not?

15     A    Yes.

16     Q    In your profession, have you ever had occasion to

17 lecture on the subject of forensic document identification?

18     A    Yes.

19     Q    Before whom have you lectured?

20     A    I've lectured on numerous occasions, mostly to

21 banking groups, bar associations.  I have lectured at

22 Indiana University.  I've lectured at various forensic

23 document groups.  For a series of about seven or eight

24 years, I lectured at the Brooklyn Law School.

25     Q    On the subject of forensic --

KCDA000994

FORM C-100 - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

JO-372

276

Osborn-Direct/Carroll

1

2      A    On the subject of questioned documents.

3      Q    Have you ever had occasion to write professionally

4  in this field?

5      A    Yes, sir.

6      Q    Do you recall some of the articles that you may

7  have written?

8      A    Well, most of my articles -- the articles I wrote

9  were quite a few years ago.  Yes, I wrote an article on the

10 Lindbergh kidnapping trial.  I wrote an article on

11 indentations and anonymous letters, paper indentations.

12     Q    For example, did you write an an article for the

13 Journal of Forensic Science in October 1983 entitled,

14 "Excerpts and Comments on Testimony by Document Examiners

15 in Regard of State of New Jersey V Bruno Richard

16 Hauptmann"?  Is that your article?

17     A    Yes.

18     Q    Did you also do an article for the Journal of

19 Forensic Sciences in April 1964 on indentations and

20 anonymous letters?

21     A    Yes.

22     Q    What is that all about, indentations and anonymous

23 letters?

24     A    Well, this articles were printed after being

25 presented to different society meetings of either the

FORM C-100 - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

JO-373

277

Osborn-Direct/Carroll

1

2          American Academy of Forensic Societies or else the American

3          Society of Questioned Document Examiners, both of which I am

4          a member and past president of.

5              Q    Have you done other professional articles and

6          scholarly articles in the field?

7              A    Yes, I have.

8              Q    Over the years, how many of these articles have you

9          done, sir?

10             A    I'm not sure.  I'd say about a dozen.

11             Q    About a dozen.  All in the field of forensic

12         identification of documents.

13             A    Yes, sir.

14             Q    And you mentioned that you're a member of

15         professional societies.

16             A    Yes.

17             Q    Could you tell us what professional societies

18         you're a member of?

19             A    Well, I'm a member of the American Academy of

20         Forensic Sciences, which is a very large group made up of

21         different forensic groups, including pathologists,

22         toxicologists, one section of questioned document

23         examiners.  Another -- different categories of forensic

24         science and I'm a past president of the Questioned Document

25         Section in that group.  I'm also a member of the American

FORM C-100 - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

JO-374

278

1                    Osborn-Direct/Carroll

2    Society of Questioned Document Examiners, which was the

3    first group of its kind formed in this country and the

4    immediate past president of that group.

5            I'm also certified by the American Board of

6    Forensic Document Examiners, Incorporated.  This was a

7    certification board set up by different groups in 1975 for

8    guidelines to use by courts and attorneys throughout the

9    country on the qualifications and backgrounds of document

10   examiners -- forensic document examiners.

11           I have been, temporarily or for short periods of

12   time, members of other organizations, of which I am not now.

13       Q    But are these the leading professional societies in

14   your field?

15       A    Yes, they are.

16       Q    Have you ever testified on the subject of disputed

17   documents?

18       A    Yes.

19       Q    How often have you testified on the subject of

20   disputed documents?

21       A    Since 1954, almost five hundred occasions.

22       Q    And in what courts have you been qualified --

23       A    Most of the courts that I've been qualified in have

24   been civil and criminal courts here in the states of New

25   York, New Jersey, Pennsylvania.  I have been qualified in

JO-375

FORM C-100 - LASER  REPORTERS PAPER & MFG. CO  800-626-6313

279

Osborn-Direct/Carroll

1

2    twenty-two different states, as well as in Canada, the

3    Virgin Islands and one time in the Panama Canal Zone.

4        Q    Do you do anything, other than testify in court?

5    Is there more to your business than just that?

6        A    Oh, yes.  Actually only a small percentage of the

7    cases that I work on require my testimony in court.  Many of

8    the problems that I report on are not matters of

9    litigation.  There are some problems which simply cannot be

10   answered because of the lack of evidence and in a good

11   percentage of my cases, my report is adverse to my client's

12   contentions, so he's not inviting me to court.

13       Q    So you don't get invited to court in those cases.

14       A    Correct.

15       Q    Mr. Osborn, were you asked, in connection with this

16   particular litigation, this lawsuit, to examine some

17   documents?

18       A    Yes, sir.

19       Q    And do you have those documents with you?

20       A    No, I do not.

21       Q    I'm going to show you two sets of documents and are

22   these in fact the documents that you were asked to examine?

23       A    Yes, sir.

24       Q    And did you prepare a report based upon those

25   documents?

FORM C-100 · LASER   REPORTERS PAPER & MFG CO.   800-626-6313

JO-376

280

1                    Osborn-Direct/Carroll

2       A    No, I did not.

3            MR. CARROLL:  Before we move that, your Honor,

4            we would move to certify Mr. Osborn as an expert in

5            the field.

6            THE COURT:  You may question him.

7            MR. MEYERS:  No objection.

8            THE COURT:  Without objection.

9       Q    Mr. Osborn, I'm going to ask you to take a look at

10   these documents that you have previously examined and you

11   have an abstract or a copy of petition sheet number 181.

12   Petition sheet number 181 in a petition that is for John

13   Kennedy -- or John K. O'Hara.  Excuse me.  It's a Democratic

14   Party designating petition.  Is that not correct, sir?

15      A    Yes, sir.

16      Q    And I would just like you to take a look at this

17   document here, which has been marked into evidence as

18   Petitioners' Exhibit Number 5, and just tell me, is that the

19   same sheet as the one that you examined (indicating)?

20      A    They're both photocopy reproductions of the same

21   sheet, yes.

22      Q    And specifically, Mr. Osborn, I would like you to

23   take a look at lines numbers 1 and 2 --

24      A    Yes, sir.

25      Q    -- of that petition.  Okay.

FORM C-100 · LASER  REPORTERS PAPER & MFG. CO.  800-826-6313

JO-377

281

Osborn-Direct/Carroll

1

2    MR. MEYERS:  Objection, your Honor.

3    Again, it's not in the bill of particulars and

4    glancing over at counsel's copy, it's not in his,

5    either.

6    MR. CARROLL:  Excuse me.  I have misidentified

7    the page.  It is 186.  That is my fault.

8    THE COURT:  Lines 1 and 2?

9    MR. CARROLL:  Lines 1 and 2.

10   Q    I ask you again, sir, to take a look at lines 1 and

11   2 on page 186 of Petitioners' Exhibit 5 and is that in fact

12   the sheet that you were asked to examine?

13   A    Yes, it is.

14   Q    Were you provided any other documents with which to

15   make your examinations?

