# EXHIBIT H

## SIDER, ZACHARY

| | |
|---|---|
| **From:** | SCHMETTERER,JERRY </O=DAKC/OU=RP/CN=RECIPIENTS/CN=JERRY S> |
| **Sent:** | Monday, January 7, 2013 9:29 AM |
| **To:** | FEINSTEIN, AMY |
| **Subject:** | OHara |
| **Attachments:** | O'Hara synopsis memo.doc |

```
Jerry Schmetterer
Director of Public Information
Kings County District Attorney
350 Jay Street
Brooklyn, N.Y. 11201
```

## Synopsis of the case of People v. John O'Hara

**Origin:** The matter was first brought to the attention of the Kings County District Attorney's Office in June of 1996. The original source of the complaint was from Assemblyman Jim Brennan and members of his staff, who asserted that O'Hara had repeatedly committed criminal violation of New York State Elections Law – these allegations came to light when they sought assistance in an ongoing police investigation into the assault of attorney Jack Carrol. While reviewing these matters, this office received a request from Special Deputy Counsel Jeffrey Waite of the New York State Board of Elections that we assist them in the investigation of John O'Hara – as they had failed in their efforts to obtain Court records on July 12, 1996.

**Investigation:** Application to the Miscellaneous Motion part of Kings County Supreme Court for a judicially endorsed subpoena for records through an affirmation on July 28th, 2006. The requested subpoena was signed by Justice Matthew D'Emic on July 29th.[1] A review of the resulting records and conversations with witnesses indicated that O'Hara had used 3 different apparently improper addresses in running unsuccessfully for various positions. There was no evidence that he actually resided at any of these locations, as he continuously lived in an apartment at 579 61st Street – where he continues to reside today. These addresses were utilized so it would appear that O'Hara resided within the boundaries of the areas he sought to represent - the boundaries of which shifted upon redistricting in 1992.

**Charges:** In order to simplify the proceedings, and as the evidence was strongest -charges were presented regarding only the latest false address at 553

---

[1] The date becomes important because while both the defense and the Court were supplied with documentary evidence of this during discovery proceedings, O'Hara has continued to publicly assert that the triggering event leading to the investigation was his participation with others as a plaintiff in a federal lawsuit relating to the conduct of Kings County democratic primaries in September of 1996
.

47th Street. This was located in the 20th ED of the 51st A.D. The Appellate Division First Department had at that time recently affirmed a dismissal of similar charges based on what were held to be improper instructions given to a Grand Jury (People v. Benjamin Ramos 1996) – so the instructions were carefully crafted to ensure compliance with the law.

The resulting indictment charged one count of Offering a False Instrument for Filing in the First Degree, one count of False Registration and five counts of illegal voting. All occurring between November 2, 1992 and November 2, 1993. Defendant surrendered to the District Attorney's Office and was arraigned on October 23, 1996.

**First trial:** The case was assigned to Judge Priscilla Hall in part 1. The judge inquired as to whether a plea bargain to a misdemeanor was possible – we indicated we were prepared to discuss it, but O'Hara expressed that he would never plead to anything. The matter proceeded to trial on 5/1/97. The evidence presented include testimony from all occupants of the building – who stated O'Hara never lived there (although he had visited and asked them to hold mail), evidence he had no utilities or phone at the bogus address, and evidence he had continuously lived on 61st Street. He was convicted of all seven E felonies on 5/13/97. He was sentenced to probation, and 1,500 hours community service as well as a fine.

**First appeal:** On 8/13/98 the Appellate Division reversed the conviction. The Court determined that a missing witness instruction was improperly given regarding the defendant's girlfriend Magaly Lucas. The defense had told the jury that she would testify she had the defendant move into the building while she negotiated the sale to the occupants who were renting it – but she failed to appear and defense refused an offer to have her declared a material witness.

**Second trial:** The case was assigned to Judge Abraham Gerges. The Judge stated his desire to resolve the matter through a plea to a misdemeanor, but O'Hara again stated that he would never plead to anything. The direct case consisted of the same evidence as at the first trail – the defendant and several acquaintances (most who had worked on past campaigns for the defendant) testified that he actually lived in a basement apartment in the building and often parked his mother's car in front. The jury was unable to reach a decision (subsequent discussion with jurors indicated they were deadlocked 10-2 for conviction) and a mistrial was declared on 6/2/99.

**Third Trial:** The trial began on 6/30/99. Most evidence was similar – the prior owners of the building had been located and confirmed that the basement in question at no time contained an apartment and was in fact uninhabitable. Additionally, evidence showed that the Hyundai automobile defense witnesses swore they had seen repeatedly parked on 47th Street – had not left the loading docks in Korea until after the dates of their reported observations. The defendant was again convicted of all charges on 7/1/99 after approximately 2 hours of deliberation. On 10/18/99, the defendant was sentenced to the same 1,500 hours of community service and a Conditional Discharge.

**Appeals:** Defendant's principal assertion on appeal was that the jury had been improperly instructed on the definition of "residence" under the Election Law. The conviction was sustained by the Appellate Division in a rather short opinion on 7/17/00 and in a more detailed opinion by the New York Court of Appeal on 6/14/01. The majority opinion recognized that the jury was instructed that the defendant could choose between residences for voting purposes, as long as the one picked was "not a sham". O'Hara sought relief in federal court through a habeas petition. That application was denied by Judge John Gleeson of the Eastern District of New York through an oral decision on 3/7/2003. The Judge again noted that the prosecution was founded on the assertion that the residence claimed by O'Hara was a "sham", and further commented that "the evidence in this case, which I reviewed exhaustively. I found extremely powerful." O'Hara then attempted unsuccessfully to appeal this decision to the Second Circuit and the U.S. Supreme Court. His petition for certiorari was denied 1/12/2004

**Collateral attacks on conviction.** Defendant's attempt to vacate the conviction by asserting ineffective assistance of counsel was denied by the Appellate on 9/23/2002. O'Hara further attempted to attack the conviction through a 440 motion asserting selective prosecution - in his decision issued on 9/23/2005; Judge Gerges not only denied the motion but also noted that "In fact, the defendant has shown that the factors used by the government in deciding to prosecute him were valid and neutral considerations."

## SIDER, ZACHARY

| | |
|---|---|
| **From:** | RIVERA, JOSE LUIS <RIVERAJ@BrooklynDA.org> |
| **Sent:** | Monday, August 10, 2015 3:06 PM |
| **To:** | CHARRETTE, MARGARET |
| **Subject:** | FW: O'Hara minutes |
| **Attachments:** | OHARAINVOICE.PDF; 063099-OHARA-signed.pdf |

**From:** wgrant3505@verizon.net [mailto:wgrant3505@verizon.net]
**Sent:** Wednesday, July 08, 2015 12:57 PM
**To:** RIVERA, JOSE LUIS
**Subject:** O'Hara minutes

 Hi, Jose.  Attached are my invoice and trial minutes for the trial of John O'Hara on June 30, 1999.  I just covered the part that day only.  Kathy Harris was the reporter that I covered for.   Suzanne Grant, 17 Thyme Lane, Sheffield, MA 01257.  Cell 917-757-4765

## SIDER, ZACHARY

| | |
|---|---|
| **From:** | wgrant3505@verizon.net |
| **Sent:** | Wednesday, July 8, 2015 12:57 PM |
| **To:** | riveraj@brooklynda.org |
| **Subject:** | O'Hara minutes |
| **Attachments:** | OHARAINVOICE.PDF; 063099-OHARA-signed.pdf |

Hi, Jose.  Attached are my invoice and trial minutes for the trial of John O'Hara on June 30, 1999.  I just covered the part that day only.  Kathy Harris was the reporter that I covered for.   Suzanne Grant, 17 Thyme Lane, Sheffield, MA 01257.  Cell 917-757-4765

1

SUZANNE GRANT
Official Court Reporter
Supreme Court - Kings County
17 Thyme Lane
Sheffield, MA 01257

_____

TO:   DISTRICT ATTORNEY
      KINGS COUNTY

RE:   People v John O'Hara
      Indict. 13525/96


Trial testimony in the above matter for 6/30/99

102 Pages @ 2.50 per page          $255.00

^

sg

```
 1   SUPREME COURT OF THE STATE OF NEW YORK
     COUNTY OF KINGS - CRIMINAL TERM - PART: 17
 2   ---------------------------------------------X
     THE PEOPLE OF THE STATE OF NEW YORK,
 3
                     -against-
 4
     JOHN O'HARA,
 5
                                   Defendant.
 6   ---------------------------------------------X

 7   Indict. No. 13525/96         360 Adams Street
                                  Brooklyn, New York
 8   Trial                        June 30, 1999

 9
     B E F O R E:
10
         HONORABLE ABRAHAM GERGES,
11
                         Justice, and a jury.
12
         (Appearances same as previously noted.)
13
                         SUZANNE GRANT
14                       OFFICIAL COURT REPORTER

15                 _ _ _ _ _ _ _ _

16              THE COURT:  Case on trial.  Tell the people

17         outside to come in.

18              I received some subpoenaed records.

19              MR. HERNANDEZ:  You might have gotten them

20         from Chemical Bank.  They indicated to me they were

21         not interested in sending a representative and they

22         were just going to send the records to court.

23              THE COURT:  Are we bringing the jury, please?

24              MR. HERNANDEZ:  Judge, how do we do -- some of

25         these exhibits have been premarked.  Some of these
```

1          exhibits are already marked from the last trial.

2          This was introduced during the last trial.

3              THE COURT:  Well, what we will do is put the

4          sticker right on top of it.

5              MR. HERNANDEZ:  All right.

6              THE COURT:  Counsel, these are the subpoenaed

7          records that were sent to me.

8              Bring the jury in, please.

9              COURT OFFICER:  Jury entering.

10             (Jury enters the courtroom.)

11             THE CLERK:  The jury being present and

12         properly seated, are you waiving any roll call?

13             MR. O'MARA:  So waived.

14             MR. HERNANDEZ:  So waived.

15             THE COURT:  Good morning, ladies and

16         gentlemen.

17             Please call your next witness.

18             MR. O'MARA:  Thank you, your Honor.

19             Good morning, ladies and gentlemen.

20             The People call Roberto Lozano to the stand.

21  R O B E R T O   L O Z A N O,  called as a witness, having

22  been first duly sworn, was examined and testified as

23  follows:

24             THE CLERK:  Please state and spell your name,

25         please.

1                THE WITNESS:  Robert Lozano, L-O-Z-A-N-O.

2                THE COURT:  Mr. Lozano, please be seated.

3           Move your seat forward.  Speak up in a nice loud

4           voice so we can all hear.

5                You may inquire.

6                MR. O'MARA:  Thank you, your Honor.

7                MR. HERNANDEZ:  Judge, can I just move my

8           chair back?

9                THE COURT:  Yes.

10                MR. HERNANDEZ:  Thank you.

11   DIRECT EXAMINATION

12   BY MR. O'MARA:

13        Q    Mr. Lozano, did there come a time in October of

14   1992 when you moved to the location, the Sunset Park area of

15   Brooklyn, the address of 553 47th Street?

16        A    Yes.

17        Q    How did you come about moving to that property?

18        A    We were looking to move into a bigger place.

19        Q    Let me hold you there a second.  When you say we --

20        A    Ralph Munoz, Quetzal Martinez and myself.

21        Q    You were looking for a place?

22        A    Yes.

23        Q    And how did you go about looking for a place?

24        A    Well, Chino met this lady, Elizabeth.

25        Q    Who is Chino?

Lozano - Direct - O'Mara                                    173

1    A    Qetzal Martinez.

2    Q    You met a lady named Elizabeth?

3    A    Yes.

4    Q    What happened?

5    A    And she spoke about this building.

6    Q    When you say she spoke about it, did she speak

7    about it to you?

8    A    She spoke to Chino and we looked into it and we

9    went to the building.

10   Q    I'm going to ask you to keep your voice up.

11        She spoke to you and then what did you do?

12   A    We went to, you know, we went to the building,

13   checked it out, and we decided to get it.

14   Q    Okay.  When you say you went to the building, who

15   went to the building?

16   A    Me, Ralph Munoz, Chino -- and Quetzal Martinez.

17   Q    Again, I'm going to ask you to keep your voice up.

18        You said you went to the building.  Could you

19   describe the building for us, please, when you first saw it.

20   A    Well, the upstairs, they had no walls.  It was

21   like, it was really messed up.  It had holes.

22   Q    How many buildings starting with the -- how many

23   floors starting with the ground floor were there?

24   A    It was the ground floor, the first floor, and the

25   upstairs.

sg

Lozano - Direct - O'Mara                                              174

 1     Q    You said -- starting with the third floor, can you

 2   describe that for us?

 3     A    It didn't have no walls.  It was like -- it was

 4   really like condemned.  The whole upstairs was like

 5   condemned.

 6     Q    What about the second floor?

 7     A    The second floor had like rooms, divided into

 8   little rooms.

 9     Q    The first floor?

10     A    The first floor wasn't that bad.

11     Q    And was there a basement?

12     A    Yes.

13     Q    Would you describe the basement to us, if you

14   would, please?

15     A    The basement was -- almost like upstairs.  The only

16   thing, it had too much stuff in it.

17     Q    Okay, you said that you decided that you would get

18   the building, what did you do in terms of getting the

19   building?

20     A    Well, Elizabeth, we spoke to her and she did the

21   proceedings.

22     Q    What kind of proceedings, as best you can remember,

23   did you enter into at that time?

24     A    She told us to get a certain amount of money and, a

25   thousand dollars I think it was.  We borrowed $10,000,

1    excuse me.

2        Q    Who was supposed to get the $10,000 together?

3        A    All three of us.

4        Q    Did you get any money yourself?

5        A    Yes.

6        Q    About how much?

7        A    About 3,300.

8        Q    And when you got the money together, what did you

9    do?

10       A    We made out a check and gave it to her.

11       Q    Okay, when you returned from giving her the money,

12   what did you get in return?

13       A    Well, we get the building.

14       Q    Okay.

15       A    We was going to move in.

16       Q    You then moved into the building?

17       A    Right.

18       Q    At the time when you gave the money to Elizabeth,

19   did she in turn make out certain checks?

20       A    Yeah, the check, the check that we gave her for the

21   apartment.

22       Q    Okay, then did she make out certain checks after

23   you gave her the money?

24       A    Yeah.

25                  MR. O'MARA:  Can we have this marked for

1        identification as People's 17.

2                MR. HERNANDEZ:  I've seen it.

3                (So marked.)

4                MR. O'MARA:  Can I have that shown to the

5        witness.

6     Q    Mr. Lozano, I'm showing you what's been marked for

7  identification as People's number 17.  Do you recognize

8  that?

9     A    Yeah.

10    Q    I'm going to ask you to look over the back as well.

11 Just turn it over.  Do you recognize that?

12    A    Yeah.

13    Q    Is that -- does that represent your signature?

14    A    Yes.

15    Q    Is that a copy of one of the checks that was made

16 out by Elizabeth in October of '92 when you gave her the

17 money?

18    A    Yes.

19                MR. O'MARA:  I ask it be moved into evidence,

20        People's 17.

21                MR. HERNANDEZ:  No objection.

22                THE COURT:  It will be People's 17.

23    Q    Now, Mr. Lozano, after you had done the financial

24 transaction, did you then move into the building?

25    A    Yes.

1    Q    Who moved into the building?

2    A    Quetzal Martinez, Ralph Munoz and myself.

3    Q    Where in the building did the three of you move in,

4  third floor, second floor?

5    A    I moved in the first floor, Ralph Munoz was on top

6  of me and Chino on the top floor.

7    Q    The top floor was the one that had to be rebuilt at

8  that point?

9    A    Yes.

10   Q    Now, in addition to the three of you, when you

11 moved in in October of '92, was anybody else living in the

12 building?

13   A    No.

14   Q    I'm going to ask you to look around -- first I ask

15 you, did you ever meet a person by the name of John O'Hara?

16   A    Yes.

17   Q    I ask you to look around the courtroom and tell us

18 if you recognize the person.

19   A    There he go.

20            THE COURT:  Indicating the defendant.

21   Q    How did you meet Mr. O'Hara?

22   A    He came around and he, he asked us if some mail

23 comes in, would you hold it for me.

24   Q    When you say he came around, he came around where?

25   A    To the building.

1    Q    Would that be 553 47th Street?

2    A    Yes.

3    Q    How long after you moved in did he come around?

4    A    A few weeks, a month.  I don't remember.

5    Q    How often do you remember you saw him come around?

6    A    Maybe once in a while.  I can't say exactly.  Once

7    a week or once a month.  I don't know.

8    Q    But he was there several times?

9    A    He was there several times.

10    Q    You said at one point he indicated something about

11    the mail.  What was that?

12    A    He told me if some mail comes there for him, to

13    hold it for him.

14    Q    Did any mail come for him?

15    A    Yeah, some Victoria Secrets catalogue and some

16    other magazines.

17    Q    And you would hold these materials for him; is that

18    correct?

19    A    Yes.

20    Q    In addition to the mail, did you discuss -- did he

21    discuss with you what would happen if someone came around

22    and asked if he was living there?

23    A    He said if someone comes around and asks if I'm

24    living there, say yes.  I didn't object to it.  Why not?

25    Q    In addition to Mr. O'Hara, did he ever come around

Lozano - Cross - Hernandez                               179

1  with anybody with a camera?

2      A    Oh, yeah.  He used to sit in front of the building,

3  take pictures.

4      Q    Did people come and take pictures of him?

5      A    Yeah, he brought another guy with him.

6      Q    Now, during the time that you were there, were you

7  there through 1993 into 1994?

8      A    Yes.

9      Q    And you started living there in October of 1992?

10     A    Yes.

11     Q    During that entire period, did Mr. O'Hara at any

12 point live or stay at 553 47th Street?

13     A    No.

14          MR. O'MARA:  Thank you.  I have no further

15          questions.

16          THE COURT:  You may inquire.

17 CROSS-EXAMINATION

18 BY MR. HERNANDEZ:

19     Q    Good morning, Mr. Lozano.  My name is Alfredo

20 Hernandez.  I'm the attorney for Mr. O'Hara.

21          If you don't understand any of my questions, just

22 let me know, okay, and I'll ask them in a way we can

23 mutually understand each other.

24     A    Sure.

25     Q    You are clear in your mind today that you moved

sg

Lozano - Cross - Hernandez                                    180

1   into this building in October of 1992?

2        A    Yes.

3        Q    Certain?

4        A    Positive.

5        Q    Do you know what the share of the $10,000 that was

6   paid to Elizabeth -- I withdraw that.

7             Elizabeth, the one you mentioned, is she the real

8   estate agent you were dealing with?

9        A    Yeah.

10       Q    When you paid the $10,000, who was the person that

11  gave the $10,000?

12       A    All three of us.  It was between all three of us.

13       Q    But who actually gave it to her?  Were you all

14  present?  You each came in with your own share and gave it

15  to her at the same time; is that what it was?

16       A    I think so.  Most probably.  I know we gave her the

17  money.  I don't know who gave it to her first, second or

18  third, but we gave her the money, I know that.

19       Q    You personally gave it to her?

20       A    I gave her my share.

21       Q    And your share was 3,300?

22       A    Yes.

23       Q    Do you remember what the share of the other two

24  partners in this venture were?

25       A    About the same amount.

                                                              sg

1    Q    Were they present the day you gave her the money?

2    A    We were all three together, yeah.

3    Q    So that check that has been moved in as People's

4    17, you didn't have that check issued, right?  It was just

5    after you gave Elizabeth money, correct?

6    A    What are you talking about?  Can you repeat it?

7    Q    You didn't give her the check, the check moved in

8    as People's 17?

9         Do you have that in front of you?

10   A    Yeah.

11   Q    Were you the one that got that check?  Were you the

12   one that went to the bank to get that check?

13   A    We usually gave her money, she made out the check.

14   Q    You just endorsed the check?

15   A    Yeah.

16   Q    That check is for $5700.  Why is that amount --

17   didn't you give her 10,000?

18   A    We gave her 10,000.  We kept paying her monthly.

19   Q    Why is that check --

20        MR.  HERNANDEZ:  May I approach?

21        THE COURT:  Yes.

22   Q    I just wanted to take a look at that date.

23        This check apparently was dated 10/6 but it shows

24   certified on 11/6 of '92.  Would you look at these dates.

25   It is written 10/6 but certified 11/6/92, correct?

Lozano - Cross - Hernandez                                    182

1    A    Right.

2    Q    The total amount of that check is 5,700, correct?

3    A    Right.

4    Q    Now, why is it 5,700; do you know?

5    A    I don't remember.  We just gave her $5,731.

6    Q    What happened to the other $4300; do you know?

7    A    I don't remember.

8    Q    Now, do you recall what the monthly -- well,

9    withdrawn.

10        When you came in in October of '92 and you remember

11   that date specifically as when you came in, right?

12   A    Yes.

13   Q    When you came in that month, did you come in as the

14   owner or tenant of that building?

15   A    We were going to take over the mortgage.

16   Q    Did you take over the mortgage when you first came

17   in?

18   A    We would take the mortgage for Magaly Lucas and it

19   was like you pay off the mortgage and then we stay with the,

20   give us, to transfer the building over to us.

21   Q    So you recall today that what you did was to pay

22   the mortgage, not rent, is that what you're saying?

23   A    Yes.

24   Q    You never paid rent for the building?

25   A    No, we never paid rent.

1    Q    In your mind do you believe when you went there in

2    October of '92 you were the owner of the building?

3    A    Yeah.

4    Q    Now, you indicated that you took over the first

5    floor, right?

6    A    Yeah.

7    Q    Just for the sake of the jury, when you are looking

8    from the sidewalk, when you look at the building from a

9    person's point of view, there are three floors to, in this

10   building if you are looking from outside?

11   A    Yeah.

12   Q    That first floor as you are outside, is that the

13   one you took over?

14   A    Yeah, the walk-in.

15   Q    And you have to walk up a set of stairs to get to

16   the second floor?

17   A    Yes.

18   Q    And you took the walk-in floor, the first floor?

19   A    Right.

20   Q    Munoz took the second floor?

21   A    Right.

22   Q    And Chino -- Mr. Martinez took the third floor?

23   A    Right.

24   Q    The third floor was the one that was in total

25   disrepair?

1      A     Ah-ha.

2      Q     Basically uninhabitable?

3      A     Yes.

4      Q     Tell me why it was Chino got stuck with the third

5    floor?

6      A     We dealt out cards.  The one with the highest -- I

7    got an Ace so I took the first floor.

8      Q     How long did you know Chino -- I'm sorry, Martinez

9    and Munoz prior to you purchasing this building?

10      A     Chino, I knew him about seventeen years.  Munoz for

11    about two years before that.

12      Q     So Mr. Munoz, seventeen years you know him?

13      A     Not Munoz, Chino; Quetzal Martinez.

14      Q     And Mr. Munoz you only knew for how long?

15      A     About four years.  Maybe not that far.  Well,

16    before this?

17      Q     I'm asking before you went into the purchasing of

18    the building, 1992, from that point of view, not as of

19    today.  From 1992, October, which is when you say you first

20    purchased the building.

21      A     Right.

22      Q     Prior to that date, how long did you know Mr. Munoz

23    and Mr. Martinez?

24      A     Well, Munoz about a year.  Something like that.

25      Q     About a year?

Lozano - Cross - Hernandez                                    185

1    A    Yeah.

2    Q    And Martinez you knew seventeen years?

3    A    Yeah, about seventeen years.

4    Q    So is it fair to say you were aware of the fact Mr.

5    Martinez had a substantial criminal record?

6              MR. O'MARA:  Objection.

7              THE COURT:  Overruled.

8    Q    Were you aware of that?

9    A    Yeah.  For what they, that have to do with

10   anything?

11   Q    Well, you were making an investment into a

12   building, correct?

13   A    Sure.  And --

14   Q    And you want to be careful about your investment,

15   right?

16   A    Yeah.

17   Q    And these are the two individuals that you went

18   into the investing of this building, correct?

19   A    Sure.

20   Q    There was no other four, five parties out there

21   supporting you in buying the building?

22   A    Not that I know of.

23   Q    Just Munoz and Martinez, right?

24   A    Yes.

25   Q    You were also aware of the fact Munoz had a

Lozano - Cross - Hernandez                                  186

1    substantial criminal record as well?

2        A    Munoz at that time?

3        Q    Yeah.

4        A    Yeah, I know that.  You asked me that question

5    before.  You told me that before.  I said yes.

6        Q    Well, you and I never met before today?

7        A    No.  You just asked me a question, the same

8    question twice.

9                THE COURT:  Hold on a second.  Can we have one

10               question and one answer, please.

11       Q    In terms of you knowing me, have we ever met before

12   today?

13       A    No.

14       Q    We have never spoken at all?

15       A    No.  But you just asked me the question twice.

16               THE COURT:  Please, just ask him and let him

17               answer the question.

18               THE WITNESS:  I'm answering his question.

19       Q    Mr. Lozano, you testified at least four times

20   involving this particular matter; haven't you?

21       A    Yeah.

22       Q    And you began testifying in -- initially back in

23   1994, remember that, back in 1994?

24       A    I don't remember exactly the year.

25       Q    Well, you were approached by one Felix Ortiz and

Lozano - Cross - Hernandez                                187

1    his group?

2        A    Yes.

3        Q    Do you know who Felix Ortiz is?  New York State

4    assemblyman?

5        A    Right.

6        Q    You were approached by him and his group and they

7    talked to you about this building back in 1994?

8        A    Right.

9        Q    Based on that conversation, you agreed to testify

10   on his behalf in a civil case, correct?

11       A    He told me, look --

12       Q    Is that correct?

13       A    Yes.

14       Q    You are certain that you moved into this building

15   in October of 1992, right?

16       A    Yes.

17       Q    I want to direct your attention to this question

18   asked and answer given, this is out of Page 31 of the civil

19   transcript the D.A. provided us with.  This is back in

20   August of 1994.

21            Do you recall being asked this question and giving

22   this answer:

23                "QUESTION:  When did you first move in?

24                "ANSWER:  November '92, I think.

25                "QUESTION:  November '92?

1           "ANSWER:  Yes."

2       That was back in August of 1994.  Do you remember

3   being asked those questions and giving that answer, do you,

4   yes or no?

5       A    Yeah.

6       Q    And it's your testimony today that when you moved

7   into that apartment, that building in '92, you moved in as

8   the owner, right?

9       A    Well, it was really option to buy.

10      Q    Well, again referring you back to your testimony

11  from August of 1994, do you recall being asked these

12  following questions and giving these answers:

13          "QUESTION:  What is the date that you

14          purchased the property?

15          "ANSWER:  '93.

16          "QUESTION:  Is that November of 1993?

17          "ANSWER:  Yeah.

18          "QUESTION:  And was there a period of time

19          before you transferred the property or purchased

20          the property that you lived at the building?

21          "ANSWER:  Yes.

22          "QUESTION:  And how long was that?

23          "ANSWER:  That was about a year before that.

24          "QUESTION:  So you moved in November of '92?

25          "ANSWER:  Yes.

1        "QUESTION:  You were a tenant of Miss Lucas

2        then you purchased the building in November of

3        1993?

4        "ANSWER:  Yes.  We rented with option to buy.

5        That's the way it was."

6        Do you remember being asked those questions and

7   giving those answers back in 1994?

8        A    Yeah.

9        Q    So which is the accurate response, that you moved

10  in in October of '92 or that you moved in in November of

11  '92?

12       A    October of '92.

13       Q    So today it's October of 1992, as far as you can

14  recall?

15       A    Yeah.

16       Q    And did you move in as a tenant or as an owner?

17       A    Like I said, option to buy.  We moved in the

18  building, we took over the mortgage, we were paying the

19  mortgage, then a year after that we purchased the building.

20       Q    Well, according to your previous statement that we

21  just read, you went in as a tenant, right?

22       A    No, we went in there with option to buy.  I

23  said -- if you read it, you must have read it, it said

24  option to buy; didn't it?

25       Q    You're clear you were not the owner of the building

Lozano - Cross - Hernandez                                    190

1    in October of 1992?

2        A    I told you, we took over the mortgage.  You keep

3    asking me the same question.  I keep on answering you the

4    same answer.  Why you keep on asking me the same question?

5        Q    Isn't it a fact that the agreement back then

6    between yourselves and the real estate agent and Miss Lucas,

7    who is the owner, she was the owner of the building,

8    correct?

9        A    Right.

10       Q    Isn't it a fact, sir, that, in fact, the agreement

11   was to have a lease where the rent on that lease was $1900

12   per month because $1900 per month was the cost of the

13   mortgage, correct?  Does the rent equal to the monthly

14   mortgage cost, right?

15       A    We were paying the bank the money.

16       Q    Was the $1900 --

17       A    It wasn't the cost for the -- it was the cost for

18   the mortgage.

19       Q    Right.  And the check that we have there was part

20   of that, they were three months in arrears back then.  You

21   agreed you would pay back that arrearage, right?

22       A    Yes.  She owed some money to the bank and we agreed

23   to pay it, yes.

24       Q    That's why the check is 5700, it equals three times

25   $1900?

sg

Lozano - Cross - Hernandez                                    191

1    A     Most probably right.  I remember that.

2    Q     You went in there as a tenant in November of 1992,

3    according to your testimony in '94, which was only eight

4    months after you actually purchased the building?

5              MR. O'MARA:  I object to the form of the

6         question.

7              THE COURT:  Objection sustained.

8    Q     August of 1994 is only eight months after, nine

9    months after you purchased the building in November of 1993;

10   isn't it?

11   A     Yeah, something like that.

12             MR. HERNANDEZ:  May I have a moment?

13             THE COURT:  Yes.  Can I have the check,

14        please?

15             THE WITNESS:  Sure.

16             THE COURT:  Thank you.

17   Q     Did you live with Martinez and Munoz prior to

18   moving into this particular building in 1992?

19   A     Yes.

20   Q     Where did you live with them?

21   A     525 East 21st Street.

22   Q     How long were you living with them?

23   A     I was living there for about five years, maybe

24   more.  Five or six years, maybe more.

25   Q     Did you do any repairs on the building at 553 47th

Lozano - Cross - Hernandez                                    192

1    Street when you moved in?

2        A    No.

3        Q    You did no repairs?

4        A    525?

5        Q    No, 553 47th Street.

6        A    Oh, yeah, yes.  I told you, the upstairs, we had to

7    put some walls.

8        Q    Who put the walls in?

9        A    Some people we knew.

10       Q    I'm sorry?

11       A    Some people we knew.

12       Q    Some people you knew?

13       A    Yeah.  We hired some people from the block.

14       Q    You didn't do any repairs yourself?

15       A    Sure we did.  Clean up a little here and there, you

16   know.

17       Q    Besides cleaning up, did you do any other kind of

18   repairs like plumbing repairs, rewiring, electrical repairs?

19       A    No.  I don't know how to do that stuff.  I'm not

20   a -- I might have held a pipe here or held a pipe there,

21   that's about it

22               MR. HERNANDEZ:  May I have a moment, your

23        Honor?

24               THE COURT:  Yes.

25               (Pause in proceedings.)

Lozano - Cross - Hernandez                                193

1    Q      Was there an apartment in the basement of 553 47th

2    Street when you moved in?

3    A      When we moved in?

4    Q      Yes.

5    A      No, no apartment at all.

6    Q      What was the condition of that basement, and that

7    would be the floor right below the first floor?

