## SIDER, ZACHARY

**From:**          Joel B. Rudin <jbrudin@rudinlaw.com>
**Sent:**          Thursday, February 18, 2016 1:21 PM
**To:**            HALE, MARK
**Subject:**       People v. O'Hara

Hi, Mark.  My client brought to my attention the references in Exhs. J and K to my letter to you of December 11, 2015, to ███████████████████████████████████ . ████████████████████████████████████████ , then I believe there would have been at least a *Rosario* violation, if not a *Giglio/Brady* violation, in not disclosing his testimony.

Please let me know if my hypothesis is correct, and I'd welcome an update on where you are otherwise in your review.  Thanks.

Joel

## SIDER, ZACHARY

| | |
|---|---|
| **From:** | Joel B. Rudin <jbrudin@rudinlaw.com> |
| **Sent:** | Thursday, June 2, 2016 12:41 PM |
| **To:** | HALE, MARK |
| **Subject:** | RE: O'Hara Progress |

Mark,

Thanks for the update.  The three purchasers are the DA's trial witnesses, aren't they?  They'd have to admit perjuring themselves.  As for Magaly Lucas, I'll try to find out what's going on.  She went through a lot with the DA's office back when and has no relationship any longer with John O'Hara and may wish not to get sucked back in to all this.  But I'll try to find out.

Any date in mid to late September is fine with me.  Can you take care of the adjournment?

Joel

**From:** HALE, MARK [mailto:HALEM@BrooklynDA.org]
**Sent:** Thursday, June 02, 2016 11:52 AM
**To:** Joel B. Rudin
**Subject:** O'Hara Progress

Joel:

Just to keep you posted, we are proceeding apace on the investigative leads you have proposed. Many of the witnesses you suggested have in fact been interviewed and been most cooperative. Exceptions are two of the three purchasers of the property in question (one is now deceased) from Ms. Lucas. Both of the men have flatly refused to discuss the matter except to say John didn't live there. I can't say I'm surprised. More surprising is Ms. Lucas who does not want to get involved in this at all. Despite assurances that she is in no trouble and we are not looking to get anybody into trouble, she refuses to help us out. If there is any chance you can prevail upon her I would be most appreciative.

Mrs, Vales now lives out of state and we hope to do an interview of her next week.

It looks like we  will not conclude this phase before the adjourn date. Start thinking of a September date to go back to court.

Mark

This email communication and any files transmitted with it contain privileged and confidential information from the Kings County District Attorney's Office and are intended solely for the use of the individuals or entity to whom it has been addressed. If you are not the intended recipient, you are hereby notified that any dissemination or copying of this email is strictly prohibited. If you have received this email in error, please delete it and notify the sender by return email.

**SIDER, ZACHARY**

| | |
|---|---|
| **From:** | HALE, MARK <HALEM@BrooklynDA.org> |
| **Sent:** | Thursday, June 2, 2016 1:04 PM |
| **To:** | 'Joel B. Rudin' |
| **Subject:** | RE: O'Hara Progress |

You are correct; the trio are the trial witnesses. I don't think you have any hope at all that the two survivors will admit perjury or even give us any details at all of their involvement in this matter. Magaly, of course, is key. She could both rebut them and confirm that the basement was in fact a habitable area when she was in possession and when she transferred title. Naturally the circumstances of her conveyance of the building is somewhat sketchy and may not have been on the up-and-up on the part of any of the parties. Magaly should be made aware that any concern over that is not germane to me and is time-barred by limitations. She would certainly help in the investigation.

Just refresh my memory as to when the June date rolls around and I will take care of putting it into September.

Mark

**From:** Joel B. Rudin [mailto:jbrudin@rudinlaw.com]
**Sent:** Thursday, June 02, 2016 12:41 PM
**To:** HALE, MARK
**Subject:** RE: O'Hara Progress

Mark,

Thanks for the update.  The three purchasers are the DA's trial witnesses, aren't they?  They'd have to admit perjuring themselves.  As for Magaly Lucas, I'll try to find out what's going on.  She went through a lot with the DA's office back when and has no relationship any longer with John O'Hara and may wish not to get sucked back in to all this.  But I'll try to find out.

Any date in mid to late September is fine with me.  Can you take care of the adjournment?

Joel

**From:** HALE, MARK [mailto:HALEM@BrooklynDA.org]
**Sent:** Thursday, June 02, 2016 11:52 AM
**To:** Joel B. Rudin
**Subject:** O'Hara Progress

Joel:

Just to keep you posted, we are proceeding apace on the investigative leads you have proposed. Many of the witnesses you suggested have in fact been interviewed and been most cooperative. Exceptions are two of the three purchasers of the property in question (one is now deceased) from Ms. Lucas. Both of the men have flatly refused to discuss the matter except to say John didn't live there. I can't say I'm surprised. More surprising is Ms. Lucas who does not want to get involved in this at all. Despite assurances that she is in no trouble and we are not looking to get anybody into trouble, she refuses to help us out. If there is any chance you can prevail upon her I would be most appreciative.

Mrs, Vales now lives out of state and we hope to do an interview of her next week.

It looks like we  will not conclude this phase before the adjourn date. Start thinking of a September date to go back to court.

Mark

This email communication and any files transmitted with it contain privileged and confidential information from the Kings County District Attorney's Office and are intended solely for the use of the individuals or entity to whom it has been addressed. If you are not the intended recipient, you are hereby notified that any dissemination or copying of this email is strictly prohibited. If you have received this email in error, please delete it and notify the sender by return email.

## SIDER, ZACHARY

| | |
|---|---|
| **From:** | Joel B. Rudin <jbrudin@rudinlaw.com> |
| **Sent:** | Thursday, June 2, 2016 1:44 PM |
| **To:** | HALE, MARK |
| **Subject:** | RE: O'Hara Progress |

Understood.  It's June 13.

**From:** HALE, MARK [mailto:HALEM@BrooklynDA.org]
**Sent:** Thursday, June 02, 2016 1:04 PM
**To:** Joel B. Rudin
**Subject:** RE: O'Hara Progress

You are correct; the trio are the trial witnesses. I don't think you have any hope at all that the two survivors will admit perjury or even give us any details at all of their involvement in this matter. Magaly, of course, is key. She could both rebut them and confirm that the basement was in fact a habitable area when she was in possession and when she transferred title. Naturally the circumstances of her conveyance of the building is somewhat sketchy and may not have been on the up-and-up on the part of any of the parties. Magaly should be made aware that any concern over that is not germane to me and is time-barred by limitations. She would certainly help in the investigation.

Just refresh my memory as to when the June date rolls around and I will take care of putting it into September.

Mark

**From:** Joel B. Rudin [mailto:jbrudin@rudinlaw.com]
**Sent:** Thursday, June 02, 2016 12:41 PM
**To:** HALE, MARK
**Subject:** RE: O'Hara Progress

Mark,

Thanks for the update.  The three purchasers are the DA's trial witnesses, aren't they?  They'd have to admit perjuring themselves.  As for Magaly Lucas, I'll try to find out what's going on.  She went through a lot with the DA's office back when and has no relationship any longer with John O'Hara and may wish not to get sucked back in to all this.  But I'll try to find out.

Any date in mid to late September is fine with me.  Can you take care of the adjournment?

Joel

**From:** HALE, MARK [mailto:HALEM@BrooklynDA.org]
**Sent:** Thursday, June 02, 2016 11:52 AM
**To:** Joel B. Rudin
**Subject:** O'Hara Progress

Joel:

Just to keep you posted, we are proceeding apace on the investigative leads you have proposed. Many of the witnesses you suggested have in fact been interviewed and been most cooperative. Exceptions are two of the three purchasers of the property in question (one is now deceased) from Ms. Lucas. Both of the men have flatly refused to discuss the

matter except to say John didn't live there. I can't say I'm surprised. More surprising is Ms. Lucas who does not want to get involved in this at all. Despite assurances that she is in no trouble and we are not looking to get anybody into trouble, she refuses to help us out. If there is any chance you can prevail upon her I would be most appreciative.

Mrs, Vales now lives out of state and we hope to do an interview of her next week.

It looks like we  will not conclude this phase before the adjourn date. Start thinking of a September date to go back to court.

Mark

This email communication and any files transmitted with it contain privileged and confidential information from the Kings County District Attorney's Office and are intended solely for the use of the individuals or entity to whom it has been addressed. If you are not the intended recipient, you are hereby notified that any dissemination or copying of this email is strictly prohibited. If you have received this email in error, please delete it and notify the sender by return email.

**SIDER, ZACHARY**

| | |
|---|---|
| **From:** | Joel B. Rudin <jbrudin@rudinlaw.com> |
| **Sent:** | Friday, June 10, 2016 11:12 AM |
| **To:** | HALE, MARK |
| **Subject:** | RE: O'Hara Progress |

Hi, Mark. Just a reminder to adjourn Monday's conference, maybe to mid-September?. I don't have anything new yet on Magaly as I've been busy, but I'll try to find out.

Joel

**From:** HALE, MARK [mailto:HALEM@BrooklynDA.org]
**Sent:** Thursday, June 02, 2016 1:04 PM
**To:** Joel B. Rudin
**Subject:** RE: O'Hara Progress

You are correct; the trio are the trial witnesses. I don't think you have any hope at all that the two survivors will admit perjury or even give us any details at all of their involvement in this matter. Magaly, of course, is key. She could both rebut them and confirm that the basement was in fact a habitable area when she was in possession and when she transferred title. Naturally the circumstances of her conveyance of the building is somewhat sketchy and may not have been on the up-and-up on the part of any of the parties. Magaly should be made aware that any concern over that is not germane to me and is time-barred by limitations. She would certainly help in the investigation.

Just refresh my memory as to when the June date rolls around and I will take care of putting it into September.

Mark

**From:** Joel B. Rudin [mailto:jbrudin@rudinlaw.com]
**Sent:** Thursday, June 02, 2016 12:41 PM
**To:** HALE, MARK
**Subject:** RE: O'Hara Progress

Mark,

Thanks for the update. The three purchasers are the DA's trial witnesses, aren't they? They'd have to admit perjuring themselves. As for Magaly Lucas, I'll try to find out what's going on. She went through a lot with the DA's office back when and has no relationship any longer with John O'Hara and may wish not to get sucked back in to all this. But I'll try to find out.

Any date in mid to late September is fine with me. Can you take care of the adjournment?

Joel

**From:** HALE, MARK [mailto:HALEM@BrooklynDA.org]
**Sent:** Thursday, June 02, 2016 11:52 AM
**To:** Joel B. Rudin
**Subject:** O'Hara Progress

Joel:

Just to keep you posted, we are proceeding apace on the investigative leads you have proposed. Many of the witnesses you suggested have in fact been interviewed and been most cooperative. Exceptions are two of the three purchasers of the property in question (one is now deceased) from Ms. Lucas. Both of the men have flatly refused to discuss the matter except to say John didn't live there. I can't say I'm surprised. More surprising is Ms. Lucas who does not want to get involved in this at all. Despite assurances that she is in no trouble and we are not looking to get anybody into trouble, she refuses to help us out. If there is any chance you can prevail upon her I would be most appreciative.

Mrs, Vales now lives out of state and we hope to do an interview of her next week.

It looks like we  will not conclude this phase before the adjourn date. Start thinking of a September date to go back to court.

Mark

This email communication and any files transmitted with it contain privileged and confidential information from the Kings County District Attorney's Office and are intended solely for the use of the individuals or entity to whom it has been addressed. If you are not the intended recipient, you are hereby notified that any dissemination or copying of this email is strictly prohibited. If you have received this email in error, please delete it and notify the sender by return email.

## SIDER, ZACHARY

| | |
|---|---|
| **From:** | John O'Mara <john.omara@nypti.org> |
| **Sent:** | Friday, August 26, 2016 11:50 AM |
| **To:** | HALE, MARK |
| **Subject:** | Meeting re O'Hara |
| **Attachments:** | O'HARA!.LTR.doc; O'HARA.SEN1.doc; Memo to file O'Hara.doc; O'Hara synopsis.doc |

Mark,

Just wanted to confirm the meeting we scheduled for next Tuesday August 30th. While I can accommodate whatever time you arrive, it would be helpful if I can arrange my schedule around your plans. Do not have much on O'Hara – but am attaching documents I found. They are: a letter accompanying a subpoena for court records during the early stages of the investigation; the sentencing letter to Judge Hall after the first trial; a memo to the file during the last trial; and a synopsis memo to DA Hynes. Not sure if these were drafts, but in any case the final versions should be in the case file. Not positive, but I believe the synopsis was prepared in connection with Hynes responding to one of the many petitions for pardons O'Hara made to various Governors.

Look forward to seeing you next week.

Thanks,

John

John O'Mara
Attorney
New York Prosecutors Training Institute
107 Columbia Street
Albany, NY 12210
Phone: (518) 432-1100 x216
john.omara@nypti.org
www.nypti.org







Memo to file 7/2/99 – J. O'Mara

Following a return from lunch at approximately 2pm today, I was notified by Detective Investigator McClean that he has received a call from Ms. Josephine Vales – Ms. Vales had been a prosecution witness yesterday in the case of the People v. John O'Hara. D.I. McLean stated that Ms. Vales was concerned over a call she had received from defense counsel for Mr. O'Hara, and wished to speak to me.

Upon calling Ms. Vales, she stated that Mr. Hernandez had called her, and that she felt harassed and threatened as a result of what he said to her. Specifically she indicated that he had threatened to subpoena members of her family to court, that her former neighbors would be calling to discuss her "lies", and that she should arrange to meet with her friend Ms. Aguirre and Mr. Hernandez to discuss her prior testimony. She also complained that Mr. Hernandez was clearly in her view attempting to intimidate her by telling her "she didn't know how important this matter was" or "what could happen". She reiterated that the testimony she had given was truthful and was upset that in her view Mr. Hernandez was now trying to get her to lie.

I informed Ms. Vales that she was free to talk to whomever she wished, but also could not be forced to speak to anyone absent a court directive. I also told her that it would be improper for anyone to attempt to coerce her to speak if she told him or her she did not wish to do so. She insisted she did not want to speak to Mr. Hernandez, and that her daughter had told him not to call again.

I then called Mr. Hernandez to inform him of Ms. Vales's wishes. Mr. Hernandez insisted that he had not threatened or harassed Ms. Vales, although he had called her to question the honesty of her testimony, and had attempted to arrange a three way meeting with Ms. Aguirre. He stated that he had not been told not to contact Ms. Vales again, but that if Ms. Vales

were to tell him she did not wish to speak to him, he would of course make no further attempts to do so.

I then again called Ms. Vales, and indicated that if she was called again, and did not wish to speak to Mr. Hernandez, she should tell him so directly, and to call me if there were any further problems of this nature.

---

### INTEROFFICE MEMO

---

**DATE:**    7/30/2008

**TO:**      CHARLES J. HYNES, DISTRICT ATTORNEY

**FROM:**    JOHN O'MARA

**RE:**      PEOPLE V. O'HARA

---

### <u>Synopsis of the case of People v. John O'Hara</u>

**Origin:** The matter was first brought to the attention of the Kings County District Attorney's Office in June of 1996. The original source of the complaint was Assemblyman Jim Brennan and members of his staff, who asserted that O'Hara had repeatedly committed criminal violation of New York State Elections Law – these allegations came to light when they sought assistance in an ongoing police investigation into the assault of attorney Jack Carrol. While reviewing these matters, this office received a request from Special Deputy Counsel Jeffrey Waite of the New York State Board of Elections that we assist them in the investigation of John O'Hara – as they had failed in their efforts to obtain Court records on July 12, 1996.

**Investigation:** Application to the Miscellaneous Motion part of Kings County Supreme Court for a judicially endorsed subpoena for records through an affirmation on July 28th, 1996. The requested subpoena was signed by Justice Matthew D'Emic on July 29th.[1] A review of the resulting records and conversations with witnesses indicated that O'Hara had used 3 different apparently improper addresses in running unsuccessfully for various positions. There was no evidence that he actually resided at any of these locations, as he continuously lived in an apartment at 579 61st Street – where he continues to reside today.  These addresses were utilized so it would appear that O'Hara

---

[1] The date becomes important because while both the defense and the Court were supplied with documentary evidence of this during discovery proceedings, O'Hara has continued to publicly assert that the triggering event leading to the investigation was his participation with others as a plaintiff in a federal lawsuit relating to the conduct of Kings County democratic primaries in September of 1996
.

resided within the boundaries of the areas he sought to represent - the boundaries of which shifted upon redistricting in 1992.

**Charges:** In order to simplify the proceedings, and as the evidence was strongest -charges were presented regarding only the latest false address at 553 47th Street. This was located in the 20th ED of the 51st A.D. The Appellate Division First Department had at that time recently affirmed a dismissal of similar charges based on what were held to be improper instructions given to a Grand Jury (People v. Benjamin Ramos 1996) – so the instructions were carefully crafted to ensure compliance with the law.

The resulting indictment charged one count of Offering a False Instrument for Filing in the First Degree, one count of False Registration and five counts of illegal voting. All occurring between November 2, 1992 and November 2, 1993. Defendant surrendered to the District Attorney's Office and was arraigned on October 23, 1996.

**First trial:** The case was assigned to Judge Priscilla Hall in part 1. The judge inquired as to whether a plea bargain to a misdemeanor was possible – we indicated we were prepared to discuss it, but O'Hara expressed that he would never plead to anything. The matter proceeded to trial on 5/1/97. The evidence presented include testimony from all occupants of the building – who stated O'Hara never lived there (although he had visited and asked them to hold mail), evidence he had no utilities or phone at the bogus address, and evidence he had continuously lived on 61st Street. He was convicted of all seven E felonies on 5/13/97. He was sentenced to probation, and 1,500 hours community service as well as a fine.

**First appeal:** On 8/13/98 the Appellate Division reversed the conviction. The Court determined that a missing witness instruction was improperly given regarding the defendant's girlfriend Magaly Lucas. The defense had told the jury that she would testify she had the defendant move into the building while she negotiated the sale to the occupants who were renting it – but she failed to appear and defense refused an offer to have her declared a material witness.

**Second trial:** The case was assigned to Judge Abraham Gerges. The Judge stated his desire to resolve the matter through a plea to a misdemeanor, but O'Hara again stated that he would never plead to anything. The direct case consisted of the same evidence as at the first trial – the defendant and several acquaintances (most who had worked on past campaigns for the defendant)

testified that he actually lived in a basement apartment in the building and often parked his mother's car in front. The jury was unable to reach a decision (subsequent discussion with jurors indicated they were deadlocked 10-2 for conviction) and a mistrial was declared on 6/2/99.

**Third Trial:** The trial began on 6/30/99. Most evidence was similar – the prior owners of the building had been located and confirmed that the basement in question at no time contained an apartment and was in fact uninhabitable. Additionally, evidence showed that the Hyundai automobile defense witnesses swore they had seen repeatedly parked on 47th Street – had not left the loading docks in Korea until after the dates of their reported observations. The defendant was again convicted of all charges on 7/1/99 after approximately 2 hours of deliberation. On 10/18/99, the defendant was sentenced to the same 1,500 hours of community service and a Conditional Discharge.

**Appeals:** Defendant's principal assertion on appeal was that the jury had been improperly instructed on the definition of "residence" under the Election Law. The conviction was sustained by the Appellate Division in a rather short opinion on 7/17/00 and in a more detailed opinion by the New York Court of Appeal on 6/14/01. The majority opinion recognized that the jury was instructed that the defendant could choose between residences for voting purposes, as long as the one picked was "not a sham". O'Hara sought relief in federal court through a habeas petition. That application was denied by Judge John Gleeson of the Eastern District of New York through an oral decision on 3/7/2003. The Judge again noted that the prosecution was founded on the assertion that the residence claimed by O'Hara was a "sham", and further commented that "the evidence in this case, which I reviewed exhaustively. I found extremely powerful." O'Hara then attempted unsuccessfully to appeal this decision to the Second Circuit and the U.S. Supreme Court. His petition for certiorari was denied 1/12/2004

**Collateral attacks on conviction.** Defendant's attempt to vacate the conviction by asserting ineffective assistance of counsel was denied by the Appellate on 9/23/2002. O'Hara further attempted to attack the conviction through a 440 motion asserting selective prosecution - in his decision issued on 9/23/2005; Judge Gerges not only denied the motion but also noted that "In fact, the defendant has shown that the factors used by the government in deciding to prosecute him were valid and neutral considerations."

[ Click here and type your memo text ]

**SIDER, ZACHARY**

| | |
|---|---|
| **From:** | John O'Mara <john.omara@nypti.org> |
| **Sent:** | Wednesday, August 31, 2016 5:55 PM |
| **To:** | HALE, MARK; LANIGAN, PATRICK |
| **Subject:** | O'Hara |

Hope your trip home went well.

As I told Pat in response to the question over the phone this morning – I am aware of no extensive conversations regarding proceeding with the second trial. I did meet with Jane Meyers from the Appeals Bureau after the reversal in the Appellate Division concerning their decision to seek leave from the Court of Appeals. Monique Ferrell and other may have been present, but conversations I recall with Monique happened after the final conviction. As in every other case remitted for trial, I received the order and a notice as to what part the case would be on in inter office mail. I do recall standing up in a part and the case being adjourned pending the Court of Appeals determination not to grant leave. I also remember appearing in a calendar control part, and that the case it was in front of Judge Firetog on at least one date where we there was some oral argument. I also recall being less than happy when the case was sent to Judge Gerges – as I thought it should have been returned to Judge Hall. Not aware of any office policies  or procedures in place regarding decisions to prosecute reversals, but the practice and default posture was to do so unless the case had been weak or the evidence/witnesses were no longer available. In most such instances defendants would  seek and often obtain a plea that accounted for the reversal – but do not recall any dismissals of cases if there was a viable case. The witnesses were all available, and despite some efforts by Gerges – O'Hara made it clear he was not interested in any plea.  The decision after the mistrial was mine and made immediately after talking to the jury (which had split 10-2 for conviction), and  followed what appeared  to me to have been  clear lies by defense witnesses, testimony  I suspect was known to defense attorney Fusco to have been perjury. I announced the desire to re-try the case immediately and the delay occurred only because Mr. Fusco had no desire to proceed.  I was completely confident that the third trial would result in a conviction, although the defense at that trial made it easier, and it likely would have taken longer than two hours to arrive at a verdict without their miscues.

In recalling how it is that I sought and found the prior owners of the 47th street building during the trial – this only became relevant after various defense witnesses testified that O'Hara lived in a basement apartment that had been renovated by the prior owners. At least one of the witnesses testified (Aguirre?) that she had visited many times while her friend Ms. Vales owned the building as well as later when she claimed  O'Hara was there. I believe she described it as the best apartment in the building. It was admissible only because the defense placed the condition of the building pre 1992 in issue. The occupants of the 47th street building in 1992 all stated that O'Hara never lived there – I don't recall the alleged "basement" apartment being an issue until the defense witnesses testified. I do know, and believe there was some testimony,  that the residents had been doing a bunch of haphazard work on the building in 1992. The DOS had ticketed them for leaving demolition material on the Street, and while I don't believe either Presser or Danny McClean went through the interior of the building when they originally contacted the witnesses – they did describe the entire house as a complete and dilapidated mess in 1996. Doubt however that the individuals involved filed plans or got any of the necessary permits – and am quite sure that constructing the kind of apartment that was testified to was totally beyond their capability  – and neither they or Magaly Lucas had the means to hire a contractor. I had subpoenaed the appraisal and inspection reports concerning the property that should have been associated with the purchase of the building, and those likely would have included descriptions and probably photographs of the interior as it existed in 1991-1992 when the property was sold, but Ms. Lucas did not provide the material demanded and the bank did not respond at all.

As discussed yesterday, while I remember the circumstances that led to the investigation and prosecution, there was never any communication with either DA Hynes or Assemblyman Brennan concerning any connection or relationship between the two. Nor did I ever have any conversation or communication from Hynes or anyone else regarding any personal interest that the DA may have had in the case. As I told you yesterday, based on the way the complaints was handled and my observation of the two – they did not appear to be friends. I was never involved in the intricacies of Brooklyn politics, so whatever information I may have on the various interests and factions is at best third-hand. I did look up a blog article on the subject that I read several years ago and am attaching it. It is anonymous and on the internet, so it certainly can't be termed reliable, but figured you might at least be amused:

http://r8ny.com/2006/10/06/slaying-the-mythical-beasts-the-legend-of-phillips-roper-and-ohara/

As mentioned, I will be leaving on vacation for a week on Friday, but am otherwise available if you have any further questions.

Best,


John



John O'Mara
Attorney
New York Prosecutors Training Institute
107 Columbia Street
Albany, NY 12210
Phone: (518) 432-1100 x216
john.omara@nypti.org
www.nypti.org

2

**SIDER, ZACHARY**

---

| | |
|---|---|
| **From:** | Alex Hennigan <ahennigan@djkellylaw.com> |
| **Sent:** | Tuesday, November 1, 2016 4:31 PM |
| **To:** | halem@brooklynda.org |
| **Cc:** | Dennis Kelly |
| **Subject:** | People v. John O'Hara |
| **Attachments:** | Letter to Mark Hale, dated December 11, 2015.pdf; Letter to Mark Hale, Esq..pdf |

Good Afternoon Mr. Hale,

Please see the attached correspondence on behalf of Mr. Kelly. If you have any questions, please feel free to contact our office.

Thank you,

Alexis Hennigan
Paralegal
**LAW OFFICES OF DENNIS J. KELLY, P.C.**
137 Glen Head Road
Glen Head, New York 11545
(516) 686-6768 – Telephone
(516) 686-6771 – Facsimile

# LAW OFFICES OF DENNIS J. KELLY, P.C.
## ATTORNEYS AT LAW

137 GLEN HEAD ROAD
GLEN HEAD, NEW YORK 11545
Telephone: (516) 686-6768
Facsimile: (516) 686-6771

**DENNIS J. KELLY, ESQ.**
**ROBERT KERRIGAN, ESQ.**

5 Penn Plaza, 23rd Floor
New York, New York 10001
(By Appointment Only)

October 31, 2016

**VIA ELECTRONIC MAIL HALEM@BROOKLYNDA.ORG**
Mr. Mark Hale, Esq.
Chief, Conviction Review Unit
Kings County District Attorney's Office
Renaissance Plaza
350 Jay Street
Brooklyn, New York 11201

RE:  People v. O'Hara
Indictment No.: 13525/96

Dear Mr. Hale:

Pursuant to our conversation on October 20, 2016, I have followed up on certain requests and concerns that you expressed regarding the investigation of this matter. Initially you indicated that you were aware that Magaly Lucas had given two affirmations contained in previous 440 motions but you had never seen them. Attached hereto is the December 11, 2015 letter from Joel Rudin, Esq., specifically referencing the two affirmations Ms. Lucas prepared as an attorney, see the Rudin letter as Exhibits C and D. Perhaps you were mistaken as to whether or not you were aware of this evidence, however, it is clear she indicates John lived at the building that she owned. In any event, the affirmations establish that John actually lived at the property and explains why she did not show up at trial. I do not believe that you would need any further information that is not contained in the two affirmations, indeed, although her testimony would have been beneficial to John at trial, the circumstances of her non-appearance is the more pertinent issue in this matter that focuses on the actions of the prosecutor John O'Mara. Before getting into the issue of O'Mara the transfer of the property to Lozano, Munoz, and Martinez seems to be a troubling aspect for you, although Mr. Rudin's letter clearly debunks the flawed and disingenuous theory Mr. O'Mara presented to three juries. There are a number of details of this real estate

1

transaction that further corroborate O'Hara's version of events. While Munoz and Lozano continually claim they were scammed somehow, any reasonable view of the facts prove otherwise. Initially, if Lucas was attempting to scam these three individuals out of the property or money, there never would have been a transfer of the deed, yet the deed was filed two weeks after the three bought the property. More importantly, why would anyone seeking to rip off the three unsuspecting purchasers in a real estate scam actually keep her name on the mortgage and therefore responsibility for the mortgage. That just does not make sense. Once the deed was transferred, Lucas had no interest in the property, yet she was still personally responsible for the mortgage. Finally, O'Hara's testimony that he made sure the trio paid the mortgage, i.e. rent while he lived there corroborates his testimony. At the time of the transfer, the mortgage was not in arrears, all payments were made to the bank. Interestingly, once the trio were on the deed the mortgage payments stopped as per the foreclosure papers, which indicate that the mortgage payments stopped in January 1994. A cursory review of the facts of the case reveal that the trio was not scammed, in fact, the three unsavory individuals actually scammed Lucas by taking possession of the property, getting the property transferred to their name using fraudulent identifications and then defaulting on the mortgage. Once transferred they used property for a flop house/drug location for years collecting rent and not paying for anything. While this scam is quite clear on its face O'Mara portrayed Lucas and O'Hara as conspiring to scam the trio while knowing the scenario was false.

The fraudulent and disingenuous actions of O'Mara on behalf of the Hynes vendetta against O'Hara goes beyond arguing false facts before a jury, it is the outright intimidation of witnesses, failure to turn over Rosario material, failure to present exculpatory material to the grand jury and a cover-up of the politically motivated crusade against a political opponent of Hynes. Therefore, the focus of your investigation should be the actions and motivations of O'Mara who intimidated the witness Lucas by threatening her if she testified for John. Lucas even complained to the Judge about O'Mara's threats in the first trial that she was being intimidated by O'Mara. The result was an inexplicable decision to charge a missing witness charge against O'Hara who had no control over the witness and the cause of her non-appearance was the unethical intimidation of the witness by O'Mara. Juan Perez testified at John's first trial favorably for the defendant, yet was intimidated by O'Mara not to appear in subsequent trials. Vicki Guveiyian, John's girlfriend, was assaulted by an operative of Hynes just before John's arrest. Unannounced, the head of the sex crimes unit appears at Vicki's place of business in Atlantic City, New Jersey, and pressures her to drop the assault charges.

Anyone of these substantiated allegations would give rise to an inquiry, the sum total of credible witnesses complaining of the same type of abuse exposes the participants as complicit in the persecution of O'Hara. Nor can it be disputed that it was political cronies of Hynes who were the driving force and active participants in the initiation, investigation, prosecution and conviction of O'Hara. Based upon the foregoing I will be submitting a supplemental 440 brief based upon actual innocence. Therefore, I am requesting the grand jury testimony of Lozano for use in my motion.

