137

1                        Groh-Cross/Meyers

2          Q     Would it be possible that there was a third person

3     present?

4          A     No.

5          Q     Why is that?

6          A     They would have had to be standing -- well, for me

7     not to see them, they would have had to be standing about

8     fifteen or twenty feet in either direction up the street.

9          Q     So from your door, you could see up and down the

10    street?

11         A     I can see up and down --

12         Q     Fifteen feet?

13         A     Fifteen to twenty feet, yes.

14                    MR. MEYERS:  Okay.  Thank you.

15                    I have no further questions.

16                    MR. CARROLL:  I have no further questions of

17               this witness.

18                    THE COURT:  You may step down.

19                    MR. CARROLL:  Mr. Groh, thank you for coming.

20                    (Whereupon, the witness was excused.)

21                    MR. MEYERS:  Your Honor, I've just been

22               informed that the referee took lunch on the

23               line-by-line.  I'm just informing the Court.

24                    THE COURT:  Off the record.

25                    (Discussion off the record.)

138

1                    Groh-Cross/Meyers

2   J O S E P H   Z O T T O,

3              residing at 20-69 46th Street, Astoria, New York,

4              called as a witness by the Petitioners, having been

5              duly sworn, testified as follows:

6                    THE CLERK:  State your name for the record,

7              please.

8                    THE WITNESS:  Joseph Zotto, Z-o-t-t-o.

9                    THE CLERK:  Where do you live?

10                   THE WITNESS:  At 20-69 46th Street, Astoria,

11             New York.

12  DIRECT EXAMINATION

13  BY MR. CARROLL:

14      Q    Thank you, Mr. Zotto, for coming.

15           Are you employed?

16      A    Yes, I am.

17      Q    By whom are you employed?

18      A    The parent company's name is Time-Warner Cable of

19  New York City.

20      Q    And does it have subsidiaries?

21      A    Yes, it does.

22      Q    Does one of those subsidiaries serve parts of

23  Brooklyn?

24      A    Yes, it does.

25      Q    And does one of those subsidiaries serve the areas

FORM C-100 - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

FORM C-100 - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

1                    Zotto-Direct/Carroll

2   at the addresses of 659 61st Street?

3        A    I'm sorry.  That wasn't the address I was given.

4        Q    679 -- excuse me -- 675 61st Street?

5        A    Actually, I have 579, if that's the one you're

6   referring to.

7                    MR. CARROLL:  My apologies, Judge.

8                    There are so many addresses involved.

9        Q    579 61st Street?

10        A    Yes, we do service that address.

11        Q    And does BQ Cable also serve the area covering

12   6017 -- six-zero-seventeen -- Fourth Avenue?

13        A    Yes, we do.

14        Q    Pursuant to a subpoena, were you requested to

15   research cable service at those two addresses?

16        A    Yes, I was asked to look for records pertaining to

17   a certain individual.

18        Q    At those two addresses?

19        A    At those two addresses.

20        Q    Are those records kept by Brooklyn-Queens Cable in

21   the normal course of business?

22        A    Yes, they are.

23        Q    And is it the noral course of business of

24   Brooklyn-Queens Cable to maintain those records?

25        A    Yes, it is.

140

1                    Zotto-Direct/Carroll

2      Q     And you have brought those records with you?

3      A     Yes.

4      Q     May I see them, sir?

5      A     Of course (handing).

6            MR. CARROLL:  Mr. Meyers, I show these to

7      you.

8            MR. MEYERS:  Your Honor, I don't have any

9      objection.

10           I have no objection, your Honor.

11           THE COURT:  All right.  Without objection,

12     mark it Petitioners' Exhibit -- what is it?  Give

13     me the number.

14           THE CLERK:  12.

15           THE COURT:  Petitioners' Exhibit 12.  That's

16     the cable records.  In evidence.

17           (So marked.)

18     Q     Sir, do these records indicate the provision of

19  cable service to a John K. O'Hara at 579 61st Street?

20     A     Yes, they do.

21     Q     And when was that service commenced?

22     A     Service was requested on December 8th, 1993 and

23  service was installed on January 27th, 1994.

24     Q     January 27, 1994 at 579 61st Street?

25     A     Correct.

141

1     Zotto-Direct/Carroll

2    THE COURT:  One/27/94.  Go ahead.

3  Q Did you also check your service records with

4 respect to an address of 6017 Fourth Avenue?

5  A Yes, we did.

6  Q Is there service provided there?

7  A There is, to one customer.

8  Q Is that customer John K. O'Hara?

9  A No, it is not.

10  Q There is no service to Mr. O'Hara at that address?

11  A No, there was no record of any service ever having

12 been provided to a John O'Hara at that address.

13  Q At 6017 Fourth Avenue.

14  A Correct.

15    THE COURT:  Anything else?

16  Q Is Mr. O'Hara's cable service still in effect at

17 579 61st Street?

18  A Yes, it is.

19    MR. CARROLL:  I have no further questions.

20 CROSS-EXAMINATION

21 BY MR. MEYERS:

22  Q Sir, at the Fourth Avenue address, does it state

23 where the service was being given, which portion of the

24 premises?

25  A These documents do not show that.  I recollect it

FORM C-100 - LASER   REPORTERS PAPER & MFG. CO   800-626-6313

1                    Zotto-Cross-Redirect

2    as being a first floor apartment.

3              MR. MEYERS:  Okay.  Thank you.

4              I have no further questions.

5              THE COURT:  You may step down.

6              MR. CARROLL:  Your Honor, if I might.

7              I have no further questions, your Honor.

8              MR. MEYERS:  Nothing further.

9              THE COURT:  You may step down.  Next.

10             (Whereupon, the witness was excused.)

11   N E A L    D e S I M O N E,

12             residing at 600 Carroll Street, Brooklyn, New York,

13             called as a witness by the Petitioners, having been

14             duly sworn, testified as follows:

15             THE CLERK:  State your name for the record,

16             sir.

17             THE WITNESS:  Neal, N-e-a-l, DeSimone,

18             D-e-S-i-m-o-n-e.

19             THE CLERK:  Where do you live, sir?

20             THE WITNESS:  600 Carroll Street, Brooklyn

21   DIRECT EXAMINATION

22   BY MR. CARROLL:

23        Q    I missed your name.  Sorry.

24        A    Neal DeSimone.

25        Q    Mr. DeSimone, thank you for coming.

143

1                              DeSimone-Direct/Carroll

2                Are you employed?

3        A     Yes, I am.

4        Q     By whom?

5        A     Con Edison.

6        Q     What do you do for Con Ed?

7        A     Right now, I work with their legal department.  My

8    title is senior customer service representative.

9        Q     In your capacity as a senior customer service

10   representative, are you familiar with the books and records

11   of Consolidated Edison?

12       A     The billing accounts of Con Edison, yes.

13       Q     And you're here responding to a subpoena; is that

14   correct?

15       A     Yes, sir.

16       Q     And I asked you to research certain addresses and

17   names in that subpoena; did I not?

18       A     Yes, sir.

19       Q     Have you done that?

20       A     Yes, sir.

21       Q     And is the information you've obtained from the

22   books and records of Con Edison?

23       A     From the computer system of Con Edison, yes, sir.

24       Q     And these books and records are kept by Con Edison

25   in the normal course of business?

1                    DeSimone-Direct/Carroll

2       A     Yes.

3       Q     And it is the normal course of Con Edison's

4    business to maintain these books and records; is it not?

5       A     Yes, sir.

6       Q     May I see the records that you've produced, sir?

7       A     (Handing).

8       Q     All right.  And these are broken out by different

9    addresses that we asked you to research; is that not the

10   case?

11      A     Yes.

12                 MR. CARROLL:  Mr. Meyers, I would show you the

13                 four folders marked at four separate addresses.

14                 MR. MEYERS:  Thank you, Mr. Carroll.

15                 No objection, your Honor.

16                 THE COURT:  Are you offering them in

17                 evidence?

18                 MR. CARROLL:  If I could, your Honor, I would

19                 like to introduce them as Petitioner's --

20                 THE COURT:  How many are there?

21                 MR. CARROLL:  There are four.  Perhaps we

22                 could do A, B, C and D.

23                 THE COURT:  Go ahead.  That would be

24                 Petioners' 13-A B C and D.  You'll give me the

25                 addresses of each.

1                    DeSimone-Direct/Carroll

2                 MR. CARROLL:  I will, Judge.

3                 MR. CARROLL:  Petitioners 13-A is 553 47th

4        Street.

5                 Petitioners 13-B is 519 47th Street.

6                 THE COURT:  519 47th.

7                 MR. CARROLL:  Petitioners 13-C is 6017 Fourth

8        Avenue.

9                 THE COURT:  6017 Fourth.

10                MR. CARROLL:  And Petitioner's 13-D is 579

11        61st Street.

12                THE COURT:  579 61st Street.  Okay.  Let's

13        go.

14                (Petitioner's Exhibits 13-A through 13-D in

15        Evidence, so marked.)

16     Q   Sir, let's start with Petitioners' Exhibit 13-B.

17   Okay.

18                THE COURT:  Why don't you go in order --

19                MR. CARROLL:  13-B actually relates to the

20        Helverson individual, your Honor, as opposed to

21        Mr. O'Hara.

22                THE COURT:  All right.  Go ahead.

23     Q   I'm going to show you this document (handing).

24        Did we ask you to research a particular name at

25   that address?

FORM C-100 - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

1                    DeSimone-Direct/Carroll

2        A    Yes, sir.

3        Q    And what was the name that we asked you to check?

4        A    It's John O'Hara.

5        Q    Did you check also on a Sandra Helverson?

6        A    Yes, I did.

7        Q    Is there service provided at that address, which is

8    519 47th Street, to a Sandra Helverson?

9        A    No, sir.

10       Q    How far back do your records -- when you do one of

11   these checks, how far back does the check go?

12       A    Well, the computer itself holds the date that the

13   account was opened.  We started putting the dates on the

14   account around 1962.

15       Q    So if a Miss Sandra Helverson had service there

16   from 1962 to the present, it would turn up on the search?

17       A    No.  The account -- one account was opened in May

18   of '75.  The other account was opened March of 1964.

19       Q    And are either of those accounts in the name of

20   Sandra Helverson?

21       A    None of them are.

22       Q    And these are the only two accounts at that

23   location?

24       A    Yes, sir.

25       Q    What are the names on those accounts?

1                    DeSimone-Direct/Carroll

2      A    William McCormack, M-c C-o-r-m-a-c-k.  The

3  apartment number is marked:  "first and second floor."  The

4  other name is John Steffenson, S-t-e-f-f-e-n-s-o-n.  The

5  apartment is marked "third floor."

6      Q    Okay.  Thank you, sir.

7           Are each of those accounts active accounts at this

8  time?

9      A    Yes.

10     Q    And there is no other service being provided in

11  that building?

12     A    No.  We only have two accounts, two meters.

13     Q    I'm going to ask you to take a look at Petioners'

14  13-A with respect to address 553 47th Street.

15     A    Okay.

16     Q    How many accounts are in that building?

17     A    We have two accounts, two meters in that building.

18     Q    Two meters in that building, all right.

19           What are the current names on those accounts?

20     A    First and second floor, we have a Roberto,

21  R-o-b-e-r-t-o; last name is L-o-z-a-n-o.

22     Q    Lozano.

23     A    Lozano.  That account was opened December 1, 1992.

24     Q    December 1, 1992, Mr. Lozano started having

25  service.

148

1                    DeSimone-Direct/Carroll

2            Is there another account in that building?

3    A    Yes, sir.

4    Q    And who is that?

5    A    The third floor account under the name of Quetzal,

6    Q-u-e-t-z-a-l, Martinez, M-a-r-t-i-n-e-z.

7    Q    And when was that opened?

8    A    That account was opened on 12/1/92.

9            THE COURT:  Also 12/1 --

10   Q    That's the same date as Mr. Lozano; is it not?

11   A    Yes, sir.

12   Q    In your search of these records, was there ever an

13   account at that address in the name of John K. O'Hara?

14           Check your records, sir.

15   A    I didn't see one.

16   Q    Not according to the records of Con Edison?

17   A    Not according to the records.

18   Q    Prior to Mr. Quetzal and Lozano opening their

19   accounts, were there other people in that building?

20   A    Yes, sir.

21   Q    Could you identify them?

22   A    For the first floor account, a customer was Magaly,

23   M-a-g-a-l-y, Lucas, L-u-c-a-s.  That account was opened on

24   May the 11th, 1990.  It was closed on December 1, 1992.

25   Q    So Ms. Lucas left that account on December 1,

1                    DeSimone-Direct/Carroll

2      1992.

3         A     It was closed on that day, yes.

4         Q     By her.  Okay.

5         A     Prior to Miss Lucas, we had a Raymond,

6      R-a-y-m-o-n-d, last name was Vales, V-a-l-e-s.  That account

7      was opened on July 10th, 1971 and it was closed on May 9,

8      1990.

9         Q     I think that's far enough.

10             Now, when Ms. Lucas was there, was there one

11     account for the entire building?

12        A     No, we always had two accounts.

13        Q     Okay.  Who else had an account there when Ms. Lucas

14     had an account?

15        A     Well, now, you go to the third floor; that's the

16     other account.

17        Q     Okay.  Would you give me that information.

18        A     The customer on the third floor prior to

19     Mr. Martinez was a Magaly, M-a-g-a-l-y, Lucas, L-u-c-a-s.

20     That account was opened on 10/1 of '92.  And it was closed

21     on 12/1 of '92.

22             The prior customer was Mr. Jose Luis, L-u-i-s,

23     Augustin, A-u-g-u-s-t-i-n, and that account was opened on

24     10/1 of '90 and closed on 9/2 of '92.

25        Q     Okay.  I think that's enough, sir.

1                          DeSimone-Direct/Carroll

2              I'd like you to look at Petioners' Number C which

3      relates to the address, 6017 Fourth Avenue.

4              Could you tell me if your records indicated an

5      electric account in the name of Mr. O'Hara at any point at

6      that address?

7        A     No, we don't have an account under that name.

8        Q     At that particular address?

9        A     At 6017 Fourth Avenue, yes.

10       Q     And how far back did your search go?

11       A     Well, we have four accounts there, four meters.

12       Q     Right.

13       A     We have an account that supplies the halls and

14     cellar under the name of Anthony and Tina, T-i-n-a; last

15     name is P-e-l-l-i-c-c-i-o.

16       Q     Pelliccio?

17       A     Pelliccio.  That account was opened March 31,

18     1967.

19             We have a store meter under the name of Anthony

20     Pelliccio doing business as Pelliccio Bakery.  That account

21     was opened on February 22nd 1980.

22       Q     Okay.

23       A     We have a second floor meter under the name of

24     Anthony Pelliccio.  That account was opened prior to 1962.

25     Now we have a third floor meter under the name of Emily

151

1                    DeSimone-Direct/Carroll

2    Massa, M-a-s-s-a, and that account has been in effect since

3    May 31, 1970.

4        Q    Finally, sir, I'd like you to take a look at

5    Petioners' D which relates to the address 579 61st Street.

6             Did you uncover any accounts in the name of

7    John K. O'Hara at 579 61st Street?

8        A    I found two accounts in the name of John O'Hara.

9        Q    John O'Hara.  And would you give me the information

10   on each of those accounts, sir?

11       A    The current account is under the name of John

12   O'Hara.  That account was opened on October the 24th, 1991.

13   It's still active.

14       Q    Okay.

15                 THE COURT:  What date was that?  October --

16                 THE WITNESS:  24th, 1991.

17                 THE COURT:  October 24th, 1991.

18       Q    And it's still active?

19       A    Yes, sir.

20       Q    Does it say what apartment that goes into?

21       A    Apartment number 2-I.

22       Q    And you said there's another account under

23   Mr. O'Hara's name.

24       A    Well, the previous account -- this account was

25   under the name of Holt, H-o-l-t, last name is McCallany.

152

1                          DeSimone-Direct/Carroll

2        Q    Is this in apartment 2-I?

3        A    This was apartment 2-I.

4             That account was opened on June 13, 1991 and it was

5    closed on October 24th, 1991.

6        Q    Now, did you have another account in that building

7    for Mr. O'Hara?

8        A    Previous to that account, we had a John O'Hara.

9    That account was opened on February 1, 1990.  And that was

10   closed on June 13, 1991.

11       Q    And anything prior to that?

12       A    No, that's all.  That's as far back as we go with

13   these records here.

14       Q    As far as you go with those records.  So starting

15   in 1990, you have records on him?

16       A    (Nodding.)

17       Q    Tell me, does Con Edison, to your knowledge, have

18   different classes of service?  Are the rates for service

19   different for residential customers as opposed to commercial

20   customers?

21       A    Yes.

22       Q    Can you tell me what type of service is provided to

23   Mr. O'Hara at 579 61st Street?

24       A    Residential service.

25       Q    It's residential service?

153

1                      DeSimone-Direct/Carroll

2      A    It's a residential rate.

3                MR. CARROLL:   I have no further questions of

4           this witness.

5                THE COURT:   You may inquire.

6                MR. MEYERS:   Thank you, sir.

7      CROSS-EXAMINATION

8      BY MR. MEYERS:

9      Q    Let's go back for a moment to Petioners' 13-A,

10     referring to 47th Street, 553 47th Street.  Is there any

11     indication in your records, sir, that showed how many

12     dwelling units there are on that premises?

13     A    No, we only have two meters listed as first and

14     second floor and the other one is listed as the third floor.

15     Q    If there were more than that number of units there,

16     would you know about it?

17     A    No.

18     Q    So you only know according to how many meters there

19     are in the building?

20     A    That's correct.

21     Q    Would the same be true for the Fourth Avenue

22     address?

23     A    Yes.

24     Q    Would that be true for every address?

25     A    Yes.

154

1                    DeSimone-Cross/Meyers

2     Q    And for every account that you have?

3     A    Yes.

4     Q    So it is possible that there are other units within

5  the dwelling that would fall under the same meter?

6     A    That are registered on the same meter.  Yes, sir.

7              MR. MEYERS:  Thank very much.

8              No further questions.

9              MR. CARROLL:  I have no further questions.

10             THE COURT:  You may step down.

11             (Whereupon, the witness was excused.)

12             THE COURT:  Anything else now?

13             The reporter needs a break.  I think we'll

14         break for lunch now.

15             (Whereupon, there was a luncheon recess.)

16             (Continued on the following page.)

17

18

19

20

21

22

23

24

25

155

1              Proceedings

2         AFTERNOON SESSION

3         THE COURT:  Case on trial.

4         MR. CARROLL:  Your Honor, the first request

5    that I have is with respect to a subscribing

6    witness who was mentioned in the testimony this

7    morning, I believe, by Ms. Galarza, as being a

8    person who had induced her to collect signatures

9    and is herself a witness for some 299 signatures, a

10   Ms. Kathy Vetere, and I would request that the

11   respondent be directed to to produce Miss Vetere.

12        MR. MEYERS:  Your Honor, I will make the same

13   diligent effort to obtain the appearance of Kathy

14   Vetere (phonetic) as I have with the other

15   witnesses in this case and which are outside today.

16        MR. CARROLL:  I thank Mr. Meyers for that.

17        The second thing, your Honor, has to do with

18   our bill of particulars.

19        One of the items that we identify in our bill

20   of particulars as being an element of proof is item

21   number 4, which references Exhibit B, and it deals

22   with a detailed list of alleged forgeries.

23        We also --

24        THE COURT:  Alleged forgeries?

25        MR. CARROLL:  Forgeries in the forgeries of

156

1                    Proceedings

2          signatures.  We identify an expert witness that we

3          intend to call, a Mr. Donald (phonetic).  I am

4          advised that Mr. Frangiapani is unavailable, will

5          not be able to come in.  I would like to substitute

6          a different expert but he will still be confined to

7          testifying to the signatures identified in the bill

8          of particulars and the different expert would be a

9          Mr. Paul Osborn.

10              THE COURT:  Do you have any objections to

11          that?

12              MR. MEYERS:  I didn't know they had Donald

13          Frangiapani coming here.

14              THE COURT:  Okay.

15              MR. MEYERS:  I have no objection.

16              MR. CARROLL:  We can proceed with witnesses,

17          if that's your pleasure.

18              THE COURT:  Before you take the stand, may I

19          see counsel, please.

20              (Discussion at the bench off the record.)

21  M I C H E L L E   R A M K I S H U N,

22          residing at 208-A 31st Street, Brooklyn, New York,

23          called as a witness by the People, having been duly

24          sworn, testified as follows:

25              THE CLERK:  State and spell your name for the

157

1               Proceedings

2         record, but we all have to hear you.

3               THE WITNESS:  Michelle, M-i-c-h-e-l-l-e,

4         Ramkishun, R-a-m-k-i-s-h-u-n.

5               THE CLERK:  Where do you live?

6               THE WITNESS:  208 31st Street.

7               THE CLERK:  In Brooklyn?

8               THE WITNESS:  Yes.  208-A.

9               THE COURT:  You may proceed.

10    DIRECT EXAMINATION

11    BY MR. CARROLL:

12         Q    Ms. Ramkishun, I'm going to show you -- and thank

13    you for coming, ma'am.

14              I'm going to show you a Democratic Party

15    designating petition that has been marked in evidence as

16    Petitioners' Exhibit 5 and I'd like you to take a look at

17    this petition and particularly at page 2 line 10 of that

18    petition, okay.

19              MR. MEYERS:  Your Honor, I'm going to make my

20         objection again in that page 2, line 10 is not

21         marked in Petitioners' bill of particulars as being

22         a signator that would be placed in evidence at this

23         trial.

24              THE COURT:  Counselor?

25              MR. CARROLL:  We're going to check, your

1            Ramkishun-Direct/Carroll

2            Honor.  I do in fact believe it is marked in

3            another place.

4                MR. MEYERS:  Your Honor, I withdraw that

5            because I found -- there are indeed two pages.

6                THE COURT:  Let's go.

7     Q    Ma'am, is this your signature on line 10?

8     A    Yes.

9     Q    Do you recall the circumstances surrounding --

10                THE COURT:  What page is that?  Excuse me.

11                MR. CARROLL:  Page 2, line 10 of the

12            petition.

13     Q    Do you recall the circumstances surrounding your

14    signature of the petition?

15     A    You mean when she came to me to sign it?

16     Q    Yes.  Do you recall that?

17     A    Uh-huh.

18     Q    How many people came to your home?

19     A    One.

20     Q    And was that person a man or a woman?

21     A    A woman.

22     Q    Do you recall what the woman looked like?

23     A    Yes, I do.

24     Q    Could you describe the woman for us, please?

25     A    She was like between 35 and 40 and she was average

1              Ramkishun-Direct/Carroll

2    height, average build.  She had, like, blondish-brown hair.

3    And she was white.

4        Q    Was there a man with her?

5        A    She said it was her husband who was across the

6    street.

7        Q    Across the street.

8             I'm going to show you a photograph that is marked

9    as Petitioners' Exhibit Number 4 in evidence.  I'm going to

10   ask you to take a look at the lady on the extreme left of

11   the photograph.  Was that the lady who came to your door?

12       A    No.

13       Q    That was not the lady.

14       A    No.

15       Q    And just for the record, would you tell us who

16   signed -- who witnessed the sheet that your signature is on;

17   what her name is?  Can you read that?  Right there

18   (indicating)?

19       A    Maureen Steffenson.

20             MR. CARROLL:  Thank you very much.

21             I have no further questions of

22        Miss Ramkishun.

23   CROSS-EXAMINATION

24   BY MR. MEYERS:

25       Q    Could you please tell me again what color hair she

1                    Ramkishun-Cross/Meyers

2     had?

3          A     It was like a blondish-brown or brownish-blond.  It

4     was, like, mixed.

5          Q     Was it light colored?

6          A     It was, like, brown but it had blond in it.

7               MR. MEYERS:  Okay.

8               MR. CARROLL:  I have no further questions.

9               THE COURT:  You may inquire.

10              MR. MEYERS:  He already said he didn't --

11              MR. CARROLL:  I thought you were finished.

12              MR. MEYERS:  Oh, no, that's okay.  I have no

13          further questions.

14          Thank you.

15              THE COURT:  You may step down.

16              (Whereupon, the witness was excused.)

17     J U A N I T A   G I L L U S,

18          residing at 260 Clinton Avenue, Brooklyn, New York,

19          called as a witness by the Petitioners, having been

20          duly sworn, testified as follows:

21              THE CLERK:  State and spell your name, for the

22          record.

23              THE WITNESS:  Juanita Gillus.

24              THE COURT:  Can you speak up, please, so that

25          we can all hear.