16   A    Yes, I was.

17   Q    And could you identify what those documents were.

18   A    Yes, I was also given reproductions of a number of

19   voting registration cards --

20   Q    Could you identify which voter register he --

21   A    -- commonly known as buff cards.  These were in the

22   names of -- do you want me to read them off?

23   Q    Please.

24   A    Rose Marie DePalma, Rose DePalma.  Jose Barreto.

25   Ronald --

KCDA001000

JO-378

282

2    Q    No, just with respect to lines 1 and 2 right now.

3              THE COURT:  Rose Marie DePalma and who else?

4              THE WITNESS:  Well, in respect to this

5         particular Exhibit, your Honor, I was given just

6         one buff card of a Lucy DeLorenzo.

7              THE COURT:  For 186, lines 1 and 2 you had a

8         buff card of Lucy DeLorenzo.

9    Q    And can you read the names of the signatures on

10   lines 1 and 2, what they purport to be?

11   A    Well, they're for the most part illegible.  The

12   first name I believe is Laurel, on line one, and probably

13   DeLorenzo or DeLorenzio.  The second name would appear to be

14   Lucy Hernandez DeLorenzio.

15             MR. CARROLL:  Your Honor, would you like to

16        see (indicating)?

17             THE COURT:  All right.

18             MR. CARROLL:  Can we have this marked as --

19             MR. MEYERS:  Your Honor, this is not a

20        certified copy of the --

21             THE COURT:  Well, I guess we can bring over

22        the buff cards, if you want.

23             MR. MEYERS:  I request the production of the

24        original but in lieu of it, I'll allow --

25             THE COURT:  So you'll have an opportunity to

FORM C-100 · LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

JO-379

283

Osborn-Direct/Carroll

1
2          check it out against it without any problem, and if

3          it's any different from the original buff card, it

4          will be stricken.

5               MR. MEYERS:  Thank you.

6               MR. CARROLL:  Thank you your Honor.

7               THE COURT:  In the interim, let's mark it.

8               MR. CARROLL:  Mark it as the next Petitioners'

9          Exhibit.

10              THE COURT:  Which is what?

11              THE CLERK:  Exhibit 18.

12              (So marked).

13    Q    Mr. Osborn, I'm going to show you again

14    Petitioners' -- in evidence -- Exhibit number 18.

15         Based upon your examination of that buff card and

16    the two signatures on page number 186 lines 1 and 2, were

17    you able to draw any conclusions as to who signed those

18    signatures?

19    A    Yes, sir.

20    Q    And what were those conclusions, sir?

21    A    The two signatures on the buff card, on the front

22    and the back of it, were signed by one individual and that

23    individual did not sign either one of the two names on

24    Exhibit 186 -- page 186.  I believe that the name Lucy

25    Hernandez DeLorenzio on line two was written by the writer

KCDA001002

JO-380

284

Osborn-Direct/Carroll

1

2 of the signature on line one, being a Laurel DeLorenzio.

3      Q    And how did you reach that conclusion, sir?

4      A    By studies and comparisons of handwriting

5 identities of the two names on the buff card as compared to

6 the characteristics of the signatures on this particular

7 petition sheet.  I also prepared an enlarged illustration of

8 the two names on the petition sheet as well as the two names

9 on the buff card.

10     Q    Do you have copies of those enlarged illustrations?

11     A    Yes, I made copy for the Court, for both counsel

12 and for myself.

13     Q    And could you provide me with those copies, sir?

14     A    Yes (handing).  There's three of them.

15     Q    Mr. Osborn, this report was prepared by you?

16     A    These illustrations were prepared by me, yes.

17     Q    And they are enlargements of the signatures in the

18 petition?

19     A    Yes.  All of the signatures have been enlarged to

20 the degree indicated by the one inch measure.

21          THE COURT:  Let me understand this,

22          Mr. Osborn.  You say that the signature on the buff

23          card of Lucy DeLorenzo -- is that correct -- or

24          DeLorenzio --

25          THE WITNESS:  Yes, sir.

FORM C-100 · LASER REPORTERS PAPER & MFG. CO.  800-626-6313

JO-381

285

1        Osborn—Direct/Carroll

2        THE COURT:  -- are identical, both front and

3    back, correct?

4        THE WITNESS:  No, I didn't say that -- oh, on

5    the buff card?

6        THE COURT:  On the buff card.  They're signed

7    by the same person?

8        THE WITNESS:  They're signed by the same

9    person.  They were given to me as specimens of hers

10   written by the same person.

11       THE COURT:  And you say that neither one --

12   that Laurel Hernandez and Lucy Hernandez DeLorenzo

13   were signed by those individuals?

14       THE WITNESS:  Neither one of those names on

15   the petition sheet was signed by the writer of the

16   two signatures on the buff card.

17       THE COURT:  Okay.  And can you make a

18   determination as to who signed it?

19       THE WITNESS:  I believe that in all

20   probability, the two names were written by one

21   person, but it was not Lucy DeLorenzio.

22   Q    And did you draw some conclusion as to who it was

23   who did sign those two signatures, based upon the comparison

24   of the signatures on the petition?

25   A    Yes, by some similarities in the name "Hernandez"

KCDA001004

286

Osborn-Direct/Carroll

1

2    on line 1, which reads "Laurel Hernandez," as compared to

3    that in the name on line 2 which reads "Lucy Hernandez

4    DeLorenzio."

5    Q    Is it your judgment that it was -- that the

6    signature on line two was signed by the individual on

7    line 1?

8    A    Based on what material there is at hand, I could

9    not make a positive identification that those two signatures

10   were written by the writer of the first name.  But from what

11   there is, I believe they were.

12   Q    But you are able to conclude that neither of them

13   were signed by Miss Lucy DeLorenzio?

14   A    That is correct.

15   Q    If we could move on on sir, to petition sheet

16   number 111.

17        MR. CARROLL:  Your Honor, I would move the

18        introduction of Mr. Osborn's enlargements as an aid

19        to the Court --

20        THE COURT:  Any objection?

21        MR. MEYERS:  Your Honor, I would have no

22        objection to the piece of evidence that's already

23        been discussed.  I'd prefer to wait for the others

24        to be introduced first.

25        MR. CARROLL:  That's fine.  We'll go through

JO-383

287

1                    Osborn-Direct/Carroll

2          them one at a time.

3               MR. CARROLL:  We're going to go to Q-4 next,

4          that is petition sheet number 147, lines number 1

5          and 2.

6               THE COURT:  Hold it just a moment.  Who was

7          the S.W., so let's clear the record.  Who was the

8          S.W. on the 186 lines -- 186.

9               MR. CARROLL:  That is Sandra Helverson, your

10         Honor, and indeed I believe Ms. Helverson is the

11         S.W. on all of the signatures that Mr. Osborn will

12         be testifying to.

13               THE COURT:  I see.  Okay.

14     Q    Now, on petition sheet number 186, Mr. Osborn, did

15     we ask you to look at any particular signatures?