8    A      Right.

9    Q      What was the condition of that particular basement?

10   A      It was all messed up.

11   Q      Give us an idea, how was it messed up?

12   A      It had a lot of junk in there.

13   Q      That's it?

14   A      A lot of junk and maybe it had a stove but that was

15   it.  It wasn't on or nothing.

16   Q      How was it messed up?

17   A      It had a lot of junk in there.

18   Q      Were the walls torn down?

19   A      No, the walls were there.  It's just a lot of

20   stuff.  It was all dirty.  It looked like they had it for a

21   storage room or something.  There was no lights.

22   Q      I'm sorry.  When you say you had others come in and

23   repair this for you, were these companies you hired,

24   contractors?

25   A      No, they weren't contractors.  They were people

Lozano - Cross - Hernandez                                    194

1    that we knew.  They worked around the block.  We knew them.

2         Q    How did you get to know these individuals?

3         A    They worked around the block.  They did a lot of

4    painting and stuff for the building that I lived in and they

5    knew how to put up sheetrock and stuff like that.

6         Q    But you lived at 525 East 21st Street?

7         A    Yeah.

8         Q    That's not around here?

9         A    525 East 21st?

10        Q    Where you lived before you moved here, that's not

11   around that particular building, right?

12        A    No.

13        Q    Now, when you first moved into the building, did

14   you have a checking account?

15        A    No.

16        Q    Banking account of any type?

17        A    No.

18        Q    What did you do for a living prior to moving into

19   the building?

20        A    Well, I used to drive an ice cream truck and we had

21   a truck, me and Quetzal.

22        Q    Who's we?

23        A    Me and Martinez.

24        Q    Did you own the truck?

25        A    Yes.

Lozano - Cross - Hernandez                              195

1    Q    You owned the truck?

2    A    Yeah.

3    Q    This is a New York State truck?

4    A    What other state are we talking about?

5    Q    Isn't it a fact, sir, you had a suspended license

6    at that time?

7    A    Yeah.

8    Q    So how are you driving a truck if you have a

9    suspended license?  You don't have a license to drive; isn't

10   that correct?

11   A    I had a license before that.  My license got messed

12   up afterwards.

13   Q    Your license was not suspended in '92?

14   A    Yeah, it was probably suspended in '92, yeah.

15   Q    Now, do you recall that in '93, November of 1993,

16   all right, you completed the transaction of the building

17   where you were now the owners of the building, correct?

18   A    Yes.

19   Q    Isn't it a fact in December, December 1st of 1993,

20   the very next month after you purchased the building, you

21   stopped making all payments on the mortgage?

22   A    That was the time we stopped?

23   Q    Yeah.  Would you like to -- I'll have you look at

24   what I'll mark as Defense B at this time.

25            THE COURT:  Marked Defendant's B for

sg

Lozano - Cross - Hernandez                                    196

1           identification

2      Q    Take a look at this and I'll show you so you can

3   refresh your recollection.  Just as background, isn't it a

4   fact for your failure to pay this mortgage, you were

5   eventually served foreclosure papers on this mortgage,

6   correct?

7      A    They came through the mail.

8      Q    But you received them, you were aware of them?

9      A    Yeah.

10     Q    Now, looking at this page, sir, does it refresh

11  your recollection as to when was the first month you stopped

12  making payments on this building?

13     A    Yeah.

14     Q    Wasn't that December 1st of 1993?

15     A    Yeah.

16     Q    The very first month after you had title to the

17  building, correct?

18     A    We didn't have the title.  We never got the title.

19     Q    But you were the owner of the building at that

20  point?

21     A    We never got the deed.

22     Q    You say you never got the deed?

23     A    We never got the deed.  We never got the title of

24  the building.

25     Q    Is that the reason for stopping all payments?

                                                              sg

Lozano - Cross - Hernandez                                    197

1      A     Because we were thinking we were getting gypped

2    too.

3      Q     What was the reason -- you never -- in fact, you

4    never made another payment again on the building, not a tax

5    payment, not a rent payment, not a mortgage payment at all

6    in, after December of 1993; did you?  You didn't make any

7    further payments?

8      A     We thought we were getting gypped.

9      Q     Just answer the question.  Isn't that correct?

10     A     Yes.

11     Q     And you were there until sometime in 1998 when the

12   foreclosure had you finally moved from the building?

13     A     No, I moved before that.

14     Q     When did you move?

15     A     I don't remember.  I moved about '97 I think it

16   was.

17     Q     So from '93 to '97 you were in this building,

18   right?

19     A     Yeah.

20     Q     And you never paid anything on the building, no

21   real estate tax, no mortgage payments, nothing, right?

22     A     Well, we paid for a little heat.

23     Q     Heat for yourself?

24     A     But of course.

25     Q     But you were making money off the building; weren't

1  you?

2      A    No, we weren't.  Maybe some tenants here and there.

3  That's why we put in heat.

4      Q    Were you making money off the building or weren't

5  you making money?

6      A    We wasn't making money off the building.  The money

7  we got, we put it into the building as paying heat and stuff

8  like that, light.

9            MR. HERNANDEZ:  I'm sorry, Judge, just give me

10           a minute.

11     Q    I want to refer you back to your 1994 testimony

12  where you were asked the following questions.

13           Do you recall being asked these questions and

14  giving this answer:

15           "QUESTION:  How many units are in the

16           building; do you know?

17           "ANSWER:  There's three floors and the

18           basement.

19           "QUESTION:  And how many units are in the

20           building?

21           "ANSWER:  There's one, two, three, four, five,

22           six.

23           "QUESTION:  Six units?

24           "ANSWER:  Six or seven, yes.

25           "QUESTION:  Do you rent those units out?

1              "ANSWER:  Yes.

2              "QUESTION:  How many of those units are

3          rented?

4              "ANSWER:  Right now, all of them.

5              "QUESTION:  You lived there also as well?

6              "ANSWER:  Yes.  That's including myself."

7          Do you remember being asked those questions and

8     giving those answers?

9     A     Yes.

10    Q     And you're renting out to tenants because you are

11    the owner of the building, you have a right to do that,

12    right?

13    A     Right.  But we also, we didn't get paid.

14    Q     You answered the question.

15    A     I am answering your --

16              THE COURT:  Wait until he asks the question.

17              MR. HERNANDEZ:  Thank you, your Honor.

18    Q     Now, let me go back.  You were driving an ice cream

19    truck with Martinez, right?  This is before you purchased

20    the building, correct?

21    A     Yeah, before we purchased the building.

22    Q     How long were you engaged in that particular job?

23    A     I was -- I did that for a few months.

24    Q     A few months?

25    A     Yeah.

Lozano - Cross - Hernandez                                    200

1        Q     Where were you before that?

2        A     Before that?

3        Q     Yeah.

4        A     Where?

5        Q     Yeah.  What were you doing?

6              Let me be precise.  I'm sorry.

7              What occupation did you have before you were

8    driving the ice cream truck which you indicated was just for

9    a few months, correct?

10       A     For about four or five months, the summertime.

11       Q     During the summer you were driving an ice cream

12   truck?

13       A     Right.

14       Q     With Mr. Martinez?

15       A     Yeah.

16       Q     Prior to that, what was your occupation?

17       A     We used to do deliveries with the truck, as I told

18   you.  We had a truck, small truck.

19       Q     The small truck, are you referring to the same

20   truck that you used to sell ice cream?

21       A     To the truck, the same truck.

22       Q     You used the same truck to make deliveries?  What

23   kind of deliveries?

24       A     Furniture deliveries.  We used to do moving jobs.

25             Not the ice cream truck.  That's a different truck.

Lozano - Cross - Hernandez                                      201

1    Q    You're talking about two trucks?

2    A    I rented -- I already told you this.  We had --

3    Q    Just for -- to be accurate.

4    A    I'm being accurate.  You are trying -- you're

5    trying to put words in my month.

6              MR. O'MARA:  Your Honor, can we just have a

7              question and answer.

8    A    You keep asking me the same question.

9              THE COURT:  Sir, he asks you the question and

10             you answer it.  He can ask you questions and the

11             district attorney can ask you questions.  Okay.

12             Just answers his questions.

13             THE WITNESS:  He keeps on asking me the same

14             question.

15             THE COURT:  That's correct.  I'm the one that

16             rules on whether he can or can't.  Please, next

17             question.

18    Q    I want to make sure, when you said I told you, you

19    are referring to your testimony here today?

20    A    I told you I had a delivery truck and then I rented

21    an ice cream truck, okay, I told you that before.  I keep on

22    repeating.

23             We had a truck with a New York State license that

24    we used to do deliveries then we rented -- I rented an ice

25    cream truck which we sold ice cream from.

Lozano - Cross - Hernandez                                202

1    Q    Thank you, Mr. Lozano.  I don't mean to agitate

2  you.

3    A    But you are.

4    Q    Life is life.

5             MR. O'MARA:  Can we just have questions and

6         answers.

7             THE COURT:  Sustained.  Please, questions and

8         answers.

9    Q    Just to make it clear to the jury, when you said

10 you told me, you're only referring to this?

11            MR. O'MARA:  Objection.

12            THE COURT:  Overruled.

13   Q    When you say you told me, you are only referring to

14 your testimony today, correct?

15   A    Yes.

16   Q    Prior to you having an ice cream truck -- that

17 truck, the ice cream truck, you owned that truck?

18   A    No, we didn't own the truck.  We rented the truck.

19   Q    You rented the ice cream truck?

20   A    I rented the truck for the summer and we sold ice

21 cream.

22            MR. O'MARA:  Your Honor, can he complete the

23        answer?

24            THE COURT:  Yes, complete the answer.

25   Q    What company did you rent the truck from?

sg

Lozano - Cross - Hernandez                                    203

1      A     Custard King.

2      Q     Don't they require an active license before you can

3   rent?

4      A     At that time I had an active license.

5      Q     '93?

6      A     It wasn't '93.

7      Q     '92?

8      A     It was before that.

9      Q     It was before that.  Okay.  So before 1992 you

10  rented an ice cream truck?

11     A     Yes.

12     Q     Okay.

13              THE COURT:  What month and what year did you

14          rent the ice cream truck?

15              THE WITNESS:  When the summer started.

16              THE COURT:  What year?

17              THE WITNESS:  I don't exactly remember the

18          year but I know it was -- '91 I think it was.  I'm

19          not sure.

20     Q     Before that you had another truck that you rented

21  for moving, correct?

22     A     No, we didn't rent that truck.  That truck was

23  ours.

24     Q     So the truck that you used to move belonged to who,

25  who owned it?

sg

Lozano - Cross - Hernandez                                204

1    A    It was Quetzal Martinez and myself.

2    Q    You owned it?

3    A    Yeah.

4    Q    And you used that truck to move furniture?

5    A    For furniture stores and we did moving jobs.

6    Q    And how long were you at that job?  How long were

7    you doing that?

8    A    We did that for a long time.

9    Q    How long?  Give me an idea.  You don't have to be

10   precise.  One year, two years, six months?

11   A    No, it was more than that.  We did that before we

12   got the ice cream truck and after we got the ice cream

13   truck.  We were doing that for a long time.

14   Q    Was it more than one year?

15   A    More.

16   Q    This was with Mr. Martinez?

17   A    Yes.

18   Q    Just prior to moving into the building in October

19   of '92, according to you, you actually then had another

20   truck that you were selling ice cream from?

21   A    No, before that.

22   Q    Let's go on to something else.

23        Did you do any repairs on the basement at all?

24   A    We started working on the basement after we fixed

25   the floor.

sg

Lozano - Cross - Hernandez                                    205

1      Q    Did you put an apartment into the basement?

2      A    An apartment?

3      Q    Yes.

4      A    We started fixing it and finally when we got it

5  fixed we rented to a guy.  He did the repairs himself, most

6  of them.  Painted and stuff like that.

7      Q    Can we go back to why you stopped payment on the

8  mortgage.  What was the reason why you stopped in December

9  of 1993?

10              MR. O'MARA:  Objection.

11              THE COURT:  Sustained.

12      Q    Did you stop paying the mortgage in December 1993?

13              MR. O'MARA:  Objection.  Same objection.

14              THE COURT:  Overruled.

15      Q    Did you stop paying the mortgage in December of

16  '93?

17              THE WITNESS:  I got to answer?  He keeps

18              asking me the same question and I got to keep

19              answering the same question he asked me before?

20              THE COURT:  Yes, sir.

21      A    Can you go back.  You already heard what I told you

22  before.

23      Q    Is the answer you don't know or you forgot?  What

24  was the answer?

25      A    What was the question again?

sg

Lozano - Cross - Hernandez                                      206

1    Q    Did you stop paying the mortgage in December of

2    1993?

3    A    Yeah.

4    Q    Can you tell us why?

5              MR. O'MARA:  Objection.

6              THE COURT:  Objection sustained.  Asked and

7         answered.

8              Counsel, next question.

9    Q    You mentioned there's a reason why you stopped

10   paying the mortgage.  What exactly happened?

11             MR. O'MARA:  Objection.

12             THE COURT:  Overruled.

13   Q    Give us the details what happened.

14   A    Mr. O'Hara, this guy, he comes around saying he

15   wanted to take over the building.  We never got the deed

16   from the lawyer, we never got the title.  You know, all this

17   stuff, you know, we never received these things so we

18   stopped paying.

19   Q    That was the reason?

20   A    Well, yeah.

21   Q    Did anyone ever come up to you at any time after

22   that, for example, during '94 and tell you you had to, tell

23   you they had to remove you from the building, you couldn't

24   live there?

25   A    No.

Lozano - Cross - Hernandez                                    207

1    Q    Did anyone tell you at that point you were not the

2    owners of the building?

3    A    The owners of the building, no.

4    Q    Did you take any steps?  For example, you spoke to

5    Mr. Ortiz, the New York State assemblyman.  You spoke to him

6    personally?

7    A    Yeah.

8    Q    Did you make any complaint to Mr. Ortiz about this

9    particular problem?

10   A    He told me he couldn't help me.

11   Q    With the building?

12   A    Yeah.

13   Q    In what way?

14   A    He can't do nothing for me.  Can he?

15   Q    I'm sorry?

16   A    I asked him.  He said he couldn't do anything for

17   me.

18   Q    What is it exactly about Miss Lucas and Mr. O'Hara

19   that you were concerned about that caused you to want to

20   stop payment on the building?  Did they do anything to

21   interfere with your use of the building?

22   A    If you purchase something you get a deed or a

23   title.  When I buy a car I get a deed or I get a title.  I

24   didn't have any.

25   Q    So you're saying the only reason you felt

Lozano - Cross - Hernandez                                    208

1    suspicious because you didn't have a deed?

2                   MR. O'MARA:  Objection.

3                   THE COURT:  Overruled.

4       A    Yes.

5       Q    Your answer is yes?

6       A    Yeah.

7       Q    Did you inquire at the real estate agency as to

8    where your deed was?

9       A    No.

10      Q    Did you inquire to any state agency regarding who

11   owned the building at 553 47th Street from the years 1993 to

12   1997?

13      A    No.

14      Q    Did -- do you know if any of your other partners

15   made any such inquiry?

16      A    I don't know.  You'll have to ask them.

17      Q    Mr. Lozano, you, yourself have a criminal record;

18   don't you?

19      A    Ha?

20      Q    You, yourself have a criminal record; don't you?

21      A    If you call misdemeanors and such like that, yeah.

22      Q    These records go back to 1979, correct?

23      A    Yeah, '79.

24      Q    It started out in Jersey, right?

25      A    Yeah.

Lozano - Cross - Hernandez                                209

1    Q    And you got convicted by a jury several times?

2    A    Several times?

3    Q    Several times.  Twice?

4    A    No, once.

5    Q    This was in Newark?

6    A    Yes.

7    Q    Back in April of '79?

8    A    Yeah.

9    Q    Correct?

10   A    Ah-ha.

11   Q    You were found guilty of burglary, possession of

12   burglary tools, right?

13   A    Burglary tools.  Let me tell you what happened.

14        I was listening to my uncle's radio in the car.  I

15   turn on the radio, we didn't turn the car on so the battery

16   got wasted.  So I went to the house that he was having a

17   party at, he went to that party, I went back to the house

18   and I asked the guy in front of the house if he could lend

19   me a pair of pliers.  As I came back I got stopped by the

20   cops.  I was carrying burglary tools.

21   Q    It's not illegal to carry pliers in New Jersey?

22   A    That's why I got stopped.

23   Q    It's because you were engaged in conduct that

24   indicated you were using those pliers for the purposes of

25   perpetrating a burglary?

Lozano - Cross - Hernandez                            210

1      A    Perpetrating, no, I don't think so.

2      Q    You pled guilty to possession of burglary tools?

3      A    That I had a pair of pliers, yes.

4      Q    That you were possessing burglary tools.  You

5 didn't admit guilt to having a pair of pliers?

6      A    That's all I had.  I forgot, I had a knife, a knife

7 I used too.  I forgot I had a knife.

8      Q    You didn't get convicted of possession of a weapon?

9      A    They said that, that's part of it.  I don't know.

10     Q    Let's go to November of 1980 here in Queens, New

11 York City.  In New York City again you were arrested for

12 attempted burglary.

13     A    Attempted burglary.  We went to my friend's house.

14 I thought that was the house.  We went to visit him.  I

15 thought that was his house.  I knocked on the door and I

16 went around the back.  When I went around the back this guy

17 comes out with a gun pointing at my friend, me and my

18 friend.  My friend was knocking on the door and I went

19 around the back.

20     Q    When you were arrested for attempted burglary in

21 the third degree and charged with criminal trespass and you

22 took a guilty plea to criminal trespass, didn't you, right?

23     A    Yeah.

24     Q    It's not because you were a petty thief back in

25 those days, it's just because of the reasons you're telling

sg

Lozano - Cross - Hernandez                              211

1   us now?

2                    MR. O'MARA:  I object to that question.  It's

3            ridiculous.

4                    THE COURT:  Sustained.

5       Q    You weren't convicted of any other crimes since

6   then, right?

7       A    No.

8       Q    Now, back in July of 1993, did you have an occasion

9   to visit the state of Virginia?

10      A    Yes, yes.

11      Q    You went with your friends, Martinez and Munoz?

12      A    No, you're wrong there.

13      Q    You went with Munoz?

14      A    With Munoz, not Martinez.

15      Q    Martinez had gone down there just prior to you;

16  hadn't he?

17      A    Most probably.

18      Q    You are not aware of the fact that Martinez went to

19  Virginia a few weeks before?

20      A    I'm aware of that.

21      Q    You are also aware he was able to obtain a license

22  down in Virginia, right?

23      A    Yeah.

24      Q    He told you, right?

25      A    Sure.

Lozano - Cross - Hernandez                                        212

1    Q    And isn't it a fact, sir, that you at that time had

2    no New York State license?

3    A    Yeah.

4    Q    Right.  You then applied for a license in the State

5    of Virginia, right?

6    A    Yes.

7    Q    And you went to a state agency which would be

8    equivalent to the Department of Motor Vehicles in New York

9    State, correct, to apply for this license, correct?

10   A    Yes.

11   Q    And they gave you forms, correct?

12   A    Yes.

13   Q    And on those particular forms it requires that you

14   tell the truth regarding the information they're asking,

15   right?

16   A    Yes.

17   Q    Subject to penalty of the law, right?

18   A    Yeah.

19   Q    When you filled out those forms, you knowingly

20   filled out this form giving them an address that was in

21   Virginia, right?

22   A    Yeah.

23   Q    And when you did that, you knowingly understood

24   that you didn't live in Virginia?

25   A    Yeah.

Lozano - Cross - Hernandez                                      213

1     Q    And you knew that when you put that address down,

2    it was a lie, correct?

3     A    Yeah.

4     Q    And you are aware by doing that you committed a

5    crime in the State of Virginia?

6     A    I needed a license because people were asking us

7    for a license when we used to make their deliveries.  I

8    needed some kind of I.D. to show.

9               MR. HERNANDEZ:  I'm sorry, Judge, just a

10              moment.

11              (Pause in proceedings.)

12     Q    So you're saying you bought the license only for

13    the purpose of driving your car to do deliveries, right?

14     A    Truck.

15     Q    Truck.  You didn't use that license for the

16    closing, right?

17     A    No.

18     Q    I just want you to be aware -- you got this license

19    in July of 1993, correct?

20     A    I don't remember exactly what year.

21              MR. HERNANDEZ:  Let's have this marked as

22              Defense C.

23              THE COURT:  It will be marked Defendant's C

24              for identification.

25     Q    Do you -- you recognize what that is, right?

1          Take a look at that.  You recognize that, right?

2     A    Yeah.

3     Q    Does that refresh your recollection when the

4     license was issued to you?

5     A    Yeah.

6     Q    What was the date?

7     A    7/8/93.

8     Q    Thank you.

9          MR. HERNANDEZ:  If I may just have a moment,

10              Judge, to take a look at what we have here.

11              I beg your patience, Mr. Lozano.

12              (Pause in proceedings.)

13    Q    How many times -- when -- you're saying that you

14    saw -- I'm sorry, how many times -- when was the first time

15    you recall seeing John O'Hara once you moved into 553 47th

16    Street?

17    A    A few months after.

18    Q    A few months?

19    A    I'm not sure.  About three months after.  I know it

20    wasn't snowing.  It wasn't that cold.

21    Q    You didn't use this driver's license from

22    Virginia -- did you use this driver's license from Virginia

23    to show as I.D. at the time of the closing?

24    A    No.

25    Q    You didn't have a driver's license, right?

Lozano - Cross - Hernandez                                    215

1        A    My license was suspended.

2        Q    So you had no New York State license at that time?

3        A    I just said it was suspended.

4        Q    Wasn't it revoked by that time for your failure to

5    pay --

6        A    Suspended.

7        Q    It was suspended for failure to pay, for all the

8    fines on the license; wasn't it?

9        A    Could be.

10       Q    Didn't they request you show them a license during

11   the closing?

12       A    I don't remember.  I don't think they --

13       Q    What did you use for identification at the closing?

14            Let me put you in the right date.  I'm referring to

15   1993, September, October 1993, before you actually purchased

16   the building in November, in that period, weren't you

17   supposed to show them some kind of identification?

18       A    I had my Social Security card with me.

19       Q    No picture identification?

20       A    I don't remember.  Maybe we did.  I don't know.

21       Q    You didn't bother showing them your Virginia

22   license?

23       A    I don't remember if we did.  I don't remember.

24       Q    Let me read to you the following.  This is Page

25   169.

Lozano - Cross - Hernandez                          216

1              THE COURT:  Do you remember being asked the

2        following question and giving the following answer?

3              On what date?

4              MR. HERNANDEZ:  Going back to May of 1997.

5   Q     Do you remember being asked these questions and

6   giving these answers:

7              "QUESTION:  And is that your driver's license,

8        sir?

9              "ANSWER:  Yes.

10             "QUESTION:  It was -- so this was your

11       driver's license?

12             "ANSWER:  But not the one I showed them when I

13       closed.

14             "QUESTION:  What driver's license did you show

15       when you closed?

16             "ANSWER:  That was, the one that I have from

17       New York City.

18             "QUESTION:  You have a New York State driver's

19       license?

20             "ANSWER:  Yes.

21             "QUESTION:  Do you have that with you, sir?

22             "ANSWER:  No.  I had it at that time."

23       Do you remember being asked those questions and

24   giving those answers?

25   A     Yeah.

Lozano - Cross - Hernandez                               217

1      Q     Now, how many times in total do you recall seeing

2   Mr. O'Hara?

3      A     I don't know.  A few times.  October of what year?

4      Q     From the period of time of 1992, October, November,

5   to November of 1993, during that period of time, how many

6   times do you recall seeing Mr. O'Hara?

7      A     Like I said before, in '92 I probably didn't see

8   him because I seen him when it started getting warmer.

9      Q     It was months later before you saw him for the

10  first time?

11     A     It wasn't that cold so I guess around March, around

12  there.

13     Q     For the first time?

14     A     Yeah, probably.

15     Q     So from March of '93 right, from March of '93 to

16  November of '93 can you approximate how many times you saw

17  Mr. O'Hara and spoke to him?

18     A     Once, twice.  I don't know.

19     Q     Once?

20     A     Not once.  More than one.  About twice or three

21  times.

22     Q     Two or three times?

23     A     Yeah.

24     Q     And you're saying it was during one of these

25  occasions, the very first time you saw him, did he approach?

Lozano - Cross - Hernandez                                    218

1   Did he ask you anything the first time you saw him?

2       A    He came over.  He said, you buying this building?

3   We said yeah.  He said, oh.  He told us who he was.

4       Q    Did you know of him before that date that he

5   approached you?

6       A    No.

7       Q    You never had occasion to meet him in any way,

8   right?

9       A    No.

10      Q    He approached you and he asked you if you were

11  buying the building?

12      A    Yeah.

13      Q    Any other conversation you had with him at that

14  point?

15      A    Well, later on he told us, I might have some mail

16  coming here.  Can you hold it for me?

17      Q    When you say later on, that same day?

18      A    That same day, yeah.

19      Q    Does that mean he went away and came back later on?

20      A    No, I think it was that same day, same time.  You

21  are talking about a while back.  Having a conversation with

22  somebody is not something you are going to remember word by

23  word or exactly what happened.  He's not that interesting

24  that I would remember everything that he told me.

25      Q    You do recall him telling you something on that

Lozano - Cross - Hernandez                                    219

1   day?

2        A    Yes.

3        Q    What do you recall him telling you on that date?

4        A    He introduced himself.  He said if some mail came

5   here, can you hold it for me?

6        Q    That's all he told you?

7        A    That's it.

8        Q    You saw him again after that on a different day?

9        A    Yeah.

10       Q    Do you know, how soon after that first meeting did

11   you see him again?

12       A    I don't keep an account seeing what day he came and

13   write it down on my calendar.  I don't remember exactly when

14   he came around but I seen him a few days around after.

15       Q    Was it cold?  Was it hot?  Do you recall the

16   weather?

17       A    I don't recall the weather.  I know the first time

18   I met him it was spring probably.

19       Q    So he came around a second time?

20       A    Yes.

21       Q    Did he have a conversation with you the second

22   time?

23       A    Yeah.

24       Q    What did he say on the second time?  Just what you

25   recall.  Just what you remember.

1    A    He said if somebody -- he said if he had any mail.

2    I gave him a few things.  Like I said, he used to have

3    Victoria Secrets come over, the catalogue.  I gave him that.

4    That's all the mail he used to have coming over to the

5    building.

6    Q    That was it?

7    A    Maybe one of them bullshit mail.  Never no real

8    letter or nothing like that.

9    Q    Just to clarify in my mind, you're saying the

10   second time you conversed with him you just talked about

11   mail?

12   A    He told me, yo, if someone comes over and they ask

13   I live here, tell them I live here.

14   Q    That happened the second time?

15   A    Probably.

16   Q    Did he ever come around again after that second

17   time to speak to you personally?

18   A    Sometime he would come around.  He would talk to

19   Ralph if he was outside.

20   Q    Did he ever come around to speak to you personally?

21   A    Maybe.  I must have seen him a few months after

22   that.

23   Q    Do you recall what the nature of that conversation

24   was?

25   A    No.  Just say, like, you know, guy talk.  What's

1   up?  How you doing?  That's it.

2              MR. HERNANDEZ:  Your Honor, if I may have a

3       moment.  I beg your pardon, sir.

4              (Pause in proceedings.)

5              MR. HERNANDEZ:  I have no further questions.

6       Thank you very much.

7              MR. O'MARA:  I have very briefly redirect,

8       your Honor.

9   REDIRECT EXAMINATION

10  BY MR. O'MARA:

11      Q    Mr. Lozano, in October of 1992 when you first gave

12  the money and moved into the building, did you receive any

13  form of lease or anything like that?

14      A    No.

15      Q    Now, the criminal record we're taking about now

16  from 20 years ago in New Jersey regarding the pliers, what

17  kind of penalty was imposed on you for that?

18      A    It was a fine, I think it was.

19      Q    And what about the misdemeanor trespass in I guess

20  it was Queens 19 years ago, what happened in that?

21      A    I don't remember.

22      Q    Did you go to jail?

23      A    No, I didn't do no jail time, not at all.

24      Q    Now, the mail at 553 47th Street, where is the mail

25  delivered there?

Lozano - Redirect - O'Mara                                    222

1      A    In the mailbox.

2      Q    Is that out front, in back?

3      A    It's out front.

4      Q    Now, finally, again during the period of October

5  '92 through 1993, did Mr. O'Hara ever live or stay at 553

6  47th Street?

7      A    Never.

8              MR. O'MARA:  I have no further questions.

9              MR. HERNANDEZ:  I have no further questions.

10             THE COURT:  You're excused.

11             (Witness excused.)

12             MR. O'MARA:  Your Honor, at this time the

13        People rest.

14             THE COURT:  Ladies and gentlemen, we're going

15        to take a short recess and we will be right back.

16             Do not discuss the case among yourselves or

17        anyone else, do not come to any conclusions until

18        all the evidence is in.  We will see you in a few

19        moments.

20             (Jury left the courtroom.)

21             THE COURT:  Counsel, at the end of the

22        People's case, you have a motion?

23             MR. HERNANDEZ:  Yes, I have a motion for a

24        trial order of dismissal on the ground I believe

25        the People have not made out a prima facia case in

sg

1      this matter.

2          I think the essence in this case with respect

3      to charge number one, filing a false instrument

4      first, Penal Law Section 175.35, there's no

5      evidence here that my client signed that card and

6      submitted it as a card of his residence.  None at

7      all.  The closest they came to establishing that

8      was on voir dire of Miss Keith, the custodian of

9      the record, where she said yes, she knew it was his

10     signature underneath what was clearly a cut and

11     paste signature.  There's no testimony where that

12     cut and paste signature came from or when it was

13     actually signed.  We don't know what's that the

14     basis of.

15         On cross-examination, however, of Miss Keith,

16     I brought out that her assertion that she knew it

17     was Mr. O'Hara's signature was completely a guess

18     job.  She had no personal knowledge that what was

19     underneath there was Mr. O'Hara's signature.  She

20     was not present when this card was made.  There was

21     no evidence and she had no record of what that

22     document was before it was altered.  There's no

23     evidence in this case that demonstrates the

24     original signature on that card, the basis of

25     charges one and two, is, in fact, Mr. O'Hara's

sg

Proceedings                                                  224

1          signature.  I don't think they even made out a

2          prima facia case in this matter.

3                  MR. O'MARA:  I'd like to respond to that.

4                  THE COURT:  Is that your total argument?

5                  MR. HERNANDEZ:  Yeah.  I think basically once

6          you have those charges, because I believe the next

7          five charges really ride with charges one and two,

8          they're all predicted on the same instrument in

9          this case, so that argument I think applies to all

10         seven charges.

11                 THE COURT:  Yes, counsel.

12                 MR. O'MARA:  Your Honor, first of all, as it

13         relates to that, there's a factual distinction

14         here.  The buff card in evidence bears more than

15         one signature for the defendant.  There's a

16         signature on the back which is clearly the original

17         signature.

18             As far as that being the signature of Mr.

19         O'Hara, there's a provision in the law when there's

20         a signature that exists, it's the signature of the

21         person in question unless it is rebutted.