2

I reiterate in this letter what has been before your unit for years, the foregoing facts compel me to aggressively pursue justice for my client. Ken Thompson, in a meeting in July of 2014, attended by now Acting District Attorney Gonzalez, declared that he would seek justice regarding the handling of the Judge Philips case he also said he would get justice for John. I can only hope that Mr. Gonzalez will continue the legacy of Mr. Thompson by exonerating John O'Hara.

Very yours truly,
**LAW OFFICES OF DENNIS J. KELLY, P.C.**

Dennis Kelly, Esq.

**SIDER, ZACHARY**

| | |
|---|---|
| **From:** | HALEM@BrooklynDA.org |
| **Sent:** | Wednesday, December 7, 2016 10:17 AM |
| **To:** | SONNENSE@BrooklynDA.org |
| **Subject:** | o'hara |
| **Attachments:** | O'Hara Recommendation Memo11.docx |

Please review for typos and errors and get into presentation form

**SIDER, ZACHARY**

| | |
|---|---|
| **From:** | SONNENSE@BrooklynDA.org |
| **Sent:** | Wednesday, December 7, 2016 1:41 PM |
| **To:** | HALEM@BrooklynDA.org |
| **Subject:** | Document1 |
| **Attachments:** | Document1.docx |

I stuck my 2 cents in the conclusion.  Here are my edits of that part for you to look at.

**SIDER, ZACHARY**

| | |
|---|---|
| **From:** | HALEM@BrooklynDA.org |
| **Sent:** | Wednesday, December 21, 2016 2:25 PM |
| **To:** | MEJIAM@BrooklynDA.org |
| **Subject:** | O'Hara Digital |
| **Attachments:** | O'Hara Recommendation Memo Panel copy.docx |

As requested

**SIDER, ZACHARY**

| | |
|---|---|
| **From:** | MEJIAM@BrooklynDA.org |
| **Sent:** | Wednesday, December 21, 2016 10:06 PM |
| **To:** | PETERSONH@BrooklynDA.org; YANIVO@BrooklynDA.org |
| **Subject:** | Memo |
| **Attachments:** | O'Hara Recommendation Memo Panel copy.docx; ATT00001.txt |

**SIDER, ZACHARY**

| | |
|---|---|
| **From:** | LICHSTET@BrooklynDA.org |
| **Sent:** | Tuesday, December 12, 2017 4:52 PM |
| **To:** | FELICIANOA@BrooklynDA.org |
| **Subject:** | FW: John O'Hara |
| **Attachments:** | O'Hara Recommendation Memo Panel copy.docx |

**From:** HALE, MARK
**Sent:** Tuesday, August 29, 2017 5:23 PM
**To:** LICHSTEIN, TONI
**Subject:** John O'Hara

Here goes Toni

## SIDER, ZACHARY

**From:**        CARROLLJ@BrooklynDA.org
**Sent:**        Sunday, September 3, 2017 6:36 PM
**To:**          Jxc31234@gmail.com


To:        John W. Carroll, Esq. (hereinafter "Jack Carroll")
From:      John C. Carroll, Esq.
Re:        O'Hara complaint
Date:      9/3/17


This memorandum contains my questions and comments concerning O'Hara's complaint. This memorandum is organized as follows: I will direct the reader to a particular paragraph in O'Hara's complaint, and then, with respect to that paragraph, I will write my questions or comments.

Memorandum

¶ 26: O'Hara claims that he withdrew from the 1988 Assembly election.  Did he withdraw or was he thrown off the ballot? Get the court records pertaining to any challenges made against O'Hara's petitions.

¶ 29: O'Hara claims that all of the challenges against O'Hara and his candidates were unsuccessful. Is this true?  Who were these other candidates?

¶ 33: What were Jim Brennan's specific arguments against O'Hara's admission to the New York State Bar?  Get Jim Brennan's letter to the Committee on Character and Fitness regarding O'Hara's admission to the Bar.

¶ 34: At this point in time, had O'Hara already filed fraudulent or otherwise suspect petitions?

¶ 35: O'Hara reference to the "Brooklyn Democratic Machine" in the complaint is conclusory.  What does this term mean? Who is a member?

¶ 37: What were the grounds for challenging O'Hara's petitions in the 1991 City Council race? Get all court documents related to the challenges made to O'Hara's petitions.

¶ 38: Did O'Hara defeat the challenge to his petitions in the 1992 Assembly race?  What happened in Brennan's defamation suit against O'Hara?  Get all court documents related to Brennan's defamation suit against O'Hara.

¶ 39: Is O'Hara accurately portraying the challenge to his petitions in the 1993 City Council race?

¶ 41: O'Hara's use of the phrase "outside the courthouse one day" is vague.  What was the actual date of the purported conversation with ADA Amorosa?

¶ 41-42: What specifically led to McCall being kicked off the ballot?

¶ 43: What were the grounds for challenging O'Hara's petitions in the 1994 Assembly race?  Did O'Hara withdraw his petitions or was he kicked off the ballot?  Were there any findings of fact by Judge Aronin?  Get all court records regarding this case.

¶ 44: Did Jim Brennan make these phone calls?  If so, then what was the purported evidence that Brennan was calling about?

¶ 45: Did O'Hara voluntarily withdraw his petitions or was there a ruling by the court.  Move to unseal all the court records and minutes for all of the election cases involving O'Hara.  At the very least, these records will show a pattern of fraud by O'Hara, and, therefore, will provide another reason for DA Hynes' decision to prosecute O'Hara.

¶ 49: What is the full name of O'Hara's girlfriend, Vicky?  Depose her.

¶ 50-51: Procure a copy of the Court's file concerning John Keefe's criminal case (King County Docket No. 96K076487 [this might be the arrest number, so check both]).  See if Eric Gonzalez will give you access to the KCDA file ("KCDA" refers to Kings County District Attorney's office).  You could make a FOIL (Freedom of Information Law) request for the file, but I am more interested in the comments on the flap of the file by the ADA handling the case and his/her supervisor.  You wouldn't get that in a FOIL request because it constitutes attorney work product.  On the flap, you might find information concerning the ADA's opinion regarding the strength of the case against John Keefe, and about what the ADA thought of O'Hara's girlfriend's credibility.  I would also want to see the ADA's "action sheet" in the KCDA file, which is a log kept by the ADA concerning everything the ADA did on the case (witnesses he called, evidence he received, etc.).

¶ 52-53: What happened in O'Hara's federal case to extend the primary in 1996?

¶ 56: In Magaly Lucas' affidavit, it is unclear whether she is talking about testifying at trial or in the grand jury. Depose Magaly Lucas.

¶ 59: Was it legal for O'Hara to allegedly move to 553 47th Street while maintaining his rent stabilized apartment at 579 61st Street?  O'Hara's conduct here would seem to be a criminal violation of the rent stabilization laws. Further, was the basement of 553 47th Street a legal apartment?

¶ 61-64: Seek unsealing order for Supreme Court file, and the KCDA file related to O'Hara's criminal case (Kings County Indictment No. 13525/96).  See if Magaly Lucas' other tenants at 553 47th Street (Rafael Munoz, Roberto Lozano, and Quetzal Martinez) were interviewed or called as witnesses.  Specifically, look for any statements from these witnesses regarding whether or not O'Hara resided at 553 47th Street.

¶ 65-66: In conclusory fashion, O'Hara claims that P.I. Spungin "employed unethical and illegal tactics to retrieve" confidential records from O'Hara. What were the confidential records that O'Hara is referring to in this paragraph?  What were the "unethical and illegal tactics" employed by P.I. Spungin?

¶ 68:  In this paragraph O'Hara claims, in conclusory fashion, that Jack Carroll entered into a conspiracy with the other defendant's.  O'Hara does not provide any of the facts which led him to believe that Jack Carroll was involved in this purported conspiracy.  Nor does O'Hara explain the affirmative acts that Jack Carroll committed in furtherance of this purported conspiracy.

¶ 69: Who is Ben Meskin? When did he make these alleged statements? In what context were Meskin's statements made?  Did he have any idea what was really going on here?

¶ 70: O'Hara uses the phrase "word started spreading" in this paragraph.  What word? Who was stating this? From whom did O'Hara here this? Etc.

¶ 71: O'Hara claims that Brennan "testified" that Hynes called Brennan "as soon as the guilty verdict in O'Hara's first trial came down." In what court case did Brennan testify about this?  Further, how does Brennan's interest in O'Hara's case show that Brennan was involved in this purported conspiracy?

¶ 72: So far, O'Hara has failed to allege in non-conclusory fashion the existence of an "agreement" to have O'Hara indicted. In any event, who did Brennan tell about this purported agreement?

¶ 73: Who is Ross Branca? Specifically, what information did Branca provide to O'Hara? From whom did Branca hear this information? If Branca did not hear it directly from one of the defendant's in this complaint then it is impermissible hearsay.

¶ 74: Find out if Susan Lobe was at this meeting. Depose Bob Knoll and Kathleen Vetere. What did Jack Carroll specifically say to Knoll and Vetere? It is my understanding that Jack Carroll hardly knew either of these people, and was only meeting with them because Knoll had been advertising for petitions in the newspaper. Moreover, Carroll was suspicious of Knoll because it was odd for a candidate to advertise for petitioners in the newspaper. Why would the subject of an illicit conspiracy against O'Hara come up at this meeting? Why would Jack Carroll tell two strangers that he was involved in an illicit conspiracy against O'Hara?

In any event, even if everything in paragraph 74 was true, it does not establish that Jack Carroll was involved in a conspiracy with the other defendants, because there are no allegations that Carroll engaged in any acts that were in furtherance of a conspiracy. Indeed, even if O'Hara's claim was true -- i.e., the other defendants had engaged in a conspiracy to illegally arrest and indict O'Hara for a crime that he didn't commit -- Jack Carroll's knowledge of this conspiracy, as well as the fact that Jack Carroll was happy that the other defendants had engaged in this conspiracy, does not establish that Jack Carroll was a part of this conspiracy, or establish that Jack Carroll had done anything in furtherance of this conspiracy.

¶ 78: On what date did O'Hara go to the bank and discover that the KCDA had subpoenaed his bank records?

¶ 80: Who were these children that O'Hara refers to in this paragraph?

¶ 81: This paragraph is conclusory? How was Carroll involved in the purported surveillance of O'Hara?

¶ 83: What is the 1985 Handschu consent decree?

¶ 86: In this paragraph O'Hara states that ADA O'Mara told Harper's Magazine that "O'Hara was not deterred by the civil actions that [inaudible] against him." O'Hara further states that, because he was "not deterred" by the civil actions against him, Brennan and Jack Carroll decided to take further action against him. This a conclusory statement, because O'Hara does not explain the further actions that Jack Carroll allegedly took against him. Moreover, ADA O'Mara's statements do not provide any insight into the subjective motivations for Carroll's and Brennan's actions.

¶ 87: Did Ben Meskin have any idea what was going on here?

¶ 88: Where is O'Hara getting his information about this meeting? Did this meeting take place? If so, what was actually said at this meeting? In any event, O'Hara does not allege that Jack Carroll was at this meeting, so how does anything that happened at the meeting implicate Carroll.

¶ 89: This paragraph is conclusory. When, where, and with whom did Jack Carroll agree to take steps to neutralize O'Hara as a political threat? What were the steps that Carroll purportedly agreed to take? Did Carroll actually take the steps that he had agreed to take? When did he take these steps? Etc.

¶ 90: This paragraph is conclusory. How did Jack Carroll get Hynes to prosecute O'Hara for election fraud?

¶ 92: How does O'Hara know that Jack Carroll knew that O'Hara, in fact, lived at the 47th street address and at the 4th Ave address? I reiterate, unseal all the election cases where O'Hara withdrew his petitions after it was established that

he committed election fraud.  Specifically, unseal the election case that was before Judge Aronin where it was established that O'Hara used a false address.

¶ 94: In this paragraph, O'Hara references an alleged agreement between Brennan and ADA Morelli.  What proof does O'Hara have of the existence of this agreement?

¶ 95: This paragraph is conclusory. O'Hara provides no proof that Jack Carroll was involved in this.

¶ 98: In this paragraph, O'Hara claims that Brennan forwarded documents that had been gathered by Keefe, Carroll, and PI Spungin to Jeff Waite at the Board of Elections.  O'Hara fails to mention the specific documents that Carroll had procured? Moreover, if it was Brennan who sent the documents to Waite then what does Carroll have to do with this.

¶ 99: What proof does O'Hara have that Anne Gutman's letter was false?  Find out where Gutman got her information about this case, and then subpoena that information.

¶ 103: What do ADA Morelli's and ADA O'Mara's purported improprieties have to do with Jack Carroll's liability under 1983.  Jack Carroll had no control over their conduct.

¶ 107: O'Hara claims that there are no documents related to the KCDA's investigation of him.  Is this true?

¶ 108: Did Ms. Peliccio institute a formal eviction proceeding against O'Hara.  Seek out any documentation of O'Hara's eviction.

¶ 109: What evidence does O'Hara have that Jack Carroll routinely conferred with ADA O'Mara and Investigator Presser about the O'Hara investigation.  In any event, Carroll's interest in the investigation, even if true, does not establish that Jack Carroll was involved in a conspiracy against O'Hara.

¶ 110-11: O'Hara claims, in conclusory fashion, that Carroll told ADA O'Mara about the witnesses from the civil trial and that they would be willing to lie in O'Hara's criminal trial if given the right incentives.  What proof does O'Hara have of the alleged conversation between ADA O'Mara and Jack Carroll where this was discussed?  Where did O'Hara get this information? Is O'Hara alleging that he was present when Carroll said this to ADA O'Mara?  In any event, ADA O'Mara would have learned the names of these witnesses when he moved to unseal the court records for the civil election fraud case.

¶ 117:  What proof does O'Hara have that this meeting took place?  Moreover, his claim that Jack Carroll "may have []" attended" the meeting is not sufficient to establish that Carroll was part of any conspiracy.

¶ 122-24:  Procure file for John Keefe's criminal case. Speak with ADA Rhonnie Jaus bout her opinion of the case.  Specifically ask her about the complaint's (O'Hara's girlfriend, Vicky's) credibility.  In any event, the fact that Hynes' office prosecuted Keefe for allegedly assaulting O'Hara's girlfriend seems to demonstrate that there was no conspiracy between Hynes' office and Brennan, Keefe, and Jack Carroll.

¶ 126: Contrary to O'Hara's claim, the fact that O'Hara was never particularly good at getting candidates elected establishes that the defendant's did not have a motive to go after him.

¶ 133-35:  O'Hara claims that the People did not have probable cause to arrest or indict him.  Probable cause is a very low standard.  In order to indict a defendant, all that is required is reasonable cause to believe, based on legally sufficient evidence, that the defendant committed the charged crimes.  Furthermore, contrary to O'Hara's claim, a prosecutor has no duty to provide exculpatory evidence to the grand jury.

¶ 136:  What report is O'Hara referring to here?

¶ 137-38: To reiterate, a prosecutor has no duty to provide exculpatory evidence to a grand jury.

¶ 139-40: Mr. Waite's civil investigation was not the same as the criminal investigation, and the civil investigation is not the subject of this lawsuit.

¶ 142: KCDA did not have control over Magaly Lucas.

¶ 143: Prosecutor certainly has no duty to seek out exculpatory evidence for the defense. The defense is supposed to do its own investigation. Moreover, O'Hara would not have had access to all of the grand jury minutes. He only would have received a transcript of the testimony of the witnesses that the People intended to call at trial.  Therefore, he is speculating about all of this.

¶ 155: Indictments are often filed several days after they are voted on by the grand jury because a supervisor has to review the indictment before it is filed.

¶ 158: Hynes has almost certainly tried other defendants three times.

¶ 163: Find out if any of this is true.  In any event, what proof is there that Jack Carroll knew about Munoz's, Lazano's, and Martinez's criminal records?  Even if Carroll did know, what would it matter? Furthermore, Carroll was not in a position to offer these men the vacatur of their criminal convictions.

¶ 164: What proof does O'Hara have for this claim.  If Martinez's cases were dismissed, as O'Hara claims, then all of the records would be sealed, including any record of Martinez's arrests. Move to unseal O'Hara's KCDA file.  Inside you will certainly find rap sheets for all of the People's witnesses, including Martinez, because ADA's are required to run a rap a sheet on every witness they intend to call.

¶ 165: Where is O'Hara getting this information?

¶ 168-70: None of this has anything to do with Carroll.  Moreover, there is nothing unethical about an ADA telling a witness that they will get in big trouble if they commit perjury.

¶ 174: Get a copy of the judge's decision denying O'Hara's motion to set aside verdict.

¶ 176, 205: Get a copy of all of the appellate decisions related to O'Hara's three trials. See if you can get all the briefs as well.

¶ 198: Where is O'Hara getting this information about Josephine Vale's son.

¶ 200: O'Hara has attached an appraisal report for 553 47th Street to his complaint as Exhibit H.  He claims that the appraisal report contradicts Vale's trial testimony that the basement was uninhabitable, in that it says, "Potential rentable cellar in basement." Look at Exhibit H.  The appraisal report actually says, "Potential rentable in cellar – No."  Therefore, at best, Exhibit H directly refutes O'Hara's claim that the basement at 553 47th Street was inhabitable.  In any event, at the very least, Exhibit H provides no support for O'Hara's claim.

¶ 232: Even if Jack Carroll was happy about what had happened to O'Hara, that does not establish that Carroll was involved in a conspiracy against O'Hara.

¶ 240: O'Hara's claim in this paragraph is conclusory, because he fails to explain how Jack Carroll fabricated evidence against O'Hara.

¶ 250-51: O'Hara's claims in these paragraphs are also conclusory, because he fails to describe the illegal and unethical acts that were committed by Jack Carroll.

**SIDER, ZACHARY**

| | |
|---|---|
| **From:** | PARK, MARIA Y <PARKM@BrooklynDA.org> |
| **Sent:** | Tuesday, July 22, 2014 8:03 PM |
| **To:** | JOBLOVE, LEONARD; GOODMAN, HOWARD |
| **Subject:** | ███████████████ |

████████████████████████████████

**From:** Donahue, Linda (Law) [mailto:ldonahue@law.nyc.gov]
**Sent:** Tuesday, July 22, 2014 1:03 PM
**To:** PARK, MARIA Y
**Cc:** Beath, Patrick (Law)
**Subject:** FW: William Lopez v. City of New York, et al.,

██████

████████████████████████████████

██████

**From:** ohara007@comcast.net [mailto:ohara007@comcast.net]
**Sent:** Monday, July 21, 2014 12:47 PM
**To:** Beath, Patrick (Law)
**Cc:** Donahue, Linda (Law); DeHay, David (Law); Kelly, Dennis; Kerrigan, Robert; Bott, Deborah; Guveiyian, Vicki Lynn
**Subject:** William Lopez v. City of New York, et al.,

Mr. Beath,
Attached is article that appeared in todays Daily News.
The case has been assigned to Judge Brian M. Cogan. - John O'Hara

http://www.nydailynews.com/new-york/brooklyn/judge-recuses-124m-lawsuit-frame-victim-article-1.1874144

**The Law Offices of Dennis J. Kelly**

137 Glen Head Road

Glen Head, New York, 11545

Phone: (516) 686-6768

Fax: (516) 686-6771

**SIDER, ZACHARY**

| | |
|---|---|
| **From:** | HAASB@BrooklynDA.org |
| **Sent:** | Monday, May 1, 2017 1:04 PM |
| **To:** | GERSOMIA@BrooklynDA.org |
| **Subject:** | Print Request |
| **Attachments:** | General prep_BH with table of contents.docx |

Can you please print the attached? 3 hole punches if possible. Thanks!

Thank you

Bethany Haas
Press Aide
Kings County District Attorney's Office
350 Jay Street
Brooklyn, NY 11201

## CASE HIGHLIGHT

***People v. John O'Hara***

John O'Hara, an attorney, political activist and frequent candidate, was convicted in 1999 for illegally voting by using his girlfriend's address—a controversial verdict that came after an unprecedented third trial. This was only the second conviction under this statute in NY (only other was suffragist Susan Anthony in 1872). O'Hara, who was sentenced to five years' probation, fine and 1,500 hours of community service, has fought since then to overturn the conviction, claiming selective prosecution. He failed, even though he got his law license back.

CRU vacated the conviction after re-interviewing Josephine Vales, the previous landlady, who was called only in the third trial and testified the basement unit in question was not an apartment. But she never said—or asked—whether the unit was habitable, which was the pertinent question at trial. Had she been asked, she would have answered affirmatively because she renovated the space but never considered it an apartment. Given this additional evidence that was discovered—which went to the heart of the case—there was no need to address the selective prosecution question. In addition, by law, selective prosecution is impermissible under the Equal Protection clauses, which applies only to a protected class and thus inapplicable in this case.

**SIDER, ZACHARY**

| | |
|---|---|
| **From:** | LICHSTET@BrooklynDA.org |
| **Sent:** | Tuesday, December 12, 2017 4:52 PM |
| **To:** | FELICIANOA@BrooklynDA.org |
| **Subject:** | FW: John O'Hara |
| **Attachments:** | O'Hara Recommendation Memo Panel copy.docx |

**From:** HALE, MARK
**Sent:** Tuesday, August 29, 2017 5:23 PM
**To:** LICHSTEIN, TONI
**Subject:** John O'Hara

Here goes Toni

**SIDER, ZACHARY**

| | |
|---|---|
| **From:** | LICHSTET@BrooklynDA.org |
| **Sent:** | Monday, July 22, 2019 11:39 AM |
| **To:** | WEINSTEINT@BrooklynDA.org |
| **Subject:** | FW: John O'Hara |
| **Attachments:** | O'Hara Recommendation Memo Panel copy.docx |

Tali,
I realized you probably have never seen  the CRU memo.
Toni

## SIDER, ZACHARY

| | |
|---|---|
| **From:** | LICHSTET@BrooklynDA.org |
| **Sent:** | Monday, April 9, 2018 12:40 PM |
| **To:** | efudim@law.nyc.gov |
| **Subject:** | FW: Email:People v. O_Hara_ 96 N.Y.2d 378 |
| **Attachments:** | People v. O_Hara_ 96 N.Y.2d 378.pdf |

**From:** LexisNexisDelivery@lexisnexis.com [mailto:LexisNexisDelivery@lexisnexis.com]
**Sent:** Monday, April 09, 2018 12:39 PM
**To:** LICHSTEIN, TONI
**Subject:** Email:People v. O_Hara_ 96 N.Y.2d 378

 Delivery

 About LexisNexis | Privacy Policy | Terms & Conditions | Copyright © 2018 LexisNexis.

* This is an automated email. Please do not reply to this email address.

1



**User Name:** Toni Lichstein

**Date and Time:** Monday, April 9, 2018 12:39:00 PM EDT

**Job Number:** 64623454

## Document (1)

1. _People v. O'Hara, 96 N.Y.2d 378_

   **Client/Matter:** -None-

   **Search Terms:** john O'hara

   **Search Type:** Natural Language

   **Narrowed by:**

   | Content Type | Narrowed by |
   |---|---|
   | Cases | Sources: NY Court of Appeals Cases from 1794; Content Type: Cases |

 Caution
As of: April 9, 2018 4:39 PM Z

## *People v. O'Hara*

Court of Appeals of New York

April 24, 2001, Argued ; June 14, 2001, Decided

No. 78

### Reporter

96 N.Y.2d 378 *; 754 N.E.2d 155 **; 729 N.Y.S.2d 396 ***; 2001 N.Y. LEXIS 1828 ****

The People of the State of New York, Respondent, v. **John O'Hara**, Appellant.

**Prior History: [****1]** Appeal, by permission of an Associate Judge of the Court of Appeals, from an order of the Appellate Division of the Supreme Court in the Second Judicial Department, entered July 17, 2000, which affirmed a judgment of the Supreme Court (Abraham G. Gerges, J.), rendered in Kings County upon a verdict convicting defendant of offering a false instrument for filing in the first degree, false registration, and illegal voting (five counts).

*People v O'Hara, 274 AD2d 486*, affirmed.

**Disposition:** Order affirmed.

### Core Terms

Election, apartment, statutory definition, voting, residency, candidate, voter, defense counsel, indictment, purposes, registration, confusing, permanent, convicted, counts, cases, electoral district, attachments, basement, credited, literal, lived

### Case Summary

### Procedural Posture

Defendant appealed his conviction of seven crimes arising from his fraudulent filing of a false voter registration form and voting in five separate elections in an election district in which he did not reside, claiming that residency definitions under *N.Y. Elec. Law § 1-104(22)* were vague.

### Overview

Defendant lived in an apartment building located within a voting district. After the building was put into a second district when the boundaries of the election district were redrawn defendant completed and filed a new voter registration form specifying that he resided at a different location within the first district. After his conviction and two appeals, he again appealed claiming that the residency definitions of *§ 1-104(22)* were vague. He also claimed that the trial court improperly instructed the jury on residency. The appellate court recognized that a person could

96 N.Y.2d 378, *378; 754 N.E.2d 155, **155; 729 N.Y.S.2d 396, ***396; 2001 N.Y. LEXIS 1828, ****1

have more than one residence. It held that the jury was not asked to determine if defendant chose the correct residence, but only if he took up the second residence solely for voting purposes. As a result, the jury charge was not confusing.

**Outcome**
The convictions were affirmed.

**LexisNexis® Headnotes**

Governments > Local Governments > Elections

Governments > State & Territorial Governments > Elections

*HN1*[⬇] **Local Governments, Elections**

A person commits the offense of false registration under the New York Election Law when he or she knowingly gives a false residence within the election district when registering as an elector. N.Y. Elec. Law § 17-10(4).

Governments > Local Governments > Elections

Governments > State & Territorial Governments > Elections

*HN2*[⬇] **Local Governments, Elections**

Illegal voting is committed when a person votes or offers or attempts to vote at an election, in an election district or from a place where he does not reside. *N.Y. Elec. Law § 17-132(3)*.

Criminal Law & Procedure > ... > Fraud Against the Government > False Statements > Elements

Criminal Law & Procedure > Criminal Offenses > Fraud > General Overview

Criminal Law & Procedure > ... > Fraud > False Pretenses > General Overview

Criminal Law & Procedure > ... > Fraud Against the Government > False Statements > General Overview

Criminal Law & Procedure > ... > Abuse of Public Office > Falsification > Elements

Governments > State & Territorial Governments > Elections

*HN3*[⬇] **False Statements, Elements**

A person violates *N.Y. Penal Law § 175.35* when, knowing that a written instrument contains a false statement or false information, and with intent to defraud the state, he offers or presents it to a public office with the knowledge or belief that it will be filed with, registered or recorded in or otherwise

96 N.Y.2d 378, *378; 754 N.E.2d 155, **155; 729 N.Y.S.2d 396, ***396; 2001 N.Y. LEXIS 1828, ****1

become a part of the records of that public office.

Governments > State & Territorial Governments > Elections

*HN4*[⬇] **State & Territorial Governments, Elections**

See *N.Y. Elec. Law § 1-104(221)*.

Governments > State & Territorial Governments > Elections

*HN5*[⬇] **State & Territorial Governments, Elections**

In an election context, to be a resident of a place, a person must be physically present with the intent to remain for a time. The definition of "residence" comes from traditional notions of domicile. The determination of an individual's residence is dependent upon an individual's expressed intent and conduct.

Governments > State & Territorial Governments > Elections

*HN6*[⬇] **State & Territorial Governments, Elections**

New York courts recognize that in a modern and mobile society, an individual can maintain more than one bona fide residence. However, for the purposes of the New York Election Law, one cannot create an address solely for

the purpose of circumventing residency requirements.

Governments > State & Territorial Governments > Elections

*HN7*[⬇] **State & Territorial Governments, Elections**

The crucial determination whether a particular residence complies with the requirements of the New York Election Law is that the individual must manifest an intent, coupled with physical presence without any aura of sham. An individual having two residences may choose one to which she has legitimate, significant, and continuing attachments as her residence for purposes of the Election Law. Generally, where there is no reason to assume that a residence has been asserted merely for the purposes of voting, where no fraud or deception has been practiced, and where there is a history of the residence employed, the courts have upheld a fact-finder's determination of residency.

**Headnotes/Syllabus**

**Headnotes**

Crimes - Appeal - Preservation of Issue for Review - Illegal Voting - Definition of "Residence"

 1. In a prosecution for offering a false instrument for filing, false (voter) registration, and illegal voting arising from defendant's alleged maintenance

96 N.Y.2d 378, *378; 754 N.E.2d 155, **155; 729 N.Y.S.2d 396, ***396; 2001 N.Y. LEXIS 1828, ****1

of two residences, defendant's arguments that the Election Law definition of "residence" cannot be applied literally in a case of dual residency, and that a literal application of *Election Law § 1-104 (22)*, wherein "residence" is defined, is vague and unconstitutional, are unpreserved for review by the Court of Appeals. Defendant, during the jury charge conference, did not object to the specific language of the charge and did not raise any of the constitutional issues now asserted.

Crimes - Instructions - Illegal Voting - Definition of "Residence"

2. Defendant, who allegedly maintained two residences in different voting districts, was properly convicted of offering a false instrument for filing, false (voter) registration, and illegal voting arising from his fraudulent filing of a false voter registration form and voting in an election district in which he did not reside.  The trial court's jury charge did not dictate a guilty verdict. The crucial determination whether a particular residence complies with the requirements of the Election Law is that the individual must manifest an intent, coupled with physical presence without any aura of sham. The charge, when read as a whole, was not confusing as a matter of law.  It instructed the jury on how to determine whether the residence in question could be considered defendant's residence for voting purposes, and it informed the jury that if the proof established that defendant had two residences, he could pick one as long as the "residence" he picked was indeed a residence of his, and not a sham. The jury credited the testimony of the various witnesses, and duly applied the instruction to the facts it found.  The jury was not asked to determine whether as between two residences defendant picked the more appropriate one.  Rather, the sole issue was whether defendant genuinely took up one residence for voting purposes. In considering whether that residence was a bona fide residence from which defendant could vote, the jury needed to be informed of the Election Law's definition of residence, and it was not instructed to convict defendant if it found that he actually maintained two residences.