161

1                    Ramkishun-Cross/Meyers

2                    THE WITNESS:  Okay.  I'm sorry.

3                    J-u-a-n-i-t-a, G-i-l-l-u-s.

4                    THE CLERK:  What's your address?

5                    THE WITNESS:  260 Clinton Avenue, Brooklyn,

6          New York.

7                    THE COURT:  You may proceed, Counsel.

8                    MR. CARROLL:  Thank you, your Honor.

9     DIRECT EXAMINATION

10    BY MR. CARROLL:

11         Q    Thank you for coming, Miss Gillus.

12              Are you employed?

13         A    Yes, I am.

14         Q    Who do you work for?

15         A    I work for New York Law School, registrar's office.

16         Q    And how long have you worked there?

17         A    Over a year.  Since January '93.

18         Q    Now, in your capacity as a worker in the

19    registrar's department at New York Law School, are you

20    familiar with the books and records of New York Law School?

21         A    Yes, I am.

22         Q    And are those books and records kept in the normal

23    course of business?

24         A    Yes, they are.

25         Q    Did I serve you with a subpoena or have you been

162

1                    Gillus-Direct/Carroll

2    served with a subpoena pursuant to which you produced

3    certain records?

4        A    Yes.

5        Q    Do you have those with you, ma'am?

6        A    Yes.

7        Q    May I see them, please.

8        A    Yes (handing.)

9        Q    Are these records part of the records of Brooklyn

10   Law School --

11       A    New York Law School.

12       Q    Excuse me.  New York Law School.  That are kept in

13   the normal course of business?

14       A    Yes.

15       Q    And is it the normal course of business of New York

16   Law School to maintain these records?

17       A    Yes.

18                 MR. CARROLL:  Mr. Meyers, I show you these

19              records (handing).

20                 MR. MEYERS:  Thank you, Mr. Carroll.

21                 Okay.  I have no objections, your Honor.

22                 THE COURT:  Without objections, you're marking

23              that into evidence?

24                 MR. CARROLL:  Into evidence, your Honor, if we

25              may.

1                    Gillus-Direct/Carroll

2                    THE COURT:  Mark the Petitioners' Exhibit 14

3          in evidence without objection, 8 pages.  That's New

4          York Law School record.

5                    THE COURT:  May I see them, please.

6                    (Court Officer hands.)

7                    COURT OFFICER:  Should we staple them, your

8          Honor?

9                    THE COURT:  Yes, I think we should staple

10         them.

11                   (Court Officer complies.)

12                   THE COURT:  Thank you.

13                   (Court Officer hands to Judge.)

14                   THE COURT:  Okay.

15                   COURT OFFICER:  Do you want me to show this to

16         the witness?

17                   MR. CARROLL:  Please.

18    Q    Now, ma'am, do these records relate to a particular

19    individual?

20    A    Yes, they do.

21    Q    And what is the name of that individual?

22    A    Sandra Helverson.

23    Q    And do the records indicate the address at which

24    Miss Helverson resides as a student at New York Law School?

25    A    Yes, they do.

1                   Gillus-Direct/Carroll

2        Q    What is the address Miss Helverson resides at?

3        A    430 Ogden Avenue, apartment number 8, Jersey City,

4   New Jersey, 07307.

5        Q    Just for the record, do the records also indicate

6   the date of births of Miss Helverson?

7        A    Yes, they do.

8        Q    What is the date of birth?

9        A    Her date of birth is January 26, 1967.

10            MR. CARROLL:  I have no further questions of

11            this witness.

12            THE COURT:  Any questions?

13            MR. MEYERS:  Yes, your Honor.

14   CROSS-EXAMINATION

15   BY MR. MEYERS:

16       Q    Miss Gillus, the records that you provided today,

17   does it indicate what year Miss Helverson is in at New York

18   Law School?

19       A    Yes, they do.

20       Q    Can you tell us what year?

21            Was she a first year, second year, third-year law

22   student?

23       A    Okay.  She was a visiting student and attended our

24   law school for one whole year.  I don't know if it's ended

25   because she may be coming back in the fall.

FORM C-100 - LASER   REPORTERS PAPER & MFG. CO   800-626-6313

165

1              Gillus-Cross/Meyers

2      Q    Is there any indication as to whether or not she

3 graduated?

4      A    No, there isn't.

5      Q    What is the latest document that you have which

6 indicates an address for Miss Helverson?

7      A    The latest document that I have?

8      Q    Uh-huh.

9      A    That would have to be -- that would have to be this

10 document that I have, her change of address request.

11     Q    And when was that?

12     A    September 1993.

13     Q    And what was the address change?

14     A    From or to?

15     Q    From and to.

16     A    It was changed from P.O. Box 26, Avalon, New

17 Jersey, to the address that I had given.

18     Q    The Ogden Avenue address?

19     A    Yes.

20     Q    And there's nothing after that; is that correct?

21     A    No.  All of her mail is going to that Ogden Avenue

22 address.

23     Q    Is there any indication as to whether or not she

24 may have graduated?

25     A    No, she was visiting from another law school.

166

1                      Gillus-Cross/Meyers

2       Q     So you wouldn't have those records to indicate

3    whether she had graduated already?

4       A     No, I would not.

5       Q     Do you know what school she is visiting from?

6       A     Yes, Golden Gate University.

7       Q     Where is that?  Is that in California?

8       A     I have no idea.

9       Q     Okay.  Have you dealt with records pertaining to

10   visiting students before?

11      A     Yes.

12      Q     And don't these records, to the best of your

13   knowledge, ever -- are they ever updated after the visiting

14   student is no longer visiting with the school?

15      A     No.  Unless they stay leave and come back.

16                 MR. MEYERS:  No further questions, your Honor.

17                 THE COURT:  Anything else?

18                 MR. CARROLL:  One question your Honor

19   REDIRECT EXAMINATION

20   BY MR. CARROLL:

21      Q     Do the records indicate when Ms. Helverson was last

22   a student at New York Law School?

23      A     Yes.

24      Q     When was she last a student there?

25      A     She was last a student during the spring of 1994

FORM C-100 · LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1                    Gillus

2    semester, which ended May the 17th, 1994.

3                    MR. CARROLL:  Thank you very much.

4                    I have no further questions.

5                    THE COURT:  May what?

6                    THE WITNESS:  May the 17th.

7                    THE COURT:  Thank you.

8                    THE WITNESS:  You're welcome.

9                    MR. MEYERS:  I have nothing further, your

10                   Honor.

11                   THE COURT:  You may step down.

12                   (Whereupon, the witness was excused.)

13   A N N E   M A R I E   C A R B O N E,

14                   residing at 20 Conselyea Street, Brooklyn, New

15                   York, called as a witness by the People, having

16                   been duly sworn, testified as follows:

17                   THE CLERK:  State and spell your name, for the

18                   record.

19                   THE WITNESS:  Anne Marie, A-n-n-e , M-a-r-i-e,

20                   Carbone, C-a-r-b-o-n-e.

21                   THE CLERK:  Where do you live, ma'am?

22                   THE WITNESS:  20 Conselyea, C-o-n-s-e-l-y-e-a,

23                   Street, Brooklyn, New York.

24   DIRECT EXAMINATION

25   BY MR. CARROLL:

168

| | | |
|---|---|---|
|1| |Carbone-Direct/Carroll|
|2|Q|Thank you for coming, Miss Carbone.|
|3| |Are you employed?|
|4|A|Yes, I am.|
|5|Q|By whom are you employed?|
|6|A|Chemical Bank.|
|7|Q|And what do you do for Chemical Bank?|
|8|A|I'm a legal assistant for the subpoena compliance|
|9|group.| |

10               THE COURT:  Which branch?

11               THE WITNESS:  Head office at 270 Park Avenue.

12   Q   In your capacity as a subpoena compliance official

13  for Chemical Bank, are you familiar with the books and

14  records of Chemical Bank?

15   A   Yes, I am.

16   Q   Are those books and records kept in the normal

17  course of business?

18   A   Yes, they are.

19   Q   And pursuant to a subpoena, have you produced

20  certain records of Chemical Bank here today?

21   A   Yes.

22   Q   Are those the documents in front of you?

23   A   Yes, they are.

24   Q   And are these particular documents maintained by

25  Chemical Bank in the regular course of its business?

FORM C-100 · LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

169

1                    Carbone-Direct/Carroll

2    A    Yes, they are.

3    Q    May I see them, ma'am?

4    A    Sure (handing.)

5              MR. CARROLL:  Mr. Meyers, may I show you these

6         documents?

7              MR. MEYERS:  Thank you, Mr. Carroll.

8              MR. MEYERS:  Your Honor, at this time I'm

9         going to object only to those portions which

10        indicate Mr. O'Hara's personal identification

11        numbers on his accounts, the amounts that are

12        listed and any other information which may be

13        deemed personal and not related to this matter;

14        this matter being only -- for the purposes of this

15        matter, that being only the name of Mr. O'Hara, the

16        address and the dates of each statement.

17             MR. CARROLL:  Your Honor, I have no objection

18        to redacting.

19             THE COURT:  Except for the dates of any

20        deposits and/or withdrawals, too, without any

21        indication of the amounts.  I'm not concerned with

22        that.

23             MR. MEYERS:  Just that it's an active

24        account.

25             THE COURT:  That's correct.  Together with the

1         Carbone-Direct/Carroll

2    dates of deposits and dates of withdrawals.

3         MR. MEYERS:  No problem with that.

4         THE COURT:  And whatever dates may be

5    pertinent to the issue here.

6         MR. CARROLL:  Thank you, your Honor.

7         THE COURT:  So you gentlemen will take care of

8    the redaction.  You'll consent to it but if you

9    cannot agree on something as being the direction of

10   the Court, you will present to me and I'll make the

11   determination.  But I'm sure you'll be able to

12   agree to everything that you're directed to do.

13        How many pages are there?

14        MR. CARROLL:  In a moment, your Honor.

15        THE COURT:  I'd and I'd like to see it.

16        MR. CARROLL:  I believe there are 48 pages,

17   your Honor.

18        THE COURT:  Exhibit 15 in evidence.

19        That's Chemical Bank?

20        MR. CARROLL:  The Chemical Bank records, your

21   Honor.

22        THE COURT:  Chemical Bank, 48 pages.  Subject

23   to redaction.

24        (Whereupon, Petitioners' Exhibit 15 was

25   received in evidence.)

1                    Carbone-Direct/Carroll

2                    THE COURT:  Okay.

3        Q    Miss Carbone, do these records relate to a

4    particular individual?

5        A    Yes, it does.

6        Q    And what is the name of that individual?

7                    THE COURT:  It speaks for itself.

8        A    John K. O'Hara.

9        Q    John K. O'Hara.

10       A    Yes.

11       Q    Do the records indicate the address at which

12   Mr. O'Hara opened his account at Chemical Bank?

13       A    Yes.

14       Q    Could you provide that to us, please.

15       A    Well, it's -- when he opened the account as of

16   June 10th of '91, he was at the address of 5617 Sixth Avenue

17   in Brooklyn.

18       Q    Was the account's address subsequently changed to

19   another address?

20       A    Yes, it was.

21                   THE COURT:  When was it changed.

22                   THE WITNESS:  We have a change request,

23            October 10th, '91.

24                   THE COURT:  You had a request for change from

25            Mr. O'Hara?

172

1                    Carbone-Direct/Carroll

2                    THE WITNESS:  Yes, October 10th, '91.

3                    THE COURT:  October 10th, '91.  To what

4          address?

5                    THE WITNESS:  579 61st Street, Brooklyn.

6                    THE COURT:  579 --

7                    THE WITNESS:  61st Street.

8                    THE COURT:  Go ahead.

9     Q     And was the address subsequently changed again?

10    A     I don't think so.  I don't have another change of

11    address.

12    Q     Would you check the statements?

13    A     I'll check the statement.

14          Well, the statement, 11/25/93 to 12/23/93, it was

15    at the address of 579 61st Street in Brooklyn.

16                    THE COURT:  Wait.  The statement of what?

17                    THE WITNESS:  Dated 11/25/93.

18                    THE COURT:  Is that a bank statement?

19                    THE WITNESS:  Yes, a bank statement.

20                    THE COURT:  Statement date is what?

21                    THE WITNESS:  11/25/93.

22                    THE COURT:  Where does that go to?

23                    THE WITNESS:  To 12/23/93.

24                    THE COURT:  To -- what?

25                    THE WITNESS:  12 -- December 23, 1993.

173

1                  Carbone-Direct/Carroll

2                  THE COURT:  To 12/23/93.  Where did that go

3           to?

4                  THE WITNESS:  The address was 579 61st

5           Street.

6      Q    And was there a change after that, ma'am?

7      A    Yes.  Statement of 12/24/93 to January 26 of '94.

8                  THE COURT:  12/24/93 to when?

9                  THE WITNESS:  1/26/94.  It went to the address

10          of 6017 Fourth Avenue, Brooklyn.

11     Q    Now, ma'am, it was for the period 12/26/93 to

12  1/24/94?

13     A    Uh-huh.

14     Q    That means it was mailed after 1/24/94; is that

15  correct?

16     A    Yes.  Well, it was dated from the date 12/24.

17                 MR. CARROLL:  I have no further questions of

18          this witness.

19                 THE COURT:  Well, when you say "dated," that's

20          the statement date?

21                 THE WITNESS:  That's the statement date.

22                 THE COURT:  For the period of 12/24/93 to

23          1/26/94?

24                 THE WITNESS:  Yes.

25                 THE COURT:  And that was changed to 6017

174

1                    Carbone-Direct/Carroll

2      Fourth Avenue; is that right?

3              THE WITNESS:  Uh-huh.

4              THE COURT:  Where did you get that change of

5      address?  Do you have an application there for it?

6              THE WITNESS:  No, I don't.  No, I don't have

7      an application for that change of address.

8              THE COURT:  So there was a change between

9      12/23/93 to after --

10             THE WITNESS:  Actually, a day, if you really

11     look at it.  12/23, it was 579 61st Street; and

12     then the day after, the 24th or the 25th -- no, I'm

13     sorry, the 23rd, the same day, it was changed to --

14     the 25th, right.

15             THE COURT:  Well, how was that change

16     effected, if you know?

17             THE WITNESS:  I just see it on the statement.

18     Not that I know it.

19             THE COURT:  Well, prior you testified that

20     there were applications for a change of address.

21             THE WITNESS:  Right.

22             THE COURT:  Isn't that correct?

23             THE WITNESS:  Yes.

24             THE COURT:  Would it be necessary to have an

25     application to change an address?

1              Carbone-Direct/Carroll

2              THE WITNESS:  Yes.

3              THE COURT:  Well, then how was the

4         effective --

5              THE WITNESS:  Well, he could have ordered his

6         checks and changed it on his order for the checks.

7              THE COURT:  Do you know if he did?

8              THE WITNESS:  I don't know.  I couldn't say.

9              MR. MEYERS:  Thank you, your Honor.

10             May I see this, please.

11             (Witness handed to Mr. Meyers.)

12   CROSS-EXAMINATION

13   BY MR. MEYERS:

14        Q    Miss Carbone, earlier you testified that on

15   October 10th, 1991 that the address was charged to 579 61st

16   Street in Brooklyn.  And then you stated right after that

17   that at 11/25/93 there was a statement that also said 579

18   61st Street in Brooklyn.

19        A    Right.

20        Q    Would you please take a look at this statement,

21   which is part of the 48 pages which you presented today

22   pursuant to Mr. Carroll's subpoena (handing).

23        A    Okay.  That's another address.

24        Q    Can you please read the date on this address -- the

25   date on that statement and the address?

176

                              Carbone-Cross/Meyers

1

2        A     It's February 25th to March 23rd, 1993.

3                    THE COURT:  Wait.  February 25th, '93?

4                    THE WITNESS:  To March 23.

5                    THE COURT:  To March 23, '93.

6                    THE WITNESS:  The address is 553 47th Street,

7             Brooklyn.

8                    THE COURT:  The address is what?

9                    THE WITNESS:  553 47th Street, Brooklyn.

10                   THE COURT:  Is that the only statement for

11            that address?

12       Q     Could you please read the next statement

13    (indicating).

14       A     March 24th to April 23rd, '93; it's the same

15    address.

16                   THE COURT:  3/24 to April what?

17                   MR. MEYERS:  To April 23.

18                   THE WITNESS:  April 23.

19                   THE COURT:  Go ahead.

20                   Anything else?

21                   THE WITNESS:  April 24th to May 25th, '93,

22            also the same address.

23                   THE COURT:  April 24th to May 25th.

24                   Go ahead, now, after that.

25                   MR. MEYERS:  Excuse me a second, your Honor.

1                    Carbone-Cross/Meyers

2       Q    Is there any way on here to determine if it's an

3  active account?

4       A    The active account is the balance --

5       Q    Is there any indication whether there were deposits

6  or withdrawals?

7       A    Yes.

8       Q    Were there deposits?

9       A    No, just withdrawals.

10           MR. MEYERS:  I'm sorry to interrupt, your

11           Honor.  I just wanted to establish that for the

12           record.

13      Q    If you'd please read that one.

14      A    May 26 - June 23rd, 1993, the same address.

15      Q    Was there any activity in that account?

16      A    Yes, there was.

17      Q    Okay.

18      A    June 24th to July 26th, '93.  Also the same

19  address.

20      Q    Was there any activity on that account?

21      A    Yes, there was.

22           July 27 to August 24th of '93, same address.

23      Q    Was there any activity in that account?

24      A    Yes, there was.

25      Q    Am I correct; is that the last of those kind of

1                        Carbone-Cross/Meyers

2    statements?

3        A     Yes, they are.

4        Q     I notice there's a different type of statement.

5    Why is that?  This is a different --

6        A     No, it's just --

7        Q     This is not a statement?

8        A     Yes, this is a statement.  It's a summary

9    statement.

10       Q     What is the difference between this kind of

11   statement and this kind of statement?

12       A     Just different forms.  It's the same thing.

13       Q     Okay.  Please read that.

14                  MR. MEYERS:  It's a little different form,

15              your Honor.

16                  THE COURT:  Go ahead.

17       A     Okay.  This is August 25th, '93 to September 24th

18   of '93, also the same address.

19       Q     Is there any activity shown in that account?

20       A     Yes, there is.  Activity, shows a balance.

21       Q     These will only show you balances; it won't show

22   you whether checks are cashed or deposits?

23       A     This is a summary copy (indicating.) This is the

24   statement (indicating.)

25       Q     We just turned the page on the same August through

179

1                    Carbone-Cross/Meyers

2    September --

3        A    Right, this was page two --

4        Q    The second page shows any activity on that account?

5        A    Yes, it does.

6        Q    Do you see any indication there was activity in

7    that account?

8        A    Yes.

9        Q    Okay.  Now then, we're back to what you testified

10   to previously.

11       A    Right.

12            MR. MEYERS:  Okay.

13            THE COURT:  There's nothing -- no statement

14            from 9/25 to 11/25; is that correct?

15            MR. MEYERS:  I thought she testified to that,

16            your Honor.

17            THE COURT:  No, I have up to 9/24.

18            MR. MEYERS:  You're right.  Let's find those.

19       Q    Okay.  Is this the one you had read previously?

20       A    Yes, I did.

21       Q    Did you put these yellow tabs in here?

22       A    I didn't, Jackie Grant, who's handling the case.  I

23   just came in to testify for her.  She couldn't come.

24       Q    I notice those are the only two yellow tabs that

25   are in there.  Is there any reason --

1                    Carbone-Cross/Meyers

2        A     That's the only two address changes she noticed.   I

3   guess she really didn't go through the other ones.   Those

4   are the only two that I guess go with the signature card

5   that she found.

6        Q     Where do you have to go to get these records?

7        A     We go to our retrieval center.

8        Q     Where is that?

9        A     They're on tape.

10       A     It's in Pawling, New York.

11       Q     Did you have to go there?

12       A     No, we computerize it; put a request in for an

13   order and then we had the messenger pick them up so we could

14   bring them here today.

15       Q     You could tell us about those (handing).

16       A     This is September 25th, '93 to October 26, '93.

17   The address is 579 61st Street in Brooklyn.

18                    THE COURT:   What was that?   What address?

19                    THE WITNESS:   579 61st Street.

20                    THE COURT:   From September what?

21                    THE WITNESS:   25th, '93 to October 26th of

22             '93.

23                    THE COURT:   And that goes to where?

24                    THE WITNESS:   579 61st Street.

25                    THE COURT:   And thereafter?

FORM C-100 · LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

181

1                    Carbone-Cross/Meyers

2              THE WITNESS:  October 27, '93 to 11/24/93,

3         also goes to 579 61st Street.

4              THE COURT:  And then it goes up to 12/23; is

5         that correct?

6              THE WITNESS:  12/23, right.

7              THE COURT:  And that's the the same address,

8         579 61st Street?

9              THE WITNESS:  Right.

10             THE COURT:  And then it goes to Fourth

11        Avenue?

12             THE WITNESS:  Yes.

13             THE COURT:  Okay.

14   Q    Now, can you please tell me what this document is,

15   ma'am (handing)?

16   A    Okay.  This is a printout of his balance as of

17   August 1st, 1994, that the account is open.

18   Q    What address is that account listed at?

19   A    6017 Fourth Avenue, Brooklyn Brooklyn.

20             MR. MEYERS:  I have no further questions, your

21        Honor.

22             THE COURT:  Anything else?

23             MR. CARROLL:  Just to clarify a couple of

24        things, your Honor?

25             THE COURT:  Sure.

182

1                    Carbone-Cross/Meyers

2    REDIRECT EXAMINATION

3    BY MR. CARROLL:

4         Q    Just so that I can get my dates straight, the

5    address at which this account was opened is which address,

6    ma'am?

7                    MR. MEYERS:  Objection.

8                    Asked and answered, your Honor.

9                    This is going over the same testimony.  She's

10              already --

11                   THE COURT:  6/10/91?

12                   MR. CARROLL:  Fine.

13                   THE COURT:  That was 5617 Sixth Avenue,

14              right?

15                   THE WITNESS:  Right.

16                   THE COURT:  10/10/91, it went to 579 61st

17              Street.

18                   THE WITNESS:  Right.

19                   THE COURT:  Then --

20        Q    From 61st Street it went to where, ma'am?

21        A    Fourth Avenue, 6017 Fourth Avenue.

22                   THE COURT:  And it stayed at 61st Street from

23              '91 through December of '93.

24                   THE WITNESS:  Yes.

25                   THE COURT:  Okay.

1                    Carbone-Redirect/Carroll

2                    MR. MEYERS:  Your Honor, again for

3          clarification --

4                    MR. CARROLL:  She's left out that it was for

5          a -- It appears that it was for the period from

6          2/25/93 through 9/24/93; am I correct?

7                    MR. MEYERS:  That's correct.

8                    MR. CARROLL:  At 47th.  2/25/93 to --

9                    THE COURT:  2/25/93, right, to 9/24/93, she

10         was at 47th Street.

11                   MR. MEYERS:  That's correct.

12    Q    And then, ma'am, for the period 9/25/93 through

13    December 25, '93 it was back to 61st Street; is that

14    correct?

15    A    Yes.

16                   MR. MEYERS:  She's testified to that.

17                   THE COURT:  That's it.

18    Q    And then to Fourth Avenue, correct?

19    A    Yes.

20                   MR. CARROLL:  I have no further questions.

21                   MR. MEYERS:  Nothing further, your Honor.

22                   THE COURT:  All right.

23                   Leave that, ma'am.

24                   MR. CARROLL:  Your Honor, the next witness is

25         coming.  I've just been informed that on the

184

1                         Carbone-Redirect/Carroll

2          line-by-line across the street, they -- for some

3          reason -- have not been able to locate a copy of

4          the updated specs.  The Court has a copy.  May we

5          provide the Board of Elections --

6                   THE COURT:  It's all right with me.

7                   MR. MEYERS:  I have no objection, your Honor.

8                   THE COURT:  What happened to them?

9                   MR. CARROLL:  Beats me.  It's something we're

10          not going to handle here in the courtroom.  This is

11          literally the updated line-by-line.

12                   THE COURT:  We don't need it.  It's not in

13          evidence, is it?

14                   MR. CARROLL:  No, it's not.  It's marked.  It

15          was filed per Judge Garry's instructions.

16                   Do you object if I give it this to one of my

17          people to carry over there?

18                   MR. MEYERS:  Absolutely not.  Go right ahead,

19          Mr. Carroll.  Immacolata Pelliccio

20  I M M A C O L A T A   P E L L I C C I O,

21          residing at 6017 Fourth Avenue, Brooklyn, New York,

22          called as a witness by the Petitioners, having been

23          duly sworn, testified as follows:

24                   THE CLERK:  Have a seat.  You have to speak

25          loudly.  Tell us what your name is and spell it for

1                          Carbone-Redirect/Carroll

2                us.

3                       THE WITNESS:  Immacolata Pelliccio,

4                I-m-m-a-c-o-l-a-t-a, P-e-l-l-i-c-c-i-o.

5                       THE CLERK:  Where do you live, ma'am?

6                       THE WITNESS:  6017 Fourth Avenue, Brooklyn.

7                       THE COURT:  You may proceed.

8                       MR. CARROLL:  Thank you, your Honor.

9                       THE COURT:  How many more witnesses do you

10               have outside?