16               THE COURT:  147?

17               MR. CARROLL:  147.

18     A    Yes.

19     Q    And what were the signatures that we requested you

20     look at on that page?

21     A    The two names on lines 1 and 2 being Raymond

22     Montalvo and Millie Montalvo (phonetic).

23     Q    Were you provided with any other documents with

24     which to make your examination?

25     A    Yes, sir.  I was provided with a registration card

KCDA001006

JO-384

288

Osborn-Direct/Carroll

1

2  in the name of Millie Montalvo containing a signature on the

3  face and a large number of signatures on the back dating

4  from 1981 to 1990.

5          MR. CARROLL:  Your Honor, subject to the same

6          caveat as as before, we would move the introduction

7          of Miss Montalvo's buff card.

8          THE COURT:  Yes, the buff card, subject to the

9          same thing.

10         MR. MEYERS:  Yes.

11         THE COURT:  So mark that Petitioners' Exhibit

12         19, Millie Montalvo's buff card, in evidence,

13         subject to the same.

14         (So marked.)

15  Q    Sir, in your review of petition sheet 147, lines 1

16  and 2, and the buff card of Millie Montalvo, were you able

17  to reach any conclusions as to the identity of the signator

18  for lines 1 and 2 on page 147?

19  A    Yes, sir.

20  Q    And what was that conclusion?

21  A    It is my conclusion that the two names on lines 1

22  and 2, Raymond Montalvo and Millie Montalvo, were written by

23  one individual.  And in comparison of those two names with

24  the numerous signatures on the buff card of Millie Montalvo,

25  I'm able to conclude that the writer of those two names was

KCDA001007

FORM C-100 · LASER  REPORTERS PAPER & MFG. CO  800-626-6313

JO-385

289

1                    Osborn-Direct/Carroll

2    not her.

3        Q    So it is not Millie Montalvo who wrote those

4    names.

5        A    Correct.

6        Q    Were you able to draw any judgment, by exclusion,

7    as to who was the author of those two names?

8        A    Who ever wrote the name "Raymond Montalvo" also

9    wrote the name "Millie Montalvo," but I don't know who that

10   author is.

11       Q    And the subscribing witness on the this sheet was

12   also Sandra Helverson?

13       A    Yes, sir.

14       Q    If we could move to page 131 of the petition.   And

15   there I believe we asked you to examine lines 7 and 8.   Is

16   that not correct?

17       A    Yes.

18       Q    Could you read those two names for us, please?

19       A    The names on those lines respectively, are Pamela,

20   Pegram, P-e-g-r-a-m, and Michelle -- I'm sorry -- and Ronald

21   Pegram.

22       Q    And in connection with your examination of the

23   signatures of Pamela and Ronald Pegram, were you provided

24   any other documents?

25       A    Yes, sir.

KCDA001008

JO-386

290

Osborn-Direct/Carroll

1

2    Q    And what was that?

3    A    That was the registration card in the name of

4    Ronald Pegram.

5                MR. CARROLL:  Subject to the same caveat, your

6            Honor, may we mark that?

7                THE COURT:  Mark it Petitioners' Exhibit 20.

8                (So marked.)

9    Q    Mr. Osborn, in comparing the signatures of Pamela

10   Pegram and Ronald Pegram on page 131, lines 7 and 8, with

11   the signatures contained on the buff card, were you able to

12   reach any conclusions as to the author of -- the signator on

13   lines 7 and 8?

14   A    Yes.

15   Q    And what was that conclusion?

16   A    The two names on lineups 7 and 8 were written by

17   one individual, and in comparison of those two names with

18   the signatures on the buff card in the name of Ronald

19   Pegram, I can determine that the writer of the signatures on

20   the buff card did not write either one of the two names on

21   the petition sheet.

22   Q    So the author was not Ronald Pegram.

23   A    Correct.

24   Q    And he did not sign his own name there?

25   A    That is correct.

FORM C-100 · LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

JO-387

291

Osborn-Direct/Carroll

1

2     Q    Were you able to draw any conclusion by exclusion

3   as to who did sign though two names?

4     A    I can only state that the evidence leads me to the

5   conclusion they were done by the same person, but I don't

6   know who that that person is.

7     Q    Let us move on to Q-8.

8         Oh, just for the record, let us note that the

9   subscribing witness once again was Miss Helverson.

10         Now, on petition sheet number 196, we asked you to

11   look at lines line numbers 3 and 4; is that correct?

12     A    Yes, sir.

13     Q    Could you identify the names on lines number 3 and

14   4?

15     A    Antonio R. Soto and Isabel Ramos Soto (phonetic).

16     Q    And were you provided any other document to assist

17   in your analysis of these signatures?

18     A    Yes, sir.

19     Q    What was that document?

20     A    That was the registration card in the name of

21   Antonio Raymond Soto.

22         MR. CARROLL:  Subject to the same caveat --

23         Mr. Meyers (handing).

24         MR. MEYERS:  Yes, subject to the same caveat,

25         your Honor.

292

1          Osborn-Direct/Carroll

2          THE COURT:  Okay.  Mark them Petitioners'

3          Exhibit 21 in evidence, subject to the same

4          caveat.

5          (So marked.)

6      Q    Mr. Osborn, when comparing Petitioners' 21 in

7  evidence -- the buff card -- with the signatures on page 196

8  on lines 3 and 4, the Sotos, were you able to come to or

9  draw any conclusion as to the author of those two

10  signatures?

11     A    Yes, sir.

12     Q    And what was that conclusion?

13     A    Both of these names on the petition sheet, Antonio

14  R. Soto and Isabel Ramos Soto were written by the writer of

15  the signatures on the buff card reading Antonio Ramos Soto.

16     Q    So it's your conclusion that Isabel Soto --

17          THE COURT:  Don't repeat, please.  That's what

18          he said.  Let's move along.

19     Q    Turning to page number 108 of the petition, were

20  you asked to examine signatures on that page?

21     A    Yes, sir.

22     Q    And how many signatures were you asked to look at

23  there?

24     A    Three signatures on lines 3, 4 and 5 which read

25  respectively, John DePalma, Rose DePalma and Rose Marie

KCDA001011

JO-389

293

1                        Osborn-Direct/Carroll

2    DePalma.

3        Q    And were you provided with any documents, in

4    addition to the petition, to assist you?

5        A    Yes, sir.

6        Q    What was given to you?

7        A    I was given the voting registration cards in the

8    names of Rose Marie DePalma and Rose DePalma.

9        Q    May we see those, please?

10       A    Yes, sir (handing).

11            MR. CARROLL:  Subject to the same caveat, may

12       we mark these?

13            THE COURT:  How many are there, two?

14            MR. CARROLL:  Two buff cards.

15            THE COURT:  Mark it Petitioners' Exhibit 22 A

16       and B.