22             That, in this case, is strengthened by the

23         evidence from the witnesses which suggests that

24         that same individual, that being Mr. O'Hara, was

25         identified at 579 61st Street by Mr. Perras and

Proceedings                                                    225

1          then at 553 47th Street by Mr. Lozano and Mr. Munoz

2          as having the individual pretending to use that

3          particular address drawing a direct logical

4          connection to the use of the same address by the

5          same individual on the buff card.

6                  THE COURT:  Motion denied.  Get the jury in,

7          please.

8                  MR. HERNANDEZ:  Judge, I made a mistake

9          yesterday with Mr. Munoz.  I showed him the

10         foreclosure papers that I had marked as Defendant's

11         A for identification.  Today I showed those same

12         foreclosure papers to Mr. Lozano and I ask them be

13         marked as Defense B.

14                 THE COURT:  It will be A.

15                 MR. HERNANDEZ:  Thank you.

16                 THE COURT:  Bring the jury in, please.

17                 COURT OFFICER:  Jury entering.

18                 (Jury enters the courtroom.)

19                 THE COURT:  All jurors being present, do both

20         sides waive the jury roll call?

21                 MR. O'MARA:  So waived.

22                 MR. HERNANDEZ:  So waived.

23                 THE COURT:  Ladies and gentlemen, we're going

24         to resume at 2:15 so you'll have a nice lunch hour.

25         Please make sure you're back here at that time.

Proceedings                                                226

1           The admonitions stay in effect, not to discuss

2      the case among yourselves or anyone else, not to

3      come to any conclusion until all the evidence is in

4      and I charge you on the law.  See you at 2:15.

5           (Jury left the courtroom.)

6           THE COURT:  Counsel, will you go back to my

7      chambers and work on the charge?

8           MR. O'MARA:  Your Honor, also to be clear on

9      the record, at this time I request all reverse

10     Rosario material, statements taken from anyone.

11          MR. HERNANDEZ:  The only thing I'm aware of, I

12     have three witnesses coming in.  They're coming in

13     with documents relating to mailing addresses.

14     These are documents I told that were already

15     introduced at the previous trial.

16          THE COURT:  Any problem with that?

17          MR. O'MARA:  As far as the documents, I have

18     no problem.

19          MR. HERNANDEZ:  I'll let him look at it.

20          (Lunch recess taken.)

21          A F T E R N O O N   S E S S I O N

22          THE COURT:  Case on trial, please.

23          Where did -- call them in from outside,

24     please.  Someone get the jury, please.

25          MR. O'MARA:  Your Honor --

Proceedings                                              227

1          MR. HERNANDEZ:  Let me make the offer on the

2       record.

3          It is my intention to call Mr. Robert

4       Dellasala.  Mr. Dellasala is a title searcher.  The

5       purpose of him testifying here is to introduce two

6       documents that are certified from the city

7       registry.  Those documents will establish in 1990,

8       1991 Magaly Lucas had a deed in her name.  And in

9       1993 there was a deed in the name of Lozano, Munoz

10      and Martinez.

11         MR. O'MARA:  I have no objection to the deeds.

12      The deeds are fine.  I don't want all the extra

13      attachments, as hearsay.

14         THE COURT:  We have it resolved.

15         I don't know what's happening with the statute

16      on sequestration.  It seems to me it ended.  If

17      both sides agree, we don't have a problem.  If you

18      have no problem, we can send them home.

19         MR. O'MARA:  When?

20         THE COURT:  After the charge.  If it becomes a

21      problem --

22         MR. O'MARA:  Tomorrow or Friday?

23         THE COURT:  I'm not going to charge them until

24      Tuesday.  It doesn't make any sense -- wait.

25         MR. HERNANDEZ:  If we have no exception, you

Proceedings                                                228

1          can charge them tomorrow and they can go home.

2                  MR. O'MARA:  That I have no problem with.  I

3          don't want to charge on Friday and --

4                  THE COURT:  I won't do summations and charge

5          until Tuesday.

6                  If I have to put it over, it won't make sense.

7          You have no problem with that?

8                  MR. HERNANDEZ:  No.

9                  THE COURT:  I have to check the statute.  I

10          think it's up in the air.

11                 MR. HERNANDEZ:  I think we'll finish tomorrow.

12                 (Jury enters the courtroom.)

13                 COURT OFFICER:  Jury entering the courtroom.

14                 THE COURT:  All jurors being present, both

15          sides waive the jury roll call?

16                 MR. O'MARA:  So waived.

17                 MR. HERNANDEZ:  So waived.

18                 THE COURT:  Please call your first witness.

19                 MR. HERNANDEZ:  Yes, your Honor.

20                 At this time I would like to call Mr. Robert

21          Dellasala.

22     R O B E R T   D E L L A S A L A,  called as a witness,

23     having been first duly sworn, was examined and testified as

24     follows:

25

                                                              sg

Dellasala - Direct - Hernandez                                     229

1            THE CLERK:  Sir, please state your name for

2       the record and spell it.

3            THE WITNESS:  Bob Dellasala, D-E-L-L-A-S-A-L-A.

4            THE COURT:  Mr. Dellasala, you may be seated.

5            Give him some water.

6            You may inquire.

7            MR. HERNANDEZ:  Thank you, your Honor.

8  DIRECT EXAMINATION

9  BY MR. HERNANDEZ:

10      Q    Mr. Dellasala, what is your present occupation?

11      A    I'm a title examiner, independent.

12      Q    You are a what?

13      A    Independent title examiner.

14      Q    What exactly does a title examiner do?

15      A    We search records.

16      Q    What do you do as a title examiner?

17      A    What I do, if it's a full service, I do 60 year

18  chains looking for liens, judgments, easements, any kind of

19  open mortgages or whatever.

20      Q    When you say you search records, records of what?

21      A    City records.

22      Q    And they're records related to what?

23      A    To the properties that I'm searching.

24      Q    Now, did you make -- pursuant to a request, did you

25  search the records for the property located at 553 47th

Dellasala - Direct - Hernandez                                    230

1    Street in Brooklyn?

2         A    Yes.

3         Q    Okay.  Did you search those records for the years

4    beginning in 1990 and going through 1993?

5         A    Yes.

6         Q    And as a result of your search, what was the result

7    of that search?

8         A    Well, 1990 --

9         Q    Did you come up with any documents?

10        A    Yes.

11        Q    Do you have any of those documents here?

12        A    Yes.

13        Q    Are these documents certified?

14        A    Yes.

15        Q    Are they certified from the city registry?

16        A    Yes.

17             MR. HERNANDEZ:  Judge, I'd like those marked

18             as Defendant's B and C.

19             MR. O'MARA:  If I can see them, I probably

20             won't object.

21             THE COURT:  Show them to the district

22             attorney.

23             MR. HERNANDEZ:  I'm sorry.

24             (Document handed to counsel.)

25             MR. O'MARA:  I have no objection, your Honor.

                                                                  sg

Dellasala - Direct - Hernandez                              231

1              THE COURT:  It will be B and C in evidence.

2              (So marked.)

3              MR. HERNANDEZ:  Thank you very much.

4              I want to make sure he marks this 1B and this

5         1C.

6         Q    Now, could you look at what has been marked Defense

7    B as evidence, sir.

8         A    Yes.

9         Q    What is that document?

10        A    This is a deed dated 5/4/90.

11        Q    It's a deed to what property?

12        A    553 47th Street.

13        Q    What year?

14        A    1990.

15        Q    And who is it made out to?  What is the name on

16   that deed?

17        A    The ownership would be to a Magaly Lucas.

18        Q    Could you look at what's marked Defendant's C as

19   evidence.  What is that document?

20        A    It's a deed.

21        Q    Is it a deed relating to the property 553 47th

22   Street?

23        A    Yes.

24        Q    What year is it dated?

25        A    10/28/93.

Dellasala - Cross - O'Mara                                    232

1      Q     What are the name or names on that deed?

2      A     Quetzal Martinez, Roberto Lozano and a Ralph Munoz.

3      Q     Those deeds were all registered in the city?

4      A     Yes.

5      Q     Filed for that property?

6      A     Yes.

7                  MR. HERNANDEZ:  I have no further questions.

8                  MR. O'MARA:  I have a very brief cross.

9                  THE COURT:  Yes.

10   CROSS-EXAMINATION

11   BY MR. O'MARA:

12     Q     Good afternoon, ladies and gentlemen.

13           Mr. Dellasala; is that right?

14     A     Yes.

15     Q     The deeds that you obtained, do they indicate the

16   signatures of the individuals that were listed on the deed,

17   Mr. Martinez, Mr. Munoz and so forth?

18     A     It's the seller that has to sign.

19     Q     Excuse me?

20     A     The seller has to sign.

21     Q     At no point is the buyer, who's in possession of

22   the property, required to sign anything?

23     A     Not the deed, no.

24     Q     Now, in addition to searching for the deed, do you

25   know what an engineer's report is?

sg

1    A    No.

2    Q    In connection with the sale of a building.  How

3  about an inspector's report?

4    A    No, I do not do the inspections.

5    Q    You didn't look for inspections in this case?

6    A    I don't do inspections.

7    Q    I didn't ask you if you did inspections.  I asked

8  you if you looked to see whether an inspection was done.

9    A    No.

10    Q    Is there anything there that indicates the receipt

11  of these deeds by any individual?

12    A    I really don't understand the question.

13    Q    Is there anything there that says, I received this

14  deed or given the deed to somebody?

15    A    It's certified.  It's a city document.

16    Q    That means the city received it?

17    A    Yes.

18         MR. O'MARA:  Thank you.  I have no further

19         questions.

20         MR. HERNANDEZ:  Just very brief.

21  REDIRECT EXAMINATION

22  BY MR. HERNANDEZ:

23    Q    Isn't it a matter of practice, the seller is the

24  only one that is required to sign the deed?

25    A    Always.

1                 MR. HERNANDEZ:  I have no further questions.

2                 MR. O'MARA:  I have no further questions.

3                 THE COURT:  You're excused.

4                 (Witness excused.)

5                 THE COURT:  Please call your next witness.

6                 MR. HERNANDEZ:  At this time the defense would

7         like to call Mr. Tony Lynch.

8    T O N Y   L Y N C H,  called as a witness, having been

9    first duly sworn, was examined and testified as follows:

10                THE COURT:  Please give your name and spell

11        your last name for the court reporter.

12                THE WITNESS:  My name is Tony Lynch,

13        L-Y-N-C-H.

14                THE COURT:  You may inquire, counsel.

15   DIRECT EXAMINATION

16   BY MR. HERNANDEZ:

17        Q    Mr. Lynch, by whom are you presently employed?

18        A    The Office of Court Administration.

19        Q    Now, what exactly does the Office of Court

20   Administration, what particular role does it play?

21        A    The Office of Court Administration is the official

22   keeper of records for all attorneys admitted to practice law

23   in the State of New York.

24        Q    What kind of records does that office keep of

25   attorneys that practice law in the State of New York?

Lynch - Direct - Hernandez                                    235

1     A    Records pertaining to their registration.

2     Q    Can you explain to the jurors what you're referring

3 to when you talk about registration?

4     A    All attorneys who are admitted to practice law must

5 file a registration statement prior to being admitted then

6 every two years after they are admitted.  That statement

7 contains basic biographical information.

8     Q    Are they required to state truthfully on those

9 statements what their residences are?

10    A    Yes, sir.

11    Q    And they're subject to penalties if they state

12 misinformation on those registration forms?

13    A    There's an affirmation they sign indicating what

14 they put on the form is true.

15    Q    Did you perform a search for any registrations of

16 one John O'Hara from 1992, '93?

17    A    Yes, from 1993.

18    Q    You did?

19    A    Yes.

20    Q    Were you able to locate any records relating to his

21 registration?

22    A    Yes.

23    Q    Do you have that record with you?

24    A    Yes, I do.

25             MR. HERNANDEZ:  Could I have that record

1             marked D for defense.

2                      THE COURT:  That will be Defendant's D.

3                      MR. O'MARA:  May I see it, your Honor?

4                 I have no objection to its admission into

5             evidence.

6                      THE COURT:  It will be D in evidence.

7                 (So marked.)

8                      MR. HERNANDEZ:  Thank you, counsel.  I

9             appreciate it.

10     Q    The item now marked D in evidence for the defense,

11     what is it, sir?

12     A    It's a copy of the registration form that was filed

13     with the Office of Court Administration in 1993.

14     Q    A copy from -- how do you keep the originals?

15     A    On microfilm after a certain period of time.

16     Q    That particular document you have in your hand,

17     does it have a name on it?

18     A    Yes, it does.

19     Q    What name is that?

20     A    John Kennedy O'Hara.

21     Q    Does it have an address on it?

22     A    There's two addresses.

23     Q    Can you tell us what the addresses are?

24     A    Home address listed here, 553 47th Street, Brooklyn

25     New York 11220.  And a business address of the firm of

1    Montclare & Guay, at 61 Broadway, tenth floor, Suite 1000,

2    New York, New York 10006.

3        Q    And the home address again is 553 47th Street,

4    Brooklyn?

5        A    Yes.

6            MR. HERNANDEZ:  Thank you.  I have no further

7            questions.

8            THE COURT:  You may inquire.

9            MR. O'MARA:  Thank you.

10   CROSS-EXAMINATION

11   BY MR. O'MARA:

12       Q    Mr. Lynch, that document is automatically sent out

13   every two years to attorneys, right?

14       A    Yes, it is.

15       Q    Can you tell from looking at that where that

16   document was sent?

17       A    At the time this was sent, it would have been sent

18   to 61 Broadway.

19       Q    That would have been the business address?

20       A    The business address, correct.

21       Q    At the time it was sent, the address, the home

22   address that you had of record was what?

23       A    From what I can read here at the time, it looks

24   like 579 61st Street.

25       Q    If I'm an attorney and I receive one of these

1    documents from you at work or where ever you sent it, can I

2    then cross out my home address and put in a new one?

3         A    The attorney makes whatever changes that need to be

4    made.

5         Q    If I put down I live in Trump Plaza, then your

6    records would indicate I live in Trump Plaza?

7         A    It would reflect it.

8         Q    You don't perform any independent check on that?

9         A    Only if there's a request -- only when we want to

10   verify information.

11        Q    Do you have a home phone number for that address?

12        A    No, we don't list home telephone numbers.

13        Q    Now, do you have in your records, as far as you are

14   able to tell, any record of anything sent, anything to 553

15   47th Street?

16        A    In 1993?

17        Q    Right.

18        A    I would have to check.

19        Q    You don't know?

20        A    No.

21             MR. O'MARA:  Thank you.  I have no further

22             questions.

23             MR. HERNANDEZ:  No further questions.

24             THE COURT:  Thank you.  You're excused.

25             (Witness excused.)

Jimenez - Direct - Hernandez                                       239

1           THE COURT:  Call your next witness.

2           MR. HERNANDEZ:  At this time I'd like to call

3      Mr. Raymond Jimenez.

4  R A Y M O N D   J I M E N E Z,  called as a witness, having

5  been first duly sworn, was examined and testified as

6  follows:

7           THE CLERK:  Please state and spell your name

8      for the record.

9           THE WITNESS:  Raymond Jimenez, J-I-M-E-N-E-Z.

10           THE COURT:  You may inquire, counsel.

11           MR. HERNANDEZ:  Thank you, your Honor.

12  DIRECT EXAMINATION

13  BY MR. HERNANDEZ:

14      Q    Mr. Jimenez, by whom are you presently employed?

15      A    American Express.

16      Q    In what capacity?

17      A    Assistant records custodian.

18      Q    Pursuant to a subpoena, were you asked to do a

19  search for records pertaining to one John O'Hara?

20      A    Yes, I was.

21      Q    And what years were you asked to look for?

22      A    For the period of February 1993 through October

23  1993.

24      Q    Did you perform that search?

25      A    Yes, I did.

1      Q    Were you able to come up with any records?

2      A    Yes, I have.

3      Q    The records that you came up with, did you bring

4   them to court with you?

5      A    Yes, I have.

6           MR. HERNANDEZ:  Can I have these records

7           marked as Defense E.

8           THE COURT:  It will be Defendant's E.

9           (So marked.)

10          (Shown to counsel.)

11     Q    Looking at Defense E, are these the records you

12   were able to acquire?

13     A    Yes, they are.

14     Q    Are these records kept in the regular course of

15   business?

16     A    Yes.

17     Q    Is it in the regular course of business for

18   American Express to keep such records?

19     A    Yes, it is.

20     Q    And is the information on these records established

21   contemporaneous to when you received that information?

22     A    That's correct.

23          MR. HERNANDEZ:  Your Honor, at this time I

24          would like to move it in as E for evidence.

25          MR. O'MARA:  I have no objection.

sg

1         THE COURT:  It will be Defendant's E in

2    evidence.

3         (So marked.)

4    Q    Now, these documents, sir, are you familiar with

5    how they are sent or how frequently they are sent to a

6    particular address?

7    A    Yes, I am.

8    Q    What is the process?

9    A    These are monthly billing statements.

10   Q    And what are the addresses on these statements?

11   A    The address is -- the card holder is John Kennedy

12   O'Hara.  The address listed is 553 47th Street, Brooklyn,

13   New York 11220.

14   Q    And is that the address on all the records you have

15   there?

16   A    That is the address listed on here for the period

17   of February '93 through September 1993.

18   Q    Do you have any other records other than those?

19   A    The October 1993 statement shows an address of --

20   Apartment 2I with the address of 579 61st Street, Brooklyn

21   New York 11220.

22   Q    What date is that?

23   A    That is for the February 17th --

24   Q    The last item, what date is that?

25   A    The October billing statement.  October 1993.

Jiminez - Cross - O'Mara                                    242

1              MR. HERNANDEZ:  Thank you.  I have no further

2         questions.

3              THE COURT:  You may inquire.

4    CROSS-EXAMINATION

5    BY MR. O'MARA:

6    Q    Now, Mr. Jimenez, if I have an American Express

7    card and I want my billing address or my address reflected

8    on American Express to be 5 Park Place and I call you up or

9    I send you a letter and say this is what I want my address

10   to be changed to, would you change it to that address?

11   A    Yes.

12             MR. O'MARA:  Thank you.  I have no further

13        questions.

14             MR. HERNANDEZ:  I have nothing further.

15             THE COURT:  Thank you.  You're excused.

16             (Witness excused.)

17             THE COURT:  Call your next witness.

18             MR. HERNANDEZ:  At this time I'd like to call

19        Miss Grace Phillips.

20   G R A C E    P H I L L I P S,  called as a witness, having

21   been first duly sworn, was examined and testified as

22   follows:

23             THE CLERK:  Please state your name for the

24        record.

25             THE WITNESS:  Grace Phillips.

                                                          sg

1           THE COURT:  Please be seated and give her some

2           water, if she needs it.  And please speak up in a

3           nice loud voice.

4                You may inquire.

5                MR. HERNANDEZ:  Thank you, your Honor.

6    DIRECT EXAMINATION

7    BY MR. HERNANDEZ:

8      Q    Good afternoon, Miss Phillips.  If I ask you a

9    question you don't understand, let me know that you don't

10   understand, okay?

11     A    Okay.

12     Q    Miss Phillips, do you know Mr. O'Hara, John K.

13   O'Hara?

14     A    Yes.  He lived next door to me.

15     Q    Do you see him in the courtroom now?

16     A    Yes.

17     Q    Just point him out.

18     A    The cute one over there (indicating).

19           MR. HERNANDEZ:  Indicating the defendant.

20           THE COURT:  Indicating the defendant.

21     Q    Where do you know him from?

22     A    From living next door to me.  He used to

23   double-park his car.

24     Q    Where did you used to live when this happened?

25     A    I lived on 557 47th.  The house next door is 553

sg

1    47th.

2        Q    What years did this occur that he, you say he

3    double-parked his car, do you recall?

4        A    In 1992.  Because my daughter was going to junior

5    high school and I would give her a ride.

6        Q    Tell us how you got to know Mr. O'Hara back then.

7        A    I saw him going in the house and leave his car

8    double-parked when he came out and his car was double-parked

9    next to mine.

10            I went next door and rang the bell and shouted in

11   the window and he came out and moved his car so I could

12   bring my daughter to school

13       Q    Are you nervous?

14       A    Yes.

15       Q    Relax.  Have a drink of water.

16            You were taking your daughter to school?

17       A    Yes, to junior high school.

18       Q    Tell us what happened when you came out of your

19   house?

20       A    I came out of the house and I saw the car

21   double-parked next to mine and I knew it was his car so I

22   went next door and I rang the bell.  The window was open on

23   the bottom just a little and I called in.

24            Can you please come out and move the car?

25       Q    When you -- when this incident occurred, did you

sg

1    know that the owner of the car, did you know his name?

2        A    No, I didn't.

3        Q    How did you know it belonged to that person, that

4    vehicle?

5        A    I'm sorry, I can't hear you.  I'm having --

6        Q    How do you know it was the person?  How did you

7    know it was their car?

8        A    Because I saw him going into the house and leaving

9    his car double-parked on another occasion.

10       Q    So what happened, you went to the door?

11       A    Right, and he came and it took a minute or two.  He

12   came out the door, he moved his car and I left.

13       Q    Had you an occasion to see Mr. O'Hara at any time

14   after that particular incident?

15       A    Yes.  I saw him walking into the house, the house

16   next door.  I also saw him in, the following -- in the

17   summertime barbecuing in the backyard.  I saw him sitting on

18   the stoop having a beer.

19       Q    This is all in one day or over a specific period?

20       A    This was between '92, when my daughter first

21   started junior high school, and '93 in the spring that I saw

22   him there.

23       Q    Did you have any occasions to have social

24   gatherings with Mr. O'Hara?

25       A    Social gathering, no.

1      Q    Did you invite him over to your house?

2      A    He came over to my house once, with my husband, and

3   we had a beer together.

4      Q    Now, did there come a time when Mr. O'Hara actually

5   worked with you?

6      A    Where he what?

7      Q    Where he actually worked with you on a project?

8   Did there come a time?

9      A    I'm sorry, I only hear from the one ear.

10     Q    Did there come a time once you got to know Mr.

11  O'Hara?  Did there come a time you had occasion to work with

12  him on a particular project?

13     A    Yes.  I got some signatures for him in 1994, June.

14     Q    To the best of your knowledge, was he still living

15  at 553 47th Street at that time?

16     A    Yes.

17     Q    Is that the only -- any other contact you ever had

18  with him?

19     A    No.

20     Q    Nothing else?

21     A    No.

22          MR. HERNANDEZ:  Let me just have a moment.

23          (Pause in proceedings.)

24          MR. HERNANDEZ:  I have no further questions.

25          THE COURT:  You may inquire.

1          MR. O'MARA:  Thank you, your Honor.

2     CROSS-EXAMINATION

3     BY MR. O'MARA:

4          Q    Miss Phillips, this association you had with him in

5     1994 - if you don't hear me, let me know - that was

6     collecting petitions, that is signatures on petitions for a

7     political campaign?

8          A    Yes.

9          Q    You were a political supporter of Mr. O'Hara,

10    correct?

11         A    Yes.

12         Q    And you worked, in fact, with some other ladies in

13    the neighborhood including Miss Vetere and Miss Steffenson;

14    is that right?

15         A    Yes.

16         Q    Now, how many days did you spend working for him?

17         A    Actually it was one day and then someone died in

18    the family so I -- I believe that's the way I remember it.

19         Q    Could it have been more than one day, ma'am?

20         A    Well, it wasn't long at all.

21         Q    Well, do you remember doing it more than once?

22         A    Excuse me?

23         Q    Do you remember going out more than one day to do

24    it?

25         A    I'm really not sure.

1           MR. O'MARA:  Your Honor, can we show this to

2      the witness to refresh her recollection?

3           THE COURT:  Yes.

4     A    All right, it was more than one day.

5     Q    It looks more like four days?

6     A    Three.

7     Q    Three days.  It was several days.  Now, do you

8  remember that now?

9     A    Yes.

10     Q    Now, you talked about how you had, the first time

11  you had seen him was involving a situation in which you say

12  he was double-parked?

13     A    Yes.

14     Q    When was that?

15     A    It was in the fall because my daughter started

16  junior high school in September.

17     Q    Was it immediately afterwards?  Was it September,

18  October, November, December?

19     A    I really don't know the exact date.  I just know

20  the weather was cool and my daughter had started school.

21     Q    Was it soon after your daughter started, that would

22  have been September?

23     A    I'm not sure.

24     Q    Could it have been September?

25     A    It could have been September.

1        Q    It could have been October?

2        A    It happened more than one time so I don't remember.
I don't know.

4        Q    The first time you say it happened, do you

5    remember, could it have been October?

6        A    I'm not sure.

7        Q    November?

8        A    I know it was cool and I know my daughter started

9    school.

10       Q    So it was after September?

11       A    I'm answering you I'm not sure.

12       Q    Your daughter started school in the beginning of

13   September?

14       A    You want to know if my daughter started school in

15   September?  Yes, she did.

16       Q    So it was after that?

17       A    After she started school, yes, it was.

18       Q    Now, was it before say the Christmas break?

19       A    Yes.

20       Q    Okay.  What kind of car was it?

21       A    A blue car, a Hyundai car.

22       Q    Was it a blue Hyundai?

23       A    Hyundai.

24       Q    Small car?

25       A    Small.

Phillips - Cross - O'Mara                                    250

1    Q    Now --

2              THE COURT:  Just for clarification, what year

3         are we talking about?

4              THE WITNESS:  We're talking about 1992.

5         That's when my daughter started.

6    Q    So sometime between September and December of 1992

7  you say you saw a blue, a small blue car parked by Mr.

8  O'Hara then you saw him go into the building; is that right?

9              THE COURT:  You have to answer, ma'am.

10   A    Yes.

11   Q    The neighborhood there on 47th Street, that's near

12 Fifth Avenue; is that right?

13   A    Closer to Sixth.

14   Q    47th Street goes the whole way from Fifth to Sixth?

15 This is between Fifth and Sixth?

16   A    Yes.  Sorry.

17   Q    It would be fair to say that parking there is very

18 difficult?

19   A    Yes, it is.

20   Q    Now, in the times that you say you saw Mr. O'Hara,

21 isn't it a fact you never saw him getting a ticket; did you?

22             MR. HERNANDEZ:  Objection, your Honor, to that

23        question.

24             THE COURT:  Overruled.

25   Q    You never saw him get a ticket?

1     A    I didn't see anybody get a ticket.  I don't stand

2  out there to see who gets a ticket.  I go out there to make

3  sure I move my car.

4     Q    Is the answer no, you never saw him get a ticket?

5     A    I didn't see anyone get a ticket.

6     Q    You never got a ticket?

7     A    Very rarely.  It was within the letter of the law

8  to double-park in these hours.

9     Q    I didn't ask you that.  I asked you, did you ever

10  get a ticket parking in that area?

11     A    Very rarely.

12     Q    Now, the -- when you say you saw Mr. O'Hara, you

13  say you saw him go in, that's how come you knew he was

14  there; is that right?

15     A    Yes.

16     Q    You have to answer yes for her.

17          Prior to this occasion, the first occasion after

18  your daughter had gone to school, around September of 1992,

19  had you ever seen Mr. O'Hara?

20     A    Before September?

21     Q    Yes.

22     A    No, I did not see him before September.

23     Q    Now, are you aware of who was living next to you

24  prior to September of 1992?

25          MR. HERNANDEZ:  Objection, your Honor.  It

sg

Phillips - Cross - O'Mara                                      252

1          goes beyond my direct.

2                    THE COURT:  Overruled.

3     A     Who was living next to me before September --

4     Q     Who was living at 553 47th Street?

5     A     A new person bought the house before September of

6     '92.  Her name was Miss Lucas.

7     Q     Had you ever spoken to Miss Lucas?

8                    MR. HERNANDEZ:  Objection, your Honor.

9                    THE COURT:  Overruled.

10    A     Yes.

11    Q     Now, if you would, please, tell us what the

12    condition of the building was you say was next to you in

13    September of 1992?

14    A     In September of 1992 it was terrible.

15          Can I give an explanation?

16    Q     Please.  Go ahead.  Tell us.

17    A     When my best friend in 1990 sold her house, this is

18    a brownstone, everybody took a lot of pride.  The house was

19    absolutely perfect.  When the new person took over they

20    ripped the whole house out, screens, everything, bathtubs.

21    Q     That would be starting when Miss Lucas took over

22    the building?

23    A     Yes.

24    Q     Now, when you say, you had conversations with Mr.

25    O'Hara, did you ever get the phone number of your neighbor?

sg

1    A    I belong to the block association and I had phone

2  numbers of every single neighbor on there.

3    Q    Did you ever call Mr. O'Hara?

4    A    No, I never got John's.  John was not a block

5  association member.

6    Q    So you did not have the phone number for your next

7  door neighbor, Mr. O'Hara?

8    A    No.

9    Q    When you -- did you ever go inside the building to

10  see where Mr. O'Hara you say lived?

11    A    I have been in the building where Mr. O'Hara lives,

12  but not while Mr. O'Hara was living there.

13    Q    So you never actually went to see Mr. O'Hara in the

14  building; is that right?

15    A    Right.

16    Q    Now, when you -- you say that you worked for Mr.

17  O'Hara in 1994; is that right?

18        You have to answer for the court reporter.

19    A    Yes.

20    Q    How did you come about to begin to work for Mr.

21  O'Hara in 1994?

22    A    I was walking up the block, Maureen Steffenson was

23  outside her house and she said, Grace, would you like to

24  help get some signatures for John O'Hara?

25        I said sure.

1    Q    That was because at that point he was still your

2  neighbor, right?

3    A    Yes.

4              MR. O'MARA:  Thank you.  I have no further

5         questions.

6  REDIRECT EXAMINATION

7  BY MR. HERNANDEZ:

8    Q    You were in the premises of 553 47th Street?

9    A    I'm sorry?

10    Q    Were you ever inside the building at 553 47th

11  Street?

12    A    Yes.

13    Q    Before Mr. O'Hara was there?

14    A    Yes.

15    Q    Did you have an occasion to visit the basement of

16  that particular building?

17    A    Yes.  Josi --

18    Q    Yes or no.

19    A    Yes.

20    Q    Did that basement have an apartment?

21    A    A complete apartment.

22    Q    Can you tell us what kind of condition that

23  apartment was in?

24    A    Perfect.

25    Q    When you say basement, can you try to describe to

1    the jurors, if you are standing outside of the building

2    looking directly at it, right, how many floors are in this

3    building?

4         A    In the building?

5         Q    Yeah, looking at it from outside.

6         A    It looks like there are three floors.

7         Q    Now, the basement you're referring to, is it under

8    the first floor?

9         A    Yes.  You walk in street level and go down the

10   steps.

11        Q    That's the one you remember?

12        A    Yes.

13        Q    And there was an apartment in there?

14        A    Yes.

15             MR. HERNANDEZ:  I have nothing further.

16             MR. O'MARA:  I have brief cross-examination.

17             THE COURT:  Yes.

18   RECROSS-EXAMINATION

19   BY MR. O'MARA:

20        Q    This supposed apartment down there, when was the

21   last time you saw it?

22        A    The last time I saw it was when -- this is before

23   John moved in, but Magaly took me downstairs because I was

24   complaining about all the water damage I was getting and she

25   showed me the apartment to show me there was no wetness,

Phillips - Recross - O'Mara                         256

1   stains on her side of her paneling.

2       Q    Did you see this apartment, also you indicated on

3   redirect, when your friends were living there?

4       A    Yes.

5       Q    Describe to us the apartment that you saw as it

6   existed when your friends were living there?