**Counsel:** *Steve S. Efron,* New York City, for appellant.  I. The court's charge on the definition of "residence" was unduly restrictive in light of this Court's rulings in civil cases, imposed an unconstitutional burden on the right of defendant to choose his voting residence and dictated a guilty verdict even if the jury credited the testimony of defendant and his witnesses. ( *Matter of Ferguson v McNab, 60 NY2d 598*; *Martin v City of Cohoes, 37 NY2d 162*; *Matter of Palla v Suffolk County Bd. of Elections, 31 NY2d 36*; *Matter of Brunner, 41 NY2d 917*; *Laufer v Hauge, 140 AD2d 671*; *Matter of Gadway, 123 AD2d 83*; **[****2]** *Matter of Gladwin v Power, 21 AD2d 665, 14 NY2d 771*; *Matter of Newcomb, 192 NY 238*;

96 N.Y.2d 378, *378; 754 N.E.2d 155, **155; 729 N.Y.S.2d 396, ***396; 2001 N.Y. LEXIS 1828, ****2

*Perkins v Guaranty Trust Co., 274 NY 250*; *Matter of Bressler v Holt-Harris, 37 AD2d 898, 30 NY2d 529*.) II. The indictment must be dismissed since the Election Law does not contain a sustainable definition of "residence." ( *People v Bright, 71 NY2d 376*; *Matter of Hosley v Curry, 85 NY2d 447*; *Longway v Jefferson County Bd. of Supervisors, 83 NY2d 17*; *Matter of Ferguson v McNab, 60 NY2d 598*; *Chalk v Catholic Med. Ctr., 58 AD2d 822*; *Williams v Salerno, 792 F2d 323*; *People v Finnegan, 85 NY2d 53*; *People v Dietze, 75 NY2d 47*.)


*Charles J. Hynes, District Attorney* of Kings County, Brooklyn (*Monique Ferrell* and *Leonard Joblove* of counsel), for respondent.  Defendant's claim that the trial court incorrectly instructed the jury on the definition of "residence" is largely unpreserved for appellate review because it is based upon theories never raised before the trial court.  Moreover, the instruction **[****3]** was a clear and correct statement of the law.  ( *People v Crimmins, 36 NY2d 230*; *People v Iannelli, 69 NY2d 684*; *People v Thomas, 50 NY2d 467*; *People v Dozier, 52 NY2d 781*; *Matter of Bressler v Holt-Harris, 37 AD2d 898, 30 NY2d 529*; *Matter of Ferguson v McNab, 60 NY2d 598*; *Matter of Gallagher v Dinkins, 32 NY2d 839*; *Matter of Palla v Suffolk County Bd. of Elections, 31 NY2d 36*; *Laufer v Hauge, 140 AD2d 671*; *Matter of Brunner, 41 NY2d 917*.)

*Deborah H. Karpatkin,* New York City, and *Arthur Eisenberg* for New York Civil Liberties Union Foundation, *amicus curiae.* The trial judge's charge to the jury with respect to the definition of "residence" was unduly narrow and not in accordance with the federal constitutional standards.


*Schwimmer & Sweeney,* New York City (*Peter P. Sweeney* of counsel), for League of Women Voters of New York City, *amicus curiae.* I. The trial court's charge on residence was erroneous. ( *Matter of Gallagher v Dinkins, 41 AD2d 946, 32 NY2d 839*; *Matter of Ferguson v McNab, 60 NY2d 598*; **[****4]** *Matter of Bressler v Holt-Harris, 30 NY2d 529*; *Matter of Gladwin v Power, 21 AD2d 665, 14 NY2d 771*; *Matter of Geller v Lasher, 196 AD2d 613*; *People v Ramos, 223 AD2d 495, 87 NY2d 1024*; *People v Kelly, 302 NY 512*; *Biener v City of New York, 47 AD2d 520*; *Hoban v Hoban, 18 AD2d 985*.) II. Charging the jury that defendant's chosen voting residence had to be a "permanent home" and the place to which he "always intend[ed] to return" was constitutionally impermissible.  ( *Levy v Scranton, 780 F Supp 897*; *Ramey v Rockefeller, 348 F Supp 780*; *Auerbach v Rettaliata, 765 F2d 350*.)


**Judges:** Opinion by Judge Wesley. Chief Judge Kaye and Judges Smith, Ciparick and Graffeo concur. Judge Rosenblatt dissents and votes to reverse in an opinion in which Judge

96 N.Y.2d 378, *378; 754 N.E.2d 155, **155; 729 N.Y.S.2d 396, ***396; 2001 N.Y. LEXIS 1828, ****4

Levine concurs.

**Opinion by:** Wesley

**Opinion**

 [*380] [***397] [**156]   Wesley, J.

Defendant ***John O'Hara***, an attorney and frequent candidate for elective office, was convicted of seven crimes arising from his fraudulent filing of a false voter registration form and voting in five separate **[****5]** elections in an election district in which he did not reside.  On appeal, defendant contends that the definition of voting residence contained in the Election Law is at  [*381] odds with our recognition that in today's society, a person can have more than one residence.  This case, however, turned on whether a second residence actually existed, not a choice between two.    The court's charge correctly reflects the state of New York law and did not, as defendant now contends, direct a verdict against him.

Defendant has lived in a multi-unit apartment building at 579 61st Street in Brooklyn since the 1980s.  Until 1992, he registered to vote using the 61st Street address, which was within the 20th Election District and part of the 51st State Assembly District and the 38th Council District of the City of New York.  Following redistricting in 1991-1992, 579 61st Street was no longer situated within these districts.

On November 2, 1992, defendant prepared, signed and filed a new voter registration form specifying that he resided at 553 47th Street.    This address was located within the newly redrawn borders of the 20th Election District, the 51st State Assembly District and the 38th **[****6]** Council District of the City of New York.  Using the 47th Street address, defendant voted in those districts on five occasions-- November 3, 1992; May 4, 1993; September 14, 1993; September 28, 1993 and November 2, 1993.

 **[**157]    [***398]**  Defendant was charged with one count of offering a false instrument for filing in the first degree ( *Penal Law § 175.35*), one count of false registration ( *Election Law § 17-104 [4]*) and five counts of illegal voting ( *Election Law § 17-132 [3]*).  Defendant was tried and convicted on all counts of the indictment in 1997.  On appeal, the Appellate Division reversed the judgment and ordered a new trial due to an improper missing witness charge, and rejected defendant's remaining contentions as unpreserved or without merit ( *253 AD2d 560*).  The second trial ended in a deadlocked jury.

During opening statements of the third trial, defense counsel argued that the only basis for the People's charges rested on the assertion that defendant never lived at 553 47th Street.  According to defense counsel, the evidence would establish that, contrary to the People's **[****7]** position, defendant had in fact taken up residence at 553 47th Street.  Defense

96 N.Y.2d 378, *381; 754 N.E.2d 155, **157; 729 N.Y.S.2d 396, ***398; 2001 N.Y. LEXIS 1828, ****7

counsel submitted that ultimately the case would turn on the credibility of the witnesses.

At trial, the People called several witnesses. An employee for the phone company testified that defendant maintained a phone at the 61st Street address. There was, however, no record **[*382]** of any telephone service at the 47th Street address. In addition, the owner of 579 61st Street testified that defendant was a tenant at that address from 1990 to 1993.

Raphael Munoz and Roberto Lozano testified that they, along with another individual, moved into 553 47th Street in 1992, with the intent of purchasing the building from Magaly Lucas, the owner, which they eventually did. According to Munoz and Lozano, when the three men first moved in, nobody else was living in the building, the apartment was in shambles and the basement was uninhabitable. Each man testified that some time after moving in, defendant approached them, told them that he was receiving mail at that address and asked them to hold it for him.

Defendant presented the testimony of an employee of the Office of Court Administration who stated **[****8]** that in 1993 defendant's attorney registration form listed 553 47th Street as his home address. Defendant further proffered the testimony of an American Express employee that defendant's billing statements listed the 47th Street address. Several neighbors who had

participated in defendant's political campaigns testified that they had on occasion observed him walking into the 47th Street house and that they had understood that he lived there with his former girlfriend, Lucas. One neighbor testified that Josephine and Raymond Vales--the owners of the house prior to Lucas--had at some time renovated the basement into a complete apartment. Defendant's mother and aunt also testified that defendant resided at the 47th Street address.

Finally, defendant testified that he moved into the 47th Street address because his ex-girlfriend, Lucas, owned the house. He stated that he kept the 61st Street address for his relatives and used it as an office. When he and Lucas separated, she moved to Manhattan and allowed him to stay in the basement apartment at 47th Street free of charge. Defendant further testified that he never changed his driver's license to the 47th Street address and that **[****9]** he used the 61st Street address for all State and Federal tax forms.

On redirect, the People called Josephine Vales, who testified that when she and her husband owned the 47th Street building they never renovated the basement into a habitable apartment.

During the charge conference, the trial court indicated that it would define residency to the jury as follows:

**[**158] [***399]** "According to the law

96 N.Y.2d 378, *382; 754 N.E.2d 155, **158; 729 N.Y.S.2d 396, ***399; 2001 N.Y. LEXIS 1828, ****9

a residence is that place **[\*383]** where a person maintains a fixed, permanent and principal home and to which he wherever temporarily located always intends to return.

"Additionally, a candidate who has two residences may choose one to which he has the legitimate, significant and continuing attachment as his residence for purpose of the Election Law. It is for the candidate to decide which address is to be his voting and campaign address.

"However, the address chosen by the defendant as his residence must comport with the definition of residence as I have previously given it to you."

Defense counsel objected to the charge, indicating that he agreed with the court's use of the definition of "residence" found in *Election Law § 1-104 (22)* **[\*\*\*\*10]** and that a candidate can choose between multiple residencies. As defense counsel noted, "I don't have a problem with that definition of residency [the charge language involving multiple residencies] being attached to the first definition of residency [the charge language taken directly from *Election Law § 1-104 (22)*]." Defense counsel limited his objection "strictly to the fact that after these two portions of residency are read, the Court refers the jurors back to *Election Law Section 1-104* sub 22." According to counsel, "I think that might be somewhat confusing."

Defense counsel further objected to use

of the Election Law's definition of residence in reference to the first count of the indictment, which charged defendant with filing a false instrument. Counsel asserted that the only definition which should be used in that regard was that a candidate who has two residences may choose one to which he has a legitimate, significant and continuing attachment. The court did not change its charge.

The jury convicted defendant on all counts of the indictment. The Appellate Division affirmed.

Defendant now argues that the Election **[\*\*\*\*11]** Law definition of "residence" cannot be applied literally in a case of dual residency and that a literal application of *Election Law § 1-104 (22)* is unconstitutional. Defendant further maintains that the indictment should be dismissed because the Election Law definition of "residence" is vague. However, during the jury charge conference, defendant did not object to the specific language of the charge, nor did he raise any of the constitutional issues he now asserts. Thus, those issues are unpreserved (*see, People v* **[\*384]** *Cadorette, 56 NY2d 1007, 1009*; *People v Whalen, 59 NY2d 273, 279-280)*.

Defendant did, however, object to the trial court's second reference to the Election Law definition of "residence" on the ground that it "might be somewhat confusing" for the jury. According to defendant, under the court's charge, his

96 N.Y.2d 378, *384; 754 N.E.2d 155, **158; 729 N.Y.S.2d 396, ***399; 2001 N.Y. LEXIS 1828, ****11

failure to relinquish the 61st Street apartment compromised his assertion that the 47th Street apartment also was his residence for purposes of registration and voting, and therefore, in essence dictated a guilty verdict. We disagree.

In this case, all the counts of the indictment stem from **[****12]** defendant's affirmation in his voter registration form that 553 47th Street was his place of residence pursuant to the Election Law during 1992-1993 for voting purposes. *HN1*[⬆] A person commits the offense of "false registration" under the Election Law when he or she "knowingly gives a false residence within the election district when registering as an elector" ( *Election Law § 17-104 [4]*). *HN2*[⬆] "Illegal voting" is committed when a person "votes or offers or attempts to vote at an election **[**159]** **[***400]** … in an election district or from a place where he does not reside" ( *Election Law § 17-132 [3]*). Finally, *HN3*[⬆] a person violates *Penal Law § 175.35* "when, knowing that a written instrument contains a false statement or false information, and with intent to defraud the state … he offers or presents it to a public office … with **[****13]** the knowledge or belief that it will be filed with, registered or recorded in or otherwise become a part of the records" of that public office.

*HN4*[⬆] The Election Law defines residence as "that place where a person maintains a fixed, permanent and principal home and to which he, wherever temporarily located, always intends to return" ( *Election Law § 1-104 [22]*). Thus, *HN5*[⬆] to be a resident of a place, a person must be physically present with the intent to remain for a time (*see, Matter of Palla v Suffolk County Bd. of Elections, 31 NY2d 36, 47*; *see also, Williams v Salerno, 792 F2d 323, 327* [2d Cir]). The definition of "residence" comes from traditional notions of domicile ( *Matter of Palla, supra, 31 NY2d, at 47*; *see also, Matter of Hosley v Curry, 85 NY2d 447, 451*, *rearg denied 85 NY2d 1033*). The determination of an individual's residence is dependent upon an individual's expressed intent and **[****14]** conduct ( *Matter of Palla, supra, 31 NY2d, at 47*).

*HN6*[⬆] New York courts have recognized that in this modern and mobile society, an individual can maintain more than one bona fide residence (*see, e.g., Matter of Gallagher v Dinkins, 41 AD2d 946*, **[*385]** *affd 32 NY2d 839*; *Matter of Gladwin v Power, 21 AD2d 665*, *affd 14 NY2d 771*; *Matter of Chance v Power, 14 AD2d 595*, *affd 10 NY2d 792*). However, for the purposes of the Election Law, one cannot create an address solely for the purpose of circumventing residency requirements ( *Matter of Hosley v Curry, 207 AD2d 116, 118*, *revd on other grounds 85 NY2d 447*, *supra; see also, Matter of Lemishow v Black, 104 AD2d 460*, *affd 63 NY2d 684, 685)*.

**HN7**[↑] The crucial determination whether a particular residence complies with the requirements of the Election Law is that the individual must **[****15]** manifest an intent, coupled with physical presence "without any aura of sham" ( *Matter of Gallagher, supra, 41 AD2d at 947*). As this Court has stated, an individual having two residences may choose one to which she has "legitimate, significant and continuing attachments as her residence for purposes of the Election Law" ( *Matter of Ferguson v McNab, 60 NY2d 598, 600)*. Generally, where there is no reason to assume that a residence has been asserted merely for the purposes of voting, where no fraud or deception has been practiced and where there is a history of the residence employed, the courts have upheld a fact-finder's determination of residency ( *Matter of Gallagher, supra, 41 AD2d at 947*; *see also, Matter of Ferguson, 96 AD2d 916*, *affd 60 NY2d 598*, *supra*; *Matter of Gladwin, supra; Matter of Chance, supra*).

Here, the jury was not asked, as defendant claims, to determine whether as between two residences defendant picked the more appropriate one. The sole issue here **[**160] [***401]** was whether defendant genuinely took up residence at 553 47th Street for voting **[****16]** purposes. In considering whether 553 47th Street was a bona fide residence from which defendant could vote, the jury needed to be informed of the Election Law's definition of residence. The jury was not instructed to convict defendant if it found that he actually maintained two residences. The charge, when read as a whole, was not confusing as a matter of law. It instructed the jury on how to determine whether 553 47th Street could be considered defendant's residence for voting purposes, and it informed the jury that if the proof established that defendant had two residences he could pick one as long as the "residence" he picked (553 47th Street) was indeed a residence of his, and not a sham. The jury applied that instruction to the facts it found, and convicted defendant on all counts of the indictment.

We respond to the dissent with three points. First, the arguments it addresses overwhelmingly are unpreserved; they were **[*386]** not made before the Trial Judge. Second, we cannot agree with the dissent's foundation premise that the Election Law and case law definitions of residence cannot stand side-by-side (an argument plainly not made to the Trial Judge). Finally, **[****17]** the dissent points out that defendant's own testimony, "if credited," would have been sufficient to establish residency under our own Election Law cases (dissenting opn, at 389). The jury, however, also heard--and by its verdict credited--testimony from the phone company employee that defendant had telephone service at 61st Street but not 47th Street; the 61st Street landlord that

96 N.Y.2d 378, *386; 754 N.E.2d 155, **160; 729 N.Y.S.2d 396, ***401; 2001 N.Y. LEXIS 1828, ****17

defendant was a tenant there; and the owners of the 47th Street premises that the basement where defendant says he resided was uninhabitable.

Accordingly, the order of the Appellate Division should be affirmed.

**Dissent by:** Rosenblatt

## Dissent

Rosenblatt, J. (Dissenting). Defendant was arrested after he registered to vote and voted in five elections using an apartment on 47th Street in Brooklyn as his legal voting residence. He was indicted on one count of false registration under *Election Law § 17-104 (4)*, five counts of illegal voting under *Election Law § 17-132 (3)* and one count of offering a false instrument for filing under *Penal Law § 175.35*. Convictions for such felonies are punishable by up to four years in prison ( *Penal Law § 55.10* **[****18]** [1] [b]). Because defendant acknowledged that he had listed the 47th Street apartment as his residence, the only fact issue at trial was whether that apartment was his "residence" within the meaning of the Election Law.

What qualifies as a voter's "residence" in New York, however, is far from crystal clear. *Election Law § 1-104 (22)* defines "residence" as "that place where a person maintains a *fixed, permanent and principal* home and to which he, wherever temporarily located, always intends to return" (emphasis added).

Under the statutory definition, residence is the equivalent of domicile (*see, Matter of Palla v Suffolk County Bd. of Elections, 31 NY2d 36, 47)*. Over the last several decades, however, this Court has not adhered to the strict, literal meaning of this statutory definition.

In *Matter of Gladwin v Power (21 AD2d 665)*, a candidate for assembly had a family home outside her assembly district. She also rented space within the district, which she used as an office and "for occasional living." A rival primary candidate brought an action to invalidate her designating petition. The Appellate Division **[****19]** held that "the evidence **[**161] [***402]** establishes **[*387]** satisfactorily the current intention and the persisting intention over a number of years of [the candidate] to maintain a legal residence" in the district ( *Gladwin v Power, supra, at 665*). We affirmed without opinion (*14 NY2d 771*).

Similarly, in *Matter of Bressler v Holt-Harris (37 AD2d 898)*, a voter lived in a house with his family outside the City of Albany. At the same time, to remain eligible to run for citywide elected office, he kept a studio apartment in the City, for which his law firm paid the rent. He kept a few personal items in the apartment and had eaten and slept there *once* in seven years. He also had his political mail sent there. A rival candidate brought an application to strike the voter from the City's registry. Applying an identically worded Election

96 N.Y.2d 378, *387; 754 N.E.2d 155, **161; 729 N.Y.S.2d 396, ***402; 2001 N.Y. LEXIS 1828, ****19

Law statute, the Appellate Division concluded that the voter had established residence by showing a "continuity of conduct … for many years evincing an intention to be and remain a resident of the City … as well as a continuous voting record from said address for several years last **[****20]** past" ( *Bressler v Holt-Harris, supra, at 898*). This Court affirmed on the Appellate Division's opinion ( *30 NY2d 529*).

In both cases, as in numerous others, the alleged "residence" located inside the voting district was by no means "a fixed, permanent and principal home" to which the candidate "always intend[ed] to return." As New York appellate courts have repeatedly refused to invalidate candidacies based on failures to comply strictly with statutory residency requirements, an alternative, judicially created test for residence has crept into the jurisprudence. Candidates may now have two "residences," providing that they "choose one to which [they] ha[ve] *legitimate, significant and continuing attachments*" ( *Matter of Ferguson v McNab, 60 NY2d 598, 600* [emphasis added] [citing *Matter of Gallagher v Dinkins, 41 AD2d 946, affd without opinion 32 NY2d 839]; see also, Matter of Isabella v Hotaling, 207 AD2d 648*; *Matter of Geller v Lasher, 196 AD2d 613*; *Matter of Umland v Board of Elections, 143 AD2d 240*).

The narrower statutory definition **[****21]** of residence cannot logically be read compatibly with the dual residency authorized by *Ferguson.* A voter cannot have two "fixed, permanent and principal home[s]." "Principal" is defined as "first, highest, or foremost in importance, rank, worth, or degree, chief" ( *see,* American Heritage College Dictionary, at 1088 [3d ed]). It is not possible to have two living quarters both of which are "first, highest or foremost in importance."

 **[*388]** In Election Law cases involving more than one residence, courts have endeavored to reconcile this incompatibility by deeming the narrow statutory definition of residence satisfied when a candidate has "legitimate, significant and continuing" attachments to the particular residence chosen for Election Law purposes ( *see, Ferguson v McNab, supra*). Thus, a residence chosen by the voter and satisfying the *Ferguson* standard essentially has been held to constitute that candidate's "fixed, permanent and principal" residence even though such a residence objectively might not satisfy the narrow statutory definition.

The charge in this case did not instruct the jury that a residence satisfying the *Ferguson* standard **[****22]** is deemed to be a "fixed, permanent and principal" residence for purposes of the Election Law. The **[**162]** **[***403]** judge instructed the jury that it must determine whether defendant's 47th Street apartment satisfied the statutory definition of residence, then noted that a candidate could have two residences under the *Ferguson v McNab*

96 N.Y.2d 378, *388; 754 N.E.2d 155, **162; 729 N.Y.S.2d 396, ***403; 2001 N.Y. LEXIS 1828, ****22

formulation, and finally reiterated that the defendant's residence "must comport with" the statutory definition. Defense counsel objected, claiming that the charge as a whole was confusing.[1] It was.

 **[****23]** A jury, upon hearing the entire charge, must be able to "gather from its language the correct rules which should be applied in arriving at decision" ( *People v Ladd, 89 NY2d 893, 895* [quoting *People v Russell, 266 NY 147, 153])*. A party is entitled to "an unambiguous instruction of the pertinent law" (*see, Schafer v Norwood Equip. Corp., 277 App Div 933, 934)*. It is not sufficient to excerpt portions of statutes or holdings in the abstract without adequately explaining them in a manner understandable to a lay person (*see, Stryzinski v Arnold, 285 App Div 780, 782-783)*.

 **[*389]** Here, the court's instruction on the issue of defendant's residence--two terse paragraphs--was the crucial

charge which would definitively guide the jury in determining guilt or innocence. It was confusing in two ways. First, the jury could have understood the charge as requiring defendant to meet *both* the statutory definition *and* the *Ferguson* dual-residence qualification. As we have demonstrated, however, the literal Election Law definition and the *Ferguson* standard cannot stand side-by-side. The charge failed **[****24]** to synthesize the statutory definition with the *Ferguson* formulation. It charged both without any further explanation. In essence, the court asked the 12 jurors to do the impossible: integrate and comprehend two facially incompatible formulations of residence. This should not be countenanced in a felony prosecution. We cannot fathom the rule that would apply in this case if a voter's chosen residence had to qualify under both *Ferguson* and the literal statutory definition. Nor could a jury.

Moreover, the instruction also could readily have been interpreted as subordinating the *Ferguson* dual-residence standard to the stringent statutory residence test. Viewed in that light, the jury was told, in effect, that it could acquit defendant only if the 47th Street apartment was in fact his "principal" residence--i.e., the home that was "first, highest and foremost in importance." This was a clear departure from the dual-residence jurisprudence of civil Election Law cases involving the same statutory definition.

---

[1] The majority correctly points out that defense counsel "had no problem" with the court charging just the statutory definition and then the *Ferguson* formulation. It was, however, the court's reiteration of the statutory definition that rendered the charge as a whole "confusing." The majority holds that defense counsel, by withholding his objection until after the reiteration of the statutory standard, somehow is foreclosed from arguing that asking the jury to apply both formulations simultaneously was confusing as a matter of law. We disagree. Counsel obviously viewed the *Ferguson* standard as *modifying* the statutory definition and therefore had no objection to the charge until the court erroneously engrafted the statutory definition back onto the *Ferguson* formulation. Counsel's objection at that point unambiguously alerted the trial court to his assertion that, objectively, the statutory definition and *Ferguson* formulation cannot abide one another and thus could not be charged conjunctively.

96 N.Y.2d 378, *389; 754 N.E.2d 155, **162; 729 N.Y.S.2d 396, ***403; 2001 N.Y. LEXIS 1828, ****24

Defendant testified that he moved to the 47th Street apartment in 1993 with the "intent to set up residency" there. He further testified that he moved his clothes **[****25]** and lamps to that apartment, where he **[**163]** **[***404]** initially stayed overnight "all the time" until construction work on the building began, after which he "stayed there a lot." This testimony, if credited, certainly would have been sufficient to establish residency under the *Ferguson* formulation as applied in our civil Election Law jurisprudence. Indeed, these facts are far stronger than those in *Bressler v Holt-Harris,* where the voter's one-room apartment was held to satisfy the Election Law definition of residence even though the voter regularly lived with his wife in a two-story house outside the City and could remember eating and sleeping at the apartment only once in seven years. Clearly, under the court's charge, the jury, in this criminal prosecution, could have returned a guilty verdict on facts indistinguishable from **[*390]** those held sufficient to establish a legal residence in *Bressler*--a civil case. [2]

**[****26]** Historically, the "residence" issue has been addressed in the context of civil election appeals. In those cases, members of the Board of Election and appellate judges have determined on a case-by-case basis whether the connection between a particular voter and the asserted voting residence is sufficient. Central to each determination is a full understanding of relevant authority, which allows a comparison between the facts of the case at bar to the facts of cases that have already been decided.

This, however, was a criminal prosecution, and a unique one at that. So far as we can discern, defendant is the only person ever brought to trial in New York on a charge of this kind. [3] If politically charged disputes such as this and questions of "residence" are going to be resolved in the criminal arena and decided by juries, with the possibility of criminal conviction and incarceration, we should ensure that the definition of residence is plainly fixed and easily understood.

**[****27]** Accordingly, we would reverse the conviction and order a new trial.

Chief Judge Kaye and Judges Smith, Ciparick and Graffeo concur with Judge Wesley; Judge Rosenblatt dissents and

---

[2] We cannot agree that the jury must have credited the testimony that contradicted defendant's position that he resided at the 47th Street apartment. It is impossible to tell what testimony the jury actually credited because the erroneous charge would have allowed the jury to return a guilty verdict even if it fully credited defendant's testimony.

[3] Defendant is one of two persons who have been criminally prosecuted for the failure to establish legal residence inside a voting district (*see, People v Ramos,* Sup Ct, Bronx County, Nov. 9, 1994, Bamberger, J., indictment No. 94-5993, *affd 223 AD2d 495*). There, the defendant was prosecuted criminally for using his inlaws' Bronx County apartment as his legal residence. The prosecutor instructed the Grand Jury on the issue of residence using only the statutory definition. The Supreme Court dismissed the indictment, holding that "it was not enough to simply read the Election Law definition of residence to the grand jury. Such an instruction did not convey the applicable law in a manner that fairly apprised the grand jury of the issue it had to decide" (slip opn, at 4). The Appellate Division affirmed.

96 N.Y.2d 378, *390; 754 N.E.2d 155, **163; 729 N.Y.S.2d 396, ***404; 2001 N.Y. LEXIS 1828, ****27

votes to reverse in a separate opinion in
which Judge Levine concurs.

Order affirmed.

---

**End of Document**

## SIDER, ZACHARY

| | |
|---|---|
| **From:** | LexisNexisDelivery@lexisnexis.com |
| **Sent:** | Thursday, April 19, 2018 11:29 AM |
| **To:** | perezle@brooklynda.org |
| **Subject:** | Email:People v. O_Hara_ 253 A.D.2d 560 |
| **Attachments:** | People v. O_Hara_ 253 A.D.2d 560.docx |

 Delivery

 About LexisNexis | Privacy Policy | Terms & Conditions | Copyright © 2018 LexisNexis.

\* This is an automated email. Please do not reply to this email address.

1



**User Name:** David Pan
**Date and Time:** Thursday, April 19, 2018 11:29:00 AM EDT
**Job Number:** 65276034

## Document (1)

1.  *People v. O'Hara, 253 A.D.2d 560*
    **Client/Matter:** -None-

 Caution
As of: April 19, 2018 3:29 PM Z

# *People v. O'Hara*

Supreme Court of New York, Appellate Division, Second Department

March 13, 1998, Argued ; August 31, 1998, Decided

97-07219

### Reporter

253 A.D.2d 560 *; 677 N.Y.S.2d 373 **; 1998 N.Y. App. Div. LEXIS 9209 ***

The People of the State of New York, Respondent, v. John O'Hara, Appellant.

**Prior History: [***1]** Appeal by the defendant from a judgment of the Supreme Court, Kings County (Hall, J.), rendered July 25, 1997, convicting him of offering a false instrument for filing in the first degree, false registration, and illegal voting (five counts), upon a jury verdict, and imposing sentence.

**Disposition:** ORDERED that the judgment is reversed, on the law and as a matter of discretion in the interest of justice, and a new trial is ordered.

## Core Terms

missing, trial court, districts, Election, voted, defense witness, initial burden, opposing party, no evidence, prima facie, new trial, knowledgeable, cumulative, registered, witness', falsely, voter

## Case Summary

### Procedural Posture

Defendant challenged a judgment from the Supreme Court of Kings County (New York), which convicted defendant offering a false instrument for filing, false registration, and illegal use of an address for voting and candidacy purposes.

### Overview

During defendant's trial, the state requested that the trial court issue a missing witness charge to the jury concerning defendant's ex-girlfriend. Defendant clearly proved that there was no evidence to show that his ex-girlfriend had any knowledge concerning the charges and that if she testified her testimony would have been cumulative of other defense witnesses' testimony.

Defendant also proved that there had been no contact between himself and his ex-girlfriend during the time in question. The trial court issued the missing witness charge, and defendant was convicted for using an illegal address. On appeal, the court reversed and held that it was error for the trial court to give a missing witness charge to the jury. The court reasoned that it could not be said that the ex-girlfriend had been under defendant's control because they had severed their relationship years before the trial and defendant had made an adequate showing that the ex-girlfriend was not available to him. The court concluded that the trial court's error was harmful and required a new trial.