11                      MR. CARROLL:  A couple more, Judge.

12                      THE COURT:  Let's go.

13      DIRECT EXAMINATION

14      BY MR. CARROLL:

15          Q    Miss Pelliccio, thank you for coming.

16               Where do you reside, ma'am?

17          A    6017 Fourth Avenue.

18          Q    How long have you lived there?

19          A    Maybe close forty years.

20          Q    Forty years.

21          A    Forty.

22          Q    Four-zero.

23          A    That's it.

24          Q    Do you live there with your husband?

25          A    My husband's dead.  I live there before my husband

1                        Pelliccio-Direct/Carroll

2    dies.  I live alone.

3         Q     Are there other members of your family in that

4    building?

5         A     I have one of my daughters upstairs.

6         Q     Could you describe the building for us.

7         A     It's two-family and a store.

8         Q     How many stories is it?

9         A     The two stories and a store.  Two apartments and a

10   store.

11        Q     So the first floor is a store?

12        A     Yeah.  The second floor is me.

13        Q     And what is the name of that store?

14        A     Tina Coffee Shop.  Used to be Pelliccio Bakery

15   before my husband died.

16        Q     Now it's Tina's Coffee Shop?

17        A     Yes.

18        Q     Who is Tina?

19        A     Me.

20        Q     So you own the coffee shop?

21        A     Yes.

22        Q     Do you live in one of the apartments?

23        A     Yes.

24        Q     Which apartment do you live in, ma'am?

25        A     The first apartment.

187

Pelliccio-Direct/Carroll

1

2    Q    So that's one of the two apartments?

3    A    One of the two apartments.

4    Q    What sort of street is this?

5    A    Huh?

6    Q    Is this a commercial street?

7    A    Commercial street.

8    Q    So there are stores on the street, correct?

9    A    Yes.

10    Q    There is another unit in that building, is there

11   not?  There is another apartment, you testified, in that

12   building?

13    A    It's my daughter upstairs, another apartment.

14    Q    And what is your daughter's name?

15    A    Emily Massa.

16    Q    So you live in one of the units and your daughter

17   Emily Massa lives in the other unit.

18    A    Yeah.

19    Q    And there are no other apartments in the building?

20    A    No.

21    Q    Do you know a Mr. John O'Hara?

22    A    I know Mr. John O'Hara all his life.

23    Q    Okay.  Does Mr. O'Hara live in your building?

24    A    Yes, in the apartment where I live.

25    Q    In the apartment where you live?

188

1                    Pelliccio-Direct/Carroll

2      A     Because I moved upstairs to my daughter's apartment

3   because she's a very sick girl, and I could not leave the

4   apartment, go up and down all the time.

5      Q     And how long has Mr. O'Hara lived there?

6      A     Oh, I think it's around September.

7      Q     Since around September of when?

8      A     '93.

9      Q     September of '93.  And in the time that Mr. O'Hara

10  has lived there, has he paid you any rent?

11     A     Yes.

12     Q     Okay.

13     Q     How does he pay you?  Does he pay you by check?

14     A     No.  Cash.

15     Q     He pays you by cash.

16           How much does he pay you?

17     A     Four hundred.

18     Q     $400.  Does Mr. O'Hara have a lease?

19     A     No, because I don't need any lease.  I know John

20  O'Hara for so many years.

21     Q     So he has no lease?

22     A     No lease.

23     Q     Do you have gas service at this apartment?

24     A     Yes.

25     Q     Okay.  In whose names do the bills come?

1                    Pelliccio-Direct/Carroll

2       A    Still under my name.  Still come under my husband's

3    name.

4       Q    Do you have electric service in this apartment?

5       A    Yes.

6       Q    Who does the electric bill come in?

7       A    Pelliccio name.

8       Q    Now, is there cable service in this building?

9       A    Yes.

10      Q    Where does the cable go?

11      A    In the apartment, mine.

12      Q    Where you live?

13      A    Yes.

14      Q    Is that the apartment with your daughter?

15      A    No, it's in the apartment where John O'Hara lives.

16      Q    It's in the apartment where John O'Hara lives.

17      A    Yes.

18      Q    In whose name is the cable service?

19      A    The cable service is under my name because it was

20   there before.

21      Q    So Mr. O'Hara -- you've known Mr. O'Hara all your

22   life, right?

23      A    That's right.

24      Q    And Mr. O'Hara moved into your building in

25   September of 1993, right?

190

1                    Pelliccio-Direct/Carroll

2        A    Yes.

3        Q    You don't have a lease with him, right?

4        A    No.

5        Q    You don't have -- you didn't change any of the

6    utility accounts with him, right?

7        A    But he pays the utility by cash.

8        Q    Oh, he pays the utilities by cash.

9        A    He gives me the money and I mail the check, my own

10   checking account.

11       Q    Do you give him any receipts for this stuff?

12       A    Yeah, I think I have a few, but I couldn't find

13   them all because, you know.  This is the only thing I could

14   find (handing).

15       Q    Okay.  You have three receipts here that are marked

16   September 1, '93, April 6, '94?

17       A    Yeah, that's what -- I couldn't find the others.

18       Q    Let me ask you ask you a question.

19            If you're giving these receipts to Mr. O'Hara, why

20   do you have them?

21       A    No, that's the copy.

22       Q    That's the copy.  Okay.

23            MR. CARROLL:  I have no further questions.

24            THE COURT:  How many receipts did you give

25            Mr. O'Hara?  Do you give him a receipt every

1                    Pelliccio-Direct/Carroll

2        month?

3              THE WITNESS:  Yeah.  But that's all I can find

4        the receipt.  I misplaced them.

5              THE COURT:  You give him a receipt every

6        month, right?  Please.  Do you give him a receipt

7        every month?

8              THE WITNESS:  Yes.

9              THE COURT:  Is that right?

10             THE WITNESS:  Yes.

11             THE COURT:  Okay.  For how much?

12             THE WITNESS:  Four hundred.

13             THE COURT:  And do you give him a receipt for

14       the utilities?

15             THE WITNESS:  No.  I don't give him a

16       receipt.  He pay cash.  He give me the cash and I

17       pay with my check.

18             THE COURT:  You pay with your check?

19             THE WITNESS:  Yeah, because they come under my

20       name.

21             THE COURT:  What difference does it make?  Why

22       can't you use his check?

23             THE WITNESS:  Because I receive under my name,

24       the bill.

25   DIRECT EXAMINATION

1                    Pelliccio-Direct/Carroll

2    BY MR. CARROLL:  (Cont'g)

3        Q    Do you put your account number on the check that

4    you mail to the utility company?

5        A    Sure.

6                MR. CARROLL:  I have no further questions.

7                THE COURT:  You may inquire.

8                MR. MEYERS:  Thank you, sir.

9    CROSS-EXAMINATION

10   BY MR. MEYERS:

11       Q    Ma'am, did you say that the gas and electric is

12   still in your husband's name?

13       A    That's right.

14       Q    And your husband is deceased?

15       A    Oh, yeah.

16       Q    How long ago did he pass away?

17       A    About fifteen years.

18       Q    Fifteen years.  Okay.

19                THE COURT:  So the utilities aren't in your

20           name; it's in your husbands name?

21                THE WITNESS:  Yes.  I never change it since he

22           die.

23       Q    Do you know if Mr. O'Hara ever paid any of the

24   utilities or the cable for you at any time?

25       A    Yes, he did.

193

1              Pelliccio-Cross/Meyers

2    Q    And how would that occur?  Would he give you a

3    check?

4         Do you recognize the handwriting on this check,

5    ma'am (handing)?

6    A    Yes, that's John O'Hara.

7    Q    Did he write this part (indicating)?

8    A    Yes.

9    Q    And that's his signature?

10   A    Yes.

11   Q    Does Mr. O'Hara have a telephone at that residence?

12   A    Yes.

13            THE COURT:  Whose name is that in?

14            MR. MEYERS:  If you know.

15            THE WITNESS:  John O'Hara.

16            THE COURT:  When was it put in?

17            THE WITNESS:  I don't know.  About October;

18       something like that.  I don't remember exactly.

19            THE COURT:  Well, let's see if you could try

20       to remember --

21            THE WITNESS:  I'm not that young to remember

22       things anymore.  I forget things one moment to the

23       other.

24            THE COURT:  So sometimes he paid by check and

25       sometimes he paid in cash, right?

1                      Pelliccio-Cross/Meyers

2                THE WITNESS:  Yes.

3                MR. MEYERS:  I'm sorry, your Honor, what was

4          that?

5                THE COURT:  Sometimes he paid by check and

6          sometimes he paid in cash; is that right?

7                THE WITNESS:  Not the rent.  The rent is

8          always --

9                THE COURT:  The rent he always paid you in

10         cash, right?

11               THE WITNESS:  Yes.

12               THE COURT:  But utilities, sometimes by check

13         and sometimes by cash?

14               THE WITNESS:  Sometimes he gave me cash and I

15         make my own check.

16               MR. MEYERS:  I have no further questions, your

17         Honor.

18               THE COURT:  Any other questions?

19               MR. CARROLL:  I have no questions of this

20         witness, your Honor.

21               THE COURT:  You may step down.

22               MR. MEYERS:  Thank you, ma'am.

23               THE WITNESS:  Do I take this or leave it

24         here?

25               MR. CARROLL:  It's not in evidence.

195

1              Pelliccio-Cross/Meyers

2              MR. MEYERS:  You can take it.

3              (Whereupon, the witness was excused.)

4              THE COURT:  Next witness.

5              MR. CARROLL:  Your Honor, our next witness I

6         believe will be Miss Steffenson, and I believe she

7         has stepped away.  I believe she'll be here

8         shortly.

9              THE COURT:  All right.  We'll take a brief

10         recess.

11              (Whereupon, there was a brief recess.)

12    M A U R E E N   S T E F F E N S O N,

13         residing at 519 47th Street, Brooklyn, New York,

14         called as a witness by the Petitioners, having been

15         duly sworn, testified as follows:

16              THE CLERK:  State and spell your name for the

17         record.

18              THE WITNESS:  Maureen, M-a-u-r-e-e-n,

19         Steffenson, S-t-e-f-f-e-n-s-o-n.

20              THE CLERK:  Where do you live, ma'am?

21              THE WITNESS:  519 47th Street.

22              THE CLERK:  Brooklyn?

23              THE WITNESS:  Right.

24              THE CLERK:  Okay.

25    DIRECT EXAMINATION

196

1                    Steffenson-Direct/Carroll

2   BY MR. CARROLL:

3       Q    Miss Steffenson, thank you for coming.

4       A    You're welcome.

5       Q    First, Miss Steffenson, just as for a matter of

6   clarification, I'm going to show you a photograph which has

7   been marked in evidence as Plaintiff's Exhibit Number 4.

8   Okay.  And I'd just ask you to take a look at that

9   photograph and particularly the lady standing on the left.

10  That is, in fact, you, isn't it?

11      A    Yes, it is.

12      Q    When was that photograph taken?

13      A    It was at a policeman's -- an affair that we had.

14      Q    And that was earlier this year; was it not?

15      A    Oh, a few months ago, I guess.  Not even.  That's

16  me.

17              MR. CARROLL:  Thank you very much.

18      Q    Miss Steffenson, do you know an individual by the

19  name of John K. O'Hara?

20      A    Yes, I do.

21      Q    And how long have you known Mr. O'Hara?

22      A    On and off through the community -- through

23  community work.

24      Q    Sure.

25      A    That's all.

1          Steffenson-Direct/Carroll

2     Q     A couple of years?  Five years?  Ten years?

3     A     He goes back a way, yes.

4     Q     Mr. O'Hara's running for the legislature this year;

5  is he not?

6     A     That's right.

7     Q     You've helped him in his campaign; is that not also

8  the case?

9     A     Yes.

10     Q     In fact, you did collect quite a few signatures on

11  a designating petition for Mr. O'Hara, didn't you?

12     A     Yes, I did.

13     Q     I'm going to show you a document which has been

14  marked in evidence as Plaintiff's Exhibit or Petitioners'

15  Exhibit Number 5 and this is in fact the designating

16  petition of Mr. O'Hara; and I ask you to focus on the

17  section of the petition under the name of the candidate,

18  okay.  The part of the petition that's called the Committee

19  on Vacancies.

20          Are you one of Mr. O'Hara's Committee on

21  Vacancies?  Are you on his Committee on Vacancies?

22     A     Yes, I am.

23     Q     And who asked you to become a member of the

24  Committee on Vacancies?

25     A     John O'Hara.

198

1               Steffenson-Direct/Carroll

2      Q     How active have you been in Mr. O'Hara's campaign?

3      A     Pretty active.  Very active, I'd say.

4      Q     Did Mr. O'Hara himself ask you to get involved in

5   the campaign?

6      A     Yes, he did.

7      Q     Do you hold any position in the campaign?

8      A     No.

9      Q     Okay.  Are you an officer of the campaign in any

10   way?

11      A     No.

12      Q     Okay.  Have you appeared in Mr. O'Hara's campaign

13   literature?

14      A     Yes.

15      Q     As a matter of fact, I'm going to show you a piece

16   of Mr. O'Hara's campaign literature, and I ask you to take a

17   look at this.

18            Do you recognize this document?

19      A     Yes, I do.

20            MR. CARROLL:  And can I show this to you,

21        Mr. Meyers.

22            MR. MEYERS:  Thank you.

23            MR. CARROLL:  Could we have this marked and I

24        would like to introduce this into evidence, if we

25        might.  Can we have it marked?

Steffenson-Direct/Carroll

1

2          MR. MEYERS:  No objection, your Honor.

3          THE COURT:  Without objection, mark it as

4     Petitioners' Exhibit what?

5          COURT OFFICER:  16.

6          THE COURT:  16.

7          THE CLERK:  16.

8          (So marked.)

9    Q    Now, in Petitioners' Exhibit 16 in evidence, there

10   are a series of quotations attributed to various people in

11   the piece.  I believe there are four quotations?

12         MR. MEYERS:  Objection.

13         Irrelevant.

14         THE COURT:  It's in evidence.  The whole

15    thing's in evidence, Counselor.

16   Q    Is one of those four quotations from you?

17   A    Yes.

18   Q    Where do you reside, ma'am?

19   A    519 47th Street.

20   Q    Could you describe that building for me.

21   A    It's a brownstone.

22   Q    Three stories?

23   A    Yes, three floors.

24   Q    How many apartments in it?

25   A    Two family.

301

1                          Osborn-Direct/Carroll

2     you asked to examine?

3          A     I was asked to examine the signatures on lines 5

4     and 6 which read respectively Amanda Romero and Mario

5     Romero.

6          Q     And based upon your review of those two signatures,

7     were you able to draw any conclusion?

8          A     Yes, sir.

9          Q     And what was that conclusion?

10         A     They were written by one individual.

11         Q     Are you able to identify who that individual is?

12         A     No, sir.

13         Q     But that the signatures were written by one person,

14    not two?

15         A     Correct.

16         Q     Sir, turning to page number 181 of the petition,

17    were you asked to examine any signatures on that page?

18         A     Yes, sir.

19         Q     What signatures were they, sir?

20         A     I was asked to examine the signatures on lines 7

21    and 8 which read respectively "Joseph Fabriszewski, F-a-b --

22    I believe -- r-i-s-z-e-w-s-k-i.  And on line 8, Helen

23    Fabriszewski.

24         Q     Did you look at any other signatures on that page?

25         A     Yes, I did.

1                      Osborn-Direct/Carroll

2       Q     What other signature on that page did you look at?

3       A     The signature, on line 6, which reads "Frank

4    Romejko."  That appears to be Romejko, R-o-m-e-j-k-o, or

5    h-o.

6                    MR. MEYERS:  Objection, your Honor.

7                    That's not marked in the bill of particulars

8               as being the subject of Petitioners' evidence.

9                    THE COURT:  Take a look.

10                   It's not marked?

11                   MR. MEYERS:  It's not.

12                   THE COURT:  All right.  So strike Romejko.

13      Q     Based upon your analysis of those signatures, were

14   you able to reach any conclusion as to who was the author of

15   the signatures for the Fabriszewskis?

16      A     Only that the two signatures on line 7 and 8 in the

17   name of Fabriszewski were written by one person.  I don't

18   know whether either one or neither was written by the named

19   individual.

20      Q     But that the two Fabriszewskis are the same

21   person.

22      A     Yes.

23      Q     Does any other signature on that page indicate to

24   you who was the author of the Fabriszewski signatures?

25                   MR. MEYERS:  Objection.

1                          Osborn-Direct/Carroll

2                  MR. CARROLL:  I'm not contending that

3              Mr. Romejko's signature is a forgery.

4                  MR. MEYERS:  I'm objecting because it's

5              speculative.

6                  MR. CARROLL:  I'm asking an expert for his

7              professional judgment.

8                  THE COURT:  Let me hear that question again.

9       Q    Does a review of any of the other signatures on

10     that page provide you with information from which you can

11     conclude who was the author of the signatures of the two

12     Fabriszewskis?

13                 MR. MEYERS:  Objection.

14                 THE COURT:  On what would he base that?

15                 MR. CARROLL:  On a review of the signatures on

16             the page.

17                 THE COURT:  Objection sustained.

18                 That would be highly speculative, unless he

19             has some comparison with something else.

20      Q    Do you have a comparison that would permit you to

21     do that, sir?

22      A    Yes, I do.

23      Q    And what is that comparison?

24      A    In comparing the characteristics forms --

25                 MR. MEYERS:  Objection.

304

1                    Osborn-Direct/Carroll

2              THE COURT:  Objection sustained.

3              Let's go.

4              (Pause in proceedings.)

5              THE COURT:  Is that it?

6              MR. CARROLL:  That is it, your Honor.

7         I would move, at this point, the introduction

8    of Mr. Osborn's enlargements -- which we have been

9    relying upon throughout this process -- into

10   evidence.

11             MR. MEYERS:  I have no objection.

12             THE COURT:  Without objection, mark the

13   enlargements as Petitioners' Exhibit 25.

14             THE COURT:  Let's take five minutes.

15             MR. MEYERS:  Your Honor, may I request that we

16   adjourn until after lunch?

17             THE COURT:  Uh-uh-uh-uh-uh, no, you cannot

18   request.  We will continue with this witness until

19   lunchtime.

20             MR. MEYERS:  Thank you, your Honor.

21             THE COURT:  How many more witnesses do you

22   have?

23             MR. CARROLL:  There is one other lady outside,

24   your Honor.

25             THE COURT:  Is that a short one?  Long one?

FORM C-100 · LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

1                    Osborn-Direct/Carroll

2                MR. CARROLL:  It could be a long one.

3                THE COURT:  Okay.  We'll finish with

4            Mr. Osborn.  Let's take five minutes.

5                (Whereupon, there was a recess.)

6                THE CLERK:  Case on trial.

7                THE COURT:  Are you ready?

8                MR. MEYERS:  Yes, sir.

9                THE COURT:  Let's do the cross.

10               Go ahead.

11               MR. MEYERS:  Thank you.

12   CROSS-EXAMINATION

13   BY MR. MEYERS:

14       Q    Mr. Osborn, I'm not very familiar with the area

15   which is your profession.  Could you please explain to me

16   what it is that you do in order to make these determinations

17   on the signatures.

18       A    Yes, sir.  I examine and compare the general

19   features of questioned writing or signatures, as well as

20   individual features, to determine if there's any basis for

21   an identification or if there is any basis for a

22   nonidentification.  The identification of handwriting is --

23   has the same basis as the identification for any object or

24   person.  It is a combination of general, as well as

25   individual, features and characteristics which, when

1                   Osborn-Cross/Meyers

2      considered singly and then in combination, and also the

3      consideration of a lack of any significant or meaningful

4      differences, allows an identification.

5            It also includes studies of the quality of the

6      writing to determine if any evidence exists indicating an

7      attempted imitation or tracing on the part of some other

8      person.

9      Q    I've heard you use the term general and individual

10     handwriting identities a number of times in your testimony

11     just a moment ago.

12           Can you please tell me what that means.

13     A    Yes, sir.  The general features and handwriting are

14     the system forms of letters that the writer learned.  The

15     overall quality of the writing, that is the penmanship

16     ability of the writer, the size of the writing, the spacing

17     between letters --

18                 THE COURT:  Hold it.  Who is that?  What's all

19           the noise?

20                 COURT OFFICER:  They're having a wedding at

21           Judge Curce's.

22                 THE COURT:  Close the door.

23     A    (Cont'g) And the relationship to the writing of the

24     base lines, if any.  These are all general features that are

25     taken into consideration.

1                           Osborn-Cross/Meyers

2        Q      Now, when you're looking at a signature --

3        A      I haven't finished your question.

4        Q      I'm sorry.  I thought you were finished.

5        A      In combination with the general features, we then

6    also examine and determine whether or not individual's

7    habits are formed.  That is, characteristics which are not

8    any characteristics of writing but which have been developed

9    by a particular writer which are repetitive or different in

10   two or more questioned writings.

11       Q      Now, when looking at a single signature, how would

12   you make that determination?

13       A      By looking at a single signature and comparing it

14   with another signature, one can determine whether or not the

15   identities are consistent and repititious or whether there

16   are unexplainable differences.

17       Q      Now, can you conclusively determine, without

18   question, that two signatures are identical, just from

19   looking at one sample?  Compared with one sample?

20       A      Only when there are no insignificant differences

21   and there is, within those two signatures, a combination of

22   general and individual writing habits that are sufficient in

23   number and quality to allow that kind of a conclusion.

24       Q      What is the general practice in your field for

25   making a determination as to whether or not a signature is

FORM C-100 · LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1                    Osborn-Cross/Meyers

2    authentic?

3        A    That depends on the nature of the questioned

4    document.

5        Q    What does that mean?

6        A    Well, in some cases, such as election petition

7    matters where there are literally -- in some matters I've

8    had -- thousands of questioned signatures, the problem is

9    not one so much of careful imitation by tracing or

10   simulation in each instance but rather a combination of

11   identities distinguishing one writer or more than one

12   writer.

13            In other types of problems, such as a signature on

14   a disputed will or signatures on stolen checks, problems of

15   that nature, why, then the problem is somewhat different in

16   that on the assumption that if the signature in question is

17   not genuine, the actual writer had a model to copy or we

18   must take into consideration all of those features that

19   would be indicative of a tracing or a simulation.

20       Q    In Q number 1 of the Exhibit that you provided for

21   us, you had stated that they were signed by the same --

22   these two signatures found in the petition --

23            THE COURT:  Excuse me.  You have my copy.

24            MR. CARROLL:  My apology, Judge (handing).

25            THE COURT:  Thank you.  Go ahead.

309

Osborn-Cross/Meyers

1

2      Q      You had stated that the two signatures --

3             THE COURT:  You're at Q-1?

4             MR. MEYERS:  Yes, he is, the first page which

5      is Q-1.

6      Q      -- that the signatures on the petition -- it was

7      your belief that they were signed by the same individual; is

8      that correct?

9      A      I believe they they probably were, yes.

10     Q      Now, looking at these two signatures together with

11     us, can you please tell me what it is that you looked at to

12     make that determination.

13     A      Oh, the quality of the writing, for one thing, and

14     the general appearance of it.  The capital letters, "L,"

15     their formation and the size in relation to the following

16     letters and in "Lucy" and "Laurel" are repititious.

17     Q      Let's begin --

18     A      Excuse me.  I haven't finished answering your

19     question.

20     Q      Go ahead, sir.

21     A      The scribbling, illegible finish to the name

22     "Hernandez" in the first name as compared to the finish of

23     that same name in the second signature; these are -- the

24     forms of the small letters, "R" in the name "Hernandez,"

25     these all indicate to me the habits of one writer, even

310

1                       Osborn-Cross/Meyers
2    though those two names are quite varied as to the exact
3    formations of letters.
4         Q    Oh, so you're saying they don't look identical?
5         A    No, they're not identical; of course not.  No
6    person writes identically every time like a rubber stamp
7    impression.  Some people who are poor writers have more
8    variation than others do.
9         Q    You're saying every time a person signs their name,
10   it's different --
11        A    It's different in that they are not exactly
12   identical.
13        Q    Over a person's span of time, a persons signature
14   could change; is that correct?
15        A    Yes, a person's signature could change over a
16   period of time due to age, due to senility, due to a mallady
17   of some sort or sickness.
18        Q    Just looking at the L's in these names.  You had
19   begun your explanation of the comparison of the two
20   signatures by the first name.  The L's appear to be
21   different.
22             What is it that makes you determine that they were
23   written by the same hand?
24        A    You're talking about the two names on the petition
25   sheet?

FORM C-100 - LASER    REPORTERS PAPER & MFG. CO.    800-626-6313

311

1      Osborn-Cross/Meyers

2  Q The L's in "Laurel" and "Lucy" --

3  A Well, they're different in that they're not exactly

4 the same, but they have the same basic size in relation to

5 the following letters.  They begin in the same manner.  They

6 end in the same manner.  And while those two L's wouldn't

7 superimpose one another, they certainly show the same

8 combination of habits in the formation of the letters.