17            MR. MEYERS:  Mr. Carroll (handing).

18            THE COURT:  A is whose?

19            MR. CARROLL:  A will be Rose and B will be

20       Rose Marie.

21            (So marked.)

22       Q    Sir, in comparing exhibits 22 A and B with the

23   signatures contained on page 108 of the petition for the

24   DePalma family, were you able to reach any conclusion as to

25   the author of those signatures?

KCDA001012

294

Osborn-Direct/Carroll

1

2      A     Yes, sir.

3      Q     And what is that conclusion?

4      A     The three signatures referred to on lines 3, 4 and

5   of sheet number 108 were written by one individual.  In

6   comparing these three names with the voting registration

7   cards signatures of Rose Marie DePalma and Rose DePalma, I

8   can conclude that the three questioned names were not

9   written by either one of them.

10     Q     Moving on to page 128 of the petition --

11            MR. CARROLL:  I think I've already stated for

12            the record that Miss Helverson is the S.W. on all

13            of the pages.

14            THE COURT:  Yes.

15     Q     On page 128, sir, did we ask you to examine certain

16   signatures?

17     A     Yes, sir.

18     Q     And what signatures were they?

19     A     The names Senaidia, S-e-n-a-i-d-i-a, Barreto,

20   B-a-r-r-e-t-o; And on line 3, Jose Barreto.

21     Q     And those are on lines 2 and 3, sir?

22     A     Yes, sir.

23     Q     Were you provided with any other documents with

24   which to assist in your analysis?

25     A     Yes, sir.

FORM C-100 - LASER REPORTERS PAPER & MFG. CO.  800-626-6313

JO-391

295

Osborn-Direct/Carroll

1

2    Q    And what was that other document?

3    A    I was given the voting registration card, a copy of

4    it, of Carlos -- I'm sorry -- of Jose Barreto.

5            MR. CARROLL:  Subject, of course (handing.)

6            THE COURT:  Mark it subject to the same terms

7        as the prior markings.  That will be Petitioners'

8        Exhibit 23.

9            (So marked.)

10           MR. MEYERS:  Your Honor, at this time, I'm

11       going to make my motion to exclude any testimony as

12       to Jose Barreto on the basis he is not an enrolled

13       voter.  Therefore, this is not a valid signature.

14       The buff card specifically states he has not chosen

15       a party designation and, therefore, is not enrolled

16       in the --

17           THE COURT:  These are being offered from the

18       purpose of striking for either party --

19           MR. MEYERS:  His signature does not exist --

20           MR. CARROLL:  Your Honor, this goes to issues

21       of fraud and the signature is on the petition.

22           THE COURT:  Overruled.

23   Q    Mr. Osborn, in comparing the buff card in evidence

24   as Petitioners' Exhibit Number 23 with the signatures on

25   line two and 3 of page number 128, were you able to come to

KCDA001014

JO-392

296

Osborn-Direct/Carroll

1

2    any conclusion as to the author of the signatures on line 2

3    and 3?

4        A    Yes, sir.

5        Q    What is the conclusion?

6        A    The two signatures on lines 2 and 3 of sheet 128

7    were written by one individual.  In comparison of those two

8    names with the signatures on the buff card in the name of

9    Jose Barreto, I can determine that neither one of the

10   petition sheet signatures was written by the writer of the

11   signatures on that registration card.

12       Q    So it was not Mr. Barreto.

13       A    Correct.

14       Q    Turning, sir, to page 73 of the petition, did we

15   ask you to examine some signatures on that sheet?

16       A    Yes, sir.

17       Q    And what signatures were they?

18       A    The signatures on lines 3 and 4 which read

19   respectively:  "Mrs. Andrea Quinones" and on line 4, "Carlos

20   Quinones."

21       Q    And were you given anything to assist you in that?

22       A    Yes, sir.  I was given a voting registration card

23   in the name of Carlos Quinones.

24            MR. CARROLL:  Subject to the same caveat.

25            Mr. Meyers (handing.)

JO-393

297

Osborn-Direct/Carroll

1

2          THE COURT:  That will be Petitioners' Exhibit

3     24.

4          (So marked.)

5     Q     Sir, in comparing Petitioners' Exhibit 24 in

6     evidence, the buff card, with the signatures on lines 2

7     and -- excuse me -- on lines 3 and 4 on page 73, were you

8     able to come to any conclusion as to the author of the

9     signatures on lines 3 and 4?

10    A     Yes, sir.

11    Q     And what was that conclusion?

12    A     It is my conclusion that the two names on lines 3

13    and 4 were written by one individual and that comparison of

14    these two names with the signatures on the buff card in the

15    name of Carlos Quinones leads me to the opinion that neither

16    one of those names was written by him.

17    Q     Sir, looking at pages -- turning, if you will, now,

18    to page 111 of the petition, were you asked to examine any

19    signatures on that page?

20    A     I was asked to examine the signatures on lines 2

21    and 3 in the names of Ana, A-n-a, M. Gonzalez and on line 3

22    Horacio Gonzalez (phonetic).

23    Q     In examining those particular signatures, were you

24    able to come to any conclusion as to the identity of the

25    author of those signatures?

KCDA001016

FORM C-100 · LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

JO-394

298

Osborn-Direct/Carroll

1

2    A    Yes.

3    Q    And what was that conclusion?

4    A    That the author of these two signatures is one and

5  the same person.  I don't know who that person is.

6    Q    And how did you go about reaching that

7  determination?

8    A    By studies and comparisons of each one of the

9  handwriting characteristics in the two names, especially the

10  surnames Gonzalez, by comparison of the quality of the

11  writing.  They clearly demonstrate, in my opinion, the same

12  combination of general as well as individual handwriting

13  identities and show no significant differences that might be

14  indicative of two different writers; and it's the

15  combination of these two identities which allow me to

16  conclude that they were both written by one person.

17    Q    And this is --

18    A    This is also buttressed by the consistency in the

19  number of the characteristics seen in the two addresses to

20  the right of each of these names.  The same evidence holds

21  true in many of the other comparisons that were made.

22    Q    We'll go through those, sir.

23        On page number 21 of the petition -- is that not

24  correct?

25    A    Yes.

KCDA001017

JO-395

299

Osborn-Direct/Carroll

1

2    Q    Page number 21 of the petition, were you asked to

3    examine --

4              MR. MEYERS:  Your Honor, I don't have a page

5         21 in the bill of particulars.

6              MR. CARROLL:  Let me see if I'm reading this

7         correctly.

8              MR. KEEFE:  Is it 130?

9              MR. CARROLL:  No, it is page 21.

10             MR. MEYERS:  Your Honor, the section that

11        petitioner has included for Sandra Helverson on

12        this exhibit begins with page 73.

13             MR. CARROLL:  They're not necessarily in

14        order.

15             Here it is, if you would like to look at it

16        (handing).

17             MR. MEYERS:  Your Honor, I'll read off every

18        page that's in this bill of particulars.  That's

19        not one of them.