7       A    You come in the hallway, you walk down the steps,

8   there's a living room, there is a bedroom, there was the

9   baby's room, there was a kitchen and a bathroom.

10      Q    Okay, and was it substantially the same when you

11  saw it with Miss Lucas?

12      A    Yes.

13      Q    What is the name of the people you say you're close

14  friends with that were living next to you before Miss Lucas?

15      A    Ray and Josi Vales.

16      Q    Do you know where they live now?

17      A    In Jersey.

18      Q    Do you know where in Jersey?

19      A    No, I haven't been in touch with them for a long

20  time.

21      Q    They would certainly be in the best condition to

22  know the condition of the apartment at the time you

23  described it?

24           MR. O'MARA:  Objection.

25           MR. HERNANDEZ:  Objection, your Honor.

sg

Phillips - Recross - O'Mara                           257

1              THE COURT:  Objection sustained.

2      Q    That was their apartment; is that right?

3      A    It was their children's apartment.

4      Q    But they built it for them, you say?

5      A    Yes.

6      Q    Now, you don't know where your friends now are; do

7  you?

8      A    No.  I have lost contact.

9      Q    Now, Miss Lucas you said did a lot of construction;

10  is that right?

11     A    Yes.

12     Q    Did she, in fact, do construction in the basement?

13     A    No, only on the first and second floor.

14             MR. O'MARA:  I have no further questions.

15             THE COURT:  Anything else?

16             MR. HERNANDEZ:  No.

17             THE COURT:  You're excused.

18             (Witness excused.)

19             THE COURT:  Please call the next witness.

20             MR. HERNANDEZ:  At this time I'd like to call

21         Kathleen Vetere.

22  K A T H L E E N   V E T E R E,  called as a witness, having

23  been first duly sworn, was examined and testified as

24  follows:

25             THE CLERK:  Please state and spell your name

Vetere - Direct - Hernandez                                    258

1          for the record.

2               THE WITNESS:  Kathleen Vetere, V-E-T-E-R-E.

3               THE COURT:  You may be seated.

4               Give her some water, please, in case she needs

5          it.

6               You may inquire.

7               Please speak up in a nice loud voice so we can

8          all hear you.

9     DIRECT EXAMINATION

10    BY MR. HERNANDEZ:

11         Q    Miss Vetere, I want to direct your attention to the

12    date of October 1992.  Do you recall where you were living

13    at that time?

14         A    541 47th Street.

15         Q    Would that be a building right next to 553 47th

16    Street?

17         A    Next to it?

18         Q    Yes.

19         A    No.

20         Q    Is it close to it?

21         A    It's about four doors up from me.

22         Q    Okay, I want to direct your attention specifically

23    to the period October 1992, November 1992.  Do you recall

24    whether or not you had any occasion to -- did you know Mr.

25    John O'Hara back then?

1    A    Personally, no.

2    Q    Do you know who John O'Hara is?

3    A    Yes, I do.

4    Q    Do you see him in the courtroom today?

5    A    Yes, I do.

6    Q    Can you just point him out for the record?

7    A    He's over there to the left (indicating).

8              THE COURT:  Indicating the defendant.

9              MR. HERNANDEZ:  Thank you, your Honor.

10    Q    When was the first time you saw Mr. O'Hara, if you

11   recall?

12    A    It was in '92.  It was around September, October.

13   It was in the fall.  He was double-parked next to me on 47th

14   Street.

15        All the cars there have a habit of double-parking.

16   I came out.  I was on my way to work and I couldn't get out

17   of the spot I was in.  And I kept beeping the horn, beeping

18   the horn.

19        One of my neighbors came out and said that it was

20   the man next door to her.  That was the first time I met Mr.

21   O'Hara.

22    Q    Someone came out and you told them that the car

23   double-parked, I assume that car was keeping you from

24   getting out?

25    A    Yes.

1    Q    Someone informed you it belonged to a man?

2    A    Yes.

3    Q    Did they indicate what building they believed that

4    person was in?

5    A    It was next door to the girl that came out.

6    Q    What was the address of the building they indicated

7    that man was in?

8    A    I don't remember the exact address.  It was in --

9    I'm 541.  Maybe 552, 553.

10    Q    47th Street?

11    A    47th.

12    Q    You went to the building?

13    A    Yes, I did.

14    Q    What happened?

15    A    Well, I entered from the ground floor.  The door

16    was open.  I pushed it open and hollered in and Mr. O'Hara

17    came out and I told him he was blocking me in.  I was late,

18    Please move your car right away.

19    Q    Was that the only occasion you had seen Mr. O'Hara,

20    at that occasion?

21    A    No.  After that actually we saw him quite often.

22    Q    Tell us how many times after that, how soon after

23    that, can you give us an idea how often you saw him

24    afterwards and what period of time you saw him?

25    A    He was running for some kind of office in '93 and

1    he came and asked us, my husband and I, if we would put a

2    poster in our window.  We actually said no, we were already

3    endorsing someone else at that time.

4          We became friendly.  We would see him up and down

5    the block and we became friends.

6    Q    Did you ever see him in the building of 553 47th at

7    any time?

8    A    Yeah, when he used to come home from work we would

9    see him.  When he came home he would go into the house,

10   whenever he went for the paper.  Everybody on that block is

11   very friendly.

12   Q    Did you ever visit him in his apartment?

13   A    No.

14   Q    Did he ever visit you in yours?

15   A    Yes.

16   Q    Did you ever have occasion to work for Mr. O'Hara

17   on any of his campaigns?

18   A    Yes.

19   Q    Did you have any social contact -- how many times

20   did he come back to your house to visit you?

21   A    He used to come in quite often.  In the summertime

22   we had barbecues.  He knew my friends, my husband, my son.

23   He was there two, three times a week.

24   Q    During what period of time, what years; do you

25   remember?

Vetere - Direct - Hernandez                                    262

1    A    In the summer of '93.

2    Q    Was that the year he was campaigning?

3    A    No, I don't know if he was campaigning at the time.

4  We didn't help him then.

5    Q    Aside from that, did you have any other occasion to

6  see Mr. O'Hara?

7    A    What do you mean by aside from that?

8    Q    You're saying the only time you've seen Mr. O'Hara

9  was on that block, 47th Street?

10   A    He lived there.  He used to come in and out of our

11 house.  He became a friend after that.

12   Q    The answer is yes, it was only on 47th Street you

13 saw him?

14   A    Yes.

15             MR. HERNANDEZ:  Just a moment.

16             (Pause in proceedings.)

17   Q    Do you recall what year you worked with him on his

18 campaign?

19   A    I think it was 1994.  He ran for the assembly.

20   Q    What did you do for him?

21   A    I got some signatures for him.

22   Q    You got petitions for him?

23   A    Yes.

24   Q    Is that it?

25   A    Yes.

1    Q    Was that all?

2    A    Yes.

3    Q    Were you paid to do that?

4    A    No.

5            MR. HERNANDEZ:  I have no further questions.

6            THE COURT:  You may inquire.

7            MR. O'MARA:  Thank you, your Honor.

8    CROSS-EXAMINATION

9    BY MR. O'MARA:

10    Q    Miss Vetere, when you came to work for Mr. O'Hara

11    on the campaign, in fact, you had a relative who was in part

12    running that campaign; is that true?

13    A    No.

14    Q    Miss Steffenson, Maureen Steffenson?

15    A    She didn't run it.

16    Q    Committee on Vacancies, do you know what that is?

17    A    No.  Explain it.

18    Q    In assisting in the O'Hara campaign, you did that

19    several days?

20    A    Several dates, yes.

21    Q    You were also working for a candidate named Robert

22    Knoll; is that right?

23    A    No.

24    Q    Do you know who I'm talking about?

25    A    He never ran.

Vetere - Cross - O'Mara                                      264

1      Q    Well, you did begin to work for him and were

2   soliciting campaign contributions for him; is that right?

3      A    No, it's not.

4           MR. O'MARA:  May we have this marked as

5           People's Exhibit 18 for identification?

6           (So marked.)

7           THE COURT:  Show it to the defense.

8           People's 18 for identification.

9           MR. HERNANDEZ:  That's People's 18.

10          MR. O'MARA:  Yes.

11     Q    I'm showing you what's been marked for

12  identification as People's 18.  Isn't that, in fact,

13  something you were handing out for Mr. Knoll who was running

14  for assembly in 1994?

15     A    It never came about.  I never handed them out, no.

16     Q    Isn't it a fact you had those?  You recognize that?

17     A    No, I don't.

18     Q    In fact, ma'am, you were handing out literature for

19  Mr. Knoll that came back to the telephone number of Mr.

20  O'Hara's campaign headquarters; isn't that right?

21     A    Not to my knowledge.

22     Q    Now, after collecting the petitions in 1994 for Mr.

23  O'Hara, you remained his friend, right?

24     A    Yes.

25     Q    Close friend?

sg

1    A    Yes.

2    Q    In 1996 isn't it a fact that you gathered

3  significant numbers of petitions and had others gather

4  petitions for a person by the name of Tanya Ruiz?

5    A    Can you repeat that?

6    Q    In 1996 did you not gather petitions for an

7  individual name Tanya Ruiz?

8              MR. HERNANDEZ:  Objection, your Honor, to this

9              line of questioning.

10             THE COURT:  Overruled.

11   A    Yes, I did.

12   Q    Now, you, in fact, had others gather petitions, you

13  asked them to gather petitions for Miss Ruiz; is that right?

14   A    There was a group of people.

15   Q    Now, that election campaign involved a Mr. Ortiz,

16  Mr. O'Hara and Miss Ruiz; isn't that right?

17   A    Yes.

18   Q    And isn't it a fact the reason that you assisted

19  Miss Ruiz was to drain votes off for Mr. O'Hara or so Mr.

20  O'Hara would be elected?

21   A    That's not true.

22   Q    Miss Ruiz was, in fact, 21 years old; is that

23  right?

24   A    I don't know how old she is.

25   Q    Did you meet her?

Case 1:17-cv-04766-LDH-RML    Document 146    Filed 02/26/24    Page 105 of 207 PageID #: 5202

1    A    Yes, I did.

2    Q    Did she appear to be about 21 years old?

3    A    She could have been 21.  She could have been 28.

4    Q    And she had no prior experience in politics; is

5    that right?

6              MR. HERNANDEZ:  Objection, your Honor.

7              THE COURT:  Objection sustained.  You don't

8         have to answer that.

9    Q    Let's move on.

10         Miss Vetere, the -- what kind of job do you have?

11   A    Right now I take care of my mother.

12   Q    And prior to that you were a bus driver; is that

13   right?

14   A    For a short time.

15   Q    For the time in question, 1996 or thereabouts,

16   1994, were you a bus driver?

17   A    Yes, I drove a school bus.

18   Q    And the contract for the school bus company would

19   come from the school board; is that right?

20   A    I don't know.  I guess so.  I don't know where they

21   get it.

22   Q    You are aware Miss Aquierre was on the school

23   board?

24             MR. HERNANDEZ:  Objection, your Honor.

25   A    That had nothing --

Vetere - Cross - O'Mara                                    267

 1        Q    You were aware Miss Aquierre was on the school

 2   board?

 3        A    I guess so.  She's principal of a school, right?

 4        Q    Miss Vetere, in 1996 you were still living on 47th

 5   Street?

 6        A    In 1996, no.

 7        Q    Where were you living at that time?

 8        A    232 Battery Avenue.

 9        Q    Ma'am, when did you move to Battery Avenue?

10        A    About four years ago.  Four, five years.

11        Q    And you are living there now?

12        A    Yes.

13        Q    Ma'am, where is your car registered?

14        A    Where I live.

15        Q    Do you have a plate -- what's your license plate

16   number, ma'am?  Is it C419AL?

17        A    I have to look at my registration.  What is that?

18   What kind of car?

19        Q    You tell me.  C419AL.

20        A    Maybe that's the Toyota.

21        Q    Ma'am, in 1996 where were you registered to vote

22   from?

23              MR. HERNANDEZ:  Objection, your Honor.

24              THE COURT:  Overruled.

25        A    Where was I registered to vote in '96?

Vetere - Cross - O'Mara                                    268

1     Q    Yes.

2     A    I own my house on 47th Street, 541.

3     Q    Who lives at 541 47th Street?

4     A    Who lives there now?

5     Q    Yes.

6     A    I sold the house last month, '99.

7     Q    Prior to last month, who was living there?

8     A    Prior to that I had it rented out, and for 17, 18

9  years I lived there.

10    Q    When did you move to this place on Battery Avenue?

11    A    Maybe sometime -- my mother had a stroke.  I moved

12  in there sometime in '94.

13    Q    So that would have been --

14    A    I moved in with my mother there.

15    Q    So that then would have been before or after 1994?

16    A    Before or after what?

17    Q    You said in 1994.  When in 1994 did you move there?

18    A    My mother had a stroke I think in September.  I

19  don't remember the exact month.

20    Q    During the time when you were collecting petitions

21  for Mr. O'Hara, where were you living?

22    A    In '94?

23    Q    Yes.

24    A    I was staying with my mother, she had a stroke.  I

25  was at Battery Avenue.

Vetere - Cross - O'Mara                                    269

1    Q    That was your residence in June of 1994?

2    A    I guess so.  I was staying there with her.

3    Q    Now, I'm going to show you --

4              MR. O'MARA:  May we have this marked as

5         People's number 19 and shown to the witness?

6              (So marked.)

7              THE COURT:  Show it to defense first, please,

8         for identification.

9    A    I need to put my glasses on.

10             THE COURT:  What's the question?

11             MR. O'MARA:  I was asking her to take a look

12        at it right now.

13   Q    Are those the petitions you gathered for Mr. O'Hara

14   in June of 1994?

15   A    Yes, I signed them.  They must be mine, yes.

16   Q    That time when you signed them you indicated your

17   address was on 47th Street; is that right?

18   A    Yes.

19   Q    Now, at that time in 1994 --

20             Well, let's go back.  You first indicated you saw

21   Mr. O'Hara in around September or October, I'm sorry, it

22   could have been -- September or October of 1992; is that

23   right?

24   A    Yes.

25   Q    And that was a car that was double-parked that drew

Vetere - Redirect - Hernandez                                    270

1    your attention to him?

2        A    Not to him.  I couldn't get out of a parking spot.

3        Q    Then you were directed toward him in September or

4    October of 1992?

5        A    Yes.

6        Q    What kind of car was that?

7        A    My car?

8        Q    No, the car that was blocking you.

9        A    It was a small car, I remember.

10       Q    Do you remember what color?

11       A    It was either -- it was a light car, white or light

12   gray.  It was a Hyundai.

13       Q    Honda or Hyundai?

14       A    Hyundai.  The cheaper one.

15       Q    The cheaper one being the Hyundai?

16            MR. O'MARA:  The Court can take judicial

17            notice the Hyundai is cheaper than the Honda.

18       A    I know because my girlfriend had the other car.

19       Q    Is this the Korean car as opposed to a Japanese

20   car?

21       A    I don't know.  I know a Hyundai costs less than a

22   Honda.

23       Q    Which is the cheaper of the two?

24       A    Yes.

25            MR. O'MARA:  I have no further questions.

sg

Vetere - Redirect - Hernandez                                    271

1              THE COURT:  Counsel.

2    REDIRECT EXAMINATION

3    BY MR. HERNANDEZ:

4        Q    Take a look at the document that's marked People's

5    18.

6        A    Excuse me?

7        Q    Can you take a look at the document marked People's

8    18.  Is your name on that document anywhere?

9              THE COURT:  Objection sustained.

10       A    No.

11             MR. HERNANDEZ:  I have no further questions.

12       A    I never saw this before.

13             THE COURT:  Thank you.  You're excused.

14             (Witness excused.)

15             THE COURT:  Can I have both sides up here,

16        please.

17             (Discussion held off the record at the bench.)

18             THE COURT:  Ladies and gentlemen, we're going

19        to break until tomorrow morning at ten o'clock.  Do

20        not discuss this case among yourselves or anyone

21        else.  Do not come to any conclusions until all the

22        evidence is in and I charge you as to the law.  See

23        you all tomorrow at ten o'clock.

24             (Jury left the courtroom.)

25             (Adjourned to Thursday, July 1, 1999, at 10

                                                              sg

1        a.m.)

2

3                              *    *    *    *

4                    It is hereby certified that the
         foregoing is a true and accurate
5        transcript of the proceedings.

6                    _Suzanne Grant_

7        _____
                 SUZANNE GRANT
8                OFFICIAL COURT REPORTER

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**SIDER, ZACHARY**

| | |
|---|---|
| **From:** | Joel B. Rudin <jbrudin@rudinlaw.com> |
| **Sent:** | Friday, December 11, 2015 11:43 AM |
| **To:** | HALE, MARK |
| **Cc:** | Steven Aquino |
| **Subject:** | RE: O'Hara |
| **Attachments:** | Letter to Mark Hale, dated December 11, 2015.pdf |

Hi, Mark.  At long last, I've completed my letter to you.  It is attached, with exhibits.  A hard copy is being mailed.  Please let me know as you go along if you need anything further from me, or have anything to discuss.

I will send you in a separate email the transcript of the 1994 civil proceeding that originally was sealed.

Thanks again for your interest.

Joel

---

**From:** HALE, MARK [mailto:HALEM@BrooklynDA.org]
**Sent:** Monday, November 23, 2015 9:18 AM
**To:** Joel B. Rudin
**Subject:** RE: O'Hara

No worries Joel. Thanks for the note. Have a great Thanksgiving.

Mark

---

**From:** Joel B. Rudin [mailto:jbrudin@rudinlaw.com]
**Sent:** Friday, November 20, 2015 5:37 PM
**To:** HALE, MARK
**Subject:** O'Hara

Hi, Mark.  I'm working on this matter but juggling it with other things with stiffer deadlines.  Am going through the three boxes and a lot of other material.  Probably earning about 20 cents an hour (overpaid!).  If I don't get done before Thanksgiving, it'll be very soon after.  Have a nice holiday if I don't speak with you before.

I will also be in touch soon about that NYSBA CRU/CIU project.

Best,

Joel

This email communication and any files transmitted with it contain privileged and confidential information from the Kings County District Attorney's Office and are intended solely for the use of the individuals or entity to whom it has been addressed. If you are not the intended recipient, you are hereby notified that any dissemination or copying of this email is strictly prohibited. If you have received this email in error, please delete it and notify the sender by return email.

1

# LAW OFFICES OF JOEL B. RUDIN, P.C.

600 FIFTH AVENUE

10TH FLOOR

NEW YORK, NEW YORK 10020

---

TELEPHONE: (212) 752-7600

FACSIMILE: (212) 980-2968

E-MAIL: jbrudin@rudinlaw.com

JOEL B. RUDIN

STEVEN R. AQUINO

GEORGE R. GOLTZER
(Of Counsel)

JABBAR COLLINS
(Legal Analyst)

December 11, 2015

Mark Hale
Chief, Conviction Review Unit
Kings County District Attorney's Office
Renaissance Plaza
350 Jay Street
Brooklyn, New York 11201

Re:  *People v. John O'Hara*
     Ind. No. 13525/96

Dear Mr. Hale:

Following up on our recent meeting, I am writing to provide information that I believe will assist in your re-investigation of the factual basis for John O'Hara's conviction (even though I believe we already have presented a compelling basis to overturn his conviction for selective prosecution). I understand you now have all three trial transcripts. If this is not the case, please let me know and I'll forward to you any missing transcripts that are in my possession. I am meanwhile forwarding to you the transcript of the civil proceedings in *Dennis L. Pol, et al., v. The Board of Elections of the City of New York and John O'Hara*, Index No. 23414/94 (Sup. Ct., Civ. Term, Part 15) (Aronin, J.S.C.) – the election law hearing, brought by allies of Assemblyman Brennan, which concerned, in part, the bona fides of Mr. O'Hara's residency on 47th Street. My client and I appreciate that you wish to dig into the merits of the underlying criminal prosecution and conviction, and to that end provide the following:

## Affirmative Evidence of Innocence

John O'Hara, now 54 years of age, is an attorney who was never convicted of any crime except for this case. He lived in the same

LAW OFFICES OF JOEL B. RUDIN, P.C.

Mark Hale
December 11, 2015
Page 2

neighborhood in Brooklyn, near where his grandparents settled after emigrating from Ireland almost 100 years ago, drove a cab to put himself through law school, volunteered for and served on his local community board until he was convicted, and was constantly involved in political affairs in his community. He battled for years on behalf of Judge John Phillips, whose estate was plundered by friends of District Attorney Hynes, opposed Hynes and his allies for years, and paid a dear price, suffering three trials on the false residence charges and ultimately a felony conviction that cost him his career in law and in politics. After his law license was restored, he worked without fee as part of a successful effort to overturn the wrongful conviction of David McCallum. Although his career has been crippled, he now wishes to clear his name and cleanse his record.

As you know, the People, during the third trial, argued the theory that Mr. O'Hara did not legitimately reside at the 47th Street address at all – that the basement there was uninhabitable, that his claim that he lived there during 1992-93 was a sham, and that he really lived at a 61st Street rent-stabilized apartment that he maintained in his name. This theory was supported by two witnesses who lived upstairs at the 47th Street building, Rafael Munoz and Robert Lozano, and a rebuttal witness, Josephine Vales. The entire case came down to their credibility. However, their testimony was false. Numerous credible witnesses testified, at this trial (and the previous trials), that they saw Mr. O'Hara at the 47th Street basement apartment under circumstances suggesting he was living there, and O'Hara himself testified he lived there for most of one year, candidly acknowledging his purpose in doing so was to establish bona fide residency in the election district following a redistricting – conduct that was lawful.

Meanwhile, there are important witnesses who did not testify, apparently because they were intimidated by the D.A.'s office into fearing for their liberty or livelihood if they did so, and also because of the way in which the prosecution sprung on the defense, without warning, the *false* rebuttal testimony of Ms. Vales. Meanwhile, the jury did not hear of the People's abusive tactics in investigating this case and trying to discourage defense-favorable witnesses from testifying – tactics (all too familiar from the Hynes

LAW OFFICES OF JOEL B. RUDIN, P.C.

Mark Hale
December 11, 2015
Page 3

era) which had great bearing on the integrity of the overall prosecution. Had the jury heard all the relevant witnesses (and had the conduct of the prosecution been more responsible), the result of the trial likely would have been different. The witnesses I urge you to contact include the following:

**1. Vicki Lynn Guveiyian**
10 Rook Court
Egg Harbor Township, New Jersey 08234
(609) 226-2644 (cell)

Ms. Guveiyian has been O'Hara's girlfriend since 1990, and she will cooperate with you. As I understand it, she will confirm that she was in the 47th Street house on multiple occasions during 1992-93 and that O'Hara was living there. She was assaulted and improperly touched by Assemblyman Brennan's chief of staff, John Keefe, on September 10, 1996, following which she received medical treatment and Keefe was arrested and charged with a series of misdemeanors (he ultimately pleaded guilty to a reduced charge of harassment as part of a deal reached with Hynes' office). Approximately two weeks later, ADA Ronnie Jaus, Hynes' Sex Crimes Bureau Chief, showed up unannounced with several others at Ms. Guveiyian's office at a casino in Atlantic City and warned that if the case against Keefe went forward it could affect Ms. Guveiyian's gaming license.[1] (Of course, as discussed below, there was quite a history between O'Hara and Brennan, and Brennan was a moving force behind O'Hara's prosecution.) About a month later O'Hara was indicted. Ms. Guveiyian never testified at his trials because of fear she would lose her license and source of income based upon her relationship with O'Hara and out of fear of the D.A.'s vindictiveness.

---

[1] Ms. Guveiyian requests that her own case not be publicly discussed as it involved a sex crime against her.

LAW OFFICES OF JOEL B. RUDIN, P.C.

Mark Hale
December 11, 2015
Page 4

### 2.  Magaly Lucas
226 East 54th Street
New York, N.Y. 10022
(212) 486-7738

Magaly Lucas was O'Hara's girlfriend through 1990.  They lived together at the 61st Street apartment while they were in law school from 1985 through 1990.  In 1990 she bought the house on 47th Street.  During that year, they broke up. She owned the 47th Street house from 1990 through November 1993. In 1992 she rented the upstairs to Munoz, Lozano, and Quetzal Martinez, in exchange for payments that equaled her monthly mortgage obligation, and the basement apartment to O'Hara, with whom she remained on good terms, in exchange for his agreement to assist her in collecting rent from the other tenants and in watching the property. She sold the building to the three men in November 1993 in exchange for their agreement to pay off her mortgage.  The deed conveying the property to them was publicly filed.  Exh. A, attached hereto.  At the time of the closing, O'Hara moved out.

Following the closing, and during the next few years, Munoz, Lozano and Martinez made no mortgage payments and allowed the house to deteriorate.  (Munoz and Lozano, in their testimony, admitted that, upon closing on the house, they immediately stopped making mortgage payments, using as an excuse that they never received the deed.  However, as O'Hara established at the first trial, the deed was on file at the County Clerk's Office, and was readily available to the men).  Ms. Lucas's lender initiated a foreclosure action in May 1994, under Index No. 17589/94.  It sued Ms. Lucas as well as Munoz, Lozano and Martinez, attached the property through a lis pendens, and then refiled the foreclosure action in 1996.  Excerpts of the foreclosure papers are attached as Exh. B.  Lozano testified that the men continued to live there (for free) at least through 1997.  Third Trial Tr. 198.

The DA's office, crediting Lozano's claims that he and his friends had purchased the property in 1992 and were the owners during the period O'Hara claimed residency there, did not contact Magaly Lucas until October

LAW OFFICES OF JOEL B. RUDIN, P.C.

Mark Hale
December 11, 2015
Page 5

21, 1996, which is the day the D.A.'s Office arrested O'Hara. She told D.I. Allan Presser that O'Hara had lived at 47th Street while she owned it and that she had not conveyed the property until November 1993. However, as she later explained in the first of her two affidavits, which was submitted to the court as part of a post-trial motion to vacate O'Hara's first conviction in 1997, she was intimidated by the D.A.'s Office into not testifying. *See* Exh. C.

The last time O'Hara spoke with ex-girlfriend Magaly Lucas (until now) was after his initial conviction was reversed in 1998 and he was facing a retrial. She was upset that the D.A.'s Office had just subpoenaed her tax returns, was still smarting from the Office's intimidating tactics during the first trial, and understandably didn't want to be involved with his case anymore. She was away when the third trial occurred. However, after O'Hara again was convicted, she gave another affidavit, dated September 22, 1999 (attached as Exh. D), in support of another 330 motion. This affidavit refuted the false trial testimony of Josephine Vales, a last-minute People's rebuttal witness, who claimed the cellar or basement space was never occupied and was uninhabitable.

Attached to Ms. Lucas's affidavit was an appraisal report on file with her original mortgage lender, Green Point Saving Bank, noting that there were three apartments: a duplex, a second floor, and a "*potential rentable in cellar.*" Exh. D (emphasis added). (O'Hara also submitted the affidavit of Denise Murray, *see* Exh. E, who swore -- contrary to Mrs. Vales' false testimony -- that the basement apartment had been renovated and that Ms. Murray would eat dinners there with Mrs. Vales' son and daughter-in-law before Vales sold the house to Ms. Lucas. The circumstances of the defense obtaining the Lucas and Murray affidavits after trial are explained in counsel's 330 motion papers, which are in your file. The court denied O'Hara's 330 motion on procedural grounds.)

O'Hara recently called Ms. Lucas, after not being in touch with her for 17 years, to see whether she would be willing to speak with you. At present, she teaches and practices law. She apparently is still wary of any involvement with your office but I believe you may be able to coax her to

LAW OFFICES OF JOEL B. RUDIN, P.C.

Mark Hale
December 11, 2015
Page 6

cooperate with you based upon your track record of independently reviewing convictions obtained under the previous District Attorney's administration.

### 3. Yvette Aguirre
559 47th Street
Brooklyn, N.Y. 11220
(718) 435-0091 (home)

Mrs. Aguirre was O'Hara's next door neighbor at 47th Street. Her house was two doors away. She testified at all three trials.

Mrs. Aguirre is a retired school principal who knew O'Hara from the community board and local politics. She usually supported his opponents. She testified at all three trials that she saw him coming and going from the house, and once came to the house to invite him to a party for her daughter and he came out of the basement apartment. She wasn't in the apartment while O'Hara lived there but had been there previously when Josephine Vales owned the house and knew – contrary to her false testimony – it was habitable.

At his sentencing, Mr. O'Hara alleged that, after his first conviction was reversed by the Appellate Division in 1998, Mrs. Aguirre was scheduled to receive an award from District Attorney Hynes at some event, but Dino Amoroso, counsel to District Attorney Hynes, called to threaten her that if she testified again for O'Hara she wouldn't get the award, and sure enough, although her name was printed on the program, she didn't get it. She testified anyway. But Mr. Amoroso's tactics were highly revealing of how political this case was and of the lengths the Office was willing to go to ensure a conviction.

LAW OFFICES OF JOEL B. RUDIN, P.C.

Mark Hale
December 11, 2015
Page 7

### 4. Juan Perez
500 Ave L, NW Apartment 1010
Winter Haven, Florida 33881
(646) 226-8620

Juan Perez testified at O'Hara's first trial, even though he was a former political opponent. He came to the 47th Street house on Election Day in November 1993. They were campaigning that day for David Dinkins' re-election as Mayor.

Mr. Perez was scheduled to testify at O'Hara's second trial, but my understanding is that ADA O'Mara warned him that he was subject to prosecution for perjury and as a result he didn't show up. O'Hara recently spoke to him and he indicated he was willing to speak with your office.

### 5. Grace Phillips (we have no contact information).

She was the next door neighbor at 47th Street and testified at the first trial about seeing O'Hara at the house. She said that construction by the new upstairs occupants damaged the house and that she saw dozens of crack vials outside it (after O'Hara had left) (see First Trial Tr. 359-71). She testified that, shortly before Magaly Lucas purchased the house and she saw O'Hara apparently living in it, the basement apartment was in "perfect" condition (Third Trial Tr. 246-261). (This was consistent with the affidavit of Denise Murray, Exh. E.)

### 6. James McCall
8701 Shore Road – Apt: 136
Brooklyn, New York 11209
(718) 833-0111

He was O'Hara's election law attorney in 1993 and visited him at the 47th Street residence during that time. My understanding is the defense did not call him out of fear that the prosecution would insinuate fraud allegations in cross-examination which would prejudice the defense even though they

LAW OFFICES OF JOEL B. RUDIN, P.C.

Mark Hale
December 11, 2015
Page 8

weren't true. He can explain as well the election law litigation that O'Hara was immersed in during this period.

7. **Denise Murray** (deceased in 2014)

Her affidavit, see Exh. E, together with the affidavit of Magaly Lucas and the appraisal report, refutes the false rebuttal testimony of Josephine Vales that the D.A.'s Office used to convict O'Hara at the third trial. Vales' testimony that the basement was never habitable as an "apartment" also is contradicted by the testimony during the first trial of People's witness Munoz, who acknowledged that the basement was "an apartment" and included a stove, refrigerator, sink and bathroom (Tr. 226-27), and by his testimony during the 1994 civil proceeding (Tr. 37) (responding, when asked "[h]ow many units are in the building," that "[t][here's three floors and the basement" and that he rented them out).

8. **Other witnesses.**

Any of the other witnesses who testified in O'Hara's favor at the three trials.