### Outcome

The court reversed defendant's conviction for using an illegal address for voting and candidacy purposes and ordered a new trial.

## LexisNexis® Headnotes

Civil Procedure > ... > Jury Trials > Jury Instructions > General Overview

Evidence > ... > Testimony > Examination > General Overview

Evidence > Inferences & Presumptions > General Overview

*HN1*[ ] **Jury Trials, Jury Instructions**

The party seeking a missing witness charge bears the initial burden of promptly notifying the trial court that there is an uncalled witness believed to be knowledgeable about a material issue pending in the case, that such witness can be expected to testify favorably to the opposing party, and that such party has

failed to call him to testify. Once the moving party has established a prima facie basis for the charge, it becomes incumbent upon the opposing party, in order to defeat the request to charge, to account for the witness' absence or otherwise demonstrate that the charge would not be appropriate by showing that the witness is not knowledgeable about the issue, that the issue is not material or relevant, that although the issue is material or relevant, the testimony would be cumulative to other evidence, that the witness is not available, or that the witness is not under the party's control such that he would not be expected to testify in his or her favor.

**Counsel:** Hoffinger Friedland Dobrish Bernfeld & Stern, P.C., New York, N.Y. (Jack S. Hoffinger and Vivian Berger of counsel), for appellant.

Charles J. Hynes, District Attorney, Brooklyn, N.Y. (Roseann B. MacKechnie, Monique Ferrell, and Jane Meyers of counsel), for respondent.

**Judges:** Pizzuto, J. P., Joy, Friedmann and Florio, JJ., concur.

# Opinion

 **[\*560]**  **[\*\*374]**  Ordered that the judgment is reversed, on the law and as a matter of discretion in the interest of justice, and a new trial is ordered.

The charges arose from the defendant's alleged illegal use of an address for voting and candidacy purposes from November 1992 to November 1993.  The defendant, an attorney and sometime-candidate for elected office, had resided in a multi-unit apartment building at **[\*\*\*2]** 579 61st Street in Brooklyn since the early 1980s.  Until 1992, that address was within the 20th Election District of the 51st Assembly District, and was in the 38th Councilmanic District of the City of New York.  The defendant was a resident and a registered voter of these districts.  However, following redistricting in 1991-1992, the defendant's 61st Street address was located outside of these districts.

 **[\*\*375]**  On November 2, 1992, the defendant prepared, signed, and filed a new voter registration form, specifying that he resided at 553 47th Street.  This address was located within the newly-redrawn borders of the 20th Election District, the 51st Assembly District, and the 38th Council District of the City of New York.  Using the 47th Street address as his residence, the

defendant voted in those districts on five occasions-- November 3, 1992, and May 4, September 14, September 28, and November 2, 1993.

The trial court, over defense counsel's objections, granted the People's request for a missing witness charge with respect to Ms. Magaly Lucas, a one-time owner of the building located at 553 47th Street and former girlfriend of the defendant.  The court ruled that Lucas possessed **[\*\*\*3]** material, non-cumulative information because only she could testify that the defendant had a license to live in the building, that the relationship between the defendant and Lucas was such that she was under the defendant's control, and that she was available to the defense.

*HN1*[↑]  The party seeking a missing witness charge bears the initial burden of promptly notifying the trial court "that there is an uncalled witness believed to be knowledgeable about a material issue pending in the case, that such witness can be expected to testify favorably to the opposing party and that **[\*561]** such party has failed to call him to testify" ( *People v Gonzalez, 68 NY2d 424, 427*; *see also*, *People v Kitching, 78 NY2d 532, 536)*. Once the moving party has established a prima facie basis for the charge, "it becomes incumbent upon the opposing party, in order to defeat the request to charge, to account for the witness' absence or otherwise demonstrate that the charge would not be appropriate" ( *People v Gonzalez, supra, at 428*) by showing that the witness is not knowledgeable about the issue, that the issue is not material or relevant, that although **[\*\*\*4]** the issue is material or relevant, the testimony would be cumulative to other evidence, that the witness is not available, or that the witness is not under the party's control such that he would not be expected to testify in his or her favor (*see*, *People v Gonzalez, supra, at 428*; *see also*, *People v Kitching, supra, at 537*).

Applying these guidelines to the instant case, the trial court erred in granting the People's request for a missing witness charge with respect to Lucas.  Initially, we note that it is not clear whether the People established a prima facie basis for the charge.  The defendant allegedly falsely registered and voted on a number of occasions from November 1992, to November 1993, using 553 47th Street as an address. A defense witness testified that Lucas had disappeared from that address at the beginning of 1992, and two of the People's witnesses testified that when they took exclusive possession of the property in October 1992, it was vacant.  There was no evidence, therefore, that

People v. O'Hara

Lucas had any knowledge concerning whether the defendant falsely used the 47th Street address to vote during the period of November 1992 to November **[\*\*\*5]** 1993 (*see, People v Brownlee, 199 AD2d 520*; *People v Santiago, 187 AD2d 255*; *People v Williams, 112 AD2d 177*). Indeed, there was no evidence of any contact between Lucas and the defendant during that time.

Even assuming the People met their initial burden, the defendant met his burden of showing that the charge would be inappropriate. If Lucas had been called to testify that the defendant lived at 553 47th Street, her testimony merely would have been cumulative to the testimony of other defense witnesses who testified as to the defendant's presence in the building (*see, People v Hernandez, 159 AD2d 722*). Moreover, it cannot be said that Lucas was under the control of the defendant since they had severed their relationship years before the trial (*see, People v Jiminez, 176 AD2d 241*). In addition, the defendant made an adequate showing that Lucas was not available to him (*see, People v Webster, 248 AD2d 738*; *People v Rivera, 234 AD2d 19*; *People v Ortiz, 209 AD2d 332*; **[\*\*376]** *see also, People v Shapiro, 50 NY2d 747*).

 **[\*562]** Since **[\*\*\*6]** the court erred in granting the People's request for a missing witness charge, and since it cannot be said that the error was harmless, a new trial is required.

The defendant's remaining contentions are either unpreserved for appellate review or without merit.

Pizzuto, J. P., Joy, Friedmann and Florio, JJ., concur.

---

End of Document

David Pan

## SIDER, ZACHARY

| | |
|---|---|
| **From:** | LICHSTET@BrooklynDA.org |
| **Sent:** | Tuesday, December 15, 2020 3:26 PM |
| **To:** | OCONNELD@BrooklynDA.org |
| **Subject:** | FW: Fwd: |
| **Attachments:** | DI Request Form_O'Hara.doc; Endorsed Engagement Agreement.pdf; Letter to Mark Hale, dated December 11, 2015.pdf; O'Hara-Goldfeder Memo.docx; 94 Sealed Civil Case 4 of 4 (3).pdf; 94 Sealed Civil Case 3 of 4 (3).pdf; 94 Sealed Civil Case 2 of 4 (3).pdf; 94 Sealed Civil Case 1 of 4 (3).pdf |
| | |
| **Importance:** | Low |

Again, thanks so much.

---

**From:** HALE, MARK <HALEM@BrooklynDA.org>
**Sent:** Wednesday, December 9, 2020 5:41 PM
**To:** LICHSTEIN, TONI <LICHSTET@BrooklynDA.org>
**Subject:** RE: Fwd:

I think this is it

---

**From:** LICHSTEIN, TONI <LICHSTET@BrooklynDA.org>
**Sent:** Wednesday, December 9, 2020 2:25 PM
**To:** HALE, MARK <HALEM@BrooklynDA.org>
**Cc:** SONNENSCHEIN, ERIC <SONNENSE@BrooklynDA.org>
**Subject:** Re: Fwd:

Thanks so much.


Sent from my Verizon, Samsung Galaxy smartphone


-------- Original message --------
From: "HALE, MARK" <HALEM@BrooklynDA.org>
Date: 12/9/20 1:55 PM (GMT-05:00)
To: "LICHSTEIN, TONI" <LICHSTET@BrooklynDA.org>
Cc: "SONNENSCHEIN, ERIC" <SONNENSE@BrooklynDA.org>
Subject: RE: Fwd:

I'm sorry Toni, I didn't know. Please feel better. I will see how much of the stuff I can jam on one post, although it may be two or three

---

**From:** LICHSTEIN, TONI
**Sent:** Wednesday, December 09, 2020 12:48 PM
**To:** HALE, MARK
**Cc:** SONNENSCHEIN, ERIC
**Subject:** Re: Fwd:

Unfortunately yes.
I don't need the trial transcripts at this time.
I am out of commission with a hip fracture whi h was operated on last week so I really appreciate your help.
Toni


Sent from my Verizon, Samsung Galaxy smartphone


-------- Original message --------
From: "HALE, MARK " <HALEM@BrooklynDA.org>
Date: 12/9/20 12:41 PM (GMT-05:00)
To: "LICHSTEIN, TONI" <LICHSTET@BrooklynDA.org>
Cc: "SONNENSCHEIN, ERIC" <SONNENSE@BrooklynDA.org>
Subject: RE: Fwd:

Toni, all that is in the file on our drive is the trial transcript(s), a transcript of one of the election cases, a lengthy letter/memorandum from Joel Rudin, a DI request (the actual DI investigative reports are kept on their drive. I'm sure I have copies but they would be in the paper file which you have), the engagement letter with Goldfeder and his report.

Do you want/need some or all of that?

Mark

---

**From:** LICHSTEIN, TONI <LICHSTET@BrooklynDA.org>
**Sent:** Wednesday, December 9, 2020 12:13 PM
**To:** HALE, MARK <HALEM@BrooklynDA.org>
**Cc:** SONNENSCHEIN, ERIC <SONNENSE@BrooklynDA.org>
**Subject:** FW: Fwd:

Hi Mark,
Eric has sent the CRU memo and exhibits, but we need access to the documents in the folder under your name as well for purposes of subpoena compliance.
We will review the documents and withhold any subject to privilege which will be listed on a privilege log.
Thanks so much, and sorry to bother.
Toni

---

**From:** SONNENSCHEIN, ERIC <SONNENSE@BrooklynDA.org>
**Sent:** Wednesday, December 9, 2020 11:24 AM
**To:** LICHSTEIN, TONI <LICHSTET@BrooklynDA.org>
**Subject:** RE: Fwd:

I can send you the O'Hara memo, but as to the rest, since it was Mark's investigation, everything is in a folder under his name.  I am reluctant to copy and past that stuff to you without his say so.

---

**From:** LICHSTEIN, TONI <LICHSTET@BrooklynDA.org>
**Sent:** Wednesday, December 9, 2020 11:21 AM
**To:** SONNENSCHEIN, ERIC <SONNENSE@BrooklynDA.org>
**Subject:** Fwd:

Hi Eric,
I wonder if you could help in obtaining these documents.

I haven' heard back from Mark so I assume he is unavailable.
Thanks so much.

Toni


Sent from my Verizon, Samsung Galaxy smartphone


-------- Original message --------
From: "LICHSTEIN, TONI" <LICHSTET@BrooklynDA.org>
Date: 12/7/20 3:34 PM (GMT-05:00)
To: "HALE, MARK" <HALEM@BrooklynDA.org>, "FORBES, GEORGE" <FORBESG@BrooklynDA.org>
Subject:

Hi Mark,
Hope all is well.
I would appreciate your sending,again, the O'Hara CRU memo and any related documents
Thanks.
TONI


Sent from my Verizon, Samsung Galaxy smartphone

**CONVICTION REVIEW UNIT**
**REQUEST FOR ASSIGNMENT OF DETECTIVE / DETECTIVE**
**INVESTIGATOR**

DATE:          5/17/16

ADA:  Mark Hale

BUREAU: Conviction Review Unit

SUPERVISOR:          Mark Hale

CASE NAME AND NUMBER:  People v. John O'Hara 12525/96

     *     *     *     *     *     *     *     *     *     *     *     *

BRIEF DESCRIPTION OF CASE:  John O'Hara was prosecuted three times for election fraud by the Hynes administration in what is being characterized as malicious prosecution of a political rival. In addition, the defense has alleged the prosecution was based on factual inaccuracies and the use of unreliable witness testimony.

INVESTIGATION NEEDED: DI Lanigan has been assisting to locate the approximately 10 witnesses that need to be interviewed.

*     *     *     *     *     *     *     *     *     *     *     *

DETECTIVE / DETECTIVE INVESTIGATOR:

SUPERVISOR:

DATE ASSIGNED:

DATE COMPLETED:

1

2  SUPREME COURT OF THE STATE OF NEW YORK
   COUNTY OF KINGS:   CIVIL TERM - PART 15
3  ----------------------------------------X
   DENNIS L. POL, LISA T. LOPEZ, and
4  FELIX W. ORTIZ,

5                          Petitioners,

6

7                  -against-

8  THE BOARD OF ELECTIONS In The CITY
   OF NEW YORK and JOHN K. O'HARA,
9
                           Respondents
10 ----------------------------------------X
   Index # 23414/94
11 ----------------------------------------X
   In the Matter of the Application of
12 ANN ENGLISH,

13                      Objector-Petitioner,

14

15                 - against -

16 JOHN K. O'HARA, Member of the Assembly
   From the 51st Assembly District, Kings
17 County, New York State,

18                          Candidate

19          - and -

20 BOARD OF ELECTIONS IN THE CITY OF NEW
   YORK,
21
                           Respondents
22 ----------------------------------------X

23                    360 Adams Street
                      Brooklyn, New York
24                    August 3, 4 and 5, 1994

25
              (Continued on the following page.)

2

1

2

3    B E F O R E:

4                          HONORABLE IRVING S. ARONIN,

5                                             Justice

6

7    A P P E A R A N C E S:

8              WOLFSON & CARROLL
               233 Broadway
9              New York, New York
               BY:   JOHN W. CARROLL, ESQ.
10             For Petitioners Pol, Lopez and Ortiz

11

               ROBERT MEYERS, ESQ.
12             15 Maiden Lane
               New York, New York   10038
13             Attorney for John K. O'Hara

14

                         MARK L. BOWIN
15               Official Court Reporter
                    -   -   -   -   -
16

17             MR. CARROLL:   John Carroll, for the

18    Petitioners, Pol, Lopez and Ortiz.

19             Mr. Ortiz is also an aggrieved candidate.

20             Your Honor, this is an invalidate proceeding.

21    We are proceeding to invalidate Mr. O'Hara on two

22    theories.   Theory number one is a residence

23    theory.   Theory number two is a fraud theory having

24    to do with fraud by subscribing witnesses.

25             We believe that we will establish sufficient

1              Proceedings

2     grounds on both theories to invalidate.

3          We also believe -- assuming this Court did not

4     rule that the petition was invalid merely on the

5     basis of the fraud -- that the fraud that has been

6     committed by particular subscribing witnesses will

7     result in the count coming --

8          THE COURT:  Permiation.

9          MR. CARROLL:  Permiation.

10         And also the count coming below five hundred.

11    Five hundred is required, in this particular case.

12         There were a couple of motions that Mr. Meyers

13    made before Judge Garry, first having to deal with

14    the sufficiency of the bill of particulars.  Judge

15    Garry ruled the bill of particulars was

16    sufficient.  And having to do with a motion to

17    disqualify myself and Mr. Dunbar as counsel in the

18    case, and Judge Garry ruled that neither of us

19    would be disqualified.

20         Mr. Meyers can speak to his grounds on those

21    things.  I believe that's where we are,

22    procedurally.

23         THE COURT:  Well, if there's been a ruling on

24    that, that's already been determined.

25         MR. CARROLL:  I believe, procedurely, your

4

1                    Proceedings

2        Honor, we need to have a trial on the fraud and

3        residency theories.  We'd like to simultaneously

4        conduct the line-by-line at the Board of

5        Elections.  We did not get a final count, as is

6        often the case.  We'd like to have crews working

7        there under the supervision of a referee --

8             THE COURT:  Hasn't that been done yet?

9             MR. CARROLL:  It has not been done yet.

10             THE COURT:  It may not be necessary, I

11        understand.

12             MR. CARROLL:  That's exactly right.

13             THE COURT:  Because the call that I received

14        was this was based on residency.

15             MR. CARROLL:  Residence and subscribing

16        witness fraud, Judge, which may very well go back

17        to the candidate.  It's fraud and residency and

18        that's all set forth in the bill of particulars.

19             THE COURT:  Come up.

20             (Discussion at the bench off the record.)

21             THE COURT:  You're from the Board.  You have

22        the original petitions.

23             They'll be returned to the Board of

24        Elections.  We're going to use the copies here.

25        Even if we need them for the fraud, we'll use them

5

1          Proceedings

2     here based on the fraud.  They're going to start

3     the line-by-line.  They'll have a crew starting the

4     line-by-line tomorrow morning.

5          We stand in recess until 2 o'clock.

6          (Present are attorneys Carroll and Meyers.)

7          THE COURT:  Arrangements have been made for

8     tomorrow morning at 9:15 you can go to the Board of

9     Elections; see Mr. Fenchel, Sherwin Fenchel

10    (phonetic).  He is in charge of the operation,

11    checking petitions at the at the Board of

12    Elections.

13         Okay.  Are we ready to proceed?

14         MR. CARROLL:  The petitioners are ready, your

15    Honor.

16         THE COURT:  Respondent?

17         MR. MEYERS:  We're ready, your Honor.

18         While we're waiting for the clerk, could we

19    take care of one or two preliminary matters?

20         (Whereupon, the Clerk entered the

21    courtroom.)

22         THE COURT:  We have two proceedings.

23         MR. CARROLL:  Yes, and they're for joint

24    trial, and I'll be putting in evidence with respect

25    to both proceedings.  I'm taking the lead on it.

6

1                     Proceedings

2          Mr. Dunbar is on trial before Mr. Justice Garry on

3     another matter.

4               THE COURT:  I see.  And you originally were

5     the attorney representing who?  Pol or English?

6               MR. CARROLL:  Pol.

7               THE COURT:  So Mr. Dunbar was representing

8     English?

9               MR. CARROLL:  Ms. English, that's correct.

10              MR. MEYERS:  Your Honor, if I may.

11              THE COURT:  Yes.

12              MR. MEYERS:  According to the

13    petitioners' -- both Petitioners' bill of

14    particulars and offers of proof, there are a large

15    number of people who they have intent or believe

16    that they will subpoena and, in fact, there are

17    witnesses who were subpoenaed in this courthouse

18    today.

19          I would like to request -- and I think that

20    the petitioner will consent -- that during this

21    proceeding, that all subpoenaed witnesses, except

22    for parties, be excluded from the courtroom.

23              THE COURT:  Certainly.  You're entitled to

24    that.

25              MR. MEYERS:  Thank you, your Honor.

1    Proceedings

2    THE COURT:  If there are any witnesses in this

3    proceeding other than the parties to the

4    proceeding, please wait until you're called to be

5    witnesses.

6    MR. CARROLL:  The only witness in the room,

7    your Honor, is Mr. Parras.  He's the first

8    witness.

9    THE COURT:  Okay.  That we'll understand.

10   MR. MEYERS:  That's fine, your Honor.

11   THE COURT:  Where is the bill of particulars?

12   MR. CARROLL:  I have a copy, your Honor, but

13   it is my working copy.  It is the big two volumes

14   of paper.  This is the bill of particulars

15   (indicating).  This is the aggrieved candidate

16   spec.  This is where the aggrieved candidate

17   supplemented the specifications of the Board and

18   this is the bill of particulars (indicating).

19   THE COURT:  Who made the exmarks on here?

20   MR. CARROLL:  On the petitions, Judge?

21   THE COURT:  Yes.

22   MR. CARROLL:  What those indicate is that

23   those are potential witnesses from those pages.

24   We're limiting ourselves to calling these

25   people, should it prove necessary; not all of the

8

1           Proceedings

2      people in the petition, just the ones with an X on

3      their name.

4           THE COURT:  Are we ready to proceed?

5           MR. CARROLL:  Year.  Ready to proceed, your

6      Honor.

7           THE COURT:  Anybody wish to make an opening

8      statement or are you ready to proceed with your

9      first witness?

10          MR. CARROLL:  We would like to make an opening

11     statement.

12          Would you like me to exclude Mr. Parras while

13     I make my opening statement?

14          THE COURT:  Please do.

15          MR. CARROLL:  Mr. Parras, will you step

16     outside while I make my opening statement.

17          (Mr. Parras left the courtroom.)

18          MR. CARROLL:  Your Honor, the portion of this

19     matter that is before the Court at this moment --

20     understanding that we're going to recommence the

21     line-by-line tomorrow -- deals with two theories,

22     each of which we believe invalidates the candidacy

23     of John K. O'Hara for Assembly in the 51st Assembly

24     District.

25          Theory number one is a residence theory.

9

1          Proceedings

2               The New York State Constitution provides that

3          for someone to be qualified to be elected to the

4          New York Legislature, they have to be a resident of

5          the political subdivision for one year prior to

6          election.  That means that as of November of this

7          year, when the general election takes place,

8          Mr. O'Hara will have to have been a resident of the

9          51st Assembly District for a year.

10              We will establish, through the testimony that

11         we're going to introduce, that Mr. O'Hara was not a

12         resident of the 51st Assembly District for the

13         requisite one-year period, that, in fact, he does

14         not reside in the First Assembly District; that the

15         address set forth on his petition, which I believe

16         is 6017 Fourth Avenue, is in fact a fictitious

17         address; that he does not reside there; that he has

18         no substantial contacts with that address.

19              We will also establish, your Honor, that

20         Mr. O'Hara has run for public office four or five

21         times in the last five or six years; that each time

22         he runs, he runs from a different address; that he

23         has had no contacts with these addresses and, in

24         fact, he has had ongoing contacts with an address

25         that has nothing to do with any of these districts,

1           Proceedings

2      and that this is, in fact, his fixed, permanent

3      place of abode, his domicile, not located in the

4      district that he is running and that that address

5      is an address on Sixth Avenue, I believe -- On 61st

6      Street in Brooklyn, excuse me, your Honor --

7           And that that is an address on 61st Street in

8      Brooklyn which is not in the 51st Assembly

9      District.

10          Also having to do with the residence part of

11     the case, your Honor, but also having fraud

12     overtones, fraud overtones that go to the question

13     of the candidate's veracity is the information he

14     has consistently supplied to the Board of

15     Elections.

16          Mr. O'Hara contends that he moved into the

17     address on his petition or he reregistered at the

18     address on his petition last January, January 20,

19     1994.

20          Mr. O'Hara moved into the address that he has

21     set forth on his petition in the 51st Assembly

22     District, which is 6017 Fourth Avenue in Brooklyn,

23     reregistered there on January 20th, 1994.

24          At the time of his reregistration -- we will

25     be introducing the buff cards shortly -- at the

11

1          Proceedings

2     time of his reregistration, he indicated that he

3     had lived there for three months before he

4     reregistered to vote.  He voted from -- the address

5     he voted from previously was an address on 47th

6     Street in Brooklyn, not inside the 51st Assembly

7     District.

8          THE COURT:  Did that overlap the previous

9     election date?

10         MR. CARROLL:  It does overlap the previous

11    election date, your Honor.  I'm informed by

12    Mr. Keefe that I am wrong when I say it is not in

13    the 51st Assembly District.  It is in the 51st

14    Assembly District, that previous address, but the

15    interesting thing, your Honor, is this goes to the

16    question of the validity of his registration and

17    enrollmentment is that we will produce evidence

18    here that he never resided at all under any

19    circumstances whatsoever at that previous address,

20    that he had no contacts with it at all and that,

21    therefore, this Court can make no conclusion based

22    upon that on how long he has, in fact, been in the

23    51st Assembly District, number one, and, number

24    two, that the information he supplied to the Board

25    of Elections as to his prior residence is false;

FORM C-100 · LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

12

| | |
|---|---|
| 1 | Proceedings |
| 2 | that it was a material false statement in his |
| 3 | statement in his registration form provided by him, |
| 4 | that this is a felony under two provisions of the |
| 5 | Election Law; it voids his enrollment and I suggest |
| 6 | is sufficient in and of itself to invalidate his |
| 7 | candidacy. |
| 8 | Moving from the residence dimensions of this |
| 9 | case to the fraud dimensions -- remember, there is |
| 10 | a fraud dimension to the residency area as well but |
| 11 | in this case, we will be producing testimony from a |
| 12 | series of individuals whose signatures were taken |
| 13 | and whose subscribing witnesses subscribed for, and |
| 14 | these individuals will testify that they did not |
| 15 | sign the petition for the subscribing witness who |
| 16 | witnessed the petition. |
| 17 | And, what's more, your Honor, they will |
| 18 | testify that the person who took their signature |
| 19 | but did not witness it on the petition was the |
| 20 | candidate.  Once again, candidate fraud. |
| 21 | That is where we are going in this case. |
| 22 | We are prepared to begin producing our |
| 23 | witnesses now. |
| 24 | THE COURT:  How many do you allege -- how many |
| 25 | signatures do you allege were involved in the |

FORM C-100 - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

13

1                    Proceedings

2        subscribing witness not taking them?

3            MR. CARROLL:  We'll be able to produce proof

4        as to fifteen, twenty, thirty; I'm not sure exactly

5        how many we can get in here.  But the collective

6        number of signatures witnessed by these subscribing

7        witnesses -- who, I suggest to the Court, after the

8        proof comes in, that they did not take these

9        signatures; it would be impossible to give credence

10       to any of their signatures -- will run into the

11       hundreds, your Honor; hundreds and hundreds.

12           That's where I indicated that it might very

13       well get to the point, when we begin knocking out

14       subscribing witnesses, that we need to know what

15       the count is.

16           THE COURT:  Okay.  Come up, counselors.

17           (Discussion at the bench off the record.)

18           MR. MEYERS:  Your Honor, before we begin, may

19       I make a motion?

20           THE COURT:  You certainly may.

21           MR. MEYERS:  Thank you, sir.

22           Your Honor, earlier, prior to being sent to

23       this part, I made a motion in front of Judge Garry

24       to have Jerry Dunbar and Jack Carroll removed --

25       disqualified.

14

1          Proceedings

2          THE COURT:  Who?

3          MR. MEYERS:  Jerry Dunbar --

4          MR. CARROLL:  Mr. Dunbar is the attorney

5     representing Miss English in the other proceeding.

6          THE COURT:  Who's Mr. Dunbar?  Is he here?

7          MR. CARROLL:  He's the one who's on trial

8     before Judge Garry.

9          MR. MEYERS:  He's turned this case over to

10    Mr. Carroll to try today.  I made that motion based

11    on the fact that Mr. Dunbar represented Mr. O'Hara

12    last year before this Court.

13         I now would like to make a motion for

14    reargument on that based on the opening statements

15    of Mr. Carroll, since Mr. Carroll stated that part

16    of his case will consist of an alleged

17    falsification of his prior residence, not the

18    residence that he's claiming on these petitions but

19    his residence prior to these petitions, that

20    counsel be removed because --

21         THE COURT:  Which counsel?

22         MR. MEYERS:  Both counsel, your Honor.  And

23    I'll explain why --

24         MR. CARROLL:  Your Honor, I have never had

25    anything to do --

1            Proceedings

2            THE COURT:  Which counsel are you talking

3       about?

4            MR. MEYERS:  Both Mr. Dunbar and Mr. Carroll.

5            THE COURT:  He's not trying the case in front

6       of me, is he?

7            MR. MEYERS:  Your Honor, if you'll give me one

8       moment to explain.

9            Mr. Dunbar represented Mr. O'Hara in an issue

10      involving the previous address last year in this

11      Court.  From what I understand, though I don't have

12      the case in front of me, Mr. Carroll informs me

13      that that case was withdrawn.

14           MR. CARROLL:  That is correct.

15           THE COURT:  So it wasn't tried.

16           MR. MEYERS:  It was not tried, but there is an

17      attorney-client privilege which exists --

18           THE COURT:  I was not questioning whether

19      there was an attorney-client privilege.

20           MR. MEYERS:  The Canons of Ethics, actually

21      Canon Number Four, prohibits an attorney from

22      representing someone against a former client,

23      especially when it is in a situation that is

24      identical or close to that which he represented

25      that client.

16

1          Proceedings

2              There are numerous cases from the Court of

3      Appeals as late as --

4              THE COURT:  What did Judge --

5              MR. MEYERS:  Judge Garry denied it, but

6      there's a new element here because Mr. Carroll in

7      his opening statement stated that they intend to

8      prove that the previous address was false.

9              THE COURT:  Counsel, I heard.

10             MR. MEYERS:  Now, your Honor, that canon goes

11     to not only the attorney who represented but

12     associate members of the firm, etcetera, that are

13     involved with that.

14             By joining this trial and by Mr. Carroll

15     taking the lead in this trial and by Mr. Dunbar not

16     appearing here, Mr. Carroll has become an associate

17     of Mr. Dunbar and is privy to information that

18     would not normally be allowed to be disclosed due

19     to the attorney-client privilege.

20             MR. CARROLL:  Your Honor, may I be heard on

21     that?

22             THE COURT:  Yes, you may.

23             MR. CARROLL:  Point number one, I have never

24     represented Mr. O'Hara on any matter, under any

25     circumstances.

1    Proceedings

2    Point number two.  This case has been

3    independently developed by my office.  We have

4    independently interviewed the witnesses.  In fact,

5    if you will examine the bills of particulars,

6    Mr. Dunbar adopted my bill of particulars and

7    incorporated it by reference.  Any evidence which

8    is adduced, I can assure the Court, was developed

9    by me independently.

10   Merely because of the vagaries of the trial

11   schedules here and the Election Justice, Garry,

12   ordered Mr. Dunbar to trial in another matter;

13   since these trials both involve the same issues --

14   THE COURT:  And there were two independent

15   petitions involved?

16   MR. CARROLL:  Absolutely totally independent,

17   Judge.

18   THE COURT:  Okay.  Anything else?

19   MR. MEYERS:  No, sir.

20   THE COURT:  Well, I can understand your motion

21   regarding Mr. Dunbar, and I think that Mr. Dunbar

22   will not be able to represent the petitioners in

23   this matter.

24   However, I find no such encumbrance on

25   Mr. Carroll, and Mr. Carroll will be able to --

1           Proceedings

2               MR. CARROLL:  Thank you, your Honor.

3               THE COURT:  -- continue as counsel in this

4       case.