9  Q Is it possible that, say, I could write an L

10 similar to that if I was hand writing that way?

11  A Yes, it's possible.

12  Q So is it possible that more than one person could

13 write an "L" in that manner?

14  A Yes, it's possible.  I'm sure that if you searched

15 long and hard enough, you would find somebody that made an L

16 that began in the same manner or made an L that ended in the

17 same manner.  Then you may find some that made an L that

18 began and ended in the same manner.  And you may then even

19 find some people who would make an L in the same size or

20 relationship to the following small letters.  But with each

21 different identity, the combination of those characters

22 brings one either closer or further away from an

23 identification.

24  Q Okay.  Well let's not search so long and hard.

25 Let's go right to the point.

312

1                         Osborn-Cross/Meyers

2               Did you examine any handwriting Samples for Laurel

3    Hernandez?

4          A     No, I did not.

5          Q     You did not.

6          A     No.

7          Q     So you can't determine whether or not Laurel

8    Hernandez wrote that.

9          A     No, I cannot.

10         Q     Now, is it a normal practice in your profession to

11   use only -- I see you have two samples taken from the buff

12   card, the front and back of the buff card.

13              Is it normal to base your conclusions on only two

14   samples of a signature?

15         A     When I believe that the samples are consistent and

16   repititious and demonstrate developed qualities as these two

17   do, I believe the evidence is sufficient.

18         Q     Well, let's take a --

19         A     In other instances where a person's writing may not

20   be so good or show a great deal more variation, why, then

21   two samples may not be enough.

22         Q     Okay.  Well let's take a look at the L in

23   "DeLorenzo" in that sample.  Those L's are very distinctive

24   from one another.  What is it that makes you conclude they

25   are written by the same person?

313

Osborn-Cross/Meyers

1

2       A       They were given to me as written by the same

3   person.   They show the natural variations in the writing of

4   Lucy DeLorenzo.   Actually, there's not much variation.

5   Those two signatures are quite consistent.

6       Q       I'm just talking about the L's now.

7       A       Yes, and so are the L's.

8       Q       Even though the "L" on one side -- on the upper L

9   is much much larger and is very closed in the scribbly lines

10  on it; and the lower one has large curves and is much

11  smaller.

12          Didn't you earlier testify that one of the things

13  you look at is the size of the letters and the curves in

14  those manners?

15      A       Yes.

16      Q       How can you make that determination just on those

17  two L's.   Let's take all four L's -- Oh, I only wanted to

18  discuss two L's?

19      A       Oh, you're going to limit me now to just two

20  letters or a portion of two letters?

21      Q       I'm asking you about the two L's in the buff card

22  that you've put on your Exhibit.

23      A       Yes.

24      Q       That's all I'm asking you about.

25      A       And you're referring everything only to the L's in

1                    Osborn-Cross/Meyers

2    DeLorenzio.

3        Q    That's correct?

4        A    And you want to limit me to just one portion of

5    those L's?

6        Q    To these two L's.  That's my question to you, sir.

7        A    Well, they're not exactly the same, no.  But they

8    are, while fairly common, taken in conjunction with the

9    other L's in those signatures, taking all four of those L's

10   and comparing them with the L's in the two questioned names

11   on the petition, in my opinion, they're clearly -- the two

12   groups are clearly unlike one another.  In fact, the writer

13   of the two petition signatures doesn't have the writing

14   ability of this Lucy DeLorenzio.

15       Q    And on what basis do you make that opinion?

16       A    Because of the very poor quality and semi-

17   legibility of the questioned names as compared to the way

18   she writes.

19       Q    Let's take a normal petition signing situation,

20   since you earlier testified to the distinguishing of these

21   type of signatures from, say, a will signing.  Typically,

22   these petitions are done in a quick manner.  We've had

23   earlier testimony where people said the person was there for

24   only a number of minutes or less.  Now, if someone is

25   signing quickly, would that make their signature any

1                        Osborn-Cross/Meyers

2    different than it would if they were signing slowly?

3        A    That depends on the individual and how quickly they

4    were doing it and under what circumstances they were doing

5    it.

6        Q    So it is possible that this hurried manner that you

7    had mentioned that the petitioned signatures are in could

8    possibly have been done by the person on the buff card, if

9    they were signing quickly on the petition and slowly on the

10   buff card?

11       A    That's not what I said.  Yes, you are correct in

12   that signatures written under different conditions can be

13   affected; but not to the extent of showing totally different

14   habits of form and general, as well as individual,

15   characteristics.

16           I'm sure that the -- whether Lucy DeLorenzio wrote

17   her signature rapidly or very carefully would not

18   demonstrate the characteristics that are seen in these two

19   names on the petition sheet.

20       Q    Well, let's --

21       A    I'm convinced of it.

22       Q    Let's take a look at the two signatures that you've

23   compared; one from the petition and the two from the buff

24   card.  Is there a noticeable difference in those two -- not

25   in the type of signature but just in the name itself?

316

Osborn-Cross/Meyers

1

2    A    Yes, in that that on the petition reads Lucy

3    Hernandez DeLorenzio whereas those on the buff card read

4    Lucy DeLorenzio.

5    Q    Now, the addition of this name added into the

6    signature, wouldn't that change the timing, the pacing, the

7    manner in which a person would sign their name, rather than

8    having it flow Lucy DeLorenzo, she now has has it Lucy

9    Hernandez DeLorenzio.  Wouldn't that alter the manner in

10   which she signs her name?

11   A    It might cause some variation, but it certainly

12   wouldn't change her developed writing identities.  For

13   example, the forms of the Captain D's in "DeLorenzio" are

14   totally different.  Look at the small letters "i's" in

15   "DeLorenzio" where in the buff cards, they're made with an

16   up-and-down stroke.  In the buff cards the i's are made with

17   an up-and-downward stroke separated making that letter

18   distinctive.

19        As a matter of fact, if you'll go through every

20   letter, you'll find some slight similarities, yes.  One

21   similarity is the very long finish of the small letters "y,"

22   but that's about the only similarity between those names.

23   That is the two on the buff card as compared to the one

24   above.

25   Q    Does the angle at which you sign a name change the

FORM C-100 - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

317

Osborn-Cross/Meyers

1
2    way it might look?

3       A    Yes, it will change the general appearance and the
4    slant of the writing.

5       Q    What about the stability of the writing area?

6       A    Stability of the writing area?

7       Q    A hard table as opposed to writing on, say, a
8    paperback book or as opposed to a hand-held petition
9    clipboard or maybe not even a clipboard, maybe just a stack
10   of loose petitions held up in the air or maybe held up
11   against the wall.  Would that alter the way that a person
12   signs their name?

13      A    Writing done under differing circumstances can
14   affect the quality of the writing or the general appearance
15   of the writing, depending on the writer.  It may not affect
16   some peoples' writing at all.

17      Q    Can you determine that from just these couple of
18   examples that you have here?

19      A    I can determine that the handwriting identities,
20   the meaningful --

21      Q    Wait a minute --

22      A    Excuse me.  I want to --

23      Q    You're not answering my question, sir.  All I want
24   to know is if you could determine whether or not there are
25   different anles of signature on this and whether or not it

318

1                          Osborn-Cross/Meyers

2    would affect the type and appearance of these signatures?

3                    MR. CARROLL:  Objection.

4                    I'm not sure I understand the question at all.

5                    THE COURT:  Well, if the witness understands

6              it, I'll let him answer.

7                    THE WITNESS:  No, I don't.

8                    MR. MEYERS:  I'll rephrase the question, your

9              Honor.

10     Q    You've testified that if they signed at different

11   angles or if the document was held on a clipboard or a loose

12   piece of paper or up against the wall, that that angle would

13   change the appearance of the signature?

14     A    I did not say that.  I said that it could.  With

15   some writers, writing under unusual circumstances may affect

16   their writing.  With other writers, it wouldn't make any

17   difference at all.

18     Q    But you can't make that determine without seeing

19   the person sign at different angles; is that correct?

20   Seeing samples of those signatures written at different

21   angles or under different circumstances; is that correct?

22     A    I don't know the circumstances under which any of

23   these signatures were written.  But I do know that the

24   nature of the difference in identity forms between the two

25   groups of signatures that are illustrated are the work of

319

Osborn-Cross/Meyers

1

2    two different writers and not one person's normal variations

3    or variations caused by unusual circumstances.

4        Q    Let's go back.  You said you didn't know what

5    conditions they were written on.

6            When you make this analysis, what do you assume

7    that they are written on?

8            How do you assume that the angle and the

9    positioning of this author is at the time?

10       A    I assume that under these -- with this type of

11   problem, that signatures on the petition sheet might be

12   written under other than ideal circumstances such as on a

13   back board held in the hand, adverse to sitting at a desk.

14           (Mr. Weiss entered the courtroom)

15       A    (Cont'g)  I understand that the situations may

16   cause variations in writings to some extent.  I've examined

17   thousands of writings that were written under different

18   circumstances.  And if there was any suggestion that these

19   four signatures illustrated on that first chart was done by

20   one person but it varied because of circumstances, then I

21   would not have identified them as being done by different

22   writers.

23       Q    Okay.  Let's take a look at Q-4, the second page.

24       A    Yes, sir.

25       Q    Okay.  In this one, you said that lines 1 and 2

1                    Osborn-Cross/Meyers

2    were signed by the same person and you said that it wasn't

3    the person whose signature appears on the buff card; is that

4    correct?

5         A    Yes, sir.

6         Q    Now, to my eye, number two and the signature -- the

7    second signature in Q-4 to the petition and these look the

8    same (indicating).  What is it, in your opinion, makes them

9    different?

10        A    The fact that here you have a great deal more

11   specimen signatures and while the general features of the

12   two questioned names are somewhat more similar to the known

13   signatures on the buff card, there are still characteristics

14   which do not fall within the genuine signatures, identities

15   or slight natural variations of identities.

16             For example, the capital letters "M" in both

17   "Millie" and "Montalvo," as well as the name above,

18   "Montalvo," all begin with a reverse hook, that is, a

19   compound hook before the beginning downward stroke; and this

20   is not a characteristic found in any one of the numerous

21   specimen signatures illustrated from the buff card.

22        Q    So based on that one difference, you're saying that

23   it's not that person who signed it?

24        A    That is not true.

25        Q    What is it, then?

Osborn-Cross/Meyers

1

2      A    It is a combination of differences.

3      Q    What's the combination of differences, sir?

4      A    I'll be glad to go through each one much them, if

5    you'd like.

6      Q    Yes, I'd love it.

7      A    Another feature is the finish of the letters "V"

8    and "O," where in the specimen signatures, there's normal

9    spacing between these letters, and the final Letter "O" ends

10   with a fairly long sweeping stroke out to the right.

11        Unlike the combination of letters "V" and "O" in

12   the two questioned names.

13     Q    Well, let's just look at "Millie Montalvo" in the

14   petition and the "Millie Montalvo" on the buff card before

15   you continue, sir --

16             MR. MEYERS:  Your Honor, I don't seem to see

17        the buff card marked into evidence for Millie

18        Montalvo here.  Does your Honor have it up at the

19        bench?

20             Do you have that one?

21             MR. CARROLL:  It should be in evidence.

22             THE COURT:  This is as good a time as any to

23        close.

24             THE WITNESS:  Here it is.

25             THE COURT:  All right.  We'll recess now till

FORM C-100-LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

1                    Osborn-Cross/Meyers

2          two o'clock.

3                    MR. MEYERS:  Thank you, your Honor.

4                    (Whereupon, there was a luncheon recess.)

5                    AFTERNOON SESSION

6                    THE CLERK:  Case on trial.

7                    MR. MEYERS:  Your Honor, before the witness

8          returns to the stand, may I have conference with

9          Mr. Carroll and your Honor?

10                   MR. CARROLL:  Sure.

11                   THE COURT:  Sure.

12                   (Discussion at the bench off the record.)

13                   THE COURT:  Counsel?

14                   MR. MEYERS:  Thank you, your Honor.

15                   Your Honor, after a conference with counsel

16         for the petitioner, Mr. Carroll, after discussion

17         with my client, without admitting any of the

18         allegations in petitioner's petition, my client

19         agrees to withdraw from this matter based on an

20         insufficient number of signatures in the petition

21         and that the record in this matter be sealed; the

22         transcript be sealed along with it.

23                   If there be any transcript, and -- I believe

24         that's all.

25                   THE COURT:  Do I understand, Counselor, that

323

1                    Proceedings

2              it's your client's desire to have his petition

3              invalidateed on the basis of an insufficient number

4              of signatures?

5                    MR. MEYERS:  That is correct, your Honor.

6                    THE COURT:  Counselor for the objectors, are

7              you aware of that?

8                    MR. CARROLL:  Your Honor, I'm aware of that

9              and there are no objections.

10                   THE COURT:  And you've also heard the request

11             of counsel about sealing of the record, the

12             minutes?

13                   MR. CARROLL:  We consent to the sealing of the

14             record and the minutes.

15                   THE COURT:  Mr. O'Hara, you heard what your

16             counsel just said?  Mr. O'Hara.

17                   MR. O'HARA:  Yes.

18                   THE COURT:  Do you agree and consent that your

19             petition -- there was one petition --

20                   MR. CARROLL:  One petition.

21                   THE COURT:  That your petition be invalidated

22             on the basis of an insufficient number of

23             signatures?

24                   MR. O'HARA:  Yes.

25                   THE COURT:  And that the record will be

324

1          Proceedings

2     sealed?

3          MR. O'HARA:  Yes, your Honor.

4          THE COURT:  Okay.  Based on the stipulation

5     between counsel and based on the statement of the

6     Candidate, Mr. O'Hara, this Court declares that the

7     petition of John K. O'Hara as a member of the

8     Assembly from the 51st Assembly District, New York

9     State, is declared invalidated on the basis of

10    insufficient number of signatures.

11         MR. CARROLL:  Thank you, your Honor.

12         I think Judge Garry may want a short form

13    order.

14         THE COURT:  If you have to submit whatever you

15    wish, please prepare a short form order, whatever

16    Justice Garry wants.

17         MR. MEYERS:  The only thing that remains is

18    there was evidence that needed to be redacted, that

19    needed redaction.

20         THE COURT:  What evidence are we talking

21    about?

22         MR. MEYERS:  There were bills --

23         THE COURT:  You're taking it back.

24         (Continued on the following page.)

25

325

1          Proceedings

2          MR. CARROLL:  Would you like those documents?

3          MR. MEYERS:  Yes, I would.

4                    *          *          *

5          It is hereby certified that the

6          foregoing is a true and accurate

7          transcript of the proceedings

8

9          Official Court Reporter

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    Steffenson-Direct/Carroll

2      Q    It's a two-family building.  And do you own the

3    building?

4      A    Yes.

5      Q    What portions of the building do you and your

6    family occupy?

7      A    The first and second floor.

8      Q    And is there a tenant on the third floor?

9      A    Yes.

10      Q    And who is that tenant?

11      A    Luz Class, C-l-a-s-s.  L-u-z is the nickname.

12               THE COURT:  Your address is?

13               THE WITNESS:  519 47th Street.

14      Q    Do you have any other tenants in that building,

15    other than Miss Class?

16      A    Yes.

17      Q    What other tenants do you have there?

18      A    I have a Sandra.

19      Q    Sandra.  Do you know her last name?

20      A    Yes, I do.  Halverson.

21      Q    And you were looking at something, ma'am.  What was

22    that that you were looking at to determine that?

23      A    Oh, councilman Joan McCabe (phonetic) asked me to

24    bring this to court.  She did.  It's an American Express

25    card.

```
 1                   Steffenson-Direct/Carroll

 2        Q    Is that addressed to Miss Helverson?

 3        A    Yes, it is.

 4        Q    Now, how long has Miss Helverson lived at that

 5   address?

 6        A    Not long.

 7             THE COURT:  How long?

 8             THE WITNESS:  Oh, she moved in in May.

 9             THE COURT:  Of what year?

10             THE WITNESS:  1994.

11        Q    Do you remember specifically when in May?

12        A    No.

13        Q    What sort of apartment do you rent to her?

14        A    A furnished room.

15        Q    Where is that furnished room located?

16        A    On the second floor.

17        Q    How much rent to do you charge her?

18        A    $200 a month.

19        Q    How does she pay that rent?

20        A    Cash.

21        Q    Does she ever give you checks?

22        A    No.

23        Q    Does she have a telephone there?

24        A    No.

25        Q    Does she have any sort of utility services --
```

1                           Steffenson-Direct/Carroll

2        A    No.

3        Q    Sandra Helverson -- who introduced you to Sandra

4    Helverson?

5        A    John O'Hara.

6        Q    Is Ms. Helverson involved in Mr. O'Hara's campaign

7    as well, to your knowledge?

8        A    To my knowledge, yes.

9        Q    What is her function in Mr. O'Hara's campaign?

10       A    As far as I know, she's a volunteer like myself.

11       Q    Do you know if she's being paid by Mr. O'Hara's

12   campaign?

13       A    I have no idea.

14       Q    Do you know whether or not she's been working full

15   time in Mr. O'Hara's campaign?

16       A    I have no idea.

17       Q    Has Miss Helverson said anything to you about her

18   employment?  Do you know where she might be employed?

19       A    I don't know if she was employed.  I don't know too

20   much about the girl.

21       Q    But she rents a room in your house?

22       A    That's right.

23       Q    When was the last time you saw her?

24       A    When would I see her?  Just before -- this is what,

25   August?

1              Steffenson-Direct/Carroll

2    Q    Right.

3    A    I saw her just -- when the petition was ending,

4    when we signed the last day --

5    Q    Was that in mid July?

6    A    It was the last day before or the day before the

7    petitioning was over because we were all so exhausted, I

8    remember.

9    Q    So that was sometime in July.

10   A    Right.  That's right.

11   Q    So it's been several weeks since since you saw

12   Miss Helverson?

13   A    That's right.

14   Q    She hasn't come to her room during that period?

15   A    Not that I know of.

16   Q    Before that, how often had you seen Miss Helverson

17   between when she moved in in May and the end of petitioning?

18   A    Oh, quite a bit because we were working together on

19   Mr. O'Hara's campaign.

20   Q    Let's draw a distinction.

21        How often did you see her at your home, at the

22   brownstone?

23   A    I would have to say at least four or five times.

24   Q    Four or five times.  And -- tell me about where her

25   rented room is.  Where is this room?

204

1                    Steffenson-Direct/Carroll

2       A    It's on the second floor.  It's -- I don't know if

3    you're familiar with brownstones.  They're railroad rooms

4    and then off to every floor, there's always a hall room and

5    off the hall room would would be a kitchen or a room.

6       Q    On that second floor, there are other rooms; are

7    there not?

8       A    Yes.

9       Q    Who occupies those rooms?

10      A    I do.  My husband.

11      Q    Are they your bedrooms?

12      A    And my son, yes.

13      Q    And your son's bedroom?

14      A    Yes.

15      Q    So her bedroom is on the same floor; is that

16   correct?

17      A    Yes.

18      Q    I do know something about brownstones.  Is there a

19   bathroom?

20      A    Yes, it's in the hall.

21      Q    Does Miss Helverson share that bathroom with you?

22      A    Yes, she does.

23      Q    Between May 4 and the middle of July when

24   petitioning ended, you saw her four or five times at the

25   apartment; is that correct?

1                    Steffenson-Direct/Carroll

2      A    If not more, at least.

3      Q    But you said four or five times?

4      A    Yes.

5      Q    Did you see her more than ten times?

6      A    More than ten times?  I would have to say ten

7  times.  Not more.

8      Q    Okay.  Not more than ten times?

9      A    Not more than ten times.

10     Q    And her bedroom is on the same floor as your

11  bedroom and your son's bedroom?

12     A    That's right.

13     Q    And she shares a bathroom with your family?

14          MR. MEYERS:  Objection.

15          Asked and answered.

16          THE COURT:  That's since May of '94?

17          THE WITNESS:  Yes.

18     Q    All right.  Now, did Mr. O'Hara ask you to rent a

19  room to Miss Helverson?

20     A    No.

21     Q    How did you come to rent the room to

22  Miss Helverson?

23     A    How it came about was he introduced me to her as

24  going to be working in the campaign and wanting to move into

25  the neighborhood and could I help her find an apartment.

1              Steffenson-Direct/Carroll

2          I said to her I had a hall room available, if she

3     wanted to stay there for awhile, and then I could help get

4     her an apartment for her and her boyfriend.

5              THE COURT:  For her and who?

6              THE WITNESS:  Her boyfriend.  She said she had

7         a boyfriend.

8              THE COURT:  Was he there, too?

9              THE WITNESS:  No, I never saw him.

10             THE COURT:  You never saw her boyfriend?

11             THE WITNESS:  No.

12     Q    Now, has Ms. Helverson ever signed a lease with

13     you?

14     A    No.

15             THE COURT:  Does she get mail there?

16             THE WITNESS:  Yes.

17             THE COURT:  That's the only mail you brought

18         for her.

19             THE WITNESS:  She collected her other mail.

20         This is the one she didn't collect.

21             THE COURT:  She she has a mail box?

22             THE WITNESS:  Yes.

23             THE COURT:  She had her own mailbox?

24             THE WITNESS:  It's one outside; we all get the

25         mail and bring it to each other.

1               Steffenson–Direct/Carroll

2     Q    So there's one mailbox for the building.

3          Now, your testimony is you haven't seen Miss

4     Helverson since the end of petitioning, correct?

5     A    Right.

6     Q    The only mail that's accumulated since then is that

7     one piece that you brought with you today?

8     A    That's -- yes.  All the rest of the mail, she's

9     collected.  I haven't seen her since then.

10    Q    But you haven't seen her since --

11    A    -- petitioning was over.

12    Q    Ma'am, I'm going to take you through this

13    Democratic Party designating petition and you, in fact, were

14    a substantial witness in this petition, were you not?

15    A    Uh-huh.

16    Q    And I'd like to focus your attention on particular

17    sheets.

18         The first sheet I'd like you to take a look at is

19    page number 1 of the petition.  That is, in fact, your

20    signature on the petition?

21    A    Yes.

22    Q    And you collected these signatures, correct?

23    A    Yes.

24    Q    How were these signatures collected?  Did you do

25    that door-to-door?

FORM C-100 - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

208

1                   Steffenson-Direct/Carroll

2        A    Yes.

3        Q    And is it your testimony that you saw each and

4   every one of these people --

5        A    Yes.

6        Q    -- who signed this petition?

7        A    Yes.

8        Q    I'd like to take you to page number 2 of the

9   petition.  Is that your signature on that page?

10       A    Yes, it is.

11       Q    And this signature or these signatures were

12  collected on 7/1; is that correct?

13       A    That's what it says.

14       Q    Now, you saw each and every one of the people who

15  signed this petition?

16       A    Yes.

17       Q    I'd like you to specifically look at line number 6

18  on this page.

19       A    Yes.

20       Q    Can you read the name of the person who signed

21  there?

22       A    Aurora Lopez.

23       Q    Possibly Aurora Lopez?

24       A    Yes.

25       Q    Is it your testimony you saw Aurora Lopez and she

1                    Steffenson-Direct/Carroll

2    signed that petition?

3        A    Yes.

4        Q    How old is Aurora Lopez; do you recall?

5        A    No.  I couldn't even identify her if I had to.

6        Q    Okay.

7             THE COURT:  Were you with anybody?

8             THE WITNESS:  On this date?  This is 7 -- I

9             could have been -- 7/1.

10            THE COURT:  Well, who did you go with?

11            THE WITNESS:  I went with all different people

12            at different times.

13            THE COURT:  Name who you went with.

14            THE WITNESS:  Okay.  I went with, sometimes,

15            John O'Hara, Rebecca and Sandy.

16       Q    Rebecca who?

17       A    I don't know last names.

18       Q    And "Sandy"; is that Sandra Helverson?

19       A    Right.

20       Q    Is Rebecca perhaps Rebecca Vales?

21       A    Yes, the one who came to court today with the baby.

22       Q    That's one of the ladies you went out with?

23       A    Yes.

24       Q    And Sandra Helverson is the lady who you rent your

25    room to?

210

1                    Steffenson-Direct/Carroll

2       A    Yes.

3       Q    And Mr. O'Hara, who's the candidate?

4       A    Yes.

5       Q    On line 10 of this petition -- we're still on page

6    2, Miss Steffenson, page 2, line 10 -- the lady who signed

7    there, do you recognize that name?  Do you know what that

8    is?

9       A    Michelle whatever.

10      Q    Ramkishun.

11      A    Whatever.

12      Q    Do you recall taking her signature?

13      A    I have to.  It's there, yes.

14      Q    And it's your testimony that you took her

15   signature.

16      A    Yes.

17      Q    Now, I'm going to skip to -- well, let's just go

18   through all the pages that you collected.  Page 16 of the

19   petition, ma'am.  Okay.  That's collected on 6/14.  And you

20   collected five signatures that day?