20             THE COURT:  Do you have any any other --

21             MR. MEYERS:  I'm going to move that the

22        evidence to be admitted in this regard by

23        petitioner be excluded on the basis that it was not

24        served upon us in the bill of particulars.

25             THE COURT:  Do you have a page 21 there at

300

Osborn-Direct/Carroll

1

2      all?

3          MR. CARROLL:  We have a page 21, your Honor.

4      Where is it?

5          It was inadvertently listed after another

6      individual.  Let's find it in Mr. Meyer's copy.

7          THE COURT:  See if it's there.  Find it.

8          Okay.  You got it?

9          MR. MEYERS:  One moment, your Honor.  It might

10     be that they have tagged it as an exhibit for a

11     different cause.

12         MR. CARROLL:  Your Honor, if it was

13     inadvertently included in another section, I

14     suggest there can be no surprise.

15         THE COURT:  As long as it's there.

16         MR. MEYERS:  Well, it is here in a different

17     section, your Honor.

18         THE COURT:  You have it, though?

19         MR. MEYERS:  Yes.

20         THE COURT:  Okay, fine.  Proceed.

21     Q    Sir, on page 21 of the petition, were you asked to

22     examine certain signatures?

23     A    Yes, sir.

24     Q    And based upon your examination of those

25     signatures -- first of all, which lines of the petition were

301

1                          Osborn-Direct/Carroll

2     you asked to examine?

3         A    I was asked to examine the signatures on lines 5

4     and 6 which read respectively Amanda Romero and Mario

5     Romero.

6         Q    And based upon your review of those two signatures,

7     were you able to draw any conclusion?

8         A    Yes, sir.

9         Q    And what was that conclusion?

10        A    They were written by one individual.

11        Q    Are you able to identify who that individual is?

12        A    No, sir.

13        Q    But that the signatures were written by one person,

14    not two?

15        A    Correct.

16        Q    Sir, turning to page number 181 of the petition,

17    were you asked to examine any signatures on that page?

18        A    Yes, sir.

19        Q    What signatures were they, sir?

20        A    I was asked to examine the signatures on lines 7

21    and 8 which read respectively "Joseph Fabriszewski, F-a-b --

22    I believe -- r-i-s-z-e-w-s-k-i.  And on line 8, Helen

23    Fabriszewski.

24        Q    Did you look at any other signatures on that page?

25        A    Yes, I did.

KCDA001020

JO-398

302

1                    Osborn-Direct/Carroll

2    Q    What other signature on that page did you look at?

3    A    The signature, on line 6, which reads "Frank

4    Romejko."  That appears to be Romejko, R-o-m-e-j-k-o, or

5    h-o.

6              MR. MEYERS:  Objection, your Honor.

7              That's not marked in the bill of particulars

8         as being the subject of Petitioners' evidence.

9              THE COURT:  Take a look.

10             It's not marked?

11             MR. MEYERS:  It's not.

12             THE COURT:  All right.  So strike Romejko.

13   Q    Based upon your analysis of those signatures, were

14   you able to reach any conclusion as to who was the author of

15   the signatures for the Fabriszewskis?

16   A    Only that the two signatures on line 7 and 8 in the

17   name of Fabriszewski were written by one person.  I don't

18   know whether either one or neither was written by the named

19   individual.

20   Q    But that the two Fabriszewskis are the same

21   person.

22   A    Yes.

23   Q    Does any other signature on that page indicate to

24   you who was the author of the Fabriszewski signatures?

25             MR. MEYERS:  Objection.

FORM C-100 - LASER  REPORTERS PAPER & MFG. CO   800-626-6313

JO-399

303

1                    Osborn-Direct/Carroll

2              MR. CARROLL:  I'm not contending that

3         Mr. Romejko's signature is a forgery.

4              MR. MEYERS:  I'm objecting because it's

5         speculative.

6              MR. CARROLL:  I'm asking an expert for his

7         professional judgment.

8              THE COURT:  Let me hear that question again.

9    Q    Does a review of any of the other signatures on

10   that page provide you with information from which you can

11   conclude who was the author of the signatures of the two

12   Fabriszewskis?

13             MR. MEYERS:  Objection.

14             THE COURT:  On what would he base that?

15             MR. CARROLL:  On a review of the signatures on

16        the page.

17             THE COURT:  Objection sustained.

18             That would be highly speculative, unless he

19        has some comparison with something else.

20   Q    Do you have a comparison that would permit you to

21   do that, sir?

22   A    Yes, I do.

23   Q    And what is that comparison?

24   A    In comparing the characteristics forms --

25             MR. MEYERS:  Objection.

304

1              Osborn-Direct/Carroll

2              THE COURT:  Objection sustained.

3              Let's go.

4              (Pause in proceedings.)

5              THE COURT:  Is that it?

6              MR. CARROLL:  That is it, your Honor.

7              I would move, at this point, the introduction

8      of Mr. Osborn's enlargements -- which we have been

9      relying upon throughout this process -- into

10     evidence.

11             MR. MEYERS:  I have no objection.

12             THE COURT:  Without objection, mark the

13     enlargements as Petitioners' Exhibit 25.

14             THE COURT:  Let's take five minutes.

15             MR. MEYERS:  Your Honor, may I request that we

16     adjourn until after lunch?

17             THE COURT:  Uh-uh-uh-uh-uh, no, you cannot

18     request.  We will continue with this witness until

19     lunchtime.

20             MR. MEYERS:  Thank you, your Honor.

21             THE COURT:  How many more witnesses do you

22     have?

23             MR. CARROLL:  There is one other lady outside,

24     your Honor.

25             THE COURT:  Is that a short one?  Long one?

KCDA001023

JO-401

305

1                    Osborn-Direct/Carroll

2              MR. CARROLL:  It could be a long one.

3              THE COURT:  Okay.  We'll finish with

4        Mr. Osborn.  Let's take five minutes.

5              (Whereupon, there was a recess.)

6              THE CLERK:  Case on trial.

7              THE COURT:  Are you ready?

8              MR. MEYERS:  Yes, sir.

9              THE COURT:  Let's do the cross.

10             Go ahead.

11             MR. MEYERS:  Thank you.

12  CROSS-EXAMINATION

13  BY MR. MEYERS:

14     Q    Mr. Osborn, I'm not very familiar with the area

15  which is your profession.  Could you please explain to me

16  what it is that you do in order to make these determinations

17  on the signatures.

18     A    Yes, sir.  I examine and compare the general

19  features of questioned writing or signatures, as well as

20  individual features, to determine if there's any basis for

21  an identification or if there is any basis for a

22  nonidentification.  The identification of handwriting is --

23  has the same basis as the identification for any object or

24  person.  It is a combination of general, as well as

25  individual, features and characteristics which, when

306

1                       Osborn-Cross/Meyers

2    considered singly and then in combination, and also the

3    consideration of a lack of any significant or meaningful

4    differences, allows an identification.