9. **Documentary Evidence showing residency at 47th Street** (page references are to the first trial):

American Express monthly statements from February to September 1993 mailed to 47th Street, introduced at trial as Exh. F and attached hereto also as Exh. F (*see* T. 350-352);

Monthly Chase bank statements from February to September 1993 mailed to 47th Street crime scene, introduced at trial as Exh. G and attached hereto also as Exh. G (*see* T. 341-345);

LAW OFFICES OF JOEL B. RUDIN, P.C.

Mark Hale
December 11, 2015
Page 9

OCA attorney registration with change of residence to 47th Street during normal biennial registration date of March 1993, introduced at trial as Defense Exh. D and attached here as Exh. H (*see* T. 475-77);

Documents from NYC Campaign Finance Board listing 47th Street as O'Hara's residence, introduced at trial as Exh. B and reproduced here as Exh. I (*see* T. 411- 414); and

Testimony of Eugene Moore, District Manager from the local Community Board, that notices of meetings were mailed to O'Hara at the 47th Street residence (1st trial, pp. 434-43).

## Facts to Consider About the Veracity and Integrity of the People's Case

This case, as the records of your Office establish, resulted from a complaint to the State Elections Board, and then to the D.A.'s Office, by John O'Hara's political and personal rival, James Brennan, and his staff member, James Keefe. Brennan and his allies, and O'Hara, had been challenging each other's election petitions and candidacies for years. In 1994, Brennan retained a private investigator to investigate O'Hara's residence, filed a complaint with the Elections Board, initiated the civil proceeding challenging O'Hara's candidacy for the Assembly, and then complained to the D.A.'s Office, which used the information Brennan spoon fed it to build a criminal case against O'Hara.

As a document in your Office's files, entitled "People v. John K. O'Hara, Preparation for Grand Jury Presentation," indicates, *see* Exh. J, the People's theory, given to them by Brennan, was that O'Hara really was living only at 579 61st Street, a rent-stabilized apartment, all along, and his claimed residencies at 553 47th Street, and then 6017 4th Avenue, were false in order to qualify him to run for office in particular election districts (see "Objective: Proof that O'Hara registered and voted from false addresses. ... Subsidiary

LAW OFFICES OF JOEL B. RUDIN, P.C.

Mark Hale
December 11, 2015
Page 10

proof of 6017 4th Avenue address as possible false residence beginning in 1993.")  Indeed, this had been the claim in the civil proceeding – that both claimed residences were false.  But the problem with this theory, which the D.A.'s Office ultimately abandoned, is that investigation showed that O'Hara really was living, as of January 1994, at the 4th Avenue location.  If he was really living there, why wouldn't he previously have established an actual occupancy at 47th Street?

Numerous law-abiding, respectable individuals testified, or gave affidavits under oath establishing, that O'Hara really did establish an actual residency, during 1992-93, at the 47th Street location, and as the defense documentary exhibits showed, he gave that listing to various government entities and businesses and received mail there.  (*See, e.g.,* Exh. K, D.A.'s Chronological Data Sheet, noting that DIs' investigation of 553 47th Street had revealed that "postal carrier states mail for O'Hara presently being delivered @ this location.").  Why would these legitimate individuals have perjured themselves at all, let alone at a time when Hynes' Office was so powerful and would regularly use heavy-handed tactics with witnesses? If they knew O'Hara really wasn't living there, wouldn't they have feared prosecution for lying?  What was the evidence proving O'Hara had orchestrated a sham residence and recruited all these individuals to lie for him?  It was the testimony of two fraudsters with criminal records who had a substantial motivation to lie, Munoz and Lozano, and the surprise, last-minute testimony of Ms. Vales.

ADA O'Mara continually portrayed Munoz, Lozano, and their co-resident, Quetzal Martinez, as poor, pathetic dupes who had somehow been tricked into buying the 47th Street house from O'Hara's former girlfriend Magaly Lucas, and made it seem as if O'Hara was in on the fraud. Martinez had a very substantial criminal record, including current cases, and was not called to testify, even though he was in court.  Munoz, too, had a serious felony record for a shooting assault and had just been released from four years in prison when he moved into the house.  Lozano admittedly was operating his ice cream truck business without a valid driver's license, which subjected him to potential arrest and the loss of his principal source of

LAW OFFICES OF JOEL B. RUDIN, P.C.

Mark Hale
December 11, 2015
Page 11

income. All three men admittedly defrauded the State of Virginia by certifying they were residing there, to illegally obtain drivers' licenses, when they were in fact residing in New York. As Ms. Lucas can tell you, they falsely claimed to be brothers and they admitted at the third trial having used those false Virginia drivers' licenses as identification to deceive her into entering into the contract with her. None of the men's criminal acts from Virginia to New York were of any interest to the Brooklyn D.A.'s Office under Mr. Hynes, which had just one mission: to convict John O'Hara.

### The People Manufacture A Real Estate Scam
### To Deflect Attention From Their Witnesses' Own Deceit

The prosecution at each trial insisted, based upon their two witnesses' testimony, that the men had never received a deed for the 47th Street house and somehow they had been defrauded. At the first trial, ADA O'Mara referred to the house transaction as a "scam" and accused O'Hara and Magaly Lopez of taking the men for a "ride" (T. 688). At the second trial, O'Mara elicited from Munoz that his signature was not on the deed, as if that supported his claim he had been scammed. Tr. 129. This led the defense, anticipating a similar sleight-of-hand at the third trial, to introduce expert testimony that only the seller signs such a deed, not the buyer. Tr. 236. Still, at the third trial, Roberto Lozano again claimed he never received a deed and believed he was being "gypped" (Tr. 197-98). Before a jury that included 11 black people, ADA O'Mara then compared O'Hara's alleged complicity in fraud with Ms. Lucas to those of a murderer and slave trader, invoking the biblical story of Joseph:

> "I remember the story of Joseph. Now Joseph had a multi layered coat and he was preferred by his father and that upset his brothers and the brothers, the older brothers took him out to the field and they were going to kill him so the inheritance would go to them, but they got greedy. So, they didn't kill him. They sold him into slavery and took the money, but as long

LAW OFFICES OF JOEL B. RUDIN, P.C.

Mark Hale
December 11, 2015
Page 12

> as he was alive the inheritance didn't go back to them. When they went back to the father, they took goat's blood and spread it on the coat so they would get the inheritance. Fooled the father for a little while until Joseph appeared again because he wasn't dead. That's just a superficial effort to try to fool people. Ask yourselves if that is not what happened here ..." (T. 464).

In fact, it was the three men who scammed Ms. Lucas. They induced Ms. Lucas to trust them, claiming they were hard-working "brothers" with valid Virginia drivers' licenses, except they weren't brothers, they had serious criminal records, and their Virginia licenses were fraudulent. They exercised their option to buy the house without any down payment, just an agreement to assume the mortgage payments, only to then not make a single payment while simultaneously earning rental income. *See* Third Trial Tr. at pp. 198-99 (Lozano admits making no payments on the building while collecting rent from tenants). Meanwhile, they ran the house into the ground; neighbors found large numbers of crack vials outside the house. The deed they claimed had been fraudulently withheld from them was publicly filed at the County Clerk's Office. *See* third trial tr., pp. 231-36, and Exh. A. It had been easily available all along. All they had to do was ask their attorney for it. The prosecution knew this. Yet they used their witnesses to shamelessly manipulate the jury.

These three men – in and out of criminal trouble, defrauding the State of Virginia into issuing false drivers' licenses, operating an unlawful ice cream truck business without a valid driver's license, violating a purchase agreement that they had induced the previous owner to enter into through fraud, and facing foreclosure – had every reason to please an influential Assemblyman, and then the D.A.'s Office, when they were approached to lend their assistance in making a case against John O'Hara.

LAW OFFICES OF JOEL B. RUDIN, P.C.

Mark Hale
December 11, 2015
Page 13

Lozano and Munoz gave demonstrably false statements and testimony about crucial issues bearing upon not only their credibility but about the charges against Mr. O'Hara. One such false statement, described above, was their false claim that they didn't make mortgage payments because they didn't receive a deed. Another was their false statements concerned when they obtained ownership of the 47th Street house. At the 1994 civil proceeding brought against O'Hara, Lozano erroneously testified that he obtained ownership of the building in 1992, but then was shown the New York City records showing the conveyance to him and his partners in November, 1993, and corrected himself. Civil Tr. 32-33. Notwithstanding his awareness that the conveyance occurred in November 1993, he repeated his false statement to the D.A.s Office, when he was interviewed, that the conveyance occurred in 1992. *See* Exh. K, D.A.'s Chronological Data Sheet "DIs' confirmed Lazano [sic] lives at location and owns building since 1992..."). As the purported owner from 1992 on, his claim that he knew O'Hara didn't live there during 1992-93 might have seemed credible to prosecutors single-mindedly trying to make a case against O'Hara, and they would have had little reason to check with the previous owner, Ms. Lucas. This may explain why she wasn't interviewed until *after* O'Hara was indicted.

Also relevant to the two witnesses' credibility was Lozano's false story at the first two trials that their reason for agreeing to go along with O'Hara's story that he was living at the 47th Street house was O'Hara's promise, like some Tammany Hall fixer, to take care of their "sanitation" or "garbage" tickets. *See* Lozano's testimony at first trial, pp. 160-61 ("He said he would take care of it") and second trial, pp. 135-37 ("[H]e said, 'Look, I'll take care of those tickets, don't worry about it..."). Lozano and the People dropped this claim at the third trial after O'Hara proved, at the second trial, that no such ticket for that location was issued until 1994 – after O'Hara moved out – at which point 11 such tickets were issued (evidently because it was then that the new owners made the house into an unlivable construction zone). *See* Second Trial Tr., at 168-75 (testimony of Bob Delasalla). It is difficult to understand how anyone could credit their testimony then (or now) in view of

LAW OFFICES OF JOEL B. RUDIN, P.C.

Mark Hale
December 11, 2015
Page 14

Lozano's fundamental lie about their purported reason for going along with O'Hara's alleged fraud.[2]

After indicting O'Hara and, no doubt under pressure from District Attorney Hynes to continue this prosecution regardless of the inconvenient facts undercutting the men's credibility, ADA O'Mara succeeded in blunting the impact of the men's fraudulent involvement in the house conveyance, and their false statements. He did so by creating the untrue impression that O'Hara had somehow been involved in defrauding *them*. Through this tactic, the prosecution succeeded in diverting attention from their star witnesses' deceitful, manipulative tactics, obscured the true facts, and unfairly used the situation to disparage O'Hara.

As for Josephine Vales, her surprise, last-minute testimony that the basement area wasn't inhabitable when she sold the house to Ms. Lucas in 1990, shocked the defense, which had no ability to challenge it, as it came

---

[2] Significantly, at the third trial, the People dropped any effort to have the jury infer, based upon utility and postal records, that O'Hara did not establish a residency at 47th Street, relying instead entirely on the credibility of its two initial and one rebuttal witnesses. O'Hara had shown at the first two trials, and also proved as part of his defense in the third trial, that the overwhelming documentary evidence on this point was in his favor. The difficulty of using records to establish that O'Hara did or did not establish a residency at 47th Street was illustrated by the Brooklyn Union Gas records, for example, which showed the absence of any account for Lozano at 47th Street before December 28, 1992, whereas Magaly Lucas's account continued at least through November 30, 1992. (There was no account in Munoz's name until February, 1995.) One could infer from this evidence that O'Hara was living there in November, as he testified, whereas Lozano did not move in until the end of December, contrary to the testimony of Lozano and Munoz that they moved in during October. Thus, it could further be inferred, they weren't in a position to know whether O'Hara was there in November, when he registered to vote from that residence – the basis for several of the counts of conviction. *See, e.g.,* Testimony of Washington Donoso, Brooklyn Union Gas Company, Second trial, pp. 140-41. Significantly, Mr. Donoso acknowledged that he could not tell whether the meter on the first floor might have also covered a gas line into the basement, further undercutting the significance of the documentary evidence with respect to whether the basement apartment was occupied by Mr. O'Hara. Tr. 141-42.

LAW OFFICES OF JOEL B. RUDIN, P.C.

Mark Hale
December 11, 2015
Page 15

immediately before summations.  Her testimony was important to buttress
the otherwise questionable testimony of Lozano and Munoz.  The defense was
given no prior notice of her testimony before she appeared, for the first time,
as a rebuttal witness for the People during the third trial.  What brought
about her testimony is known only to her, ADA O'Mara, and perhaps the
D.I.s who found her, but certainly, at least after the end of the trial, it was
apparent she had lied.

    The defense 330 motion showed that the cellar or basement area she
claimed had never been used as an apartment and was essentially
uninhabitable in fact was a rentable apartment, according to the bank
appraisal conducted in 1990 at the time she sold the house, as well as the
detailed affidavits of Magaly Lucas and Denise Murray. Indeed, it also was
contradicted by Lozano's own admission in the civil proceeding in 1994:
when asked "[h]ow many units are in the building," he answered:  "There's
three floors and *the basement*."  Tr. 37 (emphasis added). The D.A.'s Office
prevailed upon the court to deny the defense 330 motion on the theory that
the testimony of these witnesses could have been presented at trial, even
though the defense had not known that Ms. Vales, after not having testified
at either of the first two trials, suddenly would emerge as a last-minute
rebuttal witness and would lie.  The CRU is not so constrained and can take
another look at her testimony and investigate what may have led her to give
it.  There were rumors in the neighborhood after the trial that she may have
been motivated by the vulnerability of her son, David Vales, who had a
criminal record and had filed for bankruptcy.  O'Hara's attorney's affirmation
in support of his 330 motion noted rumors in the community that David Vales
had a truck hijacking charge.  While we haven't been able to substantiate
this rumor, you would have superior access to law enforcement records,
including any proceeding that may have been dismissed and sealed.  You also
may be able to determine if Ms. Vales had any other reason to lie.  Even if
her motivation cannot be uncovered (perhaps she simply responded to
pressure by the D.A.'s Office), the weight of the evidence shows that her
testimony was untruthful.

LAW OFFICES OF JOEL B. RUDIN, P.C.

Mark Hale
December 11, 2015
Page 16

## Other Things To Investigate

Exh. K, the Chronological Data Sheet, upon information and belief, was
never disclosed to the defense. It contains *Rosario* material – Lozano's false
statement that he owned the house since 1992, which he apparently made to
the D.A.'s Office even though it was brought to his attention at the 1994 civil
proceeding and he acknowledged that the conveyance occurred in November
1993 – and *Brady* material – the statement by the postal carrier that he had
delivered mail to O'Hara at the location.    The only postal carrier who
testified at trial was in another district and had no knowledge of mail
deliveries on 47th Street.[3]

---

[3] This does not appear to be the only *Rosario/Brady* violation committed by the D.A.'s
office in this prosecution. During the first trial, ADA O'Mara tried to smear O'Hara by asking a
defense witness if she was "aware" that O'Hara's petitions to get on the ballot as a candidate for
the Assembly had been invalidated for "fraud." O'Hara had not put his character in evidence,
nor was there any evidence that he was personally responsible for any defective, let alone
fraudulent, petitions. When O'Hara's counsel objected that this was a distortion of what had
occurred, ADA O'Mara represented that he had the "actual transcript of the proceedings. What
occurred is this: There was a challenge to the petitions, including those by the way of the person
who was up on the stand. There is substantial testimony taken. The Judge began to issue a
ruling concerning Mr. O'Hara's residency and also concerning the petitions, and, in fact, had
verbally said he was disqualifying them…" First Trial Tr. 404-05. However, ADA O'Mara did
not disclose the transcript to the defense until 1999, shortly before the second trial, when the
defense demanded it. It contained the testimony of People's witnesses Lozano (pp. 30-38) and
Parras (pp. 18-30), and plainly constituted (at least) *Rosario* material. (ADA O'Mara had
obtained it through a subpoena notwithstanding that it was sealed; it had not been available to the
defense.)

The civil transcript also shows that Mr. O'Hara's representations to the court were
inaccurate. Most of the testimony at the hearing concerned whether there were insufficient valid
petition signatures to sustain O'Hara's candidacy -- whether campaign workers had obtained
some signatures that they did not personally witness or which were otherwise technically
defective -- but little or no evidence of fraud, and none of the failings were shown to have been
known to or caused by O'Hara. At no time did the judge indicate he was going to make a
finding that O'Hara's residency was fraudulent, or that the petitions were fraudulent. In the end,
O'Hara agreed to withdraw his petitions and to end his candidacy, "without admitting any of the

LAW OFFICES OF JOEL B. RUDIN, P.C.

Mark Hale
December 11, 2015
Page 17

Handwritten notes from the case file indicate that the Office considered offering O'Hara an ACD, evidently because it "would foreclose [a] lawsuit for malicious prosecution." Exh. L. It would be interesting to learn who wrote this and why.

Finally, we wonder about whether there was any undisclosed financial, law enforcement, or other consideration given Lozano and Munoz, each of whom testified at no less than three trials even though, they claimed, they had no interest in this matter. Interestingly, their friend and co-purchaser of the 47th Street house, Quetzal Martinez, had an extensive criminal record, including a drug use history, and it is possible his friends were motivated to testify by their knowledge, expectation, or hope that not only would they obtain law enforcement consideration for themselves, but that Martinez would as well. After the third trial, he was arrested and indicted on two separate burglary charges, Ind. Nos. 8472/2000 and 8865/2000, was diverted into a treatment program, and repeatedly, over seven years, violated the requirements of the program and of the plea agreement by leaving the program and being rearrested, yet the D.A.'s Office never asked for any adverse consequences and ultimately his conviction was expunged. I have more than 50 transcripts for his court appearances if you would be interested in examining them as part of a further inquiry. I could find no reference to this case, but that does not mean that the District Attorney's attitude wasn't influenced by his and his friends' cooperation against John O'Hara.

Please let me know if I can assist your re-investigation in any other

_____

allegations ... based on an insufficient number of [valid] signatures in the petition," nothing more. Tr. 322-24.

LAW OFFICES OF JOEL B. RUDIN, P.C.

Mark Hale
December 11, 2015
Page 18

way.  I look forward to hearing from you.

Sincerely yours,

Joel B. Rudin

JBR/tp
Encls.

# EXHIBIT A

## CITY REGISTER RECORDING AND ENDORSEMENT PAGE
### - KINGS COUNTY -
*(This page forms part of the instrument)*

k(s) _757_

s) _54_

_553 47th St._

Record & Return to: _Carlos F. Rodriguez Abeleo, Esq._
_5403 5th Ave, Bklyn, NY, 11220_

Title/Agent Company name: _A.R.S. ABSTRACT, LTD._

Title Company number: _SECK 1522_

**REEL 3155 PG 1132**

---

THE FOREGOING INSTRUMENT WAS ENDORSED FOR THE RECORD AS FOLLOWS:

Examined by (▵): _____

Mtge Tax Serial No.: _____

Mtge Amount _____ $

Taxable Amount ____ $

Exemption (✓) _____ YES ☐    NO ☐

Type: [339EE]  [255]  [OTHER____]
CIRCLE ONE ☞

Dwelling Type: [1 to 2]  [3]  [4 to 6]  [OVER 6]
CIRCLE ONE ☞

TAX RECEIVED ON ABOVE MORTGAGE ▼

County (basic) _____ $

City (Add'l) _____ $

Spec.Add'l _____ $

TASF _____ $

MTA _____ $

NYC/YONK _____ $

TOTAL TAX _____ $

Apportionment Mortgage (✓) YES ☐  NO ☐

Joy A. Bobrow, City Register

City Register Serial Number ➾ **59402**

Indexed By (▵): _____    Verified By (▵): ✓

Block(s) and Lot(s) verified by (✓):

Address ☐    Tax Map ☐

Extra Block(s) _____    Lot(s) _____

Recording Fee _____ $ A21

Affidavit Fee ____(C) $

TP-584/582 Fee _(Y) $

RPTT Fee _____(R) $ 25

HPD-A ☒    HPD-C ☐

New York State Real Estate Transfer Tax ▼
$ 224

Serial Number ➾ 004816

New York City Real Property Transfer Tax Serial Number ➾ 14288

New York State Gains Tax Serial Number ➾

---

(sideways left margin:)
GANFF $1.0'
GANFF 44984'
11-15-93
DEED 4327.0'
DEED 44984'
BK01 11-15-93

---



RECORDED IN KINGS COUNTY
OFFICE OF THE CITY REGISTER

1993 NOV 15 A 9:30

Witness My Hand and Official Seal

City Register

A. 169

CRGFM89K.BPG 1/93

THIS INDENTURE, made the  28  day of  October , 1993

**BETWEEN**

MAGALY X. LUCAS, residing at 326 W. 45th Street, Suite 1F, New York, New York

party of the first part, and

QUETZAL MARTINEZ, ROBERTO LOZANO and RAFAEL MUNOZ all residing at 553 47th Street, Brooklyn, New York

party of the second part,

WITNESSETH, that the party of the first part, in consideration of

dollars

paid by the party of the second part, does hereby grant and release unto the party of the second part, the heirs, or successors and assigns of the party of the second part forever,

ALL that certain plot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in the Borough of Brooklyn, County of Kings, City and State of New York, bounded and described as follows:

BEGINNING at a point on the northerly side of 47th Street, distant 240 feet westerly from the corner formed by the intersection of the northerly side of 47th Street with the westerly side of 6th Avenue;

RUNNING THENCE northerly parallel with 6th Avenue, and part of the distance through a party wall, 92 feet to the southerly side of land formerly of Thomas Hunt, deceased;

THENCE westerly along said land of Hunt, 20 feet 1/2 of an inch;

THENCE southerly again parallel with 6th Avenue, and part of the distance through another party wall, 90 feet 9 inches to the northerly side of 47th Street;

THENCE easterly along the northerly side of 47th Street, 20 feet to the point or place of BEGINNING.

Said premises being known as and by 553 47th Street, Brooklyn, New York.

Sec: 3
Block: 757
Lot: 54

TOGETHER with all right, title and interest, if any, of the party of the first part in and to any streets and roads abutting the above described premises to the center lines thereof; TOGETHER with the appurtenances and all the estate and rights of the party of the first part in and to said premises; TO HAVE AND TO HOLD the premises herein granted unto the party of the second part, the heirs or successors and assigns of the party of the second part forever.

AND the party of the first part covenants that the party of the first part has not done or suffered anything whereby the said premises have been encumbered in any way whatever, except as aforesaid.

AND the party of the first part, in compliance with Section 13 of the Lien Law, covenants that the party of the first part will receive the consideration for this conveyance and will hold the right to receive such consideration as a trust fund to be applied first for the purpose of paying the cost of the improvement and will apply the same first to the payment of the cost of the improvement before using any part of the total of the same for any other purpose. The word "party" shall be construed as if it read "parties" whenever the sense of this indenture so requires.

IN WITNESS WHEREOF, the party of the first part has duly executed this deed the day and year first above written.

IN PRESENCE OF:

Magaly C. Lucas

Form 3290

A   170

STATE OF NEW YORK, COUNTY OF KINGS          ss:

On the 2 9 day of  O c.t.o.b.e.r 19 93 , before me personally came   Magaly C. Lucas

to me known to be the individual       described in and who executed the foregoing instrument, and acknowledged that   she executed the same.

_____

CAROL LEE FLITT
NOTARY PUBLIC, State of New York
No. 24-...9:0539
Qualified in King County
Commission Expires December 31, 19 94

STATE OF NEW YORK, COUNTY OF          ss:

On the       day of          19    , before me personally came
to me known, who, being by me duly sworn, did depose and say that   he resides at

that   he is the
of
, the corporation described in and which executed the foregoing instrument; that   he knows the seal of said corporation; that the seal affixed to said instrument is such corporate seal; that it was so affixed by order of the board of directors of said corporation, and that   he signed h   name thereto by like order.

_____

STATE OF NEW YORK, COUNTY OF          ss:

On the       day of          19    , before me personally came

to me known to be the individual       described in and who executed the foregoing instrument, and acknowledged that         executed the same.

_____

STATE OF NEW YORK, COUNTY OF          ss:

On the       day of          19    , before me personally came
the subscribing witness to the foregoing instrument, with whom I am personally acquainted, who, being by me duly sworn, did depose and say that   he resides at
; that   he knows
to be the individual described in and who executed the foregoing instrument; that   he, said subscribing witness, was present and saw

execute the same; and that   he, said witness, at the same time subscribed h   name as witness thereto.

_____

## BARGAIN AND SALE DEED

### WITH COVENANT AGAINST GRANTOR'S ACTS

Title No. SECK1522

Magaly C. Lucas

TO

Quetzal Martinez,
Roberto Lozano and
Rafael Munoz

A.B.S. ABSTRACT, LTD.
Standard Form of New York Board of Title Underwriters
36-12  34th Avenue L.I.C.
Commonwealth.
Land Title Insurance Company

SECTION  3
BLOCK    757
LOT      54
COUNTY OR TOWN  Kings
STREET ADDRESS  553 47th Street
                Brooklyn, NY

Recorded at Request of
COMMONWEALTH LAND
TITLE INSURANCE COMPANY

RETURN BY MAIL TO

CASTO F. RODRIGUEZ ARBELO, ESQ.
5403 5th Avenue
Brooklyn, New York 11220

THIS SPACE FOR USE OF RECORDING OFFICE

A. 171

# EXHIBIT B

05/24/96

MORTG NO : CI-50801126

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS

FORECLOSURE

------------------------------------------------x

OCI MORTGAGE CORPORATION

                                  Plaintiff,

      -against-

MAGALY LUCAS
QUETZAL MARTINEZ
ROBERTO LOZANO
RAFAEL MUNOZ
ALLAN LEE
NEW YORK CITY PARKING VIOLATIONS BUREAU
NEW YORK CITY TRANSIT AUTHORITY, TRANSIT
    ADJUDICATION BUREAU

                            Defendants.

: NOTICE OF
: MOTION FOR
: JUDGMENT OF
: FORECLOSURE
: AND SALE
:
: INDEX NO.
: 17589/94
:
: ASSIGNED TO
: JUSTICE
:
: Gloria Aronin
:
:
:
:
:
:
:
:

------------------------------------------------x

SIRS:

        PLEASE TAKE NOTICE that upon the summons and verified

complaint; notice of pendency of action;and upon all papers

already on file herein; the annexed affirmation of LISA B.

SINGER dated May 24, 1996 and upon the annexed referee's

computation dated June 27, 1995, the undersigned will move this

court at an IAS part 72 Supreme Court State of New York, County

of KINGS at 360 Adams Street Brooklyn, NY 11201 on **JUN 2 7 1996**

_____ at 9:30 a.m. in the forenoon of that day, or as soon

thereafter as counsel may be heard, for confirmation of the

referee's report, for a Judgment of Foreclosure and Sale and

for other and further relief as this Court may deem just and

proper.

  PLEASE TAKE FURTHER NOTICE, that pursuant to CPLR 2214(b) answering affidavits, if any, are required to be served upon the undersigned at least seven (7) days before the return date of this motion.

Dated: May 24    , 1996

Yours, etc.
CULLEN AND DYKMAN
Garden City Center
100 Quentin Roosevelt Blvd.
Garden City, NY  11530
(516) 357-3600

 TO:
MAGALY LUCAS
DEFENDANT
403 West 38TH STREET, #3E
NEW YORK, NY 10018

QUETZAL MARTINEZ
DEFENDANT
553 47TH STREET
BROOKLYN, NY  11220

ROBERTO LOZANO
DEFENDANT
553 47TH STREET
BROOKLYN, NY  11220

RAFAEL MUNOZ
DEFENDANT
553 47TH STREET
BROOKLYN, NY  11220

ALLAN LEE
DEFENDANT
2001 GERRITSEN AVENUE
BROOKLYN, NY  11229

ALAN S. ROTH, ESQ
ATTORNEY FOR DEFENDANT
NEW YORK CITY PARKING VIOLATIONS BUREAU
770 BROADWAY, 15TH FLOOR
NEW YORK, NY  10003

NEW YORK CITY TRANSIT AUTHORITY, TRANSIT
  ADJUDICATION BUREAU

DEFENDANT
505 FULTON STREET
BROOKLYN, NY  11201

WE ARE ATTEMPTING TO COLLECT A DEBT
ANY INFORMATION OBTAINED WILL BE USED
FOR THAT PURPOSE

05/24/96

MORTG NO : CI-50801126

At an IAS part 72 of the Supreme Court held
for the County of KINGS at the Courthouse
thereof, 360 Adams Street, Brooklyn, NY
11201 on May __, 1996.

DIST.
00000

P R E S E N T :                    HON.

SEC.                               JUSTICE.              FORECLOSURE
000     ------------------------------------------------x

BLOCK   OCI MORTGAGE CORPORATION                    : JUDGMENT OF
00757                                               : FORECLOSURE
                                  Plaintiff,        : AND SALE
LOT
054                                                 :

Lis              -against-                          :
Pendens                                             : INDEX NO.
Filed   MAGALY LUCAS                                : 17589/94
06/14/94 QUETZAL MARTINEZ                           :
        ROBERTO LOZANO                              :
        RAFAEL MUNOZ                                :
        ALLAN LEE                                   :
        NEW YORK CITY PARKING VIOLATIONS BUREAU     :
        NEW YORK CITY TRANSIT AUTHORITY, TRANSIT    :
            ADJUDICATION BUREAU                     :

                                  Defendants.       :
        ------------------------------------------------x

        On the reading of the following, all now duly filed in

the office of the Clerk of KINGS and on all the proceedings

thereon particularly the:

        Summons and Verified Complaint filed on May 31, 1994 and

on all the affidavits of service and notices of appearance,

showing that each and all of the defendants herein have been

personally served with said summons and complaint;, or have

voluntarily appeared herein by their respective attorneys; and

upon the

        Notice of Pendency of Action filed 06/14/94; and upon the

Order of Reference and Amendment dated April 12, 1995; appointing a referee to compute the amount due the plaintiff upon the bond (note) and mortgage set forth in the verified complaint and to examine and report whether or not the mortgaged premises can be sold in parcels; and upon the

Oath and Report dated June 27, 1995 in which it appears that the sum of $206,542.20 was due thereon at the date of said report; and that the mortgaged premises cannot be sold in parcels without material injury to the parties interested; and that the whole amount secured by said bond (note) has become due; and upon the

Notice of Motion for Judgment of Foreclosure and Sale dated 05/24/96; and upon the

Affirmations of Regularity and Legal Services each dated 05/24/96 of LISA B. SINGER, an associate of Cullen and Dykman attorneys for plaintiff,proving that more than thirty days had elapsed since such service upon said defendants was completed and since said defendants appeared, as aforesaid, and that none of the defendants had served an answer to said verified complaint, moved with respect thereto, nor had their time to do so been extended; and that no necessary defendant is an infant, incompetent, absentee or in the military; and that said defendants are in default,

NOW, on motion of CULLEN AND DYKMAN, plaintiff's attorneys it is

ORDERED that the plaintiff's motion is hereby granted, and it is further

ORDERED, ADJUDGED AND DECREED, that the said report of KAREN B. ROTHENBERG, ESQ the said referee is in all respects ratified and confirmed, and it is further

ORDERED, ADJUDGED AND DECREED, that the plaintiff is hereby awarded judgment herein for the sum of $206,542.20 together with interest at the rate set forth in the note and mortgage from the date specified in the referee's report, together with legal interest from the date of entry hereof, together with advances from the date specified in said report, plus the sum of $_____ to be taxed by the Clerk of the Court and inserted herein is hereby adjudged to the plaintiff for costs and disbursements of this action, with interest thereon from the date of entry hereof, together with an additional allowance of $_____ hereby awarded to plaintiff in addition to costs and disbursements, with interest thereon from the date of entry hereof, and it is further

ORDERED, ADJUDGED AND DECREED that the mortgaged premises described in the complaint in this action, as hereinafter set forth, be sold at public auction in one parcel on the foot of the Courthouse steps, facing Adams Street at the Kings County Courthouse, 360 Adams Street, Brooklyn, NY  11201 _

_____ by: _____

_____, who is hereby appointed referee for that purpose.  That said referee give public notice of the time and place of sale, according to law and the course and practice of this Court, by publishing notice of sale in the _____

_____

_____; that the plaintiff or any other party to this action may become the purchaser or purchasers at such sale; that said referee execute to the purchaser or purchasers on such sale a deed of the premises sold; that said referee on receiving the proceeds of sale forthwith pay therefrom the taxes, assessments and water and sewer rents which are, or may become liens on the premises at the time of sale and any such payments shall be allowed to the plaintiff and applied by said referee upon the amounts due to the plaintiff as specified above in item marked "THIRD." That said referee then deposit the amount received at sale in _____

_____  _____

_____("Depository") and shall thereafter make the following payments:

First: The statutory fees of said referee, in the amount of $_____.