5               MR. MEYERS:  Please note my exception.

6               THE COURT:  You have your exception, Counsel.

7               MR. MEYERS:  Thank you.

8               MR. CARROLL:  Your Honor, our first witness is

9       Mr. Parras.

10              THE COURT:  Call your first witness.

11              Counselor, you don't want to have an opening

12      statement?

13              MR. MEYERS:  Your Honor, I'd like to reserve

14      my opening statement for the beginning of my case.

15              THE COURT:  You certainly may.

16  Q U E R U B I N   P A R R A S, called as a witness by the

17      Petitioners, residing at 348 Highbrook Avenue,

18      Pelham, New York 10803, having been duly sworn,

19      testified as follows:

20              THE CLERK:  State your name for the record,

21      please.

22              THE WITNESS:  My name is Querubin,

23      Q-u-e-r-u-b-i-n, is first name, Parras,

24      P-a-r-r-a-s.

25              THE CLERK:  Mr. Parras, would you state your

19

1                    Parras - Direct/Carroll

2              address for the record, please.

3                    THE WITNESS:  Yeah, my address from where I

4              live?

5                    THE CLERK:  Yes.

6                    THE WITNESS:  348 Highbrook Avenue, Pelham,

7              New York.  Code area 10803.

8                    THE COURT:  Okay.  You may proceed.

9  DIRECT EXAMINATION

10 BY MR. CARROLL:

11     Q    Thank you for coming, Mr. Parras.

12          Did you receive a subpoena asking you to produce

13 various documents when you came to court today?

14     A    Yes, I received a notice.

15     Q    And have you brought those documents with you? ·

16     A    Yes, I have all of them with me.

17     Q    May I see them, sir?

18     A    Yes.  Here is all together and this I -- all the

19 information from here I put all together in that binder

20 (handing).

21     Q    Mr. Parras, are you the owner of any real estate in

22 the Borough of Brooklyn?

23     A    Yes, sir.

24     Q    Do you own a property on 61st Street in Brooklyn?

25     A    579 61st Street.

1                    Parras - Direct/Carroll

2       Q     You are the owner of that building?

3       A     I am the owner of 44-family apartment building.

4       Q     Are you familiar with a gentleman by the name of

5   John K. O'Hara?

6       A     He's one of my tenant.

7       Q     At what building is he a tenant?

8       A     In the 579 61st Street.

9       Q     How long have you known Mr. O'Hara?

10      A     I think that he first -- according to the record I

11  have there, the first movement was in November 1982 until

12  this time.

13      Q     And he is still a resident of that apartment?

14      A     He still having the apartment.

15      Q     What sort of building is this?  Is this a

16  residential building?

17      A     Residential.

18      Q     Are there any businesses in this building?

19      A     No business.  No commercial.

20      Q     No commercial at all.

21      A     No.

22      Q     Does anyone maintain offices in this building?

23      A     No.

24      Q     So it's a purely residential apartment building?

25      A     Yeah, all of them.

1                      Parras - Direct/Carroll

2      Q    Have you had a lease with Mr. O'Hara during that

3  whole period?

4      A    I have all the leases from the beginning from 1982.

5      Q    I would ask you to look at this document which I

6  asked you to produce.  Are these the leases for Mr. O'Hara

7  for that apartment?

8      A    Yes, all of these there.

9      Q    Included in these are from 1982 until the present?

10     A    From 1982 until this time, 1994.

11             MR. CARROLL:  Can we have this marked as

12          Petitioners' --

13             THE COURT:  Hold it; hold it.

14             MR. CARROLL:  Thank you, your Honor.

15             (Handing to Mr. Meyers.)

16             MR. MEYERS:  Your Honor, I object to this

17          evidence being admitted.  This evidence -- these

18          leases purport -- well, there's a conflict,

19          actually, on some of these leases as to the dates,

20          but the latest expires in 1992, and that's not a

21          year that's in issue here, your Honor.

22             THE COURT:  Let me see it, please.

23     Q    Do you have a lease for the period 1992 through the

24  present with Mr. O'Hara?

25             THE WITNESS:  1992 has to be there, on the

22

1                        Parras - Direct/Carroll

2              record is there.

3         Q    Would you check through there, sir.

4         A    Yes.

5         Q    Have you in fact entered into a lease with

6    Mr. O'Hara for that period?

7         A    Pardon me.  I'm no very well English speaker.  Ask

8    me the question slow, please.

9         Q    Have you entered into a lease with Mr. O'Hara for

10   the period 1992 through the present -- through 1994?

11        A    Yes.  Yes, I think is -- what happen is we send a

12   notification to him and he probably will be receiving or the

13   super have the white copy, the original one.

14        Q    Do you have a copy of the lease for 1992?

15        A    Should be, should be.

16             THE COURT:  Take a look.

17             THE WITNESS:  It should be.  You check over

18             there to see.  Have to be there.

19        Q    I certainly will.

20        A    Sometime he was a little delayed sending the

21   leases, the copy back.

22             THE COURT:  Well, it wouldn't be two years.

23             THE WITNESS:  It's not here.  Have to be the

24             white part of this one, the blue one (indicating).

25        Q    Mr. Parras, are you familiar with the tenants

FORM C-100 · LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1                    Parras - Direct/Carroll

2     currently in occupancy at your building at 44th Street -- or

3     at 61st Street?

4          A     If I am?  Repeat the question?  If I am familiar?

5          Q     Are you familiar with the tenants at your building

6     on 61st Street?

7          A     I am familiar with all of them.

8          Q     Is Mr. John Kennedy O'Hara still residing at the

9     building at 579 61st Street?

10         A     Yes, sir.  He's still there, living there.

11         Q     Do you receive rent payments from him?

12         A     He pay direct to the super.  He's up to date with

13    the rent.

14         Q     Okay.  Does the super notify you if she doesn't or

15    he doesn't receive rent payments?

16         A     The super notify me when somebody no pay.

17         Q     Has the super notified you that John Kennedy O'Hara

18    has not paid his rent?

19         A     No.

20         Q     As far as you know, as the owner of the building,

21    he continues to make payments?

22         A     Yes, sir.

23         Q     When was the last time you were at the building,

24    sir?

25         A     The last time I was in the building was a couple

24

```
 1                    Parras - Direct/Carroll
 2    weeks ago.
 3        Q    When was the last time you saw John Kennedy O'Hara
 4    at the building?
 5        A    Its more than six months.  I do not see very
 6    frequently him there.
 7        Q    But you've seen him within the last five or six
 8    months?
 9        A    Right.
10        Q    Sometime in 1994, you have seen him at 579 61st
11    Street, within the last five or six months?
12        A    Yes, sir.  I see him in the beginning of 1994.
13        Q    Now, we asked you, pursuant to subpoena, to produce
14    the leases up through today, correct?
15        A    (Nodding.)
16        Q    And you believe that Mr. O'Hara was given a lease;
17    is that correct?
18        A    Yes.  Have to be someplace.
19        Q    But you did not produce it today?
20        A    I cannot produce it today.
21             MR. CARROLL:  We would ask you to produce that
22             at some future date, sir.  But we have no further
23             questions of this witness.
24             THE COURT:  Will you please produce that
25             lease.
```

1                    Parras - Direct/Carroll

2              THE WITNESS:  I will make all the step for

3        find the --

4              THE COURT:  Are you offering that

5        (indicating)?

6              MR. CARROLL:  I am offering these copies of

7        the leases for the last ten years into evidence,

8        your Honor, and he we will be producing the 1994

9        lease.

10             MR. MEYERS:  Your Honor, I move those not be

11       accepted into evidence.  They're not --

12             THE COURT:  We'll mark it for identification

13       as Plaintiff's Exhibit 1 in light of the fact that

14       the witness has testified that Mr. O'Hara still

15       lives there, with or without a lease.  However, he

16       testified that there is a lease and that he will

17       produce it.

18             I'm going to mark it in evidence as

19       Petitioners' Exhibit 1.

20             You have your exception.

21             MR. CARROLL:  Thank you, your Honor.

22             (So marked.)

23             THE COURT:  You may inquire, sir.

24             MR. MEYERS:  Thank you, your Honor.

25  CROSS-EXAMINATION

26

1                      Parras - Direct/Carroll

2    BY MR. MEYERS:

3        Q    Good afternoon, Mr. Parras.

4              Mr. Parras, you said that the last time that you

5    were at your building was two weeks ago; is that correct?

6        A    Two weeks ago.

7        Q    And how often do you visit your building?

8        A    I -- we -- very frequently.  There a couple time in

9    the week but this time -- the last time I was was a couple

10   of weeks ago.

11       Q    When you go to your building, what do you normally

12   do there?

13       A    Beg your pardon?

14       Q    When you go to your building, what do you normally

15   do when you're there?

16       A    I'm the person that do maintenance with my worker

17   because I have other building, too.  And because I have some

18   other building, I have two men that working continually with

19   me for giving maintenance.

20       Q    Do you visit individual apartments?

21       A    Individual apartments?  I visit individual

22   apartment when they have some complaint that have to correct

23   something.

24       Q    Have you ever been in the apartment that you allege

25   is Mr. John O'Hara's?

1              Parras - Cross/Meyers

2        A    I have not been for the beginning when he moved to

3    that apartment, 2-I.

4        Q    You haven't been there since then?

5        A    I haven't been there.

6        Q    And you say that he first moved in in 1982?

7        A    First he was living in the apartment 3-H.  And from

8    3-H he moved to the 2-I.

9        Q    In 1982?

10       A    2-I, he moved later in I think '91 or something

11   like that.  1991.

12             THE COURT:  Excuse me.  When did he move from

13        2-I --

14       A    He move in 2-I -- here the lease.

15             THE COURT:  To 2-H.

16             MR. CARROLL:  3-H to 2-I.

17             THE COURT:  From 3-H to 2-I, when did he

18        move?

19             THE WITNESS:  He move, I think, in 1992.

20             THE COURT:  In 19 --

21             THE WITNESS:  1992.

22             THE COURT:  1992?

23             THE WITNESS:  Yes, sir.

24             THE COURT:  I see.

25       Q    Have you been in either of those two apartments

FORM C-100 - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1                           Parras - Cross/Meyers

2    since 1982, either 3-H or 2-I?

3         A     In 3-H -- in the 3-H, I have been before.

4         Q     When were you last in 3-H?

5         A     About three years ago, three or four years ago.

6         Q     Okay.

7         Q     When was the last time you were in apartment 2-I?

8         A     When we was repairing completely for rented to him

9    for the first time the 2-I.

10        Q     But you haven't been there since?

11        A     After that, I no make inside of the apartment.

12        Q     So you don't have any idea what's inside of that

13   apartment?

14        A     No.

15        Q     Have you ever seen Mr. O'Hara --

16              Strike that.

17                   THE COURT:  Anything else?

18                   MR. MEYERS:  Yes, your Honor, I'm just

19              checking something on these leases.

20        Q     You had mentioned that the last time you saw

21   Mr. O'Hara was approximately five months ago; is that

22   correct?

23        A     On the beginning of January, I think, 1994.

24        Q     And prior to that, do you remember when the last

25   time you saw him was?

29

1                    Parras - Cross/Meyers

2        A    I have no been seeing him.

3        Q    So within the last two years, you've only seen him

4    in January of 1994 at your building?

5        A    Before 1994, I saw him a couple time in the 1993.

6        Q    You saw him a couple of times in 1993.  When in

7    1993 did you see him?

8        A    I no remember exactly the date.  But I saw him a

9    couple time in the building.

10                MR. MEYERS:  At this time, your Honor, I have

11                no further questions.

12                THE COURT:  Anything else?

13                MR. MEYERS:  Not at this time, your Honor

14    REDIRECT EXAMINATION

15    BY MR. CARROLL:

16        Q    Mr. Parras, you don't live at 579 61st Street, do

17    you?

18        A    I do not live there.

19        Q    And you're not there on a daily basis, are you?

20        A    No very frequently.

21        Q    Mr. Parras, I'm going to show you two checks and

22    ask you to examine them and examine the endorsements on them

23    and tell me if you recognize those checks.

24                MR. MEYERS:  Your Honor, I'm going to object.

25                If this is redirect, this is beyond what he was

1                          Parras - Redirect/Carroll

2               questioning before.

3                    THE COURT:  I'm going to sustain the

4               objection.

5       A    The --

6                    MR. CARROLL:  The question is withdrawn.

7               I have no further questions.

8                    THE COURT:  You may step down, sir.

9                    MR. PARRAS:  Excuse me, sir.  Can I have a

10              receipt for that binder?  I have to leave.

11                   MR. CARROLL:  Your Honor, I have undertaken,

12              with Mr. Parras -- I told him these will be

13              introduced in evidence, and I will tell him on the

14              record, I will undertake to return them after the

15              trial.

16                   THE COURT:  Mr. Parras, you said you will get

17              the lease?

18                   MR. PARRAS:  I will try to.

19                   MR. CARROLL:  We will speak to you.  It's very

20              important.  We will make arrangements for it.  You

21              will check with your superintendent.

22                   THE COURT:  Call your next witness.

23      R O B E R T O   L O Z A N O, residing at 553 47th Street,

24              Brooklyn, New York, called as a witness by the

25              Petitioners, having been duly sworn, testified as

1                    Parras - Redirect/Carroll

2               follows:

3                    THE CLERK:  May I have your full name and

4               address for the record.

5                    THE WITNESS:  Roberto Lozano, L-o-z-a-n-o, 553

6               47th Street.  Roberto, R-o-b-e-r-t-o.

7                    THE CLERK:  Do you have a zip code on that?

8                    THE WITNESS:  Two two zero.

9    DIRECT EXAMINATION

10   BY MR. CARROLL:

11        Q    Mr. Lozano, thank you for coming.

12             You've stated that you live at 553 47th Street; is

13   that correct?

14        A    Yes.

15        Q    How long have you lived there?

16        A    Lived there for about two years now.

17        Q    Two years now?

18        A    Yes.

19        Q    When did you first move in?

20        A    November '92, I think.

21        Q    November 1992.

22        A    Yes.

23        Q    Okay.  Do you know who the owner of that property

24   is?

25        A    Was Magaly Lucas.

32

1                    Lozano - Direct/Carroll

2      Q    Who is the owner at this point?

3      A    We are.

4      Q    When you say "we are," who is "we"?

5      A    Well, there's myself, Quesal Martinez and Ralph

6    Munoz.

7                    THE COURT:  Is he a lawyer, Ralph Munoz?

8                    THE WITNESS:  No.

9                    THE COURT:  Go ahead.

10     Q    We'll go back to where we were, sir.

11          You and a group of individuals are currently the

12   owner of that building.

13     A    Yes.

14     Q    When did you buy the building?

15     A    Proceedings were -- we started in 1990, I think it

16   was, and that's when we started, like, moving in and stuff.

17   We gave the final --

18                    THE COURT:  Please speak up, sir.  The

19                    question was, when did you buy the building?

20                    THE WITNESS:  We bought the building.  We

21                    finished -- when we finally gave the rest of the

22                    money in was -- when was it?  -- November of '92.

23                    Yeah, November '92.

24     Q    Mr. Lozano, I'm going to show you a printout from

25   the New York City Department of Finance regarding transfers

FORM C-100 - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

33

1                           Lozano - Direct/Carroll

2    of business records, and I ask you to look at the line

3    relating to the transfer from Magaly Lucas to you and your

4    partners and the date and ask if that refreshes your

5    recollection as to the date that you purchased the property

6    (indicating).

7         A    Yeah.  I think so.

8         Q    What is the date that you purchased the property?

9         A    '93.

10        Q    Is that November of 1993?

11        A    Yeah.

12        Q    And was there a period of time before you

13   transferred the property or purchased the property that you

14   lived at the building?

15        A    Yes.

16        Q    And how long was that?

17        A    That was about a year before that.

18        Q    So you moved in in November of 1992?

19        A    Yes.

20        Q    You were a tenant of Ms. Lucas and then you

21   purchased the building in November of 1993?

22        A    Yes.  We rented with option to buy.  That's the way

23   it was.

24        Q    So you have been in that building continuously

25   since November 1992?

34

1                    Lozano - Direct/Carroll

2       A    Yes, sir.

3       Q    Are you familiar with all of the people who have

4  resided at that building since November 1992?

5       A    Yes.

6       Q    Do you know an individual named John Kennedy

7  O'Hara?

8       A    Yes.

9       Q    Has Mr. O'Hara resided in that building since

10  November 1992?

11      A    No.

12      Q    Did he reside in the building while you were a

13  tenant?

14      A    No.

15      Q    Has he resided in the building since you have been

16  the owner of the building?

17             MR. MEYERS:  Objection, your Honor.

18      A    No.

19             THE COURT:  Overruled.

20             MR. MEYERS:  This is not an address that he's

21         even discussed.

22             MR. CARROLL:  It most assuredly is.

23             THE COURT:  Objection's overruled.

24      Q    Did there ever come a time when you had a

25  conversation with Mr. O'Hara regarding his association with

35

1                     Lozano - Direct/Carroll

2    the building?

3              Did Mr. O'Hara ever speak to you about the

4    building?

5        A    He told me that he --

6        Q    Did he ever speak to you about the building?

7        A    No.

8        Q    Did he ever come to you and talk to you --

9    Mr. O'Hara?

10       A    Yeah.  We spoke a few times.

11       Q    What did he say to you regarding the building, the

12   address?

13       A    That if his mail comes there, can I have it.  I say

14   yeah, you could have your mail.

15       Q    Did he ever state anything to you about how you

16   should respond if somebody asked if he lived there?

17       A    He said, "If somebody asks I live here, tell them I

18   live here."

19       Q    And how did you respond to that?

20       A    I said, "Well, if you want an apartment -- if you

21   want to rent a room, you could always rent a room."

22       Q    And did he ever rent a room?

23       A    No, sir.

24              MR. CARROLL:  I have no further questions of

25              this witness -- individual.

36

1                          Lozano - Direct/Carroll

2                    THE COURT:  You may inquire.

3                    MR. MEYERS:  Thank you, your Honor.

4      CROSS-EXAMINATION

5      BY MR. MEYERS:

6          Q    Mr. Lozano, how do you know Mr. O'Hara?

7          A    Well, he came by.  He came by, talked to the people

8      on the block.

9          Q    And the first time you met him was when?  Do you

10     remember?

11         A    I don't exactly remember the date.

12         Q    Would you say that it was five years ago?

13         A    No.  I don't know five years ago.  I didn't live

14     there five years ago.

15         Q    Would you say it was three years ago?

16         A    No, sir.

17         Q    Well, approximately when was the first time you met

18     Mr. O'Hara?

19         A    When I -- about '93 or '92, he came around.  He

20     looked -- he started talking to the people in the

21     neighborhood.

22         Q    Do you remember what he was talking about?

23         A    Yeah, he just -- I guess he was campaigning around

24     the neighborhood, and he told me if any mail's there for

25     him, and there was some mail there.  I gave it to him.

37

1                        Lozano - Cross/Meyers

2        Q     Did Mr. O'Hara know any of the other owners of this

3   property?

4        A     He knew Magaly Lucas, maybe.

5        Q     Did any of your fellow co-owners ever talk to you

6   about Mr. O'Hara?

7        A     No.   We might have a conversation in the

8   neighborhood, but that's about it.   I mean, you know,

9   conversation, you walk down the street and say, "What's up?

10  How you doing?"   And that was it.

11       Q     How many units are in the building?   Do you know?

12       A     There's three floors and the basement.

13       Q     And how many units are in the building?

14       A     There's one, two, three, four, five, six.

15       Q     Six units?

16       A     Six or seven, yes.

17       Q     Do you rent those unit out?

18       A     Yes.

19       Q     How many of those units are rented?

20       A     Right now, all of them.

21       Q     You live there also as well?

22       A     Yes.   That's including myself.

23       Q     What's including yourself?

24       A     Seven units, including myself.

25                   MR. MEYERS:   Your Honor, at this time, I don't

```
 1                    Lozano - Cross/Meyers
 2          have any further questions.
 3                    THE COURT:  Do you have anything further?
 4                    MR. CARROLL:  I have nothing further.
 5                    THE COURT:  You may step down, sir.
 6                    MR. CARROLL:  Our next witness, we have a lady
 7          from Brooklyn Union Gas, your Honor, who I said I
 8          would get in and out as quickly as I could.
 9                    If you could bring in the lady from Brooklyn
10          Union Gas.
11  J O A N    K L E P A C K I, 2502 East 19th Street, Brooklyn,
12          New York, called as a witness by the Petitioners,
13          having been duly sworn, testified as follows:
14                    THE CLERK:  May I have your full name and
15          address for the record.
16                    THE WITNESS:  Joan Klepacki, 2502 East 19th
17          Street, Brooklyn, New York, 11235.
18  DIRECT EXAMINATION
19  BY MR. CARROLL:
20      Q    Thank you for coming, Miss Klepacki.
21           Are you employed?
22      A    Yes.
23      Q    By whom?
24      A    Brooklyn Union.
25      Q    How long have you worked for them?
```

                        Klepacki-Direct/Carroll

1

2       A       Twenty-two years.

3       Q       What are your your responsibilities?

4       A       I'm an accounting clerk.

5       Q       In your capacity as an accounting clerk, are you

6   familiar with the books and records of Brooklyn Union Gas?

7       A       Yes.

8       Q       And did I -- are you responding to a subpoena

9   today?

10      A       Yes.

11      Q       And were certain documents asked to be produced

12  pursuant to that subpoena?

13      A       Yes.

14      Q       May I see them, ma'am?

15      A       Sure.

16              (Mr. Carroll hands to Mr. Meyers.)

17              MR. MEYERS:  Your Honor, at this time I have

18              no objection.  I reserving the right to object

19              after I see where counsel is going with this

20              information.

21              THE COURT:  I haven't heard anything yet.

22              MR. MEYERS:  Thank you, your Honor.

23              THE COURT:  Let me hear it.

24              MR. CARROLL:  Could we have these marked for

25              identification.

FORM C-100 - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

40

1                    Klepacki-Direct/Carroll

2                    THE COURT:  Mark it as Petitioners' Exhibit 2

3            for identification.

4                    MR. CARROLL:  Consisting of 19 pages.

5                    (Petitioner's Exhibit 2 for identification, so

6            marked.)

7      Q    Miss Klepacki, I'm going to you to show you the

8   documents which you just provided me and have been marked

9   for identification as Petitioners' Exhibit 2.

10           I believe you've already testified you're familiar

11  with the records of the Brooklyn Union Gas; is that correct?

12     A    Yes.

13     Q    Are these particular documents -- are these

14  particular documents part of the books and records of

15  Brooklyn Union Gas Company?

16     A    Yes, they are.

17     Q    And were these particular documents kept in the

18  normal course of business?

19     A    Yes.

20     Q    And were these particular records produced in the

21  normal course of business?

22     A    Yes.

23                   MR. CARROLL:  Your Honor, I would move the

24           introduction of these documents.

25                   MR. MEYERS:  Again, your Honor, I still

41

1                    Klepacki-Direct/Carroll

2              haven't heard where counsel's going with this.  I

3              won't object at this time.

4                    THE COURT:  Without objection, mark it

5              Petitioners' Exhibit 2 in Evidence.

6                    (Whereupon, Petitioners' Exhibit 2 for

7              identification was received in evidence.)

8         Q    Miss Klepacki, in the subpoena, we asked you to

9    research the service that was provided by Brooklyn Union Gas

10   at various addresses -- is that not correct -- and under

11   various account names; is that correct?

12        A    Right.  Uh-huh.

13        Q    And is that what these books and records report?

14        A    Yes.

15        Q    Is one of the addresses that we asked you to

16   research that of John Kennedy O'Hara at 579 61st Street,

17   Brooklyn, New York?

18              You're permitted to look at the document.

19        A    We have it listed as "John K. O'Hara" at 579 61st

20   Street, apartment 2-I in Brooklyn.

21        Q    And do your records indicate that Mr. O'Hara has an

22   account with Brooklyn Union Gas at that address?

23        A    Yes.  Uh-huh.

24        Q    And is that a currently valid account?

25        A    Yes, it's an active account.

42

1                          Klepacki-Direct/Carroll

2        Q     When did Mr. O'Hara first open his account with

3    Brooklyn Union Gas at 579 61st Street?

4        A     February 19th, 1990.

5        Q     Is that for apartment 2-I?

6        A     Yes.

7        Q     Did he have any previous accounts at that address,

8    for 579 61st Street?

9                    MR. MEYERS:   Objection.

10                   THE COURT:   Overruled.

11                   THE WITNESS:   That means I answer or I don't?

12                   THE COURT:   You may answer.

13       A     No.

14       Q     Do you have any records of an apartment 3-H at 579

15   61st Street?

16       A     Is the question do I have them here with me?

17       Q     Do you have records which indicate the existence of

18   an account at apartment 3-H at 579 61st Street or any other

19   accounts in the name of Mr. O'Hara at 579?

20       A     No.

21       Q     But you have just brought the records with respect

22   to apartment 2-I; is that correct?

23       A     Yes.

24       Q     We would ask you to, when you return to your

25   office, to research other apartments at 579 61st Street.

FORM C-100 - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

43

Klepacki-Direct/Carroll

1

2         But let me me go back to the other addresses.

3         Did we ask you to look for account information

4  regarding John Kennedy O'Hara at -- or John K. O'Hara at 553

5  47th Street?

6         A    Yes.

7         Q    And did your records reveal any accounts for

8  Mr. O'Hara at 553 47th Street?

9         A    No.

10        Q    Did we ask you to look for account information with

11  respect to Mr. O'Hara at 6017 -- six-zero-seventeen --

12  Fourth Avenue?

13        A    Yes.

14        Q    And did your research indicate any accounts for him

15  at that address?

16        A    No.

17        Q    Did we ask you to research any accounts for

18  Mr. O'Hara at 5617 Sixth Avenue?

19        A    Yes.

20        Q    And did your research indicate any accounts for him

21  at that address?

22        A    No.

23        Q    Finally, ma'am, we did also request that you

24  research an account for an individual other than Mr. O'Hara,

25  did we not?

1                    Klepacki-Direct/Carroll

2        A    Yes.

3        Q    And that was a Ms. Sandra Helverson,

4    H-e-l-v-e-r-s-o-n, at 519 47th Street; isn't that correct?

5        A    Yes.

6        Q    Did your research indicate any accounts for

7    Ms. Helverson?

8        A    No.

9             THE COURT:  519 47th?

10            MR. CARROLL:  Five-one-nine 47th Street.

11       Q    Regarding Mr. O'Hara's account at 579 61st Street,

12   which is the only account you found for him, is he current

13   in his payments with Brooklyn Union Gas?

14       A    Yes.  He has no balance due.  He's all paid up to

15   date.

16            MR. CARROLL:  Thank you very much.  I have no

17            further questions.

18            MR. MEYERS:  May I see the exhibit, please,

19            your Honor.

20            THE COURT:  Surely.

21            (Witness hands.)

22            MR. MEYERS:  This is the exhibit?

23            THE WITNESS:  Yes.

24            MR. MEYERS:  Thank you.

25   CROSS-EXAMINATION

45

1                          Klepacki-Direct/Carroll

2    BY MR. MEYERS:

3        Q    Miss Klepacki, these records that you produced

4    today, I notice that there is a certification at the

5    bottom.

6        A    Right.

7        Q    And it's dated 8/2/94.

8        A    Right.

9        Q    Were these documents printed on 8/2/94?

10       A    Yes.

11       Q    Did this come off of a computer?

12       A    Yes.

13       Q    Computer search?

14       A    Yes.

15       Q    Were there any manual records that you went

16   through?

17       A    No.

18       Q    Can you tell me how you obtained these records.

19            What did you physically have to do in order to

20   obtain them?

21       A    I scanned the records on our main-frame computer

22   and print them on the laser printer.

23       Q    So you type -- did you type in Mr. O'Hara's name

24   into a computer?

25       A    I typed in a search for the addresses requested.

46

1                          Klepacki-Cross/Meyers

2        Q     And I notice there are pages in here which bear

3    Mr. O'Hara's name specifically.  How did pages, such as this

4    one, appear (indicating)?

5        A     Once I reach the account number for Mr. O'Hara at

6    that address, I access the computer for billing information.

7        Q     And when you did that, this is what came up?

8        A     Uh-huh.

9        Q     Are you familiar with the billing practices and

10   with the way of opening up an account and closing an account

11   with -- it still says "Brooklyn Union Gas" on it, but

12   Brooklyn Union?

13       A     Yes.

14       Q     How would one go about opening up an account with

15   Brooklyn Union Gas, if they moved into an apartment?

16              MR. CARROLL:  Objection as to relevance.

17              THE COURT:  Oh, I'll take it.

18       A     They'd call the general information number and --

19   I'm not really sure.  I haven't done that job for a long

20   time and there may have been a change in procedures.  But

21   the last I heard, they'd call and --

22              THE COURT:  If you don't know, please don't

23          guess.  That's all I want to say.

24              THE WITNESS:  Okay.  I don't know.

25              THE COURT:  Okay.

1              Klepacki-Cross/Meyers

2      Q     How would one terminate their service with Brooklyn

3 Union Gas?

4      A     They'd call the general service telephone number

5 and request service disconnected at a certain date and give

6 instructions on how the serviceman can gain access to the

7 basement to turn off the meter; and they give us a

8 forwarding address for the final bill.

9      Q     Okay.  If Brooklyn Union Gas were never to receive

10 a request to cancel the Brooklyn Union Gas service, would

11 Brooklyn Union Gas, on its own, discontinue service -- I'm

12 not talking about for nonpayment; I mean just stop their

13 service for any reason?

14     A     Well, if there were a gas leak or some kind of

15 safety problem, they could turn the service off.

16     Q     So, hypothetically, someone could no longer reside

17 at a specific residence, but as long as Brooklyn Union Gas

18 was receiving checks, that name would still appear on the

19 billing information; is that correct?

20     A     Yes.

21     Q     Is there -- I'm going to hand you back these

22 records for a moment.

23            Is there any indication on here as to what type of

24 residence that is, whether it's a commercial, residence or

25 or office?  Or anything of that nature?