21      A    Uh-huh.

22      Q    And it's your position that you collected all of

23   those signatures?

24      A    Yes.

25      Q    And that, in fact, is your signature there?

211

1                          Steffenson-Direct/Carroll

2        A    That's right.

3        Q    And on page 17 of the petition, that is also your

4    signature?

5        A    Yes, it is.

6        Q    And you collected one signature on that day.

7        A    Yes.

8        Q    Page --

9                   THE COURT:  What date was the five on page

10              16?

11                  MR. CARROLL:  6/14.

12                  THE COURT:  And the one on page 17?

13                  MR. CARROLL:  6/8.

14       Q    Okay.  Now, on page number 18, you checked those

15   signature on July 1; is that not correct?

16       A    Excuse me?

17       Q    July 1.

18       A    Yes.

19       Q    And there are ten signatures on that page.

20       A    Yes.

21       Q    And you collected all of those signatures as well.

22       A    Yes.

23       Q    And on page 34.  That's 6/10 again; is it not?

24                  THE COURT:  How many --

25       Q    On page 34, there are five signatures.  And that's

1                      Steffenson-Direct/Carroll

2    on June 10, correct?

3         A    Uh-huh.

4         Q    And you collected all those signatures?

5         A    Yes, I did.

6         Q    And on page 35, that's on June 26th, correct?

7         A    Uh-huh.

8         Q    And you collected three signatures?

9         A    Yes.

10        Q    And you collected all of those signatures?

11        A    Yes.

12        Q    Page 37; that's on July 1?

13        A    Yes.

14        Q    Ten signatures?

15        A    Right.

16        Q    And they're all yours?

17        A    Yes.

18        Q    Page 50, ten signatures?

19        A    Yes.

20        Q    June 8th again.

21        A    Yes.

22        Q    And they're all yours.

23        A    Yes.

24        Q    Page 52, once again, July 1, ten signatures.

25        A    Yes.

213

1                           Steffenson-Direct/Carroll

2       Q    All yours, ma'am?

3       A    Yes.

4       Q    Page 68, your signatures once again?

5       A    Yes.

6       Q    June 9th?

7       A    Uh-huh.  Yes.  Sorry.

8       Q    Excuse me.  They were collected on June 7th; is

9    that correct?

10      A    Yes.

11      Q    And there are two signatures on that page?

12      A    Right.

13      Q    69, June 16th?

14      A    Yes.

15      Q    69 -- that's page 69, June 16th, ten signatures,

16   correct?

17      A    Let me go back here to -- I see 6/7 and 6/9.

18      Q    Well, you collected them on 6/7?

19           MR. MEYERS:  Your Honor, the document speaks

20           for itself, as far as the number of signatures and

21           the dates.

22      Q    And on page 70, ma'am.

23      A    Yes.

24      Q    That's on June 7th again; am I correct?

25      A    Yes.

1                    Steffenson-Direct/Carroll

2      Q    And it's ten signatures.

3      A    Right.

4      Q    Page 71; that's on July 6th.

5      A    Yes.

6      Q    Is that correct?

7      A    Correct.

8      Q    And there are ten signatures there.

9      A    Right.

10     Q    Now, I see that some of these signatures are
11  collected on 33rd Street; some are collected on 10th Street
12  or I guess one is collected on 33rd Street.  Seven are
13  collected at 341 Tenth Street?

14     A    Uh-huh.

15     Q    And the last two were collected on Ninth Street, at
16  two addresses on Ninth Street.

17     A    Right.

18     Q    Do you know the individual on 33rd Street who
19  signed that petition?

20     A    No.  I don't know them other than as they came to
21  the door.

22     Q    You went to 341 Tenth Street.  Are you familiar
23  with that building?

24     A    No.

25     Q    Do you recall it?

FORM C-100 - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1                    Steffenson-Direct/Carroll

2      A    No.

3      Q    Do you recall if it was an apartment?  Store?

4      A    Tenth Street.

5      Q    341 Tenth Street.

6      A    That was, like, a big building.  That's a very

7  large building, yes.  It reminds me -- not the projects,

8  co-ops.  Very nice building.

9      Q    Did you go through there alone or were you with

10 somebody?

11     A    I'm sure I was with somebody.

12     Q    Do you recall who it was?

13     A    No.  When I went out of the neighborhood, I was

14 always with somebody.

15     Q    But it would have been Rebecca Vales or Sandra or

16 Mr. O'Hara, correct?

17     A    Yes.

18     Q    Now, on page 88 of the petition, once again, your

19 signatures?

20     A    Yes.

21     Q    And that's also on 6/8; is that correct?

22     A    That's right.

23               THE COURT:  After 71, you went to what?

24               MR. CARROLL:  88, your Honor.

25     Q    And there are ten signatures on that page --

216

1                    Steffenson-Direct/Carroll

2                    MR. CARROLL:  June 8, your Honor.

3                    THE COURT:  6/8?  Go ahead.

4       A    Yes.

5       Q    On page 105, once again, your signatures, ma'am?

6       A    That's right.

7       Q    They were collected on June 11th?

8       A    Right.

9       Q    And there are five signatures on that page.

10      A    Right.  I remember that night, yes, very well.

11      Q    I ask you specifically to look at lines 3 and 4.

12           Do you recognize those names?

13      A    No.  461 -- that's between fourth and Fifth.

14      Q    461 47th Street.

15      A    Yes.

16      Q    Can you read those names?  Thomas and and

17  Antoinette --

18      A    No, I can't.  I'm sorry.

19      Q    Is it your testimony that there in fact were two

20  separate people who came and signed that petition?

21      A    (Nodding.)

22      Q    Tell me, when you went to the door and someone

23  answered --

24      A    I know all the people on that block very well.

25      Q    Who are these two people?

1                      Steffenson-Direct/Carroll

2          A    461.  That would be the odd side of the street,

3     which would be --

4          Q    Well, Thomas and Antoinette Chrisland (phonetic) --

5          A    Whatever, yes.  461.

6          Q    Do you remember going to that house?

7          A    Yes.

8          Q    Is it possible that Thomas signed for Antoinette?

9          A    I don't know -- no, never, never.  I know they look

10    very similar, but I never would have permitted it.  Never.

11         Q    Okay.

12         Q    Move to --

13         A    What's their name?  Oh, God, I know who that is

14    now.  That's Mary -- oh, yes, oh, I went down there at the

15    last minute because I didn't -- I recall now, your Honor,

16    yes, I do.  I know these people very, very well.  They're

17    friends of my son's.

18         Q    What is their name, ma'am?

19         A    Antoinette and Tom.  Yes, very good.  Nice people.

20         Q    I can read Antoinette and Thomas.  It's the last

21    name we're having trouble with.  Do you recognize that?

22         A    The last name?

23         Q    The last name.

24         A    No, I don't.  And I know them twenty-five years.

25         Q    Really.

1                    Steffenson-Direct/Carroll

2        A    Twenty-five years I know them, your Honor.

3        Q    And even though they look alike, you're confident

4    it's two people?

5        A    Yes, she's a little woman, and I know the son very

6    well.  Good friends of the family.  That was on the last

7    twenty minutes before I quit and ripped up all my green

8    sheets.  I had to go down for an address to be filled and I

9    didn't realize it wasn't filled in.  It was very light at

10   night and I went down to get the signatures.

11       Q    You ripped up the green --

12       A    I was glad it ended.  I ripped up all the blanks.

13   This was the last day, the last minute and the last hour.

14       Q    You remember it vividly.  That was the last day of

15   petitioning?

16       A    For me it was, I think.

17       Q    What is the date on that?

18       A    June 11th.

19       Q    When did petitioning end?

20       A    I don't know.  The 13th.

21       Q    Didn't you say you met Sandra right around the last

22   day of petitioning?

23       A    Close to it, yes.

24       Q    Wasn't that in the middle of July?

25       A    I don't know what you're saying.

1                    Steffenson-Direct/Carroll

2        Q    We'll move on, ma'am.

3        A    Okay.

4        Q    But you vividly remember taking these signatures?

5        A    Oh, I could put my hand on the Bible ten times

6   over.  I remember.  I could describe them to you, even if

7   you had to bring them in.

8        Q    Let's move to page 106, okay.  These signatures

9   collected by you, right (indicating)?

10       A    Yes.

11       Q    These signatures were collected on June 16th, were

12   they not?

13       A    Yes.

14       Q    And there are ten signatures on this page, are

15   there not?

16       A    Yes.

17       Q    And you collected all of those?

18       A    Yes.

19       Q    Now, let's turn to page 125.

20            THE COURT:  How many were on 106?  I'm sorry.

21            Ten?

22            MR. CARROLL:  106 is ten, your Honor.

23       Q    Let's turn to page 125.  Excuse me just a second.

24            Let's look first at line 7 of that petition; this

25   is page 125.  That's dated 6/8; is it not, again?

1                    Steffenson-Direct/Carroll

2        A    Yes.

3        Q    You collected quite a few signatures on 6/8.

4        A    Yes.

5        Q    And line 7 is the signature of an individual at 301

6    Sixteenth Street?

7        A    Yes.

8        Q    Do you recognize that signature?

9        A    No.  16th Street.  No.

10       Q    Would it refresh your recollection if I told you

11   that that name is Maura Burnett?

12       A    Maura Burnett.  Maura.  That's the woman that was

13   here this morning, I believe.

14       Q    Yes.  That is one of the women who was here this

15   morning.

16       A    Yes.  She gave us a hard time when she came to the

17   door.  I didn't even think she was going to sign she gave us

18   such a hard time.  I remember her.

19       Q    It's your testimony that you remember Miss Burnett?

20       A    Yes, I do.

21       Q    Would it it surprise you that Miss Burnett doesn't

22   remember you?

23       A    No.

24       Q    Let's look at lines 3, 4 and 5 on that page as

25   well, okay.  The Corraro (phonetic) family.  Now, is it your

1                    Steffenson-Direct/Carroll

2    testimony that that is three separate members of the Corraro

3    family that signed that petition?

4        A    Yes.

5        Q    Okay.  Now, specifically, I ask you to look at the

6    signature of Benjamin Corraro.

7        A    Uh-huh.

8        Q    Did Mr. Benjamin Corraro come to the door?

9        A    I would assume he did.  I can't recall.  I mean if

10   they came to the door, I took their signature.  I never went

11   inside anybody's home.

12       Q    But you saw Benjamin Corraro sign.  Is it possible

13   somebody took the paper inside to Mr. Corraro to have him

14   sign it?

15       A    No, because we were told that we have to witness

16   it.

17       Q    Okay.  Let's move on ma'am --

18       A    In fact, a few people had mentioned -- ?

19       A    I said if they can't come out, I can't have the

20   signature.  I recall that specifically.

21       Q    On page 143, also on June 8th -- is that not

22   correct?

23       A    Right.

24       Q    Ten signatures?

25       A    Right.

1                    Steffenson-Direct/Carroll

2        Q    You collected all of those signatures.

3        A    Right.

4                    THE COURT:  Number what?

5                    MR. CARROLL:  June 8th.

6                    THE COURT:  What number?

7                    MR. CARROLL:  Page 143, your Honor.

8        Q    Now, would you take a look at line 3 on that page.

9        A    Yes.

10        Q    Do you recognize that name?

11        A    It says Marc something, Gro?  G-r-o.

12        Q    Do you recall getting Mr. Groh's signature?

13        A    No.  No.

14        Q    But it's your testimony that you saw Mr. Groh.

15        A    Yes.

16        Q    Do you have any recollection of what Mr. Groh looks

17   like?

18        A    No.

19        Q    Do you have any recollection of the type of house

20   he lives on?

21        A    When I went outside the community, I couldn't

22   really swear swear to --

23        Q    Do you recall being on 16th Street?

24        A    Yes.

25        Q    What sort of street is 16th Street?

1                    Steffenson-Direct/Carroll

2       A    16th Street.  They're more like frame houses.

3  They're cut in -- I couldn't -- no, I couldn't say -- I

4  wouldn't want to hang anybody on my testimony.

5       Q    You were outside the community, so somebody was

6  with you; is that correct?

7       A    Oh, yes.

8       Q    And do you recall who was with you that day?

9       A    No.  June 8th, no.

10      Q    Let's turn to page 170, ma'am.  This is dated

11 June 16th.

12      A    Yes.

13      Q    And you've signed it?

14      A    Yes.

15      Q    And you collected these signatures?

16      A    Yes.

17      Q    On page 215, ma'am, this is dated July 1 and are

18 these your signatures as well?

19      A    Yes, they are.

20           THE COURT:  How many?

21      Q    There are ten signatures on that page.

22           Did you fill out out this witness statement?

23      A    Yes.

24      Q    Is this your handwriting throughout the witness

25 statement?

224

1                    Steffenson-Direct/Carroll

2       A    Yes, it is.

3       Q    Tell me, did you fill in the E.D.'s on this

4    petition, the numbers on the side?

5       A    I don't recall that.  I don't know.  I don't

6    remember.

7       Q    Is that your handwriting?  Do you recognize that

8    (indicating)?

9       A    It's my handwriting, but I don't recall having put

10   the E.D.'s.

11      Q    You don't recall putting in the E.D.'s?

12      A    No.

13      Q    How about the number of signatures; is that your

14   handwriting, ma'am?

15      A    Yes, it is.

16      Q    Let's turn to page 220, ma'am, once again, dated

17   July 1.  Your signature?

18      A    Yes.

19      Q    And there are ten signatures on this page.

20      A    Yes.

21      Q    Now -- and it's your testimony that you collected

22   all of these; is this correct?

23      A    That's right.

24              THE COURT:  How many were there?

25              MR. CARROLL:  Ten signatures, your Honor.

1               Steffenson-Direct/Carroll

2               THE COURT:  Date?

3               MR. CARROLL:  July 1.

4       A     Very hot night.  I remember that.  It was

5  terrible.  In fact, if I recall that night and these

6  addresses for some reason, I could have been -- I know who

7  was with me at that time, yes.

8       Q     Now, I'd like you specifically to take a look at

9  lines 9 and 10 of this petition.

10      A     Yes.

11      Q     Colombine (phonetic) and Peter Antonio; is that

12  correct?

13      A     Yes.  I don't know --

14      Q     Do you recall taking their signatures?

15      A     Yes, if they're there, I had to take them.

16      Q     Had to take them.  Did you, in fact, see both of

17  them sign that petition?

18      A     Yes.

19      Q     And it's your testimony that two people signed that

20  petition and not one.

21      A     Yes.

22      Q     Let's turn to page 222.  That's dated 6/14.

23      A     Uh-huh.

24      Q     And there are three signatures on that page?

25      A     Right.

226

1                     Steffenson-Direct/Carroll

2      Q    And these are your signatures; you collected this

3  petition.

4      A    Yes.

5      Q    And then finally on 6/13, page 228, there are eight

6  signatures on this page, correct?

7      A    Yes.

8      Q    And you collected all eight of those?

9      A    Yes.

10     Q    Now, ma'am, you collected some 186 signatures; is

11 that correct?

12     A    Yes.  That's about right.

13     Q    And on June 8th, you collected 41 signatures?  Does

14 that seem right?

15     A    Yes, it does.  I remember.

16     Q    How did you go about getting these signatures?

17          What time of the day did you start collecting

18 them?

19     A    Late in the afternoon.  Not that late.  I would

20 have to say sometime, two, three; it depends upon the

21 weather.

22          It was constantly hot, so I would wait until

23 that peak of the day when the sun was almost trying to come

24 down.

25     Q    So you started, what, about two or three in the

```
 1                    Steffenson-Direct/Carroll
 2   afternoon?
 3        A    Yes.
 4        Q    What time did you work to that day?
 5        A    Till the end; till it got dark.  Till I was
 6   embarrassed to ring bells anymore.
 7        Q    About what time?
 8        A    Ten o'clock I would say; at least nine o'clock.
 9        Q    And all of these signatures were collected door to
10   door?
11        A    Yes.
12        Q    Now, on 6/8 --
13        A    Can I take that back for a minute because sometimes
14   I sat on my stoop and I would see my neighbors go up and
15   down.  I didn't make it to the house.  I would catch them
16   coming from work.
17             I'd say, "Come over here.  I missed you.  Sign my
18   petition."  Very close neighbors.
19        Q    On 6/8 you were on on Webster Place, 16th Street
20   and Jackson place; is that correct?
21        A    Right.
22        Q    And all those signatures were collected
23   door-to-door, ma'am?
24        A    Yes, they were.
25             MR. MEYERS:  What sheet is he showing her?
```

FORM C-100 - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1                    Steffenson-Direct/Carroll

2                    MR. CARROLL:  Excuse me.  We're looking at

3            page 50.

4                    THE COURT:  Anything else?

5                    MR. CARROLL:  Just a second, your Honor.

6        Q    Now, Miss Steffenson, in addition to the 41 that

7    you collected on June 8th, you collected 60 on July 1; is

8    that correct?

9        A    Yes.

10       Q    And were those also collected door-to-door?

11       A    Yes.

12       Q    Do you recall what time you started collecting

13   signatures that day?

14       A    Early.  It would have to be to get that many

15   signatures.  Bright and early.

16       Q    It was very hot, very hot day?

17       A    Very hot day.  I never want to do it again.

18       Q    I understand.  Now, you must be in pretty good

19   shape.

20       A    I lost ten pounds.  It helps, my sense of humor.

21                   MR. CARROLL:  We have no further questions of

22           this witness.

23                   MR. MEYERS:  Thank you, your Honor.

24   CROSS-EXAMINATION

25   BY MR. MEYERS:

229

Steffenson-Cross/Meyers

1

2    Q    Miss Steffenson, let me go back to something that

3    Mr. Carroll asked you earlier.

4         You said that you have a tenant that you rent a

5    room to named Sandra Helverson; is that correct?

6    A    Yes.

7    Q    Now, do you know -- other than volunteering for

8    Mr. O'Hara's campaign -- what she does?

9    A    Well, she's told me she was a law student.

10   Q    Do you know if Miss Helverson was taking the bar

11   exam this year?

12   A    Yes, she said she was.

13   Q    Do you know when the bar exam was or is?

14   A    It was right after petitioning.

15   Q    Okay.  In fact, the bar exam was last Tuesday and

16   Wednesday; were you aware of that?

17   A    Yes.

18   Q    And did Miss Helverson tell you, after petitioning

19   was over, that she would be studying for the bar exam?

20   A    Excuse me?

21   Q    Did she tell you she would be studying for the bar

22   exam?

23   A    Oh, yes.

24   Q    Did she ever mention that -- strike that.  You say

25   she receives mail at that address?

230

1                    Steffenson-Cross/Meyers

2        A    Yes.

3        Q    Did you say that Joan McCabe sent her a letter --

4        A    No.  Joan McCabe asked me to bring this letter as

5    proof that she lived here.

6        Q    Can I see that, please?

7             Who is Joan McCabe?

8        A    She's a Councilwoman -- Councilman friend of mine.

9    That's the last bit of mail that she received.

10            They asked me:  Did she live there, too?  And I

11   said, "Yes."

12       Q    I'm going to show this to Mr. Carroll (handing.)

13            Miss Steffenson, could you please tell us what this

14   is.

15       A    It's an American Express card.  That's who sent it,

16   according to the corner of the envelope.

17                 THE COURT:  American Express card?

18                 THE WITNESS:  That says "cards."  American

19            Express cards.  That's what it says.  It's local, I

20            guess.

21       A    (Cont'g) Your question is, who it was addressed

22   to?

23            Sandra Helverson.

24       Q    And the address?

25       A    519 47th Street.

231

1           Steffenson-Cross/Meyers

2                MR. MEYERS:  Your Honor, I'd like to admit

3           this in evidence as Respondent's Exhibit 1.

4                MR. CARROLL:  No objection.

5                THE COURT:  Without objection.

6                (Respondent's Exhibit A in evidence, so

7           marked.)

8                THE COURT:  Who gave this to you?

9                THE WITNESS:  The mailman.

10                THE COURT:  The mailman gave this to you?

11                THE WITNESS:  No; we have a box.  It goes in.

12           It goes in the mailbox.  We have only one mailbox.

13           All the mail goes in the one mailbox.

14                THE COURT:  And this is the only mail that's

15           been there since July 25th; is that right?

16                THE WITNESS:  For her, yes.

17                THE COURT:  Yes.

18                THE WITNESS:  Yes, yes.

19      Q    Was there other mail?

20      A    Me, I get my bills.

21      Q    Other mail for Miss --

22      A    No, I hold her mail to put under her door if I see

23   her or something, no.

24      Q    Did any other mail, other than --

25                THE COURT:  When did you see her last?

232

1                    Steffenson-Cross/Meyers

2                    THE WITNESS:  Right after petitioning was

3            over, your Honor.

4                    THE COURT:  You haven't seen her since?

5                    THE WITNESS:  No.

6                    THE COURT:  She doesn't sleep there now?

7                    THE WITNESS:  I haven't seen her.

8                    THE COURT:  When's her rent up?

9                    THE WITNESS:  Next month.

10                    THE COURT:  When do you collect rent?

11                    THE WITNESS:  The first of the month.

12                    THE COURT:  Did you collect rent for August?

13                    THE WITNESS:  Yes, I did.

14                    THE COURT:  How?

15                    THE WITNESS:  When she paid her rent.

16                    THE COURT:  How?

17                    THE WITNESS:  She gave it to me in advance,

18            your Honor.

19                    THE COURT:  When?

20                    THE WITNESS:  When she took the apartment,

21            your Honor.

22                    THE COURT:  Wait, wait, wait, wait, wait.

23            Let me understand this.

24            She gave you how many months rent in advance?

25                    THE WITNESS:  Three months, your Honor.

1                          Steffenson-Cross/Meyers

2                          THE COURT:  She just took the apartment for

3              three months?

4                          THE WITNESS:  No, one was security and the

5              other was towards the rent.

6                          THE COURT:  When did she move in?

7                          THE WITNESS:  She came at the end of May.

8                          THE COURT:  June, July; and one is security.

9                          THE WITNESS:  Yes.

10                         THE COURT:  So she didn't pay August rent.

11                         THE WITNESS:  Well, I have her security.

12                         THE COURT:  I didn't say that.

13                         She didn't pay August rent, did she?

14                         THE WITNESS:  No.

15       Q      Did she move out?

16       A      Not that I know of.  She said she would let me

17    know, because I was helping to look for an apartment for

18    her.  I have her name in three real estates with very good

19    friends of mine.  She wants very much to live in Sunset

20    Park.

21                         THE COURT:  Do you know she lives in Jersey?

22                         THE WITNESS:  So I'm told.

23                         THE COURT:  Don't you know?

24                         THE WITNESS:  No, she lives in my house.

25                         THE COURT:  Didn't she tell you?

234

1                    Steffenson-Cross/Meyers

2                    THE WITNESS:  No, she lives in my house.

3                    THE COURT:  She never told you she had a

4        Jersey address?

5                    THE WITNESS:  No.

6                    THE COURT:  Okay.

7                    Anything else?

8                    MR. MEYERS:  Yes, sir.

9        Q    I'm going to direct your attention to one of the

10       pages in the Democratic Party petition that you had looked

11       at earlier with Mr. Carroll, page number 105.

12                   Do you remember looking at this earlier with

13       Mr. Carroll?

14       A    Yes, I do.

15       Q    Did you read the witness statement?

16       A    What do you mean?  Did I read what?

17       Q    Your statement on the bottom.

18       A    Oh, yes.

19       Q    Did you note the date that you took those

20       signatures?

21       A    Yes.

22       Q    Does this refresh your recollection as to the

23       occurrences when you took those signatures?

24       A    Excuse me?

25       Q    Does this refresh your recollection?

235

1                   Steffenson-Cross/Meyers

2       A    Oh, I remember Tom and Antoinette very well that

3   night.

4       Q    You remember taking their signatures?

5       A    Yes, I do.

6       Q    And when did you take their signatures?

7       A    May, June -- let me think now.  May -- let me

8   think.  The petitioning started -- let me think -- May -- I

9   have to think now.  This is June 11th.  Yes, okay.

10                  THE COURT:  "Yes" what?

11                  When did you take their signatures?

12                  THE WITNESS:  On June 11th, your Honor.

13                  THE COURT:  Didn't you see the date there?

14                  THE WITNESS:  Yes.  But I have to --

15                  THE COURT:  Did you put the dates in?

16                  THE WITNESS:  I have to think.  In my mind, I

17             have to think --

18                  THE COURT:  Did you put the dates in?

19                  THE WITNESS:  Yes.

20      Q    You wrote these in -- are these -- on lines one

21  through five, is that your handwriting in the date section?

22      A    No.

23      Q    Who put the dates in the date section?

24      A    This isn't my handwriting right here.  This isn't

25  my handwriting (indicating).

FORM C-100 - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

236

1                      Steffenson-Cross/Meyers

2        Q    Did you put the date on the bottom --

3        A    Yes, I did.

4        Q    Let me finish the question.

5             In your "statement of witness" section --

6        A    Yes.

7        Q    Okay.

8        A    But you could bring those two people in and they

9    would testify to it; don't worry.