5           It also includes studies of the quality of the

6    writing to determine if any evidence exists indicating an

7    attempted imitation or tracing on the part of some other

8    person.

9    Q    I've heard you use the term general and individual

10   handwriting identities a number of times in your testimony

11   just a moment ago.

12          Can you please tell me what that means.

13   A    Yes, sir.  The general features and handwriting are

14   the system forms of letters that the writer learned.  The

15   overall quality of the writing, that is the penmanship

16   ability of the writer, the size of the writing, the spacing

17   between letters --

18              THE COURT:  Hold it.  Who is that?  What's all

19          the noise?

20              COURT OFFICER:  They're having a wedding at

21          Judge Curce's.

22              THE COURT:  Close the door.

23   A    (Cont'g) And the relationship to the writing of the

24   base lines, if any.  These are all general features that are

25   taken into consideration.

FORM C-100 · LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

JO-403

307

Osborn-Cross/Meyers

1

2      Q    Now, when you're looking at a signature --

3      A    I haven't finished your question.

4      Q    I'm sorry.  I thought you were finished.

5      A    In combination with the general features, we then

6  also examine and determine whether or not individual's

7  habits are formed.  That is, characteristics which are not

8  any characteristics of writing but which have been developed

9  by a particular writer which are repetitive or different in

10  two or more questioned writings.

11      Q    Now, when looking at a single signature, how would

12  you make that determination?

13      A    By looking at a single signature and comparing it

14  with another signature, one can determine whether or not the

15  identities are consistent and repititious or whether there

16  are unexplainable differences.

17      Q    Now, can you conclusively determine, without

18  question, that two signatures are identical, just from

19  looking at one sample?  Compared with one sample?

20      A    Only when there are no insignificant differences

21  and there is, within those two signatures, a combination of

22  general and individual writing habits that are sufficient in

23  number and quality to allow that kind of a conclusion.

24      Q    What is the general practice in your field for

25  making a determination as to whether or not a signature is

308

1                     Osborn-Cross/Meyers

2   authentic?

3        A    That depends on the nature of the questioned

4   document.

5        Q    What does that mean?

6        A    Well, in some cases, such as election petition

7   matters where there are literally -- in some matters I've

8   had -- thousands of questioned signatures, the problem is

9   not one so much of careful imitation by tracing or

10  simulation in each instance but rather a combination of

11  identities distinguishing one writer or more than one

12  writer.

13            In other types of problems, such as a signature on

14  a disputed will or signatures on stolen checks, problems of

15  that nature, why, then the problem is somewhat different in

16  that on the assumption that if the signature in question is

17  not genuine, the actual writer had a model to copy or we

18  must take into consideration all of those features that

19  would be indicative of a tracing or a simulation.

20       Q    In Q number 1 of the Exhibit that you provided for

21  us, you had stated that they were signed by the same --

22  these two signatures found in the petition --

23            THE COURT:  Excuse me.  You have my copy.

24            MR. CARROLL:  My apology, Judge (handing).

25            THE COURT:  Thank you.  Go ahead.

KCDA001027

JO-405

309

Osborn-Cross/Meyers

1

2    Q    You had stated that the two signatures --

3              THE COURT:  You're at Q-1?

4              MR. MEYERS:  Yes, he is, the first page which

5         is Q-1.

6    Q    -- that the signatures on the petition -- it was

7    your belief that they were signed by the same individual; is

8    that correct?

9    A    I believe they they probably were, yes.

10   Q    Now, looking at these two signatures together with

11   us, can you please tell me what it is that you looked at to

12   make that determination.

13   A    Oh, the quality of the writing, for one thing, and

14   the general appearance of it.  The capital letters, "L,"

15   their formation and the size in relation to the following

16   letters and in "Lucy" and "Laurel" are repititious.

17   Q    Let's begin --

18   A    Excuse me.  I haven't finished answering your

19   question.

20   Q    Go ahead, sir.

21   A    The scribbling, illegible finish to the name

22   "Hernandez" in the first name as compared to the finish of

23   that same name in the second signature; these are -- the

24   forms of the small letters, "R" in the name "Hernandez,"

25   these all indicate to me the habits of one writer, even

KCDA001028

JO-406

310

1                   Osborn-Cross/Meyers

2   though those two names are quite varied as to the exact

3   formations of letters.

4        Q    Oh, so you're saying they don't look identical?

5        A    No, they're not identical; of course not.  No

6   person writes identically every time like a rubber stamp

7   impression.  Some people who are poor writers have more

8   variation than others do.

9        Q    You're saying every time a person signs their name,

10  it's different --

11       A    It's different in that they are not exactly

12  identical.

13       Q    Over a person's span of time, a persons signature

14  could change; is that correct?

15       A    Yes, a person's signature could change over a

16  period of time due to age, due to senility, due to a mallady

17  of some sort or sickness.

18       Q    Just looking at the L's in these names.  You had

19  begun your explanation of the comparison of the two

20  signatures by the first name.  The L's appear to be

21  different.

22            What is it that makes you determine that they were

23  written by the same hand?

24       A    You're talking about the two names on the petition

25  sheet?

KCDA001029

FORM C-100 · LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

311

Osborn-Cross/Meyers

1

2    Q    The L's in "Laurel" and "Lucy" --

3    A    Well, they're different in that they're not exactly

4  the same, but they have the same basic size in relation to

5  the following letters.  They begin in the same manner.  They

6  end in the same manner.  And while those two L's wouldn't

7  superimpose one another, they certainly show the same

8  combination of habits in the formation of the letters.

9    Q    Is it possible that, say, I could write an L

10  similar to that if I was hand writing that way?

11    A    Yes, it's possible.

12    Q    So is it possible that more than one person could

13  write an "L" in that manner?

14    A    Yes, it's possible.  I'm sure that if you searched

15  long and hard enough, you would find somebody that made an L

16  that began in the same manner or made an L that ended in the

17  same manner.  Then you may find some that made an L that

18  began and ended in the same manner.  And you may then even

19  find some people who would make an L in the same size or

20  relationship to the following small letters.  But with each

21  different identity, the combination of those characters

22  brings one either closer or further away from an

23  identification.

24    Q    Okay.  Well let's not search so long and hard.

25  Let's go right to the point.

KCDA001030

312

1              Osborn-Cross/Meyers

2           Did you examine any handwriting Samples for Laurel

3    Hernandez?

4       A    No, I did not.

5       Q    You did not.

6       A    No.

7       Q    So you can't determine whether or not Laurel

8    Hernandez wrote that.

9       A    No, I cannot.

10      Q    Now, is it a normal practice in your profession to

11   use only -- I see you have two samples taken from the buff

12   card, the front and back of the buff card.

13           Is it normal to base your conclusions on only two

14   samples of a signature?

15      A    When I believe that the samples are consistent and

16   repititious and demonstrate developed qualities as these two

17   do, I believe the evidence is sufficient.

18      Q    Well, let's take a --

19      A    In other instances where a person's writing may not

20   be so good or show a great deal more variation, why, then

21   two samples may not be enough.