Second: Expenses of sale and advertising expenses as shown on the bill(s) presented and certified by the referee to be correct. Duplicate receipts shall be annexed to the Report of Sale.

Third: Said referee shall also pay to the plaintiff or its attorneys, the sum of $206,542.20 together with interest at the rate set forth in the note and mortgage from the date specified in the referee's report, together with legal interest from the date of entry hereof, together with advances from the date specified in said report, plus the sum of $_____ adjudged to the plaintiff for costs and disbursements in this action to be taxed by the Clerk of the Court and inserted

herein, with interest thereon from the date of entry hereof, together with an additional allowance of $_____ . hereby awarded to plaintiff in addition to costs and disbursements with interest thereon from the date of entry hereof, or so much as the purchase money of the mortgaged premises will pay of the same.  The referee shall take a receipt therefor, and file it with the referee's report of sale.

And said referee shall pay to the plaintiff a reasonable sum for preservation of the property upon presentation of receipts for such expenditures to said referee.

And said referee shall pay to plaintiff an attorney's fee as authorized by the said mortgage in the amount of $3,205.

Fourth:  If such referee intends to apply for a further allowance for his fees, he may leave upon deposit such amount as will cover such additional allowance to await the further order of this Court thereon after application duly made.

Fifth:  That in case the plaintiff be purchaser of said mortgaged premises at said sale, or in the event that the rights of the purchaser at said sale and the terms of sale under this Judgment shall be assigned to and be acquired by the plaintiff, and a valid assignment thereof filed with the said referee, said referee shall not require the plaintiff to pay in cash the entire amount bid at said sale, but shall execute and deliver to the plaintiff a deed or deeds of the premises sold upon the payment to said referee of the amounts specified above in items marked "FIRST" and "SECOND" and the amounts of the aforesaid taxes, assessments and water and sewer rents, and interest or penalties thereon, or in lieu of the payment of

said last mentioned amounts, upon filing with said referee receipts of the proper municipal authorities showing the payment thereof that the balance of the amount bid, after deducting therefrom the aforesaid amounts paid by the plaintiff, for preservation of the property, referee fees, expenses of sale, and taxes, assessments and water and sewer rents shall be allowed to the plaintiff and applied by said referee upon the amounts due to the plaintiff as specified above in item marked "THIRD"; that if after so applying the balance of the amount bid, there shall be a surplus over and above the said amounts due to the plaintiff, the plaintiff shall pay to said referee, upon delivery to it of said referee's deed, the amount of surplus; that said referee on receiving said several amounts from plaintiff shall forthwith pay therefrom said taxes, assessments, water and sewer rents and interest or penalties thereon, unless the same have already been paid, and shall then deposit the balance in said Depository.

Sixth:  That said referee take the receipt of the plaintiff or its attorneys for the amounts paid as herein before directed in item marked "THIRD", and file it with the referee's report of sale; that said referee deposit the surplus moneys, if any, with the Clerk of the court within five days after the same shall be received and be ascertainable, to the credit of this action, to be withdrawn only on the order of the Court, signed by a Justice of the Court; that the said referee make a report of such sale and file it with the Clerk of KINGS County within thirty days of completing the sale and executing

a proper conveyance to the purchaser; and that the purchaser or purchasers at such sale be let into possession on production of the referee's deed or deeds.

AND IT IS FURTHER ORDERED, ADJUDGED AND DECREED that if the proceeds of said sale be insufficient to pay the amount so reported due the plaintiff, with the expenses of sale, interest, cost and allowance, as aforesaid, the said referee shall specify the amount of such deficiency in the referee's report of sale; that the plaintiff recover of the defendant MAGALY LUCAS, the whole deficiency or so much thereof as the Court may determine to be just and equitable of the residue of the mortgage debt remaining unsatisfied after a sale of the mortgaged premises and the application of the proceeds thereof, provided a motion for a deficiency judgment shall be made as prescribed by Section 1371 of the Real Property Actions and Proceedings Law within the time limited therein, and the amount is determined and awarded by an order of this Court as provided for in said section; and that the purchaser or purchasers at such sale be let into possession of the premises sold to them on production of the referees deed or deeds of said premises.

AND IT IS FURTHER ORDERED, ADJUDGED AND DECREED, that each and all of the defendants in this action and all persons claiming through or under them, or any or either of them, after the filing of such notice of pendency of this action, are hereby forever barred and foreclosed of all right, claim, lien, title, interest and equity of redemption in the said mortgaged premises and each and every part thereof.

Annexed hereto as Schedule "A" is a description of the

said mortgaged premises hereinbefore mentioned;

SUBJECT to covenants, reservations, easements and restrictions contained in prior deeds and/or instruments and agreements of record, if any, to the extent that they are presently enforceable; to any state of facts an accurate survey and physical inspection may show; to conditional bill of sale contracts and/or financing statements of record, if any; to orders and/or notices of violations filed in Municipal, State or U.S. Governmental departments; to zoning restrictions and regulations and any amendments thereof; and to rights, if any, of occupants, to the extent only that said rights may be controlling.

ENTER

_____
JUSTICE, SUPREME COURT

SCHEDULE A

ALL that certain plot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in the Borough of Brooklyn, County of Kings, City and State of New York, bounded and described as follows:

BEGINNING at a point on the Northerly side of 47th Street, distant 240 feet westerly from the corner formed by the intersection of the northerly side of 47th Street with the westerly side of 6th Avenue:

RUNNING THENCE Northerly parallel with 6th Avenue and part of the distance through a party wall, 92 feet to the southerly side of land formerly of Thomas Hunt, deceased;

THENCE Westerly along said land of Hunt, 20 feet 1/2 of an inch:

THENCE Southerly again parallel with 6th Avenue and part of the distance through another party wall, 90 feet 9 inches to the northerly side of 47th Street;

THENCE Easterly along the northerly side of 47th Street, 20 feet to the point or place of BEGINNING.

PREMISES KNOWN AS: 553 47th Street, Brooklyn, New York.

T-36-Plaintiff's Costs:  on Foreclosure or other Real Property

**MORTG NO : CI-50801126**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS

```
--------------------------------------------------x
OCI MORTGAGE CORPORATION                          : COSTS OF
                                                  : PLAINTIFF
                                Plaintiff,         :
                                                  :
            -against-                             :
                                                  : INDEX NO.
MAGALY LUCAS                                      : 17589/94
QUETZAL MARTINEZ                                  :
ROBERTO LOZANO                                    :
RAFAEL MUNOZ                                      :
ALLAN LEE                                         :
NEW YORK CITY PARKING VIOLATIONS BUREAU          :
NEW YORK CITY TRANSIT AUTHORITY, TRANSIT         :
    ADJUDICATION BUREAU                          :
                                                  :
                                Defendants.        :
--------------------------------------------------x
```

## COSTS

Costs before note of issue CPLR 8201 subd. 1  ........ $200.00
Motion costs CPLR 8202 .................................
Allowance by statute CPLR 8302(a)(b) ...................
Percentage on $_____ at 10% (not exceeding $200.00)..   20.00
Additional $_____ at 5% (not exceeding $800.00).....    40.00
Additional $_____ at 2% (not exceeding $2,000.00)...    40.00
Additional $_____ at 1% (not exceeding $5,000.00)...    50.00
Additional allowance CPLR 8302(d) .....................    50.00

               COSTS........................... $400.00

## DISBURSEMENTS

Fee for index number CPLR 8018(a) 8301(a)(12) ........ $170.00
Referee's fees CPLR 8301(a)1 8003(b) ..................  200.00
Clerk's filing notice of pendency CPLR 8021(a)10
                                  8301(a)(12) ......    15.00
Paid for searches CPLR 8301(a)10 ..................... 275.00
Serving copy summons & complaint CPLR 8011(c)1
                                  8301(d) .......... 280.00
Paid referee's report CPLR 8301(a) 8003(a)(1) .......   50.00
Postage CPLR 8301(a)12 ...............................   15.00
Sheriff's fees on execution CPLR 8011(b) 8012 .......
Fees for publication CPLR 8301(a)3 ..................
Request for Judicial Intervention CPLR 8020(a) ......   75.00

DISBURSEMENTS................... $ 1080.00

TOTAL.............................. $ 1480.00

STATE OF NEW YORK
COUNTY OF NASSAU                    Attorney's Affirmation

    The undersigned admitted to practice in the court of this
state affirms that affirmant is an attorney for Cullen and
Dykman, the attorneys of record for plaintiff in the above
entitled action: that the foregoing disbursements have been or
will necessarily be made or incurred in this action and are
reasonable in amount; and that copies of documents or papers as
charged herein were actually and necessarily obtained for use.

    The undersigned affirms that the foregoing statements are
true, under the penalties of perjury.

                                    LISA B. SINGER

Dated May 24    , 1996

MORTG NO : CI-50801126

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS

------------------------------------------------------x

OCI MORTGAGE CORPORATION

                         Plaintiff,

              -against-

MAGALY LUCAS
QUETZAL MARTINEZ
ROBERTO LOZANO
RAFAEL MUNOZ
ALLAN LEE
NEW YORK CITY PARKING VIOLATIONS BUREAU
NEW YORK CITY TRANSIT AUTHORITY, TRANSIT
    ADJUDICATION BUREAU

                      Defendants.

------------------------------------------------------x

: AFFIRMATION
:    OF
: REGULARITY
:
:
: INDEX NO.
: 17589/94
:
:
:
:
:
:
:
:

DIST.
00000

SEC.
000

BLOCK
00757

LOT
054

Lis
Pendens
Filed
06/14/94

      LISA B. SINGER, the undersigned an attorney admitted to practice in the courts of this state, affirms under penalty of perjury as follows:

      1.   Affirmant is associated with the firm of CULLEN AND DYKMAN, plaintiff attorneys in the above entitled action, which was brought to foreclose a mortgage affecting real property situated in KINGS County, State of New York, and affirmant is familiar with the details thereof.

      2.   The summons and duly verified complaint was filed in the Office of the Clerk of KINGS County. That thereafter a notice of pendency of action in due form and containing correctly and truly all the particulars required by law to be stated in such notices was duly filed in the Office of the

Clerk of said County on the dates indicated in the left margin herein.

3.    This action was commenced by the filing of the summons and complaint in the Office of the Clerk of said county on May 31, 1994.

4.    All of the necessary parties defendant have been duly served herein with summons and verified complaint in accordance with all applicable laws and statutes, or have voluntarily appeared herein by their respective attorneys.

5.    This action was commenced because of the non-payment of monthly installments of principal and interest and mortgagor(s)'s deposits which became due and payable on January 1, 1994 and on the first day of each subsequent month.  Based upon this default in payment under the terms of the subject mortgage, plaintiff elected to exercise its option under the mortgage to declare the unpaid principal and interest immediately due and payable.

6.    Since the filing of the summons and verified complaint, and notice of pendency of action, the complaint has not been amended in any manner whatsoever.

7.    All of the necessary defendants are of full age and sound mind and that no necessary defendant is an absentee, prior encumbrancer or in the military.

8.    More than thirty days have elapsed since the completion of service of process in this action.

9.    No defendant has answered the complaint or moved with respect thereto and the time to do so has expired

including the time granted pursuant to any extension thereof.

10.    The following defendant has appeared in this action:


Defendant    : NEW YORK CITY PARKING VIOLATIONS BUREAU

Def. attorney: ALAN S. ROTH, ESQ

            770 BROADWAY, 15TH FLOOR

            NEW YORK, NY  10003


11.    The whole amount secured by said mortgage is due and payable.

12.    All the proceedings in this action have been regular and in accordance with the rules and practice of this Court.

13.    On April 12, 1995 an Order of Reference and Amendment was signed.

14.    The referee appointed herein computed the amount due plaintiff and issued the oath and report which is annexed hereto as Exhibit A.

14A.    That a prior Application for a Judgment of Foreclosure and Sale was submitted.  That at the appearance on November 2, 1995, Deborah Bryant, Esq. of this firm and Defendant Raphael Munoz  were present.  At said appearance, the defendant requested an adjournment to obtain counsel.  It was agreed that the case would be adjourned until December 14, 1995 and marked final.

14B.    However, on December 14, 1995 said case was not on the calendar call and plaintiff's attorney was told that the court had no recollection of this case.

14C.    Thereafter, upon a search of the court file, it was discovered that this case was marked off the calendar on November 2, 1995.

15.    No previous application has been made for a Judgment of Foreclosure and Sale other than the above-mentioned application.

WHEREFORE, plaintiff asks for Judgment for the relief demanded in the complaint in the form annexed hereto as Exhibit B, and for such other and further relief as to the Court may deem just and proper.

LISA B. SINGER

DATED: May 24          , 1996
      Garden City, New York

# EXHIBIT C

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS
-------------------------------------------x
THE PEOPLE OF THE STATE OF NEW YORK    :

           -against-    :    Indictment No. 13525-96

JOHN K. O'HARA,    :    AFFIRMATION

              Defendant.    :

-------------------------------------------x
STATE OF NEW YORK, COUNTY OF KINGS


    MAGALY LUCAS, an attorney duly admitted to practice before the courts of the State of New York, affirms under penalty of perjury, as follows:


    1. I submit this affirmation in connection with the case of People v. John O'Hara, the trial of which ended on May 13, 1997. I was scheduled to testify in that trial -- to be called by the defense -- but I refused to do so because I had been threatened by the prosecutor, Mr. O'Mara, that if I testified and John O'Hara "went down", I would "go down with him".

    2. Sometime in 1990 I bought the building at 553 47th Street, Brooklyn, New York. I also lived there until November 30, 1992 -- one month after Mr. O'Hara moved in to an apartment in the same building. After I moved out others moved in on December 1, 1992, rented for a period of time and then, about a year later, purchased the building.

    3. Mr. O'Hara said he wanted to move in to that building because it was in the district in which he wanted to run for

assemblyman. I agreed to permit him to live rent free because he had permitted me to live rent free in his apartment when we were living together in 1990. He agreed, at my request, to make sure my renters paid their rent to the bank.

4. On October 21, 1996 I was contacted for the first time by Allen Presser, an investigator from the Brooklyn District Attorney's office. He left a post-it note on my door asking me to call him and I did so the next day and we spoke. He called me again on October 29 and he questioned me again thereafter. Our *when?* conversations concerned my ownership of the building on 553 47th Street in Brooklyn and John O'Hara's residence in that building in 1992 and 1993.

5. In March of 1997, I was served with a subpoena to *LIMITED* bring certain records to court, which I did, and ADA O'Mara copied what he wanted. However, Mr. O'Mara told me that I could get in big trouble for what I told Mr. Presser.

6. Some weeks later I was asked to come to court by Mr. O'Hara's attorney, Mr. Meyers. I appeared in court ready to testify at trial. But the trial was adjourned and the Judge told me to come back another day. At that time, Mr. O'Mara told me, that he was not going to call me and that "If you testify and he goes down, you'll go down" and "and we're not giving you any immunity."

7. I started to complain to the Judge about what Mr. O'Mara said, but she cut me off, telling me it was not her jurisdiction. I assumed she had heard most, if not all, of what he

- 2 -

had threatened.

8.    Thereafter I told Mr. Meyers I would not testify, in view of the DA's threats.  I was frightened, that the District Attorney's Office would get on my case, would try to indict me for something (the way they did with Mr. O'Hara), that they might do something to affect my license to practice law.  I do not practice criminal law.  No one told me and I did not know that I could get immunity if I appeared and claimed my fifth amendment privilege, despite what Mr. O'Mara said -- and that I could not be forced to testify unless I got immunity.  Had I been told that, I would not have refused to appear.

9.    If not for the DA's threats, I would have testified at John's trial to the fact that he did reside at the 47th Street house beginning in October 1992.

Dated July 23rd 1997
New York, New York

Magaly Lucas

# EXHIBIT D

SUPREME COURT OF THE STATE OF NEW YORK
KINGS COUNTY :    PART 17
————————————————————————x
THE PEOPLE OF THE STATE OF NEW YORK

-against-

Indictment No. 13525/96

**AFFIRMATION**

JOHN KENNEDY O'HARA,

Defendant.
————————————————————————x

STATE OF NEW YORK) ss: KINGS COUNTY)

      **MAGALY LUCAS,** an attorney duly admitted to practice before the courts of the State of New York, affirms under penalty of perjury, as follows:

1. That, in late June of 1999 during the course of a conversation with Mr. Carlos Ferreiro, a client and friend, Mr. Ferreiro, informed me that Mr. Hernandez was trying to urgently get in touch with me. At the time that Mr. Hernandez was looking for me I was employed by the New York City Board of Education and worked as a teacher at P.S. 128, which is located on Audubon Avenue and 169th street in Manhattan.;

2. I recall the specifically date of my conversation with Mr. Ferreiro because it was just after 5th grade graduation. Mr. Ferreiro informed me that Mr. Hernandez had called about two weeks prior on several occasions.

3. After the graduation, which took place June 25, 1999, I went on vacation with my family to Cape May, New Jersey. My family had planned this vacation to coincide with the end of the school year and my sister's arrival from Zimbabwe.

4. I returned from my vacation after the Fourth of July weekend, and began to work on a special project at the district 6 main office. About a week latter I contacted Mr. Hernandez, who informed me that he wanted me to testify at Mr. O'Hara's trial. However the trial had already taken place. At that time he informed me of the outcome of the trial and specifically discussed the testimony of Mrs. Josephine Vales. He stated that Mrs. Vales had disavowed the existence of a finished basement at 553 47th street, Brooklyn, New York. I told Mr. Hernandez that statement was untrue and that I recall an appraiser's report which referred to the apartment in the basement of that building;

EXHIBIT A

5. Finding the document was difficult because I had recently moved from 319 West 47th Street, New York to 40-74th Street, Apt. 2B, North Bergen, New Jersey. My correspondence was forwarded to my office located at 403 West 38th Street, New York, New York. My voice mail was also forwarded to that address. I have worked primarily as a teacher, since the spring of 1997. During the spring and early summer of 1999 I seldom return to the 38th Street office/apartment;

6. Sometime in late August I found the appraiser's report on the 553 47th Street property. The report had been prepared by the GreenPoint Savings Bank in 1990. I gave the report to Mr. Hernandez. The report indicates that there was a finished basement at 553 47th street, Brooklyn, New York at the time that I purchased the property from Mr. and Mrs. Vales in 1990.

7. In 1991 I decided to sell the building and moved to a subleased apartment on West 45th Street in Manhattan, N.Y. At that point in time I permitted John O'Hara to live in the basement apartment in return for his commitment to supervise the work and payment of the mortgage by Messrs. Lozano, Munoz and Martinez pending the closing of the property. These three individuals signed a lease with an option to buy the property within a year.

Dated: September 22, 1999
     New York, New York

Magaly Lucas





41-60 MAIN STREET ● FLUSHING, N.Y. 11355-3820

MAGALY LUCAS
45 DANNER AVENUE
HARRISON, NY  10528

                                        Re:  PRUCHASE
                              Premises:  553 47 STREET
                                         BROOKLYN, NY  11220

      We have received your request for a copy of an appraisal report
of the above stated premises.

      Enclosed please find your copy.



                                    Sincerely,

                                    Mortgage Appraisal Department



Enc.



EXHIBIT C

crofiche No: _____

PLACEMENT VALUE: 

**VALUATION**

d 20 x 90 I PER Range of Sales: 

Application No. 000009000285

Lot Size @ Value of: 

$ 80.000

ROVEMENTS:

56000 Square Cubic ft. @ $ 5.1 0 Per-Sq.-Foot Per Cube 163600

% Depreciation 36550

Depreciated Value 146880

$ 146880 Garage

Total $ 646880

APPRAISAL     ASSESSED VALUE     FIRE INSURANCE REQUIRED [60%]

$ _____    $ 2400    Struct.: A $ _____

rmts $ _____    $ _____    B $ _____

$ _____    $ 12000    C $ _____

1.9.90    Year _____ Taxes $ 1140    Total $ 130000

I hereby certify that I have examined the above property according to my best judgement the value is as stated above and mmend a loan the amount of $

12 45 - 1

Appraiser

BAY RIDGE

| | S 14 | Commitment issued _____ |
|---|---|---|
| | | Mortgage number 184042-0-14 5-4-90 |
| | | Map Section 3 Block 757 Lot 54 |

FEB 13 1990

SMSA _____
Quadrant 10 B15
DATE 1-9-90

ENTERED A: 553 47 ST BROOKLYN 11220

PREMISES B: _____

COUNTY: KINGS  LOT SIZE: 20 X 90.75  AREA 1827  sq. ft. ZONING Residential / Commerc.

STRUCTURE(S): No. of Stories 2+BASE Type BROWNSTONE + BRICK 2 FAMILY
[ ] Detached  [ ] Semi-Detached  [+] Attached  Year Built ABT 1910

DIMENSIONS:
Main 20 X 45   Ext. 7x6 VEST (R)  Ext. _____
Ext. _____   Ext. 4x2 2+BASEBAY (F)  Ext. _____
Ext. _____   Ext. _____   Courts _____

Layout:

RENT

| | | |
|---|---|---|
| 1 Level | | |
| 1 Level | | |
| 3 Level | | |
| 3d Level | 5R·B | 450 NL |
| 4 Level | 4R·B | OWNER |
| Basement | 3R·B | |
| Cellar | 3R·B BOIL 5'8" | |

Total No. Apts. 2   Total Rooms 15
Total Baths 4   Total Bedrooms 6
Total Kitchens 3   Other BOIL
Garage: Att-Det NONE
Driveway: Common-Pri. NONE
Monthly Rent: $ OWNER+450  Ann. Rent $ O+5400

NEIGHBORHOOD:
GOOD RESIDENTIAL / COMMERCIAL AREA    SIMILAR AND VARIOUS TYPE DWELLINGS ON BLOCK.
S OF 39 ST
E OF 4TH AV
AVERAGE INCOME GROUP.

NEIGHBORHOOD ACTIVITIES:
Schools 2 BL  Churches 2 BL  Stores ON B  Other _____
Transportation BUS  Utilities [+]water [+]electric [+]gas [+]sewers [ ] cesspools [ ]

| | E G F P | EXTERIOR | | B G F P | INTERIOR |
|---|---|---|---|---|---|
| GENERAL CONDITION | ✓ | | GENERAL CONDITION | ✓ | |
| PAVEMENT | ✓ | [+]mac [ ] asph [ ] | FLOORS | ✓ | [+]hw [ ] pk [ ] ply [ ] |
| SIDEWALKS & CURBS | ✓ | [+]conc [ ] slate [ ] | WALLS | ✓ | [+]drywall [+]pl [ ] |
| DRIVEWAY | ✓ | [ ] conc [ ] mac [ ] | CEILINGS | ✓ | [+]drywall [+]pl [ ] |
| ROOF | ✓ | [ ] asph [+]rubb [ ] | KITCHENS-FLOORS | ✓ | [+]vi [ ] lino [ ] cer [ ] crpt [ ] |
| CHIMNEYS | ✓ | [+]bk [ ] galv [ ] | CABINETS | ✓ | [+]wd [ ] form [ ] met [ ] |
| LEADERS & GUTTERS | ✓ | [ ] alum [+]copp [+]galv [ ] | SINKS | ✓ | [+]s/d [ ] d/d [+]s/lo [ ] porc [ ] |
| FIRE ESCAPES | ✓ | [ ] YES [+]NO | APPLIANCES | ✓ | [+]refrig [ ] d/w [ ] wash/mch [ ] |
| PAINT | ✓ | WORK REQUIRED: [ ] YES [ ] NO | RANGES | ✓ | [+]gas [ ] elec [+]fr [ ] wo [ ] |
| CORNICE | ✓ | [ ] asph [ ] slate [+]wd [+]MET | BATHS-FLOORS | ✓ | [+]cer [ ] yt [ ] tlie [ ] crpt [ ] |
| FOUNDATION | ✓ | [+]conc [ ] CB [ ] stone [ ] | WALLS | ✓ | [+]cer [+]dry/wall [ ] pl [ ] |
| FRONT WALL | ✓ | [ ] bk [ ] alum [ ] stucco [ ] wd/sh | TUBS | ✓ | [+]cabl [ ] bl [ ] legs [ ] |
| | | [ ] asb/sh [ ] asph/sh [+]STONE | SHOWERS | ✓ | [+]ol [ ] wall [ ] |
| SIDE & REAR WALLS | ✓ | [+]bk [ ] alum [ ] stucco [ ] wd/sh | BASINS | ✓ | [+]vanity [ ] hang [ ] ped [ ] |
| | | [ ] asb/sh [ ] asph/sh [ ] | FUEL/FUEL CAPACITY | ✓ | [+]gas [+]oil [ ] elec [ ]  GALS |
| FRAME AND SASH | ✓ | [+]wh [ ] slide [ ] case [+]alu | HEATING SYSTEM | ✓ | [+]steam [ ] hw [ ] hot air [ ] |
| | | [+]alum [+]wd [ ] vinyl [ ] | HOT WATER SUPPLY | ✓ | [ ] gas [ ] oil [ ] elec [+]tnkless [ ] auto |
| PORCH | | [ ] EP [ ] OP [ ] Scr/P [ ] | AIR CONDITIONING | ✓ | YES [ ] NO [+]l [ ] cntrl [ ] wall [ ] window |
| GARAGE | | | PLUMBING | ✓ | [ ] brass [+]ci [+]galv [ ] |
| MISCELLANEOUS | | | MISCELLANEOUS | | (DAMP LB |



46 ST

| 5 | | 6 |
|---|---|---|
| AV | 97.9 92 | AV  N |

47 ST

OWNS PROP IRVIS
BUYER TO OCCUP YES OWNER
CZ1 ACTION TEAM SOLD NET NA
GOS KITCH + 2 GOS BATH IN DUPLEX
4OS KITCH + 2OS BATH 2ND FL
POTENTIAL RENTABLE IN CELLAR-NO
PRIVATE ENTRANCE - SMALL ROOMS
RECENT IMPROV's NONE

MIXED BLOCK EXTERIOR PAINT GOOD

# EXHIBIT E

SUPREME COURT OF THE STATE OF NEW YORK
KINGS COUNTY :   PART 17
-------------------------------------------------------------X
THE PEOPLE OF THE STATE OF NEW YORK

        -against-

                                      Indictment No. 13525/96

                                           **AFFIDAVIT**

JOHN O'HARA,

                        Defendant.
-------------------------------------------------------------X
STATE OF NEW YORK) ss: KINGS COUNTY)

**DENISE MURRAY**, being duly sworn, deposes and says:

1. I am familiar with the matters hereinafter set forth.  This affidavit is submitted in support of the above-named defendant's motion for an order pursuant to Criminal Procedure Law § 330.30,  to set  aside the verdict;

2. I lived at 563 47th street, Brooklyn, New York, a two- family residential brownstone, for approximately 29 years. I moved from that locale in 1991. I currently reside at 89 Bard Avenue, Staten Island, New York, 10301, apartment 2R. I am 38 year old and on disability retirement from the U.S. Postal Service;

3. The area of 47th street where I lived was and still is very a family oriented neighborhood. During my 29 years living at 563 47th street I became well acquainted with most of my neighbors. This included the Vales, who lived a few houses down at 553 47th street.  In the late summer of 1989 I was invited to live with the Vales in their home at 553 47th street. I lived with them for approximately 4 months. I lived on the second floor of their brownstone.  It was my practice to often have meals in the basement apartment with, David and Rebecca, Mrs. Vales' son and daughter-in-law. We were childhood friends and contemporaries.  All our meals were made, served and eaten in the basement.  The basement had one large studio room, a small parlor, a functional kitchen and separate bathroom;

4. I am also aware that the Vales had renovated and finished the basement apartment of the 553 47th street location in the early/ mid-1980's to accommodate their older son Mark, whose wife Debbie had given birth to a son, Mark, Jr.  They lived in the basement prior to David, his wife Rebecca and their two young daughters, Christie and Michele. .

EXHIBIT B

5. During my stay at the Vales I often helped Rebecca tend to her young daughters. Christie was two at the time, and Michele, was a newborn. This also took place in the basement apartment of David and Rebecca located at 553 47th street location;

6. I became aware of Mrs. Josephine Vales' testimony in a passing conversation with an old neighborhood friend, Grace Phillips. She asked me whether or not I had not once lived with the Vales. This conversation occurred in late August. At that time I informed her that I would be willing to speak the Mr. O'Hara's attorney. I called his office in the first week of September. I do not personally know Mr. O'Hara.


_____
DENISE MURRAY

_____
(Print Name)


On September _18_, 1999, before me personally came Denise Murray, to me known to be the person described in and who executed the foregoing instrument. Such person duly swore to such instrument before me and duly acknowledged that she executed the same.


_____
Notary Public
Commission Expires: April 22, 2000
NYS Drivers License# 762-486-345

Charles D. Parisi Jr.
Notary Public, State of New York
Registration #02PA5059032
Qualified in Richmond County
My Commission Expires
April 22, 2000

# EXHIBIT F

# Statement of Account

TERMS - PAYMENT DUE IN FULL. PLEASE PAY BY 10/04/93.

| Account Number | Pay By | Total Amount Due |
|---|---|---|
| 3711-012515-22006 | 10-04-93 | $424.55 |

JOHN KENNEDY OHARA
553 47TH STREET
BROOKLYN NY 11220-1310

MAIL PAYMENT TO:
AMERICAN EXPRESS
P.O. BOX 2853
NEW YORK NY 10116-2853

1101251526 000424550000424558

# Summary of Account

| Cardmember Name | Account Number | Closing Date |
|---|---|---|
| JOHN KENNEDY OHARA | 3711-012515-22006 | 09-18-93 |

For fast balance and payment information, call our automated service line at
1-800-292-AMEX using a touch tone phone. Please have your account number ready.
If you have a question about your account, call 1-800-528-4800 (24 hours/7 days).