48

1                    Klepacki-Cross/Meyers

2      A    Yes, it's listed as an apartment in a multi-family

3  dwelling.

4      Q    Okay.  But is there any indication as to what the

5  actual use of that apartment is, from the records?

6                    MR. CARROLL:  Objection.

7                    I believe she's testified that it's a

8            residence.

9      A    Yes, this coding rate and "S.A." here, rate:  "8"

10  means residence and "80" means use for range only, cooking

11  range only.

12      Q    To the best of your knowledge, is it possible that

13  there could be a multi-family residence which there would

14  not be the name of every resident in that building obtaining

15  Brooklyn Union Gas service or having --

16                    MR. CARROLL:  Objection.

17                    THE COURT:  Objection sustained.

18      Q    To the best of your knowledge, is if possible that

19  in a multiple-dwelling someone would not receive a bill from

20  Brooklyn Union Gas?

21                    MR. CARROLL:  Objection.

22                    THE COURT:  Objection sustained.

23                    Anything else, Counselor?

24                    MR. MEYERS:  I'm just searching through the

25            evidence, your Honor, to see if there are any other

49

1                    Klepacki-Cross/Meyers

2          questions.

3                  The pages are not numbered, your Honor.  Let

4          me try to describe this document.

5                  THE COURT:  It's in evidence.

6                  MR. MEYERS:  It's in evidence.

7                  THE COURT:  Show it.

8      Q    I show you one of the pages from this, and it

9   indicates a closing of an account.

10          Can you please explain why there's a closing date

11  on that?

12                  THE COURT:  Whose account?

13                  MR. MEYERS:  Of John O'Hara.

14                  THE COURT:  All right.

15     A    You're referring to this account here

16  (indicating)?

17     Q    Yes.

18     A    Okay.  Our records indicate that John O'Hara

19  originally occupied apartment 2-I at 579 61st Street on

20  February 19th, 1990; and that account was closed on

21  June 13th, 1991 and then another account was opened for him

22  at the same premises on October 24th, 1991.

23                  THE COURT:  Is that the same apartment?

24                  THE WITNESS:  The same apartment, right.  So

25          there was a gap of about four months.

50

1                    Klepacki-Cross/Meyers

2      Q    From what you've produced today, is there a listing

3  for Sandra Helverson in here, other than what your statement

4  is?

5      A    No, I found nothing for her in our records at that

6  address, at 519 47th Street.

7                THE COURT:  The gap of four months was between

8            what dates, ma'am, according to that?

9                THE WITNESS:  Between June 13, '91.

10               THE COURT:  June 13, 1991 and?

11               THE WITNESS:  October 24, 1991.

12               THE COURT:  October 24th, 1991.  And

13           reinstated when?

14               THE WITNESS:  It was reinstated on

15           October 24th, 1991.

16               THE COURT:  Okay.

17               MR. MEYERS:  I have no further questions at

18           this time, your Honor.

19               THE COURT:  What apartment was that again that

20           you said, 2-I?

21               THE WITNESS:  Right.  Apartment 2-I.

22               MR. CARROLL:  I have no further questions of

23           this witness.

24               THE COURT:  You may step down.

25               (Whereupon, the witness was excused.)

51

1                        Klepacki-Cross/Meyers

2                    THE COURT:  Next witness.

3                    MR. CARROLL:  Yes, your Honor.

4                    Your Honor, our next witness is Ms. Ann

5            English.  She is a party.

6                    Ms. English.

7    A N N    E N G L I S H, a Petitioner herein, residing at 220

8            25th Street, Brooklyn, New York, called as a

9            witness by the petitioners, having been duly sworn,

10            testified as follows:

11                    THE COURT:  You may proceed.

12    DIRECT EXAMINATION

13    BY MR. CARROLL:

14        Q    Ms. English, are you a resident of the 51st

15    Assembly District?

16        A    Yes, I am.

17        Q    Do you, in fact, hold a party position in the 51st

18    Assembly District?

19        A    Yes, I do.

20        Q    What is that position?

21        A    Democratic State Committeewoman.

22        Q    51st Assembly District is the district that an

23    individual named John K. O'hara is running for; is that

24    correct?

25        A    That's correct.

52

1                    English-Direct/Carroll

2        Q    Do you know Mr. O'Hara?

3        A    Yes, I do.

4        Q    How long have you known Mr. O'Hara?

5        A    Actually, it was, I believe, 1984, right in this

6    building.

7        Q    That you met him?

8        A    Yes.

9        Q    So you've known him for ten years.

10       A    Yes.

11       Q    When was the last time you saw Mr. O'Hara?

12       A    Sometime in 1993, either in -- it may have been in

13   November of '93 in San Juan, I think he was there.

14       Q    Ms. English, I'm going to show you -- well, first

15   I'm going to show it to my adversary (handing).

16            MR. MEYERS:  Does counsel want to admit this

17            as evidence?

18            MR. CARROLL:  Yes.

19            MR. MEYERS:  I'm going to object, your Honor.

20            MR. CARROLL:  Let's see if Miss English can

21            identify it.

22       Q    Miss English, do you recognize this photograph?

23       A    Yes, I do.

24       Q    And who is the male in that photograph?

25       A    That's John O'Hara.

1                    English-Direct/Carroll

2    Q    And is that a fair and accurate portrayal of

3  Mr. John O'Hara?

4    A    Absolutely.

5    Q    And you have known Mr. O'Hara for how many years?

6    A    Ten years.

7              MR. CARROLL:  Your Honor, I would move the

8              introduction of the photograph:

9              THE COURT:  Show it to counsel.

10             MR. MEYERS:  I object, your Honor.

11             I don't know what the purpose of introducing a

12             photograph of Mr. O'Hara is.

13             THE COURT:  It's for purposes of

14             identification.

15             MR. CARROLL:  It's for identification

16             purposes, your Honor.

17             THE COURT:  Is there anything other than a

18             photograph there?

19             MR. CARROLL:  We will be identifying the other

20             person in the photograph as well, your Honor.

21             MR. MEYERS:  I'm going to object, your Honor.

22             THE COURT:  Other than the people to be

23             identified, is there anything, any writing or

24             anything?

25             MR. CARROLL:  Absolutely not.

54

1                English-Direct/Carroll

2                MR. MEYERS:  There's nothing in here.

3                I object, your Honor.

4                THE COURT:  Let me see.

5                THE COURT:  Mark it Petioners' Exhibit 3 in

6           evidence, over objection.

7                You have your exception, Counselor.

8                MR. MEYERS:  Thank you, your Honor.

9                THE COURT:  That's only as to the

10          identification of Mr. O'Hara?

11               MR. CARROLL:  Mr. O'Hara.  That is correct,

12          your Honor.

13               (So marked.)

14     Q    Miss English, do you know the lady that is in the

15     photograph with Mr. O'Hara?

16               MR. MEYERS:  Objection.

17               THE COURT:  Overruled.

18     A    Yes, I do.

19     Q    And what is her name?

20     A    Her name is Vicki Lynn Guveiyian.  I believe I can

21     provide the spelling.  Guveiyian, G-u-v-e-i-y-i-a-n, Vicki,

22     L-y-n-n.

23     Q    How did you come to meet Ms. Guveiyian?

24     A    I met her through John O'Hara.

25     Q    Did Mr. O'Hara introduce you to her?

FORM C-100 - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1                    English-Direct/Carroll

2      A    Yes, he did.

3      Q    Did he identify her to you?

4      A    Yes, he did.

5      Q    What did he tell you about her?

6      A    "This is my girlfriend Vicki."

7      Q    Are you familiar with the appearance of Vicki

8   Guveiyian?

9      A    Yes, I am.

10     Q    Is this photograph a fair and accurate portrayal of

11  Vicki Guveiyian?

12     A    It certainly is.

13          MR. CARROLL:  Your Honor, we would move the

14          introduction as to Ms. Guveiyian as well.

15          MR. MEYERS:  Objection.

16          THE COURT:  Overruled.

17          Mark it, both photographs.  But they're marked

18          under one exhibit, Petitioner's Exhibit 3 in

19          evidence.

20          THE REPORTER:   It was already so marked your

21          Honor.

22          MR. CARROLL:  Mr. Meyer (handing).

23          MR. MEYERS:  (handing).

24     Q    Ms. English, I'm going to hand you a photograph and

25  I'll ask you to examine it.

1                    English-Direct/Carroll

2          Do you recognize the lady on my left in that

3    photograph?

4               MR. MEYERS:  Objection, your Honor.

5          Relevance.

6    A    Yes, I do.

7               MR. CARROLL:  Subject to --

8               MR. MEYERS:  Your Honor, there's been no

9          foundation for this.

10              THE COURT:  I don't know what the purpose is,

11         so I'm going to let him go.

12   Q    Who is that individual?

13   A    That is Maureen Steffenson.

14   Q    How long have you known Maureen Steffenson?

15   A    Off and on, five, six years.

16              THE COURT:  Let's hold it just for a moment.

17              How many people are you going to identify in

18         that?  Just her?

19              MR. CARROLL:  Just her.  We can identify the

20         others, but she's the only relevant one.

21              THE COURT:  She's the only relevant one?

22         Okay.  I wanted to know so we don't have to waste

23         time.

24              MR. CARROLL:  That's fine.

25              THE COURT:  Maureen who?

57

1              English-Direct/Carroll

2              THE WITNESS:  Steffenson.

3    Q    Is that photograph a fair and accurate portrayal of

4    Ms. Steffenson?

5    A    Yes, it is.

6              MR. CARROLL:  I would move the introduction of

7         that photograph with respect to Miss Steffenson.

8              MR. MEYERS:  Objection.

9              THE COURT:  Objection is overruled.

10              Mark it Petioners' Exhibit 4 in evidence over

11         objection, and you have your exception, sir.

12              MR. MEYERS:  Thank you, your Honor.

13              (So marked.)

14              THE COURT:  Which one did you identify?

15              THE WITNESS:  The red-haired lady, far left

16         (indicating).

17              THE COURT:  I see.  Miss Steffenson is

18         identified -- would you kindly put an X on the body

19         you identified so we'll know who it is.

20              THE WITNESS:  (Complies) There.

21              THE COURT:  Thank you.

22         May I see it please.

23              THE WITNESS:  Sure (handing).

24              THE COURT:  Okay (handing).

25              MR. CARROLL:  Thank you, your Honor.

58

1             English-Direct/Carroll

2             I have no further questions of Ms. English.

3             THE COURT:  You may inquire.

4             MR. MEYERS:  Your Honor, I have no questions

5       at this time.

6             THE COURT:  You may step down.

7             (Whereupon, the witness was excused.)

8             MR. CARROLL:  Your Honor, I have some

9       documents I'd like to put in.

10            THE COURT:  Let's get them all in.  Go ahead.

11            What do you have?

12            MR. CARROLL:  Your Honor, this is our copy of

13      the petition pursuant to your instructions this

14      morning.  We brought a copy in.

15            This is Democratic Party Designating Petition

16      of John Kennedy O'Hara showing a residence address

17      of 6017 Fourth Avenue.

18            THE COURT:  Designating petition of O'Hara.

19            What's the address?

20            MR. CARROLL:  6017 Fourth Avenue, Brooklyn,

21      11220.

22            Mr. Meyers, I'll show it to you.

23            I'd like to you to stipulate that that is the

24      petition or a copy of the petition.  The original

25      is with the Board of Elections.

FORM C-100 · LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

59

1          Proceedings

2          MR. MEYERS:  Your Honor, I haven't looked at

3     every single page, obviously, but I will take

4     Mr. Carroll's representation that this is a true

5     and accurate copy of the Democratic Party petition

6     in the 51st Assembly District for the candidate

7     John O'Hara.  And as discussed with your Honor

8     earlier in this morning's session, we'll stipulate

9     that this copy, while the line-by-line is being

10    performed at the Board, may be used for questioning

11    of witnesses in this matter.

12          However, I would like to reserve that in the

13    event that a dispute should arise as to any of the

14    photocopies in here, that that witness be held

15    until the actual petitions may be produced.

16          THE COURT:  With that understanding, we'll

17    mark it Petitioner's Exhibit 5 in evidence.

18          (So marked.)

19          THE COURT:  Next.

20          MR. CARROLL:  Your Honor, I have a series of

21    buff cards.  They are all certified by the Board of

22    Elections as being records of Mr. O'Hara's buff

23    cards.

24          THE COURT:  How many buff cards?

25          MR. MEYERS:  I have a series of four buff

60

1                Proceedings

2        cards.

3                THE COURT:  Buff cards, four.  You want to

4        mark it as one exhibit?

5                MR. CARROLL:  1A through D?

6                THE COURT:  Mark it 6-A, B, C and D.

7                MR. CARROLL:  And just for the record, 6-A --

8                THE COURT:  Petitioners' Exhibit 6-A in

9        evidence.

10               MR. CARROLL:  -- Is 6017 Fourth Avenue.

11               THE COURT:  6017 Fourth Avenue.

12               MR. CARROLL:  And it indicates that Mr. O'Hara

13       registered there on January 20th, 1994.

14               THE COURT:  Hold it.  O'Hara's registration,

15       what date?

16               MR. CARROLL:  January 20, 1994.

17               THE COURT:  Okay.

18               MR. CARROLL:  And that his previous address

19       was 553 47th Street.

20               THE COURT:  Previous address -- what was --

21       five?

22               MR. CARROLL:  553 47th Street.

23               MR. CARROLL:  6-B is a buff card for

24       553 47th Street and it indicates that he registered

25       on November 2, 1992.  And that his prior address

FORM C-100 - LASER   REPORTERS PAPER & MFG. CO   800-626-6313

61

1                    Proceedings

2      was 579 61st Street.

3              MR. CARROLL:  The third buff card is 5617

4      Sixth Avenue.

5              THE COURT:  That's 6-C in evidence.  What was

6      that address?

7              MR. CARROLL:  5617 Sixth Avenue.  And he

8      registered a registered at that address on June

9      20th, 1991.

10             THE COURT:  6/20/91.

11             MR. CARROLL:  And that also indicates his

12     previous address as 579 61st Street.  And 6-D is

13     579 61st Street, at which he registered on

14     December 14th, 1982.

15             THE COURT:  Registered what, 11 --

16             MR. CARROLL:  12/14/82.

17             THE COURT:  December.  December 14, '82 from

18     previous address?

19             MR. CARROLL:  It indicates a previous address

20     of 231 73rd Street.

21             THE COURT:  Is that it?

22             MR. MEYERS:  Your Honor, I might have an

23     objection.

24             THE COURT:  What objection could you have, if

25     these are buff cards from the Board of Elections,

62

1          Proceedings

2     unless you want somebody from the Board of

3     Elections to come in --

4          MR. MEYERS:  Your Honor, my objection is not

5     as to the veracity of these documents on their

6     face; it is to the relevance of these documents for

7     the time period that's involved.

8          Buff card C and D are admittedly -- and on the

9     face of these documents from -- dated 6/20/91, well

10    beyond the period that this trial encompasses and

11    also not at an address which is a claimed address

12    within the bill of particulars or within the

13    opening statement of Mr. Carroll.

14         MR. CARROLL:  They are clearly, most

15    assuredly, in the bill of particulars and Judge

16    Garry has already ruled on that.

17         But more importantly, your Honor, the case law

18    is absolutely clear, the residence for voting

19    purposes is your domicile, the place -- no matter

20    how often you might be absent from -- you intend

21    always to return to.  We intend to prove and

22    believe we've gone very far toward doing it; that

23    that is the Sixth Avenue address.

24         THE COURT:  Very well.

25         Anything else?

FORM C-100 - LASER   REPORTERS PAPER & MFG. CO.  800-626-6313

63

1          Proceedings

2          Objection is overruled, Counselor.

3          MR. MEYERS:  Please note my exception, your

4     Honor.

5          THE COURT:  You have your exception.

6          (Petitioners' Exhibits 6-A, B, C and D, in

7     evidence.)

8          MR. CARROLL:  Your Honor, the next document I

9     would like to introduce is a certified copy of the

10    Election Administration System voting history of

11    Mr. John O'Hara from the Board of Elections for the

12    last two -- four -- five elections, indicating

13    Mr. O'Hara voting from 553 47th Street at each

14    election from 11/3/92 through 11/2/93 during the

15    period in which the owner of the building says he

16    was not present at the building.

17          And this is a certified record of the Board of

18    Elections.

19          MR. MEYERS:  Your Honor, may I see

20    Petitioners' Exhibit 6-A through D to compare with

21    this evidence because it seems to be duplicative,

22    if it is what it purports to be.

23          MR. CARROLL:  Your Honor, it's not duplicative

24    because under the new scribe system, they no longer

25    sign the back of the buff card.  Now it is

FORM C-103 - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

64

1            Proceedings

2    necessary to get that document as opposed to just

3    looking at the buff card.

4            THE COURT:  Yes, I believe so.

5            MR. MEYERS:  Note my objection.

6            THE COURT:  Over objection, received as

7    Petitioners' Exhibit 7 in evidence.

8            MR. CARROLL:  Your Honor, would you like to

9    see it?

10           THE COURT:  Yes, I would.

11           MR. CARROLL:  Your Honor, I believe the

12   elections that they're talking about are two

13   general elections, a primary and a School Board

14   election.  I believe that's apparent from the

15   dates.

16           MR. KEEFE:  There's one more.  There's the

17   runoff for controller last year.

18           MR. CARROLL:  And the runoff for the

19   controller last year.

20           THE COURT:  The special election.

21           MR. CARROLL:  Correct, your Honor.

22           THE COURT:  All right.  Mark it Petitioner's

23   Exhibit 7.

24           (So marked.)

25           MR. CARROLL:  I have a certified copy of the

65

1          Proceedings

2     abstract of Mr. O'Hara's driving record which I'd

3     like to introduce indicating an address of 579 61st

4     Street; certified from New York State Department of

5     -- whatever -- Motor Vehicles.

6          MR. CARROLL:  Your Honor, I just want the

7     record to reflect that this document, it claims to

8     have been printed on 7/30, 1994, which was a

9     Saturday.

10         THE COURT:  What else is new?

11         MR. MEYERS:  I don't believe that the

12    Department of Motor Vehicles is in operation on

13    that day, so I don't know of the veracity of this

14    document.  So, therefore, I place an objection to

15    this document on the record.

16         MR. CARROLL:  Your Honor, it is a certified

17    copy of a document --

18         THE COURT:  Let me see it.

19         MR. CARROLL:  I don't know when it was

20    printed, but it is certified (handing to Judge.)

21         THE COURT:  They printed it at 3:41 on that

22    date, but it's a certified copy.  Therefore, since

23    it's a certified copy --

24         MR. MEYERS:  Is there a stamp on it, your

25    Honor, other than what's printed on the bottom?

66

1           Proceedings

2           THE COURT:  Only what's printed on the bottom,

3      plus a certification stamp here.

4           MR. MEYERS:  Is it a raised stamp, your

5      Honor?

6           THE COURT:  Yes.

7           MR. MEYERS:  I maintain my objection.

8           THE COURT:  You have your exception.

9           We'll mark it in evidence as Petitioner's

10     Exhibit 8.

11           (Petitioner's Exhibit 8 so marked.)

12           MR. CARROLL:  Your Honor, I have a certified

13     copy of the buff card of Ms. Sandra Helverson.

14     This is an individual who ultimately -- is a

15     subscribing witness, and it will ultimately become

16     relevant.

17           Mr. Meyers (handing.)

18           She is also a lady that the Brooklyn Union Gas

19     representative testified about.

20           MR. MEYERS:  No objection, your Honor.

21           THE COURT:  Without objection, mark it

22     Petitioner's Exhibit 9.

23           May I just take a look at it, please.

24           MR. CARROLL:  It shows a registration sometime

25     in June of this year, I believe, your Honor.

FORM C-100 · LASER  REPORTERS PAPER & MFG. CO.  800-826-6313

67

1                          Proceedings

2                THE COURT:  Mark it.

3                Is that it?

4                MR. CARROLL:  That's it for today, Judge.

5                THE COURT:  Recess until tomorrow morning,

6          9:45.

7                MR. MEYERS:  Thank you, your Honor.

8                (Whereupon, the hearing was adjourned to

9          August 4, 1994.)

10               (Continued on the following page.)

68

1

2  SUPREME COURT OF THE STATE OF NEW YORK
   COUNTY OF KINGS:   CIVIL TERM - PART 15
3  ----------------------------------------X
   DENNIS L. POL, LISA T. LOPEZ, and
4  FELIX W. ORTIZ,

5                         Petitioners,

6

7               -against-

8  THE BOARD OF ELECTIONS In The CITY
   OF NEW YORK and JOHN K. O'HARA,
9
                         Respondents
10 ----------------------------------------X
   Index # 23414/94              Hearing
11 ----------------------------------------X
   In the Matter of the Application of
12 ANN ENGLISH,

13                   Objector-Petitioner,

14
                   - against -
15

16 JOHN K. O'HARA, Member of the Assembly
   From the 51st Assembly District, Kings
17 County, New York State,

18                         Candidate

19            - and -

20 BOARD OF ELECTIONS IN THE CITY OF NEW
   YORK,
21
                         Respondents,
22 ----------------------------------------X

23                     360 Adams Street
                       Brooklyn, New York
24                     August 4, 1994

25
                (Continued on the following page.)

69

1

2

B E F O R E:

3

HONORABLE IRVING S. ARONIN,

4

Justice

5

6          (Appearances same as previously noted.)

7

MARK L. BOWIN

8          Official Court Reporter
-  -  -  -  -

9

10          THE COURT:  Ready to proceed?

11          MR. CARROLL:  We are ready to proceed, your

12    Honor.

13          MR. MEYERS:  I'm ready, your Honor.  Your

14    Honor, before we begin, I just have two requests.

15          THE COURT:  Go ahead.

16          MR. MEYERS:  First yesterday there were three

17    witnesses -- four witnesses, one of them being a

18    party, and I would like to see the subpoenas that

19    were issued to the witnesses that testified.  I

20    don't know if Mr. Carroll turned them over to the

21    Court.

22          THE COURT:  I don't have them.

23          MR. CARROLL:  I didn't turn them over to the

24    Court.  They produced themselves pursuant to

25    subpoena, and I don't see what the relevance is.

69

1

2    B E F O R E:

3                          HONORABLE IRVING S. ARONIN,

4                                              Justice

5

6         (Appearances same as previously noted.)

7

8                          MARK L. BOWIN
                      Official Court Reporter
                      -   -   -   -   -

9

10        THE COURT:  Ready to proceed?

11        MR. CARROLL:  We are ready to proceed, your

12    Honor.

13        MR. MEYERS:  I'm ready, your Honor.  Your

14    Honor, before we begin, I just have two requests.

15        THE COURT:  Go ahead.

16        MR. MEYERS:  First yesterday there were three

17    witnesses -- four witnesses, one of them being a

18    party, and I would like to see the subpoenas that

19    were issued to the witnesses that testified.  I

20    don't know if Mr. Carroll turned them over to the

21    Court.

22        THE COURT:  I don't have them.

23        MR. CARROLL:  I didn't turn them over to the

24    Court.  They produced themselves pursuant to

25    subpoena, and I don't see what the relevance is.

70

1              Proceedings

2      They produced themselves and they testified.

3              THE COURT:  So apparently you don't have them

4      with you.

5              MR. CARROLL:  I don't have them.

6              THE COURT:  So let's proceed.

7              MR. MEYERS:  My second request, your Honor,

8      pursuant to Judge Garry's order, I have subscribing

9      witnesses here today in the Court.  Two of them,

10     Rebecca Velez and Elizabeth Galarza, are here with

11     children; and I don't want to tell Mr. Carroll how

12     to try his case, but I just wanted to request they

13     go as soon as possible.

14             THE COURT:  Can you get to them as early as

15     possible?

16             MR. CARROLL:  I will take those two first,

17     your Honor.

18             THE COURT:  Okay.  Let's get the next witness,

19     then.

20             MR. CARROLL:  If we could have, I guess,

21     Elisabeth Galarza and anybody who is a witness --

22             THE COURT:  Is there anybody in the courtroom

23     who is a witness?  If you are, please wait

24     outside.

25     E L I S A B E T H   G A L A R Z A, residing at 441

71

Proceedings

48th Street, Brooklyn, New York, called as a

witness by the Petitioners, having been duly

sworn, testified as follows:

    THE CLERK:  Please state your name and address

for the record.

    THE WITNESS:  Elisabeth, E-l-i-s-a-b-e-t-h,

Galarza, 441 48th Street, Brooklyn, New York.

DIRECT EXAMINATION

BY MR. CARROLL:

    THE COURT:  You may proceed.

Q   Thank you for coming, Miss Galarza.

    Do you know a gentleman by the name of

John K. O'Hara?

A   Yes, I do.

Q   Could you speak up.

A   Yes, I do.

Q   And how do you know him?

A   I met him at a barbecue.

Q   How long ago?

A   (No response.)

Q   Was it this year?

A   Yes.

Q   It was this year.  It was a barbecue.

    Does that mean it was in the warm weather?

72

1                          Galarza-Direct/Carroll

2        A    Yes, it was.

3        Q    April?  May?  June?

4        A    No, it was in June.

5        Q    In June.  Okay.  And you met Mr. O'Hara for the

6    first time in June of 1994.

7        A    Uh-huh.

8        Q    Did there come a time when you decided to carry

9    Democratic Party designating petitions for Mr. O'Hara?

10            Did you circulate a Democratic Party petition for

11   Mr. O'Hara, go door to door or --

12       A    Yes, I did.

13       Q    And who asked you to do this?

14       A    Nobody asked me.  It was something I wanted to do.

15       Q    Did Mr. O'Hara ask you to do it?

16       A    No.

17       Q    How did you come to volunteer to collect the

18   petition signatures?

19       A    Through a friend.

20       Q    Who was that friend?

21       A    Maureen Steffenson.

22       Q    Maureen Steffenson.  Ma'am, do you have any idea

23   how many signature you collected for Mr. O'Hara?

24       A    About 100, 130.

25            MR. MEYERS:  Your Honor, I can't --

73

Galarza-Direct/Carroll

2          THE COURT:  Miss Galarza, you'll have to speak

3      up so that everybody can hear.  Please.

4          THE WITNESS:  Okay.

5    Q    And what was your practice when you went out to

6  collect signatures?  Did you go out during the day?  Did you

7  go out during the the evening or did you do both?

8    A    Both.

9    Q    Went out during the day and during the evening.

10   A    Yes.

11   Q    Now, I see you brought your children with you today

12  to court.  Did they go with you when you were petitioning?

13   A    Yes.

14   Q    They did.  So they went --

15   A    Sometimes.

16          (A woman entered the courtroom.)

17   Q    Sometimes they did, okay.

18        I'm going to show you a series of sheets in a

19  document which has been marked as Petitioners' Exhibit 5 in

20  evidence, okay, and I'm going to ask you a few questions

21  about those sheets, if you don't mind, ma'am.

22          MR. MEYERS:  Can we have the page numbers,

23      sir?

24          MR. CARROLL:  Yes, I'm going to give you the

25      page numbers; certainly.

74

1                    Galarza–Direct/Carroll

2      Q    The first page I'd like you to look at,

3   Miss Galarza, is page 51 of Petitioner's Exhibit 5

4   (handing), and I ask you to take a look at that sheet.

5            Is that your signature at the bottom of the page?

6                 MR. MEYERS:  Objection, your Honor.

7                 Your Honor, the bill of particulars submitted

8            by petitioner includes one, two, three, four

9            sheets, none of which is the sheet which he's

10           presenting now.

11                Let me just clarify.  Four sheets that bear

12           the name of Elizabeth Galarza, none of which is the

13           sheet which counsel purports to show to

14           Miss Galarza right now.

15                MR. CARROLL:  All right.  We'll restrict

16           ourselves to those four sheets listed in the bill

17           of particulars.

18                MR. CARROLL:  Miss Burnett, witnesses are not

19           permitted to sit in the courtroom until they give

20           testimony.  Thank you.

21                (Whereupon, a woman left the courtroom.)

22                MR. CARROLL:  Would you bear with me a second,

23           Judge.

24      Q    Miss Galarza, I'm going to show you in Exhibit

25   Number 5 in evidence, petition page 90, and I ask you to

75

                    Galarza-Direct/Carroll

1

2      take a look at that sheet.

3              Do you recognize it?

4      A      Uh-huh.

5      Q      Is that your signature at the bottom of the page?

6      A      Yes, it is.  Yes.

7      Q      Okay.  And on what day did you collect these

8      signatures?

9      A      On June 10th.

10     Q      And did you witness it on the same day?

11     A      Yes, I did.

12     Q      What was the procedure in terms of witnessing it?

13     How did you go about filling out the bottom?  Did anyone

14     assist you in doing that?

15     A      I was explained in the beginning how to do the

16     forms and how to go about doing the petitions.

17     Q      And who explained this to you?

18     A      One of the people that does the petitions.

19             MR. MEYERS:  Your Honor, I can't hear the

20             witness.

21             THE COURT:  Can you kindly speak up, please,

22             so everybody can hear you.

23             THE WITNESS:  Okay.

24     A      One of the people that was in charge of the

25     petitions.

76

1                          Galarza-Direct/Carroll

2        Q       And who was that?

3        A       I can't recall how to say the name.  First, last

4   name.  Her first name is Kathy.

5        Q       It's a woman, obviously?

6        A       Uh-huh.

7        Q       Was it a young woman or an older woman?

8        A       Young woman.

9        Q       Okay.  You say you can't remember how to pronounce

10  her name.  Do you know how to spell it?  Would you know how

11  to spell her name?

12       A       I don't know how to say her name.

13       Q       Phonetically?  Do you know what the first letter of

14  her last name was?

15       A       I don't know -- P, probably.

16       Q       Now, I see that there are signature here collected

17  on 16th Street in Brooklyn.  Do you remember being on that

18  block?

19       A       Yeah.

20       Q       Do you remember where it was?

21       A       Yes.

22       Q       Where on 16th Street was this?

23       A       Fifth -- 300 -- it's between -- was it Fifth and

24  Sixth and -- between Fifth and Sixth.  The numbers are

25  different.  They run differently.

77

1              Galarza-Direct/Carroll

2      Q     All right.  The last two signatures on the page,

3   lines 9 and 10?