10       Q    Now, you had earlier mentioned that you went

11   petitioning sometimes with Sandra Helverson.

12       A    Yes.

13       Q    And with Mr. O'Hara and with Rebecca Vales; is that

14   correct?

15       A    Yes.

16       Q    Was there anyone else that you may have gone out

17   with, gone petitioning with?

18       A    (No response.)

19       Q    Did you go out in pairs or did you go out with three

20   people or a large group?

21       A    No, the most I ever went out with was three people.

22       Q    When you went out with three people, who did you go

23   with?

24       A    Mr. O'Hara, his girlfriend and myself.

25       Q    And what's his girlfriend's name?

237

1                     Steffenson-Cross/Meyers

2        A     Vicki.

3        Q     Do you know her last name?

4        A     No.

5        Q     I show you page 125 of the petition.  Do you know

6    the date is June 8th?

7        A     Yes.

8        Q     Do you remember if you were by yourself or if you

9    were with anybody else on that day when you were collecting

10   signatures?

11       A     That far down, I had to be be with someone.  16th

12   Street.  That's out of my neighborhood.  I can't recall

13   right now who it was, but I can tell from just the address

14   that I was not there by myself.

15       Q     Okay.  Do you know if you were with one other

16   persons or two other people?

17       A     Well, I remember -- it would be -- I don't know,

18   because -- no, I don't recall.  I don't want to -- --

19   know --

20                     (Mr. Weiss enters the courtroom).

21                     MR. MEYERS:  Your Honor, at this time I have

22              no further questions for this witness.

23                     THE COURT:  Anything else?

24                     MR. CARROLL:  Very briefly, your Honor.

25                     THE COURT:  Could I see that page, 105,

238

                    Steffenson-Cross/Meyers

1

2          please?

3                (Pause in proceedings.)

4                THE COURT:  I think I've got the wrong one

5          here.

6                Okay.  You may proceed.

7    REDIRECT EXAMINATION

8    BY MR. CARROLL:

9       Q    Miss Steffenson, on page 105 you testified that the

10   signatures -- excuse me -- that the dates on the signature

11   lines alongside the signatures were not filled in by you; is

12   that correct?

13      A    No, this was not filled in by me, no (indicating).

14      Q    Do you know who did fill that in?

15      A    Tom.

16      Q    Tom who?

17      A    I can't pronounce his last name.

18      Q    Are you testifying that it's only with respect to

19   that line that the date was not filled in by you?

20      A    That's definitely not my way of writing, that's

21   right.

22      Q    How about on line number 1?

23      A    That's me.

24      Q    That's you.

25           Line number 2?

1                    Steffenson-Redirect/Carroll

2        A    That's me.

3        Q    Line number 3 is not you.

4        A    No.

5        Q    But you think it's Tom?

6        A    Yes.

7        Q    But you can't remember his last name?

8        A    I know the man twenty-five years, and I don't

9    remember his last name.

10       Q    Now, you testified that whenever you went out in a

11   group of three, the person who was with you was Mr. O'Hara

12   and his girlfriend Vicki, correct?

13       A    That's right.

14       Q    That's whenever you went out in a group of three.

15       A    That's right.

16       Q    What does Vicki look like?

17       A    Very nice, pretty girl.  Young.

18       Q    Just how old, would you say?

19       A    Oh, you're asking the wrong one.  I put you in your

20   grave -- I'd say in her thirties.

21       Q    In her thirties.

22            Dark hair?

23       A    Yes.

24       Q    Okay.  I'm going to show you a photograph.  Is

25   this, in fact -- that's already in evidence as Petitioners'

240

1                    Steffenson-Redirect/Carroll

2    Exhibit Number 3.  Is that, in fact, Vicki?

3         A    Yes, it is.

4         Q    And that's a fair and accurate portrayal of Vicki?

5         A    Oh, yes, that's her.

6         Q    So she's in her thirties, normal build, has dark

7    hair.

8         A    Very nice figure.

9              MR. CARROLL:  Good.  I have no further

10             questions.

11             THE COURT:  Anything else?

12             MR. MEYERS:  No, sir.

13             THE COURT:  You may step down.

14             (Whereupon, the witness was excused.)

15             THE COURT:  Is that it for today?

16             MR. CARROLL:  Your Honor, I would just like

17        to, as a housekeeping matter, to introduce a

18        certified copy of a New Jersey -- State of New

19        Jersey Division of Motor Vehicles abstract of

20        driver history record for Sandra Helverson.

21             It is a certified copy of the record

22        (handing).

23             MR. MEYERS:  Thank you, Mr. Carroll.

24             MR. MEYERS:  No objection, your Honor.

25             THE COURT:  Without objection, mark it

241

1          Steffenson—Redirect/Carroll

2     Petitioners' Exhibit 17.

3          MR. CARROLL:  Your Honor, if I might, for the

4     record, note that it shows an address of 430 Ogden

5     Avenue, Jersey City, New Jersey.

6          THE COURT:  I'd have been surprised if it

7     didn't.

8          (So marked, Petitioners Exhibit 17 in

9     Evidence.)

10         THE COURT:  Anything else?

11         MR. CARROLL:  Nothing further this afternoon,

12    your Honor.

13         THE COURT:  Thank you, gentlemen.  We'll

14    resume tomorrow.

15         (Whereupon, the hearing was adjourned to

16    August 5, 1994.)

17         (Continued on the following page.)

18

19

20

21

22

23

24

25

242

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS:   CIVIL TERM - PART 15
----------------------------------------X
DENNIS L. POL, LISA T. LOPEZ, and
FELIX W. ORTIZ,

                         Petitioners,


                -against-


THE BOARD OF ELECTIONS In The CITY
OF NEW YORK and JOHN K. O'HARA,

                         Respondents
----------------------------------------X
Index # 23414/94
----------------------------------------X
In the Matter of the Application of
ANN ENGLISH,

                    Objector-Petitioner,


                - against -


JOHN K. O'HARA, Member of the Assembly
From the 51st Assembly District, Kings
County, New York State,

                         Candidate

                - and -

BOARD OF ELECTIONS IN THE CITY OF NEW
YORK,

                         Respondents,
----------------------------------------X
                    Hearing

                         360 Adams Street
                         Brooklyn, New York
                         August 5, 1994

           (Continued on the following page.)

243

1

2

3       B E F O R E:

4                                    HONORABLE IRVING S. ARONIN,

5                                                        Justice

6
                        (Appearances same as previously noted.)
7

8                                       MARK L. BOWIN
                                    Official Court Reporter
9                                    -   -   ~   -   -

10              THE COURT:  Good morning.  Are we ready to

11      proceed?

12              MR. CARROLL:  I think we are.

13              THE COURT:  Who is the next witness?

14              MR. CARROLL:  It is Mr. Soto, but I do need

15      Mr. Keefe, if we could just have one moment.

16              THE COURT:  How many witnesses do you have

17      today?

18              MR. CARROLL:  We have several people here

19      pursuant to subpoena.

20              THE COURT:  I didn't ask that.  I only asked

21      how many.

22              MR. CARROLL:  If you don't hold me to a

23      number, at least a half dozen.

24              THE COURT:  That's your whole case?

25              MR. CARROLL:  If everybody has come in, yes,

244

1            Proceedings

2         Judge, but if everybody has not come in ---

3              THE COURT:  I see.

4              MR. CARROLL:  It's my understanding we're

5         going over to Monday, anyway.  I'm trying to get

6         everybody in today, Judge.

7              THE COURT:  All right.

8    R A L P H   S O T O,

9         residing at 29 Jackson Place, Brooklyn, New York,

10        called as a witness by the Petitioners, having been

11        duly sworn, testified as follows:

12             THE CLERK:  State and spell your name for the

13        record.

14             THE WITNESS:  Ralph, R-a-l-p-h, Soto, S-o-t-o.

15             THE CLERK:  Where do you live?

16             THE WITNESS:  29 Jackson Place, Brooklyn, New

17        York.

18             THE COURT:  You may proceed.

19             MR. CARROLL:  Thank you, your Honor.  We're

20        identifying Mr. Soto's signature.

21   DIRECT EXAMINATION

22   BY MR. CARROLL:

23    Q    Thank you for coming, Mr. Soto?

24    A    Thank you.

25    Q    Bear with me a second.  I keep popping this clip.

245

1                       Soto-Direct/Carroll

2             Mr. Soto, I'm going to show you a document which

3    has been already marked into evidence as Petitioners'

4    Exhibit 5 and which is a Democratic Party designating

5    petition for Mr. J. K. O'Hara.

6             I'd ask you to take a look at page 88 of that

7    petition, sheet number 88, and specifically at line 4 of the

8    petition and ask you if you recognize the signature.

9        A    Yes, I do.

10       Q    And is that your signature, sir?

11       A    Yes, it is.

12       Q    Do you recall the circumstances surrounding the

13   taking of that signature?

14       A    Vaguely, yes.

15       Q    Was it at your home?

16       A    Yes, it was.

17       Q    Did somebody come to your front door?

18       A    Yes.

19       Q    How many people came to your front door?

20       A    I'm not sure.  Two people.

21       Q    Two people, you believe?

22       A    I believe.

23       Q    And what were their sexes?

24       A    One male; one female.

25       Q    Do you know who the male was?

1                    Soto-Direct/Carroll

2    A    Yes.

3    Q    Who was the male?

4    A    Mr. O'Hara.

5    Q    Who was hold holding the petition when they came to

6  your door?  Do you remember?

7    A    I believe the lady was holding the petition.

8    Q    You said there was a woman who came to the door as

9  well.  Do you remember what the woman looked like?

10    A    I don't see a clear picture of her.

11    Q    Was she young or old?

12    A    She was maybe about my age.

13    Q    About your age.  How old is that, sir?

14    A    Forty.

15    Q    Do you remember what color hair she had?

16    A    Black hair.

17    Q    Mr. Soto, I'm going to show you a photograph, which

18  has been marked into evidence as Plaintiff's Exhibit Number

19  4; and I'd ask you to take a look at the lady on the extreme

20  left of the photo, that lady there (indicating).

21          Was it that lady who came to your door with

22  Mr. O'Hara?

23    A    I don't remember --

24          No.

25    Q    It was not that lady.  And could you just take a

```
1                    Soto-Direct/Carroll
2    look at the bottom of the petition and tell us who the
3    witness is there.  Just read her name.
4        A    Maureen Steffenson.
5        Q    Now, sir, I'd also like you to take a look at line
6    number 5 of the petition, I think it is, the signature right
7    under yours.  That's a Pat Harrigan?
8        A    Harrigan.
9        Q    Do you know Miss Harrigan?
10       A    Yes, I do.
11       Q    Who is Miss Harrigan?
12       A    She's my wife.
13       Q    And were you there when your wife signed that
14   petition?
15       A    Yes, she was -- I was.
16       Q    Could you tell me what the circumstances were
17   surrounding your wife signing that signature?
18                    MR. MEYERS:  Objection.
19                    THE COURT:  Overruled.
20                    THE COURT:  You may answer.
21       A    I took the petition in.  I asked her to sign it.
22       Q    And you took it into the house to her?
23       A    Yes.
24       Q    Was Mr. O'Hara there when she signed the petition?
25       A    He was in the vestibule.
```

FORM C-100 · LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

248

1                    Soto-Direct/Carroll

2       Q     But this was inside the house?

3       A     Inside the house.

4       Q     Could the people see in from the vestibule into the

5   house to where your wife signed it?

6       A     If they tried hard enough.

7       Q     Could they see into the house?

8       A     The door was open.  They could see into the house.

9             MR. CARROLL:  Okay.  I have no further

10            questions of this witness.

11            THE COURT:  You may inquire.

12            MR. MEYERS:  Thank you, your Honor.

13  CROSS-EXAMINATION

14  BY MR. MEYERS:

15      Q     Mr. Soto, did you enter into any conversations with

16  any of the people who came to your door?

17      A     Yes, I did.

18      Q     Who did you enter into a conversation with?

19      A     With Mr. O'Hara.

20      Q     How long would you say Mr. O'Hara was at your door?

21      A     About fifteen minutes.  We got into a nice

22  discussion.

23      Q     Did you talk to anybody else?  Did you talk to the

24  other person or persons?

25      A     I said "hello" to the other lady.  There was

```
1                          Soto-Cross/Meyers
2      activity throughout the block also.
3           Q     Okay.  When you say that, were there other people
4      that came and went during this fifteen minutes while you
5      were at the front door?
6           A     There were people canvassing the block.
7           Q     Okay.  The woman that you saw --
8                      THE COURT:  Canvassing the block.
9                      Were you inside your house?
10                     THE WITNESS:  No, I had stepped outside of the
11                house.  We were having the discussion on our front
12                stoop.
13                     THE COURT:  I see.
14          Q     The woman that was shown to you in the photograph
15     by Mr. Carroll, was that one of the people -- do you
16     recognize her as being one of the people that came back and
17     forth while you were talking to Mr. O'Hara?
18          A     I can't remember who they were.  There were more
19     than one that I remember.
20                     MR. MEYERS:  I have no further questions, your
21                Honor.
22                     THE COURT:  Anything else?
23     REDIRECT EXAMINATION
24     BY MR. CARROLL:
25          Q     Mr. Soto, you say you were outside on your front
```

1                    Soto-Redirect/Carroll

2    porch?

3        A    Yes, the stoop.

4        Q    Is that where Mr. O'Hara was standing when you

5    brought the petition into the house?

6        A    No, I invited him into the vestibule.

7        Q    Okay.

8        A    And I said:  Hold on a minute.  She she might not

9    be decent.  She was.  She was sitting there watching TV and

10   she signed it there.

11             THE COURT:  Did the lady come in also?

12             THE WITNESS:  No.  I remember Mr. O'Hara

13        coming in.

14             THE COURT:  Just Mr. O'Hara?

15             THE WITNESS:  Yes.  Into the vestibule area.

16       Q    Only Mr. O'Hara.  Thank you.

17       A    I think so.  It's a small vestibule.

18             THE COURT:  Anything else?

19       Q    Sir, let me -- when you signed your petition, your

20   signature, where were you?

21       A    Outside.

22       Q    You were outside?

23       A    Yes.

24       Q    When you came inside, only Mr. O'Hara came in or

25   did someone else come in as well?

1                    Soto-Redirect

2        A    Mr. O'Hara came in; like, was standing by the door

3    in the vestibule and the other lady may have been right

4    behind him.  It's a small vestibule, so.

5        Q    So she may have been in there?

6        A    She could have been in the vicinity.  We've got big

7    window, anyway.

8        Q    So someone could have seen in through the window?

9        A    Yes, it's an "L" shaped --

10                   THE COURT:  Please, let's not speculate.

11                   Did you see see the lady in the vestibule?

12              Yes or no?

13                   THE WITNESS:  She was not in the vestibule.

14                   THE COURT:  She was where --

15                   THE WITNESS:  At the window -- right there in

16              the front of the house.

17                   THE COURT:  Before the vestibule?

18                   THE WITNESS:  Right.

19                   THE COURT:  Could she see into where your wife

20              was from where she was.

21                   THE WITNESS:  Yes, she could see in.  There's

22              a big picture window there.

23                   THE COURT:  If she looked looked through the

24              window.

25                   THE WITNESS:  If she looked looked through the

252

1                    Soto-Redirect

2              window.

3                    MR. MEYERS:  No further questions.

4                    MR. CARROLL:  Thank you, sir.

5                    (Whereupon, the witness was excused.)

6     R O N    M I T K O W S K I,

7              residing at 296 16th Street, Brooklyn, New York

8              called as a witness by the Petitioners, having been

9              duly sworn, testified as follows:

10                   THE CLERK:  State your name, for the record,

11             sir.

12                   THE WITNESS:  Ron Mitkowski.

13                   THE CLERK:  Where do you live, sir.

14                   THE WITNESS:  296 16th Street, Brooklyn, New

15             York.

16    DIRECT EXAMINATION

17    BY MR. CARROLL:

18        Q    Thank you for many coming, Mr. Mitkowski.

19             I'm going to show you a Democratic Party

20    designating petition, which is Petitioner's Exhibit 5, and

21    that is in fact a petition from Mr. John O'Hara; and I would

22    like you to take a look at page 125 of the petition and

23    specifically at line number two.

24        A    Right.

25        Q    Do you recognize that signature?

1                      Mitkowski-Direct/Carroll

2      A    Yeah.  That's mine.

3                 THE COURT:  That's number what?

4                 MR. CARROLL:  Line number 2.

5                 THE COURT:  Page what?

6                 MR. CARROLL:  125.

7      Q    That is your signature, sir?

8      A    Yes.

9                 MR. MEYERS:  Objection, your Honor, 125,

10           unless it's in a separate location, Mr. Carroll,

11           it's not marked in the bill of particulars.  It's

12           probably duplicated somewhere.  I apologize if it's

13           in there.  Where is it?

14                 MR. KEEFE:  In the group with the signatures

15           on 6/8.

16                 MR. CARROLL:  It is in fact there.

17                 May I show you?

18                 MR. MEYERS:  It is.  I withdraw that, your

19           Honor.

20                 THE COURT:  Let's go.

21      Q    Mr. Mitkowski, do you recall the circumstances of

22      your signing the petition?

23      A    Yes.

24      Q    Did somebody come to your home?

25      A    Yes.

254

1                    Mitkowski-Direct/Carroll

2       Q    How many people came to your home?

3       A    Two.

4       Q    And what sexes were these people?

5       A    Male and female.

6       Q    Do you know who the male was?

7       A    I believe it was Mr. O'Hara, sitting right there.

8       Q    The is the gentleman sitting at the table,

9  Mr. O'Hara?

10      A    Yes.

11      Q    And the female, do you remember who the female

12 was?  Could you describe her?

13      A    I could describe what I remember.

14      Q    What did she look like?

15      A    Thirtyish, medium build and brunette.  That's what

16 I believe I remember.

17      Q    I'm going to show you a photograph, sir, which has

18 been marked already into evidence as Petitioner's Exhibit

19 Number 4.  And I ask you to take a look at that photograph.

20           The lady on the extreme left hand side of the

21 petition, was that the lady who was with Mr. O'Hara?

22      A    I don't recognize that lady.

23      Q    So --

24      A    I would say no.

25      Q    That was not the lady with Mr. O'Hara.  Now, sir,

1                    Mitkowski-Direct/Carroll

2    who was holding the petition when they came to your door?

3        A    The man.

4        Q    Mr. O'Hara?

5        A    Yes.

6                MR. CARROLL:  I have no further questions of

7            this witness.

8                THE COURT:  Any questions?

9                MR. MEYERS:  Yes, sir.

10   CROSS-EXAMINATION

11   BY MR. MEYERS:

12       Q    Mr. Mitkowski, do you remember how long the

13   encounter was with these people at the door?

14       A    I would say no more than three minutes.

15       Q    Is this a private house or an apartment?

16       A    Yes.

17       Q    Private house --

18       A    Yes.

19       Q    -- or an apartment.

20            Did they ring the doorbell?

21       A    Yes.

22       Q    Did you invite them in or did they you step

23   outside?

24       A    I stepped on the threshold of the front doors.

25       Q    From the threshold of the front doors, could you

256

1                          Mitkowski-Cross/Meyers

2    see out on to the street?

3        A    Sure.

4        Q    Can the people on the street see where you are?

5        A    Yes.

6        Q    Do you recall whether there was anybody on the

7    street, other than the two people that were with you?

8        A    No.

9        Q    Did you look around to see if there was anybody

10   else on the streets or were you just engaged in conversation

11   with Mr. O'Hara?

12       A    I did not look.

13       Q    You didn't look.

14       A    Right.

15       Q    Okay.  Thank you.  No further questions.

16                 THE COURT:  Anything else?

17                 MR. CARROLL:  No, your Honor.

18                 THE COURT:  You may step down, sir.

19                 (Whereupon, the witness was excused.)

20   I S A B E L L A   M A R T I N,

21                 residing at 27 Jackson Place, Brooklyn, New York,

22                 called as a witness by the Petitioners, having been

23                 duly sworn, testified as follows:

24                 THE CLERK:  State your name for the record,

25                 please.

257

1                    Mitkowski-Cross/Meyers

2                    THE WITNESS:  Isabella, I-s-a-b-e-l-l-a,

3            Martin, M-a-r-t-i-n.

4                    THE CLERK:  Where do you live, ma'am?

5                    THE WITNESS:  27 Jackson Place.

6                    THE CLERK:  In Brooklyn?

7                    THE WITNESS:  In Brooklyn.

8   DIRECT EXAMINATION

9   BY MR. CARROLL:

10       Q     Thank you for coming, Miss Martin.

11             I'm going to show you a Democratic Party

12   designating petition, which has already been marked into

13   evidence as Petitioners' Exhibit 5, and specifically I'd

14   like you to take a look at page 88 of that petition.  And

15   this is a petition for John K. O'Hara.

16             And if you would look at line 6 of that petition,

17   ma'am, if you would.  Is that your signature?

18       A     Yes.

19       Q     Do you recall signing that petition?

20       A     Yes.

21       Q     And the circumstances surrounding your signature?

22       A     Mr. O'Hara came --

23       Q     Do you recall who came to your door?

24       A     Yes.

25       Q     How many people?

1                        Martin-Direct/Carroll

2        A      Two.

3        Q      And who were they?

4        A      Mr. O'Hara and a woman.

5        Q      Do you know the name of the woman?

6        A      No.

7               THE COURT:  Hold it just a moment, please.

8               What petition is that, 88?

9               MR. CARROLL:  This is page number 88, your

10       Honor.

11              THE COURT:  Line what?

12              MR. CARROLL:  Line 6.

13       Q      Do you remember what the lady looked like?

14       A      Not really, no.

15       Q      I'm going to show you a photograph that has been

16   marked into evidence as Petitioners' Exhibit No. 4 and

17   specifically I'd like you to take a look at the lady on the

18   extreme left-hand side of that photograph, this lady right

19   here.

20              Have you ever seen that lady before?

21       A      She does not look familiar:  But I really don't

22   recall.

23       Q      You really don't recall.  But she doesn't look

24   familiar?

25       A      No.

1                     Martin-Direct/Carroll

2    Q    Okay.  I have no further questions of Miss Martin.

3              THE COURT:  Anything else?

4              MR. MEYERS:  No, I have no questions, your

5         Honor.

6              THE COURT:  You may step down.

7              MR. CARROLL:  Thank you, ma'am.

8              THE WITNESS:  Sure.

9              (Whereupon, the witness was excused.)

10             MR. CARROLL:  Your Honor, Ms. English is in

11        the hall.  May I have two minutes to speak with

12        her?

13             THE COURT:  Yes.

14             We'll take a brief recess.

15             (Whereupon, there was a recess.)

16             THE COURT:  All right.  Who's your next

17        witness?

18             MR. CARROLL:  Miss Griffith.

19   C A M I L L A   G R I F F I T H,

20        residing at 412 Prospect Avenue Brooklyn, New York,

21        called as a witness by the Petitioners, having been

22        duly sworn, testified as follows:

23             THE CLERK:  State and spell your name for the

24        record.

25             THE WITNESS:  Camilla Griffith.

1                    Martin-Direct/Carroll

2                    THE CLERK:  Where do you live?

3                    THE WITNESS:  412 Prospect Avenue.

4                    THE CLERK:  In Brooklyn?

5                    THE WITNESS:  Yes.

6    DIRECT EXAMINATION

7    BY MR. CARROLL:

8        Q    Thank you for coming Miss Griffith.  I'm going to

9    show you a Democratic designating petition which may be

10   marked in evidence as Petitioners' Exhibit 5, and I'm going

11   to ask you to take a look at some signatures in that

12   petition.

13           On page 107, ma'am; I'd like you to take a look at

14   line number 9 of that petition.  Is that your signature?

15       A    Yes, it is.

16       Q    Do you remember the circumstances surrounding your

17   signing of the petition?

18       A    Well --

19       Q    Did somebody come to your home?

20       A    Yes, somebody came to my home.

21       Q    And how many people came to your door?

22       A    When I got downstairs -- because I live on the

23   second floor --

24           When I got downstairs, there was a tall white male.

25       Q    A tall white man?

261

1                    Griffith-Direct/Carroll

2        A    Male.  Approximately between six-two and six-four.

3        Q    Right.  Was there anybody with him?

4        A    No.

5        Q    There was nobody with him?

6        A    Not at my door.

7        Q    Not at your door.

8        A    But across the street, there was a lady between

9    five-seven and five-nine.

10       Q    But she was taking signatures across the street?

11       A    Across the street.

12       Q    And the person who took your signature was a tall

13   white male?

14       A    Yes.

15       Q    And would you look at the name of the person who

16   signed this particular petition.  What's the name there?

17       A    Rebecca Vales.

18       Q    Vales?

19       A    Vales.

20            THE COURT:  Who, Rebecca Vales?

21            MR. CARROLL:  Rebecca Vales.

22       Q    I'd also like you to take a look -- you say you

23   came down from the second floor to sign the petition.