22      Q    Okay.  Well let's take a look at the L in

23   "DeLorenzo" in that sample.  Those L's are very distinctive

24   from one another.  What is it that makes you conclude they

25   are written by the same person?

KCDA001031

JO-409

313

Osborn-Cross/Meyers

1

2     A     They were given to me as written by the same

3  person.   They show the natural variations in the writing of

4  Lucy DeLorenzo.   Actually, there's not much variation.

5  Those two signatures are quite consistent.

6     Q     I'm just talking about the L's now.

7     A     Yes, and so are the L's.

8     Q     Even though the "L" on one side -- on the upper L

9  is much much larger and is very closed in the scribbly lines

10 on it; and the lower one has large curves and is much

11 smaller.

12          Didn't you earlier testify that one of the things

13 you look at is the size of the letters and the curves in

14 those manners?

15    A     Yes.

16    Q     How can you make that determination just on those

17 two L's.   Let's take all four L's -- Oh, I only wanted to

18 discuss two L's?

19    A     Oh, you're going to limit me now to just two

20 letters or a portion of two letters?

21    Q     I'm asking you about the two L's in the buff card

22 that you've put on your Exhibit.

23    A     Yes.

24    Q     That's all I'm asking you about.

25    A     And you're referring everything only to the L's in

314

1                        Osborn-Cross/Meyers

2    DeLorenzio.

3        Q    That's correct?

4        A    And you want to limit me to just one portion of

5    those L's?

6        Q    To these two L's.  That's my question to you, sir.

7        A    Well, they're not exactly the same, no.  But they

8    are, while fairly common, taken in conjunction with the

9    other L's in those signatures, taking all four of those L's

10   and comparing them with the L's in the two questioned names

11   on the petition, in my opinion, they're clearly -- the two

12   groups are clearly unlike one another.  In fact, the writer

13   of the two petition signatures doesn't have the writing

14   ability of this Lucy DeLorenzio.

15       Q    And on what basis do you make that opinion?

16       A    Because of the very poor quality and semi-

17   legibility of the questioned names as compared to the way

18   she writes.

19       Q    Let's take a normal petition signing situation,

20   since you earlier testified to the distinguishing of these

21   type of signatures from, say, a will signing.  Typically,

22   these petitions are done in a quick manner.  We've had

23   earlier testimony where people said the person was there for

24   only a number of minutes or less.  Now, if someone is

25   signing quickly, would that make their signature any

KCDA001033

JO-411

315

Osborn-Cross/Meyers

1
2   different than it would if they were signing slowly?

3       A    That depends on the individual and how quickly they

4   were doing it and under what circumstances they were doing

5   it.

6       Q    So it is possible that this hurried manner that you

7   had mentioned that the petitioned signatures are in could

8   possibly have been done by the person on the buff card, if

9   they were signing quickly on the petition and slowly on the

10  buff card?

11      A    That's not what I said.  Yes, you are correct in

12  that signatures written under different conditions can be

13  affected; but not to the extent of showing totally different

14  habits of form and general, as well as individual,

15  characteristics.

16          I'm sure that the -- whether Lucy DeLorenzio wrote

17  her signature rapidly or very carefully would not

18  demonstrate the characteristics that are seen in these two

19  names on the petition sheet.

20      Q    Well, let's --

21      A    I'm convinced of it.

22      Q    Let's take a look at the two signatures that you've

23  compared; one from the petition and the two from the buff

24  card.  Is there a noticeable difference in those two -- not

25  in the type of signature but just in the name itself?

KCDA001034

FORM C-100 - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

JO-412

316

Osborn-Cross/Meyers

1

2    A    Yes, in that that on the petition reads Lucy

3 Hernandez DeLorenzio whereas those on the buff card read

4 Lucy DeLorenzio.

5    Q    Now, the addition of this name added into the

6 signature, wouldn't that change the timing, the pacing, the

7 manner in which a person would sign their name, rather than

8 having it flow Lucy DeLorenzo, she now has has it Lucy

9 Hernandez DeLorenzio.  Wouldn't that alter the manner in

10 which she signs her name?

11    A    It might cause some variation, but it certainly

12 wouldn't change her developed writing identities.  For

13 example, the forms of the Captain D's in "DeLorenzio" are

14 totally different.  Look at the small letters "i's" in

15 "DeLorenzio" where in the buff cards, they're made with an

16 up-and-down stroke.  In the buff cards the i's are made with

17 an up-and-downward stroke separated making that letter

18 distinctive.

19    As a matter of fact, if you'll go through every

20 letter, you'll find some slight similarities, yes.  One

21 similarity is the very long finish of the small letters "y,"

22 but that's about the only similarity between those names.

23 That is the two on the buff card as compared to the one

24 above.

25    Q    Does the angle at which you sign a name change the

JO-413

317

Osborn-Cross/Meyers

1

2    way it might look?

3        A    Yes, it will change the general appearance and the

4    slant of the writing.

5        Q    What about the stability of the writing area?

6        A    Stability of the writing area?

7        Q    A hard table as opposed to writing on, say, a

8    paperback book or as opposed to a hand-held petition

9    clipboard or maybe not even a clipboard, maybe just a stack

10   of loose petitions held up in the air or maybe held up

11   against the wall.  Would that alter the way that a person

12   signs their name?

13       A    Writing done under differing circumstances can

14   affect the quality of the writing or the general appearance

15   of the writing, depending on the writer.  It may not affect

16   some peoples' writing at all.

17       Q    Can you determine that from just these couple of

18   examples that you have here?

19       A    I can determine that the handwriting identities,

20   the meaningful --

21       Q    Wait a minute --

22       A    Excuse me.  I want to --

23       Q    You're not answering my question, sir.  All I want

24   to know is if you could determine whether or not there are

25   different anles of signature on this and whether or not it

KCDA001036

FORM C-100 · LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

JO-414

318

Osborn-Cross/Meyers

1

2    would affect the type and appearance of these signatures?

3              MR. CARROLL:  Objection.

4              I'm not sure I understand the question at all.

5              THE COURT:  Well, if the witness understands

6         it, I'll let him answer.

7              THE WITNESS:  No, I don't.

8              MR. MEYERS:  I'll rephrase the question, your

9         Honor.

10   Q    You've testified that if they signed at different

11   angles or if the document was held on a clipboard or a loose

12   piece of paper or up against the wall, that that angle would

13   change the appearance of the signature?

14   A    I did not say that.  I said that it could.  With

15   some writers, writing under unusual circumstances may affect

16   their writing.  With other writers, it wouldn't make any

17   difference at all.

18   Q    But you can't make that determine without seeing

19   the person sign at different angles; is that correct?

20   Seeing samples of those signatures written at different

21   angles or under different circumstances; is that correct?