Page 1 of 2

| Previous Balance | Credits/Payments | New Charges | New Balance |
|---|---|---|---|
| $535.26 | $535.26 | $424.55 | $424.55 |

| Amex Ref. No. | Item No. | Listing of Charges and Credits | | Charges | Credits |
|---|---|---|---|---|---|
| 835249-0 | | PAYMENT RECEIVED - THANK YOU | 09/06 | | 535.26 |
| 007250-2 | 001 | ACHILLEUS OE, ATHENS GREECE | | | |
| | | 26,900 GREEK DRACHMA BILLED AS | | | |
| 501250-2 | 002 | DITMARS FLOWER SHOP ASTORIA NY | | 117.45 | |
| | | 025012833 FLOWERS/PLANTS NY144530 | 09/07/93 | | |
| 501253-2 | 003 | MEDICI SHOES NEW YORK NY | | 173.20 | |
| | | 360425876 MEN/WOMENS APPAREL/ACC | 09/09/93 | | |
| 501257-2 | 004 | TUTTA PASTA BROOKLYN NY | | 86.60 | |
| | | 000392474 FOOD AND BEVERAGE | 09/14/93 | | |
| 501260-2 | 005 | HARRY HASSON & SON FATLANTIC CITY NJ | | 17.80 | |
| | | 26000505 FLOWERS | 09/16/93 | 29.50 | |
| | | ACCOUNT TOTAL | | $424.55 | $535.26 |

*Dept Fin Evid*
*Santa, Acc*
*5/27/99*

To serve you better, we are making changes to the Cardmember newsletter.
Watch for a new look coming soon!

W2
001 OZ.
(12L 6L)

AMERICAN EXPRESS

# Statement of Account

0019/0026

ARAQ020
3498
08 7     2

YOUR ACCOUNT IS 30 DAYS PAST DUE. PAYMENT MUST BE RECEIVED
BY 09/06/93 TO AVOID A DELINQUENCY CHARGE.

| Account Number | Closing Date | Total Amount Due |
|---|---|---|
| 3711-012515-22006 | 08-18-93 | $535.26 |

JOHN KENNEDY OHARA
553 47TH STREET
BROOKLYN NY   11220-1310

MAIL PAYMENT TO:
AMERICAN EXPRESS
P.O. BOX 2853
NEW YORK NY   10116-2853

1101251526 000535260000228399

# Summary of Account

| Cardmember Name | Account Number | Closing Date |
|---|---|---|
| JOHN KENNEDY OHARA | 3711-012515-22006 | 08-18-93 |

For fast balance and payment information, call our automated service line at
1-800-292-AMEX using a touch tone phone.  Please have your account number ready.
If you have a question about your account, call 1-800-528-4800 (24 hours/7 days).

Page 1 of 2

| Previous Balance | Credits/Payments | New Charges | New Balance |
|---|---|---|---|
| $306.87 | $.00 | $228.39 | $535.26 |

| Amex Ref. No. | Item No. | Listing of Charges and Credits | Charges | Credits |
|---|---|---|---|---|
| 090229-2 | 001 | LAPIS, ATHENS GREECE | | |
| | | 53,500 GREEK DRACHMA   BILLED AS | 228.39 | |
| | | ACCOUNT TOTAL | $228.39 | $.00 |

We are pleased to announce that Car Rental Loss and Damage Insurance (CRLDI) continues
to be available for rentals from all agencies that accept the Card, both domestically
and internationally (except rentals in Italy and New Zealand). This supersedes the program
materials restricting coverage to only fifteen rental companies.

W2        001 OZ.
(12 3L   )

AMERICAN
EXPRESS

# Statement of Account

TERMS - PAYMENT DUE IN FULL.  PLEASE PAY BY 08/03/93.

| Account Number | Pay By | Total Amount Due |
|---|---|---|
| 3711-012515-22006 | 08-03-93 | $306.87 |

JOHN KENNEDY OHARA
553 47TH STREET
BROOKLYN NY   11220-1310

MAIL PAYMENT TO:
AMERICAN EXPRESS
P.O. BOX 2853
NEW YORK NY  10116-2853

1101251526  000306870000306875

# Summary of Account

| Cardmember Name | Account Number | Closing Date |
|---|---|---|
| JOHN KENNEDY OHARA | 3711-012515-22006 | 07-18-93 |

For fast balance and payment information, call our automated service line at
1-800-292-AMEX using a touch tone phone.  Please have your account number ready.
If you have a question about your account, call 1-800-528-4800 (24 hours/7 days).

Page 1 of 2

| Previous Balance | Credits/Payments | New Charges | New Balance |
|---|---|---|---|
| $2,677.17 | $2,677.17 | $306.87 | $306.87 |

| Amex Ref. No. | Item No. | Listing of Charges and Credits | Charges | Credits |
|---|---|---|---|---|
| 835175-0 | | PAYMENT RECEIVED - THANK YOU          06/24 | | 1,200.00 |
| 832183-2 | | PAYMENT RECEIVED- AMEX OFFICE         07/02 | | 1,477.17 |
| 552195-2 | 001 | BRITTANIA BEACH HTL NASSAU BAHAMAS | 38.89 | |
| | | REFER TO CHARGE FROM NASSAU BAHAMAS | | |
| 052196-2 | 002 | DOLLAR RENT A CAR BROOKLYN NY | 136.46 | |
| | | INV#376320 | | |
| 501170-2 | 003 | VICTORIA SECRET CAT COLUMBUS       OH | 131.52 | |
| | | 684961071 CATLG MDSE 800-888-1500 06/18/93 | | |
| | | **ACCOUNT TOTAL** | **$306.87** | **$2,677.17** |

Travel smart this summer and get your Travelers Cheques the easy way: call 1-800-ORDER-TC
24 hours a day and get your Travelers Cheques in any of seven currencies delivered right to your
door. First Class Mail delivery is FREE and you pay only the customary 1% transaction fee.
Order with the Optima Card or use a personal check (please have your checkbook handy).
To order your Travelers Cheques, call 1-800-ORDER-TC.

W2
001 OZ.
(12L    )



# Statement of Account

BRAQ0301
2703

0015/0026

06 7    2

YOUR ACCOUNT IS 30 DAYS PAST DUE.  PAYMENT MUST BE RECEIVED
BY 07/06/93 TO AVOID A DELINQUENCY CHARGE.

| Account Number | Closing Date | Total Amount Due |
|---|---|---|
| 3711-012515-22006 | 06-17-93 | $2,677.17 |

JOHN KENNEDY OHARA
553 47TH STREET
BROOKLYN NY ·11220-1310

MAIL PAYMENT TO:
AMERICAN EXPRESS
P.O. BOX 2855
NEW YORK NY  10116-2855

1101251526  002677170001004836

# Summary of Account

| Cardmember Name | Account Number | Closing Date |
|---|---|---|
| JOHN KENNEDY OHARA | 3711-012515-22006 | 06-17-93 |

For fast balance and payment information, call our automated service line at
1-800-292-AMEX using a touch tone phone.  Please have your account number ready.
If you have a question about your account, call 1-800-528-4800 (24 hours/7 days).

Page 1 of 2

| Previous Balance | Credits/Payments | New Charges | New Balance |
|---|---|---|---|
| $1,672.34 | $.00 | $1,004.83 | $2,677.17 |

| Amex Ref. No. | Item No. | Listing of Charges and Credits | | | Charges | Credits |
|---|---|---|---|---|---|---|
| 501147-2 | 001 | APPLE VACATIONS | NEWTOWN SQUARE | PA | | |
| | | 000459233 TOURS/TICKETS | | 05/26/93 | 644.00 | |
| 501156-2 | 002 | COMFORT INN | EDGEWATER | NJ | | |
| | | 015630781 LODGING | | 06/03/93 | 44.52 | |
| 501160-2 | 003 | BALLY'S PARK PLACE | ATLANTIC CITY | NJ | | |
| | | 001330970 LODGING | | 06/07/93 | 225.76 | |
| 501162-2 | 004 | BRIDGE CAFE | NEW YORK | NY | | |
| | | 016210827 FOOD/BEV | | 06/10/93 | 90.55 | |
| | | | ACCOUNT TOTAL | | $1,004.83 | $.00 |

W2
001 OZ.
(12L3L  )



# Statement of Account

0013/0026

ARAQ0203
4050

05 7 1

TERMS - PAYMENT DUE IN FULL. PLEASE PAY BY 06/03/93.

| Account Number | Pay By | Total Amount Due |
|---|---|---|
| 3711-012515-22006 | 06-03-93 | $1,672.34 |

JOHN KENNEDY OHARA
553 47TH STREET
BROOKLYN NY  11220-1310

MAIL PAYMENT TO:
AMERICAN EXPRESS
P.O. BOX 2855
NEW YORK NY  10116-2855

⑈⑈0⑈25⑈526 00⑈672340001672349

# Summary of Account

| Cardmember Name | Account Number | Closing Date |
|---|---|---|
| JOHN KENNEDY OHARA | 3711-012515-22006 | 05-18-93 |

For fast balance and payment information, call our automated service line at
1-800-292-AMEX using a touch tone phone. Please have your account number ready.
If you have a question about your account, call 1-800-528-4800 (24 hours/7 days).

Page 1 of 2

| Previous Balance | Credits/Payments | New Charges | New Balance |
|---|---|---|---|
| $1,009.87 | $1,009.87 | $1,672.34 | $1,672.34 |

| Amex Ref. No. | Item No. | Listing of Charges and Credits | | Charges | Credits |
|---|---|---|---|---|---|
| 832132-2 | | PAYMENT RECEIVED- AMEX OFFICE | 05/12 | | 1,009.87 |
| 873118-2 | 001 | HOLIDAY INN CROWN PLAZA SAN JUAN PR INV#415539 | | | |
| 872124-2 | 002 | DISCOUNT RENT A CAR SANTURCE PR INV#596461 | | 162.60 | |
| 663111-2 | 003 | TRANS WORLD AIRLINES BROOKLYN  NY TKT# 0151508548601 | 04/05 | 149.75 | |
| 501116-2 | 004 | WINDOWS ON THE WORLDNEW YORK  NY D1160721 FOOD-BEV | 04/25/93 | 358.00 | |
| 501119-2 | 005 | HOTEL CARIB INN ISLA VERDE PR 0428        LODGING | 04/29/93 | 45.18 | |
| 501124-2 | 006 | RAM'S HEAD  INN #3 ABSECON NJ 000597575 FOOD AND BEVERAGE | 05/01/93 | 703.55 | |
| 501124-2 | 007 | RAM'S HEAD  INN #3 ABSECON NJ 000292560 FOOD AND BEVERAGE | 05/01/93 | 193.39 | |
| | | | | | 59.87 |
| | | ACCOUNT TOTAL | | $1,672.34 | $1,009.87 |

W2
001 OZ.
(12L 4  )



# Statement of Account

BBA003005
2163

0011/0026

04 7   12 O 1

TERMS - PAYMENT DUE IN FULL.  PLEASE PAY BY 05/03/93.

| Account Number | Pay By | Total Amount Due |
|---|---|---|
| 3711-012515-22006 | 05-03-93 | $1,009.87 |

JOHN KENNEDY OHARA
553 47TH STREET
BROOKLYN          NY
11220-1310

MAIL PAYMENT TO:
AMERICAN EXPRESS
P.O. BOX 2855
NEW YORK NY   10116-2855

1101251526  001009870001009872

# Summary of Account

| Cardmember Name | Account Number | Closing Date |
|---|---|---|
| JOHN KENNEDY OHARA | 3711-012515-22006 | 04-17-93 |

For fast balance and payment information, call our automated service line at
1-800-292-AMEX using a touch tone phone.  Please have your account number ready.
If you have a question about your account, call 1-800-528-4800 (24 hours/7 days).

Page 1 of 2

| Previous Balance | Credits/Payments | New Charges | New Balance |
|---|---|---|---|
| $1,136.55 | $1,136.55 | $1,009.87 | $1,009.87 |

| Amex Ref. No. | Item No. | Listing of Charges and Credits | | Charges | Credits |
|---|---|---|---|---|---|
| 835091-0 | | PAYMENT RECEIVED - THANK YOU | 04/01 | | 1,136.55 |
| 501095-2 | 001 | ST MAGGIE'S CAFE NEW YORK NY 000108899 FOOD AND BEVERAGE | 04/02/93 | 92.75 | |
| 501095-2 | 002 | LA SERRE RESTAURANT ALBANY NY 000611195 FOOD AND BEVERAGE | 04/05/93 | 300.85 | |
| 501096-2 | 003 | OMNI ALBANY NEW YORK ALBANY NY 29550     LODGING | 04/06/93 | 163.79 | |
| 603098-2 | 004 | TRANS WORLD AIRLINES MARLTON NJ TKT# 0159200124444 | 03/05 | 452.48 | |
| | | ACCOUNT TOTAL | | $1,009.87 | $1,136.55 |

W2

The Purchase Protection(sm) Plan and Lemon Assurance have been extended
through July 31, 1993.  Watch for the June statement insert for changes effective August 1, 1993.
The Purchase Protection Plan is underwritten by Insurance Company of North America,
a CIGNA company.  Coverage is subject to the terms, conditions and exclusions of the policy.

AMERICAN
EXPRESS

0009/0026

03 7   12 O 1

BBA00300!

3522

# Statement of Account

TERMS - PAYMENT DUE IN FULL. PLEASE PAY BY 04/03/93.

| Account Number | Pay By | Total Amount Due |
|---|---|---|
| 3711-012515-22006 | 04-03-93 | $1,136.55 |

JOHN KENNEDY OHARA
553 47TH STREET
BROOKLYN    NY
11220-1310

MAIL PAYMENT TO:
AMERICAN EXPRESS
P.O. BOX 2855
NEW YORK NY   10116-2855

1101251526 00113655000126921S

# Summary of Account

| Cardmember Name | Account Number | Closing Date |
|---|---|---|
| JOHN KENNEDY OHARA | 3711-012515-22006 | 03-18-93 |

For fast balance and payment information, call our automated service line at
1-800-292-AMEX using a touch tone phone. Please have your account number ready.
If you have a question about your account, call 1-800-528-4800 (24 hours/7 days).

Page 1 of 2

| Previous Balance | Credits/Payments | New Charges | New Balance |
|---|---|---|---|
| $256.14 | $388.80 | $1,269.21 | $1,136.55 |

| Amex Ref. No. | Item No. | Listing of Charges and Credits | | | Charges | Credits |
|---|---|---|---|---|---|---|
| 501048-2 | | BALLY'S PARK PLACE | ATLANTIC CITY | N | | |
| | | 001358860 LODGING | | 02/15 | | |
| 501048-2 | 001 | BALLY'S PARK PLACE | ATLANTIC CITY | NJ | | 388.80 |
| | | 001358940 LODGING | | 02/15/93 | | |
| 501048-2 | 002 | BALLY'S PARK PLACE | ATLANTIC CITY | NJ | 388.80 | |
| | | 001358900 LODGING | | 02/15/93 | | |
| 501049-2 | 003 | SHORT RIBS RSTR BROOKLYN NY | | | 388.80 | |
| | | 000500533 FOOD AND BEVERAGE | | 02/17/93 | | |
| 501055-2 | 004 | WINDOWS ON THE WORLD NEW YORK | | NY | 25.00 | |
| | | D0550258 FOOD-BEV | | 02/18/93 | | |
| 501056-2 | 005 | MACY'S HERALD SQUARE NEW YORK | | NY | 34.69 | |
| | | 011616038 JEWELRY | | 02/24/93 | | |
| | | | | | 431.92 | |
| | | | ACCOUNT TOTAL | | $1,269.21 | $388.80 |

Look in this month's Newsletter for valuable information on the
Benefits and Services available exclusively to Cardmembers.

W2



# Statement of Account

0007/0026

ABA002035
W2
3486

O2 7 12 O 1

TERMS - PAYMENT DUE IN FULL. PLEASE PAY BY 03/04/93.

| Account Number | Pay By | Total Amount Due |
|---|---|---|
| 3711-012515-22006 | 03-04-93 | $256.14 |

JOHN KENNEDY OHARA
553 47TH STREET
BROOKLYN        NY
11220-1310

MAIL PAYMENT TO:
AMERICAN EXPRESS
P.O. BOX 2853
NEW YORK NY  1O116-2853

1101251526 0002561400002561 44

# Summary of Account

| Cardmember Name | Account Number | Closing Date |
|---|---|---|
| JOHN KENNEDY OHARA | 3711-012515-22006 | 02-16-93 |

For fast balance and payment information, call our automated service line at
1-800-292-AMEX using a touch tone phone. Please have your account number ready.
If you have a question about your account, call 1-800-528-4800 (24 hours/7 days).

Page 1 of 2

| Previous Balance | Credits/Payments | New Charges | New Balance |
|---|---|---|---|
| $88.68 | $88.68 | $256.14 | $256.14 |

| Amex Ref. No. | Item No. | Listing of Charges and Credits | | Charges | Credits |
|---|---|---|---|---|---|
| 835026-0 | | PAYMENT RECEIVED - THANK YOU | 01/26 | | 88.68 |
| 822017-2 | | ANNUAL MEMBERSHIP FEE JOHN KENNEDY OHARA | | | |
| | | PERIOD 03/93 THRU 02/94 | | 55.00 | |
| 063021-2 | 001 | BRONX ACURA BRONX NY      INV#112541 | | 55.00 | |
| 501021-2 | 002 | TROPWORLD        ATLANTIC CITY   NJ | | 50.00 | |
| | | 000000668 LODGING | 01/20/93 | | |
| 501029-2 | 003 | CAFE IGUANA      NEW YORK      NY | | 33.55 | |
| | | D0294780 FOOD-BEV | 01/28/93 | | |
| 501029-2 | 004 | CAFE IGUANA      NEW YORK      NY | | 29.25 | |
| | | D0294783 FOOD-BEV | 01/27/93 | | |
| 501029-2 | 005 | ST MAGGIE'S CAFE NEW YORK NY | | 16.00 | |
| | | 000302038 FOOD AND BEVERAGE | 01/29/93 | | |
| 501033-2 | 006 | WINDOWS ON THE WORLDNEW YORK   NY | | 48.40 | |
| | | D0330377 FOOD-BEV | 01/28/93 | | 23.94 |
| | | ACCOUNT TOTAL | | $256.14 | $88.68 |

Read the enclosed "For Members Only" newsletter for information
on the financial planning benefits of the American Express® Card.

AMERICAN EXPRESS

# EXHIBIT G



May 25,1999

NYS Supreme Court
CIVIC CENTER Part 10
360 Adams Street
Subpoena Records Dept.-rm 436
Brooklyn NY 11201

           RE:   People V. John O'Hara

Dear Sir/Madam:

      Enclosed please find photocopies of documents you had requested responsive to the above referenced  summons  served upon Chase  Bank. .

      The enclosed documents are true and accurate records kept by Chase in its

normal course of business.

      I trust that this will  comply with any evidentiary rules of the court.  This information is provided in compliance with the subpoena, but in lieu of appearance.

                               Very truly yours,

                                 Ona Weiner
                                 212 552-2707

Enc.
FILE:  29050

*Dept G in Evid*
*Santi, Acc*
*5/27/99*

**Chemical Bank**

S30323001575309    OORTCVC1 01 00000000001575309    0000501810311    A

```
          MR. JOHN K O'HARA                              661
          553 47TH STREET                               018
          BROOKLYN  NY  11220-4636
```

| PAGE  1 OF  2 | | | |
|---|---|---|---|
| Statement Period | Enclosures | Account Number | |
| FEB 25 - MAR 23,1993 | 5 | 001-575309 | |
| Previous Balance  954.19 | 2 Credits | 2,896.89 | Balances |
| Closing Balance  2,847.24 | 11 Debits | 1,003.84 | Date    Amount |

### BASIC CHECKING

| | | | | Date | Amount |
|---|---|---|---|---|---|
| | | | | FEB | |
| | | | | 26 | 2,282.64 |
| **DEPOSITS AND CREDITS** | | | | MAR | |
| FEB 26 | 1,448.45 MONTCLARE&GUA | AS OF 02-26 | | 2 | 2,228.64 |
| | SALARY DEP  ECS PM# 08263 | | | 4 | 2,171.16 |
| MAR 15 | 1,448.44 MONTCLARE&GUA | AS OF 03-15 | | 8 | 2,071.16 |
| | SALARY DEP  ECS PM# 08263 | | | 10 | 1,771.16 |
| | | | | 15 | 3,153.34 |
| | | | | 17 | 3,073.34 |
| **CHECKS AND DEBITS** | | | | 18 | 2,973.34 |
| | | | | 19 | 2,852.74 |
| FEB 26 | 120.00 ATM-4600  WITHDWL CARD# 00046658377 | | | 23 | 2,847.24 |
| | WORLD TRADE  23272 | AS OF  2-25 | | | |
| | NEW YORK CITY,NY NYCE | SEQ-100534 | | | |
| MAR 08 | 100.00 ATM-2301  WITHDWL CARD# 00046658377 | | | | |
| | BALLY PARK PLACE 3 | AS OF  3-06 | | | |
| | ATLANTIC CITY,NJ NYCE | SEQ-112590 | | | |
| MAR 17 | 80.00 ATM-6611  WITHDWL CARD# 00046658377 | | | | |
| | 52 BROADWAY | AS OF  3-16 | | | |
| | N.Y.C.      ,NY CBNY | SEQ-004246 | | | |
| MAR 18 | 100.00 ATM-8883  WITHDWL CARD# 00046658377 | | | | |
| | 401 FLATBUSH AVE. | AS OF  3-18 | | | |
| | B'KLYN      ,NY CBNY | SEQ-008643 | | | |
| MAR 19 | 100.00 ATM-7461  WITHDWL CARD# 00046658377 | | | | |
| | 260 COLUMBUS AVE. | AS OF  3-18 | | | |
| | N.Y.C.      ,NY CBNY | SEQ-003986 | | | |
| MAR 23 | 5.50 MONTHLY SERVICE CHARGE | | | | |
| | $4.00 MAINT + 75¢ CHK/WTHDWL/PURCH | | | | |

| DATE | CK.NO. | AMOUNT | DATE | CK.NO. | AMOUNT |
|---|---|---|---|---|---|
| MAR 02 | 320 | 54.00 | MAR 15 • | 363 | 65.26 |
| MAR 04 | 321 | 57.48 | MAR 19 | 364 | 20.60 |
| MAR 10 • | 324 | 300.00 | | | |

• INDICATES SKIP IN CHECK SEQUENCE

### SERVICE CHARGES

YOUR SERVICE CHARGE THIS STATEMENT PERIOD WAS $  5.50.

•• T 3••

---

Chemical Bank

930323061575309        00RTCVC1 01 00000000001575309    0000501810311    A

MR. JOHN K O'HARA                           661
553 47TH STREET                             018
BROOKLYN NY 11220-4636

PAGE 2 OF 2

| Statement Period | Enclosures | Account Number | |
|---|---|---|---|
| FEB 25 - MAR 23, 1993 | 5 | 001-575309 | |
| Previous Balance | | Credits | Balances |
| Closing Balance | | Debits | Date    Amount |

$ 4.00 MAINTENANCE PLUS 75ш PER CHECK, PURCHASE AND
WITHDRAWAL FROM CHEMICAL, NYCE, MAC OR SAM CASH MACHINES.

PLEASE EXAMINE AT ONCE. EXCEPT FOR ELECTRONIC TRANSFERS,
ACCOUNT WILL BE CONSIDERED CORRECT IF NO REPORT IS

ChemicalBank

930423001575309       OORTCVC1 01 00000000001575309     0000901810311   A
              MR. JOHN K O'HARA                               661
              553 47TH STREET                                 018
              BROOKLYN  NY  11220-4636

PAGE   1 OF   2

| Statement Period | Enclosures | Account Number | | |
|---|---|---|---|---|
| MAR 24 - APR 23,1993 | 9 | 001-575309 | | |
| Previous Balance | 2,847.24 | 2 Credits | 2,896.91 | Balances |
| Closing Balance | 2,653.53 | 15 Debits | 3,090.62 | Date | Amount |

BASIC CHECKING

DEPOSITS AND CREDITS

| | | | | | | MAR | |
| MAR 31 | 1,448.45 MONTCLARE&GUA | | AS OF 03-31 | | | 26 | 2,415.28 |
| | SALARY DEP  ECS PM$ 08263 | | | | | 29 | 2,195.28 |
| APR 15 | 1,448.46 MONTCLARE&GUA | | AS OF 04-15 | | | 31 | 3,553.73 |
| | SALARY DEP  ECS PM$ 08263 | | | | | APR | |
| | | | | | | 2 | 2,207.18 |
| | | | | | | 6 | 2,193.18 |
| | | | | | | 7 | 1,809.37 |
| | CHECKS AND DEBITS | | | | | 12 | 1,759.37 |
| | | | | | | 14 | 1,548.44 |
| | | | | | | 15 | 2,921.90 |
| MAR 29 | 50.00 ATM-6617  WITHDWL CARD# 00046658377 | | | | | 19 | 2,661.28 |
| | 52 BROADWAY | AS OF  3-29 | | | | 23 | 2,653.53 |
| | N.Y.C.         ,NY CBNY  SEQ-009180 | | | | | | |

MAR 29     170.00 ATM-7462  WITHDWL CARD# 00046658377
           260 COLUMBUS AVE.        AS OF  3-27
           N.Y.C.         ,NY CBNY  SEQ-003128
MAR 31      90.00 ATM-6613  WITHDWL CARD# 00046658377
           52 BROADWAY             AS OF  3-31
           N.Y.C.         ,NY CBNY  SEQ-005840
APR 02     210.00 ATM-7461  WITHDWL CARD# 00046658377
           260 COLUMBUS AVE.        AS OF  4-02
           N.Y.C.         ,NY CBNY  SEQ-005122
APR 06      14.00 CHECKBOOK CHARGE
                                    AS OF 02-93
APR 23       7.75 MONTHLY SERVICE CHARGE
             $4.00 MAINT + 75¢ CHK/WTHDWL/PURCH

| DATE | CK.NO. | AMOUNT | DATE | CK.NO. | AMOUNT |
|---|---|---|---|---|---|
| MAR 26 | 325 | 383.81 | APR 07 • | 370 | 383.81 |
| MAR 26 • | 365 | 48.15 | APR 14 | 371 | 47.43 |
| APR 02 | 366 | 1,136.55 | APR 14 • | 373 | 163.50 |
| APR 15 | 367 | 75.00 | APR 19 | 374 | 260.62 |
| APR 12 | 368 | 50.00 | | | |

           • INDICATES SKIP IN CHECK SEQUENCE

SERVICE CHARGES

                                              •• 023••

ChemicalBank

ChemicalBank

930423001575309    OORTCVC1 01 00000000001575309    0000901810311    A
                    MR. JOHN K O'HARA                  661
                    553 47TH STREET                    018
                    BROOKLYN NY 11220-4636

PAGE   2 OF   2

| Statement Period | | Enclosures | Account Number | | |
|---|---|---|---|---|---|
| MAR 24 – APR 23, 1993 | | 9 | 001-575309 | | |
| Previous Balance | | Credits | | Balances | |
| Closing Balance | | Debits | | Date | Amount |

YOUR SERVICE CHARGE THIS STATEMENT PERIOD WAS  $  7.75,
$  4.00 MAINTENANCE PLUS 75¢ PER CHECK, PURCHASE AND
WITHDRAWAL FROM CHEMICAL, NYCE, MAC OR SAM CASH MACHINES.

PLEASE EXAMINE AT ONCE. EXCEPT FOR ELECTRONIC TRANSFERS,
ACCOUNT WILL BE CONSIDERED CORRECT IF NO REPORT IS
RECEIVED WITHIN 14 DAYS. DIRECT ALL INQUIRIES TO (212)
935-9935 OR WRITE 52 BROADWAY, NY, NY 10004

•• P23 ••

ChemicalBank

ChemicalBank

930525001575309      OORTCVC1 01 00000000001575309    0000701810311    A
                                                                    661
        MR. JOHN K O'HARA                                           018
        553 47TH  STREET
        BROOKLYN  NY  11220-1310

PAGE   1 OF   2

| Statement Period | Enclosures | Account Number | | |
|---|---|---|---|---|
| APR  24 - MAY  25,1993 | 7 | 001-575309 | | |
| Previous Balance | 2,653.53 | 1 Credits | 1,000.00 | Balances |
| Closing Balance | 1,527.53 | 13 Debits | 2,126.00 | Date | Amount |

### BASIC CHECKING

|  | | |
|---|---|---|
| APR |  |  |
| 27 | 2,503.53 | |
| 28 | 2,403.53 | |
| MAY | | |
| 4 | 2,352.09 | |
| 5 | 2,312.09 | |
| 10 | 2,212.09 | |
| 11 | 2,152.09 | |
| 12 | 681.65 | |
| 13 | 1,681.65 | |
| 14 | 1,597.10 | |
| 17 | 1,534.53 | |
| 25 | 1,527.53 | |

#### DEPOSITS AND CREDITS

MAY 13      1,000.00 DEPOSIT

#### CHECKS AND DEBITS

APR 27      150.00 ATM-4900  WITHDWL CARD# 00046658377
                   BPPR EXP. SAN JUAN      AS OF  4-27
                   PR SAN JUAN    ,PR NYCE   SEQ-002325
APR 28      100.00 ATM-4900  WITHDWL CARD# 00046658377
                   CARIBE HILTON SAN       AS OF  4-27
                   SAN JUAN      ,P NYCE    SEQ-005320
MAY 10      100.00 ATM-2598  WITHDWL CARD# 00046658377
                   5323 5TH AVENUE         AS OF  5-08
                   BROOKLYN      ,NY NYCE   SEQ-017743
MAY 11       60.00 ATM-0031  WITHDWL CARD# 00046658377
                   BLKHR8E/ENG CK 397      AS OF  5-10
                   PLEASANTVILLE,NJ NYCE    SEQ-026518
MAY 14       20.00 ATM-2301  WITHDWL CARD# 00046658377
                   BALLY PARK PLACE 3      AS OF  5-14
                   ATLANTIC CITY,NJ NYCE    SEQ-101185
MAY 25        7.00 MONTHLY SERVICE CHARGE
                   $4.00 MAINT + 75¢ CHK/WITHDWL/PURCH

| DATE | CK.NO. | AMOUNT | DATE | CK.NO. | AMOUNT |
|---|---|---|---|---|---|
| MAY 05 | 376 | 40.00 | MAY 12 | 504 | 1,009.87 |
| MAY 04 | 377 | 51.44 | MAY 14 | 505 | 19.55 |
| MAY 12 * | 502 | 460.57 | MAY 14 | 506 | 45.00 |
| MAY 17 | 503 | 62.57 | | | |

* INDICATES SKIP IN CHECK SEQUENCE

#### SERVICE CHARGES

YOUR SERVICE CHARGE THIS STATEMENT PERIOD WAS  $   7.00,
$  4.00 MAINTENANCE PLUS 75¢ PER CHECK, PURCHASE AND
WITHDRAWAL FROM CHEMICAL, NYCE, MAC OR 8AM CASH MACHINES.