4      A     Uh-huh.

5      Q     Do you remember the individuals who signed those

6   signatures?  Do you remember taking those two signatures?

7      A     I remember taking all the signatures that I signed

8   for, but I --

9      Q     Well, do you remember that Carroro and Ben Carroro

10  (phonetic)?

11     A     I won't remember what they -- it's been so many

12  people I've seen, I don't remember what they looked like.

13     Q     Were there, in fact, two separate people, ma'am?

14     A     Yes, they were.

15     Q     You're sure it wasn't one person signing for the

16  other on Carroro?

17     A     No.

18     Q     So you saw two separate people; that's your

19  testimony.

20     A     Uh-huh.

21              MR. MEYERS:  Objection.

22              Asked and answered.

23              THE COURT:  We'll take it.  It's cross.  It's

24         a hostile witness.

25     Q     Ma'am, I'd like to take you to page number 227 of

78

Galarza-Direct/Carroll

1

2    this petition.

3             THE COURT:  May I see that petition, please.

4             MR. CARROLL:  Sure.  This is page number 90.

5             THE COURT:  That's the one I want to see.

6             THE COURT:  Go ahead.

7    Q    Page 227, ma'am, of Exhibit number 5; is that your

8    signature at the bottom?

9    A    Yes, it is.

10            THE COURT:  June 27?

11            MR. CARROLL:  June 27.

12   Q    And do you recall collecting those signatures?

13   A    Yes, I do recall.

14   Q    And is it your testimony that each and every one of

15   the people on this page appeared before you, before you

16   signed that petition?

17   A    Yes.

18   Q    In terms of filling out the witness statement, when

19   was the information that is set forth in the statement of

20   witness -- other than your signature -- filled out?  Was

21   that filled out before you signed it?

22   A    I filled out everything there.

23   Q    So that's all in your your hand (indicating)?

24   A    Yes, it is.

25   Q    I'd like you to take a look, ma'am, at page 229 of

79

1                   Galarza-Direct/Carroll

2    this petition.  Once again, is that your signature at the

3    bottom of the page?

4        A    Yes.  Yes, it is.

5        Q    And it's your testimony that you filled out the

6    witness statement?

7        A    Yes.

8        Q    Is that your handwriting in the witness statement?

9        A    Yes, it is.

10       Q    Now, on 229, ma'am, I'd like you to look

11   specifically at lines 6 and lines 8.  First at line 6.

12            Do you recall this individual signing for you

13   (indicating)?

14       A    Yes.

15       Q    And what is that gentleman's name?

16       A    Steven Day (phonetic).

17       Q    And on line 9, ma'am, do you recall that gentleman

18   signing for you?

19            And I won't even try to ask you what the name is.

20            MR. MEYERS:  Objection.

21            Your Honor, there's no signature on there.

22       A    There's no signature there.

23            MR. CARROLL:  Excuse me.  Line 8

24            (indicating).

25       A    Lucy Fagaro (phonetic).

FORM C-100 - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

80

1                    Galarza-Direct/Carroll

2      Q    And do you remember her signing for you, ma'am?

3      A    Yes.

4      Q    And it's your testimony that that is the testimony

5  (sic) of Lucy Fagaro?

6      A    Yes.

7      Q    Okay.

8                MR. CARROLL:   (Handing to Court.)

9                THE COURT:   Okay (handing).

10     Q    Now, with respect to line number 8, ma'am, would it

11 surprise you to learn that that individual's name is not

12 Lucy Fagaro but Lucy Figueroa (phonetic)?

13               MR. MEYERS:   Objection.

14     A    I might say it differently.

15               THE COURT:   Hold it.

16               Objection sustained.

17               MR. CARROLL:   Withdraw the question, your

18         Honor.

19     Q    Okay.  Let's turn to page 230.

20          Once again, ma'am, this is your signature at the

21 bottom of the page?

22     A    Yes.

23     Q    And, specifically, had I ask you to take a look at

24 signatures on lines 2, line 3 and line 4?

25     A    Uh-huh.

81

Galarza-Direct/Carroll

1

2      Q      Do you recall collecting those signatures?

3      A      Yes.

4      Q      And whose is the signature on line two

5   (indicating)?  If you can recognize it.

6      A      It looks -- I don't know.

7      Q      But you specifically recall collecting the

8   signatures on lines 2, 3 and 4.

9      A      Yes.

10     Q      And you witnessed this petition on the same day you

11   collected the signatures?

12     A      Yes.

13     Q      And that day was July 8th.

14     A      Right.

15             MR. CARROLL:  Okay.  Thank you, ma'am.

16             I have no further questions of this witness.

17             THE COURT:  Any other questions?

18             MR. MEYERS:  I have no questions, your Honor.

19             THE COURT:  No questions.

20             You may step down, ma'am.

21             (Witness excused.)

22             MR. MEYERS:  Your Honor, the other S.W. that

23          has children here is Rebecca Vales.

24             MR. WEISS:  (Speaking from gallery.) Your

25          Honor, for the record, one of the objectors, Anne

82

Galarza-Direct/Carroll

1

2       English -- my name is Peter Weiss.  My address is

3       112 Marlboro Road, Brooklyn, New York, 11226.

4               She understands that yesterday a motion was

5       made to disqualify her attorney, Mr. Dunbar, and

6       she asked me this morning to act as her counsel in

7       this matter.

8               THE COURT:  I see.  I was under the impression

9       that we were proceeding on one of the petitions at

10      this time -- one of the petitioners at this time

11      was proceeding on the petition -- Pol -- we're

12      proceeding on Pol.  They're being tried together, I

13      guess.

14              MR. WEISS:  I believe these two matters were

15      joined for trial purposes by Judge Garry, and since

16      Mr. Dunbar wasn't here when that motion was made

17      and his motion was originally made before and he

18      denied it.

19              THE COURT:  That motion was made originally

20      before Judge Garry?

21              MR. WEISS:  It was.  She called me and asked

22      me to step in as her counsel in this matter.  I

23      will agree that Mr.  --

24              THE COURT:  Do you have any objections to

25      that.

83

1            Proceedings

2            MR. MEYERS:  Your Honor, I have no objections

3        to Mr. Weiss being present, though I would object

4        to his participation in this matter, since it had

5        already been agreed when trial thirty started with

6        Mr. Carroll being the counsel.

7            MR. WEISS:  Lead counsel.  I have no objection

8        with Mr. Carroll being lead counsel, but there may

9        be a point --

10           THE COURT:  I think we'll permit him to do so,

11       in light of the fact that Judge Garry at first

12       denied the motion and also in light of the fact

13       that Mr. Dunbar wasn't here at the time the motion

14       was made.  It was basically done on consent.

15           However, if the Petitioner does want

16       representation, I think she should be entitled to

17       it.  So you may assist.

18           But let's understand this; that the lead

19       counsel, I suspect, on both cases will be

20       Mr. Carroll.

21           MR. WEISS:  That's true, your Honor.

22           THE COURT:  And if there's any questions you

23       want to pose, why don't you do it through

24       Mr. Carroll and make it easier.

25           MR. WEISS:  Fine.

84

```
 1              Proceedings
 2              MR. MEYERS:  Thank you, your Honor.  That's
 3         agreeable to me.
 4              THE COURT:  Pull up a chair.
 5              MR. WEISS:  I'm going to Judge Garry, your
 6         Honor.
 7              THE COURT:  I'm glad you substituted.
 8              MR. WEISS:  I'll be back.
 9              (Whereupon, Mr. Weiss left the courtroom.)
10  R E B E C C A   V A L E S, residing at 454 Third Avenue,
11         Brooklyn, New York, called as a witness by the
12         Petitioners, having been duly sworn, testified as
13         follows:
14              THE CLERK:  State and spell your name for the
15         record.
16              THE WITNESS:  My name is Rebecca,
17         R-e-b-e-c-c-a, Vales, V-a-l-e-s, 454 Third Avenue,
18         Brooklyn, New York.
19              THE COURT:  You may proceed, Counselor.
20              MR. CARROLL:  Thank you, your Honor.
21              Thank you for coming, Miss Vales.
22  DIRECT EXAMINATION
23  BY MR. CARROLL:
24       Q    Do you know an individual named John O'Hara?
25       A    Yes, I do.
```

FORM C-100 · LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

85

1                        Vales-Direct/Carroll

2       Q      And how did you come to meet Mr. O'Hara?

3       A      I was petitioning for a friend, name is Kathy, and

4   I was petitioning for her and she came by one day with the

5   kit, to bring me over the kit for the signatures, and he

6   happened to be in the car and I met him that day.

7       Q      Who is this Kathy?

8       A      Kathy Verte is a friend of mine.  I was next-door

9   neighbors with her.

10      Q      She's the one who asked you to petition for

11  Mr. O'Hara?

12      A      Yes.

13      Q      Now, Miss Verti is the one who asked you to carry

14  the petitions for Mr. O'Hara?

15      A      Yes, she did.

16      Q      And you had never met Mr. O'Hara before?

17      A      No.

18      Q      Do you know how many signatures you collected for

19  Mr. O'Hara?

20      A      Maybe about a hundred or so.

21      Q      Did you do this as a volunteer?

22      A      Yes, Kathy's a very good friend of mine.

23      Q      Were you paid anything for collecting signatures?

24      A      No.

25      Q      Ma'am, I'm going to show you a series of pages in a

86

1                          Vales-Direct/Carroll

2    Democratic Party designating petition that has been marked

3    as Petitioners' Exhibit 5 in evidence, okay.

4              Ma'am, the first page I'm going to to show you is

5    page number 81.  And before we get to that, what was your

6    practice in terms of collecting signatures?  When did you go

7    out to get them?

8         A    I went out every chance I could, like, after work

9    and stuff on the weekend.

10        Q    Do you work during the day, usually?

11        A    Yes.

12        Q    You have a job?  What are your normal hours in your

13   job?

14        A    Nine to five.

15        Q    So you would have had to collect the signatures in

16   the evening when you came home from work.

17        A    Right.

18        Q    Unless it was a weekend.

19        A    Right.

20        Q    Now, the first page I'm going to ask you to look

21   at, ma'am, is page number 81 of the petition, and I ask you

22   to take a look at that petition and tell me whether or not

23   you recall -- first whether or not you're the individual who

24   witnessed the petition.

25        A    Yes, I am.

87

1                           Vales-Direct/Carroll

2          Q      And do you recall collecting those signatures?

3          A      Yes, I do.

4          Q      And could you just tell me the date on which they

5    were collected?

6          A      June 28th.

7          Q      And that's the day you witnessed the petition as

8    well.

9          A      Right.

10         Q      Who filled out the information in the statement of

11   witness?

12         A      I did.

13         Q      That's all your handwriting.

14         A      Yes.

15         Q      Let's take a look at page 117 of the petition.

16   Okay.  This is also one of your petitions that you

17   witnessed?

18         A      Yes, sir.

19         Q      And the date that that was collected is also

20   June 28th, isn't it?

21         A      Yes, it is.

22         Q      And the number of signatures on this page is how

23   many?  Is it ten?

24         A      Ten.

25         Q      And just for the record, back on page 81, which we

88

1                          Vales-Direct/Carroll

2    spoke about before, how many signatures are on that page?

3        A     Ten.

4        Q     Now, let's turn to page 107, if we could.

5                      THE COURT:  The last page was 117?

6                      MR. CARROLL:  117, Judge.

7                      MR. MEYERS:  Objection, your Honor.

8                      It's not in the bill of particulars.

9                      MR. CARROLL:  It is in the bill of

10               particulars.  But we'll come back to it --

11                      MR. MEYERS:  117 or 107?

12                      MR. CARROLL:  107 is what I said.  We'll come

13               back to it in a second.  Page number 136 -- I think

14               it's in the bill of particulars in another

15               location.  We'll show you.

16                      MR. MEYERS:  I apologize.

17                      THE COURT:  136?

18                      MR. CARROLL:  136.

19        Q     Page number 136.  Are those your signatures, again?

20        A     Yes, it is.

21        Q     And the day you collected those signatures, that's

22    also June 28th, isn't it?

23        A     Right.

24        Q     And you witnessed them again on June 28th?

25        A     Right.

89

1                          Vales-Direct/Carroll

2        Q    And how many signatures are on that page?

3        A    Ten.  You got to consider also --

4        Q    I'm just going to ask you some questions, ma'am,

5   okay?

6        A    All right.

7        Q    Let's go down to page number 160.  Page number

8   160.  Is that one of your sheets again, ma'am?

9        A    Yes, it is.

10       Q    And all of those signatures were witnessed on

11   June 28th also, weren't they?

12       A    Yes.

13       Q    And how many signatures are on that page?

14       A    Ten.

15       Q    And let's go to page number 180.  Page number 180.

16   Those your signatures again, ma'am?

17       A    Yes, it is.

18       Q    And how many signatures are on that page?

19       A    Ten.

20       Q    And they're all collected on June 28?

21       A    June 28.

22       Q    And there are ten signatures once again?

23       A    Ten signatures.

24       Q    Let's go to page number 188.  Number 188, 6/28

25   again, correct?

1                    Vales-Direct/Carroll

2      A      Uh-huh.

3      Q      Are those your signatures?

4      A      Yes, it is.

5      Q      You witnessed that page.

6      A      Yes.

7      Q      And the number of signatures on that page?

8      A      Ten.

9      Q      Ten again.

10            Now, let's just focus for a second on all of these

11     signatures that you collected on 6/28.

12            On page number 188, we have a series of addresses

13     from 16th Street, 17th Street, Prospect Avenue and then one,

14     two, three, four, five addresses from Seventh Avenue.

15     A      Right.

16     Q      How did you collect these signatures, did you go

17     door to door?

18     A      Door to door.

19     Q      Door to door.

20            Okay.  Let's go back to page number 180.  Okay.

21            Once again, did you collect these signatures door

22     to door?

23     A      Uh-huh.

24     Q      Door to door.

25     A      Door to door.

91

1                          Vales-Direct/Carroll

2       Q    Back to page number 160.  Page number 160.

3            Once again, if you'd like at those addresses, how

4    did you collect those?

5       A    I went door to door.

6       Q    Door to door.  Okay.

7            Page number 136, once again, if you'd look at those

8    addresses; is that door to door, also?

9       A    Door to door.

10      Q    Page number 117.  Would you look at those

11   addresses.

12      A    Uh-huh.

13      Q    How did you collect those, ma'am?

14      A    Door to door.

15      Q    Door to door.  Okay.  Then page number 81.  How did

16   you collect those, ma'am?  Look at the addresses.

17      A    Door to door.

18      Q    Once again, door to door.  So, ma'am, on page

19   number 81 on June 28th, you collected ten signatures door to

20   door.

21           On page number 117, on June 28th you collected ten

22   signatures door to door.

23           On page number 136 on June 28th, you collected ten

24   signatures door to door.

25           On page numbered 160 --

92

Vales—Direct/Carroll

1

2          MR. MEYERS:  Objection.

3          Your Honor, the document speaks for itself.

4          THE COURT:  Not only it speaks for itself;

5          she's testified.  You don't have to repeat it.

6     Q    Ma'am, you've testified you're employed?

7     A    Yes.

8     Q    And you work nine to five?

9     A    Yes, I do.

10    Q    Do you know what day of the week June 28th was?

11    A    It was on a Wednesday or a Thursday.

12    Q    Did you collect these all in the evening?

13    A    No, during the day.

14    Q    You took that day off to collect signatures?

15    A    No, I was on vacation till about July the 8th.

16         THE COURT:  Anything else?

17         MR. CARROLL:  Oh, yes, absolutely, your

18         Honor.

19    Q    On page number 3 of in petition dated 6/27.

20    A    Uh-huh.

21    Q    That is your signature at the bottom?

22    A    Yes.

23    Q    I ask you to look specifically at line number 1.

24    Do you recall getting that signature?

25    A    Yes, I did.

93

1                        Vales-Direct/Carroll

2        Q    From a Mr. Lauderbach (phonetic)?

3        A    Yes, I did.

4        Q    I ask you also to look at signatures number two and

5    three from a Mary Elizabeth Leo (phonetic) and a Vito John

6    Leo (phonetic).

7             Do you recall getting those two signatures?

8        A    Yes, I do.

9        Q    Did two people actually sign or was it one signing

10   for the other?

11       A    It was two people.

12       Q    It's two separate people who signed that petition.

13       A    Right.

14            MR. CARROLL:  Your Honor, may I show the Court

15            those signatures.

16            THE COURT:  Yes.  I'll look at them.

17            MR. CARROLL:  On lines 2 and 3 (handing).

18            THE COURT:  Okay.

19       Q    Ma'am, if we could turn to page 10 of the petition,

20   now, these are the signatures of a Michael or -- and Barbara

21   Vale (phonetic); that's on line 6 and 7.  If you could look

22   at lines 6 and 7 of the petition.

23            These individuals are not related to you in any

24   way, are they?

25       A    No.

94

1                    Vales—Direct/Carroll

2    Q    Do you recall getting those two signatures?

3    A    Yes, I do.

4    Q    They were two separate individuals who signed?

5    A    Yes, this is the project.  I went with people.  I

6    didn't go on my own.

7    Q    When you say you went with people, tell me how you

8    did that.

9    A    Actually, I went on my own.  It was a Saturday

10   morning.  It was about twelve o'clock.

11   Q    You were there alone --

12   A    I was heading headed towards the project.  It was a

13   Saturday morning, okay.  I figured:  Let me get some

14   signatures now.  Went up towards the project.  That's right

15   up the block from where I am, on Tenth.  I live on Ninth.  I

16   went up the block to get signatures from the people in the

17   the project.

18       I met a friend Ray and his wife coming out of the

19   building.  He said:  What am I doing here?  I said I'm

20   collecting signatures for John O'Hara, because there's a lot

21   of people in the projects; I figured I'd get a lot of

22   signatures.

23       He said, you shouldn't be up in the projects on

24   your own.

25       I got a little nervous, you know, projects, so he

95

```
 1                    Vales-Direct/Carroll

 2    went around with me and he knocked on the doors.  I stood

 3    with his wife and we were talking and he was getting

 4    signatures.

 5         Q    Were you physically present when these signatures

 6    were collected?

 7         A    Yes, I was.

 8         Q    Where were you?

 9         A    If the door was here, I was, like, right here

10    talking with his wife.

11         Q    Now, do you recall Mr. and Mrs. Vale (phonetic)

12    signing this petition?

13         A    Yes, I do.  Can't remember the people on all the

14    floors.  I can't actually remember --

15         Q    It's your testimony this is in fact two different

16    people signing this petition and not one person signing for

17    another?

18         A    Two people.

19                    MR. CARROLL:  Your Honor, may I show these

20              signatures to the Court.  That's on lines 6 and 7

21              (handing).

22                    THE COURT:  (Handing).

23         Q    Let's move to page 107, ma'am, if you can.  Excuse

24    me.  To page 43.

25                    THE COURT:  Page what?
```

96

1                    Vales-Direct/Carroll

2                MR. CARROLL:  43, Judge.

3      Q    Once again, this is one of your sheets; is it not?

4      A    Yes, it is.

5      Q    Once again, I ask you to take a look at lines 6

6    and 7.

7      A    Right.

8      Q    And I believe one is a Patricia Kenny (phonetic)

9    and the other is a --

10     A    Patrick.

11     Q    Patrick Kenny.

12          And is it your testimony that two separate people

13   signed that petition?

14     A    Yes, they did.

15               MR. CARROLL:  May we show those to the Court

16          as well, your Honor?

17               THE COURT:  Go ahead.

18               MR. CARROLL:  Thank you.

19     Q    Ma'am, I'm going to show you page number 107 of

20   this petition.  And, first, this is another one of your

21   pages; is it not?

22     A    Yes.

23     Q    And if you would, ma'am, would you take a look at

24   lines 6 and 7 of that petition.

25          Do you recall these people signing?

97

1                    Vales-Direct/Carroll

2        A    Yes.

3        Q    And that's what looks like a Cecilia and Joseph

4    Tragoli (phonetic.)

5        A    Yes.

6        Q    And it's your testimony that two separate people

7    signed --

8        A    Yes.

9                MR. MEYERS:  Objection.

10               Line 6 and 7 are not marked as evidence to be

11           produced at this trial by petitioner.

12               THE COURT:  Is the sheet marked?

13               MR. MEYERS:  The sheet is here but --

14               THE COURT:  I'll take it.

15               MR. MEYERS:  Note my exception.

16               MR. CARROLL:  Your Honor, may I show the

17           signatures on line 6 and 7, Tragoli (indicating)?

18               THE COURT:  Okay.  Get the buff cards.

19               MR. CARROLL:  We will.

20       Q    Ma'am, I also would like you to look at this

21   particular sheet -- that's page 107 at lines 9 and 10 --

22   Camilla and Hazelawn (phonetic) Griffith, and I'd like you,

23   while you're looking at those signatures, also to look at

24   page 172 of the petition, line 1.

25               THE COURT:  Which one are you looking at now?

98

1                    Vales-Direct/Carroll

2              MR. CARROLL:  We're looking at page 107 and

3         172, Judge.

4              THE COURT:  We already looked at 107.

5              MR. CARROLL:  We have two more signatures on

6         107, lines 1, 9 and 10.  And I would like those to

7         be looked at in connection with line 1 of page

8         172.

9    Q    Now, ma'am, page 107 was collected by you on 6/27;

10   is that correct?

11   A    Yes.

12   Q    And page 172 was also collected by you on 6/27,

13   correct?

14   A    Right.

15   Q    And you took the signatures of Camilla and Hazelawn

16   Griffith at 412 Prospect Avenue at the bottom of page 107;

17   that's lines 9 and 10, right; and a third member of the

18   Griffith family at the top of page 172 -- is that correct --

19   line number 1, Oliver Griffith, correct?

20   A    Right.

21   Q    Is it your testimony, ma'am, that three separate

22   people signed all three of those signatures or did one

23   person sign those signatures?

24   A    Three separate people.

25             MR. CARROLL:  May I show those to the Court,

99

1                    Vales-Direct/Carroll

2            your Honor?

3                    THE COURT:  Yes (indicating).

4                    We'll go over them all with the buff cards.

5                    MR. MEYERS:  We have two signatures at the

6            bottom of page -- we have two signatures at the

7            bottom of 107, I believe.  Is that the page,

8            Judge?  Yes, 107.  And then the signature at the

9            top of page 172.

10                   THE COURT:  You saw three people sign this?

11                   THE WITNESS:  A lot of times I gave them the

12           ballot --

13                   THE COURT:  I didn't ask that.

14                   You saw three people sign this?

15                   THE WITNESS:  Yes.

16       Q    You were starting to say a lot of times --

17       A    They ask for the person and they take the ballot.

18   I would never go into the house.

19       Q    They took the petitions into their house?

20       A    Yes.  I would never go into the house.

21       Q    These signatures were not signed in your presence?

22       A    I didn't actually see every person sign it if they

23   walked in with the ballot.

24       Q    If somebody asked you to walk into the house with

25   their petition, would you let them it do it?

100

1                        Vales-Direct/Carroll

2        A    I would let them take the petition if they have to

3   lean on a table or something.

4        Q    Then you wouldn't be able to see them sign?

5        A    Right.

6        Q    And you don't know if one person signed or three

7   persons signed, do you?

8        A    No.  But I would never walk in the house.

9        Q    Let's stay on page 172 for a second, ma'am.

10                  THE COURT:  Off the record.

11                  (Discussion off the record.)

12       Q    Ma'am, I would like you to look at page 172.  And I

13  believe we've already established that this is, in fact, one

14  of your sheets.

15       A    Yes.

16       Q    And you've already testified with respect to the

17  Griffiths --

18                  MR. MEYERS:  Objection.

19                  What she already testified to is in the

20          record.

21                  MR. CARROLL:  That's fine.

22       Q    If you would take a look at lines 3 and 4 of the

23  petition, ma'am.  Is it your testimony that these

24  signatures -- this is a Loretta and Joseph Brezinsky?

25       A    Brezinsky.

1              Vales-Direct/Carroll

2              MR. MEYERS:  Objection.

3     Q    Is it your testimony that two people signed this

4     petition?

5     A    Yes, as far as to my recollection.

6     Q    Do you recall whether or not you gave them the

7     petition and they took it inside?

8     A    Some people did take it inside and some didn't.

9     There are so many people --

10    Q    And you can't remember --

11             MR. MEYERS:  Objection.

12             He's leading the witness, your Honor.

13    Q    Ma'am, I'm going to show you lines nine and ten.

14             MR. MEYERS:  Objection, your Honor.

15             They're also not marked as being part of the

16             record.

17             THE COURT:  Is the sheet marked?

18             MR. MEYERS:  The sheet is made part of it,

19             your Honor, but it specifically states in the bill

20             of particulars that the only evidence that

21             they're --

22             MR. CARROLL:  We'll move on beyond lines 9 and

23             10.

24    Q    I'm going to take you to page number 188, ma'am.

25             (Person entered courtroom.)

102

1                    Vales-Direct/Carroll

2              THE COURT:  Is that a witness?

3              MR. CARROLL:  No, she's not, Judge.

4              THE COURT:  Do you have a page on that?

5              MR. CARROLL:  188, Judge.

6     Q    Okay, ma'am, we have -- I'd like you to take a look

7     at lines number 9 and 10 on page 180.

8              Is it your testimony that these two people signed?

9     A    Yes.

10    Q    Do you recall whether you -- whether they took the

11    petition inside or do you recall if you saw both of them?

12    A    I don't recall.

13    Q    So you don't recall if you saw both of them.

14    A    No.  I don't remember the peoples' faces with the

15    names.

16    Q    And those two people are Lillian and Alfred Monaco

17    (phonetic); is that correct?

18    A    Right.  Monaco.

19    Q    I ask you, ma'am, to look at -- and that is one of

20    your sheets.

21    A    Right.

22    Q    And it's dated 6/28?

23    A    Uh-huh.

24    Q    I'd ask you to take a look at page 180 of your

25    petition as well, ma'am, and look at lines number 8 and 9.

FORM C-100 - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1              Vales-Direct/Carroll

2          Are those also the signatures of Lillian and Alfred

3    Monaco?

4      A    (No response.)

5      Q    What do they appear to be?

6      A    Alfred Monaco and --

7      Q    No.   Above.   Is that not Lillian Monaco?

8      A    Right.

9      Q    And isn't that dated 6/28?

10     A    Yes.

11     Q    And isn't that at 483 Seventh Avenue?

12     A    Yes.

13     Q    And on page 188 -- also dated 6/28 -- you have the

14   signatures of Lillian and Alfred Monaco from 483 Seventh

15   Avenue?

16     A    Right.

17     Q    The signatures aren't the same, are they?

18     A    No, they're not.

19     Q    And they're both signed the same date; are they

20   not?

21     A    Uh-huh.

22          MR. MEYERS:   Objection.

23     Q    Do you have any explanation for that?

24     A    No.

25          MR. CARROLL:   May I show these two to the

104

1                     Vales-Direct/Carroll

2           Court, your Honor?

3                THE COURT:  Were there two different Alfred

4           Monacos and Lillian Monacos at that address?

5                THE WITNESS:  It's the same address.

6                THE COURT:  Do you recall, were two different

7           Lillian and Alfred Monacos at that address?

8                THE WITNESS:  No.

9                THE COURT:  You don't recall?

10                THE WITNESS:  No, I don't.

11                THE COURT:  You don't recall -- were they

12           taken at the same time?

13                THE WITNESS:  Yes.

14      Q    So you had them sign the petition twice at the same

15   time?

16      A    I might have, and I might have not recalled.  And

17   maybe somebody else answered.  I don't know.

18                THE COURT:  Were were you alone at that time

19           or with somebody?

20                THE WITNESS:  On Seventh Avenue, I might have

21           been.  A couple times I went with friends.

22                THE COURT:  Do you remember with whom you went

23           with on that date?

24                THE WITNESS:  Maybe once or twice, I went with

25           Maureen.  Maybe another friend from the

105

1                    Vales-Direct/Carroll

2              neighborhood.

3        Q    Is it possible that somebody else took these

4    signatures?

5        A    No.

6        Q    No.  So it's your testimony that on the same day,

7    you went back to the same address twice and got the

8    signatures of the same people twice, but their signatures

9    are different?

10       A    I might have, but I don't recall.

11             THE COURT:  Let me see those.

12             MR. CARROLL:  (Handing to Judge.)

13             We, in fact, have Alfred Monaco signing three

14             times, Judge.  It's 6/28, 6/28, 6---

15             THE COURT:  Same petition, same S.W.

16             MR. CARROLL:  Same S.W.

17             THE COURT:  One's an Alfred Monaco, Jr.  One

18             is an Alfredo Monaco.

19             MR. MEYERS:  One's an Alfred Monaco.

20       Q    Now, ma'am, you said --

21             THE COURT:  Ma'am, 17th Street, is that near

22             Prospect Avenue?

23             THE WITNESS:  Yes, it is.

24             THE COURT:  And 16th Street, is that near

25             Prospect Avenue?

1                      Vales-Direct/Carroll

2              THE WITNESS:  Yes, it is.

3              THE COURT:  And 21st Street, is that near

4        Prospect Avenue?

5              THE WITNESS:  No, it's not.  It's about four

6        blocks away.

7              THE COURT:  And Seventh Avenue, is that near

8        Prospect Avenue?

9              THE WITNESS:  Yes, it is.

10             THE COURT:  And did you say on sheet number

11       188, you went from door to door?

12             THE WITNESS:  Yes, I did, but I didn't get

13       corresponding -- like, I had two or three sheets I

14       let them sign.

15             MR. CARROLL:  We're going to get to that,

16       Judge.

17   Q    Ma'am, you testified you had two or three sheets

18 that you let people sign, and you also testified that you

19 were going door to door?

20   A    Right.

21   Q    And you further testified that on this date, 6/28,

22 you were out with Kathy, correct?

23   A    Kathy or either Maureen.  I can't recollect --

24   Q    How many people did you go out with on these days?

25   A    I went with my sister.  I went with friends.

FORM C-100 - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

1                         Vales-Direct/Carroll

2        Q    When you went out on 6/28, do you remember how many

3    people you went out with; one other person or two other

4    people?