24       A    Yes.

25       Q    Other members of your family live in the house with

262

1                          Griffith-Direct/Carroll

2     you?

3          A     Yes.

4          Q     Did they come down from the second floor?

5          A     Well, my third -- my second daughter, because I

6     have a daughter, then a son then another daughter, she was

7     home -- she wasn't working.  She was off so she was

8     basically, like, coming down the stairs to go on the first

9     floor because that's where my mother and father lives.

10         Q     Did she come out and sign the petitioner or did you

11    bring it in to her to sign?

12         A     No.  So she was ahead of me, okay.  She signed

13    before I did, and that's her name.

14         Q     That's on line number 8.

15         A     Yes.

16         Q     And her name is?

17         A     Arlene Griffith.

18         Q     And she also signed for the tall white male?

19         A     Yes.

20         Q     And how about on line number 10, Hazelawn Griffith

21    (phonetic).  Who is that?

22         A     That's my oldest daughter.

23         Q     Was she home that day?

24         A     That day, yes, she was home.  But she was on the

25    first floor.

1                    Griffith-Direct/Carroll

2        Q    Okay.  How did Hazelawn's signature get taken?

3        A    Okay.

4        Q    Did she come to the door?

5        A    When she came to the door, that was after I

6   signed.  Because I was going into the first floor to talk to

7   my mother, my father and --

8        Q    Once again, was this the tall white male?

9        A    Yeah, he was there.

10       Q    And the lady was across the street?

11       A    Yeah.  Because I didn't see no face.

12       Q    Now, how about on line -- page 172, I believe it

13   is.

14            THE COURT:  Just a moment.

15            Page 172.

16            MR. CARROLL:  172, line 1.  Okay.

17       Q    Is that another member of your family, ma'am?

18       A    Yes, that's my father.

19       Q    And he was down on the first floor also; is that

20   correct?

21       A    Yes, but he has limited vision.  So he said, you

22   know, "Would you sign for me?"

23       Q    So you signed for him.

24       A    Yes.

25       Q    And was the tall white man there when you signed

264

1                        Griffith-Direct/Carroll

2    for him?

3        A    Yes.

4              MR. CARROLL:  Okay.  Thank you very much,

5         ma'am.

6              MR. MEYERS:  Miss Griffith, I just have a

7         couple of questions for you.

8              THE COURT:  Go ahead.

9    CROSS-EXAMINATION

10   BY MR. MEYERS:

11       Q    Miss Griffith, do you remember how long that person

12   was at your door, this tall white man?

13       A    Let me see.  He was there for, like, between two to

14   five minutes.

15       Q    Did you talk to him?

16       A    No, he just asked me if I could sign the petition.

17       Q    Did you look at him?

18       A    I caught a glimpse of him, yes.

19       Q    Would you recognize him if you saw him again?

20       A    I could describe him.

21       Q    Why don't you describe him.

22       A    Okay.  He was between six-two to six-five.  He was

23   wearing a T-shirt -- a faded white T-shirt.  He had faded

24   shorts; a little above the knees it ended.  He had sneakers,

25   a dirty pair of sneakers he had.

1                          Griffith-Cross/Meyers

2       Q    Was he heavy?

3       A    Yeah, he was -- let me see.  He was very tall -- my

4  son is, like, six - six-one, and I had to look up to him so

5  he was very, very tall.

6       Q    Do you see that gentleman in this courtroom

7  anywhere?

8            Take a good look around.  Do you see the gentleman

9  anywhere in in this courtroom?  I'll move over to the side

10 so you can look at everybody here.

11      A    No.

12           MR. MEYERS:  No further questions, your

13           Honor.

14           THE COURT:  Anything else?

15           MR. CARROLL:  Just one question.

16 REDIRECT EXAMINATION

17 BY MR. CARROLL:

18      Q    All of these signature were signed in front of the

19 tall white male; is that correct?

20      A    Yeah.

21      Q    Could I just ask you, for the record, to read the

22 name of the individual who witnessed petition sheet 172?

23      A    Rebecca Vales.

24      Q    And that's the signature that you signed for your

25 father, right?

1                    Griffith-Cross-Redirect

2        A    Yes, yes.

3        Q    Thank you very much.

4                 MR. MEYERS:  Your Honor, I just have one more

5             question.

6                 THE COURT:  Go ahead.

7    RECROSS-EXAMINATION

8    BY MR. CARROLL:

9        Q    Ma'am, when you signed the petition, were you

10   inside or outside the premises?

11       A    I was inside the house, but I was between the outer

12   door to the step and the inner door.  That portion is where

13   the letter box is.  And the outer door was open.

14       Q    Okay --

15       A    And the inner door was open.

16       Q    Did you at any time step all the way out of the

17   house?

18       A    No.

19       Q    Is it possible that someone could have been outside

20   of the house and you might not have seen him?

21                 THE COURT:  We're not dealing with

22            possibilities.

23                 Go ahead.

24       Q    Do you know if there was anybody else with the

25   male?

267

1                  Griffith-Recross/Meyers

2      A    No, because I didn't step outside.

3                  MR. MEYERS:  No further questions, your Honor.

4                  MR. CARROLL:  No further questions.

5                  (Whereupon, the witness was excused.)

6    Z O R A I H A   R I V E R A,

7                  residing at 390 Prospect Avenue, Brooklyn, New

8                  York, called as a witness by the Petitioners,

9                  having been duly sworn, testified as follows:

10                 THE CLERK:  State and spell your name, please.

11                 THE WITNESS:  Zoraiha Rivera.

12                 THE CLERK:  Your address, please.

13                 THE WITNESS:  390 Prospect Avenue, Brooklyn,

14                 New York.

15   DIRECT EXAMINATION

16   BY MR. CARROLL:

17     Q    Thank you for coming, ma'am.

18     A    I'm going to show you Petitioner's Exhibit Number

19   5, and I'd like you to take a look at page 172 of that

20   petition, and specifically at line number 6.

21          Do you recognize that signature?

22     A    Yes.  This one here?  Mine.

23     Q    Line number 6.  And that's your name, Zoraiha?

24     A    Yes.

25     Q    Thank you.

1              Rivera-Direct/Carroll

2              Do you remember the circumstances surrounding your

3    signing of that signature?  Did somebody come to your door?

4        A    Yes, a man came to my door and he explained why.  I

5    signed.

6        Q    Was anybody with the man?

7        A    No, he was alone.

8        Q    He was alone.  Okay.  Could you describe that man

9    for me?

10       A    He was stocky build, blond hair.

11       Q    Blond hair?  How tall was he?  Do you remember?

12       A    I can't remember that.  Could be --

13       Q    But the man was there alone.  Nobody was with him.

14       A    No.

15       Q    Did you see anybody else in the vicinity of your

16   house?

17       A    No, because my apartment -- when I opened the door

18   towards the back of the building, I can't see the front of

19   the house.

20       Q    But it was in the back of the building that you

21   signed the petition?

22       A    In front of my door, yes.

23       Q    Could you just read who signed -- who's the witness

24   on that sheet?  The name right there, ma'am.

25       A    Rebecca.

1                    Rivera-Direct/Carroll

2      Q     Rebecca Vales?

3      A     Vales, yes.

4      Q     I'd like you to take a look at the next signature

5  on that page.

6      A     Yvette Rivera.

7      Q     Do you know her?

8      A     My daughter.

9      Q     Your daughter.  How old is Yvette?

10     A     Twenty-one.

11     Q     She's twenty-one?

12     A     Yes.

13     Q     Did she also sign in front of the stocky white

14  male?

15     A     Yvette wasn't in the house at the time.  The man

16  told me that my seventeen year old -- I told him --

17  explained to him she's underage.  I didn't told him the age.

18     Q     Let me ask you something.  Did Yvette sign this or

19  did somebody else sign that?

20     A     My daughter signed it, my younger daughter.

21     Q     Your seventeen year old daughter signed for your

22  twenty-one year old daughter?

23     A     Yes.

24     Q     Did you explain that to the man?

25     A     Yes, I explain him.  I didn't told him the age of

FORM C-100 - LASER  REPORTERS PAPER & MFG. CO.  800-826-6313

270

                              Rivera-Direct/Carroll

1

2      my younger daughter.  I just told him she's underage.

3          Q    Did he tell you to sign anyway?

4          A    Yeah, he told me wasn't any problem at all.

5                    MR. CARROLL:  I have no further questions.

6                    THE COURT:  Any questions?

7                    MR. MEYERS:  Yes, your Honor.

8          Q    Miss Rivera, can you describe the doorway of your

9      apartment?

10         A    My apartment has two doors.  I use the door for

11     entering, the back of the door, the kitchen.  I live in the

12     second floor.  In order for me to see the front of the

13     house, I have to go one flight of stairs.

14         Q    How many floors are in this building?

15         A    Four.

16         Q    There are four floors.  And you live on the entire

17     second floor --

18         A    No, there are eight apartments in the building.

19     They're side by side.

20         Q    And when you responded to the doorbell, did you

21     have to take that one flight down?

22         A    No, because I don't know who let the person in the

23     building.  He knock on my door.

24         Q    So he was in the hallway?

25         A    Yes.

1                        Rivera-Direct/Carroll

2      Q      Did you step out into the hallway?

3      A      No.  I just in front of my door.

4      Q      You were in front of your door.

5      A      Yeah.

6      Q      Were you able to see up and down the hallway from

7  where you were standing?

8      A      Yes, I could.

9      Q      You could?

10     A      The second floor.

11     Q      You were able to see the entire second floor from

12  where you were?

13     A      Yes.

14     Q      Did you see anybody else?

15     A      No.

16     Q      The man who came to your door, can you describe him

17  to me.

18     A      Stocky build; light hair.  I think it was blond.  I

19  can't remember that good.

20     Q      How long did you talk to this person?

21     A      About three or two minutes, only.

22     Q      Would you remember him again if you saw him?  If

23  you saw him again, would you recognize him?

24     A      I'm not sure.  Maybe if I see him.

25     Q      Did he identify himself to you by name?

272

                        Rivera-Direct/Carroll

1

2      A    Yes.

3      Q    What did he say his name was?

4      A    I can't remember the name.

5      Q    Do you see that gentleman anywhere in this

6   courtroom at all?

7      A    No.

8              MR. MEYERS:  Okay.  I have no further

9          questions, your Honor.

10             THE COURT:  Anything else?

11             MR. CARROLL:  No further questions.

12             THE COURT:  You may step down.

13             (Whereupon, the witness was excused.)

14  L O R E T T A   B R E Z I N S K Y,

15          residing at 398 Prospect Avenue, called as a

16          witness by the Petitioners, having been duly sworn,

17          testified as follows:

18  DIRECT EXAMINATION

19  BY MR. CARROLL:

20     Q    Miss Brezinsky, thank you very much for coming.

21          I'm going to show you a Democratic Party

22  designating petition which has been already marked into

23  evidence as Exhibit No. 5 -- Petitioner's Exhibit No. 5 --

24  and I'd like you to take a look at page 172 of that petition

25  and specifically take a look at line number 3.

FORM C-100 - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

1                          Brezinsky-Direct/Carroll

2        A     Yes, that's my signature.

3        Q     Is that your signature there?

4        A     That's my signature.

5        Q     Do you remember signing the petition?

6        A     Yes, I remember signing it.

7        Q     How many people came to your door?

8        A     That I don't remember.  I think it was one.  I'm

9   not sure now.

10       Q     Do you remember if it was a man or a woman?

11       A     I thought it was a woman.

12       Q     You thought it was a woman.  Okay.

13             Could you describe this woman that you think came

14   to your door?

15       A     Just, I'd say about my height and I figure about

16   thirty-five - forty years old, something like that.

17       Q     Was she slim or heavy?

18       A     No, she was sort of a little heavier than I am, I

19   think.

20       Q     She was a little heavier than I am?

21       A     Yes.

22       Q     What color was her hair?

23       A     It was dark, but I'm not sure.  I think.  I'm not

24   sure.

25                   MR. CARROLL:  I don't have any further

274

1              Brezinsky-Direct/Carroll

2         questions.

3              MR. MEYERS:  I have no questions.

4              THE COURT:  No cross.

5              You may step down.

6              (Whereupon, the witness was excused.)

7              MR. CARROLL:  Your Honor, could we have a

8         brief break?  My expert witness is here.  He just

9         showed up.  I want to speak with him.

10              THE COURT:  We'll take a brief recess.

11              (Recess.)

12              THE CLERK:  Case on trial.

13              MR. MEYERS:  Your Honor, I just want to say

14         for the record that yesterday this Court ordered

15         that Kathy Verti be produced.  She's a S.W. on

16         Mr. O'Hara's petitions.  I just want the Court to

17         be informed that Miss Verti is present in the Court

18         outside.

19              MR. CARROLL:  Call Mr. Paul Osborn.

20    P A U L   A.   O S B O R N,

21         residing at 30 Lakewood Avenue, Cedar Grove,

22         New Jersey, called as a witness by the Petitioner,

23         having been duly sworn, testified as follows:

24              THE CLERK:  State and spell your name for the

25         record.

275

1                         Osborn-Direct/Carroll

2                   THE WITNESS:  Paul N. Osborn, O-s-b-o-r-n, 30

3             Lakewood Avenue, Cedar Grove, New Jersey.

4   DIRECT EXAMINATION

5   BY MR. CARROLL:

6        Q     Mr. Osborn, how old are you?

7        A     I'm in my sixties.

8        Q     And what is your profession?

9        A     I'm a forensic document examiner, more commonly

10  termed a handwriting and typewriting identification expert.

11       Q     And how long have you practiced this profession?

12       A     I've devoted all of my time to this field of

13  identification since 1954.

14       Q     So that's forty years; is it not?

15       A     Yes.

16       Q     In your profession, have you ever had occasion to

17  lecture on the subject of forensic document identification?

18       A     Yes.

19       Q     Before whom have you lectured?

20       A     I've lectured on numerous occasions, mostly to

21  banking groups, bar associations.  I have lectured at

22  Indiana University.  I've lectured at various forensic

23  document groups.  For a series of about seven or eight

24  years, I lectured at the Brooklyn Law School.

25       Q     On the subject of forensic --

276

1                        Osborn-Direct/Carroll

2          A      On the subject of questioned documents.

3          Q      Have you ever had occasion to write professionally

4      in this field?

5          A      Yes, sir.

6          Q      Do you recall some of the articles that you may

7      have written?

8          A      Well, most of my articles -- the articles I wrote

9      were quite a few years ago.  Yes, I wrote an article on the

10     Lindbergh kidnapping trial.  I wrote an article on

11     indentations and anonymous letters, paper indentations.

12         Q      For example, did you write an an article for the

13     Journal of Forensic Science in October 1983 entitled,

14     "Excerpts and Comments on Testimony by Document Examiners

15     in Regard of State of New Jersey V Bruno Richard

16     Hauptmann"?  Is that your article?

17         A      Yes.

18         Q      Did you also do an article for the Journal of

19     Forensic Sciences in April 1964 on indentations and

20     anonymous letters?

21         A      Yes.

22         Q      What is that all about, indentations and anonymous

23     letters?

24         A      Well, this articles were printed after being

25     presented to different society meetings of either the

Osborn-Direct/Carroll

1    American Academy of Forensic Societies or else the American

2    Society of Questioned Document Examiners, both of which I am

3    a member and past president of.

4        Q    Have you done other professional articles and

5    scholarly articles in the field?

6        A    Yes, I have.

7        Q    Over the years, how many of these articles have you

8    done, sir?

9        A    I'm not sure.  I'd say about a dozen.

10       Q    About a dozen.  All in the field of forensic

11   identification of documents.

12       A    Yes, sir.

13       Q    And you mentioned that you're a member of

14   professional societies.

15       A    Yes.

16       Q    Could you tell us what professional societies

17   you're a member of?

18       A    Well, I'm a member of the American Academy of

19   Forensic Sciences, which is a very large group made up of

20   different forensic groups, including pathologists,

21   toxicologists, one section of questioned document

22   examiners.  Another -- different categories of forensic

23   science and I'm a past president of the Questioned Document

24   Section in that group.  I'm also a member of the American

1                          Osborn-Direct/Carroll

2    Society of Questioned Document Examiners, which was the

3    first group of its kind formed in this country and the

4    immediate past president of that group.

5              I'm also certified by the American Board of

6    Forensic Document Examiners, Incorporated.  This was a

7    certification board set up by different groups in 1975 for

8    guidelines to use by courts and attorneys throughout the

9    country on the qualifications and backgrounds of document

10   examiners -- forensic document examiners.

11             I have been, temporarily or for short periods of

12   time, members of other organizations, of which I am not now.

13   Q    But are these the leading professional societies in

14   your field?

15   A    Yes, they are.

16   Q    Have you ever testified on the subject of disputed

17   documents?

18   A    Yes.

19   Q    How often have you testified on the subject of

20   disputed documents?

21   A    Since 1954, almost five hundred occasions.

22   Q    And in what courts have you been qualified --

23   A    Most of the courts that I've been qualified in have

24   been civil and criminal courts here in the states of New

25   York, New Jersey, Pennsylvania.  I have been qualified in

1                    Osborn-Direct/Carroll

2    twenty-two different states, as well as in Canada, the

3    Virgin Islands and one time in the Panama Canal Zone.

4        Q    Do you do anything, other than testify in court?

5    Is there more to your business than just that?

6        A    Oh, yes.  Actually only a small percentage of the

7    cases that I work on require my testimony in court.  Many of

8    the problems that I report on are not matters of

9    litigation.  There are some problems which simply cannot be

10   answered because of the lack of evidence and in a good

11   percentage of my cases, my report is adverse to my client's

12   contentions, so he's not inviting me to court.

13       Q    So you don't get invited to court in those cases.

14       A    Correct.

15       Q    Mr. Osborn, were you asked, in connection with this

16   particular litigation, this lawsuit, to examine some

17   documents?

18       A    Yes, sir.

19       Q    And do you have those documents with you?

20       A    No, I do not.

21       Q    I'm going to show you two sets of documents and are

22   these in fact the documents that you were asked to examine?

23       A    Yes, sir.

24       Q    And did you prepare a report based upon those

25   documents?

280

1                       Osborn-Direct/Carroll

2      A    No, I did not.

3                 MR. CARROLL:  Before we move that, your Honor,

4            we would move to certify Mr. Osborn as an expert in

5            the field.

6                 THE COURT:  You may question him.

7                 MR. MEYERS:  No objection.

8                 THE COURT:  Without objection.

9      Q    Mr. Osborn, I'm going to ask you to take a look at

10     these documents that you have previously examined and you

11     have an abstract or a copy of petition sheet number 181.

12     Petition sheet number 181 in a petition that is for John

13     Kennedy -- or John K. O'Hara.  Excuse me.  It's a Democratic

14     Party designating petition.  Is that not correct, sir?

15     A    Yes, sir.

16     Q    And I would just like you to take a look at this

17     document here, which has been marked into evidence as

18     Petitioners' Exhibit Number 5, and just tell me, is that the

19     same sheet as the one that you examined (indicating)?

20     A    They're both photocopy reproductions of the same

21     sheet, yes.

22     Q    And specifically, Mr. Osborn, I would like you to

23     take a look at lines numbers 1 and 2 --

24     A    Yes, sir.

25     Q    -- of that petition.  Okay.

FORM C-100 - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1                        Osborn-Direct/Carroll

2                   MR. MEYERS:  Objection, your Honor.

3                   Again, it's not in the bill of particulars and

4              glancing over at counsel's copy, it's not in his,

5              either.

6                   MR. CARROLL:  Excuse me.  I have misidentified

7              the page.  It is 186.  That is my fault.

8                   THE COURT:  Lines 1 and 2?

9                   MR. CARROLL:  Lines 1 and 2.

10    Q     I ask you again, sir, to take a look at lines 1 and

11    2 on page 186 of Petitioners' Exhibit 5 and is that in fact

12    the sheet that you were asked to examine?

13    A     Yes, it is.

14    Q     Were you provided any other documents with which to

15    make your examinations?

16    A     Yes, I was.

17    Q     And could you identify what those documents were.

18    A     Yes, I was also given reproductions of a number of

19    voting registration cards --

20    Q     Could you identify which voter register he --

21    A     -- commonly known as buff cards.  These were in the

22    names of -- do you want me to read them off?

23    Q     Please.

24    A     Rose Marie DePalma, Rose DePalma.  Jose Barreto.

25    Ronald --

FORM C-100 · LASER   REPORTERS PAPER & MFG. CO.   800-826-6313

282

Osborn-Direct/Carroll

1

2    Q    No, just with respect to lines 1 and 2 right now.

3             THE COURT:  Rose Marie DePalma and who else?

4             THE WITNESS:  Well, in respect to this

5         particular Exhibit, your Honor, I was given just

6         one buff card of a Lucy DeLorenzo.

7             THE COURT:  For 186, lines 1 and 2 you had a

8         buff card of Lucy DeLorenzo.

9    Q    And can you read the names of the signatures on

10   lines 1 and 2, what they purport to be?

11   A    Well, they're for the most part illegible.  The

12   first name I believe is Laurel, on line one, and probably

13   DeLorenzo or DeLorenzio.  The second name would appear to be

14   Lucy Hernandez DeLorenzio.

15            MR. CARROLL:  Your Honor, would you like to

16        see (indicating)?

17            THE COURT:  All right.

18            MR. CARROLL:  Can we have this marked as --

19            MR. MEYERS:  Your Honor, this is not a

20        certified copy of the --

21            THE COURT:  Well, I guess we can bring over

22        the buff cards, if you want.

23            MR. MEYERS:  I request the production of the

24        original but in lieu of it, I'll allow --

25            THE COURT:  So you'll have an opportunity to

1                         Osborn-Direct/Carroll

2              check it out against it without any problem, and if

3              it's any different from the original buff card, it

4              will be stricken.

5                    MR. MEYERS:  Thank you.

6                    MR. CARROLL:  Thank you your Honor.

7                    THE COURT:  In the interim, let's mark it.

8                    MR. CARROLL:  Mark it as the next Petitioners'

9              Exhibit.

10                   THE COURT:  Which is what?

11                   THE CLERK:  Exhibit 18.

12                   (So marked).

13   Q    Mr. Osborn, I'm going to show you again

14   Petitioners' -- in evidence -- Exhibit number 18.

15         Based upon your examination of that buff card and

16   the two signatures on page number 186 lines 1 and 2, were

17   you able to draw any conclusions as to who signed those

18   signatures?

19   A    Yes, sir.

20   Q    And what were those conclusions, sir?

21   A    The two signatures on the buff card, on the front

22   and the back of it, were signed by one individual and that

23   individual did not sign either one of the two names on

24   Exhibit 186 -- page 186.  I believe that the name Lucy

25   Hernandez DeLorenzio on line two was written by the writer

284

1                   Osborn-Direct/Carroll

2    of the signature on line one, being a Laurel DeLorenzio.

3        Q    And how did you reach that conclusion, sir?

4        A    By studies and comparisons of handwriting

5    identities of the two names on the buff card as compared to

6    the characteristics of the signatures on this particular

7    petition sheet.  I also prepared an enlarged illustration of

8    the two names on the petition sheet as well as the two names

9    on the buff card.

10       Q    Do you have copies of those enlarged illustrations?

11       A    Yes, I made copy for the Court, for both counsel

12   and for myself.

13       Q    And could you provide me with those copies, sir?

14       A    Yes (handing).  There's three of them.

15       Q    Mr. Osborn, this report was prepared by you?

16       A    These illustrations were prepared by me, yes.

17       Q    And they are enlargements of the signatures in the

18   petition?

19       A    Yes.  All of the signatures have been enlarged to

20   the degree indicated by the one inch measure.

21              THE COURT:  Let me understand this,

22              Mr. Osborn.  You say that the signature on the buff

23              card of Lucy DeLorenzo -- is that correct -- or

24              DeLorenzio --

25              THE WITNESS:  Yes, sir.

1                     Osborn-Direct/Carroll

2              THE COURT:  -- are identical, both front and

3       back, correct?

4              THE WITNESS:  No, I didn't say that -- oh, on

5       the buff card?

6              THE COURT:  On the buff card.  They're signed

7       by the same person?

8              THE WITNESS:  They're signed by the same

9       person.  They were given to me as specimens of hers

10      written by the same person.

11             THE COURT:  And you say that neither one --

12      that Laurel Hernandez and Lucy Hernandez DeLorenzo

13      were signed by those individuals?

14             THE WITNESS:  Neither one of those names on

15      the petition sheet was signed by the writer of the

16      two signatures on the buff card.

17             THE COURT:  Okay.  And can you make a

18      determination as to who signed it?

19             THE WITNESS:  I believe that in all

20      probability, the two names were written by one

21      person, but it was not Lucy DeLorenzio.

22      Q     And did you draw some conclusion as to who it was

23      who did sign those two signatures, based upon the comparison

24      of the signatures on the petition?