22   A    I don't know the circumstances under which any of

23   these signatures were written.  But I do know that the

24   nature of the difference in identity forms between the two

25   groups of signatures that are illustrated are the work of

KCDA001037

FORM C-100 - LASER  REPORTERS PAPER & MFG. CO  800-626-6313

JO-415

319

1                          Osborn-Cross/Meyers

2     two different writers and not one person's normal variations

3     or variations caused by unusual circumstances.

4          Q    Let's go back.  You said you didn't know what

5     conditions they were written on.

6               When you make this analysis, what do you assume

7     that they are written on?

8               How do you assume that the angle and the

9     positioning of this author is at the time?

10         A    I assume that under these -- with this type of

11    problem, that signatures on the petition sheet might be

12    written under other than ideal circumstances such as on a

13    back board held in the hand, adverse to sitting at a desk.

14               (Mr. Weiss entered the courtroom)

15         A    (Cont'g)  I understand that the situations may

16    cause variations in writings to some extent.  I've examined

17    thousands of writings that were written under different

18    circumstances.  And if there was any suggestion that these

19    four signatures illustrated on that first chart was done by

20    one person but it varied because of circumstances, then I

21    would not have identified them as being done by different

22    writers.

23         Q    Okay.  Let's take a look at Q-4, the second page.

24         A    Yes, sir.

25         Q    Okay.  In this one, you said that lines 1 and 2

KCDA001038

JO-416

320

1              Osborn-Cross/Meyers

2    were signed by the same person and you said that it wasn't

3    the person whose signature appears on the buff card; is that

4    correct?

5         A    Yes, sir.

6         Q    Now, to my eye, number two and the signature -- the

7    second signature in Q-4 to the petition and these look the

8    same (indicating).  What is it, in your opinion, makes them

9    different?

10        A    The fact that here you have a great deal more

11   specimen signatures and while the general features of the

12   two questioned names are somewhat more similar to the known

13   signatures on the buff card, there are still characteristics

14   which do not fall within the genuine signatures, identities

15   or slight natural variations of identities.

16             For example, the capital letters "M" in both

17   "Millie" and "Montalvo," as well as the name above,

18   "Montalvo," all begin with a reverse hook, that is, a

19   compound hook before the beginning downward stroke; and this

20   is not a characteristic found in any one of the numerous

21   specimen signatures illustrated from the buff card.

22        Q    So based on that one difference, you're saying that

23   it's not that person who signed it?

24        A    That is not true.

25        Q    What is it, then?

KCDA001039

JO-417

321

1              Osborn-Cross/Meyers

2     A    It is a combination of differences.

3     Q    What's the combination of differences, sir?

4     A    I'll be glad to go through each one much them, if

5  you'd like.

6     Q    Yes, I'd love it.

7     A    Another feature is the finish of the letters "V"

8  and "O," where in the specimen signatures, there's normal

9  spacing between these letters, and the final Letter "O" ends

10  with a fairly long sweeping stroke out to the right.

11         Unlike the combination of letters "V" and "O" in

12  the two questioned names.

13     Q    Well, let's just look at "Millie Montalvo" in the

14  petition and the "Millie Montalvo" on the buff card before

15  you continue, sir --

16              MR. MEYERS:  Your Honor, I don't seem to see

17         the buff card marked into evidence for Millie

18         Montalvo here.  Does your Honor have it up at the

19         bench?

20         Do you have that one?

21              MR. CARROLL:  It should be in evidence.

22              THE COURT:  This is as good a time as any to

23         close.

24              THE WITNESS:  Here it is.

25              THE COURT:  All right.  We'll recess now till

KCDA001040

JO-418

322

Osborn-Cross/Meyers

1
2 two o'clock.

3  MR. MEYERS:  Thank you, your Honor.

4  (Whereupon, there was a luncheon recess.)

5  <u>AFTERNOON SESSION</u>

6  THE CLERK:  Case on trial.

7  MR. MEYERS:  Your Honor, before the witness

8 returns to the stand, may I have conference with

9 Mr. Carroll and your Honor?

10  MR. CARROLL:  Sure.

11  THE COURT:  Sure.

12  (Discussion at the bench off the record.)

13  THE COURT:  Counsel?

14  MR. MEYERS:  Thank you, your Honor.

15  Your Honor, after a conference with counsel

16 for the petitioner, Mr. Carroll, after discussion

17 with my client, without admitting any of the

18 allegations in petitioner's petition, my client

19 agrees to withdraw from this matter based on an

20 insufficient number of signatures in the petition

21 and that the record in this matter be sealed; the

22 transcript be sealed along with it.

23  If there be any transcript, and -- I believe

24 that's all.

25  THE COURT:  Do I understand, Counselor, that

KCDA001041

JO-419

323

1           Proceedings

2      it's your client's desire to have his petition

3      invalidateed on the basis of an insufficient number

4      of signatures?

5           MR. MEYERS:  That is correct, your Honor.

6           THE COURT:  Counselor for the objectors, are

7      you aware of that?

8           MR. CARROLL:  Your Honor, I'm aware of that

9      and there are no objections.

10          THE COURT:  And you've also heard the request

11     of counsel about sealing of the record, the

12     minutes?

13          MR. CARROLL:  We consent to the sealing of the

14     record and the minutes.

15          THE COURT:  Mr. O'Hara, you heard what your

16     counsel just said?  Mr. O'Hara.

17          MR. O'HARA:  Yes.

18          THE COURT:  Do you agree and consent that your

19     petition -- there was one petition --

20          MR. CARROLL:  One petition.

21          THE COURT:  That your petition be invalidated

22     on the basis of an insufficient number of

23     signatures?

24          MR. O'HARA:  Yes.

25          THE COURT:  And that the record will be

FORM C-100 - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

JO-420

324

1          Proceedings

2      sealed?

3          MR. O'HARA:  Yes, your Honor.

4          THE COURT:  Okay.  Based on the stipulation

5      between counsel and based on the statement of the

6      Candidate, Mr. O'Hara, this Court declares that the

7      petition of John K. O'Hara as a member of the

8      Assembly from the 51st Assembly District, New York

9      State, is declared invalidated on the basis of

10     insufficient number of signatures.

11         MR. CARROLL:  Thank you, your Honor.

12         I think Judge Garry may want a short form

13     order.

14         THE COURT:  If you have to submit whatever you

15     wish, please prepare a short form order, whatever

16     Justice Garry wants.

17         MR. MEYERS:  The only thing that remains is

18     there was evidence that needed to be redacted, that

19     needed redaction.

20         THE COURT:  What evidence are we talking

21     about?

22         MR. MEYERS:  There were bills --

23         THE COURT:  You're taking it back.

24         (Continued on the following page.)

25

FORM C-100 -LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

KCDA001043

JO-421

325

1          Proceedings

2     MR. CARROLL:  Would you like those documents?

3     MR. MEYERS:  Yes, I would.

4          *          *          *

5     It is hereby certified that the

6     foregoing is a true and accurate

7     transcript of the proceedings

8

9     Official Court Reporter

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

KCDA001044

JO-422