** J24**

ChemicalBank

930525001575309      OORTCVC1 01 00000000001575309    0000701810311    A
                                                                    661
        MR. JOHN K O'HARA                                           018
        553 47TH  STREET

ChemicalBank

930525001575309          00RTCVC1 01 00000000001575309      0000701810311    A

　　　　　MR. JOHN K O'HARA                                        661
　　　　　553 47TH  STREET                                         018
　　　　　BROOKLYN  NY  11220-1310

PAGE  2 OF  2

| Statement Period | Enclosures | Account Number | | Balances | |
|---|---|---|---|---|---|
| APR  24 - MAY  25,1993 | 7 | 001-575309 | | | |
| Previous Balance | | Credits | | Date | Amount |
| Closing Balance | | Debits | | | |

PLEASE EXAMINE AT ONCE. EXCEPT FOR ELECTRONIC TRANSFERS,
ACCOUNT WILL BE CONSIDERED CORRECT IF NO REPORT IS
RECEIVED WITHIN 14 DAYS. DIRECT ALL INQUIRIES TO (212)
935-9935 OR WRITE 52 BROADWAY, NY, NY 10004

•• K24••

ChemicalBank

930623001575309      OORTCVC1 01 00000000001575309      0000601810311   A
                MR. JOHN K O'HARA                               661
                553 47TH  STREET                                018
                BROOKLYN  NY  11220-1310

PAGE  1 OF  1

| Statement Period | | Enclosures | Account Number | | |
|---|---|---|---|---|---|
| MAY  26 - JUNE 23,1993 | | 6 | 001-575309 | | |
| Previous Balance | 1,527.53 | 1 Credits | 1,200.00 | Balances | |
| Closing Balance | 1,504.67 | 7 Debits | 1,222.86 | Date | Amount |

BASIC CHECKING

DEPOSITS AND CREDITS

JUN 23      1,200.00 CASH DEPOSIT

CHECKS AND DEBITS

JUN 23          4.00 MONTHLY SERVICE CHARGE
                $4.00 MAINT + 75¢ CHK/WTHDWL/PURCH

| DATE | CK.NO. | AMOUNT | DATE | CK.NO. | AMOUNT |
|---|---|---|---|---|---|
| MAY 27 | 507 | 37.22 | JUN 18 | 512 | 25.00 |
| JUN 03 | 508 | 403.00 | JUN 23 | 513 | 500.00 |
| JUN 09 • | 511 | 170.00 | JUN 16 • | 526 | 83.64 |

• INDICATES SKIP IN CHECK SEQUENCE

| | |
|---|---|
| MAY 27 | 1,490.31 |
| JUNE | |
| 3 | 1,087.31 |
| 9 | 917.31 |
| 16 | 833.67 |
| 18 | 808.67 |
| 23 | 1,504.67 |

SERVICE CHARGES

YOUR SERVICE CHARGE THIS STATEMENT PERIOD WAS  $   4.00.
$  4.00 MAINTENANCE PLUS 75¢ PER CHECK, PURCHASE AND
WITHDRAWAL FROM CHEMICAL, NYCE, MAC OR SAM CASH MACHINES.

PLEASE EXAMINE AT ONCE. EXCEPT FOR ELECTRONIC TRANSFERS,
ACCOUNT WILL BE CONSIDERED CORRECT IF NO REPORT IS
RECEIVED WITHIN 14 DAYS. DIRECT ALL INQUIRIES TO (212)
935-9935 OR WRITE 52 BROADWAY, NY, NY 10004

•• K13••

ChemicalBank
930623001575406      OORTMBP  01 00000000001575406      0000001840211   A
                                                                661

ChemicalBank
930726001575309        OORTCVCI 01 00000000001575309    0000701810311   A
                [MR. JOHN K O'HARA                                 661
                 553 47TH STREET                                   018
                 BROOKLYN  NY  11220-1310

PAGE   1 OF   1

| Statement Period | Enclosure: | Account Number |
|---|---|---|
| JUNE 24 - JULY 26,1993 | 7 | 001-575309 |

| | | Balances |
|---|---|---|
| Previous Balance | 1,504.67 | 1 Credits | 400.00 |
| Closing Balance | 231.21 | 90 Debits | 1,673.46 |

BASIC CHECKING

| Date | Amount |
|---|---|
| JUNE | |
| 25 | 275.02 |
| JULY | |
| 14 | 254.08 |
| 16 | 234.08 |
| 19 | 120.30 |
| 20 | 520.30 |
| 22 | 461.91 |
| 26 | 231.21 |

DEPOSITS AND CREDITS

JUL 20        400.00 CASH DEPOSIT

CHECKS AND DEBITS

JUL 16        20.00 ATM-6611  WITHDWL CARD# 00046658377
              52 BROADWAY            AS OF  7-15
              N.Y.C.        ,NY CBNY  SEQ-009258
JUL 26         4.00 MONTHLY SERVICE CHARGE
              MAINTENANCE.CHARGE          4.00

| DATE | CK.NO. | AMOUNT | DATE | CK.NO. | AMOUNT |
|---|---|---|---|---|---|
| JUN 25 | 514 | 29.65 | JUL 22 | 518 | 33.39 |
| JUN 25 | 515 | 1,200.00 | JUL 14 * | 527 | 20.94 |
| JUL 22 | 516 | 25.00 | JUL 19 | 528 | 113.78 |
| JUL 26 | 517 | 226.70 | | | |

* INDICATES SKIP IN CHECK SEQUENCE

SERVICE CHARGES

PLEASE EXAMINE AT ONCE. EXCEPT FOR ELECTRONIC TRANSFERS,
ACCOUNT WILL BE CONSIDERED CORRECT IF NO REPORT IS
RECEIVED WITHIN 14 DAYS. DIRECT ALL INQUIRIES TO (212)
935-9935 OR WRITE 52 BROADWAY, NY, NY 10004

•• M16 ••

ChemicalBank

930824001575309      OORTCVC1 01 00000000001575309    0000101810311   A
                   MR. JOHN K O'HARA                          661
                   553 47TH STREET                            018
                   BROOKLYN  NY  11220-1310

PAGE   1 OF   1

| Statement Period | | Enclosures | Account Number | | |
|---|---|---|---|---|---|
| JULY 27 - AUG  24,1993 | | 1 | 001-575309 | | |
| Previous Balance | 231.21 | 0Credits | ,00 | Balances | |
| Closing Balance | 202.21 | 2Debits | 29.00 | Date | Amount |

BASIC CHECKING

CHECKS AND DEBITS

AUG 24          4.00 MONTHLY SERVICE CHARGE
                    MAINTENANCE CHARGE            4.00

| DATE | CK.NO. | AMOUNT | DATE | CK.NO. | AMOUNT |
|---|---|---|---|---|---|
| AUG 03 | 520 | 25.00 | | | |

SERVICE CHARGES

| | |
|---|---|
| AUG 3 | 206.21 |
| 24 | 202.21 |

PLEASE EXAMINE AT ONCE. EXCEPT FOR ELECTRONIC TRANSFERS,
ACCOUNT WILL BE CONSIDERED CORRECT IF NO REPORT IS
RECEIVED WITHIN 14 DAYS. DIRECT ALL INQUIRIES TO (212)
935-9935 OR WRITE 52 BROADWAY, NY, NY 10004

** D 6**

ChemicalBank
930824001575406      OORTMBP  01 00000000001575406   0000001840211   A
                   MR. JOHN N ALPERN &/OR                       661



# STATEMENT COPY

CHEMICAL
STATEMENT

01575305000 19930924

001-00140-B017-00140-          000-1-01-03-00
MR.   JOHN K O'HARA
553 47TH STREET
BROOKLYN NY 11220-1310

STATEMENT PERIOD 08-25-93 TO 09-24-93
SERVICELINE  935-9935 (TRI-STATE)
1-800-935-9935 (OUTSIDE TRI-STATE)
ACCOUNT NUMBER  001-575309
2 ITEMS ENCLOSED                    PAGE 1 OF 2

YOUR ACCOUNTS AT A GLANCE...

| ACCOUNT | | OPENING BALANCE | CLOSING BALANCE |
|---|---|---|---|
| BASIC CHECKING | 001-575309 | $ 202.21 | $ 312.95 |
| | | | $ 312.95 |

BANKING AT CHEMICAL
ALL OF YOUR ACCOUNTS LINKED IN A CHEMICAL BANK RELATIONSHIP CAN WORK
TOGETHER TO REDUCE CHECKING AND SAVINGS MONTHLY MAINTENANCE FEES,
PER CHECK FEES, TELLER WITHDRAWAL FEES, ATM FEES, AND P.O.S. MERCHANT
DEBIT FEES.  WE WOULD BE HAPPY TO DISCUSS WITH YOU WAYS IN WHICH YOUR
ACCOUNTS AT CHEMICAL BANK CAN REDUCE MONTHLY FEES.  PLEASE VISIT YOUR
BRANCH FOR DETAILS.

CHEMICAL PLANNER
QUESTIONS ABOUT YOUR ACCOUNT OR
STATEMENT?  NOW YOU CAN CALL THE
SERVICELINE NUMBER INDICATED IN THE
UPPER RIGHT HAND CORNER OF YOUR
STATEMENT ANYTIME, 24 HOURS
A DAY, 7 DAYS A WEEK,
FOR ACCOUNT INFORMATION AND
PERSONAL CUSTOMER ASSISTANCE FROM
ONE OF OUR CUSTOMER SERVICE
REPRESENTATIVES.

YOUR ACCOUNTS IN DETAIL...
BASIC CHECKING ACCOUNT          ACCOUNT NO. 001-575309
OPENING BALANCE AS OF 08-25                $ 202.21

16 WALL STREET, NEW YORK, NY 10015
$ 202.21

**CHEMICAL**

**STATEMENT COPY**

```
0015753090000 19930924
001-00140-8017-00140          000-1-01-03-00
MR. JOHN K O'HARA
```

CHEMICAL
STATEMENT:

STATEMENT PERIOD 08-25-93 TO 09-24-93
1-800-935-9935 (OUTSIDE NY STATE)
ACCOUNT NUMBER: 00-575309

PAGE 2 OF 2

DEPOSITS/CREDITS

| DATE | DESCRIPTION | AMOUNT |
|------|-------------|--------|
| 09-07 | DEPOSIT | 700.00 |
| | 1 DEPOSIT/CREDIT | $ 700.00 |

WITHDRAWALS/FEES

| DATE | DESCRIPTION | AMOUNT |
|------|-------------|--------|
| 09-24 | MONTHLY MAINTENANCE FEE | 4.00 |
| | 1 WITHDRAWALS/FEES | $ 4.00 |

CHECKS          * DENOTES A GAP IN CHECK SEQUENCE

| CHECK NO. | DATE PAID | AMOUNT | CHECK NO. | DATE PAID | AMOUNT | CHECK NO. | DATE PAID | AMOUNT |
|-----------|-----------|--------|-----------|-----------|--------|-----------|-----------|--------|
| 521 | 09-07 | 535.26 | 522 | 09-15 | 50.00 | | | |
| | 2 CHECKS | | | | | | | $ 585.26 |
| | CLOSING BALANCE AS OF 09-24 | | | | | | | $ 312.95 |

DAILY BALANCE

| DATE | BALANCE | DATE | BALANCE | DATE | BALANCE |
|------|---------|------|---------|------|---------|
| 09-07 | 366.95 | 09-15 | 316.55 | 09-24 | 212.95 |

# EXHIBIT H

OFFICE OF COURT ADMINISTRATION
P.O. BOX 2806 CHURCH ST. STATION
NEW YORK, N.Y. 10008

| | 2 | 1706 | 03-08-1993 | 2369536 |
| | Y | AD | | |

| 60193 | 1 | 300.00 |
| | TOTAL: | 300.00 |

JOHN KENNEDY OHARA ESQ.
MONTCLARE & GUAY
51 BROADWAY
10TH FLOOR SUITE 1000
NEW YORK, NY 10006

FOR THE BIENNIAL REGISTRATION
PERIOD 1993-94

NOTICE OF REQUIREMENT
TO REREGISTER   02/10/93

---

Section 468-a of the Judiciary Law and the Rules of the Chief Administrator of the Courts call for the biennial registration of all attorneys. As of May 25, 1990 the fee for such registration is $300 (sixty dollars of which shall be deposited in the Lawyers' Fund for Client Protection, and the remainder of which shall be deposited in the Attorney Licensing Fund), except that no fee shall be required from an attorney who certifies that he or she is retired from the practice of law as defined in 22 NYCRR 118.1 (g) (see reverse side).

The information that this office has on file is shown below. To reregister, you must (A) complete any information missing from this form, (B) annotate any information that should be corrected or changed, (C) sign both the Affirmation of Compliance (if applicable) and the affirmation on the bottom of this page, (D) Enclose a check or money order payable to "NYS Office of Court Administration" (No Cash Please!) for $300 or sign the certification that you are retired from the practice of law, (E) mail to: NYS Office of Court Administration, P.O. Box 2806, Church Street Station, New York, N.Y., 10008.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Affirmation of Compliance required by the Rules of the 1st and 2d Departments:

I affirm that I have read DR 9-102 of the lawyer's code of professional responsibility as adopted by the New York State Bar Association, as amended, and am in compliance therewith, and with §603.15 (1st Dept.) or §691.12 (2d Dept.) of the Rules of the Appellate Division, governing the Conduct of Attorneys, which requires an attorney to preserve the identity of funds and property entrusted to him or her and to maintain certain records relative thereto.

Signature _____

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Retirement Certification (only if applicable): I certify that I am retired from the practice of law as defined in 22 NYCRR 118.1 (g) and therefore am not required to pay the $300 fee.

Signature _____     Date _____

2369536/070291/3/2/468T\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

| 1-LAST NAME | FIRST NAME | MIDDLE NAME | 2-DATE OF BIRTH |
| OHARA | , JOHN | KENNEDY | 03/29/61 |

3-NAME WHEN ADMITTED TO NYS BAR (IF DIFFERENT):        4-YEAR ADMITTED TO
LAST           FIRST           MIDDLE                  NYS BAR:  1991

5-HOME ADDRESS:                                         6-COUNTY OF RESIDENCE
                                                        KINGS
~~477 91ST STREET~~
553 - 47th, STREET
BROOKLYN, NY 11220

7-BUSINESS NAME AND ADDRESS                             8-COUNTY OF BUSINESS
                                                        NEW YORK
MONTCLARE & GUAY

51 BROADWAY
10TH FLOOR SUITE 1000

NEW YORK, NY 10006

9-BUSINESS TELEPHONE                    10-NYS JUDICIAL DEPARTMENT
(212)509-3900                               OF BUSINESS: FIRST

11-NYS JUDICIAL DEPARTMENT              12-LAW SCHOOL GRADUATED:
OF ADMISSION: SECOND                        CUNY

AFFIRMATION:  I AFFIRM THAT THE STATEMENTS CONTAINED HEREIN ARE TRUE TO
THE REST OF MY KNOWLEDGE AND BELIEF:

SIGNATURE: _____   DATE: 3-3-93 \*\*417

# EXHIBIT I



# NEW YORK CITY
# CAMPAIGN FINANCE BOARD



40 Rector Street, 7th Floor, New York, New York 10006   (212) 306-7100   FAX: (212) 306-7143/44

## CANDIDATE CERTIFICATION
## 1993 ELECTIONS

Def Exhibit B Evid. 5/26/99.

## 1. CANDIDATE NAME

| LAST | FIRST | M.I. |
|---|---|---|
| O'HARA | John | K |

## 2. HOME ADDRESS

| STREET ADDRESS | APT. NO. | CFB USE ONLY |
|---|---|---|
| 553 - 47th Street | HOUSE | CØ |

| CITY | STATE | ZIP CODE | TELEPHONE |
|---|---|---|---|
| B'Klyn | NY | 11220 | ( ) - |

## 3. EMPLOYMENT

EMPLOYER NAME: Katz Katz + Ritzker

STREET ADDRESS: 110 Wall Street

| CITY | STATE | ZIP CODE | TELEPHONE |
|---|---|---|---|
| New York | NY | 10005 | (212) 227 - 0001 |

## 4. PREVIOUS ELECTIONS

Have you been a candidate previously for any office or political party position?  yes ☒  no ☐   If yes, please specify your most recent elections below:

| DATE OF ELECTION MONTH | YEAR | OFFICE OR PARTY POSITION SOUGHT | DISTRICT | PARTY PRIMARY ENTERED |
|---|---|---|---|---|
| 9 | 90 | NYS Assembly | 51 AD | Democrat |
| 9 | 91 | NYC Council | 38 CD | Democrat |
| 9 | 92 | NYS Assembly | 51 AD | Democrat |

## 5. CERTIFICATION

I hereby verify that I have not accepted, and I agree not to accept, any contribution or contributions from any one contributor for the 1993 elections that exceed(s) the contribution limit applicable to the office I am seeking, pursuant to Section 3-703(1)(f) of the New York City Campaign Finance Act ("Act"); that I have not made, and agree not to make, expenditures in excess of the expenditure limits applicable to the office I am seeking, pursuant to Section 3-706 of the Act, for each election (except as otherwise provided in the Act); that I have not used, and I agree not to use, my personal funds or property (or that of my spouse or unemancipated children) for these elections, except as contributions that do not exceed the applicable limit; and that I agree to abide by all other applicable requirements of the Act and the New York City Campaign Finance Board Rules ("Rules"), including requirements for campaign finance disclosure statements and recordkeeping.

I understand that I, the political committees I authorize, and my agents are required to abide by the requirements of the Act and the Rules applicable to the 1993 elections for which this Certification is submitted, regardless whether I: meet the requirements of law to have my name appear on the official ballot for those elections; meet the threshold for eligibility for public funds; accept public funds; or am otherwise not eligible to receive public funds.

I understand that this Certification is a condition for qualifying to receive public funds in these elections and that the other conditions specified in the Act and the Rules must be satisfied before I may receive public funds pursuant to the Act.

I understand that my home address as provided above is the address to which legal notices, including correspondence and legal papers, should be sent. I further understand that if it becomes necessary to update this address, I am responsible for promptly notifying the Board, in writing, of the new address.

I understand that failure to abide by the requirements of the Act or the Rules may result in the imposition of such penalties as are provided in Section 3-711 of the Act and any other applicable law. I verify that the information in this Certification is true and complete to the best of my knowledge and belief.

This Certification does not apply to special elections held to fill vacancies.

ELAINE NACCACHE
Notary Public, State of New York
No. 41-4772422
Qualified in Queens County
Certificate Filed in New York County
Commission Expires 10/31/19 94

SWORN TO ME THIS 29th DAY OF April, 1993

NOTARY PUBLIC: Elaine Naccache

CANDIDATE SIGNATURE

# EXHIBIT J

<u>PEOPLE v. JOHN K. O'HARA</u>
Preparation for Grand Jury presentation


<u>OBJECTIVE</u>: Proof that O'Hara registered and voted from false addresses. Proof to concentrate on use of a fictitous address at 553 47th Street from 1992 to end of 1993. Subsidiary proof of 6017 4th Avenue address as possible false residence beginning in 1993.


<u>SUBPOENAS</u>:
-DMV RECORDS SHOWING CHANGES IN ADDRESS & ANY VEHICLES REGISTERED TO O'HARA 1990-PRESENT.
-POSSIBLE NJ DMV? (subjects girlfriend and some associates live in Atlantic City area).
-PVB RECORDS 1990-1996
-POST OFFICE CHANGE OF ADDRESS FORMS 1990-1996.
-TRW & CREDIT CARD REPORTS: BANKS. OBTAIN FULL FINANCIAL PROFILE OF O'HARA, SUBPOENA ALL BANK RECORDS AND CREDIT CARD INFORMATION FROM PERIOD IN QUESTION.
-O.C.A. RECORDS & REGISTRATION.
-CON EDISON BILLS AND SUBSCRIBER INFORMATION FOR JOHN K. O'HARA, AND FOR ADDRESSES AT 47TH STREET AND 4TH AVENUE 1992 TO PRESENT.
-CABLE TV BILLS, SAME AS ABOVE.
-B.U.G BILLS
-NYNEX BILLS
BOARD OF ELECTIONS BUFF CARDS FOR O'HARA


<u>CANVASSES</u>
INTERVIEW & OBTAIN RECORDS AT 579 61ST ST.
INTERVIEW & OBTAIN RECORDS AT 553 47TH STREET
INTERVIEW & OBTAIN RECORDS AT 6017 4TH AVENUE
Speak to individual who may confirm or refut presence of O'Hara as visitor or tenant. Speak to any owners or supers. Be aware that O'Hara has friends/family/associates at 61st Street and 4th Avenue, do not disclose exact purpose of investigation to them - ask general questions as to residency of O'Hara. There is a good probability that they will belive that purpose of probe is recent election and they may therefore not be prepared to lie about prior residences. Make sure to keep good records of their reponses as they may change story as case progresses and O'Hara becomes aware of subject of probe.

-2-

INTERVIEWS:Review purpose of investigation, interview further witnesses as evidence develops - concentrate most on Lozano and Parras, they are essential and must testify in the Grand Jury - note that they previiously testified in 1994 civili proceeding.

## ROBERTO LOZANO  553 47TH STREET
Owner occupant of building, previously testified that O'Hara did not reside at location in 1992-1994, and that O'Hara asked him to hold mail and lie if asked if O'har lived there.

## SANDRA HELVERSON 430 OGDEN AVENUE APT. 8
## JERSEY CITY N.J. d.o.b. 1/26/67
Assisted O'Hara in 1994 campaign, may be estranged and in fear, interview concerning circumstances.

## IMMACULATA PELLICCIO  Hostile witness !
## 6017 4TH AVENUE
Owner/ occupant of building where O'Hara claims to reside. Testified that she is lifelong friend of O'Hara and that in fact he did begin living there. There are two apartments above the shop owned by the Pelicanos. One is occupied by **EMILY MASSA** (Pellicano's daughter) - interview her on a separate occassion. Ask when adnd circumstances of O'Hara moving into building.

## QUERUBIN PARRAS 348 HIGHBROOK AVENUE PELHAM N.Y.
Landlord of building at 579 61st Street in 1994. Leases & knowledge of O'Hara residence 1982- ?. O'Hara still occupied in 1994.

## MAUREEN STEFFENSEN 519 47TH STREET  Hostile witness!
Close associate/friend of O'Hara, has led petition drives for O'Hara in past and assisted Tanya Ruiz candidacy this time. Should know residencies of O'Hara.

# EXHIBIT K

CHRONOLOGICAL DATA SHEET

(2)

| TITLE | CASE NO. OHARA |
| DATE | A.D.A. OHARA |

ACTION

6 - Regarding 553/47TH St. DI's spoke TO TENNENTS (WHO ARE NEW) AND DID NOT KNOW OHARA.

7 - DID DI's MADE 3 ATTEMPTS TO SPEAK w/ LAZZA LAZANO, NOT, DI'S CONFIRMED LAZANO LIVES AT LOCATION AND OWNS BUILDINGING SINCE 1992 MAGGIE LUCAS PREVIOUS OWNER

8 - CABLE CHECK OF 553 47 st. 3 CUSTOMS IN LAST 5 YEAR NONE OF WHICH ARE OHARA. Coler check, NO LISTING FO A OHARA. POSTAL, NO LISTING POSTAL CHANGE OF ADDRESS FORMS for OHARA POSTAL CARRIER STATES MAIL for OHARA Presently BEING DELIVERED @ THIS Location.

9 - 6017 4TH Ave. Coler check NO LISTING FROM 1992-1994, 1995 - OHARA LISTED AS A NEW LISTING TO THE PRESENT. Dec. 1994 CABLE Changed from TINA PELLICC,O TO JOHN OHARA

10 - OHARA RECIEVED 3 MOVING VIOLATIONS DI'S CHECKING On WHAT VEHICLE HE WAS DRIVING DI'S OBTAINED DMV MATERIAL On OHARA & HIS MOTHER.

CHRONOLOGICAL DATA SHEET ③

| TITLE | | CASE NO. | O'HARA |
| DATE | | A.D.A. | OMARA |

### ACTION

11- Con ED - SUBPOENAED , BUG - Subpoeaned, CABLE TV COMPLETED , NYNEX SUBPOEANED,

12- Buff cards - Omara has

13. CAVASSES, DI's CANVASSED - 47th St. DI's TO CANVASS LOCATION NOT ALREADY CAVASSED - SEE REPORTS

INTERVIEWS:

1- LOZANO HARRIS - DI's INTERVIEWED & OBTAINED LEASE AGREEMENT.

2- SANDRA HELVERSON - DANNY McCLEAN HAS TRACKED HER TO A PO on THE JERSEY Shore AND is CONTINUING HIS INVESTIGATION.

3- LOZANO - DI's CONFIRMED THAT LOZANO LIVES @ 47TH St ADDRESS AND will ATTEMPT TO INTERVIEW in THE Am on 10/10/96

4- IMMACULATA PELLICCIO - DI's TO CONFER WITH O'm OHARA.

5- MAUREEN STEFFENSEN /Home PHone 845-6666, DI's McCLEAN AND PRESSER Spoke w/ HusBAND JOHN W/HO STATED MAUREEN NOT (Home AND will Fol call BE DI's.

14- DAOK FINACIAL INVESTIGATORS - Chief Bob Ruston - DOING FINACIAL INVESTIGATION

CHRONOLOGICAL DATA SHEET

(4)

| TITLE | | CASE NO. |
|---|---|---|
| DATE | | A.D.A. |

ACTION

AND DRAWING SUBPOEANA TO TWR
JOAN OMARA TO OBTAIN Subpoeana from
BURTIN, SIGN IT AND SEND IT.

15- SUBPOEANA TO office of Court ADm.
OMARA TO REVIEW AND DI BAUER
will SEARVE.

# EXHIBIT L





3525-96

John O'Hara

| | DESCRIPTION | CT DATE | ADA | A S | R A | ANS | DATE DEC. | REC. ORDER | JUDGE & DISPOSITION | N E |
|---|---|---|---|---|---|---|---|---|---|---|
| 1/9/01 | CA Order + adjudges that order is affirmed | | Ferrell | | | | | | | |
| 7/7/01 | Atty's motion to vacate | | Bruffee | | | 9/14/01 | | | | |
| 11/14/01 | SCSNY atty's motion for evidentiary hearing | | | | | | | | | |
| | Memorandum of Law | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |



**13525/96**    John O'HARA

| | DESCRIPTION | CT DATE | ADA | A S | R A | ANS | DATE DEC. | REC. ORDER | JUDGE & DISPOSITION | N E |
|---|---|---|---|---|---|---|---|---|---|---|
| | Recal D'Appellant's Reply Brief | | ferrell | | | | | | | |
| | Abra MMTO File Amicus Curie Brief (Atty's) | | ferrell | | | 2/21/00 | 3/21/00 | Granted on or before 4-5-2000 | |
| 3/30 | atty's N/M EXT. stay of Judgment | | ferrell | | | | 4/12/00 | 4/12/00 | Request as non-issuing appeal rejected 12-15-99 | |
| 4/6 | atty's amicus Curie Brief + appendix | | ferrell | | | 4/6/00 | 7/17/00 | 7/17/00 | affirmed limit to S.C.F.C. for further proceed | |
| 8/7 | CA JUDGE assig. Hon. Wesley | | ferrell | | | | 9/29/00 | 10/3/00 | Granted | |
| 8/10 | atty CA Leave Application. | | ferrell | | | | | | | |
| 8/23 | atty's motion request oral argument Case | | ferrell | | | | | | | |
| 9/? | CA jurisdiction statement | | ferrell | | | | | | | |

**SIDER, ZACHARY**

| | |
|---|---|
| **From:** | Joel B. Rudin <jbrudin@rudinlaw.com> |
| **Sent:** | Monday, June 13, 2016 12:41 PM |
| **To:** | HALE, MARK |
| **Subject:** | FW: Joel - ███████████████████████████ - John |

Mark,

Any update on the below email?  Was there a Rosario or Brady violation?

My client spoke with Magaly Lopez and unfortunately, without a subpoena, she doesn't wish to get involved.  I gather this was all very traumatic for her years ago, she hasn't had any relationship with John for many, many years, and she doesn't want to get back into it.  That's unfortunate, but I don't know what else to try.

I hope you're having luck pursuing the various other individuals and leads.  Let me know if there's anything else I can do, or John can.

Regards,

Joel

**From:** ohara007@comcast.net [mailto:ohara007@comcast.net]
**Sent:** Monday, June 13, 2016 12:22 PM
**To:** Joel B. Rudin
**Subject:** Joel - ██████████████████████ - John

**From:** "Joel B. Rudin" <jbrudin@rudinlaw.com>
**To:** "MARK HALE" <HALEM@BrooklynDA.org>
**Sent:** Thursday, February 18, 2016 1:20:34 PM
**Subject:** People v. O'Hara

Hi, Mark.  My client brought to my attention the references in Exhs. J and K to my letter to you of December 11, 2015, to ████████████████████████████████  ██████████████  then I believe there would have been at least a *Rosario* violation, if not a *Giglio/Brady* violation, in not disclosing his testimony.

Please let me know if my hypothesis is correct, and I'd welcome an update on where you are otherwise in your review.  Thanks.

Joel

1

## SIDER, ZACHARY

| | |
|---|---|
| **From:** | Joel B. Rudin <jbrudin@rudinlaw.com> |
| **Sent:** | Thursday, February 18, 2016 1:45 PM |
| **To:** | HALE, MARK |
| **Subject:** | Re: People v. O'Hara |

Ok thanks mark.

Joel Rudin
Law Offices of Joel B. Rudin
600 Fifth Avenue
10th Floor
New York, NY 10020
(212) 752-7600 (office)
(917) 885-1116 (cell)

On Feb 18, 2016, at 1:32 PM, HALE, MARK <HALEM@BrooklynDA.org> wrote:

> Will do Joel. We are still working on a number of fronts. I will keep you posted when we conduct actual interviews. Naturally interviews will be tape recorded and you will get access to those tapes.
>
> Mark
>
> ---
>
> **From:** Joel B. Rudin [mailto:jbrudin@rudinlaw.com]
> **Sent:** Thursday, February 18, 2016 1:21 PM
> **To:** HALE, MARK
> **Subject:** People v. O'Hara
>
> Hi, Mark.  My client brought to my attention the references in Exhs. J and K to my letter to you of December 11, 2015, to ███████████████████████. ████████████████████████████████████████████████████████, then I believe there would have been at least a *Rosario* violation, if not a *Giglio/Brady* violation, in not disclosing his testimony.
>
> Please let me know if my hypothesis is correct, and I'd welcome an update on where you are otherwise in your review.  Thanks.
>
> Joel
>
> This email communication and any files transmitted with it contain privileged and confidential information from the Kings County District Attorney's Office and are intended solely for the use of the individuals or entity to whom it has been addressed. If you are not the intended recipient, you are hereby notified that any dissemination or copying of this email is strictly prohibited. If you have received this email in error, please delete it and notify the sender by return email.

## SIDER, ZACHARY

| | |
|---|---|
| **From:** | HALE, MARK <HALEM@BrooklynDA.org> |
| **Sent:** | Thursday, February 18, 2016 1:33 PM |
| **To:** | 'Joel B. Rudin' |
| **Subject:** | RE: People v. O'Hara |

Will do Joel. We are still working on a number of fronts. I will keep you posted when we conduct actual interviews. Naturally interviews will be tape recorded and you will get access to those tapes.

Mark

**From:** Joel B. Rudin [mailto:jbrudin@rudinlaw.com]
**Sent:** Thursday, February 18, 2016 1:21 PM
**To:** HALE, MARK
**Subject:** People v. O'Hara

Hi, Mark. My client brought to my attention the references in Exhs. J and K to my letter to you of December 11, 2015, to ███████████████████████████████ . ██████████████████████ , then I believe there would have been at least a *Rosario* violation, if not a *Giglio/Brady* violation, in not disclosing his testimony.

Please let me know if my hypothesis is correct, and I'd welcome an update on where you are otherwise in your review. Thanks.

Joel