5        A    Just one other person.

6        Q    And is it possible that one of those other people

7    was carrying one of these sheets?

8        A    No.  The sheets were in my hand.

9        Q    But yet you were going door to door --

10       A    With another person.

11       Q    And the addresses are not sequential on the sheets,

12   are they?

13                  MR. MEYERS:  Objection.

14       A    No.

15                  THE COURT:  Overruled.

16       Q    Now, on 6 --

17                  THE COURT:  Is it your testimony you went to

18                  17th Street, then you went to 16th Street, and then

19                  you went to Prospect Avenue --

20                  THE WITNESS:  Right.

21                  THE COURT:  And then you went to 21st Street?

22                  THE WITNESS:  Right.  I walked around the

23                  neighborhood, stop to drink soda.  I'm not going to

24                  go door to door.

25                  THE COURT:  Did you go door to door or get it

1                          Vales-Direct/Carroll

2              in the street?

3                  THE WITNESS:  I went door to door, knocked on

4              peoples' doors.

5                  THE COURT:  That's how you went from 17th

6              Street to 16th Street to Prospect --

7                  THE WITNESS:  16 and 17 are adjacent to each

8              other.

9                  THE COURT:  Then you went to 21st Street?

10                 THE WITNESS:  Right.

11                 THE COURT:  Then you went back to Seventh

12             Avenue?

13                 THE WITNESS:  Yes, I did.

14                 THE COURT:  Okay.

15         Q    Now, ma'am, on 6/28, who was with you?  Was it a

16    man or a woman?

17         A    A woman.

18         Q    And the identity of that woman was?

19         A    Maureen; my friend.

20                 MR. CARROLL:  We have no further questions of

21             this witness, your Honor.

22                 THE COURT:  All right.

23                 You may inquire, Counselor.

24                 MR. MEYERS:  Thank you, your Honor.

25                 If I just may have one moment.

1                          Vales-Direct/Carroll

2     CROSS-EXAMINATION

3     BY MR. MEYERS:

4         Q    Miss Vales, at any time during your collection of

5     these petitions, did anyone sign your petitions whose door

6     you did not go in front of that maybe you ran into in the

7     street that said they lived in the neighborhood or the

8     district?

9         A    I might have.

10        Q    Is it possible --

11        A    There were some people from my neighborhood that

12    the sheets are not there, from where I live, Democrats.

13        Q    I'm sorry?

14        A    There are people also from my area that are not

15    there.

16        Q    What do you mean --

17        A    That are neighbors that signed.

18        Q    Okay.  Is it possible that on sheet number 188,

19    that you might have taken the signature of these signators

20    not at their door but maybe in the street?

21        A    It could be.

22        Q    Do you have any specific recollection of that

23    particular signature?

24        A    No, I don't.

25        Q    Or the signatures on that page?

1                   Vales-Cross/Meyers

2       A    No.

3                   MR. MEYERS:  Thank you.

4                   I have no further questions, your Honor.

5                   MR. CARROLL:  I have no further questions,

6            Judge.

7                   THE COURT:  You may step down, ma'am.

8                   (Witness excused.)

9                   THE COURT:  How many more witnesses do we

10           have?

11                  MR. CARROLL:  I think they're probably stacked

12           up outside.

13                  THE COURT:  Did we ever get that lease back?

14                  MR. CARROLL:  No, not yet.  We're trying.

15      M A U R A    B U R N E T T, residing at 301 16th Street,

16           Brooklyn, New York, called as a witness by the

17           Petitioners, having been duly sworn, testified as

18           follows:

19                  THE CLERK:  Have a seat.

20                  State and spell your name.

21                  THE WITNESS:  Maura, M-a-u-r-a, Burnett,

22           B-u-r-n-e-t-t.

23                  THE CLERK:  Where do you live?

24                  THE WITNESS:  301 16th Street?

25                  THE CLERK:  In Brooklyn?

1               Vales-Cross/Meyers

2                    THE WITNESS:  Yes.

3                    THE CLERK:  Thank you.

4    DIRECT EXAMINATION

5    BY MR. CARROLL:

6        Q    Thank you for coming, Ms. Burnett.

7             I'm going to show you a Democratic Party

8    designating petition that has been marked in evidence as

9    Petitioners' Exhibit 5, and I'm going to ask you to take a

10   look at page 125 of that petition and specifically at line

11   7.

12            Is that your signature, ma'am?

13       A    Yes.

14       Q    And do you remember the circumstances around the

15   signing of that petition?

16       A    Yes.

17       Q    When did you sign it?

18       A    I don't recall the exact date.

19       Q    You don't recall the exact date?

20       A    Uh-huh.

21       Q    Would the date alongside your name refresh your

22   recollection?  Was it around June 8?

23       A    It was around June 8, yes.

24       Q    Do you remember signing for Mr. O'Hara as the

25   potential candidate?

```
 1                      Burnett-Direct/Carroll

 2        A    Yes, I do.

 3        Q    What time of the day was it?

 4        A    I don't remember exactly, but I would say it was

 5   early evening.

 6        Q    Early evening.  You work?

 7        A    Yes.

 8        Q    Okay.  And it was after work?

 9        A    Yes.

10        Q    Did someone come to your front door?

11        A    Yes.

12        Q    How many people came to your front door?

13        A    Two people.

14        Q    And what were their sexes?

15        A    Male and female.

16        Q    And the male, did you recognize the male?

17        A    I had never seen him before.

18        Q    Do you know who the male is?

19        A    He identified himself as John O'Hara.

20        Q    So he identified himself to you as John O'Hara.

21        A    Uh-huh.

22        Q    Would you recognize Mr. O'Hara if you saw him?

23        A    Yes.

24        Q    Do you recognize anyone in the courtroom who might

25   be John O'Hara?
```

113

1                        Burnett-Direct/Carroll

2        A    Yes.

3        Q    Was that, in fact, the individual who came to your

4    door?

5        A    Yes.

6        Q    Now, someone else came to your door.

7        A    That night.  Yes.

8        Q    Who was that?

9        A    I do not know her name.

10       Q    It was a woman?

11       A    Yes.

12       Q    Could you describe her to us?

13       A    I would say she was of medium build.  Her age was

14    approximately in the thirties; it could have been the high

15    twenties; it could have been low forties; but I would say

16    thirties, as an average; medium complexion with brown hair,

17    shoulder length.

18       Q    Was she slender or heavier or -- do you recall

19    that?

20       A    Medium build, leaning towards slender.

21       Q    I'm going to show you a photograph that has been

22    marked in evidence as Plaintiff's Exhibit -- excuse me -- as

23    Petitioners' Exhibit 4 in evidence.  And I ask you to take a

24    look at the lady on the extreme left of the photo

25    (handing).

1              Burnett-Direct/Carroll

2         Was that the individual who came to your door?

3    A    No, it was not.

4    Q    And you're confident it was not that individual.

5    A    Yes.

6    Q    Thank you very much.

7         Could you just identify the person who has signed

8  that sheet of the petition?

9    A    You mean, just read it?

10   Q    Just read it.

11   A    Maureen Steffenson.

12             MR. CARROLL:  Thank you very much.

13             I have no further questions.

14             MR. MEYERS:  May I see the photograph,

15         please?

16             MR. CARROLL:  Sure (handing).

17             THE COURT:  You may inquire.

18             MR. MEYERS:  I have no further questions, your

19         Honor.

20             THE COURT:  You may step down.

21             (Witness excused.)

22             THE COURT:  Let's take a break.

23             (Whereupon, there was a recess.)

24             THE COURT:  Let's go.

25  E D M O N D   G A R A B E D I A N,

1           Garabedian-Direct/Carroll

2                Residing at 94-30 86th Street, Woodhaven, New

3                York called as a witness by the Petitioner,

4                having been duly sworn, testified as follows:

5                THE CLERK:  State and spell your name, for the

6           record.

7                THE WITNESS:  Edmond, E-d-m-o-n-d, Garabedian,

8           G-a-r-a-b-e-d-i-a-n.

9                THE CLERK:  Where do you live, sir?

10                THE WITNESS:  Woodhaven, New York.

11                THE CLERK:  Where, exactly?

12                THE WITNESS:  94-30 86th Street, Woodhaven,

13           New York.

14                THE CLERK:  Thank you.

15                THE COURT:  You may proceed.

16    DIRECT EXAMINATION

17    BY MR. CARROLL:

18       Q    It's Mr. Garabedian?

19       A    Yes, it is, sir.

20       Q    Mr. Garabedian, are you employed?

21       A    Yes.

22       Q    By whom are you employed?

23       A    American Express Travel Related Services.

24       Q    And what do you do for American Express?

25       A    I am the custodian of records for American Express.

116

1                    Garabedian-Direct/Carroll

2       Q     And are you here responding to a subpoena?

3       A     Yes.

4       Q     Could you show me the documents that you have

5   produced, sir?

6       A     Sure (handing).

7       Q     Mr. Meyers, may I show you these documents?

8             THE COURT:  This, I think, is yours.

9             MR. CARROLL:  No.  This is in evidence.

10            THE COURT:  I don't need it now.

11            MR. CARROLL:  It is, in fact, our copy, but

12            it's in evidence.

13            MR. MEYERS:  Your Honor, I am going to object

14            to every portion of this document, except for those

15            portions which indicate Mr. O'Hara's address.

16            I specifically wish to exclude any

17            identification numbers, any expenditures or

18            anything of a personal nature to Mr. O'Hara, except

19            for the addresses which this document purports to

20            show.

21            THE COURT:  Any problem?

22            MR. CARROLL:  Your Honor, I don't have any

23            problem with redacting the records.

24            THE COURT:  We'll redact the record and have

25            the records admitted merely for the purpose of

1          Garabedian-Direct/Carroll

2      showing the address of Mr. O'Hara.

3          MR. CARROLL:  Well -- and I believe there's

4      the record of another individual there as well, and

5      I would give the same stipulation for that.

6          THE COURT:  Same stipulation for the other

7      individual as well.

8          Mark it Petitioners' Exhibit -- where are we?

9          THE CLERK:  Ten, according to this list.

10         MR. MEYERS:  Your Honor, this would be

11     Petitioners' Number 10.

12         THE COURT:  Yes, 10 and 11.  Now, whose is

13     Number 10?

14         MR. CARROLL:  Number 10 will be Mr. O'Hara.

15         THE COURT:  Petitioner's Exhibit 10, O'Hara.

16         THE CLERK:  Counsel, let me have those.

17         MR. CARROLL:  Exhibit 11 is Sandra Helverson.

18         THE COURT:  What did you say?  Sandra?

19         MR. CARROLL:  Sandra Helverson (phonetic).

20     H-e-l-v-e-r-s-o-n, I believe.

21         THE COURT:  That's the AmEx record?

22         MR. CARROLL:  That's correct.

23         THE COURT:  As redacted.

24         You'll redact everything else before we put it

25     in as evidence.

FORM C-100 - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

118

1                    Garabedian-Direct/Carroll

2          MR. MEYERS:  Thank you, your Honor.

3          THE COURT:  What I will suggest is we make

4      photostatic copies and redact everything but the

5      addresses of the persons involved.  I don't want to

6      know whether you pay your bill or don't.

7          MR. MEYERS:  And the dates, your Honor.  We

8      can leave in the dates as well.

9          THE COURT:  Pardon me?

10         MR. MEYERS:  We can leave the dates in as

11     well.

12         THE COURT:  Dates?  Fine.

13         THE COURT:  Counsel, what I will suggest is

14     you both take it and redact those portions you both

15     consent to be redacted and that you both consent to

16     be admitted into evidence.  Okay?

17         MR. CARROLL:  We can do that.

18         THE COURT:  During lunch hour, you can do it.

19         MR. MEYERS:  Sure.

20         (So marked, Petitioners' Exhibits 10 and 11 in

21     evidence.)

22         THE COURT:  Do you need them for any other

23     purpose?

24         MR. CARROLL:  Do I need this gentleman for any

25     other purpose?

1              Garabedian-Direct/Carroll

2              THE COURT:  Yes.

3              MR. CARROLL:  I'd like him to identify the

4         addresses at which he located the various

5         accounts.

6              THE COURT:  Go ahead.

7    DIRECT EXAMINATION

8    BY MR. CARROLL:

9    Q    Mr. Garabedian, did we ask you -- pursuant to that

10   subpoena, were you asked to research specific addresses for

11   Mr. O'Hara?

12   A    Yes.

13   Q    Does the report indicate addresses at which

14   Mr. O'Hara opened an account?

15   A    Yes.

16   Q    What does the report indicate with respect to that?

17   A    In 1990, the address for Mr. O'Hara was 579 61st

18   Street, Brooklyn, New York, 11220.

19   Q    And did there come a time, pursuant to your

20   records, that Mr. O'Hara changed his address?

21              THE COURT:  Did you say in 1990?

22              THE WITNESS:  Yes, sir.

23              THE COURT:  Go ahead.

24              THE WITNESS:  Yes, the address was changed

25         once in 1993.

120

1                    Garabedian-Direct/Carroll

2                THE COURT:  What date?

3                THE WITNESS:  In February of 1993.

4                THE COURT:  2/93.  To where?

5                THE WITNESS:  To 553 47th Street, Brooklyn,

6        New York.

7                THE COURT:  And?

8                THE WITNESS:  And subsequently it was changed

9        in February of 1994 to 6017 Fourth Avenue,

10       Brooklyn, New York.

11   Q    And is 6017 Fourth Avenue where it's currently at?

12   A    Yes.

13   Q    And February '94 is when that address was changed.

14   A    Correct.

15   Q    I'd ask you to look at Exhibit 11 in evidence.

16   A    Yes, sir.

17   Q    And does that indicate the addresses at which an

18   account existed for a Miss Sandra Helverson?

19   A    Yes.

20   Q    And what does that indicate?

21   A    In 1993 --

22                THE COURT:  Is that when it was opened?

23                THE WITNESS:  That's when I was asked to

24       produce these documents from.

25                THE COURT:  Okay.

```
 1                        Garabedian-Direct/Carroll
 2              THE WITNESS:  In 1993, the address for
 3         Miss Helverson was listed as 1225 Pine Street, San
 4         Francisco, California; and in February of 1994, the
 5         address was changed to 430 Ogden Avenue -- that's
 6         O-g-d-e-n Avenue, Jersey City, New Jersey.  And
 7         that is the address that's on our records at the
 8         present time.
 9    Q    Do you have any account for Ms. Helverson at
10    519 47th Street, Brooklyn, New York?
11    A    No.
12    Q    Okay.  Did you check that address at our request?
13    A    The only account that American Express -- that I
14    was able to locate for Miss Helverson, based on the
15    information I had, was this account that I have the records
16    for, and that is the only address that I have listed.
17    Q    And that is currently at Ogden Avenue in Jersey
18    City?
19    A    Yes.
20              THE COURT:  And that was changed February
21         '94?
22              THE WITNESS:  Correct.
23              THE COURT:  Is the date the same as the change
24         in the O'Hara one, February '94, to 6017 Fourth
25         Avenue?
```

FORM C-100 - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1                    Garabedian-Direct/Carroll

2              THE WITNESS:  It's the same month, your Honor.

3              THE COURT:  Same month.  I know that.  What

4          about the date?

5              THE WITNESS:  I don't know the exact dates it

6          was changed.

7              THE COURT:  Okay.

8              MR. CARROLL:  We have no further questions of

9          this witness, your Honor.

10             THE COURT:  Questions?

11             MR. MEYERS:  I'd like to see the Helverson

12         exhibit, please.  I believe that's Petitioners'

13         11.

14   CROSS-EXAMINATION

15   BY MR. MEYERS:

16     Q     Sir, can you please indicate to me on here where it

17   says what her latest address is.

18     A     The latest statement with a closing date -- cut off

19   date of July 22, 1994 has the 430 Ogden Avenue address.

20     Q     When you conduct these searches, how do you do

21   them?  Is it by name only?

22     A     It's by name or Social Security numbers.

23     Q     And in this instance, what did you have to go with?

24     A     Social Security and the name.

25     Q     Social Security number?

123

1                          Garabedian-Cross/Meyers

2          A    Yes.

3                    MR. MEYERS:  I have no further questions, your

4               Honor.

5                    Thank you, sir.

6                    THE COURT:  Are you finished with this

7               witness?

8                    MR. MEYERS:  I'm finished with this witness,

9               Judge.

10                   THE COURT:  Thank you, sir.

11                   (Whereupon, the witness was excused.)

12   J O A N   K L E P A C K I, 2502 East 19th Street, Brooklyn,

13              New York, recalled as a witness by the Petitioners,

14              having been duly sworn, resumed the stand and

15              continued testimony as follows:

16                   MR. CARROLL:  Your Honor, if you will recall,

17              yesterday afternoon I asked Miss Klepacki to check

18              another apartment number at 579 61st Street.

19                   THE COURT:  That's correct.

20                   MR. CARROLL:  And to respond as to whether or

21              not an account was at that particular apartment

22              number.

23                   THE COURT:  Go ahead.

24   FURTHER DIRECT EXAMINATION

25   BY MR. CARROLL:

1              Garabedian-Cross/Meyers

2       Q    Miss Klepacki, did you check the books and records

3    of Brooklyn Union Gas pursuant to my request yesterday

4    afternoon?

5       A    Yes.

6       Q    What did you find, ma'am?

7       A    I found that John K. O'Hara was the customer of

8    record at 579 61st Street apartment 3-H, Brooklyn, New York,

9    11220 from December 7th, '81 to February 19th, 1990.

10              THE COURT:  Give me those dates?  Apartment

11           3-H from when?

12              THE WITNESS:  December 7, 1981.

13              THE COURT:  12/7/81 to --

14              THE WITNESS:  2/19/90.

15       Q    And at that point, ma'am, if my recollection is

16    correct, the records indicate that he switched service to

17    another apartment, apartment 2-I; is that not correct?

18       A    That's correct.

19              MR. CARROLL:  Your Honor -- well, we need to

20           show it to Mr. Meyers but I would move to

21           supplement the exhibit that was introduced by

22           Brooklyn Union Gas (handing).

23              MR. MEYERS:  I have no objection, your Honor.

24              THE COURT:  We can make that a part of --

25              MR. CARROLL:  At the Court's pleasure.  We

1                    Klepacki-Direct/Carroll

2          could make it a part of Exhibit Number 2 in

3          evidence.

4                MR. MEYERS:  I have no objection.

5                THE COURT:  Without objection, make it part of

6          Exhibit 2.

7                (So marked.)

8                MR. CARROLL:  I have no further questions of

9          the witness.

10               THE COURT:  Any other questions of this

11         witness?

12               MR. MEYERS:  No, I don't.

13               THE COURT:  Thank you.  You're excused.

14               (Whereupon, the witness was excused.)

15               THE COURT:  How many pages are added to this?

16         How many pages of this exhibit that were added?  We

17         had originally nineteen pages.

18               THE CLERK:  Four more pages, Judge.

19               THE COURT:  Plus four pages.

20    A U R O R A   L O P E Z, residing at 189-A 31st Street,

21         Brooklyn, New York, called as a witness by the

22         Petitioners, having been duly sworn, testified as

23         follows:

24               THE CLERK:  State and spell your name so

25         everyone in the room can hear you.

126

1                       Lopez-Direct/Carroll

2                  THE WITNESS:  My name is Aurora, A-u-r-o-r-a,

3            Lopez.

4                  THE CLERK:  Where do you live, ma'am?

5                  THE WITNESS:  189-A 31st Street, Brooklyn, New

6            York.

7    DIRECT EXAMINATION

8    BY MR. CARROLL:

9        Q     Thank you for coming, Miss Lopez.

10             I'm going to show you a Democratic Party

11   designating petition which has been marked in evidence as

12   Petitioners' Exhibit Number 5 and I'd like you to take a

13   look at page 2 of that petition, okay.

14             First, could you read who the witness on that

15   petition sheet is.  Could you read that name?

16       A     Maureen Steffenson.

17       Q     Maureen Steffenson.  And I'd like you to take a

18   look specifically at line 6 of this sheet.

19             First of all, what is your address, ma'am?

20       A     189-A 31st Street.

21       Q     And is that the address that is set forth alongside

22   the signature on line 6?

23       A     Yes, it is.

24       Q     And would you look at the name on line 6.  What is

25   that name?

127

1                          Lopez-Direct/Carroll

2        A    The name is Aurora Lopez.

3        Q    How many Aurora Lopezes live at that address?

4        A    Just me.

5        Q    Is that your signature, ma'am?

6        A    No, it isn't.

7                   MR. CARROLL:  I have no further questions of

8              this witness.

9                   THE COURT:  You may inquire.

10                   MR. MEYERS:  Thank you, your Honor.

11   CROSS-EXAMINATION

12   BY MR. MEYERS:

13        Q    Ms. Lopez, do you recall anyone ringing your

14   doorbell to ask you to sign a petition?

15        A    No.

16        Q    No one ever came to your door?

17        A    No.

18                   MR. MEYERS:  I have no further questions, your

19              Honor.

20                   THE COURT:  You may step down.

21                   (Witness excused.)

22                   MR. MEYERS:  Your Honor, the witness is still

23              present in the room.

24                   THE COURT:  She's already testified.

25                   MR. MEYERS:  I don't know if she's going to be

1              Lopez—Cross/Meyers

2         recalled.

3              MR. CARROLL:  She's not.

4    Y A M I L E T   G U T T I E R R E Z,

5         residing at 189-A 31st Street, Brooklyn, New York,

6         called as a witness by the Petitioners, having been

7         duly sworn, testified as follows:

8              THE CLERK:  Have a seat.

9              State and spell your name for the record so

10        everyone can hear you.

11             THE WITNESS:  Yamilet, Y-a-m-i-l-e-t,

12        Guttierrez, G-u-t-t-i-e-r-r-e-z.

13             THE CLERK:  And where do you live?

14             THE WITNESS:  189-A 31st Street.

15             THE CLERK:  In Brooklyn?

16             THE WITNESS:  Yes.

17             THE CLERK:  Thank you.

18   DIRECT EXAMINATION

19   BY MR. CARROLL:

20        Q    Thank you for coming, Miss Guttierrez.  Is that

21   correct?

22        A    Yes.

23        Q    Thank you.  First, could you tell us how old you

24   are, ma'am?

25        A    Fifteen.

129

Guttierrez-Direct/Carroll

2    Q    You're fifteen years old?

3    A    Yes.

4    Q    And you live at 189-A 31st Street, right?

5    A    Yes.

6    Q    And do you know a Ms. Aurora Lopez?

7    A    My sister.

8    Q    That's your big sister, right?

9    A    Yeah.

10   Q    I'm going to show you a Democratic Party

11   designating petition which is marked in evidence as

12   Petitioners' Exhibit 5, okay.  And specifically I'm going to

13   ask you to look at page 2, line 6.

14        First of all, you live at 189-A 31st Street; is

15   that correct?

16   A    Yes.

17   Q    And and your sister lives there, too, doesn't she?

18   A    Yes.

19   Q    Do you recognize that signature on line 6?

20   A    My signature.

21   Q    It's okay.

22   A    Her name but my signature.

23   Q    It's your signature on the page.

24   A    Yes.

25   Q    Did somebody come to your door to collect the

FORM C-100 - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

130

1                    Guttierrez-Direct/Carroll

2    signature?

3        A    Yes.

4        Q    What did they say to you?

5        A    They asked me if the owner of the house was there,

6    and I told them "No."

7             And they asked me if I wanted to sign for her, for

8    the owner of the house.  And I said "No," 'cause I

9    couldn't.  And she told me that it really wasn't the

10   signature that counted; it was that they needed as many

11   names as they could.

12       Q    And she asked you to sign the petition, even though

13   she knew it wasn't you?

14       A    Uh-huh.

15       Q    How many people came to your door?

16       A    Two.

17       Q    Do you remember what their sex was?

18       A    I think it was a woman and a guy.

19       Q    Do you remember what the woman looked like?

20       A    No.

21       Q    You don't?  Do you remember what the guy looked

22   like?

23       A    No.  I don't remember.

24       Q    I'm going to show you a photograph that has been

25   marked in evidence as Petitioners' Exhibit 4, and

131

1                    Guttierrez-Direct/Carroll

2    specifically I'd like you to take a look at the lady on the

3    extreme left-hand-side of the photograph.

4         Do you recall if it was that lady who came to your

5    door?

6         A    I --

7         Q    Only if you recall.

8         A    No, I just remember her having glasses.  That's all

9    I remember.

10             MR. CARROLL:  Okay.  That's fine.  I have no

11             further questions of this witness.

12             THE COURT:  Any questions?

13             MR. MEYERS:  I have no questions, your Honor.

14             THE COURT:  You may step down.

15             MR. CARROLL:  Thank you for coming, ma'am.

16             (Whereupon, the witness was excused.)

17   J O H N    M A R C    G R O H,

18             called as a witness by the Petitioners, residing at

19             252 16th Street, Brooklyn, New York, having been

20             duly sworn, testified as follows:

21             THE CLERK:  State and spell your name for the

22             record?

23             THE WITNESS:  John Marc Groh, G-r-o-h,

24             M-a-r-c.

25             THE CLERK:  Where do you live, sir?

1              Groh-Direct/Carroll

2              THE WITNESS:  252 16th Street, Brooklyn.

3              MR. CARROLL:  Thank you for coming, Mr. Groh.

4     DIRECT EXAMINATION

5     BY MR. CARROLL:

6        Q    I'm going to show you a Democratic Party

7     designating petition that's been marked in evidence as

8     Petitioners' Exhibit 5, and specifically I'd like you to

9     look at page 143 of that petition, line 3.

10             Is that your signature, sir?

11       A    Yes.

12       Q    And you signed that petition?

13       A    Yes, that's how I print my name.

14       Q    That is your signature?

15       A    Yes.

16       Q    That's the way you sign.  Okay.  And do you recall

17    signing that petition?

18       A    Yes, I do.

19       Q    Do you recall the circumstances surrounding it?

20       A    Yes.

21       Q    Well, was it on or about the 8th day of June; is

22    that correct?

23       A    As I recall, yes.

24       Q    What time of the day was it?

25       A    Early evening; 6, 7, something like that.

1                          Groh-Direct/Carroll

2        Q    Did someone come to your home?

3        A    Yes.

4        Q    How many people came to your home?

5        A    Two.

6        Q    Did those people identify themselves to you when

7   they came to your door?

8        A    The gentleman did; said --

9        Q    Who did he say he was?

10       A    Said he was Mr. O'Hara or John Kennedy O'Hara.

11       Q    John Kennedy O'Hara.  And is that individual in

12  fact in the courtroom right now?

13       A    Yes, he is.

14       Q    And he came to your door with the petition --

15            THE COURT:  Is that the individual sitting at

16            the table?

17            THE WITNESS:  Yes, on my left (indicating).

18       Q    And who was holding the petition, do you recall?

19       A    I don't recall.

20       Q    Okay.  The lady who came to the door, was it a

21  gentleman and a lady?

22       A    Yes.

23       Q    And the lady who came to the door, did she identify

24  herself to you?

25       A    No, not that I recall.

FORM C-100 - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1                        Groh-Direct/Carroll

2        Q    Do you remember what she looked like?

3        A    Youngish, dark hair and that's -- darkish hair,

4    dark brown.  Not black but dark brown.

5        Q    And a younger woman.

6        A    Yes.

7        Q    Slight build, medium build?

8                 MR. MEYERS:  Objection.

9                 THE COURT:  Overruled.

10                MR. MEYERS:  It's his witness.

11                THE COURT:  Go ahead.  You may proceed.

12       Q    Do you recall what her build was?

13       A    Not particularly heavy but not, you know, model

14   slender.

15       Q    Okay.  I'm going to show you a photograph, sir,

16   which has been marked into evidence as Petitioners' Exhibit

17   4 and I ask you specifically to focus on the lady who is at

18   the extreme left-hand side of the photograph.

19            I always get my right and left confused.

20            Was that the lady who came to your door?

21       A    No, it's not.

22       Q    And just for the record, sir, would you read who

23   witnessed that petition sheet?

24       A    Maureen Steffenson.

25                MR. CARROLL:  Thank you.

135

1                      Groh-Direct/Carroll

2                  I have no further questions.

3                  THE COURT:   You may inquire.

4    CROSS-EXAMINATION

5    BY MR. MEYERS:

6        Q    Mr. Groh, do you recall, specifically, the

7    events -- was that the evening?

8        A    Yes, it was.

9        Q    Do you recall, specifically, the events of that

10   evening?

11       A    Other than them coming to my door?

12       Q    Uh-huh.  Just all of the surrounding things that

13   hand.

14       A    I was upstairs with my wife and my two children.

15   Someone rang the doorbell at 6:30, 7 o'clock.  I believe it

16   was after we'd had supper.  It's a rather unusual occurrence

17   for people to ring our doorbell, so I went down and answered

18   it; and Mr. O'Hara and a woman were at the door, said they

19   wanted my signature on a petition for them to become part of

20   the ballot.

21       Q    How long would you say the entire encounter lasted?

22       A    Not more than two or three minutes.

23       Q    Is this a private house?

24       A    Yes.

25       Q    Can you describe the front of the house where the

FORM C-100 - LASER  REPORTERS PAPER & MFG. CO.  800-826-8313

136

Groh-Cross/Meyers

1
2  door is, the front door?

3      A    It's -- you take two steps, two small steps down to

4  the door.  It's got a pink door, which is somewhat unusual

5  on the block.  And ---

6      Q    When you open the door, does it open in or out?

7      A    It opens in.

8      Q    And is there a stoop?

9      A    No.  You have to take two steps down.  I mean, you

10  walk in the metal gate, and then there are two steps down to

11  the door.

12      Q    When you walk through the metal gate, is that right

13  up against the sidewalk?

14      A    Yes.

15      Q    And how far is it from the gate to the front door?

16      A    Oh, seven feet.

17      Q    When you answered the door, did you step out into

18  the front area or did you stay in the house?

19      A    I opened the door in towards myself and then stood

20  at the door and they were -- as I recall, one was up on the

21  top step.  I believe Mr. O'Hara was down on the step by the

22  door.

23      Q    Okay.  But you didn't come out beyond the doorway?

24      A    Well, I mean, not -- it's difficult for two people

25  to be in -- at the bottom step, there's not enough room.