25      A     Yes, by some similarities in the name "Hernandez"

1                      Osborn-Direct/Carroll

2    on line 1, which reads "Laurel Hernandez," as compared to

3    that in the name on line 2 which reads "Lucy Hernandez

4    DeLorenzio."

5        Q    Is it your judgment that it was -- that the

6    signature on line two was signed by the individual on

7    line 1?

8        A    Based on what material there is at hand, I could

9    not make a positive identification that those two signatures

10   were written by the writer of the first name.  But from what

11   there is, I believe they were.

12       Q    But you are able to conclude that neither of them

13   were signed by Miss Lucy DeLorenzio?

14       A    That is correct.

15       Q    If we could move on on sir, to petition sheet

16   number 111.

17              MR. CARROLL:  Your Honor, I would move the

18              introduction of Mr. Osborn's enlargements as an aid

19              to the Court --

20              THE COURT:  Any objection?

21              MR. MEYERS:  Your Honor, I would have no

22              objection to the piece of evidence that's already

23              been discussed.  I'd prefer to wait for the others

24              to be introduced first.

25              MR. CARROLL:  That's fine.  We'll go through

                        Osborn-Direct/Carroll

 1

 2          them one at a time.

 3                  MR. CARROLL:  We're going to go to Q-4 next,

 4          that is petition sheet number 147, lines number 1

 5          and 2.

 6                  THE COURT:  Hold it just a moment.  Who was

 7          the S.W., so let's clear the record.  Who was the

 8          S.W. on the 186 lines -- 186.

 9                  MR. CARROLL:  That is Sandra Helverson, your

10          Honor, and indeed I believe Ms. Helverson is the

11          S.W. on all of the signatures that Mr. Osborn will

12          be testifying to.

13                  THE COURT:  I see.  Okay.

14      Q    Now, on petition sheet number 186, Mr. Osborn, did

15  we ask you to look at any particular signatures?

16                  THE COURT:  147?

17                  MR. CARROLL:  147.

18      A    Yes.

19      Q    And what were the signatures that we requested you

20  look at on that page?

21      A    The two names on lines 1 and 2 being Raymond

22  Montalvo and Millie Montalvo (phonetic).

23      Q    Were you provided with any other documents with

24  which to make your examination?

25      A    Yes, sir.  I was provided with a registration card

288

1                    Osborn-Direct/Carroll

2   in the name of Millie Montalvo containing a signature on the

3   face and a large number of signatures on the back dating

4   from 1981 to 1990.

5            MR. CARROLL:  Your Honor, subject to the same

6            caveat as as before, we would move the introduction

7            of Miss Montalvo's buff card.

8            THE COURT:  Yes, the buff card, subject to the

9            same thing.

10           MR. MEYERS:  Yes.

11           THE COURT:  So mark that Petitioners' Exhibit

12           19, Millie Montalvo's buff card, in evidence,

13           subject to the same.

14           (So marked.)

15   Q    Sir, in your review of petition sheet 147, lines 1

16   and 2, and the buff card of Millie Montalvo, were you able

17   to reach any conclusions as to the identity of the signator

18   for lines 1 and 2 on page 147?

19   A    Yes, sir.

20   Q    And what was that conclusion?

21   A    It is my conclusion that the two names on lines 1

22   and 2, Raymond Montalvo and Millie Montalvo, were written by

23   one individual.  And in comparison of those two names with

24   the numerous signatures on the buff card of Millie Montalvo,

25   I'm able to conclude that the writer of those two names was

1                      Osborn-Direct/Carroll

2    not her.

3        Q    So it is not Millie Montalvo who wrote those

4    names.

5        A    Correct.

6        Q    Were you able to draw any judgment, by exclusion,

7    as to who was the author of those two names?

8        A    Who ever wrote the name "Raymond Montalvo" also

9    wrote the name "Millie Montalvo," but I don't know who that

10   author is.

11       Q    And the subscribing witness on the this sheet was

12   also Sandra Helverson?

13       A    Yes, sir.

14       Q    If we could move to page 131 of the petition.  And

15   there I believe we asked you to examine lines 7 and 8.  Is

16   that not correct?

17       A    Yes.

18       Q    Could you read those two names for us, please?

19       A    The names on those lines respectively, are Pamela,

20   Pegram, P-e-g-r-a-m, and Michelle -- I'm sorry -- and Ronald

21   Pegram.

22       Q    And in connection with your examination of the

23   signatures of Pamela and Ronald Pegram, were you provided

24   any other documents?

25       A    Yes, sir.

290

1                    Osborn-Direct/Carroll

2        Q    And what was that?

3        A    That was the registration card in the name of

4    Ronald Pegram.

5                    MR. CARROLL:  Subject to the same caveat, your

6                    Honor, may we mark that?

7                    THE COURT:  Mark it Petitioners' Exhibit 20.

8                    (So marked.)

9        Q    Mr. Osborn, in comparing the signatures of Pamela

10   Pegram and Ronald Pegram on page 131, lines 7 and 8, with

11   the signatures contained on the buff card, were you able to

12   reach any conclusions as to the author of -- the signator on

13   lines 7 and 8?

14       A    Yes.

15       Q    And what was that conclusion?

16       A    The two names on lineups 7 and 8 were written by

17   one individual, and in comparison of those two names with

18   the signatures on the buff card in the name of Ronald

19   Pegram, I can determine that the writer of the signatures on

20   the buff card did not write either one of the two names on

21   the petition sheet.

22       Q    So the author was not Ronald Pegram.

23       A    Correct.

24       Q    And he did not sign his own name there?

25       A    That is correct.

1                      Osborn-Direct/Carroll

2       Q    Were you able to draw any conclusion by exclusion

3   as to who did sign though two names?

4       A    I can only state that the evidence leads me to the

5   conclusion they were done by the same person, but I don't

6   know who that that person is.

7       Q    Let us move on to Q-8.

8            Oh, just for the record, let us note that the

9   subscribing witness once again was Miss Helverson.

10           Now, on petition sheet number 196, we asked you to

11  look at lines line numbers 3 and 4; is that correct?

12      A    Yes, sir.

13      Q    Could you identify the names on lines number 3 and

14  4?

15      A    Antonio R. Soto and Isabel Ramos Soto (phonetic).

16      Q    And were you provided any other document to assist

17  in your analysis of these signatures?

18      A    Yes, sir.

19      Q    What was that document?

20      A    That was the registration card in the name of

21  Antonio Raymond Soto.

22              MR. CARROLL:  Subject to the same caveat --

23           Mr. Meyers (handing).

24              MR. MEYERS:  Yes, subject to the same caveat,

25           your Honor.

292

1              Osborn-Direct/Carroll

2              THE COURT:  Okay.  Mark them Petitioners'

3         Exhibit 21 in evidence, subject to the same

4         caveat.

5              (So marked.)

6    Q    Mr. Osborn, when comparing Petitioners' 21 in

7    evidence -- the buff card -- with the signatures on page 196

8    on lines 3 and 4, the Sotos, were you able to come to or

9    draw any conclusion as to the author of those two

10   signatures?

11   A    Yes, sir.

12   Q    And what was that conclusion?

13   A    Both of these names on the petition sheet, Antonio

14   R. Soto and Isabel Ramos Soto were written by the writer of

15   the signatures on the buff card reading Antonio Ramos Soto.

16   Q    So it's your conclusion that Isabel Soto --

17             THE COURT:  Don't repeat, please.  That's what

18        he said.  Let's move along.

19   Q    Turning to page number 108 of the petition, were

20   you asked to examine signatures on that page?

21   A    Yes, sir.

22   Q    And how many signatures were you asked to look at

23   there?

24   A    Three signatures on lines 3, 4 and 5 which read

25   respectively, John DePalma, Rose DePalma and Rose Marie

293

1                         Osborn-Direct/Carroll

2    DePalma.

3        Q    And were you provided with any documents, in

4    addition to the petition, to assist you?

5        A    Yes, sir.

6        Q    What was given to you?

7        A    I was given the voting registration cards in the

8    names of Rose Marie DePalma and Rose DePalma.

9        Q    May we see those, please?

10       A    Yes, sir (handing).

11            MR. CARROLL:  Subject to the same caveat, may

12            we mark these?

13            THE COURT:  How many are there, two?

14            MR. CARROLL:  Two buff cards.

15            THE COURT:  Mark it Petitioners' Exhibit 22 A

16            and B.

17            MR. MEYERS:  Mr. Carroll (handing).

18            THE COURT:  A is whose?

19            MR. CARROLL:  A will be Rose and B will be

20            Rose Marie.

21            (So marked.)

22       Q    Sir, in comparing exhibits 22 A and B with the

23   signatures contained on page 108 of the petition for the

24   DePalma family, were you able to reach any conclusion as to

25   the author of those signatures?

294

1                    Osborn-Direct/Carroll

2      A    Yes, sir.

3      Q    And what is that conclusion?

4      A    The three signatures referred to on lines 3, 4 and

5  5 of sheet number 108 were written by one individual.  In

6  comparing these three names with the voting registration

7  cards signatures of Rose Marie DePalma and Rose DePalma, I

8  can conclude that the three questioned names were not

9  written by either one of them.

10     Q    Moving on to page 128 of the petition --

11              MR. CARROLL:  I think I've already stated for

12              the record that Miss Helverson is the S.W. on all

13              of the pages.

14              THE COURT:  Yes.

15     Q    On page 128, sir, did we ask you to examine certain

16 signatures?

17     A    Yes, sir.

18     Q    And what signatures were they?

19     A    The names Senaidia, S-e-n-a-i-d-i-a, Barreto,

20 B-a-r-r-e-t-o; And on line 3, Jose Barreto.

21     Q    And those are on lines 2 and 3, sir?

22     A    Yes, sir.

23     Q    Were you provided with any other documents with

24 which to assist in your analysis?

25     A    Yes, sir.

1                   Osborn-Direct/Carroll

2        Q    And what was that other document?

3        A    I was given the voting registration card, a copy of

4    it, of Carlos -- I'm sorry -- of Jose Barreto.

5                   MR. CARROLL:  Subject, of course (handing.)

6                   THE COURT:  Mark it subject to the same terms

7              as the prior markings.  That will be Petitioners'

8              Exhibit 23.

9                   (So marked.)

10                  MR. MEYERS:  Your Honor, at this time, I'm

11             going to make my motion to exclude any testimony as

12             to Jose Barreto on the basis he is not an enrolled

13             voter.  Therefore, this is not a valid signature.

14             The buff card specifically states he has not chosen

15             a party designation and, therefore, is not enrolled

16             in the --

17                  THE COURT:  These are being offered from the

18             purpose of striking for either party --

19                  MR. MEYERS:  His signature does not exist --

20                  MR. CARROLL:  Your Honor, this goes to issues

21             of fraud and the signature is on the petition.

22                  THE COURT:  Overruled.

23       Q    Mr. Osborn, in comparing the buff card in evidence

24    as Petitioners' Exhibit Number 23 with the signatures on

25    line two and 3 of page number 128, were you able to come to

1                          Osborn-Direct/Carroll

2       any conclusion as to the author of the signatures on line 2

3       and 3?

4            A    Yes, sir.

5            Q    What is the conclusion?

6            A    The two signatures on lines 2 and 3 of sheet 128

7       were written by one individual.  In comparison of those two

8       names with the signatures on the buff card in the name of

9       Jose Barreto, I can determine that neither one of the

10      petition sheet signatures was written by the writer of the

11      signatures on that registration card.

12           Q    So it was not Mr. Barreto.

13           A    Correct.

14           Q    Turning, sir, to page 73 of the petition, did we

15      ask you to examine some signatures on that sheet?

16           A    Yes, sir.

17           Q    And what signatures were they?

18           A    The signatures on lines 3 and 4 which read

19      respectively:  "Mrs. Andrea Quinones" and on line 4, "Carlos

20      Quinones."

21           Q    And were you given anything to assist you in that?

22           A    Yes, sir.  I was given a voting registration card

23      in the name of Carlos Quinones.

24                    MR. CARROLL:  Subject to the same caveat.

25                    Mr. Meyers (handing.)

297

1          Osborn-Direct/Carroll

2              THE COURT:  That will be Petitioners' Exhibit

3          24.

4              (So marked.)

5     Q    Sir, in comparing Petitioners' Exhibit 24 in

6     evidence, the buff card, with the signatures on lines 2

7     and -- excuse me -- on lines 3 and 4 on page 73, were you

8     able to come to any conclusion as to the author of the

9     signatures on lines 3 and 4?

10    A    Yes, sir.

11    Q    And what was that conclusion?

12    A    It is my conclusion that the two names on lines 3

13    and 4 were written by one individual and that comparison of

14    these two names with the signatures on the buff card in the

15    name of Carlos Quinones leads me to the opinion that neither

16    one of those names was written by him.

17    Q    Sir, looking at pages -- turning, if you will, now,

18    to page 111 of the petition, were you asked to examine any

19    signatures on that page?

20    A    I was asked to examine the signatures on lines 2

21    and 3 in the names of Ana, A-n-a, M. Gonzalez and on line 3

22    Horacio Gonzalez (phonetic).

23    Q    In examining those particular signatures, were you

24    able to come to any conclusion as to the identity of the

25    author of those signatures?

1            Osborn-Direct/Carroll

2      A    Yes.

3      Q    And what was that conclusion?

4      A    That the author of these two signatures is one and

5    the same person.  I don't know who that person is.

6      Q    And how did you go about reaching that

7    determination?

8      A    By studies and comparisons of each one of the

9    handwriting characteristics in the two names, especially the

10   surnames Gonzalez, by comparison of the quality of the

11   writing.  They clearly demonstrate, in my opinion, the same

12   combination of general as well as individual handwriting

13   identities and show no significant differences that might be

14   indicative of two different writers; and it's the

15   combination of these two identities which allow me to

16   conclude that they were both written by one person.

17     Q    And this is --

18     A    This is also buttressed by the consistency in the

19   number of the characteristics seen in the two addresses to

20   the right of each of these names.  The same evidence holds

21   true in many of the other comparisons that were made.

22     Q    We'll go through those, sir.

23          On page number 21 of the petition -- is that not

24   correct?

25     A    Yes.

299

1                    Osborn-Direct/Carroll

2      Q    Page number 21 of the petition, were you asked to

3   examine --

4                    MR. MEYERS:  Your Honor, I don't have a page

5              21 in the bill of particulars.

6                    MR. CARROLL:  Let me see if I'm reading this

7              correctly.

8                    MR. KEEFE:  Is it 130?

9                    MR. CARROLL:  No, it is page 21.

10                   MR. MEYERS:  Your Honor, the section that

11             petitioner has included for Sandra Helverson on

12             this exhibit begins with page 73.

13                   MR. CARROLL:  They're not necessarily in

14             order.

15                   Here it is, if you would like to look at it

16             (handing).

17                   MR. MEYERS:  Your Honor, I'll read off every

18             page that's in this bill of particulars.  That's

19             not one of them.

20                   THE COURT:  Do you have any any other --

21                   MR. MEYERS:  I'm going to move that the

22             evidence to be admitted in this regard by

23             petitioner be excluded on the basis that it was not

24             served upon us in the bill of particulars.

25                   THE COURT:  Do you have a page 21 there at

300

Osborn—Direct/Carroll

1

2          all?

3              MR. CARROLL:  We have a page 21, your Honor.

4          Where is it?

5              It was inadvertently listed after another

6          individual.  Let's find it in Mr. Meyer's copy.

7              THE COURT:  See if it's there.  Find it.

8              Okay.  You got it?

9              MR. MEYERS:  One moment, your Honor.  It might

10         be that they have tagged it as an exhibit for a

11         different cause.

12             MR. CARROLL:  Your Honor, if it was

13         inadvertently included in another section, I

14         suggest there can be no surprise.

15             THE COURT:  As long as it's there.

16             MR. MEYERS:  Well, it is here in a different

17         section, your Honor.

18             THE COURT:  You have it, though?

19             MR. MEYERS:  Yes.

20             THE COURT:  Okay, fine.  Proceed.

21      Q    Sir, on page 21 of the petition, were you asked to

22    examine certain signatures?

23      A    Yes, sir.

24      Q    And based upon your examination of those

25    signatures -- first of all, which lines of the petition were

## SIDER, ZACHARY

| | |
|---|---|
| **From:** | SHARPLES, JOHN <SHARPLEJ@BrooklynDA.org> |
| **Sent:** | Wednesday, February 9, 2022 4:06 PM |
| **To:** | SHIELDS, MARGARET |
| **Subject:** | Baez - O'Hara |
| **Attachments:** | O'Hara Recommendation Memo DA copy.docx |

This just keeps getting better and better.

This is Baez's attorney John O'Hara. CRU exonerated him in 2016. It's a pretty notorious case of government corruption, perfect for you.

You don't have to include this in your report, it's for your personal edification!

Happy reading….

John Sharples
Senior Assistant District Attorney
Conviction Review Unit
Post-Conviction Justice Bureau
Kings County District Attorney's Office
350 Jay Street
Brooklyn, NY 11201
718-250-2387

**SIDER, ZACHARY**

| | |
|---|---|
| **From:** | LICHSTET@BrooklynDA.org |
| **Sent:** | Wednesday, December 9, 2020 11:55 AM |
| **To:** | FORBESG@BrooklynDA.org |
| **Subject:** | FW: O'Hara Recommendation Memo |
| **Attachments:** | O'Hara Recommendation Memo DA copy.docx; O'Hara exhibit 1.pdf; O'Hara exhibit 2.pdf; O'Hara exhibit 3.pdf |

The CRU memo and exhibits.

---

**From:** SONNENSCHEIN, ERIC <SONNENSE@BrooklynDA.org>
**Sent:** Wednesday, December 9, 2020 11:50 AM
**To:** LICHSTEIN, TONI <LICHSTET@BrooklynDA.org>
**Subject:** O'Hara Recommendation Memo

Managed to do it.  Here you go.

1



Cornell University Law School (http://www.lawschool.cornell.edu/)

Search Cornell (https://www.cornell.edu/search/)

(https://www.cornell.edu)

# 2 No. 78
# The People &c.,
# Respondent,
# v.
# John O'Hara,
# Appellant.

## 2001 NY Int. 78
## June 14, 2001

*This opinion is uncorrected and subject to revision before publication in the New York Reports.*

Steve S. Efron, for appellant.
Monique Ferrell, for respondent.
The League of Women Voters of New York City; New York Civil Liberties Union, *amici curiæ.*

## WESLEY, J.:

Defendant John O'Hara, an attorney and frequent candidate for elective office, was convicted of seven crimes arising from his fraudulent filing of a false voter registration form and voting in five separate elections in an election district in which he did not

reside. On appeal, defendant contends that the definition of voting residence contained in the Election Law is at odds with our recognition that in today's society, a person can have more than one residence. This case, however, turned on whether a second residence actually existed, not a choice between two. The court's charge correctly reflects the state of New York law and did not, as defendant now contends, direct a verdict against him.

Defendant has lived in a multi-unit apartment building at 579 61st Street in Brooklyn since the 1980s. Until 1992, he registered to vote using the 61st Street address, which was within the 20th Election District and part of the 51st State Assembly District and the 38th Council District of the City of New York. Following redistricting in 1991-1992, 579 61st Street was no longer situated within these districts.

On November 2, 1992, defendant prepared, signed and filed a new voter registration form specifying that he resided at 553 47th Street. This address was located within the newly-redrawn borders of the 20th Election District, the 51st State Assembly District and the 38th Council District of the City of New York. Using the 47th Street address, defendant voted in those districts on five occasions -- November 3, 1992; May 4, 1993; September 14, 1993; September 28, 1993 and November 2, 1993.

Defendant was charged with one count of offering a false instrument for filing in the first degree (Penal Law § 175.35), one count of false registration (Election Law § 17 (/nyctap-cgi/ez-nylaw?ELN+17)- 104[4]) and five counts of illegal voting (Election Law § 17 (/nyctap-cgi/ez-nylaw?ELN+17)- 132 [3]). Defendant was tried and convicted on all counts of the indictment in 1997. On appeal, the Appellate Division reversed the judgment and ordered a new trial due to an improper missing witness charge, and rejected defendant's remaining contentions as unpreserved or without merit (253 2 560). The second trial ended in a deadlocked jury.

During opening statements of the third trial, defense counsel argued that the only basis for the People's charges rested on the assertion that defendant never lived at 553 47th Street. According to defense counsel, the evidence would establish that, contrary to the People's position, defendant had in fact

Case 1:17-cv-04766-LDH-RML   Document 146-2   Filed 02/26/24   Page 222 of 324
PageID #: 5819

taken up residence at 553 47th Street. Defense counsel submitted that ultimately the case would turn on the credibility of the witnesses.

At trial, the People called several witnesses. An employee for the phone company testified that defendant maintained a phone at the 61st Street address. There was, however, no record of any telephone service at the 47th Street address. In addition, the owner of 579 61st Street testified that defendant was a tenant at that address from 1990 to 1993.

Raphael Munoz and Roberto Lozano testified that they, along with another individual, moved into 553 47th Street in 1992, with the intent of purchasing the building from Magaly Lucas, the owner, which they eventually did. According to Munoz and Lozano, when the three men first moved in, nobody else was living in the building, the apartment was in shambles and the basement was uninhabitable. Each man testified that some time after moving in, defendant approached them, told them that he was receiving mail at that address and asked them to hold it for him.

Defendant presented the testimony of an employee of the Office of Court Administration who stated that in 1993 defendant's attorney registration form listed 553 47th Street as his home address. Defendant further proffered the testimony of an American Express employee that defendant's billing statements listed the 47th Street address. Several neighbors who had participated in defendant's political campaigns testified that they had on occasion observed him walking into the 47th Street house and that they had understood that he lived there with his former girlfriend, Lucas. One neighbor testified that Josephine and Raymond Vales _- the owners of the house prior to Lucas -- had at some time renovated the basement into a complete apartment. Defendant's mother and aunt also testified that defendant resided at the 47th Street address.

Finally, defendant testified that he moved into the 47th Street address because his ex-girlfriend, Lucas, owned the house. He stated that he kept the 61st Street address for his relatives and used it as an office. When he and Lucas separated, she moved to Manhattan and allowed him to stay in the basement apartment at 47th Street free of charge. Defendant further

Case 1:17-cv-04766-LDH-RML   Document 146-2   Filed 02/26/24   Page 223 of 224   Page 4 of 15
PageID #: 5820

testified that he never changed his driver's license to the 47th Street address and that he used the 61st Street address for all State and Federal tax forms.

On redirect, the People called Josephine Vales, who testified that when she and her husband owned the 47th Street building they never renovated the basement into a habitable apartment.

During the charge conference, the trial court indicated that it would define residency to the jury as follows:

> "According to the law a residence is that place where a person maintains a fixed, permanent and principal home and to which he wherever temporarily located always intends to return.
>
> "Additionally, a candidate who has two residences may choose one to which he has the legitimate, significant and continuing attachment as his residence for purpose of the [E]lection [L]aw. It is for the candidate to decide which address is to be his voting and campaign address.

Case 1:17-cv-04766-LDH-RML   Document 146-2   Filed 02/26/24   Page 224 of 224
PageID #: 5821

"However, the address chosen by the defendant as his residence must comport with the definition of residence as I have previously given it to you."

Defense counsel objected to the charge, indicating that he agreed with the court's use of the definition of "residence" found in Election Law § 1 (/nyctap-cgi/ez-nylaw?ELN+1)-104 (22) and that a candidate can choose between multiple residencies. As defense counsel noted, "I don't have a problem with that definition of residency [the charge language involving multiple residencies] being attached to the first definition of residency [the charge language taken directly from Election Law § 1-104(22)]." Defense counsel limited his objection "strictly to the fact that after these two portions of residency are read, the Court refers the jurors back to Election Law Section 1-104 sub 22." According to counsel, "I think that might be somewhat confusing."

Defense counsel further objected to use of the Election Law's definition of residence in reference to the first count of the indictment, which charged defendant with filing a false instrument. Counsel asserted that the only definition which should be used in that regard was that a candidate who has two residences may choose one to which he has a legitimate, significant and continuing attachment. The court did not change its charge.

The jury convicted defendant on all counts of the indictment. The Appellate Division affirmed.

Defendant now argues that the Election Law definition of "residence" cannot be applied literally in a case of dual residency and that a literal application of Election Law § 1 (/nyctap-cgi/ez-nylaw?ELN+1)- 104(22) is unconstitutional. Defendant further maintains that the indictment should be dismissed because the Election Law definition of "residence" is vague. However, during the jury charge conference, defendant did not object to the specific language of the charge, nor did he raise any of the constitutional issues he now asserts. Thus, those issues are unpreserved (see, People v Cadorette, , 56 NY2d 1007 (/nyctap-cgi/nyctap.cgi?56+1007), 1009; People v Whalen, , 59 NY2d 273 (/nyctap-cgi/nyctap.cgi?59+273), 279-280).